2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

LEXSEE



Analysis
As of: Jun 10, 2009

**METROPOLITAN OPERA ASSOCIATION, INC., Plaintiff, -against- LOCAL 100, HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES INTERNATIONAL UNION, et al., Defendants.**

**00 Civ. 3613 (LAP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2004 U.S. Dist. LEXIS 17093; 175 L.R.R.M. 2870**

**August 27, 2004, Filed**

**SUBSEQUENT HISTORY:** Motion denied by Metro. Opera Ass'n v. Local 100, 2005 U.S. Dist. LEXIS 14422 (S.D.N.Y., July 19, 2005)

**PRIOR HISTORY:** Metro. Opera Ass'n v. Local 100, Hotel Emples. & Rest. Emples. Int'l Union, 212 F.R.D. 178, 2003 U.S. Dist. LEXIS 1077 (S.D.N.Y., 2003)

**DISPOSITION:** Prior opinion adhered to on reconsideration, as clarified.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employer brought an action against defendants, a union and individual union officials, asserting claims of secondary boycott, trespass, defamation, interference with business relations and economic advantage, and prima facie tort. The court entered a judgment of liability as a sanction for repeated discovery misconduct by the union, its officials, and its counsel. Motions for reconsideration under Fed. R. Civ. P. 59(e) were filed.

**OVERVIEW:** The discovery misconduct included repeated failure to respond to requests for document production. Counsel argued that the union produced a large number of documents and that the court did not fully take into account the record of compliance. The court denied counsel's motion for reconsideration, finding that no new arguments were raised. Moreover, the court observed that producing documents did not meet the requirement for a written response under Fed. R. Civ. P.

34(b) and did not overcome the serious abuses of the discovery process. Sanctions were permissible under Fed. R. Civ. P. 37(b)(2) regardless of whether the documents were actually relevant. Sanctions under Fed. R. Civ. P. 26(g) were appropriate for counsel's baseless certifications that all responsive documents had been produced. Sanctions under 28 U.S.C.S. § 1927 were appropriate for bad faith delay and obstruction. The court found no merit in the union's argument that the First Amendment, U.S. Const. amend. I, precluded entry of judgment on a defamation claim as a discovery sanction. Judgment of liability and sanctions against the individual union officials, based on their individual misconduct, was appropriate.

**OUTCOME:** The court denied reconsideration as to counsel and the union and, in the alternative, adhered to its previous rulings. The court granted reconsideration as to the union officials and adhered to its previous rulings.

**CORE TERMS:** discovery, reconsideration, membership, deposition, campaign, defamation, misconduct, tortious, declaration, default judgment, weekly, ratification, pleaded, responsive, defamatory, notice, overlooked, default, summary judgment, injunction, defamation claim, participated, relevance, searched, adhere, citations omitted, full knowledge, labor dispute, secondary, factual matters

**LexisNexis(R) Headnotes**

Dockets.Justia.com

**Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend**
[HN1]Fed. R. Civ. P. 59(e) motions for reconsideration in the Southern District of New York are governed by U.S. Dist. Ct., S.D.N.Y., R. 6.3. The decision whether to grant such a motion is within the district court's sound discretion. In the Second Circuit, the standard for granting such a motion is strict, and reconsideration will generally be denied. Reconsideration of a previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.

**Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend**
**Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Factual Issues**
[HN2]U.S. Dist. Ct., S.D.N.Y., R. 6.3 provides that a motion for reconsideration shall set forth concisely the matters or controlling decisions which counsel believes the court has overlooked. New assertions cannot be raised in a motion for reconsideration. Rather, a motion for reconsideration is limited to bringing to the court's attention controlling authority or factual matters presented to the court in the underlying motion and overlooked. A motion for reconsideration does not mean the parties get a "do over." The purpose of a motion to reargue is neither to start a new round of arguments nor should the court be expected to wade through lengthy papers that simply reiterate in slightly different form the arguments already made in the party's original papers.

**Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend**
[HN3]Reconsideration will be denied unless the decisions or data relied upon might reasonably be expected to alter the conclusion reached by the court. A successful motion for reconsideration must present matters or controlling decisions the court overlooked that might materially have influenced its earlier decision.

**Civil Procedure > Discovery > Methods > Requests for Production & Inspection**
[HN4]See Fed. R. Civ. P. 34(b).

**Civil Procedure > Discovery > Misconduct**
**Governments > Courts > Court Personnel**
[HN5]An order issued by a court must be obeyed, even if it is later shown to be erroneous. Once discovery orders are issued, a party has two choices -- to comply with the orders or to appeal. Sanctions are permissible under Fed.

R. Civ. P. 37(b)(2) when a party fails to comply with a court order, regardless of the reasons.

**Civil Procedure > Discovery > Methods > General Overview**
**Civil Procedure > Discovery > Misconduct**
[HN6]Sanctions under Fed. R. Civ. P. 26(g) are imposed when a paper signed and filed has been interposed for an improper purpose or where a competent attorney could not have reasonably believed that the paper was well grounded in fact and warranted by existing law. The rule provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection.

**Civil Procedure > Discovery > Misconduct**
**Civil Procedure > Discovery > Sanctions > General Overview**
[HN7]Sanctions under 28 U.S.C.S. § 1927 are appropriate where an attorney unreasonably and vexatiously multiplies the proceedings and needlessly increases the cost of discovery. Section 1927 has to do with vexatious conduct.

**Civil Procedure > Discovery > Misconduct**
[HN8]Oral orders and orders made without the need for formal writings are as obligatory as any other order.

**Civil Procedure > Discovery > Misconduct**
**Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview**
[HN9]Parties and counsel have no absolute entitlement to be warned that they disobey court orders at their peril. Moreover, when any notice requirement does exist, it is satisfied when a notice of a motion has been served seeking the particular sanctions which ultimately are awarded.

**Civil Procedure > Discovery > Misconduct**
**Legal Ethics > Sanctions > General Overview**
[HN10]Under 28 U.S.C.S. § 1927, only a lawyer can be sanctioned.

**Civil Procedure > Discovery > Methods > General Overview**
**Civil Procedure > Discovery > Misconduct**
[HN11]There is no requirement that a court find that orders were violated to permit sanctions under Fed. R.

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 3 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

Civ. P. 26(g), 28 U.S.C.S. § 1927, or as part of the court's inherent authority.

**Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend**
[HN12]A party seeking reconsideration is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such motion to advance new theories or adduce new evidence in response to the court's rulings. The court cannot overlook legal arguments it was not presented with in the motion papers. A motion for reconsideration is also not a vehicle for plugging the gaps of the lost motion with additional matters. A party has no more right to have new theories heard on reconsideration than on appeal.

**Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview**
**Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend**
**Constitutional Law > Bill of Rights > Fundamental Freedoms > General Overview**
[HN13]Authority does not suggest a special exception to the standards governing reconsideration motions when purported First Amendment, U.S. Const. amend. I, concerns are raised, and the law in fact suggests that First Amendment arguments are every bit as waivable as any others.

**Civil Procedure > Pretrial Judgments > General Overview**
**Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview**
**Torts > Intentional Torts > Defamation > General Overview**
[HN14]No case law holds that a judgment on liability cannot be entered on a defamation claim either generally or specifically as a sanction for misconduct under Fed. R. Civ. P. 26 and 37, 28 U.S.C.S. § 1927, or the court's inherent power. No special rules apply to defamation cases which preclude the award of those sanctions otherwise available except after the defamation claims are, in effect, tried on the merits and findings made as to each allegation. To the contrary, a number of cases have directed the entry of judgment against defendants on defamation claims as a discovery sanction or for failure to answer.

**Civil Procedure > Discovery > Misconduct**
**Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection**

**Evidence > Inferences & Presumptions > General Overview**
[HN15]There is no due process bar to default or dismissal where a party disregards its discovery obligations with willfulness and in bad faith. By virtue of the non-complying defendant's obstruction of discovery, it is deemed to have waived its rights, and the court is permitted to infer that the evidence withheld by defendants and the legal conclusions to be drawn from that evidence would be adverse to the defendants. Indeed, such a presumption is viewed as necessary to preserve the constitutional right of due process. It is the undoubted right of the lawmaking power to create a presumption of fact as to the bad faith and untruth of an answer to be gotten from the suppression or failure to produce the proof ordered, when such proof concerned the rightful decision of the cause. The preservation of due process is secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense.

**Civil Procedure > Discovery > Misconduct**
**Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel**
**Estate, Gift & Trust Law > Will Contests > No Contest Clauses**
[HN16]A judgment entered as a discovery sanction is not an adjudication on the merits and has no collateral estoppel effect outside the case in question.

**Civil Procedure > Pretrial Judgments > Default > Default Judgments**
**Civil Procedure > Pretrial Judgments > Default > Entry of Default Judgments**
[HN17]A default judgment may only be granted upon a well-pleaded complaint. After the entry of a default judgment, the assessment of the well-pleaded nature of a complaint is subject to considerable latitude, and only in very narrow exceptional circumstances may a court find an allegation not well pleaded. Moreover, so long as the facts alleged in the complaint might have been the case, they cannot successfully be controverted by the defendant.

**Business & Corporate Law > Agency Relationships > Duties & Liabilities > Negligent Acts of Agents > General Overview**
**Business & Corporate Law > Agency Relationships > Ratification > General Overview**
[HN18]Liability is established where union members expressly or impliedly authorize or ratify a union's tortious acts. Ratification is a form of subsequent authoriza-

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

tion by which the principal, with knowledge of the material facts, accepts responsibility for the agent's act whether it was originally approved or not.

***Civil Procedure > Pretrial Judgments > Default > Default Judgments***
***Torts > Intentional Torts > Defamation > Defenses > Exaggerations & Imaginative Commentary***
***Torts > Intentional Torts > Defamation > Defenses > Fair Comment & Opinion***

[HN19]Determining whether particular statements are non-actionable rhetoric or opinion is a difficult task and is based on a multi-factor, totality of the circumstances test which includes an evaluation of (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact. Even when union speech is at issue, this contextual review is employed. Consideration of the totality of the circumstances and overall context, however, does not go to the face of the complaint but rather requires an evidentiary evaluation that is foreclosed by default. The question is not whether one inference or another is stronger but whether defendants' evidence -- in light of default and thus the absence of trial -- absolutely forecloses the possibility of the plaintiff's claims.

***Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Coverage***
***Torts > Intentional Torts > Defamation > Defenses > Privileges > Absolute Privileges***
***Torts > Public Entity Liability > Liability > General Overview***

[HN20]The essence of the Noerr-Pennington Doctrine is that parties who petition the government for governmental action favorable to them cannot be prosecuted under antitrust laws even though their petitions are motivated by anticompetitive intent. Although some courts, like the Fifth Circuit, have extended the doctrine to state tort actions analogous to anti-trust claims, there is no authority for the proposition that the Noerr-Pennington doctrine applies to defamation claims. The Noerr-Pennington Doctrine does not necessarily and absolutely preclude liability for damages resulting from defamatory statements made in the course of petitioning the government.

***Torts > Business Torts > Commercial Interference > Prospective Advantage > General Overview***

[HN21]No contract need be identified to sustain a claim of interference with business relations and economic advantage.

***Civil Procedure > Discovery > Misconduct***
***Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview***
***Legal Ethics > Sanctions > General Overview***

[HN22]A client may be sanctioned for his lawyer's misconduct. A litigant chooses counsel at his peril, and here, as in countless other contexts, counsel's disregard of his professional responsibilities can lead to extinction of his client's claim. The acts and omissions of counsel are normally wholly attributable to the client. Moreover, where the sanctionable conduct is a coordinated effort of counsel and party, joint and several liability is appropriate.

**COUNSEL:** [*1]  For Metropolitan Opera Association, Inc., Plaintiff: Deborah E. Lans, Esq., Of Counsel, COHEN LANS LLP, New York, NY. Charles A. Stillman, Esq., Catharine Easterly, Esq., Of Counsel, STILLMAN & FREIDMAN, PC, New York, NY. Sharon E. Grubin, Esq., General Counsel, Metropolitan Opera, New York, NY.

For the firm of Herrick, Feinstein LLP, Defendant: Elkan Abramowitz, Esq., Jonathan S. Sack, Esq., Elizabeth Small, Esq., Of Counsel, MORVILLO, ABRAMOWITZ, GRAND, IASON & SILBERBERG, P.C., New York, New York.

For Defendant Local 100, HERE International Union and the firm of Davis, Cowell & Bowe, LLP, Defendants: Daniel Engelstein, Esq., Adam Rynard, Esq., Of Counsel, LEVY, RATNER & BEHROOZI, P.C., New York, New York.

For Davis, Cowell & Bowe, LLP, Defendants: Steven M. Edwards, Esq., Of Counsel, HOGAN & HARTSON, LLP, New York, NY

For Henry Tamarin and Dennis Diaz, Defendants: James A. Moss, Esq., Marianne Yen, Esq., Of Counsel, HERRICK, FEINSTEIN LLP, New York, New York

**JUDGES:** LORETTA A. PRESKA, United States District Judge.

**OPINION BY:** LORETTA A. PRESKA

**OPINION**

LORETTA A. PRESKA, United States District Judge:

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 5 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

In an Opinion dated January 28, 2003, and reported at 212 F.R.D. 178 [*2]  (the "Opinion"), the motion of plaintiff, the Metropolitan Opera Association, Inc. (the "Met"), for judgment as to liability against defendants Local 100, H.E.R.E. ("Local 100" or the "Union"), and Henry Tamarin and Dennis Diaz ("Tamarin" and "Diaz"; collectively, the "individual defendants") and for sanctions against defendants and their counsel was granted. Herrick Feinstein, LLP ("Herrick"), Davis, Cowell & Bowe ("Davis"), [1] the Union and the individual defendants now move for reconsideration of the Opinion. The facts pertinent to the instant motions have been set forth in extensive detail in the Opinion, familiarity with which is assumed.

> 1   Although the notice of motion dated March 3, 2003 states that both the Union and Davis move for reconsideration, and the opening line of the Levi, Ratner & Behroozi brief notes that the firm represents both the Union and Davis, the text of the briefs and the conclusions do not mention Davis other than to state in a footnote that Davis joins the arguments made on behalf of all other defendants. Thus, Davis will not be treated separately. Because movants have joined in each other's motions, all arguments that were made are considered as to all movants.

[*3] *I. Standard for Reconsideration*

Rule 59(e) [HN1]motions for reconsideration in the Southern District of New York are governed by Local Rule 6.3. The decision whether to grant such a motion is within the district court's sound discretion. *Ursa Minor v. Aon Fin. Prods, No. 00 Civ. 2474, 2000 U.S. Dist. LEXIS 12968, at *1 (S.D.N.Y. Sept. 8, 2000),* aff'd, 7 Fed. Appx. 129 (2d Cir. 2001); see also *Wallingford Shopping, L.L.C. v. Lowe's Home Centers, Inc., 171 F. Supp. 2d 152, 153 (S.D.N.Y. 2001).* In this Circuit, "the standard for granting such a motion is strict, and reconsideration will generally be denied . . . ." *Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995); see also Ursa Minor, 2000 U.S. Dist. LEXIS 12968, at *1; Wallingford, 171 F. Supp. 2d at 153.* "Reconsideration of a previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Sys., Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)* (internal quotation marks and [*4] citations omitted).

Local Rule 6.3 [HN2]provides that the motion shall "set[] forth concisely the matters or controlling decisions which counsel believes the court has overlooked." New assertions cannot be raised in a motion for reconsideration. See *Bueno v. Gill, 237 F. Supp. 2d 447, 449 n.1*

(S.D.N.Y. 2002) (citing *National Union Fire Ins. Co. v. Stroh Cos., No. 98 Civ. 8428, 2000 U.S. Dist. LEXIS 2581, at *17-18 (S.D.N.Y. Mar. 9, 2000), aff'd, 265 F.3d 97 (2d Cir. 2001));* *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb, Inc., No. 86 Civ. 6447, 1989 U.S. Dist. LEXIS 9145, at *9-10 (S.D.N.Y. Aug. 4, 1989).* Rather, a motion for reconsideration "is limited to bringing to the Court's attention controlling authority or factual matters presented to the Court in the underlying motion and overlooked." *Bueno, 237 F. Supp. 2d at 449.*

I have already noted, and sanctions counsel to Herrick has acknowledged, that a motion for reconsideration does not mean the parties get a "do over." (Lans III, [2] Ex. 22 (Transcript of February 10, 2003 Conference ("2/10/03 Tr.") at 9).) As former Judge Martin [*5]  has so aptly commented:

> The purpose of a motion to reargue is [neither] to start a new round of arguments . . . nor should the Court be expected to wade through lengthy papers that simply reiterate in slightly different form the arguments already made in the party's original papers.

*Forsyth v. Fed'n Empl. & Guidance Serv., No. 97 Civ. 3399, 2003 U.S. Dist. LEXIS 3314, at *1-2 (S.D.N.Y. Mar. 6, 2003).*

> 2   Reference is to the Declaration of Deborah E. Lans in Opposition to Motions for Reconsideration sworn to May 5, 2003.

Further, [HN3]reconsideration will be denied unless the decisions or data relied upon might reasonably be expected to alter the conclusion reached by the court. *Shrader, 70 F.3d at 257; see also Anglo Am. Ins. Grp., P.L.C. v. CalFed, Inc., 940 F. Supp. 554, 557 (S.D.N.Y. 1996)* (successful motion for reconsideration "must present 'matters or controlling decisions the court overlooked that might materially have influenced its [*6] earlier decision'") (quoting *Morser v. AT&T Info. Sys., 715 F. Supp. 516, 517 (S.D.N.Y. 1989)); Adams v. United States, 686 F. Supp. 417, 419 (S.D.N.Y. 1988)* (motion for reconsideration denied where Government failed to point to law which was overlooked and "evidence of agency interpretation which the court is said to have overlooked lends no support to the Government's case").

*II. Herrick's Motion*

As mentioned above, at the February 10, 2003 conference, I raised my concern that Herrick was merely looking for a chance to have a "do over" on the issues that were raised or could have been raised in sanctions

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 6 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

motion. In response, Herrick's newly-retained distinguished sanctions counsel, Elkan Abramowitz, gave assurances that Herrick would move only on issues that were "the proper subject of a motion to reconsider" and that any new issues would concern arguments that were not "waivable." (2/10/03 Tr. at 9.) After more discussion of the matter, Mr. Abramowitz stated: "if there are no grounds for [a] motion to reconsider, I represent as an officer of the court I will not burden the record further . . . ." (*Id.* at 14.) Despite this representation, [*7] no arguments were raised on reconsideration that were not raised or could not have been raised on the underlying motion, and, thus, the motion is denied on that basis alone. Nevertheless, given the serious nature of the misconduct detailed in the Opinion, in the alternative, Herrick's motion for reconsideration is granted. Upon reconsideration, however, I adhere to my previous decision with respect to Herrick.

On this motion, Herrick lawyers James A. Moss and Marianne Yen have both submitted declarations which purport to refute the factual findings made in the Opinion. A statement in each one, however, reveals the true substance of Herrick's motion for reconsideration. Moss says: "In this case we strongly disagree with the Court's criticism of our handling of this case." (Moss Decl. [3] P 6.) Yen says: "I respectfully request that the Court accept and consider this Declaration so as to allow me to provide *a more complete response* to what the Court has determined to be an incomplete explanation of my actions." (Yen Decl. [4] P 1 (emphasis added).) Needless to say, these are not proper grounds for reconsideration. In any event, the supposed factual issues raised (more accurately, [*8] half raised) by the Moss and Yen Declarations are wholly insufficient to affect the result. (*See, e.g.*, Lans III P 42.)

> 3   Reference is to the Declaration of James A. Moss sworn to March 3, 2003.
> 4   Reference is to the Declaration of Marianne Yen sworn to March 3, 2003.

In its motion, Herrick continues the approach utilized on the sanctions motion -- it selects a few points to quibble over while ignoring numerous larger, more serious issues raised concerning its conduct in the process of discovery in this action. For example, Moss, the Herrick supervising partner on this matter during most of the time period upon which the Opinion is based, primarily addresses two isolated failings by Herrick lawyers found in the Opinion -- counsel's response that no documents responsive to the Met's Third Document Request existed and the misrepresentations surrounding the Peter Ward deposition -- and remains silent on the numerous other failings found. (*See* Lans III P 8.)

Similarly, as part of his explanation of [*9]  why he did not submit an affidavit in opposition to the sanctions motion, Moss states that "in fact prior to the full briefing on the sanctions motion, I did submit a seven-page letter to the Court dated April 12, 2002 [hereinafter the "April 12 letter"], addressing many of the legal and factual issues the plaintiff had indicated it wanted to raise in its motion papers." (Moss Decl. P 4.) Moss then complains that the Opinion cited some "observations made by Sharon Grubin [, counsel to the Met,] in her letter to the Court of April 25, 2002, but made no mention at all of the [April 12 letter]; instead [the Opinion found Moss'] silence was 'deafening.'" (*Id.*) First, some two weeks *after* the sanctions motion was served, Grubin's April 25 letter brief "(1) followed up on [the Met's] December 17 [, 2001] application for sanctions, including attorneys' fees, regarding the subpoenaed depositions of the Met Directors, and (2) supplemented that application to request similar relief with regard to defendant's counsel's behavior concerning the deposition of Peter Ward." 212 F.R.D. at 183, 216. Thus, the April 25 Grubin letter was a stand-alone supplement to the [*10] April 11, 2002 sanctions motion (in the informal manner utilized by all parties without objection throughout the case, *see infra* note 15), and was considered only on the two items noted therein. Moss' April 12 letter discussed neither and, indeed, noted that, because of time constraints, "we have not endeavored . . . to prepare a substantive response to [Met] counsel's many arguments." (Moss Decl., Ex. A at 3; *see also id.* at 7 ("If your Honor is inclined to permit the Met at this late stage to interpose this silly motion, we will certainly respond to it at length.").) Moss nowhere explains, however, how the unsworn letter, by its terms not a "substantive response" or a response "at length," should have been considered as part of the record on the sanctions motion or, more importantly, on what issues it should have been considered.

Then, in an apparent attempt to come within the rubric of reconsideration and to point out matters overlooked in the sanctions motion, Moss notes that he is attaching a copy of the April 12 letter to his declaration and then "asks the Court to review it, *particularly if the Court did not do so before deciding to grant the plaintiff's motion.* [*11]  " (*Id.* (emphasis added).) The implication that the April 12 letter had not been read prior to issuance of the Opinion either represents massive (and incredible) memory loss or is wholly disingenuous. When, on the eve of trial, the Met asked permission to file its sanctions motion, I was reluctant to adjourn the trial without gauging whether the motion was serious or frivolous. Thus, the Met was instructed to serve the motion the next day so that it could be reviewed. After reviewing the motion, Moss wrote the April 12 letter discussing the motion. In the April 12 teleconference that followed in which Moss participated, the motion and the

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 7 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

April 12 letter were discussed at length. Moss' suggestion now that the April 12 letter might not have been read prior to the Opinion represents more of the type of conduct on which the Opinion was based. Moreover, during the April 12 teleconference, I noted that, even assuming the various quibbles raised in the April 12 letter were correct, the letter was entirely silent on the numerous serious allegations of discovery failure detailed in the motion. (*See* Lans III PP 9-12.) Precisely the same approach has been utilized by Herrick on the reconsideration [*12] motion. A few factual matters are picked apart -- mostly unsuccessfully (*see* Lans III PP 13-36) -- while numerous major findings about Herrick's conduct over the course of the discovery process are left unaddressed.

### A. Factual Issues

As an initial ground for reconsideration, Herrick argues that numerous facts relating to the discovery process in this case were overlooked and misconstrued. (Herrick Br. [5] at 2.) Herrick contends that "many of the crucial findings of fact by the Court are not supported by the record as a whole, because the Court apparently relied solely on the Met's representations and accepted them as true." (*Id.* at 3.) The fact that the Opinion cites to the Met's submissions -- which were extraordinarily detailed and well-supported by documentary evidence -- does not render the findings incorrect or unsupported. Indeed, the statements of Deborah Lans, counsel for the Met, in her moving declaration submitted on the motion for sanctions were made under penalty of perjury and stood, for the most part, unrebutted by defendants. (*See* Lans II, [6] Ex. 60 (Lans' moving declaration marked as a marked pleading and indicating that most of the factual statements [*13] in the moving declaration were unrebutted).) The non-substantive footnote in Herrick's reply brief does not in any way change the fact that the factual allegations in the Lans Declaration remain largely unrebutted. (*See* Herrick Reply Br. [7] at 3 n.2 ("We dispute many of the assertions contained in the latest 75-page Lans Declaration and the accompanying legal memorandum, as we do many of the statements in the Met's declarations submitted in connection with its motion for judgment and this motion, totaling 236 pages. Given the length of the Met's submissions and present space limitations, we reject the notion that each of those allegations is admitted if not specifically denied.").) For the record, there are no page limits, or "space limitations," on affidavits, and no request was made by Herrick for additional briefing pages. In addition, some of the findings in the Opinion are based on my own independent recollection of the facts and events during the discovery process. *E.g.,* 212 F.R.D. at 217 (Yen's representation in the December 18 teleconference that Ward would be "getting on a plane.")

5   Reference is to the Memorandum of Law in Support of Herrick, Feinstein LLP's Motion for Reconsideration dated March 3, 2003.

[*14]

6   Reference is to the Reply Declaration of Deborah E. Lans, sworn to May 15, 2002.

7   Reference is to the Reply Memorandum of Law in Support of Herrick, Feinstein LLP's Motion for Reconsideration dated May 30, 2003.

Supposedly overlooked facts that Herrick does deign to discuss do not aid its cause. For example, Herrick argues that the finding in the Opinion that "the Union had initially objected to a walk-through [of its offices by Met counsel], and, in a effort to avoid it, Yen produced a floor plan of the Union's offices," 212 F.R.D. at 209 n.18, overlooked the fact that the floor plan had been produced *prior to* the request for a walkthrough, not *in response to* the request. Although Herrick is correct as to the narrow fact of when the floor plan was produced, that fact in no way diminishes the finding that the Union argued that Met counsel's request for a walk-through of Union offices should be denied *because* a floor plan, drawn by a Herrick lawyer and now admitted to be inaccurate, had been produced. (*See* Lans III P 42(b).) Thus, the fact that the floor [*15] plan was produced prior to the request for a walk through would not reasonably be expected to alter the conclusion in the Opinion. *See Shrader,* 70 F.3d at 257.

Similarly, Herrick argues that the finding that the "Met's Fourth Document Request dated October 31, 2001 was never responded to," 212 F.R.D. at 193, was incorrect because "documents were produced in response thereto." (Herrick Br. at 4.) Although the wording of the Opinion could have been more precise, the context of the finding and the citation following it make clear that, as admitted in Ms. Yen's May 22, 2002 letter, a written response [8] to the Met's Fourth Document Request had never been served "because one associate was transitioning out of the case and another transitioning in." 212 F.R.D. at 193. [9]

8   *See* Fed. R. Civ. P. 34(b) [HN4]("The party upon whom the [Rule 34] request is served shall serve a written response within 30 days after the service of the request . . . . The response shall state, with respect to each item or category, that inspection and related activities will be permitted, as requested, unless the request is objected to, in which event the reasons for the objection shall be stated.").

[*16]

9   The entire finding that Herrick complains of reads: "The Met's Fourth Document Request

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 8 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

dated October 23, 2001 was never responded to because one associate was transitioning out of the case and another transitioning in. (*See* Letter from Yen to the Court dated May 22, 2002 ("Yen 5/22/02 Ltr.") at 5.) Moss, the partner in charge during that period, is silent. 212 F.R.D. at 193.

Similarly, Herrick contests the finding that "counsel lied to the Court about a witness' vacation schedule," 212 F.R.D. at 182; *see also id.* at 216-18, 226-27. (Herrick Br. at 4.) Even on reconsideration, however, neither Moss nor Yen denies representing -- falsely, according to Ward's testimony under oath - that Ward would be out of town for three weeks on vacation. Moss and Yen's wordy dancing around in their declarations on reconsideration in no way contradicts or otherwise calls into question the finding that Yen represented to Met counsel and the Court that Ward would be getting "on a plane" on a certain date and that both Yen and Moss represented repeatedly to Met [*17] counsel and the Court that Ward would be out of town (not in the New York area) on vacation. (*See* Lans III PP 20-36.) [10]

> 10    The Moss and Yen Declarations are, of course, silent as to the other machinations surrounding the Ward deposition. *See* 212 F.R.D. 216-18, 226-27.

Presumably intending to discuss a factual matter, Herrick's brief contains a heading stating, "The Union Produced All Relevant Documents." (Herrick's Br. at 10.) The discussion recites the Union's responses to plaintiff's various document requests, including productions of documents, Rule 34 responses [11] and the Bates numbers of some of the documents produced. After noting these responses, the section concludes: "We respectfully submit that the Court should have taken into account this record of actual compliance by defendants and their counsel, which we believe refutes a finding of wholesale abdication of responsibility by all defense counsel involved." (Herrick Br. at 11.)

> 11    Herrick's recitation makes clear that, contrary to the implication in its discussion of the finding in the Opinion that "the Met's Fourth Document Request . . . was never responded to," Herrick Br. at 4, it well knows the difference between producing documents in response to a Rule 34 request and serving a written response to a Rule 34 request. *Compare* "documents responsive to the Fourth Document Demand were timely produced on November 21, 2001 . . . ," Herrick Br. at 11, *with* "Ms. Yen submitted a Rule 34 response to the 32 separately-numbered document requests comprising the Met's Fifth Document Request . . . ," *id.*

[*18]   First, that various productions were made and responses served in no way supports the proposition that "the Union Produced All Relevant Documents." At the very least, and aside from the documents the Opinion finds were not produced, the admitted deletion of scores of electronic documents precludes anyone's ever knowing whether *all* relevant documents were produced. The text is a non-sequitur to the heading.

Second, as to Herrick's request that the record of compliance by defendants and their counsel be taken into account, I would have thought that it was clear that a lengthy opinion devoting some thirty-one pages in Federal Rules Decisions to "The Course of Discovery" would be seen as taking into account all of the conduct involved in the discovery process, including the productions made by the Union (and, indeed, conduct by the Met's counsel). *See* 212 F.R.D. at 182. To the extent that there is any ambiguity, however, I state unequivocally that all of the Union's productions were taken into account in the underlying sanctions motion and in this reconsideration motion as well. Herrick's oft-cited reprise that the Union produced a large number of documents is, however,   [*19]  insufficient to overcome the numerous serious abuses of the discovery process by the Union and its counsel. These and the other factual matters raised by Herrick do not merit a change in the underlying sanctions decision. (*See* Lans III P 42.)

## B. Legal Matters

In arguing that "controlling precedents were overlooked or misconstrued by the Court," Herrick Br. at 15, Herrick argues principally that, as to Rule 37, Second Circuit precedent required proof of prejudice before such sanctions may be imposed, *id.* at 15-17, and, as to Rule 37, Rule 26(g) and 28 U.S.C. § 1927, sanctions may not be imposed without proof of relevance of the documents in question, *id.* at 17. Herrick does not address the Court's inherent power. Both of these arguments were raised, and rejected, in the underlying sanctions decision.

### 1. Rule 37

Herrick argues that prejudice must be shown under Rule 37 as a predicate to sanctions. As noted, this argument was fully presented in Herrick's original opposition papers and rejected in the Opinion. *See* 212 F.R.D. at 229 ("the Union's assertion that the Met must show prejudice before a sanction may be ordered under [*20] Rule 37 is without merit"). Thus, this argument is, in fact, a do-over. Perhaps worse, however, this argument ignores the very next two paragraphs of the Opinion where prejudice was expressly found. *See* 212 F.R.D. at 229 ("It is beyond peradventure that many documents have been destroyed that related directly to events taking place during the most critical time period in this action,

that is, when the Union planned its campaign against the Met, decided what its leaflets, letters and other public statements would say and on what basis"; "the documents that have been produced were often produced in an untimely, disorganized fashion, after numerous letters and telephone calls were exchanged and court conferences held and after the depositions of relevant witnesses. The Met was not only denied the opportunity to prove its case, but was denied the opportunity to plan its strategy in an organized fashion as the case proceeded"; "documents that were produced were not produced as required by Rule 34, that is, in the manner in which they were maintained or according to request number, *see* Fed. R. Civ. P. 34(b), and many important [*21] documents were produced after the depositions of key witnesses. All of these obstructions prevented the Met from adequately planning and preparing its case; it was forced to proceed with depositions before relevant documents were produced, it was no doubt hampered in opposing summary judgment and, ultimately, in preparing for trial."). Herrick's argument that sanctions under Rule 37 should be reconsidered because prejudice is required for such sanctions when prejudice was found is, charitably, somewhat below the standard required on reconsideration.

Even in arguing that prejudice is required before sanctions may be imposed under Rule 37, Herrick has not now pointed to any law the Court overlooked, but rather attempts to distinguish two cases cited in the Opinion on this point, *Miller v. Time-Warner Communs., Inc.*, No. 97 Civ. 7286, 1999 U.S. Dist. LEXIS 14512, at *5 (S.D.N.Y. Sept. 22, 1999), and *Skywark v. Isaacson*, No. 96 Civ. 2815, 1999 U.S. Dist. LEXIS 23184, at *20 (S.D.N.Y Oct. 15, 1999), on the basis that the documents withheld or tampered with in those cases were relevant whereas, Herrick claims, those withheld or destroyed in this case were [*22] not. (*See* Herrick Br. at 15-16.) Again, that attempted distinction is without merit because the Opinion found as a factual matter that the documents at issue were relevant. For example, it found that "Union counsel's position that the Weekly Reports were not . . . relevant is wholly without merit," 212 F.R.D. 197 n.14, and goes on to note that those documents report Union members' daily activities, including campaign planning and meetings regarding campaigns, such as the Union's campaign against the Met. Herrick argues that such information is not relevant because it "would not advance the Met's secondary boycott claim because it would not contain any evidence of violence or threats that are necessary to the pleading of an unlawful secondary boycott claim . . . ." (Herrick Br. at 12.) Such an argument reflects an overly narrow reading of the Met's complaint and of the meaning of relevance.

As to the former, the Met's complaint contains several claims in addition to its secondary boycott claim. For example, as to the Met's trespass claim, as noted in Lans III P 63(c), a Weekly Report that *was* produced demonstrated a trespass by documenting a Union member's presence [*23] inside the Opera House distributing leaflets on a date complained of by the Met. The information called for by the Weekly Reports might also have established the extent of the dissemination of defamatory materials, demonstrated ratification of Union management's activities in its campaign against the Met and proved the dates when leafletting occurred (relevant to the Union's statute of limitations defense).

As to the latter, relevance, the Weekly Reports could well have led to other admissible evidence, *e.g.*, testimony of individuals involved in the activities at issue, documents not theretofore produced, such as House Visit reports. (*See* Lans III P 63(c).) The suggestion that documents ordered produced, such as the Weekly Reports, were not relevant is without merit.

Even assuming that the documents requested were not relevant, the law does not support Herrick's view that a party or its counsel may ignore a court order to produce materials because it considers them irrelevant. [12] In *Van Pier v. Long Island Sav. Bank, F.S.B.*, No. 97 Civ. 6295, 1998 U.S. Dist. LEXIS 15170, at *2 (S.D.N.Y. Sept. 29, 1998), the magistrate judge granted sanctions pursuant to Rule 37 [*24] in connection with plaintiff's failure to comply with an order to produce certain documents. Plaintiff filed objections with the district court, claiming that he did not produce the documents because he believed either that they were not relevant or that they were already in the defendant's possession, but Judge Rakoff affirmed the imposition of sanctions because "these objections became irrelevant once the Magistrate Judge ordered the parties to produce all documents in their possession . . . and plaintiff, rather than complying with the order or appealing from it, chose to ignore it." *Van Pier*, 1998 U.S. Dist. LEXIS 15170, at *3; *see also McDonald v. Head Criminal Court Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988) (affirming district court's dismissal of *pro se* plaintiff's action for failure to comply with court order concerning discovery because [HN5]"an order issued by a court must be obeyed, even if it is later shown to be erroneous"); *Davidson v. Dean*, 204 F.R.D. 251, 258 (S.D.N.Y. 2001) ("Once the discovery Orders in this case were issued, plaintiff had two choices -- to comply with the Orders or to appeal. Plaintiff [*25] did appeal the Orders and lost. Plaintiff's only choice at that point was to comply with the obligation."); *Worldcom Network Servs., Inc. v. Metro Access, Inc.*, 205 F.R.D. 136, 143 (S.D.N.Y. 2002) ("sanctions

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

are permissible under Rule 37(b)(2) when a party fails to comply with a court order, regardless of the reasons").

12    The one case from this Circuit that Herrick relies on for a contrary view is wholly inapposite. In *Fonseca v. Regan*, 734 F.2d 944 (2d Cir. 1984), the Government, by means of what the Court of Appeals called a "cosmic interpleader," sought information from the plaintiff in the guise of discovery that was, in fact, only relevant to a potential criminal prosecution of him and others and had nothing whatsoever to do with the pending civil case. The far different factual setting in *Fonseca* makes its holding inapplicable here.

As the Opinion noted, counsel on more than one occasion ignored document [*26]  requests (even after the Court ordered them to produce the documents at issue) because, in their view, the documents called for were irrelevant. *See, e.g.*, 212 F.R.D. at 200-01 (during a teleconference with the Court, Yen "said the [Weekly] Reports did not matter because the employees' calendars showed the same information" and defendants never fully complied with Court order that reports be produced); *id.* at 205-07 (during a conference the Court overruled Yen's belated relevance objection and Moss' objection to a document request as "blunderbuss" and ordered defendants to respond to the request). In sum, the issues raised on reconsideration do not alter the Opinion's findings as to Rule 37.

### 2. Rule 26 and 28 U.S.C. § 1927

As noted above, Herrick's argument that sanctions are inappropriate because the discovery sought by the Met was irrelevant is not supported by case law and is factually incorrect. Beyond the documents that were the subject of court orders (and thus relevant under Rule 37), whole categories of unproduced documents are undeniably relevant. For example, as noted in the discussion of prejudice, many of the documents that [*27]  were destroyed "related directly to events taking place during the most critical time period in this action, that is, when the Union planned its campaign against the Met, decided what its leaflets, letters and other public statements would say and on what basis." 212 F.R.D. at 229. To suggest that these documents are irrelevant is, charitably, incorrect.

More importantly, however, any argument as to relevance completely misses the point. [HN6]Sanctions under Rule 26(g) are imposed when a paper signed and filed has been interposed for an improper purpose or where a competent attorney could not have reasonably believed that the paper was well grounded in fact and warranted by existing law. *See* Fed. R. Civ. P. 26(g) Advisory Committee Notes to 1983 Amendment (Rule

"provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection"). Here, where counsel's certifications were not even modified by some sort of reservation that all "relevant" documents had been produced, the Opinion [*28]  found that counsel's repeated certifications that all responsive documents had been produced to the Met, or that there were no responsive documents, "were made without any real reflection or concern for their obligations under the rules governing discovery and, in the absence of an adequate search for responsive documents, without a reasonable basis." 212 F.R.D. at 221-22. Indeed, the Opinion held that the knowing and egregious nature of the certifications led to the conclusion that they could only have been interposed for an improper purpose. *Id.* at 222. Herrick has shown no reason why the imposition of sanctions under Rule 26 was inappropriate.

[HN7]Sanctions under 28 U.S.C. § 1927 are appropriate where an attorney unreasonably and vexatiously multiplies the proceedings and needlessly increases the cost of discovery. *See* United States v. International Bhd. of Teamsters, 948 F.2d 1338, 1345 (2d Cir. 1991). Herrick's argument that sanctions under § 1927 were improper because its only discovery misconduct related to nonproduction or belated production of irrelevant documents [*29]  fails because, even had the documents been irrelevant, (1) the law is clear that § 1927 has to do with vexatious conduct, and (2) the record here is replete with evidence -- nowhere discussed by Herrick -- of bad faith delay and obstruction by Herrick. [13] The cases indicate that the relevance of the material or the "appropriateness" of the ultimate response to discovery requests does not necessarily bear on the decision to impose sanctions under this statute. Rather, the basis for the sanction is the vexatious manner in which the attorneys acted in responding to the discovery requests. For example, in Wine Mkts. Int'l v. Bass, 977 F. Supp. 601, 605-06 (E.D.N.Y. 1997), the court found that the imposition of sanctions for counsel's refusal to produce witnesses for deposition and other dilatory tactics was appropriate, even though depositions eventually occurred within the time period directed by the court. In *Apex Oil Co. v. Belcher Co. of New York, Inc.*, 855 F.2d 1009, 1020 (2d Cir. 1988), the Court of Appeals affirmed the district court's imposition of sanctions under § 1927 where defendant's counsel had refused to comply with plaintiff's [*30]  discovery requests until plaintiff's counsel made a motion to compel. By focusing on the strawman of relevance and ignoring the conduct on which the § 1927 sanction were based, Herrick has provided no reason why such sanctions were inappropriate.

13    As noted, Herrick does not even mention the Court's

imposition of sanctions as part of its inherent powers. That imposition here, of course, had to do with defendants' and counsel's overall and overwhelming pattern of bad faith misconduct having to do only in part with the withholding of relevant documents.

C. Notice

Herrick argues, astonishingly, that it had no notice that it might be subject to sanctions, because "the first indication *from the Court* that attorneys may have engaged in sanctionable conduct . . . was the issuance of the January 30, 2003 Opinion." (Herrick Br. at 17-19 (emphasis added).) Specifically, Herrick argues that the Met's repeated comments about seeking sanctions, its request for and taking of discovery into defendants' and their [*31] counsel's compliance with their respective discovery obligations, its request to file a motion seeking sanctions against defendants and their counsel and its formal motion seeking sanctions against defendants and their counsel were not enough and that the Court was required to give Herrick some more explicit order and warning. This argument, charitably, is hogwash. [14]

14    This argument as to notice is also a do-over because it was made in the underlying sanctions motion and rejected in the Opinion. *See* 212 F.R.D. at 183 n.4.

First, as a factual matter, from the May 2000 contempt and injunction hearings forward, the record shows more than ample notice to defendants and their counsel that their compliance with their respective discovery obligations was a matter of scrutiny and that sanctions could be awarded. [15] Indeed, as the "referee on the ground in this engagement," 212 F.R.D. at 182, it is fair to say that "Met counsel's continuing high-decibel allegations of [Union counsel's] [*32] failure to make adequate inquiry and repeated demonstrations of incomplete compliance and non-compliance with discovery requests," *id.* at 222, constituted warnings early and often to Herrick that its conduct of discovery was alleged to be blameworthy. As noted in the Opinion, for example, Met counsel warned the Union on several occasions that if appropriate responses to the Met's discovery requests were not forthcoming, sanctions would be sought. *See id.* at 230. When the Met did propose sanctions in its December 18, 2001 letter to the Court, it asked first for the benefit of discovery on the defendants' and their *counsel's* discovery compliance, which I granted. [16] *Id.* at 203. On March 13, 2002, I issued a written order overruling defendants' objections to the depositions of two Herrick lawyers (Yen and Lynett) on the issue of their actions

pertaining to discovery. Furthermore, I directed that the depositions proceed, making it plain, again, that the lawyers' conduct was under scrutiny. Another written order was issued on March 21, 2002, directing "inquiry of the listed witnesses [including Herrick attorneys Lynett and Yen, [*33] ] concerning discovery compliance without restriction as to time" and referring to "the serious questions raised about defendants' discovery compliance." (Lans III, Ex. 13.)

15    The fact that formally-styled motions to compel were not made is of no import. Defendants and their counsel not only participated without objection in numerous conferences about discovery but they also repeatedly solicited the Court's informal rulings by letters and telephone calls. Indeed, I made numerous discovery rulings throughout the case upon letter applications, informal conferences and telephone calls, some from depositions. *See* 212 F.R.D. at 218. Herrick and its counsel well know that [HN8]oral orders and orders made without the need for formal writings are as obligatory as any other order.

16    As the transcript of a conference with the Court on January 7, 2002 (quoted in the Opinion) makes clear, *counsel's* conduct during the discovery process was squarely in issue and was to be investigated during compliance discovery. *See* 212 F.R.D. at 207.

[*34]  Finally, on April 12, 2002, having reviewed the Met's motion for sanctions against defendants and their counsel, including Herrick, and Moss' April 12 letter and having conferred with all counsel, I issued yet another written order adjourning the trial and rejecting defendants' and Herrick's contention that the Met's motion for sanctions was "silly." (*See* Moss Decl., Ex. A (Moss April 12, 2002 letter) at 7).) The order stated that the Met's motion was not frivolous but rather presented issues of serious concern and directed the defendants and their lawyers to respond in full. (Lans III, Ex. 4.) The opposition papers submitted by Herrick addressed counsel's own conduct and, indeed, contained more defense of Herrick's conduct than of its clients' conduct.

Even without the strength of the record on the issue of notice in this case, the law in this Circuit does not support Herrick's argument. *See Daval Steel Products v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991) [HN9]("Parties and counsel have no absolute entitlement to be 'warned' that they disobey court orders at their peril."). Moreover, when any notice requirement does exist, it is satisfied when a notice of [*35]  a motion has been served seeking the particular sanctions which ultimately are awarded. *See Peters-Turnbull v. Bd. of Educ.*, No. 96 Civ. 4914, 1999 U.S. Dist. LEXIS 16079, at *11

(S.D.N.Y. Oct. 20, 1999) ("Plaintiff was given notice of the consequences of her failure to respond to discovery . . . when this Court ordered the plaintiff to show cause why this case should not be dismissed under Rule 37. Plaintiff was given further notice when the Court ordered the defendants to move for dismissal . . . ."), aff'd, 7 Fed. Appx. 107 (2d Cir. 2001). Here, the Met expressly moved for "judgment, attorneys' fees and further relief" under, inter alia, Rules 26and 37, 28 U.S.C. § 1927 and the Court's inherent power against Herrick as well as against the defendants. Indeed, [HN10]under § 1927, only a lawyer can be sanctioned, as the Met discussed in its memorandum of law on the motion. Herrick's briefing in response, in which it argued the lawyers' lack of culpability, demonstrates beyond cavil that Herrick had notice that sanctions were being sought against that firm.

D. Orders

Finally, Herrick argues that no orders were violated, [*36]   (see Herrick Br. at 20), but again is wrong on the facts. Although Herrick continues to nitpick, it is crystal clear that, for example, (1) Weekly Reports for all Union employees who "participated in any way in Local 100's effort . . . at the Met" were not produced as ordered (or their non-production properly explained), see Lans III at PP 44-49; (2) admitted deficiencies in the Union's retention and production of electronic documents were never addressed as ordered, including contacting all the Union's ISPs to attempt to retrieve deleted documents, see id. at PP 50-53; and (3) Ward's deposition did not proceed as ordered, see 212 F.R.D. at 216-218, 225 n.32, 226-27. In any event, [HN11]there is no requirement that the Court find that orders were violated to permit sanctions under Rules 26(g), 28 U.S.C. § 1927 or as part of the Court's inherent authority, three of the bases on which the sanctions were levied in this case.

E. Conclusion

Accordingly, for the reasons set forth above and because none of the matters raised is sufficient to change the result, having reconsidered the sanctions motion as to Herrick, I adhere to my prior [*37]   decision in the Opinion.

*III. The Union's Motion*

The two arguments made by the Union that are not duplicative of those made by Herrick are that (1) the First Amendment precludes the Court from directing entry of judgment for liability on the Met's defamation claim without the Court's first making detailed factual findings as to which statements are defamatory and which were uttered with malice, and (2) judgment was improper because certain of the Met's claims were legally insufficient on their face.

As Judge Leisure has so aptly summarized the law:

[HN12]A party seeking reconsideration is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such motion to advance new theories or adduce new evidence in response to the court's rulings. . . . The Court cannot overlook legal arguments it was not presented with in the motion papers. . . . It is well established that [a] motion for reconsideration is [also] not a vehicle for plugging the gaps of the lost motion with additional matters.

*Wechsler v. Hunt Health Sys., Ltd.,* 186 F. Supp. 2d 402, 410-11 (S.D.N.Y. 2002) (internal quotation [*38]   marks and citations omitted). It is clear that a party has no more right to have new theories heard on reconsideration than on appeal. *Chitkara v. N.Y. Tel. Co.*, 45 Fed. Appx. 53, 55 (2d Cir. 2002); *Forsyth*, 2003 U.S. Dist. LEXIS 3314, at *1 (losing party may not advance new arguments on a motion for reconsideration); In re Oil Spill by "Amoco Cadiz"," 794 F. Supp. 261, 267 (N.D. Ill. 1992) (motions to reconsider may not be used to "raise legal argumentation which could have been heard during the pendency of the previous motion"), aff'd, 4 F.3d 997 (7th Cir. 1993).

Here, the Union raises only arguments that could have been but were not raised initially, without any explanation for the failure to raise them the first time around. I noted this problem initially at the February 10, 2003 conference in discussing the Union's failure to raise the First Amendment issue in the underlying motion:

Can I ask why we didn't brief this in connection with the motion where counsel sought liability for discovery abuse? Where were they on that? Why wasn't that briefed then?

If you say that the sanction [*39]   of liability may not be imposed in a defamation, for example, case, where was that in the briefing? Never mentioned, correctamento?

(2/10/03 Tr. at 8.)

[HN13]The Union has not cited any authority suggesting a special exception to the standards governing

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 13 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

reconsideration motions when purported First Amendment concerns are raised, and the law in fact suggests that First Amendment arguments are every bit as "waivable" as any others. *See, e.g.*, *Word v. Croce*, No. 00 Civ. 6496, 2001 U.S. Dist. LEXIS 9071, at *14 (S.D.N.Y. July 6, 2001)* (denying reconsideration where the issue raised was retaliation for the exercise of First Amendment rights); *Costello v. McEnery*, No. 91 Civ. 3475, 1994 U.S. Dist. LEXIS 13619, at *36 (S.D.N.Y. Sept. 26, 1994)* (denying reconsideration where the claim was of a discharge in retaliation for the exercise of First Amendment rights); *Creek v. Village of Westhaven*, No. 83 C 1851, 1993 U.S. Dist. LEXIS 10634, at *8-10 (N.D. Ill. Aug. 2, 1993)* (denying reconsideration where defendants raised the issue of First Amendment protection for their actions for the first time on reconsideration and defendants failed [*40] to offer any reason why the First Amendment argument could not have been briefed initially). As discussed below, there is, in fact, no First Amendment issue raised by the sanctions decision in any event.

Furthermore, aside from the First Amendment argument that could have been raised on the sanctions motion, most of the quibbles the Union now raises concerning the legal sufficiency of the Met's claims were previously advanced and have already been rejected, establishing the law of the case. For that further reason, the Union's arguments are barred now. For example, defendants argued lack of ratification in opposition to the Met's motion for contempt and preliminary injunctive relief, *see* Lans III, Ex. 3 (excerpt from Local 100's pre-hearing brief), but I ruled in the Met's favor, finding a likelihood of success on the Met's claims. Defendants unsuccessfully challenged the Met's prima facie tort claim in their summary judgment motion on the same grounds asserted again now. (*Id.*, Ex. 2.) Defendants also unsuccessfully challenged their summary judgment motion the Met's secondary boycott claim on the same preemption and substantive grounds as they now do now. (*Id.*) The [*41] Union is precluded from presenting these legal arguments yet again by, among other principles, the doctrine of law of the case. *See In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154, 1161 (E.D.N.Y. 1996)* (citing *Baumann v. Keene Corp. (In re Joint E. Dist. & S. Dist. Asbestos Litig.)*, 18 F.3d 126, 129 (2d Cir. 1994)* (citations omitted)). [17]

[17]    Defendants did not move for summary judgment against the Met's defamation or tortious interference claims, and one assumes they would have if they believed the claims to be so deficient as they now claim. Their not moving (especially in light of the wide-ranging nature of that motion) suggests a recognition that the Met's claims were, at the very least, facially sufficient.

In sum, the Union's motion is patently improper, both because it raises issues for "reconsideration" that could have been raised in opposition to the sanctions motion but were not and because it raises issues that were disposed of by earlier rulings in this case. Accordingly, [*42] the Union's motion for reconsideration is denied. Nevertheless, in the alternative, because of the serious nature of the misconduct detailed in the Opinion and the high place the First Amendment occupies in our pantheon of rights, the Union's motion for reconsideration is granted. Upon reconsideration, however, I adhere to my previous decision with respect to the Union.

A. First Amendment Issues

Research has disclosed [HN14]no case law holding that a judgment on liability cannot be entered on a defamation claim either generally or specifically as a sanction for misconduct under Rules 26and 37, 28 U.S.C. § 1927 or the Court's inherent power. Indeed, the Union cites no case to support its argument that special rules apply to defamation cases which preclude the award of those sanctions otherwise available except after the defamation claims are, in effect, tried on the merits and findings made as to each allegation. To the contrary, a number of cases have directed the entry of judgment against defendants on defamation claims as a discovery sanction or for failure to answer. *See, e.g.*, *Lothschuetz v. Carpenter*, 898 F.2d 1200 (6th Cir. 1990)* (sustaining [*43] the entry of a default judgment as to liability on a libel claim as a sanction for defendants' discovery misconduct); *Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538 (11th Cir. 1985)* (affirming the district court's entry of judgment on a defamation claim as a discovery sanction. Defendants had declined to produce documents on the basis that they were constitutionally privileged to withhold disclosure where the disclosure requested would put their members at risk of harm from Klan groups and impair defendants' and their members' First Amendment rights. The district court ruled that the disclosure was proper and did not create such a risk. Plaintiff was granted judgment on its defamation claims as a sanction for defendants' refusal to make disclosure); *Professional Seminar Consultants, Inc. v. Sino Am. Tech. Exch. Council, Inc.*, 727 F.2d 1470 (9th Cir. 1984)* (affirming a default judgment as to liability on plaintiff's libel and conversion claims as a sanction for the proffer of false documents); *see also Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250 (7th Cir. 1995)* (upholding [*44] the district court's dismissal of defendant's counterclaims for discovery abuse and noting that the district court could also properly have entered judgment for plaintiff on its defamation (and other) claims); *Walia v. Vivek Purmasir & Associates*, 160 F. Supp. 2d 380 (E.D.N.Y. 2000)* (entry

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 14 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

of a default judgment for failure to answer a defamation claim was proper).

Further, the logic of the cases dictates that no special First Amendment exception be created. It has long been the law that [HN15]there is no due process bar to default or dismissal where, as here, a party disregards its discovery obligations with willfulness and in bad faith. [18] *See Hammond Packing Co. v. State of Arkansas*, 212 U.S. 322, 350-54, 53 L. Ed. 530, 29 S. Ct. 370 (1909); *Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 209-12, 2 L. Ed. 2d 1255, 78 S. Ct. 1087 (1958). The law holds, and logic dictates, that by virtue of the non-complying defendant's obstruction of discovery, it is deemed to have waived its rights, and the court is permitted to infer that the evidence withheld by defendants and the legal conclusions to be drawn from that [*45] evidence would be adverse to the defendants. Indeed, such a presumption is viewed as *necessary* to preserve the constitutional right of due process. As the Supreme Court explained in *Hammond Packing*, it is

> the undoubted right of the lawmaking power to create a presumption of fact as to the bad faith and untruth of an answer to be gotten from the suppression or failure to produce the proof ordered, when such proof concerned the rightful decision of the cause . . . . The preservation of due process is secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense.

*Hammond*, 212 U.S. at 350-51; *see also Societe Internationale*, 357 U.S. at 210 (quoting *Hammond*).

18   The Court of Appeals has held that the requisite showing of fault for the valid entry of default or dismissal is also satisfied by a showing of gross negligence. *See Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062 at 1066-68 (2d Cir. 1979).

[*46]   Both in *Hammond Packing* and later in *Insurance Corp. of Ireland Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 72 L. Ed. 2d 492, 102 S. Ct. 2099 (1982), the Supreme Court emphasized that the rights of litigants in our civil justice system are conditioned on compliance with procedural rules. *Hammond Packing*, 212 U.S. at 351 (noting that there are "many other presumptions attached by the law to the failure of a party to a cause to specially set up or assert his supposed

rights in the mode described by law."); *Insurance Corp. of Ireland*, 456 U.S. at 705 ("The expression of legal rights is often subject to certain procedural rules. The failure to follow those rules may well result in a curtailment of the rights."). In both decisions the Court equated the sanction of default to a waiver by the malefactor of the opportunity to contest the factual or legal basis for the adverse ruling or judgment imposed as a sanction. *Hammond Packing* 212 U.S. at 351 (analogizing to a default based on discovery non-compliance to a default because of a failure to answer "based on a presumption that the material facts alleged or pleaded were admitted [*47] by not answering"); *Insurance Corp. of Ireland*, 456 U.S. at 706 ("the sanction is nothing more than the invocation of a legal presumption or, what is the same thing, the finding of a constructive waiver"). Finally, the Court in *Insurance Corp. of Ireland* made clear that the nature of the underlying right waived had no effect on the validity of the sanction, which turns solely on whether the trial court has abused its discretion. *Id.* at 707.

Pursuant to *Hammond* and *Insurance Corp.*, as well as the court of appeals decisions from various circuits cited above specifically affirming the entry of judgment as a sanction in defamation cases, it was certainly well within my discretion to enter judgment against defendants. Defendants were afforded a full and fair opportunity to litigate their defenses but they chose instead to obstruct discovery. [19] By virtue of their malfeasance, defendants have in effect conceded the validity of the Met's claims and waived their defenses. In other words, as the Supreme Court stated in *Insurance Corp.*, "the sanction took as established the facts" -- here, *inter alia*, the false and defamatory nature of [*48] the pleaded statements and the actual malice of defendants -- "that [the plaintiff] was seeking to establish through discovery. That a particular legal consequence . . . follows from this, does not in any way affect the appropriateness of the sanction." *Id.* at 709.

19   Indeed, because many of the documents requested by the Met were lost, destroyed or simply never produced, the Met was entitled to a presumption that these documents would have been material to its case. *See Hammond Packing*, 212 U.S. at 350 (court "must assume" that items that defendants failed to produce were "material").

The Union discusses *none* of the foregoing authority. Further, none of those cases it does cite has anything to do with a situation where defendants were deemed to have abandoned their right to litigate as a sanction for misconduct. *New York Times v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), and its progeny -- *Hustler Magazine v. Falwell*, 485 U.S. 46, 99 L. Ed. 2d 41, 108 S. Ct. 876 (1988); [*49] *Bose Corp. v. Con-*

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 15 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

*sumers Union*, 466 U.S. 485, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984); **Old Dominion Branch No. 496 v. Austin**, 418 U.S. 264, 41 L. Ed. 2d 745, 94 S. Ct. 2770 (1974); *Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 15 L. Ed. 2d 582, 86 S. Ct. 657 (1966); and *Edwards v. South Carolina*, 372 U.S. 229, 9 L. Ed. 2d 697, 83 S. Ct. 680 (1963) -- all concern the burden of proof in defamation cases where, unlike here, the parties had properly litigated within the Federal Rules of Civil Procedure. Moreover, the application of the *New York Times v. Sullivan* standards in labor cases, under *Linn*, is a matter of analogy, *not* constitutional mandate. *See* Robert D. Sack, *Sack on Defamation* § 5.7 (3d ed. 2004).

*CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000), and *United States v. Various Articles of Obscene Merchandise, Schedule No. 1769*, 600 F.2d 394 (2d Cir. 1979), are equally inapposite. First, the claim upon which default judgment was granted in *Vartuli* sounded in fraud -- not defamation -- so there was no discussion of the trial court's supposed [*50] obligation to hear evidence on the standards set forth in *New York Times v. Sullivan* before imposing default judgment. Second, Local 100 incorrectly asserts that the Court of Appeals vacated the trial court's imposition of default judgment. In fact, the Court of Appeals upheld the default judgment entered against one of the co-defendants, but remanded the case for reconsideration *of the relief* granted to the plaintiff -- namely an injunction. *Vartuli*, 228 F.3d at 112. Thus, the actual holding of *Vartuli* has nothing to do with this case, where the Court has only entered judgment, and consideration of the appropriate relief will be assessed separately. [20] Similarly, *Various Articles of Obscene Merchandise* has no application here. A default judgment was issued in that case against allegedly obscene materials where recipients of the materials had either acquiesced to forfeiture or had failed to file answers. The Court of Appeals held that the First Amendment prohibited such a default because it was highly unlikely that the intended recipients of allegedly obscene materials would contest forfeiture and hence the resulting "destruction of books, magazines [*51] and films [would] become an unreviewed act of censorship." *Id.* at 399. By contrast, the judgment here raises no concern of censorship where defendants answered the complaint and vigorously litigated the Met's claims, including on a motion for summary judgment, but ultimately waived their right to defend by failing in their discovery and other obligations.

[20] To the extent that the Union is attempting to assert that default judgment constitutes an impermissible prior restraint in violation of the First Amendment prohibition, *see* Memorandum in Support of the Motion of Defendant Local 100 to Reconsider and to Vacate the Court's January 28,

2003 Order dated March 3, 2003 ("Union Br.") at 4 (discussing the Court of Appeals' decision vacating the preliminary injunction entered earlier in this case and complaining that this Court has not "set[] forth the exact statements . . . held to be unlawful"), the Union is incorrect. As noted above, the Opinion only spoke to liability, not relief, and, moreover, included no order restraining any future speech by the Union (*see infra*). In any event, there is no confusion about the nature of conduct for which defendants have been held liable in this case -- it is clearly spelled out in the complaint. *See In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154, 1160 (1996) ("[A] default effectively constitutes an admission that . . . the acts pleaded in a complaint violated the laws upon which a claim is based and caused injuries as alleged.").

[*52] Finally, the Union's censorship or "chilling" argument is entirely erroneous because the First Amendment is not implicated by the entry of judgment as to liability in this case. The Union presumes that the Opinion has a precedential and therefore potentially *in terrorem* effect on future judgment. However, [HN16]a judgment entered as a discovery sanction is not an adjudication on the merits and has no collateral estoppel effect outside the case in question. *See Willy v. Coastal Corporation*, 503 U.S. 131, 117 L. Ed. 2d 280, 112 S. Ct. 1076 (1992) (Rule 11 sanctions were properly imposed in the case even though the district court was later determined to lack subject-matter jurisdiction because the sanctions order was "collateral to the merits," *id.* at 137; further: "there is no constitutional infirmity under Article III in requiring those practicing before the courts to conduct themselves in compliance with the applicable procedural rules . . . ," *id.* at 139); *cf. Amato v. City of Saratoga Springs*, 170 F.3d 311, 323 (2d Cir. 1999) (noting that "of course a default judgment lacks preclusive effect in other litigation"); *Abrams v. Interco, Inc.*, 719 F.2d 23, 29 n.9 (2d Cir. 1983) [*53] (noting that "the decision of issues not actually litigation, e.g., a default judgment, has no preclusive effect in other litigation"); *Talib v. Garcia*, No. 98 Civ. 3318, 2000 U.S. Dist. LEXIS 9752, at *12-13 (S.D.N.Y. July 12, 2000) (reviewing law in various circuits and noting that the majority of courts, including those in New York, hold that a default judgment does not support issue preclusion). Here, while the judgment entitles the Met to relief for defamation as a procedural matter, it does not stand as an adjudication on the merits that would bar any future expression (except against the Met) of those statements alleged by the Met to have been defamatory.

B. Sufficiency Issues

Citing the undisputed principle that [HN17]a default judgment may only be granted upon a well-pleaded complaint, the Union incorrectly asserts that judgment must be vacated here because the Met's claims against the Union are "all . . . meritless on their face." (Union Br. at 6.) The Union not only twists the meaning of a "well-pleaded complaint" -- a term of art at this stage of the proceedings which, in any event, affords the nondefaulting party significant leeway in its pleading -- but [*54] also ignores the fact that the sufficiency of the Met's pleading has already been upheld against defendants' challenges on the motions for contempt and injunctive relief and the defendants' motion for summary judgment.

After the entry of a default judgment, the assessment of the "well-pleaded" nature of a complaint is subject to "considerable latitude," *Levesque v. Kelly Communications, No. 91 Civ. 7045, 1993 U.S. Dist. LEXIS 791, at *19 (S.D.N.Y. Jan. 25, 1993)*, and "only 'in very narrow exceptional circumstances' may a court find an allegation not 'well pleaded.'" *In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154, 1160 (E.D.N.Y. 1996) (quoting *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363, 34 L. Ed. 2d 577, 93 S. Ct. 647 (1973)). Moreover, so long as the facts alleged in the complaint "*might* . . . have been the case," they cannot successfully be controverted by the defendant. *Thomson v. Wooster*, 114 U.S. 104, 115, 29 L. Ed. 105, 5 S. Ct. 788, 1885 Dec. Comm'r Pat. 279 (1885) (emphasis added); *see also Hughes*, 449 F.2d at 63 (endorsing district court's list of the narrow circumstances [*55] in which a complaint is not well-pleaded: (1) allegations in the complaint are internally inconsistent, (2) allegations are "contrary to uncontroverted material in the file of the case," or (3) allegations are contrary to "indisputable" facts judicially noticed by the court) (internal quotations and citation omitted); *In re Crazy Eddie Sec. Litig.*, 948 F. Supp. at 1160 ("Although a court has discretion to determine whether the facts alleged in a complaint state a valid cause of action, a defaulting party ordinarily cannot contest the merits of the plaintiff's claim absent 'indisputable' contradictory evidence") (citations omitted). Here, the Union has shown nothing that "renders inconceivable the likelihood" that the Met could have proved that its challenged claims are all proper as a matter of law and the law of the case. *Hughes*, 449 F.2d at 64.

The Union has waived its right to a full hearing on the merits by virtue of its misconduct and must live with the consequences:

It would usher in a new era in the dynamics of litigation if a party could suffer a default judgment to be entered against it

and then go about its business as if the judgment [*56] did not exist and as though, despite the opportunities to comply with the court's orders and to defend on the merits which had been ignored, the slate was wiped clean and a new day had dawned. To state the proposition is to expose the folly of it.

*Hughes*, 449 F.2d at 63-64.

As noted above, the well-pleaded nature of the Met's complaint has already been found by my review and rejection of defendants' previous challenges to the sufficiency of many of the Met's claims. Those prior rulings are the law of the case, which I decline to disturb. *See In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154 at 1161 (previous "decisions [on the sufficiency of claims] establish the law of the case, from which no departure is warranted absent 'weighty reasons.'") (citing *In re Joint E.D. & S.D. Asbestos Litig.*, 18 F.3d 126, 130 (2d Cir. 1994) (citing *United States v. Adegbite*, 877 F.2d 174, 178 (2d Cir.), *cert. denied*, 493 U.S. 956 (1989))). By granting the Met's motion for injunctive relief and ruling that the Met was likely to succeed on the merits of its claims, including reviewing the elements of each of [*57] those claims and the Met's pleading of them in the face of the same arguments the Union now makes again about, *inter alia*, lack of ratification, and in denying defendants' motion for summary judgment (docket no. 56), I held that the Met had properly pleaded both the legal elements and the facts to support its claims of ratification, defamation, trade libel, interference, trespass, unlawful secondary boycotting and prima facie tort and, indeed, had offered substantial evidence to support those claims.

1. Pleadings under *Martin v. Curran*

In asserting that the Met failed properly to plead the Union's liability pursuant to *Martin v. Curran*, 303 N.Y. 276, 101 N.E.2d 683 (1951), the Union ignores the Met's detailed pleading concerning membership participation, authorization and ratification. *Compare* Union Br. at 7-8 (citing only P 90 of the Met's Amended Complaint) *with* Am. Compl. PP 85-90 (entitled "Local 100 Members' Knowledge of, Actual Participation in, Authorization of, and Ratification of Defendants' Tortious Acts"). When read in its entirety, the Met's Amended Complaint fully satisfies the requirements of *Martin v. Curran*, particularly in light of the "considerable [*58] latitude" that must be permitted in assessing whether the Met's complaint is well-pleaded. *Levesque*, 1993 U.S. Dist. LEXIS 791, at *19.

The Union argues that the Met has failed to plead that Union membership had full knowledge of the Un-

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 17 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

ion's specific tortious activities, Union Br. at 7, but, in fact, that is precisely what the Met did. Having detailed in preceding paragraphs the exact nature of defendants' tortious activities, Am. Compl. PP 1-7, 23-84 (activities which the Met referred to collectively as the Union's "campaign"), the Met alleged that "Local 100 members have had *full knowledge* of defendants' campaign as described herein," *id.* P 85 (emphasis added); *see also id.* P 89 ("Not only have the rank and file of Local 100 had *full knowledge* of defendants' tortious campaign against the Met . . .") (emphasis added). The Met further specifically alleged that Local 100 members (1) had been briefed by defendant and now ex-President Henry Tamarin at quarterly meetings about the Union's campaign against the Met and had full access to Tamarin's correspondence (a primary source of statements defaming the Met), *id.* P 86, (2) were "kept informed . . [*59] . of defendants' tortious activities" by Local 100's research director, Brooks Bitterman, as well as by other internal union communications, popular and Union press coverage and the Internet, *id.* P 88, and (3) attended "regular meetings" to "strategize about the campaign against the Met" and were assigned "responsibilities" related to the campaign against the Met, *id.* P 87. Moreover, the Met specifically pleaded that the Union had held meetings "before every major demonstration or attack against the Met both to keep the membership informed of the latest developments in the campaign and to enlist membership assistance in executing future offensives against the Met." (*Id.* P 87.) Finally, the Met alleged: "Local 100's membership has ratified defendants' efforts to defame, harass, intimidate and coerce the Met . . . with full knowledge of the nature and scope of the campaign . . . ." (*Id.* P 90.)

The Union's assertion that the Met failed to plead ratification adequately is simply wrong; the Met's Amended Complaint, in satisfaction of *Martin v. Curran*, alternatively pleaded that the Local 100 membership participated in, authorized beforehand and/or ratified after the [*60] fact the tortious activities specifically detailed in the Met's complaint. *See Giffords Oil Co., Inc. v. Boss,* 54 A.D.2d 555, 556, 387 N.Y.S.2d 51, 52 (2d Dep't 1976) (liability under *Martin v. Curran* established by proof of participation in, authorization of or ratification of a union's tortious conduct); *Saint v. Pope,* 12 A.D.2d 168, 176, 211 N.Y.S.2d 9, 16 (4th Dep't 1961) (same). The Met specifically pleaded, Am. Compl. P 89, that the membership had "actually participated in defendants' numerous acts of defamation, harassment, intimidation and trespass," specified that the Union issued instructions to the membership regarding "how to act and what to say when leafleting and demonstrating against the Met," and quoted ex-President Tamarin's saying that Union rallies against the Met were the "best place" to see the membership. *See Westchester County v. Westchester*

*County Federation of Labor,* 129 N.Y.S.2d 211, 215 (N.Y. Sup. Ct. 1953) (participation of union membership in tortious activity at direction of union officers satisfied requirement of *Martin v. Curran*). The Met also specifically pleaded that the membership "authorized [*61] defendants as their agents to pursue these tortious activities," Am. Compl. P 85, and asserted that "defendants have held 'union meetings' before every major demonstration or attack against the Met" *id.* P 87. *See Martin v. Curran,* 303 N.Y. at 282 [HN18](liability established where union members "expressly *or impliedly" authorize* or ratify the union's tortious acts) (emphasis added).

In any event, the Met also adequately alleged that, with "full knowledge" of the Union's conduct, the membership of Local 100 ratified each of the tortious activities of their union detailed in the Met's Amended Complaint. "'Ratification' is a form of subsequent authorization by which the principal, with knowledge of the material facts, accepts responsibility for the agent's act whether it was originally approved or not." *A. Terzi Productions, Inc. v. Theatrical Protective Union,* 2 F. Supp. 2d 485, 492 n.3 (S.D.N.Y. 1998). Formal ratification is not required under *Martin v. Curran* and may be "implied from the members' conduct." *Solow v. Delit,* No. 90 Civ. 2273, 1992 U.S. Dist. LEXIS 14232, at *12 (S.D.N.Y. Sept. 21, 1992) (citing *Martin v. Curran,* 303 N.Y. at 282). [*62] Here, the Met specifically pleaded that the Local 100 membership ratified "defendants' efforts to defame harass, intimidate and coerce the Met" -- fully described in the preceding paragraphs of the Amended Complaint -- " both by continuing to confer actual and apparent authority on defendants to wage this tortious campaign against the Met on their behalf, and, with full knowledge of the nature and scope of the campaign, by not protesting or making any attempt to discontinue or alter these attacks," Am. Compl. P 90. *See Browne v. International Brotherhood of Teamsters,* 203 A.D.2d 13, 15, 609 N.Y.S.2d 237, 239 (1st Dep't 1994) ("a union may 'ratify' or 'authorize' without going so far as to openly encourage or embrace the tactics of its official representative") (internal quotations and citation omitted). The Met also specifically pleaded that the Local 100 membership had "full knowledge" of the Union's conduct through "regular meetings with union officers and membership to strategize about the campaign against the Met," Am. Compl. P 86, additional meetings "before every major demonstration or attack against the Met both to keep the membership informed of the latest [*63] developments in the campaign and to enlist membership assistance in executing future offensives against the Met," *id.* P 87 and "the constant coverage over the past three years of [the] campaign against the Met in the popular and union press and over the internet (spurred on by the press released issued by Local 100's 'research director' Brooks Bitterman)," *id.* P 88. *See Westchester,* 129

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 18 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

N.Y.S.2d at 215 (membership ratified tortious activity "by their silence" after "actions of [union] officers were reported to the membership at a duly called meeting").

Thus, the Union's argument appears to boil down to the semantic quibble that the Met did not modify each mention of the Local 100 membership and of defendants' tortious acts with the words "each and every." The law does not support such a petty argument. Taken in context, it is clear that by "members" and "membership," the Met was referring to the entire membership of Local 100. It is likewise clear that when the Met referred to the tortious acts of defendants, it was referring back to all the acts previously specified in the Amended Complaint as "Factual Allegations Common [*64]  to All Claims." (Am. Compl. at 5.) Finally, the Met is, of course, entitled to enjoy the benefit of any doubt as to the meaning of its pleadings (1) where it has clearly made the effort to satisfy the requirements of *Martin v. Curran* (unlike the cases to which defendants cite),[21] (2) where, again unlike the cases to which defendants cite,[22] in the present posture, the Met's pleadings must be liberally construed, *see Hughes, 449 F.2d at 63*; *Levesque, 1993 U.S. Dist. LEXIS 791, at *19*, and (3) in light of defendants' spoliation and nonproduction of relevant documents as to member activities and ratification.

> 21   Defendants cite to a number of cases where (1) plaintiffs failed to plead participation, authorization or ratification *at all*, and/or (2) plaintiffs conceded the inadequacy of their pleadings. *See, e.g.*, *Building Industry Fund v. Local Union No. 3, 992 F. Supp. 162, 165 (E.D.N.Y. May 29, 1996)* (plaintiffs failed to allege authorization or ratification), *aff'd w/o opinion*, *141 F.3d 1151 (2d Cir. 1998)*; *Modeste v. Local 1199, Drug, Hosp. and Health Care Employees Union, RWDSU, AFL-CIO, 850 F. Supp. 1156, 1160 (S.D.N.Y.)* (plaintiff conceded claims were invalidated under *Martin v. Curran*), *aff'd w/o opinion*, *38 F.3d 626 (2d Cir. 1994)*; *R.M. Perlman Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Local 89-22-1, 789 F. Supp. 127, 131 (S.D.N.Y. 1992)* (plaintiffs conceded that they had not adequately pleaded liability); *Mounteer v. Bayly, 86 A.D.2d 942, 943 448 N.Y.S.2d 582, 583 (3d Dep't 1982)* (*no* allegations of liability on part of membership were made).

> [*65]
> 22   None of the cases to which the Union cites concerns the review of a complaint for compliance with the requirements of *Martin v. Curran* preliminary to the entry of default judgment as a sanction for defendants' egregious abuse of discovery which abuse relates (among other

things) to withheld disclosures bearing on ratification.

2. Evidentiary showing under *Martin v. Curran* The Union's assertions about the evidentiary difficulties of satisfying the requirements of *Martin v. Curran*, (Union Br. at 7), are irrelevant at this point.[23] Now that judgment on liability has been ordered against the defendants based on discovery abuse, the question is not what the Met can now prove or could have proven -- defendants having withheld and destroyed an unknown number of the documents that the Met could have used in satisfying its burden of proof.[24] *See Hughes, 449 F.2d at 66*; *see also Thomson, 114 U.S. at 114* (question is whether allegations are "[]susceptible" of proof).

> 23   Moreover, the suggestion that the requirements of *Martin v. Curran* are impossible to satisfy is simply untrue. *See, e.g.*, *Westchester, 129 N.Y.S.2d at 215.*

> [*66]
> 24   The many Weekly Reports, minutes and notes of meetings, Housecalling Sheets, and meeting sign-in sheets, for example, never produced by defendants would surely have been relevant.

B. Merits Issues

Without acknowledging its current procedural position, the Union asserts that the Met has failed to *prove* the falsity or defamatory content of defendants' speech, and/or that the Court had some obligation to assess individually the false and defamatory nature of these statements and defendants' malice in making each statement. (*See, e.g.*, Union Br. at 14.) All of these arguments are, in fact, backdoor attempts to attack the merits of the Met's claim. But, in the words of the Court of Appeals, "there was a time for that and [, defendants] cannot elect to default and then defend on the merits. [They] cannot have [their] cake and eat it too." *Hughes, 449 F.2d at 64*; *see also Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 853 (2d Cir. 1995)* (where "defendants rolled the dice on the district court's tolerance for deliberate obstruction, and they [*67]  lost," court refused to allow them to "return to the table").

1. Defamation

As discussed above, by its destruction of evidence and willful refusal to cooperate with discovery, the defendants lost their right to contest the sufficiency of the Met's proof, to raise defenses to the Met's claims or to seek review by the Court of the same. Nevertheless, the Union asserts that the Met bears an "affirmative" "burden of showing that each defamatory statement is false," that the Met has failed to prove the defamatory nature of

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 19 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

speech that defendants characterize as merely "negative or harassing," and that the Met has failed to prove the falsity of the Union's statements that the Met was party to a labor dispute. (Union Br. at 12-15.) Similarly, in a repetition of the argument made in Point I of its brief, Local 100 argues that this Court must "specifically rule on each alleged defamatory statement" before entering judgment. (Union Br. at 10.) On all points, the Union is wrong.

As *Hughes* makes clear, because the complaint adequately pleads defamation and its factual assertions are not incontrovertibly disproven by the case file or facts of which the Court has judicial notice, judgment [*68] may be entered. The Union's contrary argument was explicitly rejected by the Court of Appeals in *Hughes*. The defendant in *Hughes*, having suffered a default, nonetheless asserted that the plaintiff had to prove its claims on the merits at the damages inquest. Rejecting this assertion, the court held that this argument "stands the matter on its head and implies that it was [the plaintiff's] responsibility to defend the allegations of its complaint . . . . [The plaintiff] had no obligation to introduce any evidence whatever in support of the allegations of its complaint." The Met properly pleaded defamation in this case, *e.g.*, Am. Compl. PP 3-5, 23-44, 94-99, alleging that defendants made false and defamatory statements about the Met with malice, *see Linn*, 383 U.S. at 65, and the Union's arguments do not "render inconceivable the likelihood" that the Met could have made out its claim of defamation, *Hughes*, 449 F.2d at 64.

The decision of the Court of Appeals vacating as vague the preliminary injunction in this case also does not constitute the necessary indisputable evidence that each of the Union's statements alleged to be defamatory [*69] in the Met's Amended Complaint was merely "negative" and "harassing" and hence not actionable. (Union Br. at 15.) Given that the Met's Amended Complaint had not yet been filed, the Court of Appeals could not have passed on all, or indeed most of, the Met's allegations of defamation. In any event, the Court of Appeals did not rule on the merits of the Met's defamation claim as originally drafted but held only that the preliminary injunction initially issued was unduly vague. *Metropolitan Opera Ass'n v. Local 100, Hotel Emples. & Restaurant Emples. Int'l Union*, 239 F.3d 172, 174, 175-76 (2d Cir. 2001) ("We do not reach the merits of the Union's other argument"; and "we agree that the injunction presents serious questions under First Amendment and libel law, but find it unnecessary to ultimately determine these issues because we hold that the injunction must be vacated as its scope and meaning are unclear"). [25]

   25   The Union also quotes the Court of Appeals' opinion to suggest that the Court conferred blan-

ket protection on "harassing" speech, but, read in its proper context, the passage only addresses the propriety of injunctive relief to support the Court's conclusion, in *dicta*, that equity will not generally *enjoin* a libel even where the libel is harassing. In short, in no way does this passage affect the imposition of liability upon the Union's default.

[*70] Finally, as this Court has already ruled, and hence as is the law of this case, the Norris LaGuardia Act and the National Labor Relations Act do not constitute indisputable evidence that the Met was party to a labor dispute such that defendants' public statements were true. [26] In any event, the Met's allegations of defamation do not turn on the existence of a labor dispute, but on the defendants' statement falsely linking the Met to that dispute.

   26   Of course, the term "labor dispute" as understood by lay people, not labor lawyers, is what would have been relevant at a trial on this point. In any event, even under the hypertechnical definition of federal labor law, there was no "labor dispute" here. The dispute between the Union and RA -- regarding the means by which Local 100 would seek to recognize the RA workers at the Met, election or card check -- did not concern "the terms or conditions of employment or . . . the association of or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment." *Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees, 481 U.S. 429, 95 L. Ed. 2d 381, 107 S. Ct. 1841 (1987)*, cited by the Union, Union Br. at 13, concerned a dispute between a company and a union regarding the *employment* of union members by the company's subcontractor and, as such, is wholly distinguishable.

[*71]   2. "Commonplace Labor Rhetoric"

Nor does the Union's claim of privilege to engage in so-called "commonplace labor rhetoric" or to defame the Met to government officials affect the sanctions decision. With respect to the statements the Union benignly characterizes as "commonplace labor rhetoric," it selects certain phrases from the Met's Amended Complaint, lists them out of context, and argues that they are non-actionable, non-factual statements. (Union Br. at 11.) As the basis for such a characterization, the Union suggests that there is a definitive list of permissible invectives and degrading words and phrases that may used with impunity in a labor dispute. Assuming *arguendo* this Court were free to examine the merits of the Met's claims, the cases to which the Union cites would not be

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 20 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

found to *establish conclusively* (as *Hughes* requires) the existence of such a categorical list.

Indeed, in *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 501 N.E.2d 550, 508 N.Y.S.2d 901 (1986), cited by the Union (Union Br. at 10), the New York Court of Appeals explicitly stated:

> We eschew any attempt here to reduce the problem of distinguishing fact from opinion to a rigid set of criteria [*72] which can be universally applied. The infinite variety of meanings conveyed by words -- depending on the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used -- rules out, in our view, a formulistic approach.

*Id.* at 68 N.Y.2d at 291, 508 N.Y.S.2d at 905; *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990) (rejecting a "wholesale defamation exemption for anything that might be labeled 'opinion'"). In fact, [HN19]determining whether particular statements are "non-actionable rhetoric or opinion" is "a difficult task" and is based on a multi-factor, totality of the circumstances test which includes an evaluation of (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact" (internal [*73] quotations and citations omitted). *Brian v. Richardson*, 87 N.Y.2d 46, 51, 660 N.E.2d 1126, 637 N.Y.S.2d 347, 350 (1995); *see also Milkovich*, 497 U.S. at 9; *Gross v. New York Times Co.*, 82 N.Y.2d 146, 155, 623 N.E.2d 1163, 603 N.Y.S.2d 813, 819 (1993); *Steinhilber*, 68 N.Y.2d at 292, 508 N.Y.S.2d 905. Even when union speech is at issue, this contextual review is employed. *See Old Dominion*, 418 U.S. 264 at 284, 41 L. Ed. 2d 745 (holding that the alleged defamatory words "were obviously used *here* in a loose, figurative sense" but noting that "this is not to say that there might not be situations where the use of this writing or other similar rhetoric in a labor dispute could be actionable") (emphasis added). Consideration of the totality of the circumstances and overall context, however, does not go to "the face" of the Met's complaint but rather requires an evidentiary evaluation that is foreclosed. *See Hughes*, 449 F.2d at 68 ("the question is not whether one inference or another is stronger but whether [defendants'] evidence -- in light of

default and thus the absence of trial -- absolutely forecloses the possibility" [*74] of the plaintiff's claims).

Likewise, the Union had no absolute privilege as a matter of law to defame the Met to the Members of the New York City Council under the *Noerr-Pennington* doctrine. [HN20]"The essence of the Noerr-Pennington Doctrine is that parties who petition the government for governmental action favorable to them cannot be prosecuted under antitrust laws even though their petitions are motivated by anticompetitive intent." *Video Int'l Production, Inc. v. Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988). Although some courts, like the Fifth Circuit, have extended the doctrine to state tort actions *analogous to anti-trust claims*, the Union provides no authority for the proposition that the *Noerr-Pennington* doctrine applies to defamation claims. Indeed, the only authority located holds that it does not. *In re IBP Confidential Business Documents Litigation*, 755 F.2d 1300, 1313 (8th Cir. 1985) (the "NoerrPennington Doctrine does not necessarily and absolutely preclude liability for damages resulting from defamatory statements made in the course of petitioning the government").

### 3. Tortious Interference

[*75] The Union argues that the Met's tortious interference claim is preempted, Union Br. at 16-17, but that argument was rejected on the preliminary injunction motion. The Union also argues that the claim is deficient because an "inducement of breach of contract" claim must recite the contract(s) breached. (*Id.* at 17.) The problem with this argument, however, is that the Met pleaded interference with its "business relations and economic advantage," not contract. (Am. Compl. at p. 58 (title of claim) & P 123.) [HN21]No contract need be identified to sustain such a claim, and the Union cites no cases suggesting otherwise. [27] *See NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.*, 87 N.Y.2d 614, 623, 664 N.E.2d 492, 641 N.Y.S.2d 581, 586 (1996).

> 27    The Union also says that at the February 10, 2003 conference, the Met committed that it would offer no proof of effect on donor relations. (Union Br. at 17 n.11.) In fact, the Met said, in response to defendants' suggestion that it answer their earlier interrogatories as to damages: "The requests were, as you may recall, for all the contribution records and all of the ticket sales and so forth, and it is not our intention to rely on that kind of data . . . ." (2/10/03 Tr. at 19-20.)

[*76]   4. Prima Facie Tort

As part of their summary judgment motion, defendants argued the Met's prima facie tort claim should be dismissed "Because the Met Has Not Alleged and Can-

not Prove 'Disinterested Malevolence.'" (Lans III, Ex. 2 at Table of Contents, Point VI.) This aspect of the defendants' motion was denied upon a finding that there were questions of fact requiring trial. The Union's argument now to the same effect accordingly is foreclosed. *See In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154 (E.D.N.Y. 1996).

### 5. Secondary Boycott

The Union argues that the secondary boycott claim is preempted. This argument has been rejected twice: once at the injunction stage and later on defendants' motion for summary judgment, and I decline to disturb that law of the case.

### C. Conclusion

In sum, having reconsidered the sanctions decision as to the Union and having found nothing that would change the result, I adhere to my prior sanctions decision as to the Union.

### *IV. The Individual Defendants' Motion*

Tamarin and Diaz move to clarify whether the judgment of liability based on the Opinion applies to them, to correct it so as not to impose such liability or, in [*77] the alternative, to reconsider. The motions to clarify and reconsider are granted, and, for the reasons set out below, I adhere to my prior decision granting judgment on liability against Tamarin and Diaz.

First, the finding of liability indeed applies to Tamarin and Diaz, as I intended and as the Opinion makes clear. The Opinion differentiates between "the Union" and "defendants" as appropriate, and, as all defendants were aware, the Met's motion was expressly made against all defendants, not only the Union. Because I found that Tamarin and Diaz willingly participated in the discovery misconduct, I ultimately granted the Met's motion for sanctions as against all defendants. Thus, the findings of liability and sanctions set out in the Opinion apply to the individual defendants.

Tamarin and Diaz also move for reconsideration on the ground that the Opinion made no findings of bad faith or misconduct by either of them. They quibble with the significance of the Opinion's recitation of the facts relating to them, arguing that such findings are insufficient to support judgment and sanctions against them. While I believe the Opinion's findings are sufficient to support my decision, I grant [*78] Tamarin and Diaz's motion for reconsideration to clarify the factual and legal findings as to Tamarin and Diaz's misconduct.

### A. The Facts

#### 1. Tamarin

Tamarin, although an individually-named defendant with the same obligations as the Union, appears never once to have searched his own files for documents responsive to the Met's document requests, even though many requests were directed specifically to him. *See, e.g.*, 212 F.R.D. at 228 n.35 ("Tamarin, the then-outgoing Union president, was also grossly inadequate in his own document search. For example, he never even looked at the documents in his Chicago office."). In his deposition, Tamarin testified that sometime after May 2000-around the time that the Met sent out its First Document Request -- either Brooks Bitterman or Joseph Lynett gave him "a list of files to look for and documents" and that he looked for some documents "personally and some [he] delegated to other people on [his] staff." (Lans I, [28] Ex. 48 (Deposition of Henry Jonathan Tamarin dated Dec. 11, 2001) at 65.) However, the Met served four other Document Requests -- the Second in May 2001, the Third and Fourth in October 2001 -- to which Tamarin, [*79] as Local 100's leader, undoubtedly had responsive materials. Yet Tamarin testified that he could not recollect whether he ever looked through his files again after this first occasion in 2000 until the night before his deposition in December of 2001. (*Id.* at 6769 .)

> 28   Reference is to the Declaration of Deborah E. Lans, sworn to April 11, 2002.

Compliance discovery revealed that Tamarin, the Union's member of the board of the benefit trust plans, participated in communications about subsidies and Union member benefits at committee meetings, with Union personnel and otherwise, many of which communications went unproduced. *See, e.g.*, 212 F.R.D. at 192 (Margaret Rimmelin, the Union's Office Manager, testified at her deposition that from time to time Tamarin received member inquiries regarding benefits and sometimes responded by letter); *id.* at 199-200 (Tamarin questioned at deposition about letters he wrote concerning subsidies and when asked if he had copies of those documents, [*80] answered, "Well, I don't know. We're looking."); *id.* at 224 (Executive Board Minutes and Membership Meeting Minutes referenced the existence of reports on such topics yet Moss' signed response to the Met's Third Document Request stated that there were no documents concerning benefits to its members and their families). Tamarin sent numerous letters out about the campaign which also went unproduced. *See id.* at 194 (noting that Tamarin sent letters to members of the New York City Council's Parks, Cultural Affairs, Finance and Labor committees, but no copies of these letters were made); *id.* at 200 (noting that Tamarin did not believe he had looked at any files in his office in Chicago which he had occupied since November 1999 and from which he dealt with the Union's campaign against the Met).

In addition, Tamarin participated in numerous rallies and meetings, yet Tamarin's Weekly Reports, when finally produced, were produced only in part. *See id. at 212 n.23* (noting that the reports were produced three days before the close of discovery and that "there were significant gaps" in the production). Although Herrick (not [*81] Tamarin) now claims (in an unsworn submission) that the non-produced reports were for times when Tamarin was uninvolved in the campaign at the Met, there is documentary evidence disproving this last-minute excuse. (*See* Lans III, Ex. 15 (memorandum and letters written by Tamarin).)

Tamarin himself, as an individual defendant to whom the document requests were addressed, bore part of the burden to ensure that responsive documents were produced. However, as set out in the Opinion, documents that should have been produced either were produced at the last minute or not at all. When Tamarin was questioned at his deposition with respect to Weekly Reports, for example, he responded as follows:

> Q: *Have your counsel in this case asked you to provide them with copies of those reports*
>
> A: *Yesterday evening*.
>
> Q: Yesterday evening?
>
> A: Yes.
>
> Q: *Have your counsel in this case ever asked you to provide them with your files relating to Restaurant Associates, the Metropolitan Opera, card check neutrality agreements or the like*? A: *Not prior to yesterday evening.*
>
> * * *
>
> Q: Did you ever provide your files so far as [*82] they relate [to] the Met, R.A., the activities at the Met, card check agreements? A: I believe I was asked last year and provided whatever I had at that time.
>
> Q: Asked by whom?

> A: It was either Joe Lynett or Brooks Bitterman.
>
> * * *
>
> Q: You stated last year, so you're talking about some time in 2000?
>
> A: I believe so. . . .
>
> Q: . . . Between last year and last night were you asked for anything?
>
> A: I don't have a recollection.
>
> Q: Last night were you asked for anything other than your Weekly Reports?
>
> A: No.

212 F.R.D. at 199 (emphasis added). The Opinion found that counsel's failure to produce, or even inquire about, the Weekly Reports in a timely manner constituted "conduct [that] is wholly inconsistent with counsel's obligation to conduct discovery in good faith." *Id.* For the record, Tamarin's own failure to make any effort to ensure that a document request directed to him personally as an individual defendant (which he nowhere denies receiving) had been complied with also constitutes discovery misconduct. *See id. at 198 n.35* ("Tamerin, the then-outgoing [*83] Union President, was also grossly inadequate in his own document search. For example, he never even looked at the documents in his Chicago office.").

2. Diaz

Dennis Diaz was the lead organizer assigned by Local 100 to the Met campaign. He was involved in many relevant activities, including near-daily communications with RA workers at the Met for at least a two-year pe-

riod, numerous house visits to the workers to solicit participation and persuade them to sign "cards," travelling with an RA worker from the Met to a conference in Puerto Rico to discuss organizing tactics, and participating in numerous leaflet "actions" and visits to Met directors and affiliates.

Because Diaz was named as an individual defendant in this case, the Met's document requests were directed to him personally, and he nowhere denies receiving them. As noted in the Opinion, Joseph Lynett gave a copy of the Met's First Document Request to Diaz in May 2000, *see* 212 F.R.D. at 185, yet neither the Weekly Reports nor any other of a multitude of documents in Diaz' custody, possession, or control was obtained by the Met until some 15-18 months later (if at all). Searching of Diaz's files, to the extent [*84] done, was performed by Bitterman and Yen. However, Bitterman testified at his deposition that he only searched the file drawer that Diaz himself designated, Lans I, Ex. 42 (Deposition of Brooks Bitterman dated Oct. 25, 2001 ("Bitterman Dep.")) at 496-497, meaning that numerous boxes in Diaz's office and all but the one file drawer went uninspected, Lans I P 88-89. Never produced (with two exceptions, *see* Lans I, Ex. 51) were any records of his house visits to RA workers. (Lans I P 90.) Again, like Tamarin, Diaz bore a responsibility to ensure compliance with his discovery obligations, yet the record reveals that he did not fulfill this responsibility.

Counsel for both sides expend much ink arguing about what to make of Diaz's testimony in a related NLRB proceeding that he did not keep a log of his activities on behalf of Local 100 and the citation to that testimony in footnote 34 of the Opinion. Diaz's testimony before the NLRB was as follows:

Q: Do you keep a diary?

A: No.

Q: Do you keep a calendar of your appointments?

A: A calendar of what's going on, yes. But I don't save them.

Q: *Do you log what you do on a day-to-day* [*85]

*basis? Your activities on behalf of Local 100.*

A: *No.*

212 F.R.D. at 195 (emphasis added).

In his deposition on November 15, 2001, however, Diaz testified as follows:

Q: Do you see to the left of where it says

cafeteria it says report?

A: Yes.

Q: What does it mean?

A: Could be, had to do with my reports, my daily reports. I can't remember -

Q: *What are your daily reports*

A: *Office reports that we fill in at each week we fill out reports.*

Q: *What are those reports about*

A: *The weekly work that was done.*

*Id.* (emphasis added). Diaz's NLRB testimony was cited in the Opinion in the section discussing wilfulness and bad faith, specifically "falsehoods uttered by individual

Case 4:08-cv-04022-JLH   Document 69-7   Filed 06/12/09   Page 24 of 25

2004 U.S. Dist. LEXIS 17093, *; 175 L.R.R.M. 2870

defendants." *Id.* at 225-26. There, it was noted that Granfield originally denied providing any "written reports . . . to the International with respect to [his] activities," a statement later shown to be undeniably false. *Id.* Following the recitation of that testimony, a footnote in the Opinion states: "Similarly, [*86] in his testimony in a related NLRB proceeding, Diaz denied that he 'logged what [he did] on a day-to-day basis . . . [, his] activities on behalf of Local 100.'" 212 F.R.D. at 226 n.34. Although the testimony appears to be false, because it was not given in this case -- and thus was not relied on as a basis for sanctions -- it was relegated to a footnote. Thus, it is without import on reconsideration.

## B. Conduct as Individuals

Tamarin and Diaz attempt to obfuscate the real issue -- a pervasive pattern of discovery misconduct over an extended period of time -- by arguing that their conduct in not producing, for example, the Weekly Reports does not warrant sanctions because, *inter alia*, "a party may be substantially justified in not disclosing evidence if the party could not have been expected to foresee its relevance." (Individual Defs' Reply Br. [29] at 5 (citing 7 Moore's Federal Practice § 37.62 at 37-126.1-127 (3d ed. 2003)).) This argument is of no moment in the face of the record in this case. All five of the Met's Document Requests were addressed to Local 100 *and* Tamarin *and* Diaz. Neither of the individual defendants has denied receiving copies [*87] of these requests addressed personally to them. Neither Tamarin nor Diaz ever himself searched any of his own files for documents or took any steps to ensure that a competent search was made by others, even after their depositions were taken on the topic of their search for documents and their possession of documents and even after they had been asked by Met counsel to produce documents directed to them personally. Although Bitterman searched one of Diaz's file drawers for documents responsive to the Met's First, Second and Third Requests, no one, Diaz included, searched for documents responsive to the Fourth and Fifth Requests. (Lans I, Ex. 54 at Responses of Dennis Diaz to Compliance Interrogatories ("Diaz's Responses") P 3.) As set out in part above, the Opinion found that categories of documents were not produced -- indeed were not even searched for -- by Tamarin and Diaz, and documents likely to be in each defendant's files were withheld during discovery. In addition, although Diaz uses email, (Bitterman Dep. at 26-27), not one email to or from Diaz was produced or the absence of email explained. Nor were the files and computer used by Tamarin's New York secretary (Tamarin's secretaries [*88] do all his typing) ever searched for responsive documents. *See* 212 F.R.D. at 192.

29   Reference is to Reply Memorandum of Law on Behalf of Defendants Henry Tamarin and Dennis Diaz dated May 30, 2003.

As the foregoing record and the Opinion make clear, Tamarin and Diaz utterly failed in their discovery obligations as individuals to whom each and every document request by the Met was directed. They had a duty to assure that such requests were complied with, at least on behalf of themselves, and they did not do so. For these reasons and the reasons set out in the Opinion, judgment of liability and sanctions against Tamarin and Diaz is appropriate based on their individual misconduct.

## C. Coordinated

Conduct with Counsel Tamarin and Diaz may also properly be sanctioned for the misconduct of their counsel. It has long been the law in this Circuit that [HN22]a client may be sanctioned for his lawyer's misconduct. As the Court of Appeals wrote in *Cine Forty-Second Street Theatre*, "[a] litigant chooses [*89] counsel at his peril, and here, as in countless other contexts, counsel's disregard of his professional responsibilities can lead to extinction of his client's claim." 602 F.2d at 1068 (citing *Link v. Wabash Railroad Co.*, 370 U.S. 626, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962)). The Court went on to note that the "acts and omissions of counsel are normally wholly attributable to the client." *Id.* Moreover, where, as here, the sanctionable conduct is a "coordinated effort" of counsel and party, joint and several liability is appropriate. *See Estate of Calloway v. Marvel Entm't Group*, 9 F.3d 237, 239-240 (2d Cir. 1993), *cert. denied*, 511 U.S. 1081 (1994).

As high-ranking members of the Union's staff and individually-named defendants in this action, Tamarin and Diaz must be assumed to have had familiarity with the many documents called for by the Met's document requests, whether in their possession or in the possession of others at the Union. Tamarin and Diaz bore the responsibility of coordinating with counsel-particularly as individuals to whom the requests were addressed-to assure that the Union's and their own discovery obligations [*90] were complied with. The record in this case demonstrates willful disregard of that responsibility on the part of Tamarin and Diaz. While Tamarin and Diaz initially might have relied on Bitterman to gather responsive documents and their counsel to supervise Bitterman, they were not free to forget about their obligations merely upon turning over some portion of their files. As outlined above, neither defendant knew, or made an effort to learn, whether his files had been reviewed by a lawyer. (*See, e.g.*, Diaz's Responses P 6 ("I do not know if any lawyers searched my files which I turned over to Brooks Bitterman."); Lans I, Ex. 54 at Tamarin's Responses to Compliance Interrogatories P 4 ("I delegated

Page 24

responsibility for searching and producing responsive documents to Brooks Bitterman and other staff members of Local 100").)

D. Conclusion

In sum, the individual defendants and their counsel may not engage in parallel know-nothing, do-nothing, head-in-the-sand behavior in an effort consciously to avoid knowledge of or responsbility for their discovery obligations and to obstruct plaintiff's wholly appropriate efforts to prepare its case. Accordingly, the individual defendants are properly [*91] sanctioned for the misconduct of their counsel, independently, and for their participation with the Union and counsel in coordinated, multiple acts of willful misconduct. Upon reconsideration, I adhere to my previous decision with respect to Tamarin and Diaz.

*CONCLUSION*

Because Herrick, Davis and the Union motions do not raise matters appropriate on reconsideration, their motions for reconsideration (docket nos. 64 and 71) are denied.

In the alternative, the motions for reconsideration by Herrick, Davis and the Union (docket nos. 64 and 71) are granted and, upon reconsideration, I adhere to my prior decision.

The motion for clarification and reconsideration by the individual defendants Tamarin and Diaz (docket no. 62) is granted. The Opinion is clarified such that the Opinion applies to Tamarin and Diaz in granting judgment on liability against them. Upon reconsideration, I adhere to my prior decision granting judgment on liability against Tamarin and Diaz.

Counsel shall confer and inform the Court by letter no later than September 13, 2004 how they would propose to proceed.

SO ORDERED

August *27*, 2004

LORETTA A. PRESKA, U.S.D.J.