IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOHN WARD, JR.

      Plaintiff

VS.

CISCO SYSTEMS, INC.

      Defendant

CASE NO. 08-4022

JUNE 12, 2009

10:00 A.M.

TELEPHONE CONFERENCE
BEFORE THE HONORABLE JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE
FAYETTEVILLE, ARKANSAS

APPEARANCES BY TELEPHONE

MR. NICHOLAS H. PATTON                          FOR THE PLAINTIFF
Patton, Tidwell & Schroeder, LLP
P. O. Box 5398
Texarkana, TX  75505

MS. PATRICIA L. PEDEN                           FOR THE PLAINTIFF
Attorney at Law
610 16th Street, Suite 400
Oakland, CA  94612

MR. CHARLES L. BABCOCK                          FOR THE DEFENDANT
MS. CRYSTAL J. WALKER
1401 McKinney, Suite 1900
Houston, TX  77010

*Prepared by:*
**THERESA SAWYER, CCR**
**35 East Mountain Street, Room 529-C**
**Fayetteville, AR  72701**
479-444-7876

*(Proceedings recorded by Stenomask; transcript produced from dictation)*

-2-

1          <u>JUNE 12, 2009</u>

2

3          THE COURT:   Good morning.   Ladies and gentlemen, I

4  appreciate you being available for this conference call.   I

5  refer to the case that's in the Texarkana Division.   It's Ward

6  versus Cisco, and I think it's Case Number 08-4022.   And I

7  understand that plaintiff Ward is represented by Mr. Patton and

8  Ms. Peden, and that Cisco is represented by Mr. Babcock and Ms.

9  Parker, and that all are on the line.

10         I will tell you that I have with me here one of my

11  lawyers, Ms. Erin Setser, who is working with me on this case.

12  Actually, Ms. Gilbert I believe has been working with me, but

13  Ms. Setser has kindly agreed to try to help us here today.   I

14  also have Theresa Sawyer, who is our court reporter, and she

15  will be keeping a record of what we say, so I will appreciate

16  it, at least initially, if you will identify yourself when you

17  speak so that she will know who is talking.

18         I called to visit with you about the motion that was

19  filed by plaintiff, the motion to compel responses.   Let's see,

20  I believe it's styled Motion to Compel Compliance With the

21  Court's March 30 Order.   We also have a Joint Motion to Modify

22  the Scheduling Order.   We'll try to talk about that as well.

23         Now, with respect to the Motion to Compel Compliance,

24  that's Document Number 61, and I believe it was filed on April

25  the 27th.   It looks like we got a response to that by the

1  defendant.   I believe that's Document Number -- Let me get my

2  file straightened up here.   Document Number -- Well, I don't

3  have a number, but it was filed in response to that Motion to

4  Compel Response.  After that, we got a reply from the plaintiff.

5  That's Document Number 64.  That was filed May the 21st.  Then we

6  got defendant Cisco's sur-reply to the plaintiff's Motion to

7  Compel.  That's Document 67, filed on June the 4th.

8         And then I believe on the 10th -- and I think I was out

9  of the office that -- yes.  We got plaintiff Ward's motion for

10  leave to file a response to basically the sur-reply.  That came

11  in -- I don't think that's been responded to, but I think that's

12  the document trail and track that I have in front of me now.

13         So let me first inquire, have I missed anything,

14  plaintiff, as far as you know, in terms of the documents that

15  have been filed?  Basically, two motions; one, the plaintiff's

16  Motion to Compel, and then the Joint Motion to Extend Discovery.

17         Mr. Patton and Ms. Peden, is there anything I'm over-

18  looking that you know about on the papers?

19         MS. PEDEN:  No, Your Honor.

20         THE COURT:  All right.  What about Mr. Babcock or Ms.

21  Parker from the defense side?  Have I covered the papers that

22  I've got on this?

23         MR. BABCOCK:  I think you have, Your Honor.

24         THE COURT:  All right.  Okay.  Well, let me give you

25  brief opportunities to add to or to speak on what's in your

 1 │ papers.  I will say that with the exception of the latest things
 2 │ that I've got, I have not had a chance to look at in detail, or
 3 │ very little at all, the plaintiff Ward's Motion to File a
 4 │ Response and its contents.  The reason for that was that I was
 5 │ out of town and I didn't see it this morning because, frankly,
 6 │ I was working another -- working another field this morning.  I
 7 │ had a conference call a bit earlier and I was enmeshed in that
 8 │ and did not have a chance to review that.  I do apologize.  I
 9 │ should have.  I just did not get to it before we got on the line
10 │ here, so I'll have to kind of take that as it comes.  It might
11 │ help if I'm supplemented some on that.

12 │         But let me first turn to the plaintiff and give you a
13 │ chance to supplement, say anything you want in support of your
14 │ position on the matters at hand.

15 │         MS. PEDEN:  Yes, Your Honor, thank you.  I think the
16 │ issues have been fairly well briefed at a high level if the
17 │ Court will recall.  The plaintiff filed a Motion to Compel
18 │ Responses to Interrogatories that we served I believe in
19 │ December of last year.

20 │         The two interrogatories in the issue are Interroga-
21 │ tories Number 5 and 6.  And with respect to Interrogatory Number
22 │ 5, plaintiff's interrogatory asks the defendant what Rick
23 │ Frenkel, who was the anonymous toll tracker blogger who posted
24 │ the comments at issue in this case, we asked what he relied on
25 │ in making the statements that he made in his quote.

1          Defendants responded that he relied on a number of
2  things, but one of the things that he relied on were privileged
3  communications with counsel, so we asked plaintiff in our inter-
4  rogatory to identify all communications and documents.  That
5  information is critical to this case because the defense will
6  argue to the jury that Frenkel made his statements believing
7  that they were true, and made a good faith and without actual
8  malice.

9          So plaintiff needed to be able to ask exactly what it
10  was he relied on and if he had at hand information that he
11  should have relied on and didn't.  So when defendant responded
12  that Frenkel had relied on privileged communications with
13  counsel, we argued that putting those communications at issue
14  triggered an at issue waiver, and that defendant needed to
15  produce responses that included that information.  The Court
16  agreed with us, granted our motion to compel, and ordered
17  defendant to provide full and complete interrogatory responses.

18          When we got the supplemental interrogatory responses
19  instead of a supplemental response, defendant gave us a amended
20  response that purported to supercede the first response.  They
21  took out the express language that Mr. Frenkel relied on
22  privileged communications with counsel, and gave us a list of
23  information that Frenkel purported to rely on, and didn't
24  identify any of the privileged documents, privileged communi-
25  cations, any of the things that we had previously complained

1  were missing from their interrogatory response.  We don't
2  believe that plaintiff complied with the Court's order.

3        There's really no dispute that Frenkel relied on
4  privileged communication or relied on communications with
5  counsel.  In the Albritton case in Texas, there's sworn declar-
6  ations offered in support of the Motion for Summary Judgment.
7  There's deposition testimony.  It's just simply a fact that
8  Frenkel relied on information he received from Baker Botts.
9  That fact is responsive to the interrogatory and documents that
10  defendants are still refusing to identify are responsive and
11  should have been produced.

12        And then with Interrogatory Number 6, we asked
13  defendant to tell us when Cisco first learned that the filing of
14  the ESN complaint was in error, that there was an error in the
15  court's software system, because Frenkel posted in the accused
16  articles that our client had engaged in a conspiracy with the
17  court clerk to alter governmental records, and we believe the
18  record shows that at the time he made those statements, he knew
19  that there had been an error and that the court clerks corrected
20  an error.  And so because of defendant's malice defense, it's
21  very important for us to be able to show what Frenkel knew and
22  when he knew it.

23        And defendant's response identifies the fact that
24  Baker Botts, their outside counsel, placed the call to the court
25  clerk, and the court clerk told them that they had made a

1  correcting entry because there was an error with the software.

2  And we know that there are documents that memorialize that

3  conversation, but those documents weren't identified in our

4  interrogatory response.

5  So with that, I mean, that's the high level summary,

6  Your Honor.  We feel like we served our discovery early.  We

7  knew what the issues in the case were.  Defendants responded

8  truthfully and consistently with the Albritton record the first

9  time, but then after the Court found an at issue waiver, came

10 back with responses that were clearly aimed at avoiding

11 producing documents that they put at issue that they've waived

12 and need to be produced in this case.

13 THE COURT:  Are you saying, Ms. Peden, that the

14 documents you are seeking were in fact produced in the Albritton

15 litigation?

16 MS. PEDEN:  That's right, they were produced in the

17 Albritton litigation before Mr. Patton and I became involved in

18 that case.  Cisco and Mr. Albritton had worked out an agreement,

19 an agreement that covered the production of documents where

20 Cisco could produce what -- both parties could produce whatever

21 documents that they wanted to produce, but they were protected

22 under the protective order.

23 So there's been, you know, I want to estimate maybe 60

24 emails between Baker Botts and Cisco and Frenkel all around the

25 October 15th, 17th, and 18th time frame, discussing the filing of

1   the ESN complaint, and what Frenkel knew and what they were

2   looking at, and what was going on with the court.  All those

3   documents were produced to Albritton.

4            THE COURT:  All right.  Let me hear then from Cisco,

5   either Mr. Babcock or Ms. -- forgive me, Ms. Parker.

6            MR. BABCOCK:  Judge, this is Chip Babcock.  I'll take

7   a -- I'll take a run at it.

8            First of all, with respect to the Court's question, in

9   the Albritton case, Ms. Peden's predecessor and I reached an

10  agreement whereby both sides would produce what would otherwise

11  be privileged documents within certain parameters, but with the

12  agreement that the production would not constitute a waiver of

13  the attorney-client privilege, and that we would protect those

14  documents such that they weren't released into the public

15  domain, thereby triggering a waiver.

16           The reasons why both sides wanted to do that was

17  because there is another piece of active litigation going on,

18  the ESN versus Cisco case, where both Mr. Ward and Mr. Albritton

19  remain as local counsel for ESN, and Cisco was trying to do two

20  things.  Number one, it wasn't trying to hide anything with

21  respect to the Frenkel situation in the defamation case, but at

22  the same time, it did not want to trigger a waiver so that

23  documents would be -- privileged documents would be revealed in

24  the ESN case.  And so that was the arrangement that we had in

25  the Albritton case.

1          And I would add that we are set for trial on September
2   14th in that case.  We have got full discovery.  Discovery is
3   completed, and there's only been one discovery motion filed that
4   was subsequently resolved without court intervention, and we
5   have not had the kind of problems that we have had in this case
6   for whatever reason.  The documents were not produced in this
7   case because Ms. Peden refused to enter into any sort of an
8   agreement that would satisfy Cisco's concerns about waiver for
9   the ESN case.  So that is the background from our perspective on
10  that issue.

11         The second issue which I think has caused confusion,
12  considerable confusion, and led to the statement in the Court's
13  order compelling answers to these two interrogatories, that it
14  "appeared to the Court that Cisco had waived its privilege by
15  asserting" -- as Ms. Peden just told the Court -- "the malice
16  defense."  We have not -- Cisco has not asserted a malice
17  defense.  That is an absolute fabrication and has been repeated
18  over and over again by Ms. Peden to the Court.

19         What is at issue in a defamation case, if the
20  plaintiff is a public figure, is that there is a requirement
21  that plaintiff prove, by clear and convincing evidence, as an
22  element of the cause of action that the publication was made
23  with "actual malice", which is a constitutional standard from
24  the New York Times versus Sullivan case and doesn't mean what we
25  would normally think it to mean is ill will or hatred or spite,

1    but rather that the publisher, in this case, the non-party Rick

2    Frenkel, published either, one, knowing that what he was

3    publishing was false, or acting in reckless disregard of the

4    truth.  That is, he in fact entertained serious doubt as to the

5    truth of what he was saying.  That is not a defense, never been

6    pled as a defense.  It is an element of the plaintiff's cause of

7    action.

8            It is true that sometimes in libel cases a defendant

9    will say, "I relied on advice of counsel."  That typically

10   happens when -- with big publishing companies like the networks

11   or newspapers.  They will have a pre-publication review of what

12   is later said to be a defamatory article, and the lawyer will

13   look at it, and then the defendant will say, you know, "There's

14   no actual malice because I relied on advice of counsel regarding

15   this publication."  That defense has not been pled here and that

16   did not happen here.  Baker Botts was representing Cisco in the

17   ESN case.  It had absolutely nothing to do with, and no

18   knowledge about, these articles that are being complained about

19   in this lawsuit.

20           Ms. Peden I think mis-characterizes the record when

21   she says that Mr. Frenkel relied on the advice of counsel and

22   privileged communications.  What she is referring to is the fact

23   that a Baker Botts paralegal called the clerk's office and

24   learned that Eric Albritton, through one of his staff people,

25   one of his paralegals, had asked that the docket be altered from

1   one date to the second date.  In fact, Baker Botts didn't tell
2   that to Mr. Frenkel, but they did tell it to one in-house
3   lawyer, a different in-house lawyer, who repeated it to Mr.
4   Frenkel.

5        He relied upon that information, only to say that
6   Albritton called up the clerk and got them to alter the docu-
7   ment.  It wasn't advice of counsel, it was a fact that the
8   paralegal learned from a clerk, and that fact has been fully
9   disclosed and discovered in this case.  It's not privileged.  In
10  fact, in this case, Mr. Patton took the deposition of the
11  paralegal, Jillian Powell, the Baker Botts paralegal, and asked
12  her all about that conversation.  Now, the paralegal never had
13  a conversation with Frenkel, but she did have a conversation
14  with a Baker Botts lawyer, who told that to an in-house Cisco
15  person, who told it to Frenkel, and that, I don't think, is
16  privileged.  It's not attorney-client privilege.  But in any
17  event, that has been fully discovered and disclosed.

18       Getting to the answer to Interrogatory Number 5 which
19  asks to identify all information relied upon by Richard Frankel,
20  the conversation that Frenkel had with the in-house lawyer -- it
21  was either a woman by the name of Yen or another person by the
22  name of Beckwith, he can't remember which -- has been disclosed,
23  and it was disclosed in the answer to Interrogatory 5.  As the
24  Court may recall, Frenkel was originally a defendant in this
25  case, but the plaintiff non-suited him for whatever reason.  And

1   the Court may not know this, but since the lawsuit was filed,

2   Mr. Frenkel has left the employ of Cisco so that at the time the

3   original answer was provided, Mr. Frenkel was neither a party,

4   nor was he an employee of Cisco.

5          Notwithstanding that, we did, of course, try to

6   communicate with him so that our answer was accurate.  The Court

7   found that it was inadequate, and I might say properly so.  The

8   plaintiff characterized the answer as anemic, and you ordered us

9   to file a new answer, which we did.  That answer was gone over

10  with Mr. Frenkel in some considerable detail, and it is complete

11  and it is accurate.  And not only that, but Mr. Frenkel has

12  filed a declaration as part of our response to the motion for

13  sanctions where he says,  "This is a complete and accurate

14  answer and contains all the information that I relied upon."

15         The plaintiffs have spent 56 pages of briefing and an

16  additional -- I guess they want to file an additional 14 pages

17  to complain that our answer is not to their liking, and I can't

18  help that.  But the answer is complete and it is accurate, and

19  if they want to say that it is inconsistent with a prior answer,

20  then that happens in litigation all the time.  And if it comes

21  up before the Court on a motion or if it -- a Motion for Summary

22  Judgment -- or if it comes up before the jury at trial, you show

23  the first answer and the second answer and say,  "See, they

24  changed their answer and there must be something nefarious about

25  that."   And then the defendant says,  "No, there's nothing

1   nefarious, it's just something that we did to make it complete
2   and accurate."  I don't think the two answers are, by the way,
3   inconsistent, but taking their argument at its face, that's the
4   way you handle it, not with -- not with sanctions.

5        With respect to Interrogatory Number 6, that, too, was
6   fully and completely answered.  The question asks when Cisco --
7   not Frenkel, but Cisco -- first became aware that ESN claimed
8   the filing date of the complaint as listed on the Court's docket
9   was in error.  Now, one could argue that that doesn't -- that
10  that's not necessarily the pertinent inquiry because in a
11  defamation case where the state of mind of the publisher is
12  important, they would want to know when Frenkel learned that to
13  make it applicable to this case.

14       And they also know, although didn't tell the Court,
15  that the other two Cisco employees, Yen and Noh, who were sued
16  in the Albritton case, had been granted a summary judgment based
17  on their summary judgment motion, that they didn't have a single
18  thing to do with these publications.  They didn't read them
19  ahead of time, they didn't edit them, they didn't publish them,
20  they didn't send them to anybody, and they've been granted
21  summary judgment.

22       But nevertheless, the question was, identify when
23  Cisco first became aware that ESN claimed the filing date of the
24  complaint was in error.  And the first time that occurred was
25  when Cisco received ESN's pleading, a pleading in a related

1  Connecticut case that made that claim, and that's what we said

2  in our answer to the interrogatory.

3        We added, for completeness, that Baker Botts learned,

4  through this conversation with the court clerk, that Mr.

5  Albritton, or at least Mr. Albritton's paralegal, had claimed

6  that there was an error, which is different from, of course, ESN

7  making that claim.  But notwithstanding that distinction, we

8  didn't try to split that hair, but rather we revealed the fact

9  that Cisco learned this fact from Baker Botts, and as best we

10  could tell, told the plaintiff when we learned it.

11        So the answers have been completely responded to and

12  I see, frankly, no argument to the contrary.

13        I would add one other thing, Judge, and that is, we

14  have asked that you clarify the statement in your order compel-

15  ling us to answer these two interrogatories, the statement being

16  that it appears that there has been a waiver of the attorney-

17  client privilege because of this non-existent malice defense.

18        THE COURT:   I don't believe I said that, Mr. -- I

19  didn't say that.

20        MR. BABCOCK:   It was -- I believe there was a phrase

21  that -- in ordering the --

22        THE COURT:   Yeah, but I didn't mention a non-existent

23  malice defense, I don't think.

24        MR. BABCOCK:   No, I -- No.  I should have ended my

25  quotes before -- You said it appeared that there had been a

1   waiver of the attorney-client privilege, end quote, and it's our

2   position that that was -- that statement was made as a result of

3   the plaintiff's claim that we were asserting a malice defense,

4   as Ms. Peden just said to you.

5           That is causing -- has already caused, and I think

6   will cause, some mischief in the other litigation.  They've

7   already taken the position that this is a holding of the Court,

8   and therefore we have -- we have waived that, and that is going

9   to -- if not clarified, is going to result in their being able

10  to continue to make that argument and perhaps get documents that

11  at least Albritton's counsel and I never intended to have

12  revealed and, in fact, expressly agreed would not be a waiver.

13          THE COURT:  Now, do you mean clarified, or changed?

14          MR. BABCOCK:  I'm sorry, Your Honor, you cut off.  I

15  didn't hear --

16          THE COURT:  I say do you mean clarified, or changed?

17          MR. BABCOCK:  Well, I'd prefer -- Any way the Court

18  wants to do it.

19          THE COURT:  No, no.  I'm asking you what you mean.

20  When you say I should clarify it, do you want me to clarify it?

21  I don't know what there is to clarify.  I think you're asking me

22  to change it.  Isn't that right?

23          MR. BABCOCK:  I think that's probably right, Judge.

24          THE COURT:  Yeah, I thought so.

25          All right, let me turn to Ms. Peden.  Ms. PED-en, Ms.

1   PEE-den.  Am I saying your name correctly?

2             MS. PEDEN:  Ms. PEE-den.

3             THE COURT:  Ms. PEE-den.  Do you have any comments you

4   want to make?

5             MS. PEDEN:  Yes.  That's a lot -- a lot to cover.

6   I'll try to keep it brief, Your Honor.

7             I think one of the issues and what the Court is

8   probably seeing from the briefing is that the parties have a

9   fundamental disagreement about the legal framework, and I think

10  plaintiff set out in the reply at Page 7 what their legal

11  framework is, and I think that that case law is totally missing

12  from any of defendant's briefs.

13            But in the Eighth Circuit, an at issue waiver is not

14  a formalistic you have to use these particular buzz words to

15  create a waiver, fact-intensive.  It's basically a fundamental

16  fairness doctrine that lets -- that precludes somebody like

17  Cisco from picking and choosing which pieces of the attorney-

18  client communications that they get to offer to the jury and

19  withhold from us documents that we need to challenge their case.

20            So in the Eighth Circuit, it's sort of a broad

21  concept, although there are certain fact scenarios that

22  routinely result in an at issue waiver.  One of those is when a

23  party testifies concerning portions of the attorney-client

24  privilege.  Frenkel has clearly done that in the Albritton case.

25  He's given a sworn declaration to Judge Shell that said that he

1    relied on communications with counsel.   Mr. Babcock included

2    that as an uncontested statement of fact in a summary judgment

3    brief.   He briefed that issue.   It's just -- It's not contested

4    that Frenkel relied on information that he received.   And what

5    Cisco would like to do is impact that first prong of an at issue

6    waiver because they want to testify about portions of the

7    attorney-client privilege, but not trigger the broader subject

8    matter waiver, and, frankly, that's just impermissible.

9            The second common fact scenario where a party can

10   trigger an at issue waiver is when the party places attorney-

11   client relationship directly at issue in the case.   Well, Cisco

12   continues to say that they haven't done that because malice is

13   a element of plaintiff's case in chief.   But as the Workman case

14   in the Eighth Circuit demonstrates, you don't have to -- it's

15   not a requirement that there be an affirmative defense.   Cisco

16   is not required to affirmatively come forward and use some buzz

17   words in its answer to trigger an at issue waiver.

18           And even if they were, they have the -- they've

19   asserted an affirmative defense of immunity under Arkansas Code

20   1653-504 and have affirmatively pled their malice issue at issue

21   in this case.   So under those first two common fact scenarios

22   that really aren't addressed by Cisco, the Court was entirely

23   correct in ordering -- in finding that there has been an at

24   issue waiver.

25           What seems to be Cisco's argument is the third common

1  fact scenario where you can get an at issue waiver, and that's

2  where a party asserts reliance on an attorney's advice.  So it's

3  the common, you know, reliance on advice of counsel defense

4  where they did something affirmative.  And Cisco, throughout

5  this briefing and the underlying Motion to Compel, has taken the

6  position that that requires for them to have an at issue waiver.

7          Well, one, it's not, and, two, even if it were

8  required, even if the law wasn't broader as it is, they did

9  exactly that when they filed their interrogatory responses or

10 when they took their interrogatory responses that served as the

11 basis of this Court's order.  That was the record before the

12 Court, was the interrogatory response.  So they said, consistent

13 with all of the facts in the Albritton case, that Frenkel relied

14 on information he received from Baker Botts.  The law is really

15 clear Cisco -- as Mr. Babcock said, while there are certain

16 parts of those communications that aren't privileged and what

17 Yen or Beckwith, who Frenkel can't remember which one, but Mr.

18 Babcock never said whether or not Cisco could remember whether

19 Frenkel had that conversation with Yen or Beckwith.

20         But Frenkel wants to be able to point to that conver-

21 sation and say from that conversation that he reasonably

22 believed that ESN called the court clerk and "altered govern-

23 mental records".  At the same time, he wants to -- he wants to

24 argue that the at issue waiver is a communication by communi-

25 cation waiver or a document by document waiver, and they can

1  just put in enough information to make that argument to keep the
2  plaintiff from getting other communications and other documents
3  that show that Frenkel's statements were far from reasonable.

4       Mr. Babcock spent some time talking about the actual
5  malice standards that are applicable if the Court were to rule
6  that Mr. Ward's a public figure, and we don't think that this
7  Court will, just as Judge Shell didn't in the Albritton case,
8  but Mr. Babcock's statement about how stringent the actual
9  malice requirement is actually supports why those documents and
10 interrogatory responses are critically important to this case.
11 That's a high burden, and if plaintiff is going to meet that
12 burden, he's entitled -- my client is entitled to see everything
13 that was at Frenkel's disposal when he decided to accuse my
14 client of conspiring with the court clerk.

15      Mr. Babcock said, "Well, you know, they don't really
16 need this information because Ms. Jillian Powell, the paralegal
17 who called the court clerk, her deposition was taken and she
18 testified about the communication that she had with the court
19 clerk."  Well, that's not entirely correct.  Her deposition was
20 taken.  She was asked questions about her conversation with the
21 court clerk, but Ms. Powell couldn't remember.  She had a real
22 difficult time remembering the facts of the -- of that conver-
23 sation and what the court clerk told her.  But there's a
24 document where Ms. Powell memorialized her conversation with the
25 court clerk shortly after she had it at the request of Baker

1  Botts, and that document hasn't been produced in this case.  It

2  was in the Albritton case.

3         And when I was taking Ms. Powell's deposition, I asked

4  them to let me use that document so that we could get somewhere,

5  so Ms. Powell could be refreshed, her memory refreshed about

6  that conversation, and they wouldn't let us do that.  That's the

7  problem in this case is if we don't have access to everything

8  that Cisco has access to, we get into depositions, and people

9  forget things, or they instruct the witness not to answer, and

10  it's just too much of a handicap where Cisco has put their

11  communications with counsel directly at issue in this case.

12         THE COURT:  All right.  Anything else?

13         MS. PEDEN:  One other thing.  I have a note here that

14  Mr. Babcock said that Ms. Yen or Mr. Noh didn't have anything to

15  do with the publication of these cases, or these articles, and

16  that they've been granted summary judgment in the Albritton

17  case.

18         Judge Shell did grant summary judgment as to liability

19  against Ms. Yen and Mr. Noh in the Albritton case, but there's

20  no way to argue that those two individuals did not have anything

21  to do with the publication of these articles.  In fact, those

22  were the people who suggested and encouraged Mr. Frenkel to do

23  so, to publish these articles and to do it anonymously so it

24  couldn't be tracked back to Cisco.  And in this case, Cisco's

25  the defendant.  Cisco's a corporation who acts, and only acts

 1  through its employees, and in this case Cisco is acting through

 2  Yen, Noh, and Mr. Frenkel, and their actions are relevant and

 3  the jury is entitled to see them.

 4              THE COURT:  All right.  Anything else?

 5              MS. PEDEN:  Unless the Court has questions.

 6              THE COURT:  Well, let me turn back to Mr. Babcock to

 7  see if he's got something else to say.

 8              MR. BABCOCK:  Yes, Your Honor, I've got a couple of

 9  things to say.  It seems to me there are two issues; one, did we

10  answer Interrogatories Number 5 and 6 as you ordered us to do,

11  and I think the answer to that is yes, and Frenkel can't do any

12  better.  He told them what he relied on and --

13              THE COURT:  Let me stop you right there now.  Maybe

14  I'm not following this, but let me just ask a couple of

15  questions about that.  I thought I've understood you to say, Mr.

16  Babcock, that in the Albritton case, that there were numerous

17  documents that were supplied under either a protective order or

18  an agreed protective order that related to this same matter,

19  what Frenkel knew, who told him what, and so forth, but it was

20  protected in that disclosure in the Albritton case under a

21  protective -- an agreed protective order.  Is that correct?

22              MR. BABCOCK:  Partially.  We produced documents under

23  an agreed protective order and under side agreements with the

24  parties.

25              THE COURT:  All right.  Now --

-22-

1          MR. BABCOCK:  The thing that's not correct about what
2    you said was not all of those documents related to what Mr.
3    Albritton relied upon.

4          THE COURT:  What Mr. Albritton relied upon?

5          MR. BABCOCK:  I'm sorry, what Mr. Frenkel relied upon.

6          THE COURT:  All right.  But you did supply some
7    documentation that Mr. Frenkel relied upon, and you supplied it
8    under an agreed protective order in the Albritton case.  Am I
9    right?

10         MR. BABCOCK:  We did produce documents he relied upon.
11   Most of those were not -- in fact, none of them were privileged.
12   We did --

13         THE COURT:  Well, but I'm -- It's a simple question.
14   Did you not provide a number of documents that Mr. Frenkel
15   relied upon under a protective order in the Albritton case?
16   That's the question.  Is that true?

17         MR. BABCOCK:  That is not true.

18         THE COURT:  Mr. Babcock, you're opening up a credi-
19   bility gap.  I think you told me just the opposite earlier in
20   your remarks.  You said that you did supply those documents
21   under an agreement in the Albritton case, and you're peeved,
22   apparently, with Ms. Peden because she wouldn't make a similar
23   agreement in this case.  Did you not tell me that?

24         MR. BABCOCK:  Well, not exactly, Judge.

25         THE COURT:  Well, not exact -- Come on, don't parse

1  words with me, Mr. Babcock.  Let's get down to it.  Here's what

2  I'm getting at.  You're telling me you have supplied everything

3  that you have.  I don't think so, because if you supplied any-

4  thing in the Albritton case under protective order that you

5  didn't supply here, you're not being honest with me.  I think

6  the problem is here that you have those documents that should be

7  discoverable, and you don't want to give them up because there's

8  no protective order in place.  Isn't that the problem?

9        MR. BABCOCK:  That is -- that is the problem.  That's

10  one of the --

11        THE COURT:  All right.  Then it's not true for you to

12  tell me that you have given everything that's possibly relevant.

13  That's just not true, sir.  What you're telling me is that

14  you've given everything that's relevant that is not protectable.

15        MR. BABCOCK:  Judge, there are two different --

16  there's a difference between what you relied on and what's

17  relevant.

18        THE COURT:  Well, that's not what I'm talking about.

19  This is discovery.  I'm not talking about what's going to be

20  admissible in evidence.

21        MR. BABCOCK:  Right.  But what you just asked me that

22  I've said no to that you said I was being not -- not square with

23  the Court, you asked me if we had given them everything that he

24  relied on, and I'm talking about the Ward lawyers, and we have.

25  And we also identified everything that he relied upon.  We --

 1            THE COURT:  But you -- would you --

 2            MR. BABCOCK:  -- have given them --

 3            THE COURT:  Just a minute.

 4            MR. BABCOCK:  -- the Shell documents --

 5            THE COURT:  Hold on, Mr. Babcock.  Would you agree

 6 with me, sir, that if Ms. Peden would agree to some sort of

 7 protective order, there would be further documents you would

 8 give her?

 9            MR. BABCOCK:  Yes.  True.

10            THE COURT:  All right, good.  That answers my

11 question.  Now, in answer to your response, I will not recon-

12 sider or try to clarify my order.  I think my order is very

13 clear.  I directed you to produce those documents and I want you

14 to do that.

15            MR. BABCOCK:  Judge, your order did not direct us to

16 produce the documents.  Your order --

17            THE COURT:  I think that's what's at --

18            MR. BABCOCK:  -- interrogatories.

19            THE COURT:  Well --

20            MR. BABCOCK:  It did not direct us to produce docu-

21 ments.  In fact, I've been waiting for them to try to file a

22 motion, at which point we could more fully raise the privilege

23 issues.  But your order directed us to answer Interrogatories 5

24 and 6.

25            THE COURT:  And those interrogatories I think asked

1  you to produce documentation that backed up your answers, didn't
2  they?

3          MR. BABCOCK:  Yes, sir, and we've done that.

4          THE COURT:  Well, I think we differ on that.  I don't
5  think you have.  If you haven't produced the documents that you
6  are contending ought to be covered by a privilege agreement, you
7  haven't done that.

8          MR. BABCOCK:  No, Your Honor, that's different.  The
9  question asked what Rick Frenkel relied on, and we have produced
10  every document that he relied on.  We've done that.  And they
11  can say until the cows come home that we haven't, but we have.
12  And he has said under oath to you, in response to this motion,
13  that everything that he relied on is in that answer to inter-
14  rogatory and every document we have about that has been produced
15  to you.

16          THE COURT:  All right.  Ms. Peden, you say that he
17  hasn't?

18          MR. BABCOCK:  Produced to them.

19          MS. PEDEN:  No, Your Honor.  Here's the problem.
20  Cisco thinks that the interrogatory response allows them to
21  respond with just what Frenkel relied on.

22          THE COURT:  Well, Ms. Peden, let's stay on track here.
23  I want to know --

24          MS. PEDEN:  (Unintelligible).

25          THE COURT:  You -- Wait a minute, Ms. Peden.  Let's

1   stay on track here.  I want to know -- You're telling me that

2   you believe that there are documents that they have that are

3   relevant to your request, your interrogatories, and your inter-

4   rogatories does say identify all documents.  I don't know

5   whether you say produce them, but identify them.  But you're

6   saying they have documents that are responsive to that inter-

7   rogatory that they won't identify or give you copies of.  And

8   the reason you say that is because you believe those selfsame

9   documents that you're interested in have been produced in the

10  Albritton case under a protective order.  Is that right?

11          MS. PEDEN:  Absolutely correct.

12          THE COURT:  All right.  Well, what specific documents

13  are we talking about?

14          MS. PEDEN:  Sir, there are a host of emails that were

15  exchanged between Baker Botts, Frenkel, people at Cisco,

16  internal communications at Cisco, with the  public relations

17  people, trying to get the story out, discussions about how they

18  could do it without it being traced back to Cisco.

19          THE COURT:  All right.  Now, stop right there.

20          Now, Mr. Babcock, are you telling me that if you

21  didn't identify those emails that she's talking about that would

22  relate to those things, if you didn't identify them here, that

23  you still have identified and/or produced everything that's

24  responsive to that interrogatory?

25          MR. BABCOCK:  I am telling you that, Judge, because

1   the interrogatory says, "Identify all information relied upon
2   by Richard Frenkel in making the statements."  And we went
3   through with respect to each statement and each article, and we
4   listed -- with respect to the October 17th article, we listed 11
5   documents and conversations.  With respect to the October 18th
6   article, we listed 10 matters, and the same with respect to the
7   October 19th matter, and it's -- and we have tracked them,
8   document to statement.

9           What she is talking about are things that he did not
10  rely on.  I mean, they may be things that they want to see.  I
11  didn't have any objection in the other case to letting them see
12  them, and I don't have any objection here if they just won't
13  claim attorney-client waiver in the ESN case.  That's all I'm
14  asking for.  But in terms of answering the interrogatory, we
15  answered it completely and they have all the documents, every
16  single one of them.

17          MS. PEDEN:  Your Honor, if I can give you one concrete
18  example, maybe it'll give you an idea of why we differ on this
19  point.

20          THE COURT:  Well, look, maybe one way to get at this,
21  I had said in my order -- Let me see if I can find that again.
22  I had said in my order that we've been discussing here at some
23  point that if there were documents that -- and I think this had
24  to do with Interrogatory Number 9.  I don't think we're really
25  talking about that, but I did say with respect to that that --

1    let's see.   "To the extent that Cisco contends any communi-
2    cations subject to this interrogatory are privileged, it's
3    ordered to submit them in camera."

4         Is it possible that with respect to these things that
5    you just mentioned, Mr. Babcock -- You said you didn't have any
6    problem with them seeing various emails in which Ms. Peden is
7    interested in as long as you can secure either an agreement or
8    some sort of an order from the Court insuring that they would
9    not be used in the ESN litigation.  Did I follow that right?

10        MR. BABCOCK:  Yes, you did.

11        THE COURT:  All right.  Here's one suggestion that
12   might get to the bottom of this.  Why wouldn't it be possible
13   for you to submit to the Court in camera those selfsame communi-
14   cations so that I can look at them and I can make up my own mind
15   as to whether or not, under the parameters of the order that
16   I've already issued, whether they are still subject to any sort
17   of a privilege or whether they are not?

18        MR. BABCOCK:  Yeah, I wouldn't have any objection to
19   doing that, Judge, although Number 9 I don't think --

20        THE COURT:  No, I used 9 as an example, that I had
21   said that was one thing we might do there.  But I'm thinking
22   about one way to get at this because I'm kind of out in left
23   field here.  I'm not sure I'm following that.  But if I could do
24   that -- What about that, Ms. Peden?  If I could get these emails
25   and communications in which you're interested and which you

1  believe are certainly relevant and discoverable in this case,
2  and apparently you know of them because they were discovered or
3  they were made available in the Albritton case, and apparently
4  you want to try to get those same documents here; he wants to
5  protect them for the reasons that he's said.  Maybe one way to
6  get this thing off dead center is have those things submitted to
7  me in camera so I can review them and determine whether it
8  appears to me that they are subject to some privilege, or
9  whether I need to hear some argument on that, or whether any
10  privilege that might have protected them has been waived as to
11  this case.  Would you have any problem with that, Ms. Peden?

12        MS. PEDEN:  No, Your Honor.  In fact, we had asked
13  Cisco to agree to that during the briefing with --

14        THE COURT:  Well, aside from that.  I'm trying to talk
15  about the now.  What about it, Mr. Babcock?  Are you agreeable
16  to do that?

17        MR. BABCOCK:  That is a terrific solution, Your Honor.
18        THE COURT:  Well, I don't know that it's a solution,
19  but I want to try to get this thing resolved.  Folks, this case
20  needs to be resolved.  These folks are entitled to get it off
21  dead center, Mr. Ward and/or Cisco.  I don't want to make a
22  career out of it and I don't think you lawyers do either.  I am
23  interested in trying to make orders that will promote that to
24  that end.  And to me, discovery is not an end in itself, but
25  it's a means to an end, hopefully, to get the discovery out

1  there so that the parties can properly evaluate their cases.

2  Who knows, they may at some point take it -- there may be

3  motions that this would be relevant to.  But this is a means to

4  an end, and I don't want it to become an end in and of itself,

5  so I'm trying to figure out a way to get it resolved and to move

6  it along.  So it seems to me that might be a way to do it.

7       Now, so that we don't have any misunderstanding about

8  that, it would seem to me that you all should agree, if you can,

9  on a log of some kind so that you both understand and agree the

10 identification of the documents that are being sent to the

11 Court.  Obviously, the plaintiff would not see them unless and

12 until the Court decides that they should be produced and are

13 discoverable, but I think I have to have some control over this.

14 I don't want to get the documents and spend the time looking

15 them over and trying to cogitate on them, only to have the

16 plaintiff come in and say,  "Well, Judge, they didn't give you

17 all that they're supposed to."

18      So is that a possibility, Ms. Peden and Mr. Babcock,

19 that you two could work together on a log?  I won't call it a

20 privileged log, but I'll call it a submission log, so that you

21 both are on the same page in terms of the fact that I'm getting

22 everything put in front of me that we have an argument about.

23 Ms. Peden?

24      MS. PEDEN:  Yes, Your Honor.  I think that actually

25 from the plaintiff's perspective, those documents would include

1  all of the -- We have been produced in this case everything in

2  the Albritton case except for this one subset of documents.

3  There aren't that many of them.  From our perspective --

4          THE COURT:  Well, what I'm asking, though, could you

5  and Mr. Babcock and/or his team, whatever, and Mr. Patton, try

6  to work together and come up with an agreed, shall we call it a

7  submission log --

8          MR. BABCOCK:  Yes, sir.

9          THE COURT:  -- so that both sides know the identity,

10  by date and some subject identity about the sender or receiver

11  or whatever, whatever it is, so that you both know what's being

12  sent to me to look at.

13          MR. PATTON:  Judge, this is Nick.  We can certainly

14  try to do that, and we ought to do so.

15          THE COURT:  All right.  Mr. Babcock, do you agree?

16          MR. BABCOCK:  Yeah.  I think that makes perfect sense.

17  There's no mystery about this, I don't think, because both Mr.

18  Patton and Ms. Peden are in the Albritton case, so they have

19  seen the documents in that --

20          THE COURT:  Well, I kind of suspected that, but I

21  wasn't going to come out and say that because, like I said, I

22  don't know as much about it as you all do.  But why don't we try

23  to do that because, like I said, I want to move this matter

24  along.  And, obviously, there are some sharp differences of

25  opinion here about what's been asked for or what should be

1   produced, whether there's a waiver of privilege, and so forth.

2          And before I jump on this thing, I want to make sure

3   that I have all the information I need.  I think it will be

4   helpful to me to put this matter in context.  Once I see what

5   we're talking about here, then I can go back and review what the

6   interrogatories have been, what the responses were initially,

7   and what they have been after the Court's order, and determine

8   whether it seems to me that these documents should, in fact, be

9   produced, or at least identified, or whatever, or not, and so

10  let me ask you to do that.

11          I don't know what time frame we need to look at here,

12  but I'd like to get this done sooner rather than later.  So if

13  it's possible -- Do you think it's possible to get such a

14  submission log together and agreed upon, say, within a week or

15  10 days?

16          MR. BABCOCK:  A week would be hard for me, Judge,

17  because as I think I told your clerk, I'm leaving tomorrow to go

18  out of the country for a week, but I think if you gave us 14

19  days, we could certainly do it.

20          THE COURT:  All right.  Ms. Peden, Mr. Patton, what do

21  you say?

22          MR. PATTON:  Mr. Babcock does have something, Judge,

23  that I don't want to interfere with, so the 14 days is --

24          THE COURT:  You like to ski, too, don't you?

25          MR. PATTON:  Well, he's not going skiing.

1          THE COURT:  Oh, okay.  I'm sorry.  All right.  Well,
2    listen, can you agree to 14 days?  Now, what I'd like to see
3    happen here, could we agree on the log, and then have the
4    documents to me?  Surely that wouldn't be that big a burden to
5    get them to me, what, within certainly 21 days.  If you can
6    agree within 14 days, and then have them in my hands no later
7    than 21 days.  And I don't know what that's going to do to our
8    schedule here.  I hope it doesn't screw it up very much.  But
9    will that work?

10          MR. PATTON:  Is that okay with you?

11          MS. PEDEN:  Yeah, definitely.  There's not going to be
12   a huge amount of dispute about which documents are at issue, and
13   there aren't that many of them.

14          THE COURT:  Well, if you can agree on them and submit
15   them simultaneously within that 14 days, that would even be
16   better.

17          MR. PATTON:  I don't see any reason, Judge, why that
18   can't be done because we all know what the documents are.

19          MR. BABCOCK:  Yeah.  I don't have any --

20          THE COURT:  Okay.  Well, this is the 12th, and I
21   believe we're talking about having them to me no later than the
22   26th.  Agree upon a submission log, and then be able to get them
23   to me in camera no later than June 26th.  Does that sound reason-
24   able, Ms. Peden and Mr. Patton?

25          MR. PATTON:  Yes, sir.

1           MS. PEDEN:  Absolutely.

2           THE COURT:  Mr. Babcock?

3           MR. BABCOCK:  Yes, Your Honor.

4           THE COURT:  Okay.  Now, we haven't talked about the

5  second motion, and I know we've been at this for quite awhile,

6  but I strongly suspect that that motion is going to be good, and

7  I'd rather -- and I will just say I anticipate it's probably

8  going to need to be done because of this development.  And also

9  there are other problems that we've dealt with, but I'd rather

10 leave that until I can deal with that after I've had a look at

11 these documents in camera, and try to put it all to bed at once.

12 Is there any problem with that for the plaintiff?

13          MR. PATTON:  No problem, Judge.

14          THE COURT:  Defendant?

15          MR. BABCOCK:  No.  That'll be fine, Your Honor.

16          THE COURT:  Okay.  Let me thank you then for talking

17 with me.  And I part ways with you here with, first of all, a

18 suggestion.  Well, an expression of appreciation for your

19 willingness to try this possible solution that I'm trying to

20 look at here to get this thing resolved.

21          Secondly, I know that this is a pretty hard fought

22 case.  There are some strong feelings back and forth, but be

23 that all as it may, you all are professionals, and it's another

24 case.  Cases come and cases go, as you know, but we've got to

25 take them one at a time, and I want to try to handle them, as

-35-

1  best I can, in a professional way, and I want the lawyers to do

2  it the same way.

3              So I'd like to get this thing resolved on the

4  discovery issue, get the issues properly framed, and if we're

5  going to have a trial, let's have it.  And if we're not, if

6  there's going to be motions or if it's going to go away some

7  other way, let's do that.  So I appreciate your willingness to

8  try to work with me on that, and ask you to try to cooperate

9  with each other to see if we can move it along and get the thing

10 resolved as quickly as possible.

11             Anything else from the plaintiff at this time?

12             MR. PATTON:  No, Judge.  Patty, are you at home or at

13 the office?

14             MS. PEDEN:  I'm at the office.

15             THE COURT:  All right, thank you.  And anything

16 further from the defendants?

17             MR. BABCOCK:  No, Your Honor.  Thank you.

18             THE COURT:  All right, thank you.

19 (WHEREIN THE TELEPHONE CONFERENCE WAS CONCLUDED.)

20

21

22

23

24

25

## <u>COURT REPORTER'S CERTIFICATE</u>

I, THERESA SAWYER, do hereby certify that the foregoing is a true and correct transcript from the record of proceedings in the above-entitled matter.

_/s/  *Theresa Sawyer* _____
THERESA SAWYER
CERTIFIED COURT REPORTER, #235
TRANSCRIBER

_____June 19, 2009_____
(Date)