# Exhibit 2

Dockets.Justia.com

1

```
 1         IN THE UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF ARKANSAS
 2             TEXARKANA DIVISION

 3   JOHN WARD, JR.,       *
                           *
 4   V.              * C.A. NO. 08-4022
                     * JURY TRIAL DEMANDED
 5   CISCO SYSTEMS, INC.   *

 6

 7

 8

 9   --------------------------------

10      ORAL AND VIDEOTAPED DEPOSITION OF

11          THOMAS JOHN WARD, JR.

12             AUGUST 10, 2009

13   --------------------------------

14

15

16      ORAL AND VIDEOTAPED DEPOSITION of THOMAS JOHN WARD,

17   JR., produced as a witness at the instance of the

18   Defendant, and duly sworn, was taken in the above-styled

19   and -numbered cause on the 10th day of August, 2009,

20   from 4:44 a.m. to 1:21 p.m., before Stacy L. Jordan, CSR

21   in and for the State of Texas, reported by machine

22   shorthand, taken in the law offices of John Ward, Jr.,

23   111 West Tyler Street, City of Longview, County of

24   Gregg, State of Texas, pursuant to the Federal Rules of

25   Civil Procedure.
```

3

```
 1                 I N D E X
 2   Appearances ......................... 2
 3   THOMAS JOHN WARD, JR.
 4      Examination by Mr. Babcock ............... 6
 5   Changes and Signature .................. 142-143
     Reporter's Certificate ................. 144
 6

 7

 8             VIDEOTAPES

 9   BEGINNING OF TAPE 1 .................... 5
     BEGINNING OF TAPE 2 .................... 105
10

11

12             E X H I B I T S

13   NO.  DESCRIPTION              MARKED

14   Exhibit 2  Deposition Notice          5

15   Exhibit 3  10/17/07 and 10/18/07 Patent Troll    34
                Tracker Articles
16              (Bates Ward 000003 to 06)

17   Exhibit 4  11/5/07 Olivo e-mail string to Ward   52
                (Bates Ward 000011 to 12)
18   Exhibit 5  12/4/07 Pridham e-mail to Ward        52
                (Bates Ward 000200)
19
     Exhibit 6  2/29/08 Niro e-mail string to Ward,   52
20              with attachment
                (Bates Ward 000077 to 78)
21
     Exhibit 7  3/8/08 Crouch e-mail to Ward          52
22              (Bates Ward 000080)
23   Exhibit 8  3/12/08 Fokas e-mail to Ward, et al.  52
                (Bates Ward 000369)
24
     Exhibit 9  3/12/08 Fokas e-mail string to Ward   52
25              (Bates Ward 000370 to 371)
```

2

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4      Patricia L. Peden, Esq.
        LAW OFFICES OF PATRICIA L. PEDEN
 5      5901 Christie Avenue, Suite 201
        Emeryville, California  94608
 6      Phone: 510.268.8033  Fax: 510.547.2446
        E-mail: ppeden@pedenlawfirm.com
 7
        Nicholas H. Patton, Esq.
 8      PATTON, TIDWELL & SCHROEDER, LLP
        4605 Texas Boulevard
 9      Texarkana, Texas  75503
        Phone: 903.792.7080  Fax: 903.792.8233
10      E-mail: nickpatton@texarkanalaw.com
11
12   FOR THE DEFENDANT:
13      Charles L. Babcock, Esq.
        Crystal J. Parker, Esq.
14      JACKSON WALKER, LLP
        1401 McKinney Street, Suite 1900
15      Houston, Texas  77010
        Phone: 713.752.4200  Fax: 713.752.4221
16      E-mail: cbabcock@jw.com
        E-mail: cparker@jw.com
17
18
     ALSO PRESENT:
19      Thad Strobach, Videographer
20
21
22
23
24
25
```

4

```
 1          E X H I B I T S (Continued)
 2   NO.  DESCRIPTION              MARKED
 3   Exhibit 10  3/14/08 Smith e-mail to Ward and     52
                 Albritton, with attachments
 4               (Bates Ward 000088, Ward 000247 to 255)
 5   Exhibit 11  Law.com article:  Patent Attorneys Sue 52
                 Cisco and Blogging In-House Lawyer for
 6               Defamation
                 (Bates Ward 000228 to 232)
 7
 8   Exhibit 12  3/17/08 Ward e-mail string to Fenner  52
                 (Bates 000346)
 9   Exhibit 13  3/17/08 Gilstrap e-mail to Ward,      52
                 with attachment
10               (Bates Ward 000092 to 96)
11   Exhibit 14  3/28/08 Ward e-mail string to Fokas,  52
                 with attachment
12               (Bates Ward 000348 to 352)
13   Exhibit 15  4/7/08 McAndrews letter to Chandler   52
                 (Bates Ward 000359 to 368)
14
     Exhibit 16  4/18/08 Strachan e-mail to Ward,      52
15               with attachment
                 (Bates Ward 000098 and Ward 000256)
16
     Exhibit 17  10/17/07 and 10/18/07 Patent Troll    52
17               Tracker Articles
                 (Bates Ward 000009 to 10)
18
     Exhibit 18  11/7/07 Patent Troll Tracker Article  52
19               (Bates Ward 000015 to 29)
20   Exhibit 19  Web site Printouts                    52
                 (no Bates)
21
22
23
24
25
```

5

1   PROCEEDINGS
2   (Exhibit 2 marked.)
3   (Videotape 1.)
4   THE VIDEOGRAPHER: Here begins the
5   videotaped deposition of John Ward, Jr., Tape 1, Volume
6   1, in the matter of John Ward, Jr. versus Cisco Systems,
7   Inc., in the U.S. District Court, Western District of
8   Arkansas, Texarkana Division, Case Number 08-4022.
9   Today's date is August the 10th, 2009.
10   The time on the video monitor is 9:44 a.m.
11   The video operator today is Thad Strobach;
12   the court reporter is Stacy Jordan, both of them
13   representing West Reporting.
14   Will counsel please state their agreements
15   and appearances.
16   MR. BABCOCK: Mr. Patton will be in the
17   camera shortly.
18   MS. PEDEN: Yeah.
19   Come -- come across.
20   Patricia Peden, representing plaintiff.
21   MR. PATTON: Nick Patton, representing
22   the plaintiff.
23   MR. BABCOCK: Charles Babcock and Crystal
24   Parker, representing the defendant.
25   THOMAS JOHN WARD, JR.,

6

1   having been first duly sworn, testified as follows:
2   EXAMINATION
3   BY MR. BABCOCK:
4   Q.   Will you state your name, sir.
5   A.   Thomas John Ward, Jr.
6   Q.   Mr. Ward, right in front of you is -- is the
7   deposition notice for your wife, which I forgot to
8   introduce.
9   A.   Okay.
10   Q.   But here's Exhibit 2.   That's your notice.
11   A.   Okay.
12   Q.   The only reason I do this is so I can keep
13   track of depositions by numbers.
14   Would you tell us how you're employed?
15   A.   I'm an attorney working for Ward & Smith law
16   firm, which is an assumed name.
17   Q.   Okay.
18   A.   T. John Ward, Jr., P.C. is the business entity
19   that I'm employed by.
20   Q.   And T. John Ward, P.C. is the owner of the
21   Ward & Smith law business; is that right?
22   A.   Jr.   Yes.
23   Q.   T. Ward [sic] Jr., P.C.
24   I take it there is a Smith?
25   A.   There is.

7

1   Q.   Okay.   And what's his relationship, if any, to
2   the T. Ward [sic], Jr., P.C.?
3   A.   He is a shareholder in my professional
4   corporation.
5   Q.   Are there any shareholders besides yourself
6   and Mr. Smith?
7   A.   Yes, one more, Thomas Reardon.   That happened
8   about two months ago.
9   Q.   Okay.   And the current percentage ownership is
10   what?
11   A.   There's 2,000 shares, and Mr. Smith and
12   Mr. Reardon each have one share.   So whatever that
13   percentage is.
14   Q.   Okay.
15   A.   A benevolent dictatorship.
16   Q.   So you own 1,998 of the 2,000 shares of
17   T. John Ward, Jr., P.C.?
18   A.   I do.
19   Q.   All right.   T. John Ward, Jr., P.C. is not a
20   plaintiff in this case, correct?
21   A.   Correct.
22   Q.   Is -- are you claiming damages to T. John
23   Ward, Jr., P.C. indirectly in this case?
24   A.   No.
25   Q.   Have you practiced law since 2007 -- since

8

1   October 2007 in any -- with any entity or in any way
2   other than through the T. John Ward, Jr., P.C.?
3   A.   No.
4   Q.   Okay.   How are you compensated by the -- by
5   the law practice?
6   A.   I take a paycheck when there's money to be
7   taken.
8   Q.   Since October of 2007, have your paychecks
9   decreased?
10   A.   No.   I made more in 2008 than I did in 2007.
11   Q.   Okay.
12   A.   Probably less in 2009 than I made in 2007.
13   Q.   Although, there's still hope for 2009.
14   A.   We've still got some -- we've still got some
15   time left.
16   Q.   It -- it looks, to me, from looking at the
17   new-case filings in the Eastern District of Texas, that
18   you are a very active litigant there.   Is that fair to
19   say?
20   A.   I --
21   MS. PEDEN: Objection to form.
22   A.   I'm not an active litigant.   I --
23   Q.   (BY MR. BABCOCK) I mean --
24   A.   I represent --
25   Q.   -- represent people.   Yeah.

9

1     A.  I represent a number of individuals and
2   entities.
3     Q.  I should say you have an active practice.
4     A.  I have an active practice, yes.  I'd agree
5   with that characterization.
6     Q.  And has -- do you think your practice has
7   suffered since October 17th and 18th of 2007?
8     A.  Now, what do you mean when you say "suffered"?
9     Q.  Well, are you sitting in -- sitting in your
10  office, twiddling your thumbs, waiting for the next case
11  to come in?
12    A.  No.  I've stayed very busy.
13    Q.  Yeah.  And I'm just guessing, based on my own
14  practice, that you probably work more than 2,000
15  billable hours a year?
16    A.  I have a feeling that I do.  I think I work
17  pretty hard.
18    Q.  Yeah.  And one of my client -- one of my
19  partners, Richard Griffin, says:  Great lawyers are made
20  by great clients.  Do you agree with that?
21    A.  And hard work, yeah.
22    Q.  Hard work and great --
23    A.  And some luck.
24    Q.  And luck.
25         I've heard it said about you that you're a

10

1   great lawyer.  Do you agree with that?
2     A.  You know, I'm not going to toot my own horn.
3   I'll let other people make that determination.
4     Q.  Okay.  Let me see if I can see a description
5   that I saw.  We'll get to it in a minute.
6         How about giving me your educational
7   background?
8     A.  Where do you want me to start?  High school?
9     Q.  You can start --
10    A.  College?
11    Q.  You can start with high school, sure.
12    A.  I graduated from Longview High School in 1988.
13  I went to the University of Oklahoma and graduated from
14  there in 1992 with a bachelor of arts in economics.
15    Q.  Phi Beta Kappa, I might add.
16    A.  Yes, sir.  And went directly to law school at
17  Texas Tech University School of Law.  Graduated from
18  there in 1995.
19    Q.  Okay.  And after law school, you clerked for
20  Judge Parker in the Fifth Circuit, I think?
21    A.  I did.
22    Q.  And then you went to work for McKool & Smith,
23  correct?
24    A.  Correct.
25    Q.  And what did you do for McKool & Smith?

11

1     A.  I looked at documents all day, most of the
2   time.  That's what ran me out of there in nine months.
3     Q.  Okay.  McKool & Smith is, as I understand it,
4   a Dallas-based litigation firm, correct?
5     A.  Correct.
6     Q.  Commercial litigation?
7     A.  Primarily, yes.
8     Q.  Okay.  And then -- and then after nine months
9   with McKool & Smith, you came out to Longview and set --
10  set up your practice?
11    A.  No.  I -- I moved to Longview, but I worked in
12  Marshall for Mike Miller.
13    Q.  All right.  And how long did you work for
14  Mr. Miller?
15    A.  Two years.  Right about two years.
16    Q.  Okay.  And were you an employee or a partner,
17  or what was your --
18    A.  I was an employee.
19    Q.  Okay.  And after that two-year period with
20  Mr. Miller, what did you do?
21    A.  I became a partner in Holmes, Albritton &
22  Ward.  I moved my practice back to Longview.
23    Q.  Okay.  And the "Holmes" is which Holmes?
24    A.  Clifton, better known as Scrappy.
25    Q.  Scrappy.  Okay.  Not Jam- -- Jamie, who is --

12

1     A.  Not Jamie Holmes, no.
2     Q.  Okay.  And the "Albritton" was Eric Albritton,
3   correct?
4     A.  Correct.
5     Q.  Okay.  And how long did that partnership last?
6     A.  A little less than two years.
7     Q.  Why did it -- why did it dissolve?
8     A.  Oh, we were going different directions.  I had
9   gone to work with Scrappy and Eric because Scrappy had
10  said he had a lot of personal injury business.  And I
11  think he had some, but it was -- I was probably carrying
12  as much of my own business as I was getting from
13  Scrappy.  Their practice was really criminal.  And what
14  sounded like a good idea probably wasn't the best
15  business move.  And so we split up.  Eric went out on
16  his own, and I went in with Glenn Perry and Tim Womack.
17    Q.  Okay.  And how long did the Womack, Perry &
18  Ward practice last?
19    A.  Until the tort deform [sic] hit and I went out
20  on my own.  So a couple of years.
21    Q.  Okay.
22    A.  But it was an amicable split.
23    Q.  Okay.  And then your current practice started
24  what year?
25    A.  I'm not positive, but I'm thinking it was

13

1    2002.

2        Q.   Has your practice changed since 2002?  Is it

3    still the same mix of cases, or is it different?

4        A.   It's changed a lot since 2002.

5        Q.   What was it in 2002?

6        A.   Personal injury.

7        Q.   Okay.

8        A.   90 -- 95 percent of my -- my practice was.

9        Q.   And what -- how did -- what did it morph into?

10       A.   Well, we still have -- Bruce Smith and Tom

11   Reardon still maintain that personal injury docket.  But

12   my personal docket has really transformed into probably

13   90 percent patent litigation.

14       Q.   Okay.

15       A.   It started as a small percentage and grew and

16   grew and grew until that's all I've got time for.

17       Q.   All right.  And when did it -- when did it

18   change from personal injury to 90 percent patent

19   litigation for you, personally?

20       A.   It's taken place over the years.  So it's over

21   five or six years.  Each year, the intellectual

22   property/patent litigation for me grew.

23       Q.   All right, sir.

24       A.   Became a larger and larger portion of my

25   personal practice.

14

1        Q.   Okay.  In -- in 2007, what percentage of your

2    work was patent litigation?  I know roughly.  I mean,

3    you can't do it precisely.

4        A.   No.  I'm guessing it was probably 70,

5    75 percent.

6        Q.   Okay.  And 2008?

7        A.   It -- it's hard to break it down in percentage

8    because I still have my hand in the personal injury

9    business.  I still --

10       Q.   Sure.

11       A.   -- get those clients and go to mediations.

12   And if we go to trial, I go to trial.  So, you know,

13   I've still got a per-- I don't know if we're talking

14   about a percentage of income or a percentage of my time

15   that I spend on cases.

16       Q.   Sure.

17       A.   So I don't know how you want to break that

18   out.

19       Q.   Well, it's -- it's good enough.  I mean, it's

20   hard to -- I mean, I'd be hard-pressed if anybody asked

21   me the question.

22            But in 2007 to -- to today, it's -- it's

23   grown from 70 or 75 percent to 90 percent?

24       A.   As far as the day-in, day-out time that I

25   devote to practice, yes.

15

1        Q.   Okay.  And what about the revenue derived from

2    patent litigation; is that the -- is that the same

3    percentage, or is it more or less?

4        A.   I haven't looked at that.  I'd be guessing.

5    I -- I would guess it's -- well, I know it's more.  I've

6    generated more revenue from intellectual property than I

7    have from personal injury.

8        Q.   Okay.

9        A.   How much more, I'd have to go pull the books.

10       Q.   Okay.  Here's the -- here's the comment that I

11   was -- had been searching for earlier.  Quote.  Many

12   lawyers talk about their ability to try cases, but few

13   can match the results obtained by Johnny Ward.  He has

14   "first chair" (the attorney with ultimate responsibility

15   at trial) trial experience in over 30 jury -- jury

16   trials, covering a variety of challenging cases.

17            Is that an accurate description of you?

18       A.   I told you I wasn't going to toot my own horn,

19   but I was tooting my own horn there.  Yes, I had kind

20   words to say about myself.

21       Q.   Yeah, this is from your -- from your Web site.

22       A.   Correct.

23       Q.   It goes on to say, quote:  Not only has he

24   tried a wide variety of cases, he has done so with

25   success.  He obtained his first verdict in excess of a

16

1    million dollars at the age of 34.

2            True?

3        A.   True.

4        Q.   Mr. Ward turned down a settlement offer, took

5    the case to trial, and the jury awarded his client

6    $1,010,000.

7            Also true?

8        A.   Absolutely.

9        Q.   Okay.

10           In the years that followed, Mr. Ward

11   obtained several multimillion-dollar verdicts, including

12   a $133 million verdict in a patent infringement case

13   against Microsoft.

14           Also true?

15       A.   True.

16       Q.   Okay.

17       A.   I had some help doing it, but yes.

18       Q.   Okay.  It also talks about a case where you

19   were appointed as a special prosecutor in Cass County

20   and that maybe the criminal trial is going to go forward

21   like right about now?

22       A.   It keeps getting bumped, but we're trying to

23   get it done in the fall of this year.

24       Q.   Okay.  And in that case -- on the civil side

25   of that case, you recovered a verdict in excess of 13

17

```
1    million for the family?
2        A.  I did.  Probably my favorite case, most
3    rewarding case I've ever --
4        Q.  And the reason for that is because the
5    district attorney had refused to prosecute somebody that
6    you believed was responsible for the death of a family
7    member that you were representing?
8        A.  The family initially believed, and they
9    convinced me, that that's what had had happened to them.
10   The deeper I dug, the more convinced I was.
11       Q.  And you convinced a civil jury of that, I take
12   it?
13       A.  The facts did.  The facts --
14       Q.  The facts did.
15       A.  -- speak pretty loud.
16       Q.  And -- and are you aware of any other time a
17   special prosecutor has been appointed like that?
18       A.  I -- I -- it's not common, but I know it has
19   happened.
20       Q.  Okay.
21       A.  I know a private lawyer has been appointed as
22   special prosecutor.
23       Q.  Okay.  So the criminal trial is going to go
24   forward sometime in -- in the near future, I take it?
25       A.  He's not going to confess, so I think we're
```

18

```
1    going to have a trial.
2        Q.  Okay.  Great.
3            Your -- you just sat through the
4    deposition of your wife, correct?
5        A.  I did.
6        Q.  And she said that -- that after these Troll
7    Tracker articles that are at issue in this case, she
8    believed that your sleepless -- sleep problem -- or
9    inability to sleep through the night increased from one
10   to two times a week to three to four times a week.  Is
11   that true?
12       A.  I had more sleepless nights, I believe, after
13   this --
14       Q.  Okay.
15       A.  -- these articles were published, yes.
16       Q.  Okay.  And do you relate your sleep problems
17   to the articles?
18       A.  The increase in sleepless nights initially ,
19   yes.
20       Q.  Okay  And -- and is that because you'd be
21   lying in bed asleep and then you'd wake up thinking
22   about the Patent Troll Tracker?
23       A.  During the four months that we were trying to
24   find out who the Patent Troll Tracker was, yes, because
25   I knew these articles were out there; I knew people were
```

19

```
1    reading them, and so yes, it was something that had me
2    very agitated --
3        Q.  Okay.
4        A.  -- angry, frustrated, upset about.
5        Q.  Okay.  And focusing on the -- on the
6    sleeplessness, your wife estimated that it was three to
7    four times a week that you would wake up, and she
8    attributed it to the Patent Troll Tracker.
9            My question to you, since you're the only
10   one that would know:  Was it three to four times a week
11   that you were waken up for that four-month period?
12       A.  It's hard to pinpoint.  I think it's gotten
13   better over time.  I think she's a better judge, because
14   I -- I have a bad habit of waking her up when I'm having
15   trouble sleeping.  I can't disagree that it was three or
16   four nights because I don't -- I don't have a good feel
17   for it.
18       Q.  And in that -- you say "it's gotten better."
19   When did it get better?
20       A.  Well, she forgot that I take Tylenol PM every
21   night, and I didn't take that before.  It's gotten
22   better since I take Tylenol PM.  I've got a friend who's
23   an ER doctor, and I said:  I'm not sleeping.
24           And I didn't attribute it to -- it to
25   anything but I'm having trouble sleeping.
```

20

```
1            He said:  Try taking Tylenol PM before you
2    get to something harder.
3        Q.  What's the name of the doctor?
4        A.  Brian Mendenhall, a good friend of mine, ER
5    doctor.
6        Q.  And when did you talk to Dr. -- Mendenhall,
7    did you say?
8        A.  Mendenhall.  I know it was when we lived at
9    101 Fountain Valley Court.  I want to say it was over a
10   year ago.
11       Q.  Have you been taking Tylenol PM for a year
12   every night?
13       A.  Yeah, one.
14       Q.  One -- one tablet?
15       A.  One tablet.
16       Q.  Okay.  And now are you sleeping through the
17   night every night?
18       A.  I didn't last night, but pretty much, yeah.
19   I've had --
20       Q.  You were worried about me, right?
21       A.  Well, I was worried about my wife, what -- how
22   my wife was going to --
23       Q.  She seemed --
24       A.  -- hold up.
25       Q.  She seemed okay.
```

Ward, John  8/10/2009  1:21:00 PM

21

1    A.  She did great.

2    Q.  Okay.  So excluding last night, have you been

3  sleeping through the night every night?

4    A.  You know, if -- if I've got something going to

5  trial, I'll have some sleepless nights.  That's just

6  part of the business, I think.

7    Q.  I was going to say if -- if you sleep before a

8  big trial, you're -- you're unusual.

9    A.  No.

10    Q.  But -- but other than -- you know, other than

11  the normal, you know, wear and tear of practice, have

12  you been sleeping through the night --

13    A.  Yeah.

14    Q.  -- since you've been taking Tylenol PM?

15    A.  Yes.

16    Q.  Okay.  Now --

17    A.  I say that.  I mean, there'll be times when,

18  you know, I'm answering this discovery and it gets me

19  worked up again.  I try not to read these articles.

20  When I get back into them, it gets me worked up.

21    Q.  Sure.

22    A.  It gets me worked up right now thinking about

23  them.

24    Q.  Okay.  And that's as a result of your

25  litigation against Cisco; that's why you're re- --

22

1  rereading them?

2    A.  No.  It's a result of what they accused me of,

3  I think.

4    Q.  Well -- but you don't have a ritual where you

5  sit down every couple of weeks and read these articles,

6  do you?

7    A.  Oh, no.  I put them -- I try to put them out

8  of my mind.

9    Q.  Okay.  And the only reason that you have to

10  answer discovery is because of this lawsuit, right?

11    A.  That's right.

12    Q.  Okay.  But prior to your taking the Tylenol

13  PM -- which you said, I think, was maybe a year ago?

14    A.  I think so.

15    Q.  Okay.  Prior to that, was the only thing

16  causing your sleepless nights the Troll Tracker

17  articles?

18    A.  No.

19    Q.  Okay.  What -- what else?

20    A.  Stresses of practice, stresses of life.

21    Q.  What -- what stressful events in your life do

22  you have other than the stress of your practice?

23    A.  I've got kids.  I've got three kids.  I worry

24  about my kids.  I worry about my family.  The people at

25  church, they have tough things going on in their lives

23

1  that helps keep things in perspective, but you worry

2  about your friends and family.  I think normal stresses

3  that people deal with.  Maybe I internalize them more.

4  Maybe I should let them out.  I don't know.

5    Q.  Would you agree with your wife that your kids

6  are doing fine?

7    A.  They're doing great.

8    Q.  Okay.  So it's nothing about your children

9  that are causing stress in your life?

10    A.  No.

11    Q.  Okay.  I know for some people children can be

12  a huge --

13    A.  They're --

14    Q.  -- stress problem.

15    A.  They're not to that age yet.  They still want

16  to hang out with Mom and Dad and generally want to do

17  right.

18    Q.  I don't know.  When they -- mine were five and

19  six, they were some of the most stressful times, but

20  they evened out.  Okay.

21    A.  They're -- they're what I enjoy going home to

22  every night.

23    Q.  Okay.  Can you recall, when you're waking up

24  at night, any specific instances where you wake up and

25  think about something about the Patent Troll Tracker?

24

1    A.  Initially, absolutely.

2    Q.  Yeah.  Okay.  Tell me about initially.

3    A.  I just would wake up wondering who's doing

4  this to me.

5    Q.  And, in fact, you filed a lawsuit to try to

6  find out who was the author of the Patent Troll Tracker,

7  right?

8    A.  As fast as I could, I did, yes.

9    Q.  You filed it quickly, but nothing much

10  happened in that case for a while, did it?

11    A.  The wheels of justice turn slowly.  We were

12  doing everything we could to get a deposition of Google.

13  I don't think I'd ever filed a -- or been involved in a

14  filing of a 202 petition.

15    Q.  Right.

16    A.  But it sure seemed like it crawled.  Although

17  I understand that -- from Google, he was made aware of

18  it real quickly.

19    Q.  Who at Google told you that?

20    A.  I think we got a letter or -- I don't know

21  how -- how we found out that Google had sent some type

22  of notification to the account holder that there had

23  been a request for information on the -- the identity of

24  the account holder and that they would reveal that

25  information to us within 10 days without an objection --

25

```
 1      Q.  Okay.
 2      A.  -- from the account holder.  And we never got
 3  any information.  So I assume that Mr. Frenkel objected.
 4  But, again, that's all speculation.
 5      Q.  Uh-huh.  And you're aware that Mr. Niro had
 6  offered some money to -- for anybody who would unmask
 7  the Troll Tracker?
 8      A.  We talked about it several times, yes.
 9      Q.  Did you offer to help contribute to -- to that
10  fund?
11      A.  No.
12      Q.  Okay.  What did you -- what did you say to
13  Mr. Niro about trying to unmask the Troll Tracker?
14      A.  We had been involved in some cases together,
15  so I knew Mr. Niro before this event.  And I just said:
16  If you find out who it is, let me know; and if I find
17  out who it is, I'll let you know.
18      Q.  Did you know why Mr. Niro was trying to find
19  out about who he was?
20      A.  My recollection is that they were posting
21  information about his family and where he lived, and he
22  had gotten some kind of threats or something.  I mean,
23  there was pretty serious -- what he viewed, and I
24  agreed -- was potential harm to him, that he wanted to
25  get to the bottom of it.
```

26

```
 1      Q.  It -- it had nothing to do with the type of
 2  practice that he was engaged in?
 3      A.  They didn't accuse him of a crime or anything,
 4  that I know of.
 5      Q.  Okay.  So Mr. Niro never told you that it
 6  was -- he was trying to get the identity of the Troll
 7  Tracker because of -- he was critical of Niro's practice
 8  or the type of clients that he had?
 9      A.  Well, he was going after Mr. Niro's clients,
10  like he was going after mine.  That's why we were all --
11  I say "we."  That's why I was reading it, because it was
12  interesting to see what he was going to write about
13  which client next.  I don't -- you'd have to talk to
14  Mr. Niro about what his motivation was.
15      Q.  Okay.  Your wife testified about a dinner that
16  you had with Mr. Niro in Chicago.  Do you recall
17  anything else about that dinner?
18      A.  He -- he gave me a gift, a -- a cartoon of
19  Niro hopping out of the bush with Frenkel reading a
20  Cisco book.  I'm sure you've seen it.
21      Q.  I have.
22      A.  He framed it, and I think he wrote on it "we
23  got him," which, you know --
24      Q.  Do you still have that?
25      A.  I do.  It's in a -- it's in a moving box,
```

27

```
 1  packed, but I've got it.  I'll keep it.
 2      Q.  Anything else that you recall from that dinner
 3  with Mr. Niro?
 4      A.  I think we were just -- unbelievable that
 5  Cisco was behind this.  I mean, I remember having
 6  that -- that's usually everyone's reaction:
 7  Unbelievable that a company like Cisco would do this.
 8      Q.  And what is the "this"?  The fact that the
 9  patent -- the -- the Troll Tracker blog?
10      A.  The fact that they would accuse a lawyer of
11  engaging in criminal activity and do it anonymously in a
12  case where they were my -- the opposing party, and
13  the -- the person writing it was involved in the
14  negotiations, was an attorney, and that it goes all the
15  way to the top of their legal department, in my opinion,
16  if not further.
17      Q.  The -- there were two, maybe three, articles
18  that are at issue in the lawsuit:  the 17th, 18th, and
19  then the revised 18th on the one next day.  Is that your
20  understanding of what --
21      A.  I --
22      Q.  -- is at issue here?
23      A.  Oh, I think there's more at issue, but those
24  are the ones that I think accuse me of a crime.  And
25  then I think there were some subsequent ones where he
```

28

```
 1  could have corrected things and he chose not to.
 2      Q.  Okay.  But in terms of what you're suing for
 3  defamation, it's the October 17th, 18th, and whatever
 4  was revised the next day?  I mean, that's what your
 5  pleadings say, but --
 6      A.  Right, that's what the pleadings say.  I'd
 7  just say, when you say it's "at issue," there are some
 8  subsequent statements that have been made that, I think,
 9  will be at issue if we try the case.
10      Q.  That's --
11      A.  As far as the -- the allegations that I
12  engaged in criminal activity, it's the 17th and 18th.
13      Q.  Right.  Yeah, I just -- when you defend a
14  defamation case, you want to know what the -- what the
15  language is that's being claimed to be defamatory.  And
16  it's the 17th -- the articles on the 17th and the 18th
17  that's what you're claiming are -- is defamatory of you,
18  correct?
19          MS. PEDEN:  Objection, form.
20      A.  I've never defended a defamation case.  You're
21  the expert there.  And I've never been a plaintiff; I've
22  never represented a plaintiff in a defamation case, so I
23  don't know.  I know there's a lot of documents
24  that -- that we've produced that, I think, has some
25  things that are offensive.  Now, whether or not they
```

29

1  rise to the level of defamation, I'm going to let you --
2      Q.  (BY MR. BABCOCK)  I'm not -- not trying to
3  make you make a legal conclusion.
4      A.  Okay.
5      Q.  But -- but if we -- if we lined the -- the
6  documents up in front of us and -- and listed what
7  you -- what you want to go to the jury on for what's
8  caused you damage, we would put the October 17th article
9  in the -- in the pile, for sure, right?
10     A.  Right.
11     Q.  And the October 18th article in the pile, for
12 sure, right?
13     A.  Absolutely.
14     Q.  Okay.  What else?
15     A.  Now, again, I don't --
16         MS. PEDEN:  Objection, form.
17     A.  I -- the articles that I've personally --
18 other things that have been written, I think, are
19 offensive.  There was a post in November where Frenkel
20 acted like he didn't know why these cases were being
21 dismissed; and he knew all along why they were being
22 dismissed and that Cisco had admitted that jurisdiction
23 was proper --
24     Q.  (BY MR. BABCOCK)  Okay.
25     A.  -- in the Eastern District.  So I -- that

30

1  leaves a false impression with the -- a reader.
2      Q.  So you're claiming defamation, or falselike,
3  as to that November post?
4          MS. PEDEN:  Objection, form.
5      A.  I don't know what I'm claiming.  I'm telling
6  you which documents I think are --
7      Q.  (BY MR. BABCOCK)  Do you think --
8      A.  -- inaccurate.
9      Q.  Okay.  Do you think the November post of
10 Frenkel has caused you harm, damage?
11     A.  I don't know.
12     Q.  Okay.
13     A.  It's -- it's hard for me to know who's --
14 won't come hire me because of what they read.  Those
15 folks won't call me and say:  Hey, we're not hiring you
16 because we think you're a criminal.
17     Q.  Well, I can -- I can appreciate whether you
18 don't know if you're caus- -- if it's caused you damage
19 or not.  Are you going to claim that it caused you
20 damage?  Are you claiming that the November post caused
21 you damage?
22     A.  I'm going to leave that up to my lawyers.
23 I -- I don't know.
24     Q.  Well --
25     A.  I think it -- it factors in the entire picture.

31

1  of this false impression that Mr. Frenkel was leaving
2  with his readers.  So is it actionable?  I don't know.
3  It's my personal opinion, I think it was false.
4      Q.  And what about the November post was false?
5      A.  If you've got it, I'll take a look at it.
6  There's -- he wrote several things.
7      Q.  Well, it's not -- it's not -- it's not pled, I
8  don't believe.  Maybe it is, but I've never thought
9  until this moment that the November -- the November
10 post, whatever it is, is part of this lawsuit.  So --
11     A.  Okay.
12     Q.  -- you're going to have to give me some more
13 specificity about what it is.
14     A.  Without reading it, I can't tell you
15 precisely; but essentially, Mr. Frenkel wrote that he
16 was checking the docket and ESN had dismissed its case
17 and Cisco had dismissed its case in Connecticut and that
18 somehow the ESN case had been filed again in Texarkana.
19 That's all he knew about it, was the way he wrote, which
20 is a lie.  He knew exactly what was going on, and he
21 didn't write about exactly what was going on.
22     Q.  Okay.  And you think that that -- that that
23 caused you damage?
24     A.  Did it cause me damage?  No.  Did it upset me?
25 Yes, because I knew that those weren't the facts.  Of

32

1  course, I didn't know it was Cisco at the time.  I was,
2  like:  Wait, there's a lot more going on here.  If these
3  people knew, they'd know what he'd written on the 17th
4  and the 18th, or whatever those two days were -- they'd
5  know that, you know, this happened -- that Cisco had
6  admitted that there was no problem, in my mind.
7      Q.  Okay.  All right.  So you got the October 17th
8  article, the October 18th article, this November post
9  that you just talked about.  Anything else in the stack
10 that we should talk about has caused you damage?
11         MS. PEDEN:  Objection to form.
12     A.  Again, I think you've -- you've had some
13 comments in the press that I think are inaccurate --
14     Q.  (BY MR. BABCOCK)  Okay.
15     A.  -- or that have been attributed to you.
16         MS. PEDEN:  I -- I just need to clarify
17 something, Chip.  When you say "the October 18th
18 article," are you talking about both versions of --
19         MR. BABCOCK:  I'm not talking about
20 anything; I'm just asking questions.
21     Q.  (BY MR. BABCOCK)  Yeah, there was one -- one
22 thing that, I think, snuck into the pleadings that was
23 attributed to me about -- something about your motives.
24     A.  Yeah, that I was trying to curry favor with
25 the Court -- that this was a baseless lawsuit, and the

33

1　only thing you could think of was that I was trying to
2　curry favor with the Court. You tell me: Did they --
3　did you say that?
4　　　Q. No, not the way it was reported. But is
5　that -- is that one of the things that you're seeking
6　damages for?
7　　　A. I -- I don't know that I'm seeking damages for
8　it. I think it continues this perception that there's
9　some truth behind the allegations that were made against
10　me --
11　　　Q. Okay.
12　　　A. -- that my lawsuit's baseless and that I've
13　got some other motive.
14　　　Q. Okay.
15　　　A. There's another one, too. I think you've
16　written in some of these pleadings that I -- this case
17　is just an attempt to get documents for ESN, which --
18　untrue. But --
19　　　Q. Okay.
20　　　A. -- you can say that in the lawsuit; I
21　understand that.
22　　　Q. You -- you've said things in lawsuits about --
23　about your litigation opponents, I assume, from time to
24　time?
25　　　A. I try to support them with facts, but --

34

1　　　Q. You would agree that sometimes your litigation
2　opponents don't agree with -- with what you say about
3　them?
4　　　A. I'm sure they don't.
5　　　Q. But I'm trying to get to the bottom of what --
6　what you're -- you're suing over. The 17th and the
7　18th. And Ms. Peden reminds everybody that you've
8　amended to allege another article that's the same as the
9　18th, although revised, that was posted the following
10　day. And you've got the November post. Is there
11　anything else?
12　　　A. That's all I can think of, you know --
13　　　Q. Okay.
14　　　A. -- as we -- as we sit here. There's a lot
15　more documents and things that have been written. But
16　as far as --
17　　　Q. I understand.
18　　　A. -- what stands out to me, those things stand
19　out to me. Those things --
20　　　Q. Okay.
21　　　A. -- irritate me.
22　　　　　(Exhibit 3 marked.)
23　　　Q. (BY MR. BABCOCK) Here's Exhibit 3.
24　　　A. Okay.
25　　　Q. And this is a document that was produced to us

35

1　by your lawyers. And I want to ask you first about the
2　bottom notation. It says
3　http://trolltracker.blogspot.com/2007, archive, paren,
4　15 of 47, paren, 11/5/2007, 2:28:33 p.m.
5　　　　　Do you see what I -- where I was reading
6　from?
7　　　A. I see that.
8　　　Q. Does that represent when you accessed the
9　Patent Troll Tracker to get -- to get the document, this
10　document?
11　　　A. Maybe. I'm not -- I'm not sure. I remember I
12　started, you know, capturing them, Adobe, PDFs, I think,
13　at -- at some point. I was -- I remember reading it as
14　they were coming out because I was getting phone calls
15　from folks saying: Have you seen what he's written
16　about you?
17　　　Q. Okay. And the -- the first page here is the
18　October 18th one, I believe. And then the one behind it
19　is the October 17th. Would that be right?
20　　　A. That's what it -- it purports to be. I don't
21　know if these are the ones that are revised or
22　unrevised. I'd -- I'd have to lay them right next to
23　each other --
24　　　Q. Yeah, I lose --
25　　　A. -- to figure out.

36

1　　　Q. -- track of it, too. You can usually tell by
2　whether the "banana republic" thing is in there.
3　　　A. Yeah, I think this is the revised one because
4　he edits: You can't change history, but you can change
5　a blog --
6　　　Q. Yeah.
7　　　A. -- entry.
8　　　Q. Okay.
9　　　A. So that would indicate that this --
10　　　Q. Okay. So this would be the one that was
11　the -- the 19th, or whatever.
12　　　　　Let me -- let me ask you about the Oct-- --
13　October 17th one.
14　　　A. Okay.
15　　　Q. Do you believe that the October 17th article,
16　or post, accuses you of a crime?
17　　　A. No. I think you have to read them together.
18　　　Q. Okay.
19　　　A. I think you have to read the 17th and 18th
20　together to get there.
21　　　Q. The -- the 17th, in and of itself, doesn't --
22　doesn't accuse you of a crime?
23　　　A. My recollection is no. I've been through
24　these line by line, obviously, in preparation for my
25　deposition. I think there's a lot of things that are

37

1   inaccurate.  But as far as accusing me of a crime, I
2   think you have to put them right next to each other.
3      Q.  Okay.  Let's -- let's go through it and see
4   what's -- what's inaccurate.
5      A.  Okay.
6      Q.  The headline, "Troll Jumps the Gun, Sues Cisco
7   Too Early," what is -- if anything, is inaccurate about
8   the headline?
9      A.  We didn't sue Cisco too early.
10      Q.  Okay.  Anything else?
11      A.  I think -- I don't think ESN meets the
12   definition of what folks think of as a troll, since it's
13   the inventor, as a part of ESN, but --
14      Q.  Okay.
15      A.  I think that's inaccurate, as well.
16      Q.  All right.  The first -- it starts out:  Well,
17   I knew the day would come.  I'm getting my troll news
18   from Dennis Crouch now.  According to Dennis, a company
19   called ESN sued Cisco for patent infringement on
20   October 15th, while the patent did not issue until --
21   until October 16th.
22      Is there anything inaccurate about that?
23      A.  Yeah.  I don't think he was getting his news
24   from Dennis Crouch.  I think he was getting his news
25   from his lawyers.

38

1      Q.  Okay.
2      A.  He might have been getting some from Dennis
3   Crouch, but he was in charge of the litigation, so I
4   think he knew about it.
5      Q.  Okay.
6      MS. PEDEN:  What about the next sentence?
7      MR. BABCOCK:  Yeah, I'm -- I'm going to
8   make sure we cover everything.
9      THE WITNESS:  Okay.
10      MS. PEDEN:  Thank you.
11      Q.  (BY MR. BABCOCK)  And it says:  According to
12   Dennis, a company called ESN sued Cisco for patent
13   infringement on October 15th --
14      A.  That -- that is untrue.  That statement's
15   untrue.
16      Q.  Okay.  And -- and that's because you think
17   that ESN didn't sue until the 16th, correct?
18      A.  I know for a fact we didn't sue until the
19   16th.
20      Q.  Okay.  "While the patent did not issue until
21   October 16th," that part's true?
22      A.  I believe that's true.
23      Q.  Okay.  The next sentence:  I looked, and ESN
24   appears to be a shell entity managed by the president
25   and CEO of DirectAdvice, an online financial Web site.

39

1   Is that inaccurate in any way?
2      A.  I believe so, because I think he already knew
3   who ESN was, because I think ESN had been in contact
4   with Cisco before filing the lawsuit.  So he knew who
5   ESN was without looking anywhere.
6      Q.  Okay.  So it -- he should have dropped the --
7   the "I looked."  He should have just said:  ESN appears
8   to be a shell entity managed by the president and CEO of
9   DirectAdvice, an online financial Web site?
10      A.  He knew.  I mean, it should say:  I'm a lawyer
11   representing Cisco, and --
12      Q.  Okay.
13      A.  -- I know who ESN is.  So --
14      Q.  If he --
15      A.  -- I think that's false.
16      Q.  Okay.  But if he'd said that, if he said,
17   "Hey, I'm Rick Frenkel, and I'm here to tell you that
18   ESN is a shell entity managed by the president and CEO
19   of DirectAdvice, an online financial Web site ," would
20   that be accurate or not?
21      A.  I don't know -- I don't know enough about ESN.
22   I know they're my client, but I -- I don't know exactly
23   who it is.  I've met one of the principals, but I don't
24   know how it's set up.
25      Q.  Okay.  Have you ever heard of DirectAdvice?

40

1      A.  No.
2      Q.  Do you know who the president and CEO of
3   DirectAdvice is?
4      A.  No.
5      Q.  Do you know whether the principal of ESN that
6   you've met is the president and CEO of DirectAdvice?
7      A.  I don't know.
8      Q.  Okay.  Who is the principal of ESN you've met?
9      A.  I knew we were going to ask me that.  He was
10   at the -- the hearing on venue, and I can't -- I can't
11   remember his name, sitting here.  If --
12      Q.  Okay.
13      A.  If it's important, we can leave a blank and I
14   can find it, but I don't remember.
15      Q.  And it goes on to say in the -- in the
16   article:  And, yes, he's a lawyer.
17      And I take it, since you don't know who
18   the president and CEO is, you don't know if that's true
19   or not?
20      A.  I don't.
21      Q.  Okay.
22      He clerked for a federal judge in
23   Connecticut and was an attorney at Day, Berry &
24   Howard -- Howard.  Now he's suing Cisco on behalf of a
25   nonpracticing entity.

---

45

1        MS. PEDEN:  You said "Texas" instead of
2   "Texarkana."  You just --
3        MR. BABCOCK:  I'm sorry.
4        MS. PEDEN:  -- misread it.
5        MR. BABCOCK:  All right.  Let me try
6   again.
7        Q.  (BY MR. BABCOCK)  -- ESN (represented by
8   Chicago firm McAndrews, Held & Malloy and local counsel
9   Eric Albritton and T. Johnny Ward) filed an amended
10  complaint in Texarkana today - amending to change
11  absolutely nothing at all, by the way, except the filing
12  date of the complaint.
13       Did I read it correctly --
14       A.  I think you --
15       Q.  -- that time?
16       A.  I think you read it correctly.  Untrue.
17       Q.  Okay.  What's untrue about it?
18       A.  We didn't file to change the filing date; we
19  filed it to attach the patent.
20       Q.  The patent.  Okay.  Were there any changes
21  other than attaching the patent?
22       A.  There might have been a reference to the
23  patent number in the complaint.  I don't -- I don't
24  know.  I didn't actually file it.  I remember -- that
25  was probably the -- some of my first involvement in this

47

1        Q.  Okay.  Let me ask you just a couple of things
2   about that last paragraph again.  It says, "represented
3   by Chicago firm McAndrews, Held & Malloy."  ESN was
4   represented by them, correct?
5        A.  Correct.
6        Q.  And it says, "local counsel Eric Albritton and
7   T. Johnny Ward."  You-all were the local counsel,
8   correct?
9        A.  Correct.
10       Q.  What does it mean in the con- -- I know -- I
11  know "local counsel" means different things to different
12  people.  But in this case, what did it mean to be local
13  counsel?
14       A.  I can tell you generally what it means to me.
15       Q.  Sure.
16       A.  Because I -- I had not had any interaction
17  with McAndrews, Held & Malloy until after the fact.
18       Q.  Okay.  That -- that was Albritton that was
19  doing that?
20       A.  Correct.
21       Q.  Okay.
22       A.  Generally, "local counsel," we're in -- we
23  make sure that everything complies with the local rules
24  and kind of give advice on what local custom and
25  practice are and -- a little bit different than what I

46

1   case, was after the initial complaint had been filed.
2   So I remember from reviewing the e-mail, that we filed
3   to attach the patent.
4        Q.  Okay.
5        Survey says?  XXXXXXX (insert "Family
6   Feud" sound here).  Sorry, ESN.  You're on your way to
7   New Haven.  I wonder how Johnny Ward will play there?
8        Did I read that correctly?
9        A.  I think you did.
10       Q.  All right.  And is -- is there anything false
11  about that?
12       A.  No, I don't think so --
13       Q.  Do you ever --
14       A.  -- other than we weren't on our way to New
15  Haven.  Cisco wanted us to be on our way to New Haven,
16  but --
17       Q.  Yeah.
18       A.  -- we beat them.
19       Q.  Ever played in New Haven?
20       A.  No.  Never been there.
21       Q.  Ever litigated in -- in Connecticut?
22       A.  Have not.
23       Q.  Okay.  One of your friends said you thought
24  that -- he thought you'd play fine there.
25       A.  I -- I do recall someone saying that.

48

1   think of as general local counsel.  Eric and I try these
2   cases very actively and are actively involved in them:
3   jury selection, opening statements, taking witnesses.
4        Q.  Were you -- had it been decided whether you
5   and Eric were going to be actively involved in trying
6   this ENS -- ESN case at this October 17th point?
7        A.  Again, I don't know what they discussed.  I
8   can tell you what our -- the general practice was.  We
9   don't get involved unless we're going to be active
10  and -- and so I would assume that that was understood
11  going in.
12       Q.  Were -- were you -- was your involvement in
13  this case through Eric or did McAndrews call you up or
14  did somebody from ESN call you up?
15       A.  It was through Eric.  Now, whether they called
16  and said, "We want to hire you guys" -- I don't know
17  exactly how it went down.
18       Q.  Okay.
19       A.  But Eric -- Eric was kind of in charge of ESN
20  at that time.
21       Q.  Okay.  But you had separate bus- -- law firms
22  at that time; you weren't partners then, right?
23       A.  Correct.  Still -- still have separate
24  businesses.
25       Q.  Yeah.  So the first contact that was made to

49

1   you was by Eric Albritton, correct?
2       A.  I believe so.
3       Q.  Okay.  And -- and Mr. Albritton and his staff
4   were responsible for filing the -- the pleadings.  And
5   you didn't have anything to do with that, right?
6       A.  That's correct.
7       Q.  Okay.
8       A.  The -- the original complaint --
9       Q.  The original --
10      A.  -- yes.
11      Q.  -- complaint, which there is some
12  documentation on the 15th, some stuff on the docket
13  sheet on the 15th.
14          MS. PEDEN:  Objection to form.
15      Q.  (BY MR. BABCOCK)  Do you agree that there's a
16  docket sheet that shows something was filed on the 15th?
17          MS. PEDEN:  Objection to form.
18      A.  This -- again, embarrassingly, I -- I haven't
19  gone back and looked through all the docket sheets.  I
20  don't know that I've ever looked at the docket sheet.
21  I've looked at the notice of electronic filing well
22  after the fact to see it was filed --
23      Q.  (BY MR. BABCOCK)  Okay.
24      A.  -- when we say it was.
25      Q.  There's -- certainly, within a short period of

50

1   time, within a few days, Cisco filed a declaratory
2   judgment, as you -- as you indicated.  And -- and then
3   there was some filings in -- in Texarkana in front of
4   Judge Folsom.  Did you have any involvement in that, or
5   were you pretty much on the sidelines?
6           MS. PEDEN:  Objection to form.
7       A.  My involvement was pretty limited.  It was,
8   you know, consulting me about should we burn our
9   amendment, or something to that effect, and I think I
10  said "do it."  I mean, we're -- the rules here are you
11  can amend for just about any reason up to a certain time
12  period.  You don't have to seek leave.  That'll be in
13  the docket control order.  So I think I said:  Attach
14  the patent, and file it.
15      Q.  (BY MR. BABCOCK)  Okay.
16      A.  But beyond that, I -- I -- I was not very
17  hands-on on this case at that time.
18      Q.  Mr. Albritton's assistant -- I'm not sure if
19  she's a paralegal or -- I think she's a paralegal.
20  Anyway, Amy Mathis, do you know her?
21      A.  Yes, I know her.
22      Q.  Did you know her before this case was filed?
23      A.  Absolutely.
24      Q.  Okay.  Before she filed it, did you talk to
25  her at all about it?

51

1       A.  No.
2       Q.  All right.  After -- after it was filed and
3   she had certain conversations with the clerk's office
4   in -- in both Texarkana and Tyler, did you have any
5   conversation with her during that time period?
6       A.  None that I can recall.
7       Q.  All right.  I asked Mr. Albritton a question
8   about whether or not he fully supported what Amy Mathis
9   did in her contacts with the clerk's office, and he said
10  he did.  I asked him if you did, and he said:  You
11  better ask him at his deposition.  So --
12      A.  All right.
13      Q.  So here we are.
14      A.  I -- I had no problem with what she did.
15      Q.  Okay.
16      A.  I would have done it the same way.
17      Q.  All right.
18      A.  I mean, if it was my -- if we were in charge
19  of filing it and this issue popped up, I'd -- Alecia
20  Kaiser is my primary assistant, and I would say:  Call
21  them and find out what's going on.
22      Q.  You would -- do you know what what she says she
23  did, and do you know what the clerk says she did?  In
24  other words, have you reviewed the depositions in the
25  Albritton case?

52

1       A.  No.
2       Q.  Okay.  Every --
3       A.  I know generally, from talking to Eric, what
4   she says she did.  So --
5       Q.  Okay.
6       A.  -- that's really where my knowledge comes
7   from.
8       Q.  Okay.  And at least as you sit here today,
9   you -- you support what Amy Mathis did in her contacts
10  with the clerk's office?
11      A.  Absolutely.
12      Q.  Okay.
13          MS. PEDEN:  Are we at a good breaking
14  point?  Can we take a break?
15          MR. BABCOCK:  Sure.  We can take a break
16  anytime you want to take a break, Patty.
17          MS. PEDEN:  Sorry.  I just have to go to
18  the ladies' room.
19          THE VIDEOGRAPHER:  Off the record, 10:35.
20          (Off the record 10:35-10:42.)
21          (Exhibits 4-19 marked.)
22          THE VIDEOGRAPHER:  Back on the record,
23  10:42.
24      Q.  (BY MR. BABCOCK)  Okay.  Did Ms. Peden take
25  you to the woodshed?  I told her you were doing fine.

53

1    A.   She didn't have to woodshed me.

2    Q.   Okay.  Well, that's good.

3         Let me hand you Exhibit 17.

4    A.   Okay.

5    Q.   And this, I think, is the original first-day

6  Patent Troll Tracker and not the revised version that we

7  see in Exhibit 3.

8    A.   Okay.

9    Q.   And the -- the October 18th, 2007 version that

10 is Exhibit 17 I want to go over with you.  It says,

11 ES-- -- the headline is "ESN Convinces EDTX Court Clerk

12 To Alter Documents To Try To Manufacture Subject Matter

13 Jurisdiction Where None Existed."  Did I read that

14 correctly?

15   A.   You did.

16   Q.   All right.  And I take it you think that's

17 false?

18   A.   That lit my fire.

19   Q.   And why -- and -- and why do you say it lit

20 your fire?

21   A.   Just when I read it, I was like, oh, my gosh,

22 you know.  I mean, I was called, saying:  Have you seen

23 what they've written about you?

24   Q.   Okay.  Who -- who called you?

25   A.   It was either one or two clients and --

54

1  there's -- there's three names, and I can't remember

2  exactly who it was.  Either Terry Fokas, Erich

3  Spangenberg, or David Pridham, who worked for

4  Spangenberg.  It was either one or two of those

5  individuals called me.  I -- I talked to them all about

6  it, but --

7    Q.   Okay.

8    A.   -- I -- I don't remember who alerted me to it

9  initially.

10   Q.   All right.  And they -- and this was all by

11 phone:  Fokas, Spangenberg, and David Pridus [sic]?

12   A.   Correct.

13   Q.   Okay.  And was this on the 18th?

14   A.   I don't remember, because I remember that

15 we -- you know, everyone was -- I say "everyone."  Folks

16 that were doing patent litigation in the Eastern

17 District, it had kind of become required reading to read

18 what the Patent Troll Tracker was writing about folks.

19 So I don't know if someone said "did you see what he

20 wrote about you" on the -- the 17th?

21        And then the 18th, I got another call,

22 going:  You really ought to see what -- what's been

23 written.

24        But I don't remember exactly how it

25 happened.

55

1    Q.   Okay.

2    A.   I was -- I was reading it when I -- I think

3  this was the first time my name popped up.  It popped up

4  several times, but I think that was the first I had been

5  called out by name.

6    Q.   Okay.  The -- actually, the October 18th, 2007

7  article, or post, doesn't mention you by name, correct?

8    A.   That's correct.

9    Q.   Okay.  It was the October 17th one that

10 mentioned your name and wondered how you'd play in -- in

11 New Haven, right?

12   A.   It calls me by name in the --

13   Q.   Okay.

14   A.   -- 17th, correct.

15   Q.   Your relationship with Fokas, Spangenberg, and

16 Pridus [sic] has not been affected by this article, has

17 it?

18   A.   No.

19   Q.   Okay.  In fact, Fokas sent you an e-mail and

20 said he -- you were his hero.  Do you remember that?

21   A.   I do.

22   Q.   Okay.  So the headline, you think, is false,

23 and it lit your fire because neither E-- -- ESN, nor its

24 counsel, in your view, tried to convince the Eastern

25 District of Texas court clerk to alter documents for any

56

1  reason?

2    A.   For any reason.

3    Q.   Okay.

4    A.   Nothing -- nothing was altered.

5    Q.   Okay.  Well, that last part, that's not true.

6  I mean, the -- the docket sheet was altered, wasn't it?

7        MS. PEDEN:  Objection to form.

8    A.   No.

9    Q.   (BY MR. BABCOCK)  You don't think it changed

10 at all?

11   A.   I think it changed.  You know, you use the

12 word "alter," and I think that's in the criminal

13 statutes; and that's what jumps out to me.  Altering

14 something, you're doing some-- -- something

15 surreptitiously, is what it connotes to me.

16   Q.   Okay.  What criminal statute is the word

17 "alter" in?

18   A.   I don't know.

19   Q.   Well, you just said it was in the criminal

20 statutes.  I wondered --

21   A.   I've read it in a criminal statute that either

22 Mr. Patton or Ms. Peden had sent to me.  So I know I've

23 seen "alter" in some criminal statute.  Whether it's the

24 Arkansas statute or the Texas statute or the Federal

25 statute, that's not my cup of tea.  But I know I've seen

57

1   it somewhere.

2       Q.  You would admit that -- that the docket

3   changed, if that's the word you prefer?

4       A.  The docket was corrected.

5       Q.  It -- it changed from one thing to another,

6   correct?

7           MS. PEDEN:  Objection to form.

8       A.  Like I told you earlier, I haven't been and

9   even looked at the docket to see what changed.  I

10  understand that the -- there was a correcting entry made

11  by the clerk.

12      Q.  (BY MR. BABCOCK)  Okay.  And whether you call

13  it "correction" or whether you call it something else,

14  the fact is that it was different one day than it was

15  the day before or the minute before, really?

16      A.  I think --

17          MS. PEDEN:  Objection to form.

18      Q.  (BY MR. BABCOCK)  Correct?

19      A.  I believe that to be correct.

20      Q.  Okay.  This says:  I got a couple of anonymous

21  e-mails this morning pointing out that the docket in ESN

22  versus Cisco (the Texas docket, not the Connecticut

23  docket) had been altered.

24          Other than the word "altered," which we've

25  just talked about, do you have any information as to

58

1   anything else in that sentence that's false?

2       A.  Again, I think he's being false when he's

3   saying he's getting anonymous e-mails.  He's the lawyer

4   in charge of the case, so he -- I assume that he's

5   communicating with people about what's going on in the

6   case.

7       Q.  Okay.

8       A.  So I think that's false.

9       Q.  Okay.  Do you know whether he got anonymous

10  e-mails or not?

11      A.  In addition to monitoring the case?

12      Q.  Right.

13      A.  No.

14      Q.  Okay.

15      A.  No, I don't.

16      Q.  It says:  One e-mail suggested that ESN's

17  local counsel called the Eastern District of Texas court

18  clerk and convinced him/her to change the docket to

19  reflect an October 16th filing date rather than the

20  October 15th filing date.

21          First of all, did I read that correctly?

22      A.  I believe you did.

23      Q.  And I assume you don't have any information

24  one way or the other about whether he received an e-mail

25  of this type?

59

1       A.  I don't.

2       Q.  Okay.  And here the word "changed" is used as

3   opposed to "altered."  Do you know whether

4   Mr. Albritton's paralegal, Ms. Mathis, called the

5   Eastern District court clerk?

6       A.  I -- I know that that's who contacted the

7   clerk's office to say:  There's a problem.  How do we

8   correct it?

9       Q.  Okay.  Do you have any information one way or

10  the other whether Ms. Mathis convinced the court clerk

11  to change the docket to reflect the October 16th filing

12  date rather than the October 15th filing -- filing date?

13      A.  Well, that supposes that there was an

14  October 15th filing date, which there was not.

15      Q.  You admit that the docket sheet had the --

16  the -- October 15th as the filing date, don't you?

17      A.  You'd have to show it to me.  But I understand

18  there's something that showed a filing date of

19  October 15th --

20      Q.  Okay.

21      A.  -- and that at some point, it reflected a

22  filing date of October 16th.  But the -- the notice of

23  electronic filing --

24      Q.  Yeah, I --

25      A.  -- has not been changed.

60

1       Q.  I've been -- I've been through this a lot,

2   so --

3       A.  All right.

4       Q.  I think I know what you're saying.

5       A.  Okay.

6       Q.  But -- but my point is:  Do you have any

7   information about the interaction between

8   Mr. Albritton's paralegal, Ms. Mathis, and the court

9   clerk one way or the other?  Do you know?

10      A.  Only what Eric's told me.

11      Q.  Okay.  So --

12      A.  And we were discussing it at that time, and,

13  obviously, we've discussed it since that time.

14      Q.  Okay.  What has Eric told you about it?

15      A.  At that time or, you know, after this --

16      Q.  Let's start with at that time.

17      A.  Okay.  It's -- we had a mediation going that

18  day where we were on opposite sides of the case.  And it

19  seemed like he told me that we'd had a -- there was

20  something that happened on the -- the filing, that we

21  had filed it after midnight and the clerk's office had

22  screwed up, not to worry about it; they were taking care

23  of it.

24      Q.  Okay.

25      A.  And, I mean, I knew it was against Cisco.  I

61

1  knew we were filing -- I knew we had a client named ESN
2  and we were suing Cisco.
3      Q.  Okay.  So he said:  Don't worry about it;
4  we're taking care of it?
5      A.  Pretty much.  That's --
6      Q.  Okay.
7      A.  That's what I recall.
8      Q.  Okay.  And I take it, then, since then, you've
9  had discussions with him about this subject?
10     A.  We had more discussions that day at the
11 mediation, because I was local counsel with Baker Botts
12 for Terry Fokas' company.  Mr. Patton was the mediator.
13 So we --
14     Q.  Kind of a small world?
15     A.  It is a small world.  You know, you never --
16 you look back on it, and it's funny that it worked out
17 that way.
18     Q.  Uh-huh.
19     A.  But we had additional discussions there, so
20 there were additional discussions.
21     Q.  Okay.  Tell me about the additional
22 discussions.
23     A.  I made the bad mistake of popping off to Baker
24 Botts, my -- my cohorts, that I had gotten some more
25 business for them; we had sued Cisco and -- just making

62

1  small talk.  I knew they represented them and -- I knew
2  those guys; I knew they represented them.
3         And Kevin Meek, I believe, said:  Yeah,
4  but y'all've got -- you've got a problem there.
5  Y'all've -- you -- you filed too early.
6         And I made some comment back to him that
7  We've got that taken care of.
8         And then I remember talking to Eric during
9  a break, going, you know:  Cisco thinks we've got a
10 problem.  You know, what -- what happened?
11        And he relayed to me:  They think the
12 docket shows we filed early.  We didn't.  We filed it
13 after midnight.  Don't worry about it.
14        And I didn't worry about it.
15     Q.  Okay.  Anything else -- else you remember
16 discussing with any of the players:  Mr. Patton,
17 Mr. Meek, Mr. Albritton, Terry Fokas?
18     A.  At that -- at that time?
19     Q.  Yes.
20     A.  No.  We were more focused -- focused on that
21 mediation.
22     Q.  Sure.  How about subsequent to that; have you
23 talked to Mr. Albritton about -- about this issue of
24 Ms. -- Ms. Mathis contacting the clerk?
25     A.  I -- it seems like after this came out -- I

63

1  don't think I knew about this at the -- when we were
2  talking.
3      Q.  Okay.
4      A.  That's my recollection.  Then I asked for more
5  detail, you know, when -- when I saw what was written.
6  I -- I said:  Now, tell me exactly what happened.
7      Q.  Okay.  And what did he tell you?
8      A.  Now we're going -- you know, that's -- this
9  has been almost two years ago.
10     Q.  Sure.
11     A.  Generally, I remember him telling me that
12 Amy had to wait up here until after midnight to file it
13 because we had to file it on -- now I know it was the
14 16th, just from me knowing this.  But whatever day, we
15 had to wait until that day, at midnight.  That she had
16 done that, and that he had had to open a shell case the
17 day before; because back then, you had to have the -- a
18 cause number before you could file, and you'd have to
19 open a -- you couldn't wait -- if you want to file at
20 12:01 on the 16th, you have to get it on the 15th;
21 otherwise, you've got to wait until the clerk's office
22 opens at 8:00 a.m. on the day that you're going to file.
23 And you lose your -- that time period; someone on the
24 East Coast can beat you to the courthouse.
25        So he opened up the -- the shell case on

64

1  the 15th.  Somehow they were showing that's the date it
2  got filed, but that we had the notice of electronic
3  filing.  I don't know if he used those words, but we
4  have the file stamp that shows when it was filed.
5      Q.  Okay.  And this was -- it was a few days
6  later, probably after the Patent Troll Tracker articles
7  came out?
8      A.  It would have been -- I would have asked for
9  that much detail when I saw this, you know:  What has
10 this guy written?  And tell me exactly what happened,
11 because I want to know exactly what happened.
12     Q.  Okay.
13     A.  I never went and looked at the docket and
14 looked at the notice of electronic filing.  I've
15 never -- you know, at that time.  I have since then.  I
16 did not look at it at the time.
17     Q.  You just relied on what Eric told you?
18     A.  Absolutely.
19     Q.  Okay.  Any other conversations you've had with
20 Eric about -- about the issue of Ms. Mathis
21 contacting -- calling the -- the Eastern District of
22 Texas court clerk about the -- about the docket sheet
23 changing, altering, whatever word you want to use?
24        MS. PEDEN:  Objection to form.
25     A.  You know, at some point, he -- I think he's

65

1    asked me, "Would you have done it any differently," you
2    know.  I said:  Absolutely not.  That's -- that's what
3    my assistant does when there's a --
4        Q.  Okay.
5        A.  -- an error in the clerk's office.
6        Q.  Okay.  Have you talked to David Maland about
7    this, the -- the clerk himself, the --
8        A.  Never.
9        Q.  Okay.  Have you talked to any of the deputy
10   clerks or assistant clerks about it?
11       A.  Never.
12       Q.  Okay.  Have we exhausted everything you and
13   Mr. Albritton talked about the issue of Ms. Mathis
14   calling the Eastern District of Texas court clerk
15   regarding the change of the docket?
16       A.  I believe so.
17       Q.  Okay.  Let's keep going on this article.
18       A.  Okay.
19       Q.  Quote:  I checked, and sure enough, that's
20   exactly what happened - the docket was altered to
21   reflect an October 16th filing date, and the complaint
22   was altered to change the filing-date stamp from October
23   15th to October 16th.
24           Did I read that correctly?
25       A.  I believe you did.

66

1        Q.  Is there anything false about that?
2        A.  Yes.
3        Q.  What is it?
4        A.  He says "that's exactly what happened," that
5    we had convinced the clerk to change the filing date.
6    We know that to be untrue.  Whether or not the docket
7    was changed, again, that -- I -- I ascribe a different
8    definition to "altered," which implies criminal conduct.
9    So I don't think that's true.  If you want to say it was
10   "corrected," I think that would be more accurate.  So I
11   don't think --
12       Q.  If -- if he had said, "The docket was
13   corrected to reflect an October 16th filing date, and
14   the complaint was corrected to change the filing-date
15   stamp from October 15th to October 16th," that would be
16   accurate?
17       A.  No.
18       Q.  Okay.  What would be inaccurate about that?
19       A.  If he said, "The docket was corrected to
20   reflect an October 16th filing date" --
21       Q.  Okay.
22       A.  -- I think that would be --
23       Q.  That would be accurate?
24       A.  That would be accurate.
25       Q.  Okay.

67

1        A.  The complaint -- the filing date on the
2    complaint was never altered.  It's incapable of being
3    altered.  So that is categorically false.
4        Q.  Okay.  The -- did the header on the complaint,
5    the thing at the top, did that change?
6        A.  I don't know.
7        Q.  Okay.
8        A.  I know now that that's an allegation, that the
9    header -- I have never gone and printed the header and
10   looked at the different headers and --
11       Q.  Okay.
12       A.  That -- that would not surprise me if the
13   header is -- is different.
14       Q.  Okay.  The last sentence of this paragraph
15   says:  Only the Eastern District of Texas court clerk --
16   court clerk could have made such changes.
17           Do you think that's false?
18       A.  Again, if a filing-date stamp is being
19   altered, I don't know who could make that.  Since it's
20   computer -- computerized and you can do it
21   electronically, I don't know who else is capable of
22   doing that.
23       Q.  Okay.  Do you think that -- that this article,
24   the October 18th, 2007 article, is accusing the -- the
25   district court clerk of anything?

68

1        A.  Being -- yeah.  I think it's accusing the
2    court clerk of being a -- a party to a crime.  I think
3    it later says, wittingly or unwittingly, they conspired
4    with us to alter the filing date or we hoodwinked them
5    and -- and tricked her in -- or him/her into altering --
6        Q.  Okay.
7        A.  -- the filing date.
8        Q.  Yeah, the next sentence, actually, says:  Of
9    course, there are a couple of flaws in this conspiracy.
10           And you would say there's no conspiracy?
11       A.  Yeah.  No.
12       Q.  Okay.
13           First, ESN counsel Eric Albritton signed
14   the civil cover sheet stating that the complaint had
15   been filed on October 15th.
16           Anything false about that, to your
17   knowledge?
18       A.  I believe so.
19       Q.  What is that?
20       A.  The civil cover sheet actually gets attached
21   to the complaint on the date that it's filed.  So I
22   don't -- I don't think the civil cover sheet says:  I'm
23   filing on the 15th.  So I think that's --
24       Q.  Do you know whether he signed it on the 15th?
25       A.  I believe he did, so he could open the shell.

69

1    Q.   Okay.
2         Second, there's tons of proof that ESN
3    filed on October 15th.  Heck, Dennis Crouch may be
4    subpoenaed as a witness, exclamation point.
5         Anything false about that?
6    A.   Absolutely.
7    Q.   And what's that?
8    A.   That there's tons of proof that ESN filed on
9    October 15th.  It's the exact opposite of that.
10   Q.   You think there's no proof of that?
11   A.   No, the definitive document for filing is that
12   notice of electronic filing, and that's what you look
13   at.
14   Q.   Okay.  So --
15   A.   So that's untrue.
16   Q.   So the notice of electronic filing is what
17   controls?
18   A.   That's my understanding.
19   Q.   Okay.  And --
20   A.   I say the -- when it says it's filed is what
21   controls.
22   Q.   Dennis Crouch subpoenaed as a witness, you
23   know, that's, I assume --
24   A.   I -- I don't know what --
25   Q.   -- superfluous?

70

1    A.   Right.
2    Q.   Paragraph:  You can't change history, and it's
3    outrageous that the Eastern District of Texas is
4    apparently, wittingly or unwittingly, conspiring with a
5    nonpracticing entity to try to manufacture subject
6    matter jurisdiction.
7         I read that correctly?
8    A.   You did.
9    Q.   And you disagree with that?
10   A.   I think it's all untrue.
11   Q.   Okay.
12        This is yet another example of the abusive
13   nature of litigating patent cases in the Banana Republic
14   of Texas.
15        Did I read that correctly?
16   A.   You did.
17   Q.   Okay.  Do you think that relates to you?  Do
18   you think these --
19   A.   In part.  "Abusive nature of litigating" here.
20   They know -- people know I file a lot of cases on behalf
21   of plain-- -- plaintiffs, and absolutely untrue that this
22   is an abusive district.  I've been on both sides of the
23   docket, and just absolutely untrue.
24   Q.   Okay.  And then:  (n.b.:  Don't be surprised
25   if the docket changes back once the higher-ups in the

71

1    court get wind of this, making this post completely
2    irrelevant.)
3         Do you even know what that's talking
4    about?
5    A.   We didn't finish the rest of that.  I don't
6    it's true that this is a banana republic.
7    Q.   Oh, okay.
8    A.   But, you know --
9    Q.   I could have --
10   A.   I'm sorry.
11   Q.   I could have guessed that, but thanks.
12   A.   Right.
13   Q.   The next one, quote:  (n.b.:  Don't be
14   surprised if the docket changes back once the higher-ups
15   in the court get wind of this, making this post
16   completely irrelevant.)
17        Any -- what is that saying to you?
18   A.   It's implying that once we're caught, and
19   we're going to be caught, that the -- the judges will
20   correct this criminal activity.
21   Q.   Okay.  Do you know -- I asked you this a
22   second ago, but in a slightly different way:  Do you
23   know what criminal activity you think this -- this
24   article is accusing you of?
25   A.   I think I do.

72

1    Q.   Okay.  What's --
2    A.   The way I read it, when I -- when I saw it,
3    was that I would think it'd be a crime to go in and
4    change a court filing, scratch out a date and put a new
5    date on it to try and create subject matter
6    jurisdiction.  I think that'd be illegal --
7    Q.   Okay.
8    A.   -- and -- and unethical.
9    Q.   Okay.  And you -- your lawyers have shown you
10   some statutes, but you can't cite us anything?
11   A.   If you pull out my interrogatory -- you've
12   got -- you sent a lot of discovery to me, and I would
13   have looked at it in conjunction with answering my
14   interrogatories.  So that's --
15   Q.   You -- you cited some state bar rules.  I
16   don't think you cited -- cited a statute, but --
17   A.   I think we cite-- --
18        MS. PEDEN:  Objection to form.
19   A.   I think we cited some statutes.
20   Q.   (BY MR. BABCOCK)  Did you?  Okay.
21   A.   But --
22   Q.   If you did, we won't bother to go over this
23   again.
24        Let's go back to 3 now.  And this thing
25   changes.

73

1      A.  And I don't -- which one?  The 18th changes?

2      Q.  The 18th changes.  I don't -- I don't believe

3   the 17th changed.

4      A.  Okay.  I thought there was somewhere where he

5   wrote that he'd gotten a couple of e-mails that were

6   critical of what he'd written about us, and I don't

7   remember which article that's --

8      Q.  Yeah, I think that's the November thing that

9   you're talking about.

10     A.  Okay.  Okay.

11     Q.  But --

12     A.  I don't know what made him change it.

13     Q.  Okay.

14     A.  That's -- that's my speculation, but --

15     Q.  Okay.  It looks to me -- but confirm that I'm

16  right -- that it's in the third paragraph.  The first

17  sentence is the same in both Exhibit 3 and Exhibit 17.

18  But then the sentence, "This is yet another example of

19  the abusive nature of litigating patent cases in the

20  Banana Republic of East Texas," that is deleted --

21     A.  Well, there's some -- there were changes

22  before that.

23     Q.  Oh, there were?  Okay.  I'm sorry.

24     A.  He dropped the word "conspiring."

25     Q.  From -- from what paragraph?

74

1      A.  In that third paragraph, he says "conspiring."

2   He drops "conspiring" and says "helped."

3      Q.  Oh, okay.  I'm with you.  You're right.  So he

4   dropped "conspiring" and put "helped."

5      A.  Right.  And then he adds:  Even if this was a

6   "mistake," which I can't see how it could be, given that

7   someone e-mailed me a printout of the docket from Monday

8   showing the case, the proper course of action should be

9   a motion to correct the docket.

10     Q.  Okay.

11     A.  That's -- that's all new.  And then he dropped

12  that last sentence.

13     Q.  Okay.  And then he's still got the "don't be

14  surprised" part?

15     A.  Right.  But, again, I think he's leaving

16  that -- he knows or can easily find out exactly what

17  happened at that point.  He can -- any number of ways,

18  he knows.

19     Q.  Okay.  He says:  The proper course of action

20  should be a motion to correct the docket.

21         Do you see where he -- he wrote that?

22     A.  Yes.

23     Q.  You think that that is not correct, that

24  that -- that's not the proper way to proceed?

25     A.  I think that we were given two options by the

75

1   clerk's office:  file a motion to correct or call Tyler,

2   in the computer department, and raise your complaint

3   with them.

4      Q.  Okay.  And you -- you agree with the way

5   Mr. Albritton and his paralegal handled it, by rejecting

6   the first option of filing a motion, and calling Tyler

7   to talk to the clerk, right?

8      A.  I --

9         MS. PEDEN:  Objection to form.

10     A.  I don't know that they rejected it.  They

11  said:  Here's the two things you can do.  And they said:

12  Well, the most expeditious one is to make a phone call

13  and say:  Can you correct it on your end before we have

14  to file another pleading?

15         So I don't know that they rejected it.  If

16  the clerk's office in Tyler had said, "We can't correct

17  it here; you're going to have to file a motion," they

18  would have filed a motion.

19     Q.  (BY MR. BABCOCK)  Okay.  But -- but you said

20  they were given two options?

21     A.  Right.

22     Q.  And you know for a fact that they didn't

23  pursue Option Number 1.  Whether they rejected it or

24  not, they didn't --

25         MS. PEDEN:  Objection to form.

76

1      Q.  (BY MR. BABCOCK)  -- pursue that, right?

2      A.  Well, your -- your question made it sound like

3   they said:  Well, we're not going to do that.

4         I think they did what -- what we all do,

5   as lawyers, and try and take, you know, what's easiest

6   and quickest and -- and proper, and that is, make a

7   phone call.  If that'll take care of it, then I don't

8   have to file another pleading, you know, draft it and

9   get it filed.

10     Q.  Okay.

11     A.  If the clerk's office had said, "No, you've

12  got to -- they're wrong; you've got to file a motion," I

13  can guarantee you he would have filed a motion.

14     Q.  Sure.  But -- but do you have any information

15  to suggest that -- that Mr. Albritton ever considered

16  filing a motion?

17     A.  I don't know what he considered.  I know those

18  were the options --

19     Q.  Okay.

20     A.  -- he was given.

21     Q.  You know, you've talked about how, you know,

22  you guys were at this mediation and then you had other

23  conversations.  Did he ever say to you:  Hey, maybe we

24  should file a motion, or, I want to file a motion, or --

25         MS. PEDEN:  Objection to form.

77

1    Q.  (BY MR. BABCOCK)  -- did the issue of the
2  motion ever come up?
3    A.  I don't think so because we had it corrected.
4  We did what they told us to do.  So we never had to get
5  to the motion.
6    Q.  Yeah, you -- you -- you did one of the things
7  they told you to do?
8       MS. PEDEN:  Objection to form.
9    A.  They didn't tell us to do two things.  They
10  said:  You can do A or B.
11    Q.  (BY MR. BABCOCK)  Right.
12    A.  And we said:  Let's go with A.
13    Q.  Okay.  They said:  You can do A, call the
14  clerk in Tyler, or, B, file a motion.  Right?
15    A.  I think --
16    Q.  That's your understanding?
17    A.  I think that's what the Texarkana clerks
18  told -- if I understand -- who she was talking to.
19    Q.  Right.
20    A.  And she chose to call the Tyler district
21  clerk's office.
22    Q.  Okay.  And -- and you think that was the right
23  way to handle it?
24    A.  Absolutely.
25    Q.  No criticism of that?

78

1    A.  None.
2    Q.  Okay.
3       (Sotto voce discussion between Mr. Babcock
4        and Ms. Parker.)
5    Q.  (BY MR. BABCOCK)  Has -- I know you've --
6  you've produced --
7    A.  Are we through with these?
8    Q.  Yeah, we're done with those.
9       I know you've produced e-mails from a
10  number of people regarding those -- those articles,
11  Exhibit -- Exhibits 3 and 17.  Can you recall any e-mail
12  that you got that was critical of you or of your
13  handling of this -- of this matter?
14    A.  No.
15    Q.  Okay.
16    A.  And to be clear, I don't know exactly what's
17  been produced to you.  I know they turned over some
18  things that I didn't think they should have turned over,
19  but that's their decision.
20    Q.  Are you looking for a lawyer to sue them?
21    A.  Nope, nope.  That's what I've got lawyers for.
22    Q.  Would -- even though -- even though there's
23  been none turned over, have -- did you ever get any that
24  you may have deleted, or whatever, that were critical of
25  you?

79

1    A.  I would have saved it if I'd gotten any.
2    Q.  All right.
3    A.  So I don't think I ever got an e-mail saying:
4  You -- you criminal.
5       Now, that stuff was in the blogs, but I
6  quit reading that.
7    Q.  Did anybody from the U.S. Attorney's Office
8  contact you regarding your being accused of or guilty --
9  possibly of guilty of some criminal misconduct?
10    A.  No.
11    Q.  Okay.  How about from the Department of
12  Justice?
13    A.  No.
14    Q.  How about from any state District Attorney's
15  Office?
16    A.  No.
17    Q.  How about the State Bar of Texas; anybody
18  contact you about unethical behavior?
19    A.  No.
20    Q.  Okay.  How about the Eastern District of
21  Texas; did any of the judges contact you about improper
22  behavior?
23    A.  No.
24    Q.  Okay.  Did you get any correspondence from
25  anybody suggesting that you were guilty of criminal or

80

1  unethical conduct?
2    A.  No.
3    Q.  Okay.
4    A.  I -- I don't know how you want to char- --
5  I've given you everything that I've got.  I don't -- I
6  don't think you can characterize any of those e-mails in
7  that fashion.
8    Q.  All right.  I didn't, but, you know --
9    A.  Okay.
10    Q.  -- I'm not sitting there, either.
11       Have you had any conversation with anybody
12  that -- that -- listening to them, you thought, that
13  believed you were guilty of criminal or unethical
14  conduct?
15    A.  I've had conversations with people who had had
16  conversations with other people.
17    Q.  Okay.
18    A.  No one directly said:  Hey, I've read this
19  stuff, and I think you're a bad guy.
20    Q.  Okay.  Tell me about the conversation you had
21  with somebody who had a conversation with somebody else.
22    A.  The first one was when my wife and I had
23  dinner with Pete McAndrews and his wife, whose name I
24  can't recall.  A lovely lady.
25    Q.  We'll seal this part of the deposition.  Okay?

81

1    A. A lovely lady, but I can't recall her name,
2  sitting here.
3    Q. Okay. And -- and your wife gave a
4  recollection of that conversation. Give me yours.
5    A. Hers was pretty close to mine. I -- you know,
6  we had gone out there just kind of to keep business
7  contacts going. It was nice to go have dinner with
8  these folks. And something came up about the Cisco
9  case. I mean, that's the only case that Pete and I have
10  together. And his wife said: Oh, you're the one. And
11  clearly, they had talked about it.
12      And I said: Yeah, I'm the one.
13    And Pete -- I don't think he would have
14  ever told me if he'd known it was going to end up in
15  get- -- getting his deposition taken -- told about this
16  time where he was meeting with some in-house counsel at
17  some company. And I don't know if they were
18  contemplating filing a lawsuit in the Eastern District
19  or what. And he said: We've got good local counsel
20  down there, Johnny Ward and Eric Albritton.
21      And they relayed to him they'd have
22  nothing to do with us; they'd read about us; they knew
23  that we were unethical or engaged in bad acts, and not
24  to raise our names again as hiring us as local counsel.
25  That's my recollection of --

82

1    Q. Okay.
2    A. -- what was said.
3    Q. Did you do anything to follow up on that and
4  say: Hey, you know, I assume you told the in-house
5  counsel that we're good guys and --
6    A. I didn't -- I mean, I was kind of surprised
7  that I'm hearing this. I -- I had suspected that that
8  had gone on, but it's hard -- people don't call me and
9  say: Hey, you were in the running, but we're not hiring
10  you because of what we read about you.
11    Q. Uh-huh.
12    A. So it kind of confirmed my suspicion.
13      And I subsequently talked to Pete and
14  said: I know we were having this over-a-casual-dinner
15  conversation, but it's important to me. Would you mind
16  me telling my lawyers about it and letting them know
17  that I have confirmation?
18      And he said -- he's a stand-up guy, and he
19  said: Have at it. The facts are the facts.
20    Q. Do you remember the name of the in-house
21  counsel?
22    A. No. He -- he -- he would know because he
23  called them by name and company.
24    Q. Okay. And you didn't make any effort to
25  contact the in-house counsel or the company yourself

83

1  to --
2    A. I think that --
3    Q. -- talk to --
4    A. I think that'd be improper, but I wouldn't
5  have done that.
6    Q. Okay. In any event, improper or not, you
7  didn't do it?
8    A. I did not do it.
9    Q. Okay. And did Pete at dinner specify the
10  Patent Troll Tracker as the source of this in-house
11  counsel's comment to him about you and Mr. Albritton?
12    A. That's the only place I've been accused of a
13  crime and unethical behavior. So maybe I just assumed
14  that that's what the source of his information was.
15    Q. Okay. But he didn't mention it?
16    A. I -- I can't recall, sitting here. I -- I
17  would defer to Pete whether or not he mentioned it or
18  not.
19    Q. Okay. As lawyers, we all, from time to
20  tame -- time to time, get -- get in beauty contests,
21  what they call, the counsels -- I mean the companies
22  trying to pick counsel.
23    A. I -- I understand that goes on in the big
24  firms. I hear about it because -- Jackson Walker, Baker
25  Botts, or Vinson & Elkins, they get interviewed by

84

1  clients, and I've heard that goes on. I don't
2  typically -- we're not --
3    Q. You don't do --
4    A. -- involved -- my name's brought up, and
5  that's how I found out about another instance where
6  someone had a negative reaction to me.
7    Q. Okay. But you typically don't do the beauty
8  contests like the big firms do?
9    A. No.
10    Q. Okay.
11    A. I've got lawyers that use me as local counsel,
12  and they tend to come back to me.
13    Q. Okay. You say there was another instance,
14  other than the Peter McAndrews matter, where somebody
15  was reporting what somebody else had said?
16    A. Right.
17    Q. And who was that?
18    A. Bob Chiaviello at Fulbright & Jaworski.
19    Q. And what did Mr. Chiaviello say?
20    A. Same general type of thing. They were
21  enrolled in a beauty contest, and he brought up that:
22  Hey, we use Johnny Ward as local counsel. We could help
23  you out.
24      You know, it would've had to have been a
25  case filed in Judge Davis' court or Judge Folsom's

85

1  court --
2      Q.  Sure.
3      A.  -- defense case.
4          And whoever his contact -- and he said it
5  happened on more than one occasion.  He didn't give a
6  client name to me.  He just said that people have said:
7  We've -- we've heard about that guy; we've read about
8  him; we're not going to use him.
9          And he attributed it to the Patent Troll
10 Tracker specifically.
11     Q.  Okay.
12     A.  So I assume that these folks raised the
13 articles to him.
14     Q.  Okay.  And Chiaviello said that he heard about
15 it from how many clients?
16     A.  I don't know if it was one or several.  It
17 seems like it was on more -- more than one occasion that
18 he had been trying to land some business and had
19 referenced me by name and --
20     Q.  Okay.
21     A.  He did not specify a client, though.
22     Q.  Okay.
23     A.  And I kind of had the same conversation:  Bob,
24 I hate to put you in this situation, but can I give your
25 name to my lawyers?  Would you be willing to talk to

86

1  them about what's happened?
2      Q.  Uh-huh.  And he -- he said yes?
3      A.  He said --
4      Q.  Okay.
5      A.  -- whatever you need to do.
6      Q.  Is there anybody of this nature, like Pete
7  McAndrews and Bob Chiaviello, who you've asked
8  permission who have denied it, said:  No, you can't give
9  my name to the lawyers?
10     A.  Yes.
11     Q.  Who is that?
12     A.  I don't -- they don't want their names out
13 there, and I -- I don't -- I'm not comfortable giving
14 them to you.  I think it's confidential.  They've had
15 clients who've -- and I can't -- obviously, if I
16 can't -- if I don't give it to you now, I'm not going to
17 get to talk about it at trial, and I understand I live
18 and die by that.
19     Q.  Okay.  Are you claiming economic damages in
20 this case?
21     MS. PEDEN:  Objection to form.
22     A.  I don't believe so.  I think I'm claiming
23 pain, suffering, mental anguish, and reputational
24 damage.  I think I've lost business, but, you know, I
25 can't ever -- again, I can't prove who's not hiring me

87

1  because of this, so I can't put any dollar value on it.
2      Q.  (BY MR. BABCOCK)  You could prove, however,
3  that a bunch of people are hiring you.  I mean --
4      A.  I've --
5      Q.  -- you've got a pretty active docket.
6      A.  I've got an active docket, yes.  This has, by
7  no means, shut my practice down.
8      Q.  Okay.  So there's Pete McAndrews, Bob
9  Chiaviello, and one or more people that you won't name?
10     A.  One.  One lawyer.
11     Q.  Okay.  One lawyer that you won't name.
12     A.  And Mr. Fokas has told me that he would not
13 have hired me if he did not know me prior to this and
14 know this to be untrue about me.  That's hindsight,
15 but --
16     Q.  Uh-huh.
17     A.  -- he's made that comment to me.  I think he's
18 very happy with my representation of him, so I'm not
19 worried about losing him as a client.
20     Q.  All right.  Okay.  Anybody -- anybody else,
21 other than McAndrews, Chiaviello, the one lawyer you
22 won't tell us, who has said that because of this Patent
23 Troll Tracker article -- were you even quoting somebody
24 else?
25     A.  Quoting some- --

88

1      Q.  Yeah.
2      A.  Who he would not identify.
3      Q.  Right.
4      A.  He said:  I'm not going to testify.
5      Q.  Okay.  So anybody else other than those
6  people?
7      A.  No.
8      Q.  Okay.
9      A.  Not -- not that I know of.
10     Q.  Okay.  Is there -- is there anybody outside of
11 your professional life -- and I understand the patent
12 bar is a small bar and everything.  But
13 anybody outside of your professional life that has made
14 comments -- disparaging comments to you about the Patent
15 Troll Tracker?  I mean, anybody at church or at school
16 or --
17     A.  Nobody.
18     Q.  Okay.
19     A.  I mean, people, obviously, read about it when
20 we sued and it turned out to be Cisco, but no one's said
21 anything disparaging to me.
22     Q.  Okay.
23     A.  But, obviously, there are folks outside of the
24 profession that have read about it now.
25     Q.  Because there has been -- there has been some

89

1   press comment about the case -- about your case?
2       A.   I think that's fair.
3       Q.   Your very own lawyer, Mr. Patton, was quoted
4   in the Texarkana Gazette.  Did you read that article?
5       A.   I did.
6       Q.   And in that, he said that Frenkel was a
7   coward.  Do you agree with that?
8       A.   Absolutely.
9       Q.   And that Cisco was a bully.  Do you agree with
10  that?
11      A.   Absolutely.
12      Q.   Okay.
13           They've just been caught.
14      Q.   Do you -- do you know -- did you know that
15  Mr. Patton was going to talk to the newspaper prior to
16  him speaking?
17           MS. PEDEN:  Objection.
18           To the extent that that calls for
19  attorney-client-privileged communications, I'm going to
20  instruct you not to answer it.
21      A.   I'm going to follow my lawyer's advice.
22      Q.   (BY MR. BABCOCK)  So you think that that calls
23  for an attorney-client --
24      A.   What --
25      Q.   -- conversation?

90

1       A.   What Mr. Patton and I talked about, whether or
2   not I was contacted by the press?
3       Q.   Sorry.  You misunderstood my question.  Did
4   you --
5       A.   Okay.
6       Q.   -- know before Mr. Patton spoke to the
7   Texarkana Gazette that he was going to speak to them?
8           MR. PATTON:  That's not the question you
9   asked, Chip.
10      A.   The -- the only way I would --
11           MR. BABCOCK:  Go back and read the
12  question I asked before.
13           (Record read.)
14      A.   The only way I would know that is if he told
15  me, and I think that's privileged.
16      Q.   (BY MR. BABCOCK)  Not necessarily.  The
17  reporter could have told you; a lot of people could have
18  told you.
19      A.   Yeah.  No -- no reporter told me that --
20      Q.   Okay.
21      A.   I gave Mr. Patton -- I contacted -- I was
22  contacted by a lot of reporters, and I never gave
23  comment.
24      Q.   Okay.  Did you --
25      A.   As much as I would want -- want to, I know

91

1   better and said:  Contact my lawyer.
2       Q.   All right.  And you gave Mr. Patton authority
3   to speak for you to the press about this case, correct?
4       A.   Absolutely.  He speaks -- he speaks for me.
5       Q.   Is there anything that he has said that you
6   have disavowed or think is improper?
7       A.   Not -- not sitting here.
8       Q.   Okay.  Do you know if the Texarkana Gazette
9   article was after this lawsuit -- was after your lawsuit
10  was filed?
11      A.   I'm guessing, but educated guess is yes, it
12  was after -- after the lawsuit got filed.
13      Q.   Have you ever served on the local rules
14  committee of the Eastern District of Texas?
15      A.   I have not.
16      Q.   Okay.  Let me -- here's Exhibit 18.  I think
17  this is the -- this is the one that maybe you referenced
18  earlier as being a November article by Mr. Frenkel.  It
19  talks about the ESN case on the third page.
20      A.   Right.  Okay.
21      Q.   Is -- is this the one you were talking about?
22      A.   It is.
23      Q.   Okay.
24      A.   And I had forgotten about some of this, so you
25  ask your questions, and I'll answer you.

92

1       Q.   Okay.  It says ESN -- it's -- it's in a larger
2   article about "Troll Call and Other Patent Stats for
3   October 2007."  And then it has a whole bunch of
4   statistics.  And then it lists some cases, and it says
5   "116."  Anyway, it says:  116) ESN, LLC versus Cisco
6   (and related company) (Texarkana October 5th [sic],
7   November -- November 15.  No, wait.  Oct- -- let me
8   start over again.
9           116) ESN, LLC versus Cisco (and related
10  company) (Texarkana, October 15.  No, wait.  October 16.
11  No, October 15.  When was it "filed" again?).  I posted
12  on it here.  Michael Smith also had a post on the case.
13  I had thought there was a dueling jurisdictional battle,
14  but then I read an article yesterday that ESN dismissed
15  its case against Cisco.  I looked, and the same is true
16  for the Cisco case against ESN:  gone.
17           Aside from his, you know, we don't know
18  whether he read it or not, it is true that both cases
19  were dismissed, right?  Both the Texarkana case and the
20  Connecticut case were dismissed?
21      A.   Okay.  But you said something before that, and
22  you -- you threw me off.  You said we don't know whether
23  or not it's true.
24      Q.   Well, all of his musings about what he was
25  doing or -- do you know anything about whether he was

Ward, John  8/10/2009  1:21:00 PM

93

1  listening to Michael Smith or whether he was looking on
2  his computer?
3          MS. PEDEN:  Objection to form.
4      A.  I don't know what he was doing.  I know that
5  the things that he's writing here are false, and he
6  would have known they were false at that time --
7      Q.  (BY MR. BABCOCK)  Okay.
8      A.  -- or should have known.
9      Q.  What -- what was true was that both the
10  Texarkana case and the Connecticut case were dismissed,
11  correct?
12      A.  That's part of the truth, yes.  He knew a lot
13  more, though.
14      Q.  Okay.  But -- but that fact is true?
15      A.  That's -- that's -- that's part of the truth.
16      Q.  Okay.  And what do you think he should have
17  added?  Like, who he was or --
18      A.  Well, no.  And Cisco -- he knew that Cisco had
19  consented to say that jurisdiction is correct in the
20  Eastern District of Texas.  And then in the first line,
21  he's saying:  When is it filed?
22          He knows when it's filed.  He certainly
23  has access to the notice of electronic filing, and he's
24  still saying, oh, we can't -- and he's using the word --
25  he's putting it in quotes -- "filed," because that's a

94

1  very specific meaning.  And he's saying -- he's
2  referring back to his -- and he's linked back to it:  I
3  posted on it here.  So go back and look about the
4  article where I said --
5      Q.  Okay.
6      A.  -- they've altered the filing date.
7      Q.  Okay.
8      A.  He's connecting the articles himself.
9      Q.  Then he says:  I got some critical
10  e-mails for using the word "altered" with respect to the
11  Texas docket.  Well, let me respond.  If a document
12  appears one day with a date stamp and the next day that
13  date stamp disappears and is replaced with a different
14  stamp, what would you call it?  To the extent the use of
15  the word "altered" implied that anyone did anything
16  illegal, that was not my intent.  I'm positive the court
17  clerk was following local custom, as was the ESN Texas
18  lawyer.  But putting aside the propriety of such actions
19  with respect to local custom, isn't such a "customary"
20  action detrimental to the credibility of the Court?  We
21  have been -- we have to be able to trust the U.S. courts
22  and their ECF system.  How can we trust the courts when
23  date stamps on documents disappear on one day and
24  reappear the next day with a different date?
25          This all could be averted if the local

95

1  rules committee adds a rule that no document shall be
2  replaced without a motion made to correct the docket.
3          Have I read his article -- or blog in --
4  in its entirety -- well, these two paragraphs, I should
5  say?
6      A.  Yes, sir.
7      Q.  Okay.  Did I read them correctly?
8      A.  I believe you did.
9      Q.  Okay.
10      A.  I mean, they pretty much speak for themselves.
11  They say what they say.
12      Q.  Right.  And -- and do you have criticism for
13  what he said in -- in those two paragraphs I just read?
14      A.  Absolutely.
15      Q.  Okay.  What -- what are your criticisms?
16      A.  Do we want to go through it line by line?
17      Q.  Sure.
18      A.  Okay.  I think I've already told you about the
19  criticism about where he's talking October 15th,
20  October 16th.
21      Q.  Okay.
22      A.  No, wait.  October --
23      Q.  Gotcha.
24      A.  -- 15th.
25          He knew there was a dueling jurisdictional

96

1  battle.  He knew that we'd talked to Sam Baxter and that
2  Cisco had conceded that jurisdiction was appropriate in
3  the Eastern District.  He admits all those facts.
4          And he's not telling the truth when he
5  says:  I read an article that ESN was dismissed.
6          We know he's monitoring the docket.  He's
7  the attorney in charge of the ESN case.  We know that's
8  untrue.
9          And he says he's looking to see if the
10  same is true for the Cisco case.  That's untrue.  He's
11  getting reports daily from his lawyers about what's
12  going on, if not hourly, and then he omits what's
13  happened.  So he's not giving the full picture of what's
14  going on, I think.
15      Q.  Okay.
16      A.  I don't know whether he -- or not he got
17  critical e-mails.  My understanding is he says he can't
18  find any of his e-mails, which I find to be incredible.
19          He uses the word "altered."  I -- I don't
20  doubt that people read it the same way I did and that he
21  was criticized for using it.  I'd love to see what those
22  folks wrote him, but I don't know if we'll ever see
23  that.
24          And then this next sentence, he's talking
25  about the date stamp changing and -- and reappearing and

97

1  being replaced. All untrue. The date stamp was never
2  changed, was never altered. I think he knew what he was
3  doing when he used the word "altered," that he was
4  implying illegal activity. That was his intent.
5         And, again, he's assuming that the court
6  clerk -- in this next sentence, that the court clerk is
7  altering the date, which didn't happen.
8         And he's saying -- he sets aside the
9  propriety of such actions. Well, there's nothing
10  improper about it, nothing to set aside.
11        Calling into question the credibility of
12  the Court. There's no -- no reason to question anyone's
13  credibility. And, you know, he's supporting this banana
14  republic statement, that we need to be able to trust the
15  Courts and their -- their system, that there's something
16  nefarious going on.
17     Q.  He -- he doesn't mention banana republic
18  again, does he?
19     A.  No, no --
20     Q.  Okay.
21     A.  -- he doesn't. He previously referred to this
22  practice --
23     Q.  Oh, okay. All right.
24     A.  And then he's saying it's -- you know, we have
25  to be able to trust these date stamps; somehow they're

98

1  not trustworthy, when, in fact, we know it never
2  changed. He's saying they disappear and reappear.
3  Untrue.
4     Q.  Anything else?
5     A.  Not that I can think of.
6     Q.  Okay. You said that you talked to Sam Baxter
7  and Cisco conceded jurisdiction was proper. Was it you
8  that talked to Sam Baxter?
9     A.  No.
10    Q.  Who talked to Sam Baxter?
11    A.  Eric --
12    Q.  Okay.
13    A.  -- talked to Sam.
14    Q.  And reported to you?
15    A.  Yes. They -- they were working out an
16  agreement on how we're going to go forward.
17    Q.  Okay.
18    A.  Now, I've had conversations with Sam since
19  that time, but --
20    Q.  Okay.
21    A.  -- at that time, I had not.
22    Q.  Okay. Tell me about your conversations with
23  Sam Baxter regarding this case -- or regarding this
24  matter.
25    A.  Very brief. It was when we were identifying,

99

1  you know, persons with knowledge of relevant facts. We
2  identified Sam. And I contacted Sam to ask him what he
3  thought about this post, what his opinion was, was it
4  accusing me of criminal conduct, and would he come
5  testify.
6     Q.  Okay. And what did he say?
7     A.  Absolutely accused me of criminal conduct, and
8  he'd be happy to come testify.
9     Q.  Okay. Was he representing Cisco at the time?
10    A.  At the time of --
11    Q.  Of that conversation.
12        MS. PEDEN:  Objection to form.
13    A.  I don't know if he was or not. It was fairly
14  recently.
15    Q.  (BY MR. BABCOCK)  But when was it?
16    A.  It would have had to have been shortly before
17  we gave you the list of --
18    Q.  People with relevant knowledge?
19    A.  Well, I say that, because it might have
20  been when we -- I don't know what they've -- what
21  they've done with the pleadings. I know that the
22  conversation took place in the last, I'd say, 90 days.
23    Q.  When you say the date stamp never changed, do
24  you know whether any things on the docket that
25  changed -- I mean on the pleadings that changed at all?

100

1         MS. PEDEN:  Objection to form.
2     A.  I don't know it for a fact. I -- my
3  understanding is that there's something on the docket
4  entry that reflects a different date. It originally
5  showed "file," and now it shows the 16th, but I -- I
6  don't know. If you know it to me, I'm -- I'm not
7  trying to deny that happened.
8     Q.  (BY MR. BABCOCK)  Okay. All right. Do you
9  disagree with his last sentence here, that -- that maybe
10  there ought to be a local rule to say that you can't
11  replace a document without a motion made to correct the
12  docket?
13    A.  I disagree with the statement that he said
14  "this could all be averted." This could all have been
15  averted if he'd asked for a copy of the file stamp,
16  which he didn't do.
17    Q.  Okay. But the issue of whether you can change
18  things on the docket, do you think that having a local
19  rule requiring a motion to do that would be a better
20  practice?
21    A.  No. I think the clerk's office needs to get
22  this complete -- computer glitch fixed. But for lawyers
23  who are relying on the filing dates, they know what to
24  look at. But I don't -- I don't know how we can do
25  that.

Ward, John  8/10/2009  1:21:00 PM

101

1    Q.  Okay.  All right.  You produced for us a video
2  of you going onto Google.  Do you remember doing that?
3    A.  I do.
4    Q.  And when did you do that?
5    A.  I'm sure it's -- you can get it off that
6  document.  It would show a -- I don't know.  It was
7  shortly after it happened.  My IT guy said: I want to
8  capture this to show that now I'm -- you put my name in
9  and "attorney."  The first thing that's popping up is
10  Patent Troll Tracker.
11    Q.  Yeah.  I think you -- you put in "Eric
12  Albritton, patent attorney," and the October 17th post
13  showed up.  Correct?
14        MS. PEDEN:  Objection to form.
15    A.  I think I put --
16    Q.  (BY MR. BABCOCK)  Do you know?
17    A.  I think I put in "Johnny Ward," but I --
18    Q.  Okay.  Yeah.
19    A.  I -- it's been a long time since I've looked
20  at it.
21    Q.  We both should have listened to her objection.
22    A.  Okay.
23    Q.  It's "Johnny Ward" --
24        MS. PARKER:  Patent.
25    Q.  (BY MR. BABCOCK)  "Patent attorney."

102

1        MS. PARKER:  Not --
2    Q.  (BY MR. BABCOCK)  I said "Eric Albritton."
3        MS. PARKER:  Not "attorney," just
4  "patent."
5    Q.  (BY MR. BABCOCK)  Oh, "Johnny Ward, patent."
6    A.  Okay.
7    Q.  "Johnny Ward, patent."  And then the
8  October 17th article popped up, right?
9    A.  Again, I don't remember exact --
10    Q.  It's whatever it says?
11    A.  It's whatever it says.
12    Q.  Okay.
13    A.  It's --
14    Q.  How many times -- how many different
15  combinations of words did you put into the Google system
16  before you got "Johnny Ward, patent" --
17        MS. PEDEN:  Objection to form.
18    Q.  (BY MR. BABCOCK)  -- if any?
19    A.  I -- I don't remember.  I remember that I did
20  it, and I was shocked that that was what was coming up.
21  And I was like:  I'm going to save this, because
22  there's -- in my mind, it was more sophisticated than
23  just some individual out there blogging.  They had a lot
24  of time.  They were giving lots of stats.  Either this
25  person had -- was independently wealthy or someone was

103

1  paying them to do this or there was a crew of people
2  doing it.  I don't know.
3    Q.  Do you know whether the -- the March 17th -- I
4  mean the October 17th and 18th, 2007 Patent Troll
5  Trackers can be accessed today?
6    A.  I believe they can be.
7    Q.  Okay.  And how do you think they can be?
8    A.  I know I've played around on the Internet, and
9  I -- you can -- you can see them captured in some spots.
10  Now, whether or not they're the altered ones or the
11  revised ones or not, I -- I -- I think you can still
12  access them.
13    Q.  And have you actually, yourself, accessed
14  them?
15    A.  I don't believe I have.  Well, I don't -- I
16  can't remember.  I know I've looked at them and they
17  were available for -- I haven't done this in a long
18  time, but I think they're still there.
19    Q.  Okay.
20    A.  I kind of operate under the -- the belief that
21  once it's out there, it's always out there,
22  unfortunately, whether it's e-mail or Web sites.  I know
23  we've been involved in cases where we use this deal
24  called the way-back machine and you go and -- I didn't
25  realize this -- you find Web sites that were around 15

104

1  years ago.  I did it in a case with your firm.
2    Q.  Besides your -- besides yourself -- excuse
3  me -- besides yourself, do you know of anybody who has
4  tried to -- to see the -- see the October 17th or 18th
5  articles after March of 2008?
6        MS. PEDEN:  Okay.  I need to interject
7  and just tell you not to disclose any
8  attorney-client-privileged communications.  So you can
9  answer to the extent that you have any knowledge outside
10  of those.
11    A.  As far as other individuals, other than what
12  my lawyers have told me, I can't.  I -- I know of nobody
13  else.
14    Q.  (BY MR. BABCOCK)  Okay.  Have you retained a
15  testifying expert to -- to testify on this expert -- on
16  this subject?
17        MS. PEDEN:  Again, I'm going to interject
18  and just instruct you not to divulge attorney-client
19  communications.
20    Q.  (BY MR. BABCOCK)  Can't answer it?
21    A.  Well, I have not individually gone out and
22  retained somebody to testify, no.
23    Q.  But do you know of a testifying expert
24  who's --
25        MS. PEDEN:  I instruct you not to answer.

105

```
1    A. The only way I'd know that is if my lawyers
2  have told me, and I'm not answering that one way or the
3  other.
4    Q. (BY MR. BABCOCK) Okay.
5       MR. BABCOCK: We need a tape change, and
6  so let's --
7       MR. PATTON: Oh, I'm so glad.
8       MR. BABCOCK: -- let's take a little
9  break. Okay.
10      THE VIDEOGRAPHER: Off the record, 11:37.
11 This is the end of Tape 1 of the deposition of John
12 Ward.
13      (Lunch recess 11:37-12:36.)
14      (Videotape 2.)
15      THE VIDEOGRAPHER: This is the beginning
16 of Tape 2 of the deposition of John Ward, Jr. Back on
17 the record, 12:36.
18   Q. (BY MR. BABCOCK) Can you tell us, Mr. Ward,
19 who John Olivo is, O-l-i-v-o?
20   A. Jack Olivo?
21   Q. Okay.
22   A. Yeah, Jack Olivo. He's a lawyer in New
23 Jersey.
24   Q. And do you recall him telling you that -- that
25 you'd play perfectly in Connecticut?
```

106

```
1    A. Is that who wrote that e-mail? I don't --
2  maybe.
3    Q. Okay. I probably have it somewhere.
4       MR. BABCOCK: Where -- where are my
5  documents? Let's see if I can find it.
6    Q. (BY MR. BABCOCK) Here's Exhibit 4. This is
7  an e-mail that Jack Olivo from New Jersey sent to you on
8  November 5th, 2007.
9    A. Yeah.
10   Q. Still friends with Mr. Olivo?
11   A. I am. I mean, we're -- we're professional
12 acquaintances.
13   Q. Okay. But you took this as a -- as a
14 complimentary communication regarding -- following the
15 October 17th e-mail saying: Wonder how he'll play in
16 Connecticut?
17   A. That's not how I took it. It was, yeah,
18 people are reading this, and they're in New Jersey
19 reading it. So, I mean, it kind of --
20   Q. You didn't think he was being critical of you,
21 did you?
22   A. No. He's saying: Shake it off. You'll be
23 all right.
24   Q. Okay. David Pridham you've talked about
25 earlier. Let me hand you Exhibit 5, which is an e-mail
```

107

```
1  from him. And it's dated December 4th, 2007, and it
2  directs you to a -- a Web site or something. Do you
3  know what it is?
4    A. I'm sure I clicked it at the time, but I don't
5  know what it is now.
6    Q. Okay. Okay. Let me hand you Exhibit 6. This
7  is, I think, maybe the cartoon that you -- you referred
8  to earlier --
9       MS. PEDEN: Chip, do you have another
10 copy?
11      MR. BABCOCK: Oh, I'm sorry.
12      MS. PEDEN: That's all right. Thank you.
13   Q. (BY MR. BABCOCK) This is the cartoon that you
14 referred to earlier, where Mr. Niro is jumping out of
15 the bushes and Mr. Frenkel is looking scared, sitting on
16 a stone?
17   A. Yeah, that's the one I -- I was referring to.
18 He framed it in a little -- it's not blown up. It's
19 this size, in a frame.
20   Q. Okay. And signed it for you?
21   A. It says: We got him --
22   Q. Okay.
23   A. -- Ray.
24   Q. And this is dated February 29th of 2008, the
25 e-mail to you; is that correct?
```

108

```
1    A. Correct.
2    Q. And was the framed cartoon given to you
3  sometime subsequent to that -- subsequent to that?
4    A. Yes. It was in that October -- October 2008
5  trip that we took up to Chicago.
6    Q. Okay. And here's Exhibit 7. This is an
7  e-mail from Dennis Crouch to you, dated March 8th, 2008,
8  asking you to comment about your defamation lawsuit
9  against Frenkel and Cisco.
10      MS. PEDEN: Objection to form.
11   Q. (BY MR. BABCOCK) I'll back up. This is an
12 e-mail from Dennis Crouch, dated March 8th, 2008, to
13 you, subject: Lawsuit against Frenkel. Correct?
14   A. That's what it says.
15   Q. Okay. Did you get this?
16   A. I believe I did.
17   Q. And then he says he's writing a post on your
18 defamation lawsuit against Frenkel and Cisco. Any
19 comments?
20      Did you have any?
21   A. No.
22   Q. Did you refer to your lawyer?
23   A. I don't know if I even responded to it.
24   Q. Okay. This is the third of three lawsuits
25 that you filed relating to the articles written by
```

109

1  Mr. Frenkel.  You filed the first one against Google,
2  trying to find out who Frenkel was, right?
3      A.  Yeah, I don't think of it --
4          MS. PEDEN:  Objection to form.
5      A.  I don't think of it as a lawsuit filed against
6  Google.  It was a lawsuit --
7      Q.  (BY MR. BABCOCK)  Actually, it was a 202, and
8  you gave Google notice?
9      A.  Right.
10     Q.  Okay.
11     A.  It was a lawsuit against John Doe, I think, is
12 how it was --
13     Q.  Right.
14     A.  -- styled.
15     Q.  And then the -- and then the next one was
16 filed in -- in state court in Gregg County, correct?
17     A.  Correct.
18     Q.  And that attached the -- two articles
19 we've been talking about today, correct?
20     A.  I believe so.
21     Q.  Okay.  And then that was nonsuited, and this
22 case was filed in federal court in Arkansas, correct?
23     A.  Correct.
24     Q.  And that attached the articles to the federal
25 lawsuit initially, correct?

110

1      A.  If you say it did.  I don't doubt that.
2      Q.  Okay.  Why did you not comment to Mr. Crouch,
3  who was trying to seek your -- get your comment about
4  the lawsuit?
5          MS. PEDEN:  I just want to interject.
6  If -- to the extent it doesn't call for any
7  communications you've had with counsel.
8      A.  I really have a rule of not commenting to
9  anybody about anything going on with this case.  I've
10 tried to let my lawyers talk for me.  Kind of the same
11 advice I give my clients.
12     Q.  (BY MR. BABCOCK)  Okay.
13     A.  I try to be a good client.  And I know we're
14 not -- lawyers are, they say, the worst clients, but --
15     Q.  That's what I've always heard.
16     A.  -- I try not to be.
17     Q.  This fellow, Terry Fokas, you said, is a -- is
18 a client?
19     A.  Yes.  Not individually, but his companies are.
20     Q.  His company.  Is that Parallel Networks?
21     A.  Yes, formerly Epic Realm, now Parallel.
22     Q.  Okay.  Here's Exhibit 8, which is an e-mail
23 from Mr. Fokas --
24         MR. PATTON:  Chip, let me have one, too,
25 if you don't mind.

111

1          MR. BABCOCK:  Sure.
2      Q.  (BY MR. BABCOCK)  -- is an e-mail to Larry
3  Carlson and Kevin Meek and you, subject:  Patent Troll
4  Tracker Defamation Suit.  "Johnny Ward is my hero."
5          Did you receive that e-mail?
6      A.  I did.
7      Q.  Who is Larry Carlson?
8      A.  He's an attorney at Baker Botts.  We tried a
9  case together --
10     Q.  Okay.
11     A.  -- for Parallel, and this was leading up to
12 that trial.
13     Q.  Okay.  And Kevin Meek, also at Baker Botts?
14     A.  Yes.
15     Q.  All right.  And did you take it that Mr. Fokas
16 was saying that you're his hero?
17     A.  I mean, that's what he wrote.
18     Q.  Any -- any idea why you were heroic, in his
19 eyes?
20         MS. PEDEN:  Objection to form.
21     A.  I can speculate.  I -- I know that the Patent
22 Troll Tracker had written about Parallel Networks, as
23 well, and -- there were lots -- lots of folks he wrote
24 unflattering things about.  I don't know that they
25 crossed the line into being defamatory, but there were a

112

1  lot of folks who wanted to know who he was.
2      Q.  (BY MR. BABCOCK)  Okay.  And -- and "Johnny
3  Ward is my hero" is right above a -- what appears to be
4  a news article about Mr. Frenkel, under the headline
5  "Down & Outed."
6      A.  Right.
7      Q.  Okay.  Did you believe that Mr. Fokas, in
8  saying that you were his hero, were -- was also
9  commenting about Frenkel and Cisco?
10         MS. PEDEN:  Objection to form.
11     A.  I don't know what you mean.
12     Q.  (BY MR. BABCOCK)  Well --
13     A.  I'm -- I'm his hero for -- maybe I
14 misunderstood you.
15     Q.  Yeah.
16     A.  Ask me that again.
17     Q.  Probably -- well, it probably wasn't a good
18 question.
19         Why do you think Mr. Fokas was saying
20 "Johnny Ward is my hero"?
21     A.  I'd be guessing.  I'm happy to guess why he'd
22 think that.
23     Q.  Well, why don't you first tell me what you're
24 thinking, and then I'll ask you if you talked to him
25 about it.

113

1     A.   Okay.  I'll answer your second question first.
2     I didn't talk to him --
3         Q.   Okay.
4         A.   -- about:  Why -- why am I your hero, Terry?
5              I think it was because I was not going to
6     take it.
7         Q.   Got it.
8              Here's Exhibit 9, another one from
9     Mr. Fokas.  Did you receive this e-mail regarding Patent
10    Troll Tracker defamation suit?
11        A.   Yeah, and I re -- I responded to it in
12    between.  And then that would have been his reply.
13        Q.   Okay.  You -- your response in the middle
14    says:  I'm getting drawn and quartered in a bunch of the
15    blogs.
16        A.   Yes.
17        Q.   What -- what did you mean by that?
18        A.   When the lawsuit hit the press, you know,
19    whether it's -- I don't remember what all the blogs
20    were.  Like, the Patent Prospector, Patent Leo.  There's
21    some guy who writes another blog, and maybe it's one of
22    these.  And people post comments to the story.  I mean,
23    it -- there was very unflattering things being said,
24    which, you know, if you just don't read them, they don't
25    get to you quite as bad, and I quit reading them.

114

1         Q.   Okay.
2         A.   But that -- but that's what I was referring
3     to.
4         Q.   All right.
5         A.   I didn't save those, but I think they're still
6     out there.  If you want to go get them, I think they're
7     still online.
8         Q.   Okay.  And these -- these are not Frenkel
9     blogs, but these are other blogs?
10        A.   Correct.
11        Q.   Okay.  And they're saying unflattering things
12    about you?
13        A.   Yes.
14        Q.   Okay.  And do you remember what the -- what
15    the criticism of you was?
16        A.   Yeah, that I had sued Cisco.  Now, they're all
17    anonymous, so you don't ever know who's doing it, but,
18    you know, people saying that they're patent lawyers and
19    I should be more thick-skinned and let people accuse me
20    of a crime and just let it roll off my back and not do
21    anything about it.
22        Q.   So they were critical of you filing a lawsuit,
23    basically?
24        A.   Generally, yeah.
25        Q.   Okay.  And -- and Mr. Fokas says:  I thought

115

1     most of them were trying very, very hard to be as
2     objective as possible (heck, they're probably scared
3     they're going to get tagged for defamation - LOL) --
4     which my kids tell me means laugh out loud.
5         A.   That's what I understand, too.
6         Q.   Okay.
7         A.   I don't use it, but some people do.
8         Q.   And was it your understanding that Mr. Fokas
9     was referring to the blogs that -- that you thought
10    were -- were drawing and quartering you?
11             MS. PEDEN:  Objection to form.
12        A.   You'd have to ask him.  I don't --
13        Q.   (BY MR. BABCOCK)  I know.  My question --
14        A.   I -- I didn't -- I didn't -- I didn't follow
15    up and didn't ask him.
16        Q.   So you didn't know what -- when he wrote this,
17    you didn't know what he was talking about?
18        A.   There were a number of articles that were
19    written in a number of magazines and things, so, you
20    know, I don't know what he's referring to specifically.
21        Q.   Okay.  Do you -- do you think these blogs and
22    magazine articles damaged your reputation?
23        A.   I -- I don't know.  I think -- I -- I
24    balanced:  Do I stand up for myself, knowing that when I
25    file a lawsuit, people are going to jump all over me

116

1     versus sitting there and taking it.
2              So I don't know if it damaged my
3     reputation by suing Cisco or not.
4         Q.   All right, sir.
5         A.   I don't really care.
6         Q.   "Personally, I believe that Rick Frenkel is an
7     idiot," writes Mr. Fokas.
8              Had you ever had any discussions with
9     Mr. Fokas about Rick Frenkel?
10        A.   I'm sure we've talked about this case at some
11    point.  You know, he's asked me, "How is it going," or
12    something, but I'm pretty quiet about what's going on in
13    this case with anybody.
14        Q.   Okay.  Do you share his view that Mr. Frenkel
15    is an idiot?
16        A.   I think the guy is plenty smart.
17        Q.   So not an idiot?
18        A.   No.  He's pretty -- pretty smart.  I've got
19    other -- other things I think about him, but I don't
20    think he's dumb.  I think he knew what he was doing.
21        Q.   Have you ever met him?
22        A.   No.
23        Q.   Never talked to him, I take it?
24        A.   No.
25        Q.   And never corresponded with him?

117

1    A.  No.

2    Q.  Let me hand you Exhibit 10.  And this is an

3    e-mail from Michael Smith to you and Eric Albritton on

4    March 14th, 2008, with the message "I'm sure you've seen

5    this, but just in case."  And it attaches a lengthy

6    article from IP Law 360.  Did you receive this?

7    A.  I'm sure I did.

8    Q.  Without going through this whole IP Law 360

9    article, it appears to be commenting, in part, on your

10   lawsuit against Cisco and Mr. Albritton's lawsuit

11   against Cisco and Frenkel.  Is that a fair summary of

12   it?

13   A.  I --

14       MS. PEDEN:  Objection to, form.

15   A.  If you want me to read through it, I can.  I

16   know I read it at one time.  Generally, I think that's a

17   fair -- fair statement, that it was about the lawsuits

18   and what led to the lawsuits.

19   Q.  (BY MR. BABCOCK)  Okay.  Let me hand you

20   Exhibit 11.  This is an article from, I believe,

21   Law.com, which I think is also The Texas lawyer.  Do you

22   remember seeing this article?

23   A.  Again, I think I probably PDF'd it.

24   Q.  Okay.

25   A.  So I'm sure I saw it.

118

1    Q.  And you know that your -- from looking at it,

2    that your lawyer, Mr. Patton, made certain comments to

3    the press about your case, correct?

4    A.  You -- you're going to have to give me a

5    minute, because there were lots of articles, but --

6    Q.  Yeah.

7    A.  -- I imagine he did.

8    Q.  The second page, two-thirds of the way down:

9    Ward's lawyer, Nicholas Patton, a partner in Patton,

10   Tidwell & Schroeder in Texarkana, says Frenkel's

11   postings about his client on Patent Troll Tracker are a

12   "horrible thing," and Ward had no choice but to sue to

13   protect his reputation.  "Those things are damaging.

14   Those kinds of accusations are seen by literally

15   hundreds of thousands of people.  Those are serious

16   accusations that you just can't let go unaddressed,"

17   Patton says.  "There's no truth to it whatsoever."

18       Did I read it correctly?

19   A.  You read it correctly.

20   Q.  Okay.  And those were comments that Mr. Patton

21   was quoted as saying, in any event?

22   A.  They're attributed to Mr. Patton.

23   Q.  Okay.  And as you said before, he was your

24   spokesperson with respect to this case, correct?

25   A.  Was then and is now.

119

1    Q.  Okay.  Here's Exhibit 12 --

2       MR. PATTON:  Got another one?

3       MR. BABCOCK:  Yeah.  (Handing.)

4    Q.  (BY MR. BABCOCK)  -- from Peter Fenner.  Who

5    is Mr. Fenner?

6    A.  He's an inventor who's also a client.

7    Q.  Okay.

8       Johnny, heat up that poker real hot before

9    you stick in the "Patent Troll Tracker" blogger Rick

10   Frenkel and Cisco System, Inc.'s [sic].

11       Did you receive that from Mr. Fenner?

12   A.  I did.

13   Q.  And you respond "thanks."

14   A.  Yep.

15   Q.  Did you discuss this e-mail with Mr. Fenner at

16   any time?

17   A.  Never.

18   Q.  Okay.  This is March 2008, correct?

19   A.  Correct.

20   Q.  Do you have any idea what prompted this e-mail

21   from Mr. Fenner about a year after you filed the

22   lawsuit?

23       MS. PEDEN:  Objection to form.

24   Q.  (BY MR. BABCOCK)  I'll take that back.  It

25   wasn't a year later.  It was --

120

1    A.  No, it was right -- right about the time.

2    Q.  Right at the time of the lawsuit.

3    A.  That's kind of when I got e-mails from folks

4    that had been watching the Patent Troll Tracker blog.

5    Q.  Fair enough.

6       Let me hand you Exhibit 13.  This is from

7    Rodney Gilstrap.  Do you know who he is?

8    A.  Yes.  He's a lawyer in Marshall.

9    Q.  And he's sending along an article in The Texas

10   Lawyer, dated March 17th, 2008, with the comment, quote,

11   now you're famous --

12   A.  Yeah.

13   Q.  -- end quote.

14   A.  Yeah.

15   Q.  And how did you take that comment, "now you're

16   famous"?

17   A.  Not -- not what I wanted to be famous for.

18   Q.  I think you may even say that here in a

19   minute.

20   A.  Okay.

21   Q.  Let me hand you 14.

22       MR. BABCOCK:  Nick, I think somebody

23   miscopied here.

24       MR. PATTON:  That's okay.  That's okay.

25       MR. BABCOCK:  Maybe -- maybe not.  Maybe

Ward, John  8/10/2009  1:21:00 PM

121

1   not. I just didn't staple it. That was the problem.
2       Q. (BY MR. BABCOCK) This is Terry Fokas sending
3   you another article from Business Week about -- about
4   your lawsuit and then the -- Cisco's reaction to it,
5   correct?
6           MS. PEDEN: Objection to form.
7       A. I'm not sure. We can -- if you want me to go
8   through the article, I can. I know it was an article
9   about the lawsuit. I haven't read it in a long time.
10  Kind of what led up to the lawsuit.
11      Q. (BY MR. BABCOCK) Yeah. A lengthy article.
12  You don't need to read the whole thing.
13          But you say: This is the best article
14  I've seen.
15          That's what you said in March of 2008,
16  correct?
17      A. Correct.
18      Q. Have you seen any better articles since then?
19      A. And when I say "better" and "best," as
20  far as giving a full rendition of what was said, the
21  Forbes article might have -- I might have thought it was
22  more balanced as far as saying exactly what was at
23  issue. Clearly, someone else had read it the same way I
24  read it.
25      Q. All right, sir. Here's Exhibit 15. And this

122

1   is a letter from George P. McAndrews to Mark Chandler,
2   dated April 7th, 2008. I don't think you're copied on
3   it, but my question is: Did you see this letter or a
4   draft of it before it was sent to Mr. Chandler?
5           MS. PEDEN: And I -- I need to interject
6   and say that communications that you had with ESN may be
7   attorney-client-privileged. So don't divulge any of
8   your confidential communications with your client.
9       A. I don't recall whether I saw this or not. I
10  saw it after the fact --
11      Q. (BY MR. BABCOCK) Okay.
12      A. -- for sure. I know I saw it after he sent
13  it.
14      Q. Okay.
15      A. I had no hand in writing it. I can tell you
16  that.
17      Q. That was my next question.
18          Here's Exhibit --
19      A. Not to distance myself from it, but I -- I
20  did not have a hand in writing it.
21      Q. Right.
22          Exhibit 16. This is from Mark -- is it
23  Strachan (pronunciation) or --
24      A. Strachan (pronunciation).
25      Q. Strachan. And who is he?

123

1       A. He's an attorney who used to practice in East
2   Texas and then moved to Dallas, and he's with Mark
3   Werbner.
4       Q. "I thought you and Eric might enjoy this
5   cartoon. It was in the National Law Journal. I hope
6   all is well with you."
7           This is April of 2008. And the cartoon is
8   on the third page, but I'm wondering if the second page
9   is supposed to be there.
10          MR. PATTON: It looks like that the
11  second page ends that particular article, Chip.
12          MR. BABCOCK: It looks like what?
13          MR. PATTON: The second page, which is
14  99 -- and then you skip to 256 on the --
15          MR. BABCOCK: Right.
16          MS. PARKER: What's the --
17          MR. PATTON: -- Bates number.
18          MS. PARKER: -- Bates number on the first
19  page?
20          MR. BABCOCK: 98 is the first page.
21          MR. PATTON: You've got 98, 99, and 256.
22          MR. BABCOCK: Okay.
23          THE WITNESS: It looks like it was sent
24  to you.
25          MS. PARKER: It should only have 256 on

124

1   it.
2           MR. BABCOCK: Okay.
3           MR. PATTON: I'm sorry, Crystal?
4           MS. PARKER: According to your discovery
5   responses, it should only have 256 as the attachment,
6   not --
7           MS. PEDEN: So just take off the first
8   two pages?
9           MR. BABCOCK: Take out the middle page.
10          MS. PARKER: The middle page.
11          MS. PEDEN: Oh, the middle page.
12          MS. PARKER: Sorry about that.
13          MR. BABCOCK: Yeah.
14          MS. PEDEN: Okay.
15          MR. BABCOCK: Yeah.
16      A. Do you want me to remove it from this exhibit?
17      Q. (BY MR. BABCOCK) Sure. Yeah, let's -- let's
18  take it out of there. It's not supposed to be there.
19          MR. PATTON: Okay. So 98 and 256 are
20  Exhibit 16?
21          MS. PARKER: Yes.
22          MR. BABCOCK: Right.
23          MS. PARKER: Sorry about that.
24      Q. (BY MR. BABCOCK) And my question is: Is --
25  is the second page of Exhibit 16 the cartoon from the

125

1    National Law Journal that Mr. Strachan sent you?
2        A.   I assume it is.  I mean, it says right above
3    it talking about an NLJ column.  So I can't imagine it'd
4    be anything different.
5        Q.   Okay.  It says that -- the headline is Law and
6    Laughter.  "I'd like to know if my blog can be used
7    against me."
8            Did you find that humorous?
9        A.   I don't know how I found it.  I -- you've
10   given it to me as a -- I don't remember looking at it,
11   to be honest with you.
12       Q.   Okay.
13           (Sotto voce discussion between Mr. Babcock
14           and Ms. Parker.)
15           MR. BABCOCK:  What's the next number?
16           MR. PATTON:  17.
17           MS. PARKER:  I've -- I've already marked
18   that one 19.
19           MR. BABCOCK:  Oh, 19.  Okay.
20       Q.   (BY MR. BABCOCK)  The court reporter will have
21   to put this together, but I read you some information
22   from a Web site earlier, and I just want to give you
23   Exhibit 19.  And tell me if -- if that's your -- if
24   that's your Web site.
25       A.   Well, part of it is and part of it isn't.

126

1        Q.   Okay.
2        A.   I'm in the process of redoing my Web site.
3        Q.   Okay.
4        A.   So the Web site that's live, my profile is, I
5    guess, the first part of this exhibit.  And then I was
6    curious as to how you got that because it wasn't live;
7    it's not out there yet.
8        Q.   It must have been the way-back machine.  Did
9    you produce it to us?
10       A.   No.
11       Q.   No?
12       A.   I mean, it's not -- I literally just finished
13   a proof on Friday.
14       Q.   Okay.
15       A.   But it looks -- it's through Find -- FindLaw,
16   and it looks like they've just linked it to my profile.
17       Q.   Okay.  And which is -- which -- the -- the
18   first four pages of the exhibit are the live --
19       A.   What's up right now.
20       Q.   Okay.  And then that's what's coming up,
21   the -- the --
22       A.   This is what's coming up; although there's
23   still some edits that need to be done to -- there's
24   about 30 pages of material on the new Web site that --
25       Q.   Okay.

127

1        A.   -- need to be edited further.
2            MR. BABCOCK:  How did we get that?
3            MS. PARKER:  Google.
4            THE WITNESS:  Okay.
5        Q.   (BY MR. BABCOCK)  We got it from Google.
6        A.   There you go.
7        Q.   First thing that popped up.
8        A.   Yeah.
9            MR. PATTON:  They're after us, Johnny.
10           THE WITNESS:  Yeah.
11       Q.   (BY MR. BABCOCK)  Okay.  Is there anything in
12   the last three pages, what you've got in your hands now,
13   that is inaccurate?
14       A.   No.  It's -- it's -- well, yeah, areas of
15   practice.  I'm not doing medical malpractice, nursing
16   home negligence.  That's one thing; when I read the
17   proof, I'm, like, they've got two things -- railroad
18   injuries, not doing that.
19       Q.   Okay.
20       A.   I don't even have patent infringement listed
21   as an area of practice, so I, you know --
22       Q.   That's an oversight.
23       A.   Yeah, since that's what I'm doing mostly,
24   so...
25           I mean, I can go through this more

128

1    detailed.  I remember looking at it on Friday, going --
2        Q.   Yeah.
3        A.   -- don't go live with this because this isn't
4    accurate.
5            And so that's why, when you started --
6        Q.   Yeah.
7        A.   -- reading, I knew --
8        Q.   You knew where it was coming from?
9        A.   I knew where it was coming from.
10       Q.   Could -- could you go through it with more
11   detail and tell me anything that's inaccurate?
12       A.   Sure, sure.
13           (Sotto voce discussion between Mr. Babcock
14           and Ms. Parker.)
15       A.   All right.  Everything is accurate down to
16   areas of practice.
17       Q.   (BY MR. BABCOCK)  Okay.
18       A.   I'm not doing medical malpractice; I'm not
19   doing nursing home; I'm not doing railroad injuries; not
20   doing federal tort claims.  I say that.  I've handled
21   those in the past, so I guess I could -- that could be
22   listed.
23           Bar admissions are all accurate, with the
24   exception of maybe the Sixth Circuit.  I remember
25   handling a case, but I don't know if I'm admitted there.

129

1    Just don't...
2            I don't know if I'm still a sustained
3    member of the American Association for Justice.  And I'm
4    a fellow now with the Texas Trial Lawyers Association,
5    which just means I gave them more money.
6        Q.  It's funny how that happens.
7        A.  Yeah.
8            And everything else is accurate.
9            Then we get down to "West Practice
10   Categories."  Again, I'm -- I'm tak- -- that's not what
11   I'm going to have listed there, so -- I've -- I've done
12   all those things, but I'm not going to advertise them.
13       Q.  Okay.  Very good.
14           You mentioned Bob Chiaviello earlier.
15   There's a communication between you and him on your
16   privilege log dated March 14th of '08.  The privilege is
17   said to be work product, but it's regarding this case.
18   Do you know why that document is listed as privileged?
19           MS. PEDEN:  Objection.
20       A.  I -- I'd have to look at it.  And like I said,
21   much of those communications with Mr. Fokas I thought
22   would be privileged, but they've decided what to produce
23   to you, and --
24       Q.  (BY MR. BABCOCK)  Okay.
25       A.  -- I haven't gone back and looked at it.

130

1        Q.  Is -- Mr. Chiaviello is the lawyer at
2    Fulbright --
3        A.  Chiaviello (pronunciation).
4        Q.  Chiaviello.  Sorry.  He is the lawyer at
5    Fulbright, correct?
6        A.  Correct.
7        Q.  And he's the one that told you about a
8    conversation he'd had with somebody else about you?
9        A.  Correct.
10       Q.  Okay.  Are you working with him on any case?
11       A.  Yes.
12       Q.  Are -- is he a -- an attorney on the Ward
13   versus Cisco case?
14       A.  No.
15       Q.  Okay.  Okay.
16       A.  But I'm in -- I'm in a number of cases with
17   Mr. Chiaviello and his firm.
18       Q.  Is Mr. Pridham, who you referenced earlier, an
19   attorney in the Ward versus Cisco case?
20       A.  No.
21       Q.  Is he a client?
22       A.  He's an attorney for a client -- former client
23   who I'm no longer working for.
24       Q.  Okay.  Do you recall talking to him about
25   litigation strategy regarding Ward versus Cisco?

131

1            MS. PEDEN:  Objection to form.
2        A.  I -- I can't reveal to you what we've talked
3    about without revealing attorney-client communications
4    dealing with the client that he worked for.
5        Q.  (BY MR. BABCOCK)  Okay.  Bruce Lagerman, who
6    is he -- or Lagerman (pronunciation)?
7        A.  He was a gentleman who contacted me about
8    potential representation who I did not end up working
9    for, I believe.
10       Q.  Okay.  Are your conversations with him -- do
11   you view them as privileged?
12           MS. PEDEN:  Objection to form.
13       A.  I do.  If he was seeking legal representation,
14   yes, sir.
15       Q.  (BY MR. BABCOCK)  Okay.  So anything he said
16   in that conversation would be covered by the
17   attorney-client privilege?
18           MS. PEDEN:  Objection to form.
19       A.  I -- I don't know that anything he says in the
20   conversation with me, when he's seeking legal
21   representation, would be privileged.
22       Q.  (BY MR. BABCOCK)  Did he -- did you
23   have any discussion with Mr. Lagerman about Cisco?
24           MS. PEDEN:  Objection to form.  And,
25   also, I -- you know, I don't know -- because I don't

132

1    know specifically the documents we're talking about,
2    I -- I just want you to be very cautious --
3            THE WITNESS:  Yeah, I don't --
4            MS. PEDEN:  -- since these may be
5    attorney-client-privileged communications.
6        A.  I would need to look at the e-mails before I
7    tell you that, because I don't -- I don't recall,
8    sitting here --
9        Q.  (BY MR. BABCOCK)  Okay.
10       A.  -- saying, "Let me tell you about my case,"
11   because I -- I generally would never do that.
12       Q.  Here -- here's -- you know, here's my view of
13   it:  I certainly don't want to know -- want to know what
14   you talked to a -- even -- even a potential client
15   about.  But if -- if you talked to him about, you know,
16   Frenkel or Cisco or, you know, this thing and that's not
17   anything to do with your representation, then I do want
18   to know about that.  So --
19       A.  I don't recall having those types of
20   conversations, but I'd need to look at whatever document
21   is on the privilege log and see what -- the context and
22   why I've even produced it to -- to --
23       Q.  To them.
24       A.  -- to them.
25       Q.  Yeah.  Yeah, the only -- the only help I can

133

1    give you is it says:  Bruce Lagerman, John Ward, 4/5/08,
2    e-mails, re:  potential case and comment regarding Troll
3    Tracker post.  Attorney client -- or AC and WP, which I
4    assume is attorney client, work product.
5        A.  I'd have to look at the document.
6        Q.  Okay.  But in any event, there's -- there's no
7    con- -- no unprivileged conversation with him that you
8    can share with us today?
9            MS. PEDEN:  Objection to form.
10       A.  Not that I can recall.
11       Q.  (BY MR. BABCOCK)  Okay.
12       A.  Again, I'm -- I'm surprised we even -- the
13   topic came up, but apparently it's in an e-mail, so --
14       Q.  I tell you, these --
15       A.  Dadgum e-mails.
16       Q.  -- these lawyers, you know --
17       A.  Yeah.
18       Q.  -- you've got to watch them all the time.
19       A.  Not mine.
20       Q.  Have you been -- ever been investigated by the
21   State Bar of Texas, to your knowledge?
22           MS. PEDEN:  Objection to form.
23           Now, let me counsel you on attorney-client
24   privilege and if -- and not to divulge any
25   attorney-client communications.

134

1        Q.  (BY MR. BABCOCK)  Well, now she's got --
2            MS. PEDEN:  Do we need to --
3        Q.  (BY MR. BABCOCK)  -- my curiosity up.
4            MS. PEDEN:  No, do you -- do you -- do we
5    need to --
6            THE WITNESS:  Yeah, let's take a break.
7        A.  We're going to --
8            MS. PEDEN:  All right.
9        A.  -- determine privilege and things like that.
10       Q.  (BY MR. BABCOCK)  Sure.
11           THE VIDEOGRAPHER:  Off the record, 1:08.
12           (Off the record 1:08-1:12.)
13           THE VIDEOGRAPHER:  Going back on record.
14   The time is 1:12.
15       Q.  (BY MR. BABCOCK)  I think before the break,
16   the question was:  Have you ever been investigated by
17   the State Bar of Texas?
18           MS. PEDEN:  And I'm going to object.  I'm
19   not going to let the witness answer as to
20   investigations.  Those are absolutely privileged.  If
21   you want to ask him if he's ever been disciplined by the
22   state bar, that's a different question.  But I'm going
23   to instruct him not to answer as to whether any
24   complaints have been filed.
25           MR. BABCOCK:  Well, your instruction just

135

1    changed my question a little bit, but I'll -- I'll
2    change my question.
3        A.  Okay.
4        Q.  (BY MR. BABCOCK)  Have -- have any -- any
5    complaints been filed against you with the State Bar of
6    Texas, to your knowledge?
7            MS. PEDEN:  I object and instruct the
8    witness not to answer.  Complaints are absolutely
9    privileged.  If you want to ask him if he's been
10   disciplined, he can answer that.
11       Q.  (BY MR. BABCOCK)  Do you know the identity of
12   people that have complained about you to the State Bar
13   of Texas?
14           MS. PEDEN:  Objection.
15           Instruct you not to answer.
16       Q.  (BY MR. BABCOCK)  Okay.  I -- I take it
17   whenever your lawyer says those magic words, you're not
18   going to answer.  Correct?
19       A.  When she tells me not to answer, I'm going to
20   follow her advice.
21       Q.  Okay.  So you're not going to answer about
22   whether complaints have been filed or -- or who the
23   complainants were, correct?
24       A.  That's correct.
25       Q.  Okay.  Can you tell me whether you know if the

136

1    State Bar of Texas has ever investigated you?
2            MS. PEDEN:  Objection.
3            I instruct you not to answer.
4        Q.  (BY MR. BABCOCK)  You're not going to answer
5    that?
6        A.  I'm not going to answer.
7        Q.  Okay.  Have you ever been investigated for
8    alleged criminal misconduct?
9            MS. PEDEN:  Objection.  That question is
10   vague.  What -- what do you mean, "investigated,"
11   "criminal conduct"?
12           I mean, honestly, Chip, I'm -- I'm not --
13   these questions are not relevant and they're aimed at
14   embarrassing and humiliating the witness, and we're
15   going to be very careful about what kind of questions we
16   let you delve into here.
17       Q.  (BY MR. BABCOCK)  Are you going to answer that
18   question or not?
19       A.  I'm going to follow my lawyer's advice.
20       Q.  Okay.  She objected on the basis it was vague,
21   so I want to -- want to cure that, if I can.
22       A.  Okay.
23       Q.  Do you know whether you have been the subject
24   of an investigation by a state district attorney?
25       A.  I know I have not been.

137

```
1       Q.  Okay.  Have you been the subject of an
2    investigation by a state grand jury?
3       A.  I have not been.
4       Q.  Have you been the subject of an
5    investigation by any U.S. attorney or anybody in the
6    U.S. Attorney's Office?
7       A.  Not to my knowledge.
8       Q.  How about the Department of Justice?
9       A.  Not to my knowledge.
10      Q.  How about any federal grand jury?
11      A.  Not to my knowledge.
12      Q.  Okay.  Have you been the subject of any
13   investigation by any law-enforcement agency?
14          MS. PEDEN:  Objection.  Law-enforcement
15   agency?
16      Q.  (BY MR. BABCOCK)  Yeah, an agency of the state
17   or federal government that is charged with enforcing the
18   criminal laws of whatever their jurisdiction is.
19      A.  Why don't we go off the record for just a
20   minute.
21      Q.  Sure.
22      A.  Okay.
23          THE VIDEOGRAPHER:  Off the record --
24      A.  Let me talk to --
25          THE VIDEOGRAPHER:  -- 1:15.
```

138

```
1          (Off the record 1:15-1:18.)
2          THE VIDEOGRAPHER:  Back on the record,
3    1:18.
4       Q.  (BY MR. BABCOCK)  Have you ever engaged in any
5    lobbying efforts in Washington regarding patent reform
6    or the patent laws?
7          MS. PEDEN:  Objection, vague and
8    ambiguous.
9          You can --
10      Q.  (BY MR. BABCOCK)  Go -- go ahead and answer.
11      A.  Yeah.
12          MS. PEDEN:  If you can.
13      A.  Yeah.  When you say "have engaged in," have I
14   gone to D.C.?  Have I called congressmen?  You know,
15   what is it that you're wanting to know?
16      Q.  (BY MR. BABCOCK)  All right.  Good questions,
17   all of them --
18      A.  Okay.
19      Q.  -- since you're a trial -- I bet you're a
20   trial lawyer.
21          Have you ever gone to Washington, D.C. in
22   connection with patent law?
23      A.  No.
24      Q.  Have you ever called any members of Congress
25   regarding -- regarding issues of patent law?
```

139

```
1       A.  No.
2       Q.  Okay.  Have you ever been involved with any
3    organizations that have been on one side or the other of
4    the patent reform law debate?
5       A.  I think the American Association for Justice
6    got involved, and so -- I send money to them.  I don't
7    believe the Texas Trial Lawyers Association has weighed
8    in on it.  So only the AAJ.
9       Q.  Have you ever been to Washington, D.C. on
10   business?
11      A.  Yes.
12      Q.  And while in Washington, D.C., did you ever
13   meet with a member of Congress, either a senator or a
14   representative --
15      A.  Never.
16      Q.  -- or their staff?
17      A.  Never.
18      Q.  Okay.  Did you ever meet with a lobbyist,
19   somebody who -- either for AAJ or for the -- anybody
20   else who's lobbying Congress?
21      A.  Face-to-face meetings, no.
22      Q.  How about telephone meetings?
23      A.  Never on the telephone.
24      Q.  Okay.  You said that the notice of electronic
25   filing was available online.  Could you tell -- I think
```

140

```
1    you said that in your prior testimony.  Could you tell
2    me how you -- how you see that notice of electronic
3    filing?
4       A.  You log in and pull it up.
5       Q.  Have you done that yourself?
6       A.  Yes.
7       Q.  Even for matters where you're -- you're not
8    the lawyer of record?
9       A.  I don't know that.  I did -- I did it to see
10   if I could do it in this case, and I can pull it up.
11      Q.  Okay.  Did you speak to any reporters about
12   the Frenkel Troll Tracker matter before you filed this
13   lawsuit?
14      A.  The instant lawsuit, the one that's filed in
15   Arkansas --
16      Q.  Well, let me say --
17      A.  -- or --
18      Q.  -- the Gregg County one.
19      A.  -- any one?
20          I don't believe I've ever spoken to a
21   reporter, other than to say "contact my lawyer."  And
22   that's usually through a member of my staff or an e-mail
23   inquiry.  I'll say:  No comment.
24      Q.  Okay.
25      A.  Talk to my attorney.
```

Ward, John  8/10/2009  1:21:00 PM

141

```
 1      Q.  Have you ever lived in Arkansas?
 2      A.  No.
 3      Q.  Have you ever owned property in Arkansas?
 4      A.  No.
 5      Q.  Do you have any family in Arkansas?
 6      A.  I'm sure I've got some distant family, but no
 7   one that I --
 8      Q.  No Arkansas jokes, now.
 9      A.  No.  My folks came through that area, so...
10      Q.  Have you ever been to Arkansas?
11      A.  Absolutely.
12      Q.  Okay.  You're not a member of any Arkansas bar
13   association?
14      A.  No.
15      Q.  Okay.  Okay.  That's all I have, Mr. Ward.
16   Thank you very much.
17      A.  All right.
18          MS. PEDEN:  Thank you.
19          THE WITNESS:  Thank you.
20          THE VIDEOGRAPHER:  Off the record, 1:21.
21   This concludes the deposition of John Ward.
22          (Deposition concluded at 1:21 p.m.)
23
24
25
```

142

```
 1              CHANGES AND SIGNATURE
 2          DEPOSITION OF THOMAS JOHN WARD, JR.
 3                  AUGUST 10, 2009
 4   PAGE   LINE    CHANGE              REASON
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

143

```
 1   I, THOMAS JOHN WARD, JR., have read the foregoing
 2   deposition and hereby affix my signature that same is
 3   true and correct, except as noted above.
 4          _____
 5              THOMAS JOHN WARD, JR.
 6   STATE OF _____)
 7   COUNTY OF _____)
 8
 9
10      Before me, _____, on this day
11   personally appeared THOMAS JOHN WARD, JR., known to me
12   (or proved to me under oath or through
13   _____) (description of identity card
14   or other document) to be the person whose name is
15   subscribed to the foregoing instrument and acknowledged
16   to me that they executed the same for the purposes and
17   consideration therein expressed.
18      Given under my hand and seal of office this
19   _____ day of _____, 2009.
20
21          _____
22              NOTARY PUBLIC IN AND FOR
22              THE STATE OF _____
23   My Commission Expires: _____
24
25
```

144

```
 1   STATE OF TEXAS    )
 2   COUNTY OF DALLAS  )
 3
 4      This is to certify that I, Stacy L. Jordan,
 5   Certified Shorthand Reporter in and for the State of
 6   Texas, certify that the foregoing deposition of THOMAS
 7   JOHN WARD, JR. was reported stenographically by me at
 8   the time and place indicated, said witness having been
 9   placed under oath by me, and that the deposition is a
10   true record of the testimony given by the witness.
11      I further certify that I am neither counsel
12   for nor related to any party in this cause and am not
13   financially interested in its outcome.
14      Given under my hand of office on this 17th day
15   of August, 2009.
16
17          _____
17          STACY L. JORDAN, CSR 7499
18          Expiration Date:  12/31/10
18          Firm No. 593
19
20          WEST COURT REPORTING SERVICES
20          221 Main Street
20          Suite 1250
21          San Francisco, California 94105
21          (800) 548-3668
22
23   Taxable cost of original charged to Defendant:
23   $_____
24
25   Atty:  Mr. Charles L. Babcock and Ms. Crystal J. Parker,
25   Jackson Walker, L.L.P.
```