# Exhibit 4

Dockets.Justia.com

Chiavello, Robert H.  9/23/2009  11:10:00 AM

1

```
 1         IN THE UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF ARKANSAS
 2             TEXARKANA DIVISION
 3   JOHN WARD, JR.,      )
                          )
 4                        )  C.A. NO. 08-4022
     v.                   )  JURY TRIAL DEMANDED
 5                        )
     CISCO SYSTEMS, INC.  )
 6
 7
 8
 9   *************************************************
        ORAL AND VIDEOTAPED DEPOSITION OF
10        ROBERT H. CHIAVELLO, JR.
              SEPTEMBER 23, 2009
11                VOLUME I
     *************************************************
12
13
14
15       ORAL AND VIDEOTAPED DEPOSITION OF ROBERT H.
16   CHIAVELLO, JR., produced as a witness at the instance of
17   the Defendant, and duly sworn, was taken in the
18   above-styled and numbered cause on the 23rd day of
19   September, 2009, from 9:06 a.m. to 11:10 a.m., before
20   April R. Eichelberger, CSR in and for the State of
21   Texas, reported by machine shorthand, at the law offices
22   of Fulbright & Jaworski, 220 Ross Avenue, Suite 2800,
23   Dallas, Texas, pursuant to the Federal Rules of Civil
24   Procedure and the provisions stated on the record or
25   attached hereto.
```

3

```
 1                  INDEX
 2                            PAGE
 3
     Appearances........................ 2
 4
 5   Exhibit List....................... 4
 6
     ROBERT H. CHIAVELLO, JR.
 7     Examination by Mr. Schwarz............. 6
 8     Examination by Mr. Patton.............. 79
 9
     Signature and Changes...................... 81
10
11   Reporter's Certificate....................... 83
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2

```
 1            A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
       Nicholas H. Patton, Esq.
 4     PATTON, TIDWELL & SCHROEDER, LLP
       4695 Texas Boulevard
 5     Texarkana, Texas  75505
       Phone: 903.792.7080  Fax: 903.792.8233
 6     E-mail: nickpatton@texarkanalaw.com
 7   FOR THE DEFENDANT:
 8     Kurt A. Schwarz, Esq.
       JACKSON WALKER, LLP
 9     Bank of America Plaza
       901 Main Street, Suite 6000
10     Dallas, Texas  75202
       Phone: 214.953.6000  Fax: 214.953.5822
11     E-mail: kschwarz@jw.com
12   FOR THE WITNESS:
       Joni Collins, Esq.
13     FULBRIGHT & JAWORSKI, LLP
14     2200 Ross Avenue, Suite 2800
       Dallas, Texas  75201
15     Phone: 214.855.8000  Fax: 214.855.8200
       E-mail: lcollins@fulbright.com
16
17   ALSO PRESENT:
18     Paul Young, Videographer
       Kathleen McCurry, Intern
19
20
21
22
23
24
25
```

4

```
 1                EXHIBIT LIST
 2   EXHIBIT NAME   DESCRIPTION              PAGE
 3   Exhibit 26  Cisco Systems, Inc's Notice of    14
                 Deposition of Bob Chiavello
 4
     Exhibit 27  Plaintiff's Initial Disclosure    16
 5
     Exhibit 28  Plaintiff's First Supplemental    17
 6             Disclosures
 7   Exhibit 29  Patent Troll Tracker September 24, 2007   33
                 FRENKEL2.000353-364
 8
     Exhibit 30  Civil Docket 5:07-cv-156-DF-CMC    43
 9             CISCO.000240-241
10   Exhibit 31  Complaint for Patent Infringement   43
                 5:07-cv-156-DF-CMC filed 10/15/2007
11             CISCO.000091-96
12   Exhibit 32  Complaint for Patent Infringement   48
                 5:07-cv-156-DF-CMC filed 10/16/2007
13             CISCO.000165-170
14   Exhibit 33  Docket Report 5:07-cv-00156-DF-CMC   48
                 CISCO.000242-243
15
     Exhibit 34  Patent Troll Tracker October 18, 2007   50
16
     Exhibit 35  Patent Troll Tracker October 18, 2007   50
17
     Exhibit 36  Patent Troll Tracker October 18, 2007   50
18
19
20
21
22
23
24
25
```

**5**

1  P R O C E E D I N G S
2  THE VIDEOGRAPHER:  Here begins the
3  videotaped deposition of Robert Chiavello, Tape 1,
4  Volume 1, in the matter of John Ward, Jr., versus Cisco
5  Systems, Incorporated.  It's in the U.S. District Court,
6  Western District of Arkansas, Texarkana Division, Case
7  Number 08-4022.  Today's date is September 23rd, 2009.
8  The time on the video monitor is 9:06 a.m.
9  The video operator today is Paul Young,
10  representing West Court Reporting Services.  The court
11  reporter is April Eichelberger from HG Litigation
12  Services, reporting on behalf of West Court Reporting
13  Service.
14  Today's deposition is being taken on
15  behalf of the defendant and taking place at Fulbright &
16  Jaworski at 2200 Ross Avenue, Dallas, Texas.
17  Counsel, please identify yourselves for
18  the record and whom you represent.
19  MR. PATTON:  I'm Nick Patton.  I
20  represent the plaintiff, Johnny Ward.
21  MR. SCHWARZ:  I'm Kurt Schwarz with
22  Jackson Walker, and I represent the defendant, Cisco
23  Systems, Inc.
24  MS. COLLINS:  I'm Joni Collins of
25  Fulbright & Jaworski, and I represent Mr. Chiavello.

**6**

1  THE VIDEOGRAPHER:  And the witness may
2  now be sworn in by the court reporter.
3  ROBERT H. CHIAVELLO, JR.,
4  having been first duly sworn, testified as follows:
5  EXAMINATION
6  BY MR. SCHWARZ:
7  Q.  Good morning.  Would you please state your
8  full name for the record.
9  A.  It's Robert M. Chiavello, Jr.
10  Q.  Okay.  Mr. Chiavello, my name Kurt Schwarz.
11  I'm with Jackson Walker, and I represent the defendant
12  in this lawsuit, Cisco Systems, Inc.
13  Have you given your deposition or given
14  testimony before?
15  A.  I have.
16  Q.  Okay.  So you're familiar with the basic
17  ground rules?
18  A.  I am.
19  Q.  Okay.  That -- for example, that you're under
20  oath?
21  A.  Of course.  Yes.
22  Q.  Okay.  And I've asked you -- and this is a
23  particular problem for me.  If I say something that --
24  if I ask you a question that's confusing or disjointed
25  or you don't understand in any way, would you please ask

**7**

1  me to clarify it?
2  A.  I will.
3  Q.  Okay.  Are you on any medication or do you
4  have any condition that would prevent you from giving
5  true and complete testimony today?
6  A.  I'm not and I do not.
7  Q.  Okay.  Could you please give audible answers
8  to all of my questions so the court reporter can record
9  them?
10  A.  Yes.
11  Q.  Okay.  You notice -- you mentioned that you've
12  been deposed before.  How many times?
13  A.  Twice.
14  Q.  Okay.  And what sort of cases were those?
15  A.  One was a good-faith breach of contract-type
16  case.  I'm not exactly sure what the underlying claims
17  were.  And the other was a trademark case.
18  Q.  Okay.  And were you -- were you deposed as a
19  fact witness or an expert witness?
20  A.  Fact witness.
21  Q.  In both cases?
22  A.  Yes, sir.
23  Q.  Okay.  Do you recall the entities that you
24  were deposed on behalf of?
25  A.  Well, I remember one.  I was deposed in a case

**8**

1  involving EDS, and I was deposed by the plaintiff in
2  that case, which was two individuals who claimed EDS had
3  breached an agreement with them.  And then in the other
4  case I was deposed, it was a trademark infringement
5  case, and I was deposed by the accused infringer is my
6  recollection.
7  Q.  Okay.  Where did you go to college?
8  A.  I went to Washington & Lee University.
9  Q.  Okay.  And what was your major?
10  A.  Physics.
11  Q.  And did you grow up in that part of the
12  country?
13  A.  No, sir.
14  Q.  Where did you grow up?
15  A.  I grew up in New Jersey.
16  Q.  Oh, really?  What part?
17  A.  Rutherford, New Jersey, which is in the
18  northeastern part of New Jersey.
19  Q.  And today is Bruce Springsteen's birthday.
20  A.  Okay.
21  Q.  And you went to law school at John Marshall
22  Law School; is that correct?
23  A.  That's correct.
24  Q.  Okay.  I understand that you're licensed to
25  practice law in the state of Texas?

Chiavello, Robert H.  9/23/2009  11:10:00 AM

9

1   A.   That's correct, yes, sir.

2   Q.   Okay.  And since when?

3   A.   1989, I believe.

4   Q.   And are you certified by the Texas board of

5   specialization in any area?

6   A.   No, sir.

7   Q.   Okay.  Well, I understand also that you're

8   licensed to practice law in New York?

9   A.   Yes, sir.

10   Q.   Okay.  And since when have you been licensed

11   in New York?

12   A.   I believe it's 1981.

13   Q.   And I also understand that you're licensed to

14   practice before the U.S. Patent and Trademark Office; is

15   that correct?

16   A.   That's correct.

17   Q.   Okay.  And since when have you been?

18   A.   I believe that's 1986.

19   Q.   Would you briefly go through your employment

20   history since you were graduated from law school?

21   A.   Sure.  I originally went to work for a firm

22   called Penny Edmonds, and it actually was a little bit

23   more complicated than that because I originally started

24   working for a single partner at Penny Edmonds, a man by

25   the name of Stan Lawrence in New Jersey because New

10

1   Jersey, at the time, had some restrictions on New York

2   firms practicing law in the state of New Jersey.  But I

3   was actually being compensated by Penny Edmonds.  That

4   relationship ended pretty quickly, and I went to work --

5   and I worked for Penny Edmonds until 1985.

6        In 1985, I went to work for IBM as a

7   patent attorney.  I left IBM in 1988, and in -- on

8   January 1st, 1981, I started with the firm of Baker

9   Mills & Glast.

10   Q.   I'm sorry.  You said 1981.

11   A.   I'm sorry.  No, '89.

12   Q.   '89, okay.

13   A.   Yeah.  '88 -- I worked at IBM until 1988,

14   December 31st, and then January 1, 1989, I started at

15   Baker Mills & Glast.

16   Q.   And where was that office?

17   A.   Here in Dallas.

18   Q.   Okay.  So when did you move down to Dallas?

19   A.   January 1st, 1989.

20   Q.   Okay.

21   A.   I was at Baker Mills & Glast until April of

22   1990, at which time I joined Baker Botts.  I was at

23   Baker Botts until September of 2002, at which time I

24   joined Fulbright & Jaworski.

25   Q.   And you've been with Fulbright, obviously,

11

1   since '02?

2   A.   Yes, sir.

3   Q.   Okay.  Would you please describe the nature of

4   your practice here at Fulbright?

5   A.   I specialize in intellectual property and

6   primarily handle litigations, court actions involving

7   intellectual property.

8   Q.   According to your bio on your firm's website,

9   which I didn't bring today, it says you have personally

10   handled hundreds of patent cases; is that correct?

11   A.   I believe so, yes.  Yes.

12   Q.   Okay.  Is it common in patent cases to sue on

13   the exact date a patent issues?

14        MR. PATTON:  Object, form.

15   A.   No.  I would say it's not common.

16   Q.   (BY MR. SCHWARZ)  Why would one sue on the

17   date a patent issues?

18        MR. PATTON:  Object to form.

19   A.   Oh, there are lots of reasons.  You know,

20   primary reason would be concern that it's well-known in

21   the industry that the patent is going to issue and that

22   the patent owner would be subject to a declaratory

23   judgment action by an accused infringer.

24   Q.   (BY MR. SCHWARZ)  Okay.  What did you do to

25   prepare for your deposition today?

12

1   A.   Oh, I -- to prepare for the deposition, I met

2   with my attorney.

3   Q.   And who is your attorney?

4   A.   Ms. Collins.

5   Q.   And she's sitting right next to you, correct?

6   A.   Yes, sir.

7   Q.   Okay.  Did you -- have you read the complaint

8   or the amended complaint in the lawsuit that we're here

9   for?

10   A.   I looked at a complaint.  I can't tell you

11   whether it was the original complaint or the amended

12   complaint.  I did not read it word for word.

13   Q.   Okay.  And when did you do that?

14   A.   Yesterday.

15   Q.   Okay.  Have you read Cisco's answer?

16   A.   No, sir.

17   Q.   Okay.  Have you read any depositions?

18   A.   No, sir.

19   Q.   Have you read -- have you reviewed any other

20   documents in preparation for today's?

21   A.   No, sir.

22   Q.   Did you discuss your testimony or your

23   anticipated testimony here today with Mr. Ward or any of

24   his attorneys?

25   A.   No, sir.

Chiavello, Robert H.  9/23/2009  11:10:00 AM

13

1    Q.  Okay.  Have you spoken with Mr. Ward about
2  this case since it was filed?
3    A.  I did.
4    Q.  And when was that?
5    A.  I believe I was served -- I think it was last
6  Thursday.
7    Q.  And you started to say that you were served.
8  Could you please put your conversation with Mr. Ward
9  into context?
10    A.  Sure.  When -- when I was served with the
11  subpoena, I called him to alert him to the fact that I
12  had received a subpoena to make sure that he was aware
13  that I had been -- been noticed.
14    Q.  Okay.  Had he notified you at any time prior
15  to your being served that you had been designated as a
16  witness in this case?
17    A.  Yes, he did.
18    Q.  And do you recall when that was?
19    A.  No, I don't.
20    Q.  Okay.  Do you have any sort of attorney-client
21  relationship with Mr. Ward?
22    A.  Well, Mr. Ward and I are co-counsel on -- on
23  some cases, and so, of course, we have -- I'm not sure
24  it would be attorney-client privilege in those
25  circumstances, but we're certainly co-counsel in some

14

1  matters.
2    Q.  I understand that.  I should have been more
3  clear in my question.
4        Do you have any sort of attorney-client
5  relationship as it relates to the case that we're here
6  for today, the Ward v. Cisco case?
7    A.  No.
8    Q.  Okay.  Are you aware of any communications
9  between you and Mr. Ward that relate to this case that
10  might be privileged?
11    A.  Not that I'm aware of.
12    Q.  Okay.
13        (Exhibit Number 26 was marked.)
14        MR. PATTON:  What number is it?
15        MR. SCHWARZ:  This is 26.  At least
16  that's what I've been told to start with.
17    Q.  (BY MR. SCHWARZ)  I've just handed you a
18  document that has been labeled Exhibit 26, and is this
19  the deposition notice and subpoena that you received
20  last week?
21    A.  It appears to be, yes.
22    Q.  Okay  Do you understand that we're here in
23  connection with the case of John Ward, Jr., versus Cisco
24  Systems, Inc., which is pending in the U.S. District
25  Court for the Western District of Arkansas?

15

1    A.  Yes, sir.
2    Q.  Okay.  And do you understand that this case
3  arises out of an underlying patent infringement case
4  pending in the Eastern District of Texas styled
5  ESN v. Cisco?
6        MR. PATTON:  Object to form.
7    A.  I'm not exactly sure I understand your
8  question.
9    Q.  (BY MR. SCHWARZ)  Okay.  We'll get to those --
10  to those matters a little later.
11        Are you aware of being involved in any
12  litigation where your client is adverse to Cisco?
13    A.  Now or in the past?
14    Q.  Let's start with now.
15    A.  No, I'm not aware of -- I am not personally
16  handling any matter where Cisco is adverse.
17    Q.  Okay.  In the past, have you?
18    A.  Yes.
19    Q.  Okay.  And what case or cases would those be?
20    A.  There were two cases.  And I better go back
21  and amend -- amend my answer.  I am involved in one case
22  where a -- as I understand it, a Cisco subsidiary is a
23  named defendant.  Cisco Systems is not a named
24  defendant, but one of its subsidiaries.  The two cases
25  were Fenner Investments, and I can't remember -- I think

16

1  it was Fenner Investments versus Juniper, and QPSX
2  versus -- again, I think it may have been Juniper, but
3  Cisco was a co-defendant in both of those cases.
4    Q.  Okay.
5        (Exhibit Number 27 was marked.)
6    Q.  (BY MR. SCHWARZ)  I've handed you a document
7  which has been labeled Exhibit 27, and it is plaintiff's
8  initial disclosure in the Ward v. Cisco Systems case.
9  And I would ask you to look at page 6.
10    A.  Okay.
11    Q.  You'll note that your name is listed as --
12  next to the Number 23.  Would you please read for the
13  record the description of the testimony you've been
14  designated as a witness for?
15    A.  Starting with my name?
16    Q.  Yeah.
17    A.  "Bob Chiavello has knowledge of damage done to
18  plaintiff's reputation by defendant's statements.  He
19  also has knowledge of plaintiff's reputation in the
20  legal community."
21    Q.  Okay.  Is that description accurate?
22    A.  Yes, sir.
23    Q.  Okay.  Is that description complete?
24    A.  I don't understand.
25    Q.  Well, I should have asked it differently.  Do

Chiavello, Robert H.  9/23/2009  11:10:00 AM

17

1  you have knowledge of any other -- to your knowledge, do
2  you have personal knowledge of any facts, other than
3  these that have been listed in the designation, that
4  relate to Mr. Ward's claims against Cisco Systems?
5      A.  I really don't know because I don't know
6  what -- all of Mr. Ward's claims against Cisco.
7      Q.  Fair enough.  I will note that, on the
8  Certificate of Service on this document, it indicates
9  that this document was served in December of 2008.  Were
10  you contacted by Mr. Ward or his attorney about
11  designated as a person with knowledge of relevant facts
12  at that time?
13      A.  I can't --
14          MR. PATTON:  Object to form.
15      A.  I can't remember.
16      Q.  (BY MR. SCHWARZ)  Okay.  Did you review that
17  description of your anticipated testimony before it was
18  served on other parties in this case?
19      A.  No, sir.
20      Q.  Have you ever seen that before today?
21      A.  No, sir.
22      Q.  Okay.
23          (Exhibit Number 28 was marked.)
24      Q.  (BY MR. SCHWARZ)  I've just handed you a
25  document that's styled Plaintiff's First Supplemental

18

1  Disclosures, and it's been labeled Exhibit Number 28.
2  Would you please turn to page 7 of this first
3  supplemental disclosure.  You are again listed as
4  Number 23, and would you please read the description of
5  your knowledge of facts in this case from that
6  designation?
7      A.  "Bob Chiavello has knowledge of damage done to
8  plaintiff's reputation by defendant's statements.  He
9  also has knowledge of plaintiff's reputation in the
10  legal community.  Mr. Chiavello may have additional info
11  regarding the facts of this case."
12      Q.  You'll note that Mr. Ward added the sentence
13  "Mr. Chiavello may have additional info regarding the
14  facts to this case" to --
15          MR. PATTON:  Object to form.
16      Q.  (BY MR. SCHWARZ)  -- the -- to this
17  designation.  Did Mr. Ward or his attorney discuss this
18  change -- changed description with you before these
19  disclosures were served on Cisco in September of 2009?
20      A.  No, sir.
21      Q.  Okay.  What info, as it says in the
22  description, regarding the facts of this case that
23  you've learned between December 2008, when those initial
24  disclosures were served, and December 2009, when the
25  supplemental disclosures were served?

19

1      A.  I don't know.
2      Q.  Okay.  What information regarding the facts of
3  this case do you have outside of information about
4  plaintiff's reputation in the legal community and the
5  damage done to plaintiff's reputation by defendant's
6  statements?
7      A.  Like I said, I don't know what the -- what the
8  claims are, and so I don't know what facts I may have
9  that would relate to those claims.
10      Q.  Okay.  Well, then how long have you known
11  Mr. Ward?
12      A.  I think 2003.
13      Q.  Do you recall the circumstances of your
14  meeting?
15      A.  I was introduced to Mr. Ward by Mr. Franklin
16  Jones.
17      Q.  And who is Mr. Franklin Jones?
18      A.  Mr. Franklin Jones is deceased now.  He was
19  one of the pillars of the Texas bar.  He was one of the
20  leading attorneys in the state.  He practiced law in
21  Marshall, Texas.  He was a fine lawyer.
22      Q.  And what were the circumstances of your being
23  introduced by Mr. Jones to Mr. Ward?
24      A.  Mr. Jones was working with us on a case and
25  informed me that he was -- he was up there in age at the

20

1  time.  I think he was in his '70s and wanted to cut back
2  a little bit and had suggested that we might want to
3  work with Johnny Ward, who, in his view, was one of the
4  finest young lawyers he had seen in a long time and
5  thought very highly of him and recommended --
6  recommended him to me to work with.  And so I was
7  introduced to Johnny by Mr. Jones.
8      Q.  Okay.  Are you personal friends with Mr. Ward
9  or just business acquaintances?
10      A.  We don't see one another socially outside of
11  business, if that's what you mean.
12      Q.  Okay.  How many cases have you worked on with
13  Mr. Ward over the years?
14      A.  I don't remember the exact number.
15      Q.  Can you give me a ballpark?
16      A.  It's probably in the neighborhood of five.
17      Q.  Okay.  Is your relationship with Mr. Ward
18  generally that of your firm being lead counsel and
19  Mr. Ward being local counsel?
20      A.  Yes, sir.
21      Q.  And in light of your previous testimony about
22  the nature of your practice, are the cases that you've
23  been involved with been intellectual property cases?
24      A.  Yes, sir.
25      Q.  How do you and your clients typically use

21

1  Mr. Ward as local counsel?  What sorts of
2  responsibilities does he assume?
3          MR. PATTON:  Object to form.
4      A.  It varies from case to case and from week to
5  week, but Mr. Ward is -- I view him as a trusted
6  counselor, and so when issues arise, I will call on him
7  for his advice and counsel.
8      Q.  (BY MR. SCHWARZ)  Do you generally ask him to
9  draft pleadings?
10     A.  Not generally, no.
11     Q.  Or discovery?
12     A.  No.  I would say no.
13     Q.  Okay.  To interview witnesses?
14     A.  That's a task that I would ask him to do --
15     Q.  Okay.
16     A.  -- and I believe he has done for me.
17     Q.  Does he draft motions for you?
18     A.  I think that's something that I would call on
19  him to do from time to time.
20     Q.  And take depositions?
21     A.  Yes.
22     Q.  Okay.  Draft jury charges?
23     A.  He would assist, yes.
24     Q.  Argue before the court?
25     A.  Yes.

22

1      Q.  I know this may vary from case to case, but
2  let me ask, in general, do you make the decision as to
3  whom to hire as local counsel or do your clients?
4          MR. PATTON:  Object to form.
5      A.  It does vary from case to case, and I would
6  say it's usually a collaborative affair.
7      Q.  (BY MR. SCHWARZ)  Do you typically recommend
8  several for a client to choose from or say let's hire
9  Johnny Ward because he's really good?
10         MR. PATTON:  Object to form.
11     A.  Again, it varies from case to case.
12     Q.  (BY MR. SCHWARZ)  Okay.  You mentioned you've
13  probably worked with him on the -- on about five cases.
14  Can you recall any of them in particular, which clients
15  you represented?
16     A.  Yes.  The Antor -- what we call the Antor
17  cases, there were a number of cases.  We represented
18  Antor Media in an infringement action against a number
19  of defendants, and there were a number of separate cases
20  that were filed.
21         Another case I recall, the Fenner versus
22  Juniper case is one and another case involved -- Fenner
23  versus Microsoft.  And I believe Mr. Ward is helping us
24  with the Fenner versus 3Com case.
25     Q.  And in -- let's start with the first one.  Did

23

1  you say it was Antor?
2      A.  Yes, sir.
3      Q.  Did you represent the plaintiff or the
4  defendant in that?
5      A.  Plaintiff.
6      Q.  And do you recall the process by which you and
7  your client decided to retain Mr. Ward in that case?
8      A.  Yes, sir.
9          MR. PATTON:  Objection, form.
10     A.  I do recall that.
11     Q.  (BY MR. SCHWARZ)  Would you describe it for
12  us, please.
13     A.  That was the matter where Mr. Jones
14  recommended that we associate with Mr. Ward.
15     Q.  Okay.  And how about the Fenner versus Juniper
16  case?
17     A.  We were very pleased with Mr. Ward's
18  assistance in the Antor case, and so we recommended him
19  in the Fenner case to the -- to the plaintiff in that
20  case, who we represented.
21     Q.  Okay.  And was that also true in the other two
22  Fenner cases that you mentioned?
23     A.  Yes, sir.
24     Q.  Okay.  What are your criteria for choosing
25  local counsel?

24

1          MR. PATTON:  Object to form.
2      A.  Well, I'm sure you appreciate we -- there are
3  a lot of different factors that go into the decision on
4  who to associate with as associate counsel in any
5  matter.
6      Q.  (BY MR. SCHWARZ)  Can you list some of those
7  criteria, for example, in the Fenner versus 3Com case?
8      A.  Well, I would say certainly the most important
9  matter is the person's legal -- legal skills, his
10  ability or her ability as a lawyer.  Certainly their
11  reputation as an upstanding person.  Knowledge of the
12  local court is also an important -- important factor.
13     Q.  When you say "knowledge of the local court,"
14  does that -- are you referring to the judges or just the
15  system as a whole?
16     A.  Both.
17     Q.  Okay.  So would you say that Mr. Ward has a
18  good relationship with the judges in East Texas?
19         MR. PATTON:  Object to form, calls for
20  speculation.
21     A.  Yeah, I -- you know, you're asking me what the
22  judges think, and they don't share that with you.
23     Q.  (BY MR. SCHWARZ)  I'm asking -- I'm asking you
24  your perception.
25         MR. PATTON:  Object to form.

Chiavello, Robert H.   9/23/2009   11:10:00 AM

25

1    A.  Yeah, I believe he's well respected by the
2    judges in the Eastern District.
3    Q.  (BY MR. SCHWARZ)  And he's the son of a
4    federal judge, correct?
5    A.  Yes, he is.
6    Q.  Do you have personal knowledge of Mr. Ward's
7    reputation in the legal community?
8    A.  I believe I do.
9    Q.  Okay.  And let me back up.  When I said "legal
10   community," the reason I used that phrase is because
11   Mr. Ward used it in his -- in the two designations I put
12   before you as Exhibits 27 and 28.  Would you define your
13   understanding of legal community?
14   A.  Okay.  I would say I personally am associated,
15   you might say, in two communities.  One community would
16   be the lawyers who practice in Texas and particularly in
17   the Eastern District of Texas generally.  And then the
18   second community I would -- I'm associated with would be
19   on a more national level involving intellectual property
20   cases, and so these would include lawyers who do not
21   routinely practice in the Eastern District of Texas, if
22   they ever practice there.
23   Q.  Okay.  What do you consider to be -- excuse
24   me.  Let me back up.
25       You've just basically kind of defined two

26

1    kind of separate groups of lawyers.  Do you -- what do
2    you consider to be the universe of lawyers who might
3    care about Mr. Ward's reputation?
4       MR. PATTON:  Object to form.
5    A.  Well, I would say both of those groups.  You
6    can appreciate there's some overlap between the two
7    groups.
8    Q.  (BY MR. SCHWARZ)  Right.  So please, tell me
9    your understanding of Mr. Ward's reputation.
10   A.  My understanding is that -- well, let me --
11   let me ask you to pin down a time.
12   Q.  Let's start with today.
13   A.  I think he generally has a -- has a good
14   reputation, certainly from my perspective.
15   Q.  How about -- you've said you first met him --
16   I'm sorry -- in 2003?
17   A.  Yes, sir.
18   Q.  How would you evaluate his reputation in 2003?
19   A.  Well, when I -- when I first met him, I mean,
20   his -- the -- it was a community of one or two that --
21   well, I would say he had a good reputation at that time
22   and -- yes, I'd say he had a very good reputation at
23   that time.  I would distinguish between before I knew
24   him and afterward.  Before -- before I was introduced, I
25   didn't know him.

27

1    Q.  Okay.  You had not heard of him before that
2    time?
3    A.  That's correct.
4    Q.  Okay.  And if I understand you correctly, you
5    think highly of him today?
6    A.  I do.
7    Q.  And you believe his reputation today is that
8    of a well-respected honorable attorney?
9       MR. PATTON:  Object to form.
10   A.  Well, again, you have -- you know, among most
11   people, I think that's true.  I think there are some
12   people that -- where that's not true.
13   Q.  (BY MR. SCHWARZ)  And who would those people
14   be?
15   A.  You know, I've had people question his
16   reputation as a result of the comments that your client
17   made that bring us all here today.
18   Q.  Okay.  Did you ever have -- and you made
19   reference to the comments that were made that are -- you
20   understand that they're the basis of this lawsuit,
21   correct?
22   A.  I do.  I believe I do.
23   Q.  I mean you did -- you mentioned that you
24   were -- I'm not saying you studied it, but you did at
25   least briefly review the -- a petition or a complaint in

28

1    this case, correct?
2       MR. PATTON:  Object to form.
3    A.  I briefly reviewed a complaint, yes.
4    Q.  (BY MR. SCHWARZ)  Okay.  Do you understand
5    that certain statements were made by the author of a
6    blog called the Patent Troll Tracker?
7    A.  I know that that's -- could you restate the
8    question?
9    Q.  Fair enough.
10   A.  I'm sorry.
11   Q.  Do you understand that certain comments were
12   made to which Mr. Ward has raised objection by an
13   anonymous blogger or a person who was then anonymous
14   called the Patent Troll Tracker?
15   A.  Yes, I understand that.
16   Q.  Okay.  Did you ever have occasion to read the
17   blog Patent Troll Tracker?
18   A.  Yes.
19   Q.  Okay.  And do you recall when you first read
20   it?
21   A.  It would have been, I believe, in 2007
22   sometime.
23   Q.  Do you recall how you found out about the
24   Patent Troll Tracker blog?
25   A.  One of my colleagues informed me about it.

Chiavello, Robert H.  9/23/2009  11:10:00 AM

29

1  Q.  Do you recall who that was?
2  A.  I believe it was Kirby Drake.
3  Q.  Do you recall why he recommended that you read
4  it?
5  A.  Well, it's a she.
6  Q.  Oh, I'm sorry.
7  A.  In -- I believe it was.  It was a blog that
8  was getting a lot of attention in the -- in the
9  community, and I had heard about -- heard about it and
10  asked her to show me how to find out what it was about.
11  Q.  Okay.  When you -- you mentioned -- you used
12  the word "community."  Would you explain to us what you
13  mean by the -- by your use of that word?
14  MR. PATTON:  Objection, form.
15  A.  Well, I would use it -- I'm sorry.  The two
16  communities I would -- mentioned before, the national
17  patent bar and the -- and the Texas bar.
18  Q.  (BY MR. SCHWARZ)  Okay.  Did you read the
19  Patent Troll Tracker often?
20  A.  No, sir.
21  Q.  Okay.  Did you ever e-mail the Patent Troll
22  Tracker or otherwise try to communicate with it?
23  A.  No, sir.
24  Q.  Okay.  Did you ever recommend to others that
25  they read the Patent Troll Tracker?

30

1  A.  I don't think I ever did that.
2  Q.  Okay.  Were any of the cases that you've been
3  involved with ever discussed by the Patent Troll
4  Tracker?
5  A.  I believe that -- I believe at least one of
6  them has, maybe two of them.
7  Q.  And do you recall which cases?
8  A.  I believe one of the Fenner cases and I
9  believe one of the Antor cases.
10  Q.  Do you recall what the Patent Troll Tracker
11  said about the Fenner case?
12  A.  I don't remember the details other than it was
13  a negative and misleading, if not false, comment about
14  the case.  And my recollection was it was -- it was not
15  a -- not a positive statement.
16  Q.  You said it was misleading.  Do you recall in
17  what way you considered it misleading?
18  MR. PATTON:  Object to form.
19  A.  My recollection was he just misstated the
20  facts.
21  Q.  (BY MR. SCHWARZ)  And was that the Fenner
22  case?
23  A.  I believe it was.
24  Q.  Okay.  How about the Antor case?  Do you
25  recall the coverage there?

31

1  A.  I don't have a clear recollection of him
2  having said anything about the Antor case, other than
3  just maybe reporting on -- well, now that -- now that I
4  think about it, I think he had -- he made some comments
5  about our fact that the case was filed with one named
6  defendant and then multiple defendants were added at a
7  subsequent time.
8  And as I recollect, he accused us of doing
9  something in violation of the rules with respect to
10  those -- that pleading.  That's -- you know, it's been a
11  while since I reviewed it, and I never did anything
12  about it after that.
13  Q.  And I believe you've already answered this,
14  but did you complain to the Patent Troll Tracker about
15  any of this coverage?
16  MR. PATTON:  Object to form.
17  A.  No, sir.
18  Q.  (BY MR. SCHWARZ)  Are you aware that the
19  Patent Troll Tracker blog has been discontinued?
20  A.  No, I'm not aware that it's been discontinued.
21  Q.  Okay.
22  A.  Well, I should remand that.  As I understand,
23  he's no longer blogging, but it's my understanding his
24  blog is still available, that if you -- if you seek it
25  out on the internet, you can find the blog.

32

1  Q.  And I probably should have asked this a while
2  ago.  We've been referring to -- we've been using the
3  word "blog."  Would you explain for the jury what --
4  what you mean by the term "blog."
5  A.  Well, I'm not sure I have any -- any meaning
6  for that term, other than what I think is generally
7  understood.  It's a -- it's a website where an
8  individual or group of individuals can share their
9  views, publish their views, make public statements about
10  one or more topics of interest.
11  Q.  Okay.  Do you know who Raymond Niro is or
12  Niro?
13  A.  I do.
14  Q.  And would you tell the jury who he is?
15  A.  Mr. Niro or Niro -- I think it's pronounced
16  Niro -- is one of the pillars of the national patent
17  bar.
18  Q.  Okay.
19  A.  Or national intellectual property bar.
20  Q.  Were you aware that he offered a reward to
21  anyone who could reveal the identity of the Patent Troll
22  Tracker?
23  A.  Yes.
24  Q.  And how did you learn about that?
25  A.  When it -- when the Troll Tracker's identity

33

1  was revealed and it became -- there was some publicity
2  over it at that time, and Mr. Niro's reward was
3  mentioned in some of the articles I read.  At least one
4  of the articles I read.
5       (Exhibit Number 29 was marked.)
6       Q.  (BY MR. SCHWARZ)  Do you recall -- I'll
7  represent to you this is Exhibit Number 29.  It is a
8  printout of part of the Patent Troll Tracker blog.  And
9  do you recall -- by any chance, did you read any part of
10  this at the time it was published, in particular the
11  matter concerning Mr. Niro on the first page?
12      A.  I don't recall ever -- ever seeing this
13  before.
14      Q.  Okay.  You mentioned that the Patent Troll
15  Tracker's identity was exposed.  Do you know the name of
16  the Patent Troll Tracker?
17      A.  I don't recall it, no.
18      Q.  If I represented to you that his name was
19  Richard Frenkel, would that refresh your recollection?
20      A.  That's -- that sounds like the name I've heard
21  before, yes.
22      Q.  And do you recall when you learned that the
23  Patent Troll Tracker was Mr. Frenkel?
24      A.  I don't recall the date, no, sir.
25      Q.  Do you know anything else about Mr. Frenkel?

34

1       A.  I know that he's a lawyer and that he works
2  for Cisco.
3       Q.  Okay.
4       A.  Or worked for Cisco at a time.
5       Q.  Would you describe for the jury at least your
6  understanding of what the Patent Troll Tracker blog was
7  about?
8           MR. PATTON:  Object to form.
9       A.  Well, my understanding of it at the time was
10  it was a vehicle to, to put it bluntly, cast aspersions
11  on a category of patent owner and to -- that it -- that
12  there was an agenda to -- that he had an agenda that was
13  against people trying to enforce their patents.
14      Q.  (BY MR. SCHWARZ)  You made reference to "a
15  category of patent owner."  Could you explain for the
16  jury what you meant by that phrase?
17      A.  Typically sole inventors, individuals who made
18  inventions and obtained patents for their inventions
19  and, for one reason or another, were seeking to enforce
20  their patents against infringers.
21      Q.  Okay.  What is your understanding of the
22  meaning of the term "patent troll"?
23          MR. PATTON:  Object to form.
24      A.  I find it to be a very derogatory term, and I
25  oppose its use by those who do use it because I think

35

1  they use it as a derogatory term.  My understanding is
2  that it's essentially used by anyone who doesn't like a
3  patent owner seeking to enforce his or her patents
4  against them.
5           MR. PATTON:  Could we take a two-minute
6  break?
7           MR. SCHWARZ:  Sure.  No problem.
8           THE VIDEOGRAPHER:  We're off the record.
9  It's 9:46 a.m.
10      (Break was taken.)
11          THE VIDEOGRAPHER:  Back on the record,
12  it's 9:50 a.m.
13      Q.  (BY MR. SCHWARZ)  Okay.  You mentioned just a
14  few moments ago that you felt that the Patent Troll
15  Tracker had an agenda.  Would one way of describing that
16  agenda be that the Patent Troll Tracker advocated
17  certain types of patent reform?
18          MR. PATTON:  Object to form.
19      A.  I don't know.
20      Q.  (BY MR. SCHWARZ)  Okay.  You mentioned that
21  the Patent Troll Tracker was against persons who wanted
22  to enforce their patent rights.  Could you expand on
23  that answer?
24          MR. PATTON:  Object to form.
25      A.  I don't know in what sense.  I mean --

36

1       Q.  (BY MR. SCHWARZ)  I guess let me -- let me ask
2  a better question.  Was -- in your opinion, was the
3  Patent Troll Tracker against all persons who wished to
4  enforce their patent rights?
5           MR. PATTON:  Object to form.
6       A.  I think against -- it seemed to me against
7  people that would enforce them against his client.
8       Q.  (BY MR. SCHWARZ)  Okay.
9       A.  Or the client and those similarly situated
10  with his client.
11      Q.  Okay.  And prior to the disclosure of the
12  Patent Troll Tracker's identity, how would you describe
13  the persons or entities about which the Patent Troll
14  Tracker had favorable views?
15      A.  Based on what I had seen and heard, it was
16  apparent that he represented a large company -- a large
17  company or companies such as Cisco.
18      Q.  Are you aware -- are you aware of the fact
19  that one of the issues in Mr. Ward's case against Cisco
20  concerns the propriety of a clerk or deputy clerk of the
21  United States District Court for the Eastern District of
22  Texas changing the dates on a complaint and docket sheet
23  to reflect a different date of filing?
24      A.  Yes.
25          MR. PATTON:  Object to form.

Chiavello, Robert H.  9/23/2009  11:10:00 AM

37

1    A.  Yes, sir.

2    Q.  (BY MR. SCHWARZ)  In your almost 30 years

3  experience as a lawyer, have you ever been involved in a

4  case where the clerk of a court has changed the date of

5  a filing of a complaint?

6        MR. PATTON:  Object to form.

7    A.  Yes, sir.

8    Q.  (BY MR. SCHWARZ)  And what -- would you

9  describe the circumstances of that case.

10   A.  Yeah, it's happened on a couple of occasions

11  where -- sometimes they fail to change the stamp at the

12  beginning of the day.  Sometimes clerks make mistakes in

13  terms of -- you know, they put the wrong month on the

14  stamp.  It typically happens when, you know, we change

15  months or dates.

16        And so we received, I'm thinking in two

17  instances, a complaint that had the wrong date on it.

18  And it was brought to the attention of the clerk, and

19  the clerk fixed it.

20   Q.  Okay.  And do you recall how it was brought to

21  the attention of the clerk?

22   A.  In -- in one instance, I know it was simply a

23  telephone call, and you know, and it was fixed.  In the

24  other instance, I believe a messenger was sent or a

25  legal assistant was sent down to the clerk's office.

38

1    Q.  Okay.  And would you explain for the jury why

2  the date of a filing of a complaint can be of

3  importance?

4        MR. PATTON:  Object to form.

5    A.  Well, I mean, there are lots of -- lots of

6  reasons, but we all want -- want to be accurate in what

7  we do in terms of the court system, I would think.  I

8  would say yes.

9    Q.  (BY MR. SCHWARZ)  Well, in terms of a patent

10  case, subject matter jurisdiction wouldn't exist if a

11  complaint filed before the patent issued, correct?

12        MR. PATTON:  Object to form.

13   A.  You know, I don't know.

14   Q.  (BY MR. SCHWARZ)  Well, in other cases, the

15  statute of limitations may run, correct?

16   A.  That could be a -- certainly be an issue, yes,

17  sir.

18   Q.  Okay.  And in cases removed from state court

19  to federal court, there are deadlines for removal,

20  correct?

21   A.  There are deadlines, yes, sir.

22   Q.  Okay.  And just in general, courts can impose

23  deadlines on parties to cases, and when you file

24  something can be -- if you miss a deadline, that can

25  have significant consequences, correct?

39

1        MR. PATTON:  Object to form.

2    A.  Deadlines are important, yes.

3    Q.  (BY MR. SCHWARZ)  Do you regularly refer to

4  docket sheets for information about cases?

5        MR. PATTON:  Object, form.

6    A.  Yes, sir.

7    Q.  (BY MR. SCHWARZ)  And it's important to be

8  able to rely on a court's docket sheet, isn't it?

9    A.  Absolutely, yes, sir.

10   Q.  Okay.

11   A.  Though I will tell you there are often

12  inaccuracies on them, so no one would rely entirely on

13  the docket sheet.

14   Q.  And what else would you rely on?

15   A.  Well, that's a -- that's one of the challenges

16  in the practice of law is that there's probably no one

17  thing one can rely on.  It's a -- it's a group of --

18  it's a group of things.

19   Q.  And could you describe some of the members of

20  that group of things?

21   A.  Well, you would rely on your own file.  You

22  would rely on the court's file.  You would rely on --

23  occasionally rely on your opponent's file.

24   Q.  And you're familiar with the ECF systems,

25  correct?

40

1        MR. PATTON:  Object to form.

2    A.  Is that the electronic docketing system?

3    Q.  (BY MR. SCHWARZ)  Yeah, the electronic -- I

4  believe it stands for electronic case filing.

5    A.  Yes, I'm familiar with it, yes, sir.

6    Q.  Have you ever filed something using an ECF

7  system?

8    A.  I personally have never done that, no, sir.

9    Q.  Have you had either an associate or a staff

10  member do it for you?

11   A.  Yes, sir.

12   Q.  Okay.  And you have seen, I would -- let me

13  ask you this way:  Have you ever seen a document that

14  has been filed through the ECF system?

15   A.  Yeah, I think -- yes.

16   Q.  And do those documents not have a banner at

17  the top containing some information about the filing?

18        MR. PATTON:  Object to form.

19   A.  They certainly do now, yes.  They frequently

20  have a banner at the top of the document.

21   Q.  (BY MR. SCHWARZ)  Okay.  If I wanted to find

22  out some information about a case that you're involved

23  with, at least a case in federal court, one of the first

24  places I'd look is the docket sheet prepared and

25  maintained by the clerk; wouldn't be the case?

41

1  MR. PATTON: Object to form.

2  A. You could do that, yes.

3  Q. (BY MR. SCHWARZ) Okay. Would you explain for

4  the jury your understanding of the duties and

5  responsibilities of a United States district clerk?

6  MR. PATTON: Object, form.

7  A. I don't think I've ever really looked at it,

8  but, from my experience, their responsibilities are to

9  maintain the files of the United States federal court

10  for whichever district and division they are charged

11  with that responsibility.

12  Q. (BY MR. SCHWARZ) Would you say that it's the

13  case that a clerk's duties are determined and assigned

14  by the court for which he or she works?

15  MR. PATTON: Object to form.

16  A. I would think so.

17  Q. (BY MR. SCHWARZ) Okay. In fact, I'll

18  represent to you that 28 USC Section 956 states that --

19  and I'm quoting -- The clerk of each court and his

20  deputies and assistants shall exercise the powers and

21  perform the duties assigned to them by the court, end

22  quote.

23  A. Well, I was going to -- you mentioned the

24  statute. I was going to say the clerk's duties are also

25  probably provided by -- almost certainly provided by

42

1  statute, obviously, the constitution, rules of court, as

2  well as the orders of the court.

3  Q. Okay. And based on the statute that I just

4  quoted to you, would it be fair to say that a clerk

5  isn't authorized to act beyond the scope of authority

6  granted to him by the court?

7  MR. PATTON: Object to form.

8  A. I think a clerk always has to work under

9  whatever authority he or she may have.

10  Q. (BY MR. SCHWARZ) Okay.

11  A. I don't mean to suggest that that's the

12  only -- that that statute that you read is the only

13  authority that they would operate under. I don't -- I

14  just don't know.

15  Q. Okay. I'd like to go back to those two

16  instances you mentioned of clerks getting the date wrong

17  on a filing.

18  A. Right.

19  Q. And you mentioned that in one case there was a

20  phone call and another case there was -- I believe you

21  said a courier was sent?

22  A. Correct.

23  Q. In those cases, were both parties aware of the

24  discrepancy on the docket sheet?

25  MR. PATTON: Object to form.

43

1  Q. (BY MR. SCHWARZ) I mean -- or the filing?

2  A. I don't think so.

3  Q. Okay. So are you saying, in those cases, one

4  side simply unilaterally had the clerk change a date on

5  a document?

6  A. I don't agree with the way you stated it, so

7  I --

8  Q. Then please -- are you saying that, in those

9  cases, one side had the clerk change the date on the

10  document without informing the other side?

11  MR. PATTON: Object to form.

12  A. Maybe I should tell you what happened.

13  Q. (BY MR. SCHWARZ) Fair enough.

14  A. The fact of the date on the document was

15  pointed out to the clerk. The clerk realized the date

16  was wrong and corrected the error.

17  Q. Okay.

18  MR. SCHWARZ: What is this, 30? Let's go

19  ahead and do 31, too.

20  MR. PATTON: I have 30.

21  MR. SCHWARZ: I'm about to give them to

22  you. Hang on.

23  MR. PATTON: Oh, okay.

24  THE WITNESS: 30 and 31.

25  (Exhibit Number 30 and 31 were marked.)

44

1  Q. (BY MR. SCHWARZ) I've just handed you

2  documents that have been labeled Exhibits 30 and 31.

3  Could you just describe them for the jury for us?

4  A. Well, 30 appears to be a copy of a docket

5  sheet, and 31 appears to be a complaint.

6  Q. Okay. And looking at these two exhibits, can

7  you determine what date the complaint that is Exhibit --

8  I believe it's 30 -- 31 was filed?

9  MR. PATTON: Object to form.

10  A. The date that it was filed?

11  Q. (BY MR. SCHWARZ) Right.

12  A. Well, based on what's printed at the top of

13  the document, it appears to have been filed on

14  October 15, 2007.

15  Q. And on the docket sheet, can you tell the jury

16  what date it appears the complaint was filed?

17  MR. PATTON: Object to form.

18  A. Well, it appears to be October 15, 2007.

19  Q. (BY MR. SCHWARZ) Okay. Is there anything on

20  either document that suggests that the complaint was

21  filed on October 16?

22  MR. PATTON: Are you talking about

23  Exhibit 31?

24  MR. SCHWARZ: 30 or 31.

25  MR. PATTON: You said the other document,

Chiavello, Robert H.  9/23/2009  11:10:00 AM

45

1   and I'm not sure which one of the two you're talking
2   about.
3       MR. SCHWARZ:  Fair enough.  I appreciate
4   that.  I want to be clear.
5       Q.  (BY MR. SCHWARZ)  Is there anything on -- on
6   Exhibit 30 that would suggest that the complaint was
7   filed on October 16?
8       A.  No.
9       Q.  And how about is there anything on Exhibit 31
10  that suggests that that document was filed on
11  October 16?
12      A.  No.  And again, I haven't seen these documents
13  before; and 31 is a six-page document, I guess, and I
14  haven't read it.  But just looking at the cover page and
15  the last page, I don't see anything that would suggest
16  that it was filed on other than October 15, 2007.
17      Q.  In your view, would it be unreasonable for a
18  person viewing these documents to conclude that this
19  lawsuit, ESN versus Cisco, was filed on October 15th?
20      MR. PATTON:  Object to form.
21      A.  Well, there is a fact that would raise a
22  question in my mind, and that's Mr. Ward's notice of
23  appearance on the 16th.
24      Q.  (BY MR. SCHWARZ)  And why does that raise a
25  question for you?

46

1       A.  Because typically notices of appearance are
2   filed at the same time as the complaint.
3       Q.  Is there any way -- in your experience with
4   the ECF system, is there some way to kind of look behind
5   what's on the -- on the face of the system, so to speak,
6   to determine whether the dates listed there are correct?
7       MR. PATTON:  Object.
8       A.  Well, certainly, yes.
9       MR. PATTON:  Object to form.
10      Q.  (BY MR. SCHWARZ)  And how is that?
11      A.  Call the clerk.
12      Q.  Okay.  So do you think it's incumbent on
13  persons to call the clerk and check with every filing
14  that's made to make -- to confirm that the date that's
15  displayed on the ECF system is correct?
16      A.  I wouldn't say with every filing, but with --
17  with something that might be of importance where that --
18  you mentioned earlier that dates are important.  When
19  those -- if there's a filing where there's an important
20  date, absolutely.
21      Q.  Okay.  And what sorts of filing dates are
22  important?
23      MR. PATTON:  Object to form.
24      A.  Well, you mentioned things like statute of
25  limitations, and you mentioned there are rules that

47

1   set -- the courts set rules in terms of dates to
2   respond.  The statute sets rules on when you can
3   respond.  For example, a plaintiff has 20 days -- I'm
4   sorry.  A defendant has 20 days to answer a complaint
5   once they're served with a complaint and summons.  And
6   so those types of dates, as I say, there are court
7   orders that require you to do things by -- by certain
8   dates, and those dates are important.
9       Q.  (BY MR. SCHWARZ)  Okay.  So in any given case,
10  there could be many, many important dates?
11      A.  Absolutely.
12      Q.  And do you believe that it's incumbent on
13  parties to double-check all of those?
14      MR. PATTON:  Object to form.
15      A.  Well, not all of them.  But -- but frequently,
16  it is important to double-check those, those dates, yes,
17  sir.
18      Q.  (BY MR. SCHWARZ)  And do you do that
19  frequently?
20      A.  You know, not to quibble with your term
21  "frequently," but it happens with a high degree of
22  regularity, yes, sir.
23      Q.  Okay.  So if -- if one called a clerk about
24  Exhibits 30 and 31, how would the clerk determine that
25  there was anything incorrect about what was displayed

48

1   there?
2       MR. PATTON:  Object to form.
3       A.  You know, I really don't know all of the
4   details and all of the procedures that clerks -- that
5   the clerks of the various district courts follow.  But I
6   do understand that they have -- they do have procedures
7   that are what I would view as backup systems and that
8   they have a way of double-checking entries is what I
9   would call it.
10      (Momentary off-the-record discussion.)
11      (Exhibit Numbers 32 and 33 were marked.)
12      Q.  (BY MR. SCHWARZ)  Would you please describe
13  the documents that have been handed to you that are
14  labeled Exhibits 32 and 33?
15      A.  32 appears to be a complaint, and 33 appears
16  to be a docket sheet.
17      Q.  Okay.  And if you'd like the time to actually
18  compare them word for word, feel free and we'll go off
19  the record and you can do that.  But does the complaint
20  that is -- that has been labeled Exhibit 32 appear to be
21  the same complaint as Exhibit Number 31?
22      A.  Yeah, I would just -- quickly scanning it.
23  Mr. Schwarz, they do appear to be essentially the same.
24  I mean, you know, there are -- there's a difference, of
25  course, at the top.

Chiavello, Robert H.  9/23/2009  11:10:00 AM

49

1    Q.  And would you describe what that difference
2  is?
3    A.  The exhibit -- Exhibit 32 bears the date of
4  October 16, 2007, at the top.
5    Q.  And --
6    A.  And on each page.
7    Q.  And on Exhibit 33?
8    A.  Exhibit 33, you're saying in comparison to
9  Exhibit 30?
10    Q.  Correct.
11    A.  Well, first, there at least would appear to be
12  three additional entries on the docket, and the date --
13  let me say Exhibit 33 appears to have at least three
14  more entries than in this form. And the date field for the
15  complaint is October 16, 2007, on Exhibit 33.
16    Q.  Okay.
17    A.  You know, you asked me a question about
18  Exhibit 30 and whether there was anything on the -- on
19  the docket that appeared that the date of October 15,
20  2007, might be wrong. And in looking at it, there's --
21  there's the statement on -- in the -- what they call the
22  docket text at the end of Docket Entry Number 1.
23        It says "entered October 16, 2007," so
24  that -- if I had been looking at this docket, that would
25  tell me there's -- there's something inconsistent, and

50

1  that would -- that would raise a question in my mind as
2  to what the -- whether which date -- which of the two
3  dates was the -- was the right date.
4    Q.  Fair enough. Would it be unreasonable for
5  someone comparing the two docket sheets and the two
6  complaints that I've handed you that collectively are
7  exhibits, I believe it's 30 through 33, would it be
8  unreasonable to conclude that the filing date was
9  changed?
10        MR. PATTON:  Object to form.
11    A.  The filing date was changed --
12    Q.  (BY MR. SCHWARZ)  Okay.
13    A.  -- in one -- in one respect, yes.
14    Q.  Okay. Are you familiar with the Patent Troll
15  Tracker blogs at issue in this lawsuit?
16    A.  I don't understand your question.
17    Q.  Okay.
18    A.  You mean the specific blogs that made the --
19  made the statements that bring us all here today?
20    Q.  Correct.
21    A.  Yes, I'm generally familiar with those
22  statements. Let me say I'm generally familiar with
23  the -- with that blog, those blog entries, statements,
24  yes.
25        (Exhibits 34, 35, and 36 were marked.)

51

1    Q.  (BY MR. SCHWARZ)  Mr. Chiavello, I've handed
2  you three documents that have been labeled Exhibits 34,
3  35, and 36, and I will represent to you that these three
4  documents are exhibits to Mr. Ward's amended complaint
5  in the case that we're here about today. That is not
6  exactly explained, but if you look at the very top, the
7  banner notes that it's Document 66-1, 66-2, and 66-3.
8  And I'll represent to you that Document 66, to which
9  these are attachments, are Mr. Ward's amended complaint
10  in the present lawsuit.
11        Have you seen any of these blogs before?
12    A.  You know, yes, I've -- well, I've seen papers
13  that would look like this. You know, again, I don't
14  remember reading them in this form. You know, as I look
15  at it, as I read this first -- these first couple of
16  statements, I don't think I ever read this before,
17  frankly, because, in reading this, I'm really outraged
18  by what I've read, and I don't recall being outraged
19  before. In particular, the comment about the Banana
20  Republic of East Texas I think is just absolutely
21  outrageous.
22        MR. PATTON:  Could we maybe clear
23  something up here? You've given 34 and 35, and I would
24  assume that the -- the first blog is at the bottom of
25  the page on 34. That's the 17th.

52

1        MR. SCHWARZ:  Yes, I agree with that.
2        MR. PATTON:  Okay. Sometimes people
3  separate them out. It's a separate document. But you
4  have the 17th and the 18th both on 34 and 35?
5        MR. SCHWARZ:  That is correct.
6        MR. PATTON:  Okay.
7        MR. SCHWARZ:  And as I represented to
8  Mr. Chiavello, I'll simply say that this is how they've
9  been filed with the amended complaint.
10        MR. PATTON:  Okay.
11    Q.  (BY MR. SCHWARZ)  So I take it that you feel
12  that the -- the reference to the Banana Republic of East
13  Texas is a derogatory and untoward expression?
14    A.  Yes, sir.
15    Q.  If you would compare -- and you'll note that
16  that reference is made in a blog that is dated Thursday,
17  October 18th, under the title "ESN convinces EDTX court
18  clerk to alter documents to try to manufacture subject
19  matter jurisdiction where none existed." Is that
20  correct?
21    A.  That's what it says, yes, sir.
22    Q.  Okay. I'd ask you to look at the following
23  two exhibits, 35 and 36. And under the same Thursday,
24  October 18th entry with the same -- the same title, do
25  you see any reference to the Banana Republic of East

53

1    Texas?
2         MR. PATTON:  And this is what I'm trying
3    to clear up and want to make certain, because the top
4    one on 35 does have the Banana Republic on the first
5    page.
6         THE WITNESS:  Right.
7         MR. PATTON:  But I think what you're
8    referring -- you're wanting to refer to is right
9    underneath it, which is the October 17th or it will be
10   the next one, which is dated the 18th, but was actually
11   corrected on the 19th.
12        MR. SCHWARZ:  Okay.  Perhaps we should go
13   off the record for a second just to clarify this.
14        MR. PATTON:  That's probably a good idea.
15        MR. SCHWARZ:  Okay.
16        THE VIDEOGRAPHER:  We're off the record
17   at 10:17 a.m.
18        (Momentary off-the-record discussion.)
19        THE VIDEOGRAPHER:  We're back on record
20   at 10:19 a.m.  Please proceed.
21        Q.  (BY MR. SCHWARZ)  Mr. Chiavello, while we were
22   off the record, Mr. Patton and I had a discussion and we
23   clarified these exhibits.  There are some questions
24   about these exhibits.  And I'll ask him to -- I will try
25   to put our understanding on the record, and I'll ask

54

1    Mr. Patton to correct me or expand upon it if he sees
2    fit.
3         But I believe we've agreed that Exhibit 34
4    was -- Exhibit 34 and Exhibit 35 are identical copies.
5    And on each of them, there is, at the bottom of the
6    first page of Exhibit 34 and the bottom of the first
7    page of Exhibit 5 [sic], there is an October 17th, 2007,
8    blog entry.  And above that is an October 18th, 2007,
9    blog entry.  And those are identical.
10        Exhibit 36 has, on one page, a changed
11   version of the blog entry, which is on -- at the top of
12   the first page of Exhibits 34 and 35.
13        MR. SCHWARZ:  Is that -- is that our
14   understanding, Mr. Patton?
15        MR. PATTON:  It is, except you've got to
16   understand that the October -- Exhibit 36 was the
17   amended or edited version of the October 18th blog, and
18   while it shows October 18th on the face of Exhibit 36,
19   that blog was edited on the 19th.
20        MR. SCHWARZ:  While I don't believe there
21   is any dispute about that, I'd simply comment --
22        MR. PATTON:  Right.  I can promise you
23   there is no dispute about that.
24        MR. SCHWARZ:  Right.  I don't believe
25   there's --

55

1         MR. PATTON:  Sorry to interrupt you.
2         MR. SCHWARZ:  No, that's okay.  We want
3    everything to be clear about it.
4         Q.  (BY MR. SCHWARZ)  Like I said, while I don't
5    think there's any dispute about that, for today, I'm not
6    going to be referring -- the dates are not going to be
7    significant other than what's posted on there; and if
8    they are, I'm sure Mr. Patton will correct me.
9         But in any event, to get back to the
10   question which led into this morass of clarifications,
11   if you would compare the October 18th, 2007, entry that
12   is on Exhibit 34 with that on Exhibit 36, which
13   Mr. Patton has just explained was edited, I believe you
14   said, on the 19th --
15        MR. PATTON:  That's correct.
16        Q.  (BY MR. SCHWARZ)  -- do you see that the
17   reference to the Banana Republic of East Texas is no
18   longer there?
19        A.  I see that omission, yes, sir.
20        Q.  Okay.  If -- if I understand what you said
21   earlier, this is the first time you've actually read
22   these blogs?
23        A.  I believe -- I believe that's to be the case.
24        Q.  Okay.  I'd ask you to look at the blog entry
25   dated October 17th.

56

1         A.  On which -- on Exhibit 34?
2         Q.  Yeah, on 34 or 35, because they're identical.
3    And I'd ask you to read it, and then I'll have a very
4    good question for you.
5         A.  I've read it, and in reading it, it jogged a
6    recollection.  You asked me earlier today whether you
7    could file a lawsuit if a patent -- before a patent
8    issues, and there's a reference here to GAF versus Elk.
9    I recall that case, and the answer is, no, you cannot
10   file a patent infringement suit before the patent
11   issues.
12        Q.  Right.  Thank you.
13        Having read the October 17th blog, is
14   there any mention of Mr. Ward in it?
15        A.  I believe so, yes.  In the last paragraph,
16   he's mentioned twice.
17        Q.  Okay.  And in what context is he mentioned?
18        A.  What do you mean by "in what context"?
19        Q.  Well, how was he referenced in that last
20   paragraph?
21        A.  Rudely, I would say.
22        Q.  He's referenced twice, correct?
23        A.  Yes, sir.
24        Q.  And are you saying that -- stating that he is
25   local counsel is referencing him rudely?

Chiavello, Robert H.   9/23/2009   11:10:00 AM

57

```
1    A.  The last sentence says, "Wonder how I don't
2    Johnny Ward will play there," question mark.  I read
3    that as a negative comment about Johnny Ward.
4    Q.  So do you think that that -- that comment
5    would harm Mr. Ward's reputation?
6    A.  It's a negative comment, yes, and negative
7    comments can harm a person's reputation.
8    Q.  I'd ask you to look at now the October 18th
9    blog, either on Exhibit 34 or 35, again because they're
10   identical.
11   A.  Okay.  I'm looking at 34.
12   Q.  That's fine.
13   A.  Okay.  I've read it.
14   Q.  Is there any mention of Mr. Ward's name there?
15   A.  I don't -- I don't see one, no, sir.
16   Q.  I'd ask you to look at the October 18th blog
17   on Exhibit 36.
18   A.  I'm looking at it.
19   Q.  If you wouldn't mind reading it.
20   A.  Okay.
21   Q.  And is there any mention of Mr. Ward's name
22   there?
23   A.  His name?
24   Q.  Correct.
25   A.  No, no, his name is not mentioned.
```

58

```
1    Q.  Mr. Ward has testified that you told him that
2    there were clients or potential clients, and I believe
3    he's testified that -- that there were -- in his
4    recollection, that this happened more than once, but in
5    any event, that there was at least one client who -- who
6    refused to hire Mr. Ward because of the patent troll --
7    Patent Troll Tracker blogs.  Is that true?
8    A.  Yes, sir.
9    Q.  And do you recall how many -- first, how many
10   clients or potential clients there were?
11   A.  By my recollection, there were three
12   instances.
13   Q.  Okay.  And who were those?  Could I simply
14   call them clients, for the sake of our discussion here?
15   A.  Yes, sir.
16   Q.  Okay.  And who were those clients?
17       MS. COLLINS:  Objection, privileged.
18   A.  Yeah, I'm not going to reveal the names.
19   Q.  (BY MR. SCHWARZ)  Okay.  When did these --
20   when did these events occur?
21   A.  My recollection is it was at the end of 2007,
22   early part of 2008.
23   Q.  Without naming the clients -- let me back up
24   for a moment.  Let's just make sure our record's clear.
25       Would you please name those clients for
```

59

```
1    us?
2        MS. COLLINS:  Objection, privileged.
3    A.  I will not name the clients.
4    Q.  (BY MR. SCHWARZ)  Okay.
5        MR. SCHWARZ:  Are you instructing your
6    client not to answer the question?
7        MS. COLLINS:  Yes, sir.
8        MR. SCHWARZ:  Okay.
9    Q.  (BY MR. SCHWARZ)  Did these clients -- if --
10   did any of these clients say that they did not want to
11   retain Mr. Ward solely because of the Patent Troll
12   Tracker blogs?
13   A.  In all three instances, that was identified as
14   the reason, yes, sir.
15   Q.  When you said "the reason," was it the only
16   reason?
17   A.  To the best as I recall, that was the stated
18   reason.
19   Q.  Okay.  Did you try to convince them otherwise?
20   A.  Yes, sir.
21   Q.  Okay.  And could I ask you first what it was
22   that they said was their reason for not wanting to
23   retain Mr. Ward?
24   A.  Well, again, I -- the specific communication
25   is privileged, and I don't remember the exact -- exact
```

60

```
1    words.  But in all three instances, there was -- there
2    was mention of these statements and the concern about
3    Mr. Ward being somebody to -- a concern about his
4    honesty and their willingness to have him act as their
5    attorney.
6    Q.  Okay.  And what did you tell them, to the
7    extent that you can, to disabuse them of the notion that
8    there was a problem with Mr. Ward's integrity?
9    A.  Well, again, in all three cases, I was
10   outraged and tried to defend Mr. -- Mr. Ward's
11   integrity.  But in those cases, I was unsuccessful.
12   Q.  Okay.  Did you say that the blogs were untrue?
13   A.  Yes.
14   Q.  Had you actually read them at the time?
15   A.  No.  I was familiar with them, though.
16   Q.  And how was it that you were familiar with
17   them?
18   A.  You know, Mr. Schwarz, in reading these, now
19   that I've read them a couple of times, the one on the
20   17th I may have read at the time.  I don't think I read
21   the one on the 18th.  I'm pretty confident I don't
22   recall having read the one on -- well, I just don't
23   remember the one on the 36 -- Exhibit 36.
24       That Banana Republic comment really kind
25   of sticks out at me, and as I say, I just don't recall
```

61

1    having seen that before or the comment about Mr. Ward in
2    the -- in the one dated the 17th.  So I just don't
3    recall whether I read them or not.
4    Q.  Do you know whether these clients had actually
5    read the blogs?
6        MR. PATTON:  Object, form.
7    A.  You know, I believe they represented that they
8    had, yes, sir.
9    Q.  (BY MR. SCHWARZ)  And if I recall your
10   testimony from just a few moments ago, you believe all
11   of this -- all three of these clients declined
12   Mr. Ward's representation either in late 2007 or early
13   2008, correct?
14   A.  Correct.
15   Q.  Okay.  By early 2008, do you know what time
16   frame -- could you explain what time frame you have in
17   mind?
18   A.  First quarter 2008.
19   Q.  So the first three months of 2008?
20   A.  That's correct.
21   Q.  Do you have -- can you recall with any greater
22   specificity when that might have been?
23   A.  I believe one was in December of 2007, and I
24   believe the other two were either in December or
25   January/February time frame.

62

1    Q.  Okay.  Mr. Ward has testified that he is
2    currently working on several cases with you and your
3    firm; is that correct?
4    A.  Yes, sir.
5    Q.  Okay.  And what cases is he working on?
6    A.  I thought we went over this before, but
7    it's -- he is co-counsel with us on a -- on a various
8    number of the Antor cases, and he is co-counsel with us
9    on at least one -- on the Fenner case, which we call
10   Fenner 3.
11   Q.  And I apologize if I asked the question
12   twice.
13       And did any of those clients retain
14   Mr. Ward after the -- after October of 2007?
15   A.  I believe for sure the Fenner 3 case.  I
16   believe that that's the case.
17   Q.  Do you know if the folks at Fenner knew about
18   those blog posts at the time they retained Mr. Ward?
19   A.  I think -- I think they did.
20   Q.  Okay.  Did they express any opinion about
21   those posts?
22   A.  They -- you mean about the specific posts
23   about Mr. Ward or about the -- about the Patent Troll
24   Tracker blog in general?
25   Q.  Fair question.  Let's start with the Patent

63

1    Troll Tracker in general.
2        MR. PATTON:  Object to form.
3    A.  I believe the comments had been that they had
4    been treated just as improperly as Mr. Ward had been
5    treated.  I think he had made negative statements about
6    Fenner Investments.
7    Q.  (BY MR. SCHWARZ)  Okay.  So at least as to
8    those clients, is it fair to say Mr. Ward's reputation
9    is intact?
10       MR. PATTON:  Object to form.
11   A.  It's hard -- hard for me to say.  I mean, they
12   were aware that -- that there had been some negative
13   statements made about -- about him.
14   Q.  (BY MR. SCHWARZ)  Since those blog posts, the
15   Patent Troll Tracker blog posts that we've discussed,
16   has Mr. Ward's performance as a lawyer diminished in any
17   respect?
18       MR. PATTON:  Object to form.
19   A.  You mean his performance as advocating for
20   clients?  I'm not sure I understand your --
21   Q.  (BY MR. SCHWARZ)  Correct.
22   A.  I'm not aware of his performance changing,
23   other than it gets better as time goes on, I think.
24   Q.  Okay.  So he still works his cases
25   effectively?

64

1    A.  To my knowledge, yes.
2    Q.  Okay.  Has your opinion of Mr. Ward changed as
3    a result of the poll -- Patent Troll Tracker blog?
4    A.  Yes.
5    Q.  And in what respect?
6    A.  I had a high regard for him before.  I have
7    higher regard for him now, standing up to face Cisco in
8    this matter.  It takes an -- it's an act of courage to
9    take on a big company like Cisco.
10   Q.  Okay.  You said earlier that there were some
11   clients who -- who declined to hire Mr. Ward because of
12   the Patent Troll Tracker blogs, correct?
13   A.  I said that, yes, sir.
14   Q.  Okay.  And I assume, based on our earlier
15   discussion, that you had given those clients your
16   typical high praise and expressed your admiration for
17   Mr. Ward; is that correct?
18   A.  Yes, sir.
19   Q.  And despite the fact that you, with 30 years
20   experience in IP law and a partner at easily one of the
21   most prestigious firms ever -- I mean anywhere, they
22   chose to -- apparently chose to believe the expressions
23   of an anonymous blogger over your recommendation?
24   A.  I guess you could say that, yes, sir.
25   Q.  Okay.  Were those clients that we were

65

1 discussing, are they presently your clients?

2 A. Two of them are, yes, sir.

3 Q. You stated a moment ago that you actually

4 think more highly of Mr. Ward as a result of the events

5 that started the Patent Troll Tracker's blogs, correct?

6 A. Yes, sir.

7 Q. Okay. Isn't it possible that Mr. Ward's

8 reputation actually has been enhanced because of the

9 controversy?

10 MR. PATTON: Object to form.

11 A. Well, again, I guess you have to be specific

12 as to who you are -- who you are referring to.

13 Q. (BY MR. SCHWARZ) Well, has anyone spoken to

14 you saying that they respect Mr. Ward even more because

15 of the events that have transpired since the Patent

16 Troll Tracker blogs have -- were posted?

17 A. I think one or more of my colleagues here at

18 the firm have voiced similar expressions.

19 Q. Okay. And could you be a little bit more --

20 could you expand on that and tell me what sorts of

21 things your colleagues have expressed to you?

22 A. Generally that they are impressed -- again

23 I'll use the word Mr. Ward's courage in standing up to

24 Cisco and a regard for his willingness to try to remedy

25 the evil that this Troll Tracker perpetuated against the

66

1 administration of justice in the federal system and in

2 the Eastern District of Texas, in particular, and stand

3 up for the many people who I believe were victimized by

4 the Troll Tracker.

5 And Mr. Ward and Mr. Albritton, by the

6 way, as well, I think it was an act of bravery on their

7 part to take on this individual and Cisco to try and

8 remedy the wrong that they perpetuated against --

9 certainly against Mr. Ward and Mr. Albritton.

10 Q. Have you ever filed a patent infringement

11 case, for want of a better expression, amended after

12 midnight, when/ particularly on the date of patent

13 issue?

14 A. Yes, sir.

15 Q. And why do you do that?

16 A. To avoid a defendant infringer from filing a

17 declaratory judgment action against you, against the

18 patent owner

19 Q. And would you say that that is a sign of an

20 effective and aggressive litigator?

21 A. I would say it's an effective litigator. It's

22 certainly something you have to be concerned about, and

23 in some instances, it's necessary.

24 Q. Okay. And so the Patent Troll Tracker, at

25 least in part, publicized the fact that Mr. Ward was an

67

1 effective litigator, didn't he?

2 A. Well, I don't know about -- I mean -- I think

3 it's his intent, from reading these statements that

4 you've handed me, was just the opposite, that he had --

5 he and Mr. Albritton had done something dishonest. I

6 don't view people who do things dishonestly as being

7 effective at all.

8 MR. SCHWARZ: Objection, nonresponsive.

9 Q. (BY MR. SCHWARZ) Has Mr. Ward told you that

10 he's received some very positive messages in response to

11 the Patent Troll Tracker controversy?

12 A. I don't recall.

13 Q. Okay. Did he tell you that one message that

14 he received called him a hero?

15 A. He did not tell me that, no, sir.

16 Q. Okay. Would that expression, referring to

17 someone as a hero, be considered a symptom of an injured

18 reputation?

19 A. It would -- actually, I would think it's a

20 symptom of an injured -- of an injury, yes, sir. Heroes

21 tend to be injured in the actions that they undertake.

22 That's why we call them heroes.

23 Q. Do you -- would you describe for the jury the

24 damage that you believe has been done to Mr. Ward's

25 reputation?

68

1 MR. PATTON: Object to form.

2 A. I believe there are members of the

3 community -- by that, the -- certainly the national

4 patent community, that believe that there were questions

5 about his ethics and integrity sufficient enough that

6 they would be unwilling to retain him as counsel.

7 Q. Okay. And we've discussed a few of those,

8 correct?

9 A. Yes, sir.

10 Q. Are you aware of any others?

11 A. Not that I can recall.

12 Q. Do you have any other knowledge or information

13 about Mr. Ward's claim that Cisco injured his

14 reputation?

15 A. Other than what we've discussed here today?

16 Q. Correct.

17 A. I don't -- again, I mean, I don't know what --

18 I may know some fact that -- and it may relate to his

19 claim. I just don't know, you know, what specifically

20 you're asking.

21 Q. Well, you've been designated as a fact witness

22 as to his reputation, and I believe you answered those

23 questions pretty fully, correct?

24 A. I tried to.

25 Q. Okay. And you've also been designated as a

69

1    witness as to the injury to his reputation.  And have
2    you told us everything that you can think of today
3    concerning the injury to Mr. Ward's reputation?
4        A.  Well, you know, obviously we did not discuss
5    the privileged communications, and you know, there may
6    be some other facts that -- that I would recall if you
7    would ask me questions that were directed at certain
8    facts.  I think your question is a hard one to answer.
9        Q.  And I appreciate -- I appreciate that fact.
10   On the other hand, I'm dealing with a designation that
11   simply says reputation and injury to reputation.
12       A.  Uh-huh.
13       Q.  Can you think of any other clients or
14   potential clients that Mr. Ward has not gotten in whole
15   or in part because of the Patent Troll Tracker blogs?
16       A.  I am not specifically aware on a first-hand
17   basis, but I definitely perceived in the community and
18   in the national community that there were concerns.
19           And in fact, last week I attended the
20   Intellectual Property Owners conference, and a speaker,
21   whose name I do not recall, but she was discussing
22   patent venue or venue in patent cases, and she referred
23   to the Eastern District in what I would consider a
24   negative manner, which I attribute to the comments of
25   the Troll Tracker.

70

1           It was -- it is my perception that he
2    created this negative view of the Eastern District of
3    Texas and the local -- as they would say, the local
4    counsel and the lawyers who practice in that district.
5    So I mean, it's out there.  People sort of treat it as
6    an assumed fact that they don't get a fair shake in the
7    Eastern District, which I find to be just absolutely
8    outrageous.
9        Q.  Okay.  You -- I believe you've already
10   answered this, but you don't recall the name of the
11   speaker at the IP conference?
12       A.  No, I don't remember her name.  No, sir.
13       Q.  Okay.  And what would lead you to believe that
14   she had ever seen the Patent Troll Tracker blogs that
15   we're talking about here?
16       A.  Well, what would lead me to believe is that,
17   in the community, the national patent community, it was
18   given quite a bit of prominent -- prominence and treated
19   with some -- some authority.  In a number of instances,
20   members of the national patent community would refer to
21   the Patent Troll Tracker as almost authority for things
22   going on in the Eastern District and other places.
23       Q.  Who would treat it as authority?  Do you
24   recall?
25       A.  Aside from the clients that I've mentioned,

71

1    who I won't -- won't mention, let me think here for a
2    second.  The names just don't -- don't come to me at the
3    moment.  I mean, I -- and I would not limit it, by the
4    way, to the national patent community.  It was -- it
5    received commentary from the in the Dallas area as well.
6    Lawyers at other law firms, in-house counsel.
7        Q.  Can you identify any of them?
8        A.  I can't remember anybody specifically.
9        Q.  Okay.  You said --
10       A.  I believe --
11       Q.  I'm sorry.
12       A.  I will tell you I believe there was one or
13   more presentations at the Dallas Bar, and I believe Bart
14   Showalter referred to the -- to the Troll Tracker in
15   a -- as somewhat of an authority on this topic, and he's
16   an attorney at Baker Botts.
17       Q.  Right.  And --
18       A.  As I say, I just have a vague recollection of
19   those comments.
20       Q.  That's fine.  I appreciate that.  You
21   mentioned that Mr. Showalter is at Baker Botts.  Does he
22   have a good reputation in the legal community?
23       A.  Sure.
24       Q.  I've just been handed a note saying we're
25   almost out of tape.

72

1           MR. SCHWARZ:  Why don't we take just a
2    short break.
3           THE VIDEOGRAPHER:  And this ends Tape
4    Number 1, Volume 1 of the Robert Chiavello deposition.
5    Going off record at 10:51 a.m.
6           (Break was taken.)
7           THE VIDEOGRAPHER:  We're going back on
8    the record at 10:58 a.m.  This marks Tape Number 2,
9    Volume 1 on Robert Chiavello's deposition.  Please
10   proceed.
11       Q.  (BY MR. SCHWARZ)  Mr. Chiavello, before we
12   broke to change the videotape, we were discussing
13   comments by a number of people, including a woman whose
14   name you can't recall who you heard at -- I believe you
15   said it was an IP -- IP Owner's conference.
16       A.  It's called the Intellectual Property Owners
17   Annual Meeting, and it was in Chicago.  The -- it was
18   the 14th and 15th of September.  She spoke on the 15th,
19   I recall.
20       Q.  Okay.
21       A.  She was the moderator, as I recall.
22       Q.  Okay.  And you said that she made some
23   references to the Eastern District of Texas, and I just
24   want to kind of focus on -- on just what she said.  Do
25   you recall, with any greater specificity than you've

73

1    already described, what she said about the Eastern
2    District of Texas?
3        A.  Yes, sir.  She used it as -- she was giving a
4    talk about the top ten districts where patent cases were
5    filed, and she was discussing the reasons why cases were
6    filed in the various districts.  And she said the reason
7    people filed in the Eastern District of Texas was to
8    strike fear in the hearts of defendants.
9        Q.  And do you disagree with that?
10       A.  Absolutely.
11       Q.  And in your opinion, why do people file in the
12   Eastern District of Texas?
13       A.  There are a variety of reasons, and they've
14   changed over time.  I would say on one of the most
15   important reasons is the fact that the judges assign
16   specific trial settings and stick to those trial
17   settings.  That is a very important consideration.
18           Number two, the judges in the Eastern
19   District have significant experience with patent
20   matters.
21           Number three, there are rules specifically
22   directed to patent matters in the Eastern District, and
23   there's a body of law that's developed over time.  So
24   there's a high degree of predictability in terms of what
25   rules will apply and how those rules will apply in

74

1    particular circumstances.
2           I would say that those three -- those
3    three factors -- well, the fourth factor I would
4    identify is the -- what we call the file-to-trial time.
5    That's increased a bit over the years, but it is
6    generally -- and by the way, this professor pointed out,
7    it's roughly in the middle of the pack.  And so those
8    four factors together generally make it a cost-effective
9    venue to resolve a patent dispute.
10          I would say the judges in the Eastern
11   District are -- the three judges that handle patent
12   cases are three good men.  They try to get it right.
13   They're fair-minded -- they're fair-minded, I would just
14   say, good judges and believe that they are some of the
15   best judges in the -- in the U.S. system.
16          So I'm a -- I've been a huge fan of the
17   Eastern District since 1990 when I first had a case in
18   front of Judge William Wayne Justice in Tyler and
19   have -- another factor is the court clerks are
20   effective.  They do a very good job, and they're very
21   knowledgeable and helpful.
22          And then a fifth fact -- sixth factor, I
23   would say, is it has the best electronic filing system
24   in the country, to my -- in my experience.  So those are
25   just, you know, what I can think of off the top of my

75

1    head.
2        Q.  We've got six things to hang the ED Texas hat
3    on.
4           And I'd like to get back, you mentioned in
5    your last response, that the woman who gave this talk
6    was a professor?
7        A.  I believe that's right.  I believe that's
8    correct.
9        Q.  Do you believe she's a professor of law?
10       A.  Yes, sir.
11       Q.  Okay.  Have any recollection as to where?
12       A.  As to where?
13       Q.  As to where.
14       A.  I don't.
15       Q.  Okay.  Did she mention by name the Patent
16   Troll Tracker?
17       A.  No, sir.
18       Q.  And by name, I should say I meant the name
19   "Patent Troll Tracker."
20       A.  She did not.
21       Q.  Did she mention the name "Mr. Frenkel"?
22       A.  She did not.
23       Q.  Has -- have you ever heard negative views of
24   the Eastern District of Texas before?
25       A.  Yes, sir.

76

1        Q.  Had you heard them before the Patent Troll
2    Tracker expressed his views about the Eastern District
3    of Texas?
4        A.  I don't know when he started.
5        Q.  Well, let's just pick a date of October 2007.
6        A.  I believe I had heard -- I believe I had heard
7    negative comments before that date.  I'm trying to think
8    back.  I believe I had, yes.
9        Q.  Okay.  I mean, isn't it common for anyone
10   who's at least on the losing side of a case to find
11   fault everywhere but with themselves?
12          MR. PATTON:  Object to form.
13       A.  Oh, that may be true, but that's not what
14   we're talking about.  We're talking about people who
15   have lawsuits filed against them, not necessarily who
16   have gone to -- gone to judgment.
17       Q.  (BY MR. SCHWARZ)  Okay.  So apart from the
18   professor at the IP meeting that you discussed, you
19   mentioned earlier that -- you made reference to the
20   national community when I asked you about --
21       A.  Yes, sir.
22       Q.  -- Mr. Ward's reputation.  And could I ask you
23   to describe any other instances where you heard of
24   something or otherwise received information that
25   suggested that Mr. Ward's reputation had been -- had

77

1    been injured or diminished in any way?
2        A.  You know, in -- as a result of your questions,
3    I do recall another instance where we gave a
4    presentation to a client and had recommended Mr. Ward
5    and received a very harsh response.  And it was very --
6    it was a troubling meeting because one of my colleagues
7    mentioned to me later that I was probably too aggressive
8    in trying to defend him in that meeting.
9        Q.  Did anyone in -- well, first, let's run
10   through this.  Would you please identify the folks that
11   you were speaking with?
12       A.  I will not.  It's a client of the firm.
13       Q.  Okay.  And so you're invoking privilege?
14       A.  Yes, sir.
15       Q.  Okay.  You said there was a harsh response and
16   that it was -- it was a troubling meeting.  Did anyone
17   in that meeting make reference to the Patent Troll
18   Tracker blog?
19       A.  As I'm recalling it now, yes, sir.
20       Q.  And could you tell us what was said about the
21   Patent Troll Tracker blog?
22       A.  Again, without disclosing a privileged
23   communication, it was cited again as an authority for --
24   a reason for not wanting Mr. Ward to be on the trial
25   team.

78

1        Q.  And I believe you said that you defended
2    Mr. Ward's reputation in that meeting?
3        A.  I was -- I was, again, truly outraged by it.
4        Q.  I take it Mr. Ward was not retained in that
5    case?
6        A.  That's correct.
7        Q.  Okay.  I just want to make sure.  I don't
8    think we had covered that -- that small detail.
9            So that makes a total of four clients who
10   have declined to retain Mr. Ward?
11       A.  Yeah.  And just to be specific, one of them is
12   not a client.  It was a -- it was another lawyer who
13   would -- who we were investigating co-counsel together.
14       Q.  Okay.  But someone had come to you with the
15   intention of at least possibly retaining your services
16   and those of Mr. Ward?
17       A.  That's correct, yes, sir.
18       Q.  Okay.  Can you think of any other instances,
19   now that we've gone through those four, where anyone has
20   declined to retain Mr. Ward?
21       A.  No, sir.  There may have been some others, and
22   certainly if I can recall them, I'll tell you.
23       Q.  Okay.  Can you tell me when this last
24   conversation or meeting took place that you referred to
25   as a troubling meeting?

79

1        A.  I believe it was in January or February of
2    2008.
3        Q.  January or February of 2008.  Have you
4    recommended Mr. Ward to be counsel for any other clients
5    since January or February of 2008?
6        A.  I would be reasonably confident -- I'd have to
7    think about it, you know, for specific instances, but
8    I'm sure I have.
9        Q.  Okay.  Have you received any negative feedback
10   when you've made those recommendations?
11       A.  Well, that's the -- I can't remember any
12   specific instances since -- since the early part of
13   2008, and so I just don't -- I just don't recall any
14   particular instances.
15           MR. SCHWARZ:  No further questions.  I
16   pass the witness.
17           MR. PATTON:  I just have a couple of
18   questions.
19               EXAMINATION
20   BY MR. PATTON:
21       Q.  In the instances that you have described,
22   Mr. Chiavello, when you were told these things about
23   Johnny Ward, did you form an impression about what they
24   meant?
25       A.  Yes, sir.

80

1        Q.  Was that a positive impression of Johnny Ward
2    or a negative impression?
3        A.  It was a negative impression.
4        Q.  Okay.  And if I understand your prior
5    testimony, none of these people agreed with you that
6    Johnny Ward should be hired?
7        A.  That's correct.
8            MR. PATTON:  I'll pass the witness.
9            MR. SCHWARZ:  That's all I have for
10   today.  Thank you.
11           THE WITNESS:  Thank you.
12           THE VIDEOGRAPHER:  And this concludes the
13   video deposition of Robert Chiavello, consisting of two
14   tapes.  We're now going off the record.  The time is
15   11:10 a.m.
16           (Proceeding concluded.)
17
18
19
20
21
22
23
24
25

Chiavello, Robert H.  9/23/2009  11:10:00 AM

81

```
 1          CHANGES AND SIGNATURE
 2    WITNESS: Robert Chiavello Jr.  DATE: September 23, 2009
 3    PAGE   LINE  CHANGE          REASON
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____
```

82

```
 1         I, ROBERT H. CHIAVELLO, JR., have read the
       foregoing deposition and hereby affix my signature that
 2     same is true and correct, except as noted above.
 3
 4
 5                 _____
                   ROBERT H. CHIAVELLO, JR.
 6
 7
 8     THE STATE OF _____)
       COUNTY OF _____)
 9
          Before me, _____, on
10     this day personally appeared ROBERT H. CHIAVELLO, JR.,
       known to me (or proved to me under oath or through
11     _____) (description of identity
       card or other document)) to be the person whose name is
12     subscribed to the foregoing instrument and acknowledged
       to me that they executed the same for the purposes and
13     consideration therein expressed.
          Given under my hand and seal of office this
14     _____ day of _____, _____.
15
16
17                 _____
                   NOTARY PUBLIC IN AND FOR
18                 THE STATE OF _____
                   COMMISSION EXPIRES _____
19
20
21
22
23
24
25
```

83

```
 1           IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF ARKANSAS
 2               TEXARKANA DIVISION
 3    JOHN WARD, JR.         )
                            )
 4                          )  C.A. NO. 08-4022
      v.                    )  JURY TRIAL DEMANDED
 5                          )
                            )
 6    CISCO SYSTEMS, INC.    )
 7
 8
 9
10            REPORTER'S CERTIFICATION
11        DEPOSITION OF ROBERT H. CHIAVELLO, JR.
12              SEPTEMBER 23, 2009
13
15         I, April Eichelberger, Certified Shorthand Reporter
16    in and for the State of Texas, hereby certify to the
17    following:
18         That the witness, ROBERT H. CHIAVELLO, JR., was duly
19    sworn by the officer and that the transcript of the oral
20    deposition is a true record of the testimony given by
21    the witness;
22         That the deposition transcript was submitted on
23    _____ to the witness or to the attorney
24    for the witness for examination, signature and return to
25    me by _____.
```

84

```
 1         That the amount of time used by each party at the
 2    deposition is as follows:
 3         MR. SCHWARZ.....1 hour, 51 minutes
 4         MR. PATTON......1 minutes
 5         MS. COLLINS.....0 minutes;
 6         That pursuant to information given to the deposition
 7    officer at the time said testimony was taken, the
 8    following includes counsel for all parties of record:
 9         FOR THE PLAINTIFF:
10         Mr. Nicholas H. Patton
11         FOR THE DEFENDANT:
12         Mr. Kurt Schwarz
13         FOR THE WITNESS:
14         Ms. Joni Collins
15         That $_____ is the deposition officer's charges
16    to the Defendant for preparing the original deposition
17    transcript and any copies of exhibits;
18         I further certify that I am neither counsel for,
19    related to, nor employed by any of the parties or
20    attorneys in the action in which this proceeding was
21    taken, and further that I am not financially or
22    otherwise interested in the outcome of the action.
23         Certified to by me this _____ day of
24    _____, 2009.
25
```

Chiavello, Robert H.  9/23/2009  11:10:00 AM

85

1

2   _____

April Eichelberger

3   Texas CSR No. 7495

Expiration Date:  December 31, 2009

4   HG Litigation, Firm No. 69

As certified partner for

5   West Court Reporting Services

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25