# Ex. G

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | |
|---|---|
| JOHN WARD, JR., | * |
| | * |
| V. | *  C.A. NO. 08-4022 |
| | *  JURY TRIAL DEMANDED |
| CISCO SYSTEMS, INC. | * |

---

ORAL AND VIDEOTAPED DEPOSITION OF

THOMAS JOHN WARD, JR.

AUGUST 10, 2009

---

ORAL AND VIDEOTAPED DEPOSITION of THOMAS JOHN WARD, JR., produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and -numbered cause on the 10th day of August, 2009, from 9:44 a.m. to 1:21 p.m., before Stacy L. Jordan, CSR in and for the State of Texas, reported by machine shorthand, taken in the law offices of John Ward, Jr., 111 West Tyler Street, City of Longview, County of Gregg, State of Texas, pursuant to the Federal Rules of Civil Procedure.

```
 1        Q.   Okay.  And what's his relationship, if any, to
 2   the T. Ward [sic], Jr., P.C.?
 3        A.   He is a shareholder in my professional
 4   corporation.
 5        Q.   Are there any shareholders besides yourself
 6   and Mr. Smith?
 7        A.   Yes, one more, Thomas Reardon.  That happened
 8   about two months ago.
 9        Q.   Okay.  And the current percentage ownership is
10   what?
11        A.   There's 2,000 shares, and Mr. Smith and
12   Mr. Reardon each have one share.  So whatever that
13   percentage is.
14        Q.   Okay.
15        A.   A benevolent dictatorship.
16        Q.   So you own 1,998 of the 2,000 shares of
17   T. John Ward, Jr., P.C.?
18        A.   I do.
19        Q.   All right.  T. John Ward, Jr., P.C. is not a
20   plaintiff in this case, correct?
21        A.   Correct.
22        Q.   Is -- are you claiming damages to T. John
23   Ward, Jr., P.C. indirectly in this case?
24        A.   No.
25        Q.   Have you practiced law since 2007 -- since
```

```
 1      October 2007 in any -- with any entity or in any way
 2      other than through the T. John Ward, Jr., P.C.?
 3           A.   No.
 4           Q.   Okay.  How are you compensated by the -- by
 5      the law practice?
 6           A.   I take a paycheck when there's money to be
 7      taken.
 8           Q.   Since October of 2007, have your paychecks
 9      decreased?
10           A.   No.  I made more in 2008 than I did in 2007.
11           Q.   Okay.
12           A.   Probably less in 2009 than I made in 2007.
13           Q.   Although, there's still hope for 2009.
14           A.   We've still got some -- we've still got some
15      time left.
16           Q.   It -- it looks, to me, from looking at the
17      new-case filings in the Eastern District of Texas, that
18      you are a very active litigant there.  Is that fair to
19      say?
20           A.   I --
21                MS. PEDEN:  Objection to form.
22           A.   I'm not an active litigant.  I --
23           Q.   (BY MR. BABCOCK)  I mean --
24           A.   I represent --
25           Q.   -- represent people.  Yeah.
```

```
 1          A.   I represent a number of individuals and
 2    entities.
 3          Q.   I should say you have an active practice.
 4          A.   I have an active practice, yes.  I'd agree
 5    with that characterization.
 6          Q.   And has -- do you think your practice has
 7    suffered since October 17th and 18th of 2007?
 8          A.   Now, what do you mean when you say "suffered"?
 9          Q.   Well, are you sitting in -- sitting in your
10    office, twiddling your thumbs, waiting for the next case
11    to come in?
12          A.   No.  I've stayed very busy.
13          Q.   Yeah.  And I'm just guessing, based on my own
14    practice, that you probably work more than 2,000
15    billable hours a year?
16          A.   I have a feeling that I do.  I think I work
17    pretty hard.
18          Q.   Yeah.  And one of my client -- one of my
19    partners, Richard Griffin, says:  Great lawyers are made
20    by great clients.  Do you agree with that?
21          A.   And hard work, yeah.
22          Q.   Hard work and great --
23          A.   And some luck.
24          Q.   And luck.
25                    I've heard it said about you that you're a
```

```
 1        Q.   Okay.  In -- in 2007, what percentage of your
 2   work was patent litigation?  I know roughly.  I mean,
 3   you can't do it precisely.
 4        A.   No.  I'm guessing it was probably 70,
 5   75 percent.
 6        Q.   Okay.  And 2008?
 7        A.   It -- it's hard to break it down in percentage
 8   because I still have my hand in the personal injury
 9   business.  I still --
10        Q.   Sure.
11        A.   -- get those clients and go to mediations.
12   And if we go to trial, I go to trial.  So, you know,
13   I've still got a per- -- I don't know if we're talking
14   about a percentage of income or a percentage of my time
15   that I spend on cases.
16        Q.   Sure.
17        A.   So I don't know how you want to break that
18   out.
19        Q.   Well, it's -- it's good enough.  I mean, it's
20   hard to -- I mean, I'd be hard-pressed if anybody asked
21   me the question.
22             But in 2007 to -- to today, it's -- it's
23   grown from 70 or 75 percent to 90 percent?
24        A.   As far as the day-in, day-out time that I
25   devote to practice, yes.
```

1    think of as general local counsel.  Eric and I try these
2    cases very actively and are actively involved in them:
3    jury selection, opening statements, taking witnesses.
4         Q.   Were you -- had it been decided whether you
5    and Eric were going to be actively involved in trying
6    this ENS -- ESN case at this October 17th point?
7         A.   Again, I don't know what they discussed.  I
8    can tell you what our -- the general practice was.  We
9    don't get involved unless we're going to be active
10   and -- and so I would assume that that was understood
11   going in.
12        Q.   Were -- were you -- was your involvement in
13   this case through Eric or did McAndrews call you up or
14   did somebody from ESN call you up?
15        A.   It was through Eric.  Now, whether they called
16   and said, "We want to hire you guys" -- I don't know
17   exactly how it went down.
18        Q.   Okay.
19        A.   But Eric -- Eric was kind of in charge of ESN
20   at that time.
21        Q.   Okay.  But you had separate bus- -- law firms
22   at that time; you weren't partners then, right?
23        A.   Correct.  Still -- still have separate
24   businesses.
25        Q.   Yeah.  So the first contact that was made to

```
 1    you was by Eric Albritton, correct?
 2         A.   I believe so.
 3         Q.   Okay.  And -- and Mr. Albritton and his staff
 4    were responsible for filing the -- the pleadings.  And
 5    you didn't have anything to do with that, right?
 6         A.   That's correct.
 7         Q.   Okay.
 8         A.   The -- the original complaint --
 9         Q.   The original --
10         A.   -- yes.
11         Q.   -- complaint, which there is some
12    documentation on the 15th, some stuff on the docket
13    sheet on the 15th.
14              MS. PEDEN:  Objection to form.
15         Q.   (BY MR. BABCOCK)  Do you agree that there's a
16    docket sheet that shows something was filed on the 15th?
17              MS. PEDEN:  Objection to form.
18         A.   This -- again, embarrassingly, I -- I haven't
19    gone back and looked through all the docket sheets.  I
20    don't know that I've ever looked at the docket sheet.
21    I've looked at the notice of electronic filing well
22    after the fact to see it was filed --
23         Q.   (BY MR. BABCOCK)  Okay.
24         A.   -- when we say it was.
25         Q.   There's -- certainly, within a short period of
```

```
 1     asked me, "Would you have done it any differently," you
 2     know.  I said:  Absolutely not.  That's -- that's what
 3     my assistant does when there's a --
 4          Q.   Okay.
 5          A.   -- an error in the clerk's office.
 6          Q.   Okay.  Have you talked to David Maland about
 7     this, the -- the clerk himself, the --
 8          A.   Never.
 9          Q.   Okay.  Have you talked to any of the deputy
10     clerks or assistant clerks about it?
11          A.   Never.
12          Q.   Okay.  Have we exhausted everything you and
13     Mr. Albritton talked about the issue of Ms. Mathis
14     calling the Eastern District of Texas court clerk
15     regarding the change of the docket?
16          A.   I believe so.
17          Q.   Okay.  Let's keep going on this article.
18          A.   Okay.
19          Q.   Quote:  I checked, and sure enough, that's
20     exactly what happened - the docket was altered to
21     reflect an October 16th filing date, and the complaint
22     was altered to change the filing-date stamp from October
23     15th to October 16th.
24               Did I read that correctly?
25          A.   I believe you did.
```

1   them about what's happened?
2        Q.   Uh-huh.  And he -- he said yes?
3        A.   He said --
4        Q.   Okay.
5        A.   -- whatever you need to do.
6        Q.   Is there anybody of this nature, like Pete
7   McAndrews and Bob Chiaviello, who you've asked
8   permission who have denied it, said:  No, you can't give
9   my name to the lawyers?
10       A.   Yes.
11       Q.   Who is that?
12       A.   I don't -- they don't want their names out
13  there, and I -- I don't -- I'm not comfortable giving
14  them to you.  I think it's confidential.  They've had
15  clients who've -- and I can't -- obviously, if I
16  can't -- if I don't give it to you now, I'm not going to
17  get to talk about it at trial, and I understand I live
18  and die by that.
19       Q.   Okay.  Are you claiming economic damages in
20  this case?
21            MS. PEDEN:  Objection to form.
22       A.   I don't believe so.  I think I'm claiming
23  pain, suffering, mental anguish, and reputational
24  damage.  I think I've lost business, but, you know, I
25  can't ever -- again, I can't prove who's not hiring me

```
 1    because of this, so I can't put any dollar value on it.
 2         Q.   (BY MR. BABCOCK)  You could prove, however,
 3    that a bunch of people are hiring you.  I mean --
 4         A.   I've --
 5         Q.   -- you've got a pretty active docket.
 6         A.   I've got an active docket, yes.  This has, by
 7    no means, shut my practice down.
 8         Q.   Okay.  So there's Pete McAndrews, Bob
 9    Chiaviello, and one or more people that you won't name?
10         A.   One.  One lawyer.
11         Q.   Okay.  One lawyer that you won't name.
12         A.   And Mr. Fokas has told me that he would not
13    have hired me if he did not know me prior to this and
14    know this to be untrue about me.  That's hindsight,
15    but --
16         Q.   Uh-huh.
17         A.   -- he's made that comment to me.  I think he's
18    very happy with my representation of him, so I'm not
19    worried about losing him as a client.
20         Q.   All right.  Okay.  Anybody -- anybody else,
21    other than McAndrews, Chiaviello, the one lawyer you
22    won't tell us, who has said that because of this Patent
23    Troll Tracker article -- were you even quoting somebody
24    else?
25         A.   Quoting some- --
```

```
 1                  (Off the record 1:15-1:18.)
 2              THE VIDEOGRAPHER:  Back on the record,
 3      1:18.
 4          Q.   (BY MR. BABCOCK)  Have you ever engaged in any
 5      lobbying efforts in Washington regarding patent reform
 6      or the patent laws?
 7              MS. PEDEN:  Objection, vague and
 8      ambiguous.
 9              You can --
10          Q.   (BY MR. BABCOCK)  Go -- go ahead and answer.
11          A.   Yeah.
12              MS. PEDEN:  If you can.
13          A.   Yeah.  When you say "have engaged in," have I
14      gone to D.C.?  Have I called congressmen?  You know,
15      what is it that you're wanting to know?
16          Q.   (BY MR. BABCOCK)  All right.  Good questions,
17      all of them --
18          A.   Okay.
19          Q.   -- since you're a trial -- I bet you're a
20      trial lawyer.
21              Have you ever gone to Washington, D.C. in
22      connection with patent law?
23          A.   No.
24          Q.   Have you ever called any members of Congress
25      regarding -- regarding issues of patent law?
```

1   A.   No.
2   Q.   Okay. Have you ever been involved with any
3   organizations that have been on one side or the other of
4   the patent reform law debate?
5   A.   I think the American Association for Justice
6   got involved, and so -- I send money to them. I don't
7   believe the Texas Trial Lawyers Association has weighed
8   in on it. So only the AAJ.
9   Q.   Have you ever been to Washington, D.C. on
10  business?
11  A.   Yes.
12  Q.   And while in Washington, D.C., did you ever
13  meet with a member of Congress, either a senator or a
14  representative --
15  A.   Never.
16  Q.   -- or their staff?
17  A.   Never.
18  Q.   Okay. Did you ever meet with a lobbyist,
19  somebody who -- either for AAJ or for the -- anybody
20  else who's lobbying Congress?
21  A.   Face-to-face meetings, no.
22  Q.   How about telephone meetings?
23  A.   Never on the telephone.
24  Q.   Okay. You said that the notice of electronic
25  filing was available online. Could you tell -- I think