# Exhibit B

Dockets.Justia.com

Ward, John  8/10/2009  1:21:00 PM

1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF ARKANSAS

TEXARKANA DIVISION

JOHN WARD, JR.,        *
                *
V          * C.A. NO. 08-4022
           * JURY TRIAL DEMANDED
CISCO SYSTEMS, INC.   *

--------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

THOMAS JOHN WARD, JR

AUGUST 10, 2009

--------------------------------

     ORAL AND VIDEOTAPED DEPOSITION OF THOMAS JOHN WARD,
JR., produced as a witness at the instance of the
Defendant, and duly sworn, was taken in the above-styled
and -numbered cause on the 10th day of August, 2009,
from 9:44 a.m. to 1:21 p.m., before Stacy L. Jordan, CSR
in and for the State of Texas, reported by machine
shorthand, taken in the law offices of John Ward, Jr.,
111 West Tyler Street, City of Longview, County of
Gregg, State of Texas, pursuant to the Federal Rules of
Civil Procedure.

---

2

A P P E A R A N C E S

FOR THE PLAINTIFF:
  Patricia L. Peden, Esq.
  LAW OFFICES OF PATRICIA L. PEDEN
  5901 Christie Avenue, Suite 201
  Emeryville, California  94608
  Phone: 510.268.8033  Fax: 510.547.2446
  E-mail: ppeden@pedenlawfirm.com

  Nicholas H. Patton, Esq.
  PATTON, TIDWELL & SCHROEDER, LLP
  4605 Texas Boulevard
  Texarkana, Texas  75503
  Phone: 903.792.7080  Fax: 903.792.8233
  E-mail: nickpatton@texarkanalaw.com

FOR THE DEFENDANT:
  Charles L. Babcock, Esq.
  Crystal J. Parker, Esq.
  JACKSON WALKER, LLP
  1401 McKinney Street, Suite 1900
  Houston, Texas  77010
  Phone: 713.752.4200  Fax: 713.752.4221
  E-mail: cbabcock@jw.com
  E-mail: cparker@jw.com

ALSO PRESENT:
  Thad Strobach, Videographer

---

3

I N D E X

Appearances ......................... 2
THOMAS JOHN WARD, JR.
  Examination by Mr. Babcock ............... 6
Changes and Signature ............. 142-143
Reporter's Certificate ................... 144

VIDEOTAPES

BEGINNING OF TAPE 1 ......................... 5
BEGINNING OF TAPE 2 ......................... 105

E X H I B I T S

NO.  DESCRIPTION                         MARKED

Exhibit 2   Deposition Notice              5

Exhibit 3   10/17/07 and 10/18/07 Patent Troll   34
        Tracker Articles
        (Bates Ward 000003 to 06)

Exhibit 4   11/5/07 Olivo e-mail string to Ward   52
        (Bates Ward 000011 to 12)
Exhibit 5   12/4/07 Pridham e-mail to Ward   52
        (Bates Ward 000200)

Exhibit 6   2/29/08 Niro e-mail string to Ward,   52
        with attachment
        (Bates Ward 000077 to 78)

Exhibit 7   3/8/08 Crouch e-mail to Ward   52
        (Bates Ward 000080)
Exhibit 8   3/12/08 Fokas e-mail to Ward, et al.   52
        (Bates Ward 000369)

Exhibit 9   3/12/08 Fokas e-mail string to Ward   52
        (Bates Ward 000370 to 371)

---

4

E X H I B I T S (Continued)
NO.  DESCRIPTION                         MARKED
Exhibit 10  3/14/08 Smith e-mail to Ward and   52
        Albritton, with attachments
        (Bates Ward 000088, Ward 000247 to 255)
Exhibit 11  Law.com article: Patent Attorneys Sue   52
        Cisco and Blogging In-House Lawyer for
        Defamation
        (Bates Ward 000228 to 232)

Exhibit 12  3/17/08 Ward e-mail string to Fenner   52
        (Bates 000346)
Exhibit 13  3/17/08 Gilstrap e-mail to Ward,   52
        with attachment
        (Bates Ward 000092 to 96)
Exhibit 14  3/28/08 Ward e-mail string to Fokas,   52
        with attachment
        (Bates Ward 000348 to 352)
Exhibit 15  4/7/08 McAndrews letter to Chandler   52
        (Bates Ward 000359 to 368)

Exhibit 16  4/18/08 Strachan e-mail to Ward,   52
        with attachment
        (Bates Ward 000098 and Ward 000256)

Exhibit 17  10/17/07 and 10/18/07 Patent Troll   52
        Tracker Articles
        (Bates Ward 000009 to 10)

Exhibit 18  11/7/07 Patent Troll Tracker Article   52
        (Bates Ward 000015 to 29)
Exhibit 19  Web site Printouts   52
        (no Bates)

5

1       P R O C E E D I N G S
2           (Exhibit 2 marked.)
3           (Videotape 1.)
4           THE VIDEOGRAPHER:  Here begins the
5   videotaped deposition of John Ward, Jr., Tape 1, Volume
6   1, in the matter of John Ward, Jr. versus Cisco Systems,
7   Inc., in the U.S. District Court, Western District of
8   Arkansas, Texarkana Division, Case Number 08-4022.
9           Today's date is August the 10th, 2009.
10   The time on the video monitor is 9:44 a.m.
11           The video operator today is Thad Strobach;
12   the court reporter is Stacy Jordan, both of them
13   representing West Reporting.
14           Will counsel please state their agreements
15   and appearances.
16           MR. BABCOCK:  Mr. Patton will be in the
17   camera shortly.
18           MS. PEDEN:  Yeah.
19           Come -- come across.
20           Patricia Peden, representing plaintiff.
21           MR. PATTON:  Nick Patton, representing
22   the plaintiff.
23           MR. BABCOCK:  Charles Babcock and Crystal
24   Parker, representing the defendant.
25           THOMAS JOHN WARD, JR.,

6

1   having been first duly sworn, testified as follows:
2           EXAMINATION
3   BY MR. BABCOCK:
4       Q.  Will you state your name, sir.
5       A.  Thomas John Ward, Jr.
6       Q.  Mr. Ward, right in front of you is -- is the
7   deposition notice for your wife, which I forgot to
8   introduce.
9       A.  Okay.
10       Q.  But here's Exhibit 2.  That's your notice.
11       A.  Okay.
12       Q.  The only reason I do this is so I can keep
13   track of depositions by numbers.
14           Would you tell us how you're employed?
15       A.  I'm an attorney working for Ward & Smith law
16   firm, which is an assumed name.
17       Q.  Okay.
18       A.  T. John Ward, P.C. is the business entity
19   that I'm employed by.
20       Q.  And T. John Ward, P.C. is the owner of the
21   Ward & Smith law business; is that right?
22       A.  Jr.  Yes.
23       Q.  T. Ward [sic], Jr., P.C.
24           I take it there is a Smith?
25       A.  There is

7

1       Q.  Okay.  And what's his relationship, if any, to
2   the T. Ward [sic], Jr., P.C.?
3       A.  He is a shareholder in my professional
4   corporation.
5       Q.  Are there any shareholders besides yourself
6   and Mr. Smith?
7       A.  Yes, one more, Thomas Reardon.  That happened
8   about two months ago.
9       Q.  Okay.  And the current percentage ownership is
10   what?
11       A.  There's 2,000 shares, and Mr. Smith and
12   Mr. Reardon each have one share.  So whatever that
13   percentage is.
14       Q.  Okay.
15       A.  A benevolent dictatorship.
16       Q.  So you own 1,998 of the 2,000 shares of
17   T. John Ward, Jr., P.C.?
18       A.  I do.
19       Q.  All right.  T. John Ward, Jr., P.C. is not a
20   plaintiff in this case, correct?
21       A.  Correct.
22       Q.  Is -- are you claiming damages to T. John
23   Ward, Jr., P.C. indirectly in this case?
24       A.  No.
25       Q.  Have you practiced law since 2007 -- since

8

1   October 2007 in any -- with any entity or in any way
2   other than through the T. John Ward, Jr., P.C.?
3       A.  No.
4       Q.  Okay.  How are you compensated by the -- by
5   the law practice?
6       A.  I take a paycheck when there's money to be
7   taken.
8       Q.  Since October of 2007, have your paychecks
9   decreased?
10       A.  No.  I made more in 2008 than I did in 2007.
11       Q.  Okay.
12       A.  Probably less in 2009 than I made in 2007.
13       Q.  Although, there's still hope for 2009.
14       A.  We've still got some -- we've still got some
15   time left.
16       Q.  It -- it looks, to me, from looking at the
17   new-case filings in the Eastern District of Texas, that
18   you are a very active litigant there.  Is that fair to
19   say?
20       A.  I --
21           MS. PEDEN:  Objection to form.
22       A.  I'm not an active litigant.  I --
23       Q.  (BY MR. BABCOCK)  I mean --
24       A.  I represent --
25       Q.  -- represent people.  Yeah.

Ward, John  8/10/2009  1:21:00 PM

9

1      A.  I represent a number of individuals and
2   entities.
3      Q.  I should say you have an active practice.
4      A.  I have an active practice, yes.  I'd agree
5   with that characterization.
6      Q.  And has -- do you think your practice has
7   suffered since October 17th and 18th of 2007?
8      A.  Now, what do you mean when you say "suffered"?
9      Q.  Well, are you sitting in -- sitting in your
10   office, twiddling your thumbs, waiting for the next case
11   to come in?
12      A.  No.  I've stayed very busy.
13      Q.  Yeah.  And I'm just guessing, based on my own
14   practice, that you probably work more than 2,000
15   billable hours a year?
16      A.  I have a feeling that I do.  I think I work
17   pretty hard.
18      Q.  Yeah.  And one of my client -- one of my
19   partners, Richard Griffin, says:  Great lawyers are made
20   by great clients.  Do you agree with that?
21      A.  And hard work, yeah.
22      Q.  Hard work and great --
23      A.  And some luck.
24      Q.  And luck.
25          I've heard it said about you that you're a

10

1   great lawyer.  Do you agree with that?
2      A.  You know, I'm not going to toot my own horn.
3   I'll let other people make that determination.
4      Q.  Okay.  Let me see if I can see a description
5   that I saw.  We'll get to it in a minute.
6          How about giving me your educational
7   background?
8      A.  Where do you want me to start?  High school?
9      Q.  You can start --
10      A.  College?
11      Q.  You can start with high school, sure.
12      A.  I graduated from Longview High School in 1988.
13   I went to the University of Oklahoma and graduated from
14   there in 1992 with a bachelor of arts in economics.
15      Q.  Phi Beta Kappa, I might add.
16      A.  Yes, sir.  And went directly to law school at
17   Texas Tech University School of Law.  Graduated from
18   there in 1995.
19      Q.  Okay.  And after law school, you clerked for
20   Judge Parker in the Fifth Circuit, I think?
21      A.  I did.
22      Q.  And then you went to work for McKool & Smith,
23   correct?
24      A.  Correct.
25      Q.  And what did you do for McKool & Smith?

11

1      A.  I looked at documents all day, most of the
2   time.  That's what ran me out of there in nine months.
3      Q.  Okay.  McKool & Smith is, as I understand it,
4   a Dallas-based litigation firm, correct?
5      A.  Correct.
6      Q.  Commercial litigation?
7      A.  Primarily, yes.
8      Q.  Okay.  And then -- and then after nine months
9   with McKool & Smith, you came out to Longview and set --
10   set up your practice?
11      A.  No.  I -- I moved to Longview, but I worked in
12   Marshall for Mike Miller.
13      Q.  All right.  And how long did you work for
14   Mr. Miller?
15      A.  Two years.  Right about two years.
16      Q.  Okay.  And were you an employee or a partner,
17   or what was your --
18      A.  I was an employee.
19      Q.  Okay.  And after that two-year period with
20   Mr. Miller, what did you do?
21      A.  I became a partner in Holmes, Albritton &
22   Ward.  I moved my practice back to Longview.
23      Q.  Okay.  And the "Holmes" is which Holmes?
24      A.  Clifton, better known as Scrappy.
25      Q.  Scrappy.  Okay.  Not Jam-- -- Jamie, who is --

12

1      A.  Not Jamie Holmes, no.
2      Q.  Okay.  And the "Albritton" was Eric Albritton,
3   correct?
4      A.  Correct.
5      Q.  Okay.  And how long did that partnership last?
6      A.  A little less than two years.
7      Q.  Why did it -- why did it dissolve?
8      A.  Oh, we were going different directions.  I had
9   gone to work with Scrappy and Eric because Scrappy had
10   said he had a lot of personal injury business.  And I
11   think he had some, but it was -- I was probably carrying
12   as much of my own business as I was getting from
13   Scrappy.  Their practice was really criminal.  And what
14   sounded like a good idea probably wasn't the best
15   business move.  And so we split up.  Eric went out on
16   his own, and I went in with Glenn Perry and Tim Womack.
17      Q.  Okay.  And how long did the Womack, Perry &
18   Ward practice last?
19      A.  Until the tort deform [sic] hit and I went out
20   on my own.  So a couple of years.
21      Q.  Okay.
22      A.  But it was an amicable split.
23      Q.  Okay.  And then your current practice started
24   what year?
25      A.  I'm not positive, but I'm thinking it was

13

```
1    2002.
2       Q.  Has your practice changed since 2002?  Is it
3    still the same mix of cases, or is it different?
4       A.  It's changed a lot since 2002.
5       Q.  What was it in 2002?
6       A.  Personal injury.
7       Q.  Okay.
8       A.  90 -- 95 percent of my -- my practice was.
9       Q.  And what -- how did -- what did it morph into?
10      A.  Well, we still have -- Bruce Smith and Tom
11   Reardon still maintain that personal injury docket.  But
12   my personal docket has really transformed into probably
13   90 percent patent litigation.
14      Q.  Okay.
15      A.  It started as a small percentage and grew and
16   grew and grew until that's all I've got time for.
17      Q.  All right.  And when did it -- when did it
18   change from personal injury to 90 percent patent
19   litigation for you, personally?
20      A.  It's taken place over the years.  So it's over
21   five or six years.  Each year, the intellectual
22   property/patent litigation for me grew.
23      Q.  All right, sir.
24      A.  Became a larger and larger portion of my
25   personal practice.
```

14

```
1       Q.  Okay.  In -- in 2007, what percentage of your
2    work was patent litigation?  I know roughly.  I mean,
3    you can't do it precisely.
4       A.  No.  I'm guessing it was probably 70,
5    75 percent.
6       Q.  Okay.  And 2008?
7       A.  It -- it's hard to break it down in percentage
8    because I still have my hand in the personal injury
9    business.  I still --
10      Q.  Sure.
11      A.  -- get those clients and go to mediations.
12   And if we go to trial, I go to trial.  So, you know,
13   I've still got a per- -- I don't know if we're talking
14   about a percentage of income or a percentage of my time
15   that I spend on cases.
16      Q.  Sure.
17      A.  So I don't know how you want to break that
18   out.
19      Q.  Well, it's -- it's good enough.  I mean, it's
20   hard to -- I mean, I'd be hard-pressed if anybody asked
21   me the question
22          But in 2007 to -- to today, it's -- it's
23   grown from 70 or 75 percent to 90 percent?
24      A.  As far as the day-in, day-out time that I
25   devote to practice, yes
```

15

```
1       Q.  Okay.  And what about the revenue derived from
2    patent litigation; is that the -- is that the same
3    percentage, or is it more or less?
4       A.  I haven't looked at that.  I'd be guessing.
5    I -- I would guess it's -- well, I know it's more.  I've
6    generated more revenue from intellectual property than I
7    have from personal injury.
8       Q.  Okay.
9       A.  How much more, I'd have to go pull the books.
10      Q.  Okay.  Here's the -- here's the comment that I
11   was -- had been searching for earlier.  Quote.  Many
12   lawyers talk about their ability to try cases, but few
13   can match the results obtained by Johnny Ward.  He has
14   "first chair" (the attorney with ultimate responsibility
15   at trial) trial experience in over 30 jury -- jury
16   trials, covering a variety of challenging cases.
17          Is that an accurate description of you?
18      A.  I told you I wasn't going to toot my own horn,
19   but I was tooting my own horn there.  Yes, I had kind
20   words to say about myself.
21      Q.  Yeah, this is from your -- from your Web site.
22      A.  Correct.
23      Q.  It goes on to say, quote:  Not only has he
24   tried a wide variety of cases, he has done so with
25   success.  He obtained his first verdict in excess of a
```

16

```
1    million dollars at the age of 34.
2          True?
3       A.  True.
4       Q.  Mr. Ward turned down a settlement offer, took
5    the case to trial, and the jury awarded his client
6    $1,010,000.
7          Also true?
8       A.  Absolutely.
9       Q.  Okay.
10         In the years that followed, Mr. Ward
11   obtained several multimillion-dollar verdicts, including
12   a $133 million verdict in a patent infringement case
13   against Microsoft.
14         Also true?
15      A.  True.
16      Q.  Okay.
17      A.  I had some help doing it, but yes.
18      Q.  Okay.  It also talks about a case where you
19   were appointed as a special prosecutor in Cass County
20   and that maybe the criminal trial is going to go forward
21   like right about now?
22      A.  It keeps getting bumped, but we're trying to
23   get it done in the fall of this year.
24      Q.  Okay.  And in that case -- on the civil side
25   of that case, you recovered a verdict in excess of 13
```

17

```
1    million for the family?
2        A.  I did.  Probably my favorite case, most
3    rewarding case I've ever --
4        Q.  And the reason for that is because the
5    district attorney had refused to prosecute somebody that
6    you believed was responsible for the death of a family
7    member that you were representing?
8        A.  The family initially believed, and they
9    convinced me, that that's what had had happened to them.
10   The deeper I dug, the more convinced I was.
11       Q.  And you convinced a civil jury of that, I take
12   it?
13       A.  The facts did.  The facts --
14       Q.  The facts did.
15       A.  -- speak pretty loud.
16       Q.  And -- and are you aware of any other time a
17   special prosecutor has been appointed like that?
18       A.  I -- I -- it's not common, but I know it has
19   happened.
20       Q.  Okay.
21       A.  I know a private lawyer has been appointed as
22   special prosecutor.
23       Q.  Okay.  So the criminal trial is going to go
24   forward sometime in -- in the near future, I take it?
25       A.  He's not going to confess, so I think we're
```

18

```
1    going to have a trial.
2        Q.  Okay.  Great.
3            Your -- you just sat through the
4    deposition of your wife, correct?
5        A.  I did.
6        Q.  And she said that -- that after these Troll
7    Tracker articles that are at issue in this case, she
8    believed that your sleepless -- sleep problem -- or
9    inability to sleep through the night increased from one
10   to two times a week to three to four times a week.  Is
11   that true?
12       A.  I had more sleepless nights, I believe, after
13   this --
14       Q.  Okay.
15       A.  -- these articles were published, yes.
16       Q.  Okay.  And do you relate your sleep problems
17   to the articles?
18       A.  The increase in sleepless nights initially,
19   yes.
20       Q.  Okay.  And -- and is that because you'd be
21   lying in bed asleep and then you'd wake up thinking
22   about the Patent Troll Tracker?
23       A.  During the four months that we were trying to
24   find out who the Patent Troll Tracker was, yes, because
25   I knew these articles were out there; I knew people were
```

19

```
1    reading them, and so yes, it was something that had me
2    very agitated --
3        Q.  Okay.
4        A.  -- angry, frustrated, upset about.
5        Q.  Okay.  And focusing on the -- on the
6    sleeplessness, your wife estimated that it was three to
7    four times a week that you would wake up, and she
8    attributed it to the Patent Troll Tracker.
9            My question to you, since you're the only
10   one that would know:  Was it three to four times a week
11   that you were waken up for that four-month period?
12       A.  It's hard to pinpoint.  I think it's gotten
13   better over time.  I think she's a better judge, because
14   I -- I have a bad habit of waking her up when I'm having
15   trouble sleeping.  I can't disagree that it was three or
16   four nights because I don't -- I don't have a good feel
17   for it.
18       Q.  And in that -- you say "it's gotten better."
19   When did it get better?
20       A.  Well, she forgot that I take Tylenol PM every
21   night, and I didn't take that before.  It's gotten
22   better since I take Tylenol PM.  I've got a friend who's
23   an ER doctor, and I said:  I'm not sleeping.
24           And I didn't attribute it to -- it to
25   anything but I'm having trouble sleeping
```

20

```
1    He said:  Try taking Tylenol PM before you
2    get to something harder.
3        Q.  What's the name of the doctor?
4        A.  Brian Mendenhall, a good friend of mine, ER
5    doctor.
6        Q.  And when did you talk to Dr. -- Mendenhall,
7    did you say?
8        A.  Mendenhall.  I know it was when we lived at
9    101 Fountain Valley Court.  I want to say it was over a
10   year ago.
11       Q.  Have you been taking Tylenol PM for a year
12   every night?
13       A.  Yeah, one.
14       Q.  One -- one tablet?
15       A.  One tablet.
16       Q.  Okay.  And now are you sleeping through the
17   night every night?
18       A.  I didn't last night, but pretty much, yeah.
19   I've had --
20       Q.  You were worried about me, right?
21       A.  Well, I was worried about my wife, what -- how
22   my wife was going to --
23       Q.  She seemed --
24       A.  -- hold up.
25       Q.  She seemed okay
```

Ward, John  8/10/2009  1:21:00 PM

21

```
1    A.  She did great.
2    Q.  Okay.  So excluding last night, have you been
3  sleeping through the night every night?
4    A.  You know, if -- if I've got something going to
5  trial, I'll have some sleepless nights.  That's just
6  part of the business, I think.
7    Q.  I was going to say if -- if you sleep before a
8  big trial, you're -- you're unusual.
9    A.  No.
10   Q.  But -- but other than -- you know, other than
11 the normal, you know, wear and tear of practice, have
12 you been sleeping through the night --
13   A.  Yeah.
14   Q.  -- since you've been taking Tylenol PM?
15   A.  Yes.
16   Q.  Okay.  Now --
17   A.  I say that.  I mean, there'll be times when,
18 you know, I'm answering this discovery and it gets me
19 worked up again.  I try not to read these articles.
20 When I get back into them, it gets me worked up.
21   Q.  Sure.
22   A.  It gets me worked up right now thinking about
23 them.
24   Q.  Okay.  And that's as a result of your
25 litigation against Cisco; that's why you're re- --
```

22

```
1  rereading them?
2    A.  No.  It's a result of what they accused me of,
3  I think.
4    Q.  Well -- but you don't have a ritual where you
5  sit down every couple of weeks and read these articles,
6  do you?
7    A.  Oh, no.  I put them -- I try to put them out
8  of my mind.
9    Q.  Okay.  And the only reason that you have to
10 answer discovery is because of this lawsuit, right?
11   A.  That's right.
12   Q.  Okay.  But prior to your taking the Tylenol
13 PM -- which you said, I think, was maybe a year ago?
14   A.  I think so.
15   Q.  Okay.  Prior to that, was the only thing
16 causing your sleepless nights the Troll Tracker
17 articles?
18   A.  No.
19   Q.  Okay.  What -- what else?
20   A.  Stresses of practice, stresses of life.
21   Q.  What -- what stressful events in your life do
22 you have other than the stress of your practice?
23   A.  I've got kids.  I've got three kids.  I worry
24 about my kids.  I worry about my family.  The people at
25 church, they have tough things going on in their lives
```

23

```
1  that helps keep things in perspective, but you worry
2  about your friends and family.  I think normal stresses
3  that people deal with.  Maybe I internalize them more.
4  Maybe I should let them out.  I don't know.
5    Q.  Would you agree with your wife that your kids
6  are doing fine?
7    A.  They're doing great.
8    Q.  Okay.  So it's nothing about your children
9  that are causing stress in your life?
10   A.  No.
11   Q.  Okay.  I know for some people children can be
12 a huge --
13   A.  They're --
14   Q.  -- stress problem.
15   A.  They're not to that age yet.  They still want
16 to hang out with Mom and Dad and generally want to do
17 right.
18   Q.  I don't know.  When they -- mine were five and
19 six, they were some of the most stressful times, but
20 they evened out.  Okay.
21   A.  They're -- they're what I enjoy going home to
22 every night.
23   Q.  Okay.  Can you recall, when you're waking up
24 at night, any specific instances where you wake up and
25 think about something about the Patent Troll Tracker?
```

24

```
1    A.  Initially, absolutely.
2    Q.  Yeah.  Okay.  Tell me about initially.
3    A.  I just would wake up wondering who's doing
4  this to me.
5    Q.  And, in fact, you filed a lawsuit to try to
6  find out who was the author of the Patent Troll Tracker,
7  right?
8    A.  As fast as I could, I did, yes.
9    Q.  You filed it quickly, but nothing much
10 happened in that case for a while, did it?
11   A.  The wheels of justice turn slowly.  We were
12 doing everything we could to get a deposition of Google
13 I don't think I'd ever filed a -- or been involved in a
14 filing of a 202 petition.
15   Q.  Right.
16   A.  But it sure seemed like it crawled.  Although
17 I understand that -- from Google, he was made aware of
18 it real quickly.
19   Q.  Who at Google told you that?
20   A.  I think we got a letter or -- I don't know
21 how -- how we found out that Google had sent some type
22 of notification to the account holder that there had
23 been a request for information on the -- the identity of
24 the account holder and that they would reveal that
25 information to us within 10 days without an objection --
```

Ward, John  8/10/2009  1:21:00 PM

25

```
 1     Q.  Okay.
 2     A.  -- from the account holder.  And we never got
 3   any information.  So I assume that Mr. Frenkel objected
 4   But, again, that's all speculation.
 5     Q.  Uh-huh.  And you're aware that Mr. Niro had
 6   offered some money to -- for anybody who would unmask
 7   the Troll Tracker?
 8     A.  We talked about it several times, yes.
 9     Q.  Did you offer to help contribute to -- to that
10   fund?
11     A.  No.
12     Q.  Okay.  What did you -- what did you say to
13   Mr. Niro about trying to unmask the Troll Tracker?
14     A.  We had been involved in some cases together,
15   so I knew Mr. Niro before this event.  And I just said.
16   If you find out who it is, let me know; and if I find
17   out who it is, I'll let you know.
18     Q.  Did you know why Mr. Niro was trying to find
19   out about who he was?
20     A.  My recollection is that they were posting
21   information about his family and where he lived, and he
22   had gotten some kind of threats or something.  I mean,
23   there was pretty serious -- what he viewed, and I
24   agreed -- was potential harm to him, that he wanted to
25   get to the bottom of it.
```

26

```
 1     Q.  It -- it had nothing to do with the type of
 2   practice that he was engaged in?
 3     A.  They didn't accuse him of a crime or anything,
 4   that I know of.
 5     Q.  Okay.  So Mr. Niro never told you that it
 6   was -- he was trying to get the identity of the Troll
 7   Tracker because of -- he was critical of Niro's practice
 8   or the type of clients that he had?
 9     A.  Well, he was going after Mr. Niro's clients,
10   like he was going after mine.  That's why we were all --
11   I say "we."  That's why I was reading it, because it was
12   interesting to see what he was going to write about
13   which client next.  I don't -- you'd have to talk to
14   Mr. Niro about what his motivation was.
15     Q.  Okay.  Your wife testified about a dinner that
16   you had with Mr. Niro in Chicago.  Do you recall
17   anything else about that dinner?
18     A.  He -- he gave me a gift, a -- a cartoon of
19   Niro hopping out of the bush with Frenkel reading a
20   Cisco book.  I'm sure you've seen it.
21     Q.  I have.
22     A.  He framed it, and I think he wrote on it "we
23   got him," which, you know --
24     Q.  Do you still have that?
25     A.  I do.  It's in a -- it's in a moving box,
```

27

```
 1   packed, but I've got it.  I'll keep it.
 2     Q.  Anything else that you recall from that dinner
 3   with Mr. Niro?
 4     A.  I think we were just -- unbelievable that
 5   Cisco was behind this.  I mean, I remember having
 6   that -- that's usually everyone's reaction.
 7   Unbelievable that a company like Cisco would do this.
 8     Q.  And what is the "this"?  The fact that the
 9   patent -- the -- the Troll Tracker blog?
10     A.  The fact that they would accuse a lawyer of
11   engaging in criminal activity and do it anonymously in a
12   case where they were my -- the opposing party, and
13   the -- the person writing it was involved in the
14   negotiations, was an attorney, and that it goes all the
15   way to the top of their legal department, in my opinion,
16   if not further.
17     Q.  The -- there were two, maybe three, articles
18   that are at issue in the lawsuit:  the 17th, 18th, and
19   then the revised 18th one the next day.  Is that your
20   understanding of what --
21     A.  I --
22     Q.  -- is at issue here?
23     A.  Oh, I think there's more at issue, but those
24   are the ones that I think accuse me of a crime.  And
25   then I think there were some subsequent ones where he
```

28

```
 1   could have corrected things and he chose not to.
 2     Q.  Okay.  But in terms of what you're suing for
 3   defamation, it's the October 17th, 18th, and whatever
 4   was revised the next day?  I mean, that's what your
 5   pleadings say, but --
 6     A.  Right, that's what the pleadings say.  I'd
 7   just say, when you say it's "at issue," there are some
 8   subsequent statements that have been made that, I think,
 9   will be at issue if we try the case.
10     Q.  That's --
11     A.  As far as the -- the allegations that I
12   engaged in criminal activity, it's the 17th and 18th.
13     Q.  Right.  Yeah, I just -- when you defend a
14   defamation case, you want to know what the -- what the
15   language is that's being claimed to be defamatory.  And
16   it's the 17th -- the articles on the 17th and the 18th
17   that's what you're claiming are -- is defamatory of you,
18   correct?
19        MS. PEDEN:  Objection, form.
20     A.  I've never defended a defamation case.  You're
21   the expert there.  And I've never been a plaintiff; I've
22   never represented a plaintiff in a defamation case, so I
23   don't know.  I know there's are a lot of documents
24   that -- that we've produced that, I think, has some
25   things that are offensive.  Now, whether or not they
```

29

1    rise to the level of defamation, I'm going to let you --
2    Q.  (BY MR. BABCOCK)  I'm not -- not trying to
3    make you make a legal conclusion.
4    A.  Okay.
5    Q.  But -- but if we -- if we lined the -- the
6    documents up in front of us and -- and listed what
7    you -- what you want to go to the jury on for what's
8    caused you damage, we would put the October 17th article
9    in the -- in the pile, for sure, right?
10    A.  Right.
11    Q.  And the October 18th article in the pile, for
12    sure, right?
13    A.  Absolutely.
14    Q.  Okay.  What else?
15    A.  Now, again, I don't --
16        MS. PEDEN:  Objection, form.
17    A.  I -- the articles that I've personally --
18    other things that have been written, I think, are
19    offensive.  There was a post in November where Frenkel
20    acted like he didn't know why these cases were being
21    dismissed; and he knew all along why they were being
22    dismissed and that Cisco had admitted that jurisdiction
23    was proper --
24    Q.  (BY MR. BABCOCK)  Okay.
25    A.  -- in the Eastern District.  So I -- that

30

1    leaves a false impression with the -- a reader.
2    Q.  So you're claiming defamation, or falselike,
3    as to that November post?
4        MS. PEDEN:  Objection, form.
5    A.  I don't know what I'm claiming.  I'm telling
6    you which documents I think are --
7    Q.  (BY MR. BABCOCK)  Do you think --
8    A.  -- inaccurate.
9    Q.  Okay.  Do you think the November post of
10    Frenkel has caused you harm, damage?
11    A.  I don't know.
12    Q.  Okay.
13    A.  It's -- it's hard for me to know who's --
14    won't come hire me because of what they read.  Those
15    folks won't call me and say:  Hey, we're not hiring you
16    because we think you're a criminal.
17    Q.  Well, I can -- I can appreciate whether you
18    don't know if you're caus- -- if it's caused you damage
19    or not.  Are you going to claim that it caused you
20    damage?  Are you claiming that the November post caused
21    you damage?
22    A.  I'm going to leave that up to my lawyers.
23    I -- I don't know.
24    Q.  Well --
25    A.  I think it -- it factors in the entire picture

31

1    of this false impression that Mr. Frenkel was leaving
2    with his readers.  So is it actionable?  I don't know.
3    It's my personal opinion, I think it was false.
4    Q.  And what about the November post was false?
5    A.  If you've got it, I'll take a look at it.
6    There's -- he wrote several things.
7    Q.  Well, it's not -- it's not -- it's not pled, I
8    don't believe.  Maybe it is, but I've never thought
9    until this moment that the November -- the November
10    post, whatever it is, is part of this lawsuit.  So --
11    A.  Okay.
12    Q.  -- you're going to have to give me some more
13    specificity about what it is.
14    A.  Without reading it, I can't tell you
15    precisely; but essentially, Mr. Frenkel wrote that he
16    was checking the docket and ESN had dismissed its case
17    and Cisco had dismissed its case in Connecticut and that
18    somehow the ESN case had been filed again in Texarkana.
19    That's all he knew about it, was the way he wrote, which
20    is a lie.  He knew exactly what was going on, and he
21    didn't write about exactly what was going on.
22    Q.  Okay.  And you think that that -- that that
23    caused you damage?
24    A.  Did it cause me damage?  No.  Did it upset me?
25    Yes, because I knew that those weren't the facts.  Of

32

1    course, I didn't know it was Cisco at the time.  I was,
2    like:  Wait, there's a lot more going on here.  If these
3    people knew, they'd know what he'd written on the 17th
4    and the 18th, or whatever those two days were -- they'd
5    know that, you know, this happened -- that Cisco had
6    admitted that there was no problem, in my mind.
7    Q.  Okay.  All right.  So you got the October 17th
8    article, the October 18th article, this November post
9    that you just talked about.  Anything else in the stack
10    that we should talk about has caused you damage?
11        MS. PEDEN:  Objection to form.
12    A.  Again, I think you've -- you've had some
13    comments in the press that I think are inaccurate --
14    Q.  (BY MR. BABCOCK)  Okay.
15    A.  -- or that have been attributed to you.
16        MS. PEDEN:  I -- I just need to clarify
17    something, Chip.  When you say "the October 18th
18    article," are you talking about both versions of it?
19        MR. BABCOCK:  I'm not talking about
20    anything; I'm just asking questions.
21    Q.  (BY MR. BABCOCK)  Yeah, there was one -- one
22    thing that, I think, snuck into the pleadings that was
23    attributed to me about -- something about your motives.
24    A.  Yeah, that I was trying to curry favor with
25    the Court -- that this was a baseless lawsuit, and the

Ward, John  8/10/2009  1:21:00 PM

33

1   only thing you could think of was that I was trying to
2   curry favor with the Court.  You tell me:  Did they --
3   did you say that?
4       Q.   No, not the way it was reported.  But is
5   that -- is that one of the things that you're seeking
6   damages for?
7       A.   I -- I don't know that I'm seeking damages for
8   it.  I think it continues this perception that there's
9   some truth behind the allegations that were made against
10  me --
11      Q.   Okay.
12      A.   -- that my lawsuit's baseless and that I've
13  got some other motive.
14      Q.   Okay.
15      A.   There's another one, too.  I think you've
16  written in some of these pleadings that I -- this case
17  is just an attempt to get documents for ESN, which --
18  untrue.  But --
19      Q.   Okay.
20      A.   -- you can say that in the lawsuit; I
21  understand that.
22      Q.   You -- you've said things in lawsuits about --
23  about your litigation opponents, I assume, from time to
24  time?
25      A.   I try to support them with facts, but --

34

1       Q.   You would agree that sometimes your litigation
2   opponents don't agree with -- with what you say about
3   them?
4       A.   I'm sure they don't.
5       Q.   But I'm trying to get to the bottom of what --
6   what you're -- you're suing over.  The 17th and the
7   18th.  And Ms. Peden reminds everybody that you've
8   amended to allege another article that's the same as the
9   18th, although revised, that was posted the following
10  day.  And you've got the November post.  Is there
11  anything else?
12      A.   That's all I can think of, you know --
13      Q.   Okay.
14      A.   -- as we -- as we sit here.  There's a lot
15  more documents and things that have been written.  But
16  as far as --
17      Q.   I understand
18      A.   -- what stands out to me, those things stand
19  out to me.  Those things --
20      Q.   Okay.
21      A.   -- irritate me.
22           (Exhibit 3 marked.)
23      Q.   (BY MR. BABCOCK)  Here's Exhibit 3.
24      A.   Okay.
25      Q.   And this is a document that was produced to us

35

1   by your lawyers.  And I want to ask you first about the
2   bottom notation.  It says
3   http://trolltracker.blogspot.com/2007, archive, paren,
4   15 of 47, paren, 11/5/2007, 2:28:33 p.m.
5           Do you see what I -- where I was reading
6   from?
7       A.   I see that.
8       Q.   Does that represent when you accessed the
9   Patent Troll Tracker to get -- to get the document, this
10  document?
11      A.   Maybe.  I'm not -- I'm not sure.  I remember I
12  started, you know, capturing them, Adobe, PDFs, I think,
13  at -- at some point.  I was -- I remember reading it as
14  they were coming out because I was getting phone calls
15  from folks saying:  Have you seen what he's written
16  about you?
17      Q.   Okay.  And the -- the first page here is the
18  October 18th one, I believe.  And then the one behind it
19  is the October 17th.  Would that be right?
20      A.   That's what it -- it purports to be.  I don't
21  know if these are the ones that are revised or
22  unrevised.  I'd -- I'd have to lay them right next to
23  each other --
24      Q.   Yeah, I lose --
25      A.   -- to figure out.

36

1       Q.   -- track of it, too.  You can usually tell by
2   whether the "banana republic" thing is in there.
3       A.   Yeah, I think this is the revised one because
4   he edits:  You can't change history, but you can change
5   a blog --
6       Q.   Yeah.
7       A.   -- entry.
8       Q.   Okay.
9       A.   So that would indicate that this --
10      Q.   Okay.  So this would be the one that was
11  the -- the 19th, or whatever.
12           Let me -- let me ask you about the Oct- --
13  October 17th one.
14      A.   Okay.
15      Q.   Do you believe that the October 17th article,
16  or post, accuses you of a crime?
17      A.   No.  I think you have to read them together.
18      Q.   Okay.
19      A.   I think you have to read the 17th and 18th
20  together to get there.
21      Q.   The -- the 17th, in and of itself, doesn't --
22  doesn't accuse you of a crime?
23      A.   My recollection is no.  I've been through
24  these line by line, obviously, in preparation for my
25  deposition.  I think there's a lot of things that are

37

1  inaccurate  But as far as accusing me of a crime, I
2  think you have to put them right next to each other.
3     Q.  Okay.  Let's -- let's go through it and see
4  what's -- what's inaccurate.
5     A.  Okay.
6     Q.  The headline, "Troll Jumps the Gun, Sues Cisco
7  Too Early," what is -- if anything, is inaccurate about
8  the headline?
9     A.  We didn't sue Cisco too early.
10    Q.  Okay.  Anything else?
11    A.  I think -- I don't think ESN meets the
12  definition of what folks think of as a troll, since it's
13  the inventor, as a part of ESN, but --
14    Q.  Okay.
15    A.  I think that's inaccurate, as well.
16    Q.  All right.  The first -- it starts out:  Well,
17  I knew the day would come.  I'm getting my troll news
18  from Dennis Crouch now.  According to Dennis, a company
19  called ESN sued Cisco for patent infringement on
20  October 15th, while the patent did not issue until --
21  until October 16th.
22        Is there anything inaccurate about that?
23    A.  Yeah.  I don't think he was getting his news
24  from Dennis Crouch.  I think he was getting his news
25  from his lawyers.

38

1     Q.  Okay.
2     A.  He might have been getting some from Dennis
3  Crouch, but he was in charge of the litigation, so I
4  think he knew about it.
5     Q.  Okay.
6        MS. PEDEN:  What about the next sentence?
7        MR. BABCOCK:  Yeah, I'm -- I'm going to
8  make sure we cover everything.
9        THE WITNESS:  Okay.
10       MS. PEDEN:  Thank you.
11    Q.  (BY MR. BABCOCK)  And it says:  According to
12  Dennis, a company called ESN sued Cisco for patent
13  infringement on October 15th --
14    A.  That -- that is untrue.  That statement's
15  untrue.
16    Q.  Okay.  And -- and that's because you think
17  that ESN didn't sue until the 16th, correct?
18    A.  I know for a fact we didn't sue until the
19  16th.
20    Q.  Okay.  "While the patent did not issue until
21  October 16th," that part's true?
22    A.  I believe that's true.
23    Q.  Okay.  The next sentence:  I looked, and ESN
24  appears to be a shell entity managed by the president
25  and CEO of DirectAdvice, an online financial Web site

39

1  Is that inaccurate in any way?
2     A.  I believe so, because I think he already knew
3  who ESN was, because I think ESN had been in contact
4  with Cisco before filing the lawsuit.  So he knew who
5  ESN was without looking anywhere.
6     Q.  Okay.  So it -- he should have dropped the --
7  the "I looked."  He should have just said:  ESN appears
8  to be a shell entity managed by the president and CEO of
9  DirectAdvice, an online financial Web site --
10    A.  He knew.  I mean, it should say:  I'm a lawyer
11  representing Cisco, and --
12    Q.  Okay.
13    A.  -- I know who ESN is.  So --
14    Q.  If he --
15    A.  -- I think that's false.
16    Q.  Okay.  But if he'd said that, if he said,
17  "Hey, I'm Rick Frenkel, and I'm here to tell you that
18  ESN is a shell entity managed by the president and CEO
19  of DirectAdvice, an online financial Web site," would
20  that be accurate or not?
21    A.  I don't know -- I don't know enough about ESN.
22  I know they're my client, but I -- I don't know exactly
23  who it is.  I've met one of the principals, but I don't
24  know how it's set up.
25    Q.  Okay.  Have you ever heard of DirectAdvice?

40

1     A.  No
2     Q.  Do you know who the president and CEO of
3  DirectAdvice is?
4     A.  No
5     Q.  Do you know whether the principal of ESN that
6  you've met is the president and CEO of DirectAdvice?
7     A.  I don't know.
8     Q.  Okay.  Who is the principal of ESN you've met?
9     A.  I knew you were going to ask me that.  He was
10  at the -- the hearing on venue, and I can't -- I can't
11  remember his name, sitting here.  If --
12    Q.  Okay.
13    A.  If it's important, we can leave a blank and I
14  can find it, but I don't remember.
15    Q.  And it goes on to say in the -- in the
16  article:  And, yes, he's a lawyer.
17        And I take it, since you don't know who
18  the president and CEO is, you don't know if that's true
19  or not?
20    A.  I don't.
21    Q.  Okay.
22        He clerked for a federal judge in
23  Connecticut and was an attorney at Day, Berry &
24  Howard -- Howard.  Now he's suing Cisco on behalf of a
25  nonpracticing entity.

41

1     The part about clerked for a federal judge
2   and was an attorney, you don't know whether that's true
3   or not?
4     A.  I don't.
5     Q.  Okay.  And then:  Now he's suing Cisco on
6   behalf of a nonpracticing entity.
7       You think that maybe ESN is not a
8   nonpracticing entity?
9     A.  I think they're a nonpracticing entity, but I
10  believe that the two principals -- there's a -- the
11  inventor, and then there's someone -- there's another
12  gentleman, the one that came to the hearing, that --
13    Q.  Okay.
14    A.  -- are the two involved in ESN.  I think of
15  nonpracticing entities as folks that acquire patents and
16  prosecute them against --
17    Q.  Okay.
18    A.  -- companies.
19    Q.  "I asked myself, can ESN do this?"
20      Anything false about that?  You don't
21  think he asked himself that?
22    A.  Well, I mean, he's -- he's setting it up:  Can
23  we file it on the 15th, when the patent doesn't issue
24  until the 16th?  So --
25    Q.  Right.

42

1     A.  -- I think that's inaccurate
2     Q.  Because the premise -- the whole premise of it
3   is that you had filed on the 15th?
4     A.  Correct --
5     Q.  Okay.
6     A.  -- which is not accurate.
7     Q.  Okay.  And then he says:  I would think that
8   the court would lack subject matter jurisdiction since
9   ESN owned no property right at the time of the lawsuit,
10  and the passage of time should not cure that.  And, in
11  fact, I was right, underlined.
12      Again, you'd say because his premise is
13  wrong, that would be wrong.  But other than that?
14    A.  I don't know -- I -- I, maybe embarrassingly,
15  have not researched whether or not you've got a right to
16  file a lawsuit before midnight.  So I don't know if
17  that's an accurate statement.  I know he states that as
18  fact.  I haven't done the legal research to be able to
19  tell you that that's correct.
20    Q.  Okay.  And then he -- there's a block quote
21  from a case called the GAF Building Materials Corp
22  versus Elk Corp of Texas, Federal Circuit.  Any reason
23  to believe he miscited that case?
24    A.  I don't know.  I haven't -- I haven't compared
25  it -- I don't put anything past him, but I haven't

43

1   gone to look at it.
2     Q.  Okay.
3       One other -- one other interesting tidbit:
4   Cisco appeared to pick up on this very quickly.  Cisco
5   filed a declaratory judgment action (in Connecticut)
6   yesterday, the day after ESN filed its -- its null
7   complaint.  Since Cisco's lawsuit was filed after the
8   patent issued, it should stick in Connecticut.
9       Anything false about that?
10    A.  Absolutely.  I mean --
11    Q.  What's false about that?
12    A.  The -- the very first sentence:  Cisco
13  appeared to pick up on this very quickly.
14    Q.  Okay.
15    A.  I mean, again, he's -- he's acting like, gee,
16  I'm just looking at the dockets, and I don't know what
17  they're picking up on or what they're doing.  He knew
18  exactly what they were doing.
19    Q.  Okay.  It is true that Cisco filed a
20  declaratory judgment action in Connecticut?
21    A.  I believe that's correct.  The same day we
22  filed in -- in Marshall, they filed in Connecticut --
23    Q.  Okay.
24    A.  -- later
25    Q.  And then he says it ought to stick in

44

1   Connecticut.  And you think that's wrong because it
2   shouldn't have stuck?
3     A.  Well, he said it was a null complaint, which I
4   think is inaccurate.
5     Q.  Okay.
6     A.  And then, again, he's got a conclusion of law,
7   kind of, where he's saying what he thinks --
8     Q.  Right.
9     A.  -- thinks should happen.
10    Q.  Okay.
11      Perhaps realizing their fatal flaw (as a
12  couple of other bloggers, comma [sic], news items have
13  pointed out), comma --
14      Do you know whether there were other
15  bloggers or news items about that?
16    A.  I don't know.
17    Q.  Okay
18      -- ESN (represented by Chicago firm
19  McAndrews, Held & Malloy and local counsel Eric
20  Albritton and T. Johnny Ward) filed an amended claim --
21  complaint in Texas today - amending to change absolutely
22  nothing at all, by the way, except the filing date of
23  the complaint.
24      MS. PEDEN:  Objection to form.
25      MR. BABCOCK:  What's the objection?

45

1      MS. PEDEN:  You said "Texas" instead of
2   "Texarkana."  You just --
3      MR. BABCOCK:  I'm sorry.
4      MS. PEDEN:  -- misread it.
5      MR. BABCOCK:  All right.  Let me try
6   again.
7      Q.  (BY MR. BABCOCK)  -- ESN (represented by
8   Chicago firm McAndrews, Held & Malloy and local counsel
9   Eric Albritton and T. Johnny Ward) filed an amended
10  complaint in Texarkana today - amending to change
11  absolutely nothing at all, by the way, except the filing
12  date of the complaint.
13      Did I read it correctly --
14      A.  I think you --
15      Q.  -- that time?
16      A.  I think you read it correctly.  Untrue.
17      Q.  Okay.  What's untrue about it?
18      A.  We didn't file to change the filing date; we
19  filed it to attach the patent.
20      Q.  The patent.  Okay.  Were there any changes
21  other than attaching the patent?
22      A.  There might have been a reference to the
23  patent number in the complaint.  I don't -- I don't
24  know.  I didn't actually file it.  I remember -- that
25  was probably the -- some of my first involvement in this

46

1   case, was after the initial complaint had been filed.
2   So I remember from reviewing the e-mail, that we filed
3   to attach the patent.
4      Q.  Okay.
5      Survey says?  XXXXXXX (insert "Family
6   Feud" sound here).  Sorry, ESN.  You're on your way to
7   New Haven.  I wonder how Johnny Ward will play there?
8      Did I read that correctly?
9      A.  I think you did.
10      Q.  All right.  And is -- is there anything false
11  about that?
12      A.  No, I don't think so --
13      Q.  Do you ever --
14      A.  -- other than we weren't on our way to New
15  Haven.  Cisco wanted us to be on our way to New Haven,
16  but --
17      Q.  Yeah.
18      A.  -- we beat them.
19      Q.  Ever played in New Haven?
20      A.  No.  Never been there.
21      Q.  Ever litigated in -- in Connecticut?
22      A.  Have not.
23      Q.  Okay.  One of your friends said you thought
24  that -- he thought you'd play fine there.
25      A.  I -- I do recall someone saying that.

47

1      Q.  Okay.  Let me ask you just a couple of things
2   about that last paragraph again.  It says, "represented
3   by Chicago firm McAndrews, Held & Malloy."  ESN was
4   represented by them, correct?
5      A.  Correct.
6      Q.  And it says, "local counsel Eric Albritton
7   and T. Johnny Ward."  You-all were the local counsel,
8   correct?
9      A.  Correct.
10      Q.  What does it mean in the con-- -- I know -- I
11  know "local counsel" means different things to different
12  people.  But in this case, what did it mean to be local
13  counsel?
14      A.  I can tell you generally what it means to me.
15      Q.  Sure.
16      A.  Because I -- I had not had any interaction
17  with McAndrews, Held & Malloy up until after the fact.
18      Q.  Okay.  That -- that was Albritton that was
19  doing that?
20      A.  Correct.
21      Q.  Okay.
22      A.  Generally, "local counsel," we're in -- we
23  make sure that everything complies with the local rules
24  and kind of give advice on what local custom and
25  practice are and -- a little bit different than what I

48

1   think of as general local counsel.  Eric and I try these
2   cases very actively and are actively involved in them:
3   jury selection, opening statements, taking witnesses.
4      Q.  Were you -- had it been decided whether you
5   and Eric were going to be actively involved in trying
6   this ENS -- ESN case at this October 17th point?
7      A.  Again, I don't know what they discussed.  I
8   can tell you what our -- the general practice was.  We
9   don't get involved unless we're going to be active
10  and -- and so I would assume that that was understood
11  going in.
12      Q.  Were -- were you -- was your involvement in
13  this case through Eric or did McAndrews call you up or
14  did somebody from ESN call you up?
15      A.  It was through Eric.  Now, whether they called
16  and said, "We want to hire you guys" -- I don't know
17  exactly how it went down.
18      Q.  Okay.
19      A.  But Eric -- Eric was kind of in charge of ESN
20  at that time.
21      Q.  Okay.  But you had separate bus-- law firms
22  at that time; you weren't partners then, right?
23      A.  Correct.  Still -- still have separate
24  businesses.
25      Q.  Yeah.  So the first contact that was made to

Ward, John  8/10/2009  1:21:00 PM

49

1  you was by Eric Albritton, correct?
2      A.  I believe so.
3      Q.  Okay.  And -- and Mr. Albritton and his staff
4  were responsible for filing the -- the pleadings.  And
5  you didn't have anything to do with that, right?
6      A.  That's correct.
7      Q.  Okay.
8      A.  The -- the original complaint --
9      Q.  The original --
10     A.  -- yes.
11     Q.  -- complaint, which there is some
12  documentation on the 15th, some stuff on the docket
13  sheet on the 15th.
14         MS. PEDEN:  Objection to form.
15     Q.  (BY MR. BABCOCK)  Do you agree that there's a
16  docket sheet that shows something was filed on the 15th?
17         MS. PEDEN:  Objection to form.
18     A.  This -- again, embarrassingly, I -- I haven't
19  gone back and looked through all the docket sheets.  I
20  don't know that I've ever looked at the docket sheet.
21  I've looked at the notice of electronic filing well
22  after the fact to see it was filed --
23     Q.  (BY MR. BABCOCK)  Okay.
24     A.  -- when we say it was.
25     Q.  There's -- certainly, within a short period of

50

1  time, within a few days, Cisco filed a declaratory
2  judgment, as you -- as you indicated.  And -- and then
3  there was some filings in -- in Texarkana in front of
4  Judge Folsom.  Did you have any involvement in that, or
5  were you pretty much on the sidelines?
6         MS. PEDEN:  Objection to form.
7      A.  My involvement was pretty limited.  It was,
8  you know, consulting me about should we burn our
9  amendment, or something to that effect, and I think I
10  said "do it."  I mean, we're -- the rules here are you
11  can amend for just about any reason up to a certain time
12  period.  You don't have to seek leave.  That'll be in
13  the docket control order.  So I think I said:  Attach
14  the patent, and file it.
15     Q.  (BY MR. BABCOCK)  Okay.
16     A.  But beyond that, I -- I -- I was not very
17  hands-on on this case at that time.
18     Q.  Mr. Albritton's assistant -- I'm not sure if
19  she's a paralegal or -- I think she's a paralegal.
20  Anyway, Amy Mathis, do you know her?
21     A.  Yes, I know her.
22     Q.  Did you know her before this case was filed?
23     A.  Absolutely.
24     Q.  Okay.  Before she filed it, did you talk to
25  her at all about it?

51

1      A.  No.
2      Q.  All right.  After -- after it was filed and
3  she had certain conversations with the clerk's office
4  in -- in both Texarkana and Tyler, did you have any
5  conversation with her during that time period?
6      A.  None that I can recall.
7      Q.  All right.  I asked Mr. Albritton a question
8  about whether or not he fully supported what Amy Mathis
9  did in her contacts with the clerk's office, and he said
10  he did.  I asked him if you did, and he said:  You
11  better ask him at his deposition.  So --
12     A.  All right.
13     Q.  So here we are.
14     A.  I -- I had no problem with what she did.
15     Q.  Okay.
16     A.  I would have done it the same way.
17     Q.  All right.
18     A.  I mean, if it was my -- if we were in charge
19  of filing it and this issue popped up, I'd -- Alecia
20  Kaiser is my primary assistant, and I would say:  Call
21  them and find out what's going on.
22     Q.  You would -- do you know what she says she
23  did, and do you know what the clerk says she did?  In
24  other words, have you reviewed the depositions in the
25  Albritton case?

52

1      A.  No.
2      Q.  Okay.  Every --
3      A.  I know generally, from talking to Eric, what
4  she says she did.  So --
5      Q.  Okay.
6      A.  -- that's really where my knowledge comes
7  from.
8      Q.  Okay.  And at least as you sit here today,
9  you -- you support what Amy Mathis did in her contacts
10  with the clerk's office?
11     A.  Absolutely.
12     Q.  Okay.
13         MS. PEDEN:  Are we at a good breaking
14  point?  Can we take a break?
15         MR. BABCOCK:  Sure.  We can take a break
16  anytime you want to take a break, Patty.
17         MS. PEDEN:  Sorry.  I just have to go to
18  the ladies' room.
19         THE VIDEOGRAPHER:  Off the record, 10:35
20         (Off the record 10:35-10:42.)
21         (Exhibits 4-19 marked.)
22         THE VIDEOGRAPHER:  Back on the record,
23  10:42.
24     Q.  (BY MR. BABCOCK)  Okay.  Did Ms. Peden take
25  you to the woodshed?  I told her you were doing fine

Ward, John  8/10/2009  1:21:00 PM

53

1    A.  She didn't have to woodshed me.

2    Q.  Okay.  Well, that's good.

3        Let me hand you Exhibit 17.

4    A.  Okay.

5    Q.  And this, I think, is the original first-day

6  Patent Troll Tracker and not the revised version that we

7  see in Exhibit 3.

8    A.  Okay.

9    Q.  And the -- the October 18th, 2007 version that

10  is Exhibit 17 I want to go over with you.  It says,

11  ES- -- the headline is "ESN Convinces EDTX Court Clerk

12  To Alter Documents To Try To Manufacture Subject Matter

13  Jurisdiction Where None Existed."  Did I read that

14  correctly?

15    A.  You did.

16    Q.  All right.  And I take it you think that's

17  false?

18    A.  That lit my fire.

19    Q.  And why -- and -- and why do you say it lit

20  your fire?

21    A.  Just when I read it, I was like, oh, my gosh,

22  you know.  I mean, I was called, saying: Have you seen

23  what they've written about you?

24    Q.  Okay.  Who -- who called you?

25    A.  It was either one or two clients and --

54

1  there's -- there's three names, and I can't remember

2  exactly what it was.  Either Terry Fokas, Erich

3  Spangenberg, or David Pridham, who worked for

4  Spangenberg.  It was either one or two of those

5  individuals called me.  I -- I talked to them all about

6  it, but --

7    Q.  Okay.

8    A.  -- I -- I don't remember who alerted me to it

9  initially.

10    Q.  All right.  And they -- and this was all by

11  phone: Fokas, Spangenberg, and David Pridus [sic]?

12    A.  Correct.

13    Q.  Okay.  And was this on the 18th?

14    A.  I don't remember, because I remember that

15  we -- you know, everyone was -- I say "everyone."  Folks

16  that were doing patent litigation in the Eastern

17  District, it had kind of become required reading to read

18  what the Patent Troll Tracker was writing about folks.

19  So I don't know if someone said "did you see what he

20  wrote about you" on the -- the 17th?

21  And then the 18th, I got another call,

22  going: You really ought to see what -- what's been

23  written.

24  But I don't remember exactly how it

25  happened.

55

1    Q.  Okay.

2    A.  I was -- I was reading it when I -- I think

3  this was the first time my name popped up.  It popped up

4  several times, but I think that was the first I had been

5  called out by name.

6    Q.  Okay.  The -- actually, the October 18th, 2007

7  article, or post, doesn't mention you by name, correct?

8    A.  That's correct.

9    Q.  Okay.  It was the October 17th one that

10  mentioned your name and wondered how you'd play in -- in

11  New Haven, right?

12    A.  It calls me by name in the --

13    Q.  Okay.

14    A.  -- 17th, correct.

15    Q.  Your relationship with Fokas, Spangenberg, and

16  Pridus [sic] has not been affected by this article, has

17  it?

18    A.  No.

19    Q.  Okay.  In fact, Fokas sent you an e-mail and

20  said he -- you were his hero.  Do you remember that?

21    A.  I do.

22    Q.  Okay.  So the headline, you think, is false,

23  and it lit your fire because neither E- -- ESN, nor its

24  counsel, in your view, tried to convince the Eastern

25  District of Texas court clerk to alter documents for any

56

1  reason?

2    A.  For any reason.

3    Q.  Okay.

4    A.  Nothing -- nothing was altered.

5    Q.  Okay.  Well, that last part, that's not true.

6  I mean, the -- the docket sheet was altered, wasn't it?

7        MS. PEDEN:  Objection to form.

8    A.  No.

9    Q.  (BY MR. BABCOCK)  You don't think it changed

10  at all?

11    A.  I think it changed.  You know, you use the

12  word "alter," and I think that's in the criminal

13  statutes; and that's what jumps out to me.  Altering

14  something, you're doing some- -- something

15  surreptitiously, is what it connotes to me.

16    Q.  Okay.  What criminal statute is the word

17  "alter" in?

18    A.  I don't know.

19    Q.  Well, you just said it was in the criminal

20  statutes.  I wondered --

21    A.  I've read it in a criminal statute that either

22  Mr. Patton or Ms. Peden had sent to me.  So I know I've

23  seen "alter" in some criminal statute.  Whether it's the

24  Arkansas statute or the Texas statute or the Federal

25  statute, that's not my cup of tea.  But I know I've seen

57

1    it somewhere.

2        Q.   You would admit that -- that the docket

3    changed, if that's the word you prefer?

4        A.   The docket was corrected.

5        Q.   It -- it changed from one thing to another,

6    correct?

7            MS. PEDEN:  Objection to form.

8        A.   Like I told you earlier, I haven't been and

9    even looked at the docket to see what changed.  I

10   understand that the -- there was a correcting entry made

11   by the clerk.

12       Q.   (BY MR. BABCOCK)  Okay.  And whether you call

13   it "correction" or whether you call it something else,

14   the fact is that it was different one day than it was

15   the day before or the minute before, really?

16       A.   I think --

17           MS. PEDEN:  Objection to form.

18       Q.   (BY MR. BABCOCK)  Correct?

19       A.   I believe that to be correct.

20       Q.   Okay.  This says:  I got a couple of anonymous

21   e-mails this morning pointing out that the docket in ESN

22   versus Cisco (the Texas docket, not the Connecticut

23   docket) had been altered.

24           Other than the word "altered," which we've

25   just talked about, do you have any information as to

58

1    anything else in that sentence that's false?'

2        A.   Again, I think he's being false when he's

3    saying he's getting anonymous e-mails.  He's the lawyer

4    in charge of the case, so he -- I assume that he's

5    communicating with people about what's going on in the

6    case.

7        Q.   Okay.

8        A.   So I think that's false.

9        Q.   Okay.  Do you know whether he got anonymous

10   e-mails or not?

11       A.   In addition to monitoring the case?

12       Q.   Right.

13       A.   No.

14       Q.   Okay.

15       A.   No, I don't.

16       Q.   It says:  One e-mail suggested that ESN's

17   local counsel called the Eastern District of Texas court

18   clerk and convinced him/her to change the docket to

19   reflect an October 16th filing date rather than the

20   October 15th filing date.

21           First of all, did I read that correctly?

22       A.   I believe you did.

23       Q.   And I assume you don't have any information

24   one way or the other about whether he received an e-mail

25   of this type?

59

1        A.   I don't.

2        Q.   Okay.  And here the word "changed" is used as

3    opposed to "altered."  Do you know whether

4    Mr. Albritton's paralegal, Ms. Mathis, called the

5    Eastern District court clerk?

6        A.   I -- I know that that's who contacted the

7    clerk's office to say:  There's a problem.  How do we

8    correct it?

9        Q.   Okay.  Do you have any information one way or

10   the other whether Ms. Mathis convinced the court clerk

11   to change the docket to reflect the October 16th filing

12   date rather than the October 15th filing -- filing date?

13       A.   Well, that supposes that there was an

14   October 15th filing date, which there was not.

15       Q.   You admit that the docket sheet had the --

16   the -- October 15th as the filing date, don't you?

17       A.   You'd have to show it to me.  But I understand

18   there's something that showed a filing date of

19   October 15th --

20       Q.   Okay.

21       A.   -- and that at some point, it reflected a

22   filing date of October 16th.  But the -- the notice of

23   electronic filing --

24       Q.   Yeah, I --

25       A.   -- has not been changed.

60

1        Q.   I've been -- I've been through this a lot,

2    so --

3        A.   All right.

4        Q.   I think I know what you're saying.

5        A.   Okay.

6        Q.   But -- but my point is:  Do you have any

7    information about the interaction between

8    Mr. Albritton's paralegal, Ms. Mathis, and the court

9    clerk one way or the other?  Do you know?

10       A.   Only what Eric's told me.

11       Q.   Okay.  So --

12       A.   And we were discussing it at that time, and,

13   obviously, we've discussed it since that time.

14       Q.   Okay.  What has Eric told you about it?

15       A.   At that time or, you know, after this --

16       Q.   Let's start with at that time.

17       A.   Okay.  It's -- we had a mediation going that

18   day where we were on opposite sides of the case.  And it

19   seemed like he told me that we'd had a -- there was

20   something that happened on the -- the filing, that we

21   had filed it after midnight and the clerk's office had

22   screwed up, not to worry about it; they were taking care

23   of it.

24       Q.   Okay.

25       A.   And, I mean, I knew it was against Cisco.  I

Ward, John  8/10/2009 1:21:00 PM

61

1  knew we were filing -- I knew we had a client named ESN
2  and we were suing Cisco.
3      Q.  Okay.  So he said:  Don't worry about it,
4  we're taking care of it?
5      A.  Pretty much.  That's --
6      Q.  Okay
7      A.  That's what I recall.
8      Q.  Okay.  And I take it, then, since then, you've
9  had discussions with him about this subject?
10      A.  We had more discussions that day at the
11  mediation, because I was local counsel with Baker Botts
12  for Terry Fokas' company.  Mr. Patton was the mediator.
13  So we --
14      Q.  Kind of a small world?
15      A.  It is a small world.  You know, you never --
16  you look back on it, and it's funny that it worked out
17  that way.
18      Q.  Uh-huh.
19      A.  But we had additional discussions there, so
20  there were additional discussions.
21      Q.  Okay.  Tell me about the additional
22  discussions.
23      A.  I made the bad mistake of popping off to Baker
24  Botts, my -- my cohorts, that I had gotten some more
25  business for them; we had sued Cisco and -- just making

62

1  small talk.  I knew they represented them and -- I knew
2  those guys; I knew they represented them.
3          And Kevin Meek, I believe, said:  Yeah,
4  but y'all've got -- you've got a problem there.
5          Y'all've -- you -- you filed too early.
6          And I made some comment back to him that
7  We've got that taken care of.
8          And then I remember talking to Eric during
9  a break, going, you know:  Cisco thinks we've got a
10  problem.  You know, what -- what happened?
11          And he relayed to me:  They think the
12  docket shows we filed early.  We didn't.  We filed it
13  after midnight.  Don't worry about it.
14          And I didn't worry about it.
15      Q.  Okay.  Anything else -- else you remember
16  discussing with any of the players:  Mr. Patton,
17  Mr. Meek, Mr. Albritton, Terry Fokas?
18      A.  At that -- at that time?
19      Q.  Yes.
20      A.  No.  We were more focused -- focused on that
21  mediation.
22      Q.  Sure.  How about subsequent to that; have you
23  talked to Mr. Albritton about -- about this issue of
24  Ms. -- Ms. Mathis contacting the clerk?
25      A.  I -- it seems like after this came out -- I

63

1  don't think I knew about this at the -- when we were
2  talking.
3      Q.  Okay.
4      A.  That's my recollection.  Then I asked for more
5  detail, you know, when -- when I saw what was written.
6  I -- I said:  Now, tell me exactly what happened.
7      Q.  Okay.  And what did he tell you?
8      A.  Now we're going -- you know, that's -- this
9  has been almost two years ago.
10      Q.  Sure.
11      A.  Generally, I remember him telling me that
12  Amy had to wait up here until after midnight to file it
13  because we had to file it on -- now I know it was the
14  16th, just from me knowing this.  But whatever day, we
15  had to wait until that day, midnight.  That she had
16  done that, and that he had had to open a shell case the
17  day before; because back then, you had to have the -- a
18  cause number before you could file, and you'd have to
19  open a -- you couldn't wait -- if you want to file at
20  12:01 on the 16th, you have to get it on the 15th;
21  otherwise, you've got to wait until the clerk's office
22  opens at 8:00 a.m. on the day that you're going to file.
23  And you lose your -- that time period; someone on the
24  East Coast can beat you to the courthouse.
25          So he opened up the -- the shell case on

64

1  the 15th.  Somehow they were showing that's the date it
2  got filed, but that we had the notice of electronic
3  filing.  I don't know if he used those words, but we
4  have the file stamp that shows when it was filed.
5      Q.  Okay.  And this was -- it was a few days
6  later, probably after the Patent Troll Tracker articles
7  came out?
8      A.  It would have been -- I would have asked for
9  that much detail when I saw this, you know:  What has
10  this guy written?  And tell me exactly what happened,
11  because I want to know exactly what happened.
12      Q.  Okay.
13      A.  I never went and looked at the docket and
14  looked at the notice of electronic filing.  I've
15  never -- you know, at that time.  I have since then.  I
16  did not look at it at the time.
17      Q.  You just relied on what Eric told you?
18      A.  Absolutely.
19      Q.  Okay.  Any other conversations you've had with
20  Eric about -- about the issue of Ms. Mathis
21  contacting -- calling the -- the Eastern District of
22  Texas court clerk about the -- about the docket sheet
23  changing, altering, whatever word you want to use?
24      MS. PEDEN:  Objection to form.
25      A.  You know, at some point, he -- I think he's

65

1    asked me, "Would you have done it any differently," you
2    know.  I said:  Absolutely not.  That's -- that's what
3    my assistant does when there's a --
4        Q.  Okay.
5        A.  -- an error in the clerk's office.
6        Q.  Okay.  Have you talked to David Maland about
7    this, the -- the clerk himself, the --
8        A.  Never.
9        Q.  Okay.  Have you talked to any of the deputy
10   clerks or assistant clerks about it?
11       A.  Never.
12       Q.  Okay.  Have we exhausted everything you and
13   Mr. Albritton talked about the issue of Ms. Mathis
14   calling the Eastern District of Texas court clerk
15   regarding the change of the docket?
16       A.  I believe so.
17       Q.  Okay.  Let's keep going on this article.
18       A.  Okay.
19       Q.  Quote:  I checked, and sure enough, that's
20   exactly what happened - the docket was altered to
21   reflect an October 16th filing date, and the complaint
22   was altered to change the filing-date stamp from October
23   15th to October 16th.
24           Did I read that correctly?
25       A.  I believe you did.

66

1        Q.  Is there anything false about that?
2        A.  Yes
3        Q.  What is it?
4        A.  He says "that's exactly what happened," that
5    we had convinced the clerk to change the filing date.
6    We know that to be untrue.  Whether or not the docket
7    was changed, again, that -- I -- I ascribe a different
8    definition to "altered," which implies criminal conduct.
9    So I don't think that's true.  If you want to say it was
10   "corrected," I think that would be more accurate.  So I
11   don't think --
12       Q.  If -- if he had said, "The docket was
13   corrected to reflect an October 16th filing date, and
14   the complaint was corrected to change the filing-date
15   stamp from October 15th to October 16th," that would be
16   accurate?
17       A.  No.
18       Q.  Okay.  What would be inaccurate about that?
19       A.  If he said, "The docket was corrected to
20   reflect an October 16th filing date" --
21       Q.  Okay.
22       A.  -- I think that would be --
23       Q.  That would be accurate?
24       A.  That would be accurate.
25       Q.  Okay.

67

1        A.  The complaint -- the filing date on the
2    complaint was never altered.  It's incapable of being
3    altered.  So that is categorically false.
4        Q.  Okay.  The -- did the header on the complaint,
5    the thing at the top, did that change?
6        A.  I don't know.
7        Q.  Okay.
8        A.  I know now that that's an allegation, that the
9    header -- I have never gone and printed the header and
10   looked at the different headers and --
11       Q.  Okay.
12       A.  That -- that would not surprise me if the
13   header is -- is different.
14       Q.  Okay.  The last sentence of this paragraph
15   says:  Only the Eastern District of Texas court clerk --
16   court clerk could have made such changes.
17           Do you think that's false?
18       A.  Again, if a filing-date stamp is being
19   altered, I don't know who could make that.  Since it's
20   computer -- computerized and you can do it
21   electronically, I don't know who else is capable of
22   doing that.
23       Q.  Okay.  Do you think that -- that this article,
24   the October 16th, 2007 article, is accusing the -- the
25   district court clerk of anything?

68

1        A.  Being -- yeah.  I think it's accusing the
2    court clerk of being a -- a party to a crime.  I think
3    it later says, witingly or unwittingly, they conspired
4    with us to alter the filing date or we hoodwinked them
5    and -- and tricked her in -- or him/her into altering --
6        Q.  Okay
7        A.  -- the filing date.
8        Q.  Yeah, the next sentence, actually, says:  Of
9    course, there are a couple of flaws in this conspiracy.
10           And you would say there's no conspiracy?
11       A.  Yeah.  No.
12       Q.  Okay.
13           First, ESN counsel Eric Albritton signed
14   the civil cover sheet stating that the complaint had
15   been filed on October 15th.
16           Anything false about that, to your
17   knowledge?
18       A.  I believe so.
19       Q.  What is that?
20       A.  The civil cover sheet actually gets attached
21   to the complaint on the date that it's filed.  So I
22   don't -- I don't think the civil cover sheet says:  I'm
23   filing on the 15th.  So I think that's --
24       Q.  Do you know whether he signed it on the 15th?
25       A.  I believe he did, so he could open the shell.

Ward v. Cisco                    Unsigned                    Page 65 - 68

69

1    Q.  Okay.
2          Second, there's tons of proof that ESN
3    filed on October 15th.  Heck, Dennis Crouch may be
4    subpoenaed as a witness, exclamation point.
5          Anything false about that?
6    A.  Absolutely.
7    Q.  And what's that?
8    A.  That there's tons of proof that ESN filed on
9    October 15th.  It's the exact opposite of that.
10   Q.  You think there's no proof of that?
11   A.  No, the definitive document for filing is that
12   notice of electronic filing, and that's what you look
13   at.
14   Q.  Okay.  So --
15   A.  So that's untrue.
16   Q.  So the notice of electronic filing is what
17   controls?
18   A.  That's my understanding.
19   Q.  Okay.  And --
20   A.  I say the -- when it says it's filed is what
21   controls.
22   Q.  Dennis Crouch subpoenaed as a witness, you
23   know, that's, I assume --
24   A.  I -- I don't know what --
25   Q.  -- superfluous?

70

1    A.  Right.
2    Q.  Paragraph:  You can't change history, and it's
3    outrageous that the Eastern District of Texas is
4    apparently, witingly or unwittingly, conspiring with a
5    nonpracticing entity to try to manufacture subject
6    matter jurisdiction.
7          I read that correctly?
8    A.  You did.
9    Q.  And you disagree with that?
10   A.  I think it's all untrue.
11   Q.  Okay.
12          This is yet another example of the abusive
13   nature of litigating patent cases in the Banana Republic
14   of Texas.
15          Did I read that correctly?
16   A.  You did.
17   Q.  Okay.  Do you think that relates to you?  Do
18   you think these --
19   A.  In part.  "Abusive nature of litigating" here.
20   They know -- people know I file a lot of cases on behalf
21   of plain- -- plaintiffs, and absolutely untrue that this
22   is an abusive district.  I've been on both sides of the
23   docket, and just absolutely untrue.
24   Q.  Okay.  And then.  (n.b.:  Don't be surprised
25   if the docket changes back once the higher-ups in the

71

1    court get wind of this, making this post completely
2    irrelevant.)
3          Do you even know what that's talking
4    about?
5    A.  We didn't finish the rest of that.  I don't
6    it's true that this is a banana republic.
7    Q.  Oh, okay.
8    A.  But, you know --
9    Q.  I could have --
10   A.  I'm sorry.
11   Q.  I could have guessed that, but thanks.
12   A.  Right.
13   Q.  The next one, quote:  (n.b.:  Don't be
14   surprised if the docket changes back once the higher-ups
15   in the court get wind of this, making this post
16   completely irrelevant.)
17          Any -- what is that saying to you?
18   A.  It's implying that once we're caught, and
19   we're going to be caught, that the -- the judges will
20   correct this criminal activity.
21   Q.  Okay.  Do you know -- I asked you this a
22   second ago, but in a slightly different way:  Do you
23   know what criminal activity you think this -- this
24   article is accusing you of?
25   A.  I think I do.

72

1    Q.  Okay.  What's --
2    A.  The way I read it, when I -- when I saw it,
3    was that I would think it'd be a crime to go in and
4    change a court filing, scratch out a date and put a new
5    date on it to try and create subject matter
6    jurisdiction.  I think that'd be illegal --
7    Q.  Okay.
8    A.  -- and -- and unethical.
9    Q.  Okay.  And you -- your lawyers have shown you
10   some statutes, but you can't cite us anything?
11   A.  If you pull out my interrogatory -- you've
12   got -- you sent a lot of discovery to me, and I would
13   have looked at it in conjunction with answering my
14   interrogatories.  So that's --
15   Q.  You -- you cited some state bar rules.  I
16   don't think you cited -- cited a statute, but --
17   A.  I think we cite --
18          MS. PEDEN:  Objection to form.
19   A.  I think we cited some statutes.
20   Q.  (BY MR. BABCOCK)  Did you?  Okay.
21   A.  But --
22   Q.  If you did, we won't bother to go over this
23   again.
24          Let's go back to 3 now.  And this thing
25   changes.

73

1    A.   And I don't -- which one?  The 18th changes?

2    Q.   The 18th changes.  I don't -- I don't believe

3  the 17th changed.

4    A.   Okay.  I thought there was somewhere where he

5  wrote that he'd gotten a couple of e-mails that were

6  critical of what he'd written about us, and I don't

7  remember which article that's --

8    Q.   Yeah, I think that's the November thing that

9  you're talking about.

10    A.   Okay.  Okay.

11    Q.   But --

12    A.   I don't know what made him change it

13    Q.   Okay.

14    A.   That's -- that's my speculation, but --

15    Q.   Okay.  It looks to me -- but confirm that I'm

16  right -- that it's in the third paragraph.  The first

17  sentence is the same in both Exhibit 3 and Exhibit 17.

18  But then the sentence, "This is yet another example of

19  the abusive nature of litigating patent cases in the

20  Banana Republic of East Texas," that is deleted --

21    A.   Well, there's some -- there were changes

22  before that.

23    Q.   Oh, there were?  Okay.  I'm sorry.

24    A.   He dropped the word "conspiring."

25    Q.   From -- from what paragraph?

74

1    A.   In that third paragraph, he says "conspiring."

2  He drops "conspiring" and says "helped."

3    Q.   Oh, okay.  I'm with you.  You're right.  So he

4  dropped "conspiring" and put "helped."

5    A.   Right.  And then he adds:  Even if this was a

6  "mistake," which I can't see how it could be, given that

7  someone e-mailed me a printout of the docket from Monday

8  showing the case, the proper course of action should be

9  a motion to correct the docket

10    Q.   Okay.

11    A.   That's -- that's all new.  And then he dropped

12  that last sentence.

13    Q.   Okay.  And then he's still got the "don't be

14  surprised" part?

15    A.   Right.  But, again, I think he's leaving

16  that -- he knows or can easily find out exactly what

17  happened at that point.  He can -- any number of ways,

18  he knows.

19    Q.   Okay.  He says:  The proper course of action

20  should be a motion to correct the docket.

21         Do you see where he -- he wrote that?

22    A.   Yes.

23    Q.   You think that that is not correct, that

24  that -- that's not the proper way to proceed?

25    A.   I think that we were given two options by the

75

1  clerk's office:  file a motion to correct or call Tyler,

2  in the computer department, and raise your complaint

3  with them.

4    Q.   Okay.  And you -- you agree with the way

5  Mr. Albritton and his paralegal handled it, by rejecting

6  the first option of filing a motion, and calling Tyler

7  to talk to the clerk, right?

8    A.   I --

9         MS. PEDEN:  Objection to form.

10    A.   I don't know that they rejected it.  They

11  said:  Here's the two things you can do.  And they said:

12  Well, the most expeditious one is to make a phone call

13  and say:  Can you correct it on your end before we have

14  to file another pleading?

15         So I don't know that they rejected it.  If

16  the clerk's office in Tyler had said, "We can't correct

17  it here; you're going to have to file a motion," they

18  would have filed a motion.

19    Q.   (BY MR. BABCOCK)  Okay.  But -- but you said

20  they were given two options?

21    A.   Right.

22    Q.   And you know for a fact that they didn't

23  pursue Option Number 1.  Whether they rejected it or

24  not, they didn't --

25         MS. PEDEN:  Objection to form.

76

1    Q.   (BY MR. BABCOCK)  -- pursue that, right?

2    A.   Well, your -- your question made it sound like

3  they said:  Well, we're not going to do that.

4         I think they did what -- what we all do,

5  as lawyers, and try and take, you know, what's easiest

6  and quickest and -- and proper, and that is, make a

7  phone call.  If that'll take care of it, then I don't

8  have to file another pleading, you know, draft it and

9  get it filed.

10    Q.   Okay.

11    A.   If the clerk's office had said, "No, you've

12  got to -- they're wrong; you've got to file a motion," I

13  can guarantee you he would have filed a motion.

14    Q.   Sure.  But -- but do you have any information

15  to suggest that -- that Mr. Albritton ever considered

16  filing a motion?

17    A.   I don't know what he considered.  I know those

18  were the options --

19    Q.   Okay

20    A.   -- he was given

21    Q.   You know, you've talked about how, you know,

22  you guys were at this mediation and then you had other

23  conversations  Did he ever say to you:  Hey, maybe we

24  should file a motion, or, I want to file a motion, or --

25         MS. PEDEN:  Objection to form

77

```
1      Q.  (BY MR. BABCOCK) -- did the issue of the
2   motion ever come up?
3      A.  I don't think so because we had it corrected.
4   We did what they told us to do.  So we never had to get
5   to the motion.
6      Q.  Yeah, you -- you -- you did one of the things
7   they told you to do?
8         MS. PEDEN:  Objection to form.
9      A.  They didn't tell us to do two things.  They
10  said:  You can do A or B.
11     Q.  (BY MR. BABCOCK)  Right.
12     A.  And we said:  Let's go with A.
13     Q.  Okay.  They said:  You can do A, call the
14  clerk in Tyler, or, B, file a motion.  Right?
15     A.  I think --
16     Q.  That's your understanding?
17     A.  I think that's what the Texarkana clerks
18  told -- if I understand -- who she was talking to.
19     Q.  Right.
20     A.  And she chose to call the Tyler district
21  clerk's office.
22     Q.  Okay.  And -- and you think that was the right
23  way to handle it?
24     A.  Absolutely.
25     Q.  No criticism of that?
```

78

```
1      A.  None.
2      Q.  Okay.
3         (Sotto voce discussion between Mr. Babcock
4         and Ms. Parker.)
5      Q.  (BY MR. BABCOCK)  Has -- I know you've --
6   you've produced --
7      A.  Are we through with these?
8      Q.  Yeah, we're done with those.
9         I know you've produced e-mails from a
10  number of people regarding those -- those articles,
11  Exhibit -- Exhibits 3 and 17.  Can you recall any e-mail
12  that you got that was critical of you or of your
13  handling of this -- of this matter?
14     A.  No.
15     Q.  Okay.
16     A.  And to be clear, I don't know exactly what's
17  been produced to you.  I know they turned over some
18  things that I didn't think they should have turned over,
19  but that's their decision.
20     Q.  Are you looking for a lawyer to sue them?
21     A.  Nope, nope.  That's what I've got lawyers for.
22     Q.  Would -- even though -- even though there's
23  been none turned over, have -- did you ever get any that
24  you may have deleted, or whatever, that were critical of
25  you?
```

79

```
1      A.  I would have saved it if I'd gotten any.
2      Q.  All right.
3      A.  So I don't think I ever got an e-mail saying:
4   You -- you criminal.
5         Now, that stuff was in the blogs, but I
6   quit reading that.
7      Q.  Did anybody from the U.S. Attorney's Office
8   contact you regarding your being accused of or guilty --
9   possibly guilty of some criminal misconduct?
10     A.  No.
11     Q.  Okay.  How about from the Department of
12  Justice?
13     A.  No.
14     Q.  How about from any state District Attorney's
15  Office?
16     A.  No.
17     Q.  How about the State Bar of Texas; anybody
18  contact you about unethical behavior?
19     A.  No.
20     Q.  Okay.  How about the Eastern District of
21  Texas; did any of the judges contact you about improper
22  behavior?
23     A.  No.
24     Q.  Okay.  Did you get any correspondence from
25  anybody suggesting that you were guilty of criminal or
```

80

```
1   unethical conduct?
2      A.  No.
3      Q.  Okay.
4      A.  I -- I don't know how you want to char- --
5   I've given you everything that I've got.  I don't -- I
6   don't think you can characterize any of those e-mails in
7   that fashion.
8      Q.  All right.  I didn't, but, you know --
9      A.  Okay.
10     Q.  -- I'm not sitting there, either.
11        Have you had any conversation with anybody
12  that -- that -- listening to them, you thought, that
13  believed you were guilty of criminal or unethical
14  conduct?
15     A.  I've had conversations with people who had had
16  conversations with other people.
17     Q.  Okay.
18     A.  No one directly said:  Hey, I've read this
19  stuff, and I think you're a bad guy.
20     Q.  Okay.  Tell me about the conversation you had
21  with somebody who had a conversation with somebody else.
22     A.  The first one was when my wife and I had
23  dinner with Pete McAndrews and his wife, whose name I
24  can't recall.  A lovely lady.
25     Q.  We'll seal this part of the deposition.  Okay?
```

81

```
1      A.  A lovely lady, but I can't recall her name,
2    sitting here.
3      Q.  Okay.  And -- and your wife gave a
4    recollection of that conversation.  Give me yours.
5      A.  Hers was pretty close to mine.  I -- you know,
6    we had gone out there just kind of to keep business
7    contacts going.  It was nice to go have dinner with
8    these folks.  And something came up about the Cisco
9    case.  I mean, that's the only case that Pete and I have
10   together.  And his wife said:  Oh, you're the one.  And
11   clearly, they had talked about it.
12          And I said:  Yeah, I'm the one.
13          And Pete -- I don't think he would have
14   ever told me if he'd known it was going to end up in
15   get-- getting his deposition taken -- told about this
16   time where he was meeting with some in-house counsel at
17   some company.  And I don't know if they were
18   contemplating filing a lawsuit in the Eastern District
19   or what.  And he said:  We've got good local counsel
20   down there, Johnny Ward and Eric Albritton.
21          And they relayed to him they'd have
22   nothing to do with us; they'd read about us; they knew
23   that we were unethical or engaged in bad acts, and not
24   to raise our names again as hiring us as local counsel.
25   That's my recollection of --
```

82

```
1      Q.  Okay.
2      A.  -- what was said.
3      Q.  Did you do anything to follow up on that and
4    say:  Hey, you know, I assume you told the in-house
5    counsel they were good guys and --
6      A.  I didn't -- I mean, I was kind of surprised
7    that I'm hearing this.  I -- I had suspected that that
8    had gone on, but it's hard -- people don't call me and
9    say:  Hey, you were in the running, but we're not hiring
10   you because of what we read about you.
11     Q.  Uh-huh.
12     A.  So it kind of confirmed my suspicion.
13          And I subsequently talked to Pete and
14   said:  I know we were having this over-a-casual-dinner
15   conversation, but it's important to me.  Would you mind
16   me telling my lawyers about it and letting them know
17   that I have confirmation?
18          And he said -- he's a stand-up guy, and he
19   said:  Have at it.  The facts are the facts.
20     Q.  Do you remember the name of the in-house
21   counsel?
22     A.  No.  He -- he -- he would know because he
23   called them by name and company.
24     Q.  Okay.  And you didn't make any effort to
25   contact the in-house counsel or the company yourself
```

83

```
1    to --
2      A.  I think that --
3      Q.  -- talk to --
4      A.  I think that'd be improper, but I wouldn't
5    have done that.
6      Q.  Okay.  In any event, improper or not, you
7    didn't do it?
8      A.  I did not do it.
9      Q.  Okay.  And did Pete at dinner specify the
10   Patent Troll Tracker as the source of this in-house
11   counsel's comment to him about you and Mr. Albritton?
12     A.  That's the only place I've been accused of a
13   crime and unethical behavior.  So maybe I just assumed
14   that that's what the source of his information was.
15     Q.  Okay.  But he didn't mention it?
16     A.  I -- I can't recall, sitting here.  I -- I
17   would defer to Pete whether or not he mentioned it or
18   not.
19     Q.  Okay.  As lawyers, we all, from time to
20   time -- time to time, get -- get in beauty contests,
21   what they call, the counsels -- I mean the companies
22   trying to pick counsel.
23     A.  I -- I understand that goes on in the big
24   firms.  I hear about it because -- Jackson Walker, Baker
25   Botts, or Vinson & Elkins, they get interviewed by
```

84

```
1    clients, and I've heard that goes on.  I don't
2    typically -- we're not --
3      Q.  You don't do --
4      A.  -- involved -- my name's brought up, and
5    that's how I found out about another instance where
6    someone had a negative reaction to me.
7      Q.  Okay.  But you typically don't do the beauty
8    contests like the big firms do?
9      A.  No.
10     Q.  Okay.
11     A.  I've got lawyers that use me as local counsel,
12   and they tend to come back to me.
13     Q.  Okay.  You say there was another instance,
14   other than the Peter McAndrews matter, where somebody
15   was reporting what somebody else had said?
16     A.  Right.
17     Q.  And who was that?
18     A.  Bob Chiaviello at Fulbright & Jaworski.
19     Q.  And what did Mr. Chiaviello say?
20     A.  Same general type of thing.  They were
21   enrolled in a beauty contest, and he brought up that:
22   Hey, we use Johnny Ward as local counsel.  We could help
23   you out.
24          You know, it would've had to have been a
25   case filed in Judge Davis' court or Judge Folsom's
```

85

1  court --
2      Q.  Sure.
3      A.  -- defense case.
4          And whoever his contact -- and he said it
5  happened on more than one occasion.  He didn't give a
6  client name to me.  He just said that people have said:
7  We've -- we've heard about that guy, we've read about
8  him; we're not going to use him.
9          And he attributed it to the Patent Troll
10  Tracker specifically.
11     Q.  Okay.
12     A.  So I assume that these folks raised the
13  articles to him.
14     Q.  Okay.  And Chiaviello said that he heard about
15  it from how many clients?
16     A.  I don't know if it was one or several.  It
17  seems like it was on more -- more than one occasion that
18  he had been trying to land some business and had
19  referenced me by name and --
20     Q.  Okay.
21     A.  He did not specify a client, though.
22     Q.  Okay.
23     A.  And I kind of had the same conversation:  Bob,
24  I hate to put you in this situation, but can I give your
25  name to my lawyers?  Would you be willing to talk to

86

1  them about what's happened?
2      Q.  Uh-huh.  And he -- he said yes?
3      A.  He said --
4      Q.  Okay.
5      A.  -- whatever you need to do.
6      Q.  Is there anybody of this nature, like Pete
7  McAndrews and Bob Chiaviello, who you've asked
8  permission who have denied it, said:  No, you can't give
9  my name to the lawyers?
10     A.  Yes.
11     Q.  Who is that?
12     A.  I don't -- they don't want their names out
13  there, and I -- I don't -- I'm not comfortable giving
14  them to you.  I think it's confidential.  They've had
15  clients who've -- and I can't -- obviously, if I
16  can't -- if I don't give it to you now, I'm not going to
17  get to talk about it at trial, and I understand I live
18  and die by that.
19     Q.  Okay.  Are you claiming economic damages in
20  this case?
21         MS. PEDEN:  Objection to form.
22     A.  I don't believe so.  I think I'm claiming
23  pain, suffering, mental anguish, and reputational
24  damage.  I think I've lost business, but, you know, I
25  can't ever -- again, I can't prove who's not hiring me

87

1  because of this, so I can't put any dollar value on it.
2      Q.  (BY MR. BABCOCK)  You could prove, however,
3  that a bunch of people are hiring you.  I mean --
4      A.  I've --
5      Q.  -- you've got a pretty active docket.
6      A.  I've got an active docket, yes.  This has, by
7  no means, shut my practice down.
8      Q.  Okay.  So there's Pete McAndrews, Bob
9  Chiaviello, and one or more people that you won't name?
10     A.  One.  One lawyer.
11     Q.  Okay.  One lawyer that you won't name.
12     A.  And Mr. Fokas has told me that he would not
13  have hired me if he did not know me prior to this and
14  know this to be untrue about me.  That's hindsight,
15  but --
16     Q.  Uh-huh.
17     A.  -- he's made that comment to me.  I think he's
18  very happy with my representation of him, so I'm not
19  worried about losing him as a client.
20     Q.  All right.  Okay.  Anybody -- anybody else,
21  other than McAndrews, Chiaviello, the one lawyer you
22  won't tell us, who has said that because of this Patent
23  Troll Tracker article -- were you even quoting somebody
24  else?
25     A.  Quoting some- --

88

1      Q.  Yeah.
2      A.  Who he would not identify
3      Q.  Right.
4      A.  He said:  I'm not going to testify.
5      Q.  Okay.  So anybody else other than those
6  people?
7      A.  No.
8      Q.  Okay.
9      A.  Not -- not that I know of.
10     Q.  Okay.  Is there -- is there anybody outside of
11  your professional life -- and I understand the patent
12  bar is a small bar and talks and everything.  But
13  anybody outside of your professional life that has made
14  comments -- disparaging comments to you about the Patent
15  Troll Tracker?  I mean, anybody at church or at school
16  or --
17     A.  Nobody.
18     Q.  Okay.
19     A.  I mean, people, obviously, read about it when
20  we sued and it turned out to be Cisco, but no one's said
21  anything disparaging to me.
22     Q.  Okay.
23     A.  But, obviously, there are folks outside of the
24  profession that have read about it now.
25     Q.  Because there has been -- there has been some

Ward, John  8/10/2009  1:21:00 PM

89

1    press comment about the case -- about your case?
2        A.  I think that's fair.
3        Q.  Your very own lawyer, Mr. Patton, was quoted
4    in the Texarkana Gazette.  Did you read that article?
5        A.  I did.
6        Q.  And in that, he said that Frenkel was a
7    coward.  Do you agree with that?
8        A.  Absolutely.
9        Q.  And that Cisco was a bully.  Do you agree with
10   that?
11       A.  Absolutely.
12       Q.  Okay.
13       A.  They've just been caught.
14       Q.  Do you -- do you know -- did you know that
15   Mr. Patton was going to talk to the newspaper prior to
16   him speaking?
17           MS. PEDEN:  Objection.
18           To the extent that that calls for
19   attorney-client-privileged communications, I'm going to
20   instruct you not to answer it.
21       A.  I'm going to follow my lawyer's advice.
22       Q.  (BY MR. BABCOCK)  So you think that that calls
23   for an attorney-client --
24       A.  What --
25       Q.  -- conversation?

90

1        A.  What Mr. Patton and I talked about, whether or
2    not I was contacted by the press?
3        Q.  Sorry.  You misunderstood my question.  Did
4    you --
5        A.  Okay.
6        Q.  -- know before Mr. Patton spoke to the
7    Texarkana Gazette that he was going to speak to them?
8           MR. PATTON:  That's not the question you
9    asked, Chip.
10       A.  The -- the only way I would --
11          MR. BABCOCK:  Go back and read the
12   question I asked before.
13          (Record read.)
14       A.  The only way I would know that is if he told
15   me, and I think that's privileged.
16       Q.  (BY MR. BABCOCK)  Not necessarily.  The
17   reporter could have told you; a lot of people could have
18   told you.
19       A.  Yeah.  No -- no reporter told me that --
20       Q.  Okay.
21       A.  I gave Mr. Patton -- I contacted -- I was
22   contacted by a lot of reporters, and I never gave
23   comment.
24       Q.  Okay.  Did you --
25       A.  As much as I would want -- want to, I know

91

1    better and said:  Contact my lawyer.
2        Q.  All right.  And you gave Mr. Patton authority
3    to speak for you to the press about this case, correct?
4        A.  Absolutely.  He speaks -- he speaks for me.
5        Q.  Is there anything that he has said that you
6    have disavowed or think is improper?
7        A.  Not -- not sitting here.
8        Q.  Okay.  Do you know if the Texarkana Gazette
9    article was after this lawsuit -- was after your lawsuit
10   was filed?
11       A.  I'm guessing, but educated guess is yes, it
12   was after -- after the lawsuit got filed.
13       Q.  Have you ever served on the local rules
14   committee of the Eastern District of Texas?
15       A.  I have not.
16       Q.  Okay.  Let me -- here's Exhibit 18.  I think
17   this is the -- this is the one that maybe you referenced
18   earlier as being a November article by Mr. Frenkel.  It
19   talks about the ESN case on the third page.
20       A.  Right.  Okay.
21       Q.  Is -- is this the one you were talking about?
22       A.  It is.
23       Q.  Okay.
24       A.  And I had forgotten about some of this, so you
25   ask your questions, and I'll answer you.

92

1        Q.  Okay.  It says ESN -- it's -- it's in a larger
2    article about "Troll Call and Other Patent Stats for
3    October 2007."  And then it has a whole bunch of
4    statistics.  And then it lists some cases, and it says
5    "116."  Anyway, it says:  116) ESN, LLC versus Cisco
6    (and related company) (Texarkana October 5th [sic],
7    November -- November 15.  No, wait.  Oct- -- let me
8    start over again.
9           116) ESN, LLC versus Cisco (and related
10   company) (Texarkana, October 15.  No, wait.  October 16.
11   No, October 15.  When was it "filed" again?).  I posted
12   on it here.  Michael Smith also had a post on the case.
13   I had thought there was a dueling jurisdictional battle,
14   but then I read an article yesterday that ESN dismissed
15   its case against Cisco.  I looked, and the same is true
16   for the Cisco case against ESN:  gone.
17          Aside from his, you know, we don't know
18   whether he read it or not, it is true that both cases
19   were dismissed, right?  Both the Texarkana case and the
20   Connecticut case were dismissed?
21       A.  Okay.  But you said something before that, and
22   you -- you threw me off.  You said we don't know whether
23   or not it's true.
24       Q.  Well, all of his musings about what he was
25   doing or -- do you know anything about whether he was

Ward, John  8/10/2009  1:21:00 PM

93

1  listening to Michael Smith or whether he was looking on
2  his computer?
3      MS. PEDEN.  Objection to form.
4      A.  I don't know what he was doing.  I know that
5  the things that he's writing here are false, and he
6  would have known they were false at that time --
7      Q.  (BY MR. BABCOCK)  Okay.
8      A.  -- or should have known.
9      Q.  What -- what was true was that both the
10  Texarkana case and the Connecticut case were dismissed,
11  correct?
12      A.  That's part of the truth, yes.  He knew a lot
13  more, though.
14      Q.  Okay.  But -- but that fact is true?
15      A.  That's -- that's -- that's part of the truth.
16      Q.  Okay.  And what do you think he should have
17  added?  Like, who he was or --
18      A.  Well, no.  And Cisco -- he knew that Cisco had
19  consented to say that jurisdiction is correct in the
20  Eastern District of Texas.  And then in the first line,
21  he's saying:  When is it filed?
22          He knows when it's filed.  He certainly
23  has access to the notice of electronic filing, and he's
24  still saying, oh, we can't -- and he's using the word --
25  he's putting it in quotes -- "filed," because that's a

94

1  very specific meaning.  And he's saying -- he's
2  referring back to his -- and he's linked back to it:  I
3  posted on it here.  So go back and look about the
4  article where I said --
5      Q.  Okay.
6      A.  -- they've altered the filing date.
7      Q.  Okay.
8      A.  He's connecting the articles himself.
9      Q.  Okay.  Then he says:  I got some critical
10  e-mails for using the word "altered" with respect to the
11  Texas docket.  Well, let me respond.  If a document
12  appears one day with a date stamp and the next day that
13  date stamp disappears and is replaced with a different
14  stamp, what would you call it?  To the extent the use of
15  the word "altered" implied that anyone did anything
16  illegal, that was not my intent.  I'm positive the court
17  clerk was following local custom, as was the ESN Texas
18  lawyer.  But putting aside the propriety of such actions
19  with respect to local custom, isn't such a "customary"
20  action detrimental to the credibility of the Court?  We
21  have been -- we have to be able to trust the U.S courts
22  and their ECF system.  How can we trust the courts when
23  date stamps on documents disappear on one day and
24  reappear the next day with a different date?
25          This all could be averted if the local

95

1  rules committee adds a rule that no document shall be
2  replaced without a motion made to correct the docket.
3          Have I read his article -- or blog in --
4  in its entirety -- well, these two paragraphs, I should
5  say?
6      A.  Yes, sir.
7      Q.  Okay.  Did I read them correctly?
8      A.  I believe you did.
9      Q.  Okay.
10      A.  I mean, they pretty much speak for themselves.
11  They say what they say.
12      Q.  Right.  And -- and do you have criticism for
13  what he said in -- in those two paragraphs I just read?
14      A.  Absolutely.
15      Q.  Okay.  What -- what are your criticisms?
16      A.  Do we want to go through it line by line?
17      Q.  Sure.
18      A.  Okay.  I think I've already told you about the
19  criticism about where he's talking October 15th,
20  October 16th.
21      Q.  Okay.
22      A.  No, wait.  October --
23      Q.  Gotcha.
24      A.  -- 15th.
25          He knew there was a dueling jurisdictional

96

1  battle.  He knew that we'd talked to Sam Baxter and that
2  Cisco had conceded that jurisdiction was appropriate in
3  the Eastern District.  He admits all those facts.
4          And he's not telling the truth when he
5  says:  I read an article that ESN was dismissed.
6          We know he's monitoring the docket.  He's
7  the attorney in charge of the ESN case.  We know that's
8  untrue.
9          And he says he's looking to see if the
10  same is true for the Cisco case.  That's untrue.  He's
11  getting reports daily from his lawyers about what's
12  going on, if not hourly, and then he omits what's
13  happened.  So he's not giving the full picture of what's
14  going on, I think.
15      Q.  Okay.
16      A.  I don't know whether he -- or not he got
17  critical e-mails.  My understanding is he says he can't
18  find any of his e-mails, which I find to be incredible.
19  He uses the word "altered" I -- I don't
20  doubt that people read it the same way I did and that he
21  was criticized for using it.  I'd love to see what those
22  folks wrote him, but I don't know if we'll ever see
23  that.
24          And then this next sentence, he's talking
25  about the date stamp changing and -- and reappearing and

97

1    being replaced.  All untrue.  The date stamp was never
2    changed, was never altered.  I think he knew what he was
3    doing when he used the word "altered," that he was
4    implying illegal activity.  That was his intent.
5         And, again, he's assuming that the court
6    clerk -- in this next sentence, that the court clerk is
7    altering the date, which didn't happen.
8         And he's saying -- he sets aside the
9    propriety of such actions.  Well, there's nothing
10   improper about it, nothing to set aside.
11        Calling into question the credibility of
12   the Court.  There's no -- no reason to question anyone's
13   credibility.  And, you know, he's supporting this banana
14   republic statement, that we need to be able to trust the
15   Courts and their -- their system, that there's something
16   nefarious going on.
17        Q.  He -- he doesn't mention banana republic
18   again, does he?
19        A.  No, no --
20        Q.  Okay.
21        A.  -- he doesn't.  He previously referred to this
22   practice --
23        Q.  Oh, okay.  All right.
24        A.  And then he's saying it's -- you know, we have
25   to be able to trust these date stamps; somehow they're

98

1    not trustworthy, when, in fact, we know it never
2    changed.  He's saying they disappear and reappear.
3    Untrue.
4         Q.  Anything else?
5         A.  Not that I can think of.
6         Q.  Okay.  You said that you talked to Sam Baxter
7    and Cisco conceded jurisdiction was proper.  Was it you
8    that talked to Sam Baxter?
9         A.  No.
10        Q.  Who talked to Sam Baxter?
11        A.  Eric --
12        Q.  Okay.
13        A.  -- talked to Sam.
14        Q.  And reported to you?
15        A.  Yes.  They -- they were working out an
16   agreement on how were going to go forward.
17        Q.  Okay.
18        Q.  Now, I've had conversations with Sam since
19   that time, but --
20        Q.  Okay.
21        A.  -- at that time, I had not.
22        Q.  Okay.  Tell me about your conversations with
23   Sam Baxter regarding this case -- or regarding this
24   matter.
25        A.  Very brief.  It was when we were identifying,

99

1    you know, persons with knowledge of relevant facts.  We
2    identified Sam.  And I contacted Sam to ask him what he
3    thought about this post, what his opinion was, was it
4    accusing me of criminal conduct, and would he come
5    testify.
6         Q.  Okay.  And what did he say?
7         A.  Absolutely accused me of criminal conduct, and
8    he'd be happy to come testify.
9         Q.  Okay.  Was he representing Cisco at the time?
10        A.  At the time of --
11        Q.  Of that conversation.
12        MS. PEDEN:  Objection to form.
13        A.  I don't know if he was or not.  It was fairly
14   recently.
15        Q.  (BY MR. BABCOCK)  But when was it?
16        A.  It would have had to have been shortly before
17   we gave you the list of --
18        Q.  People with relevant knowledge?
19        A.  Well, I say that, because it might have
20   been when we -- I don't know what they've -- what
21   they've done with the pleadings.  I know that the
22   conversation took place in the last, I'd say, 90 days
23        Q.  When you say the date stamp never changed, do
24   you know whether any things on the docket that
25   changed -- I mean on the pleadings that changed at all?

100

1         MS. PEDEN:  Objection to form.
2         A.  I don't know it for a fact.  I -- my
3    understanding is that there's something on the docket
4    entry that reflects a different date.  It originally
5    showed "file," and now it shows the 16th, but I -- I
6    don't know.  If you show it to me, I'll -- I'm not
7    trying to deny that happened.
8         Q.  (BY MR. BABCOCK)  Okay.  All right.  Do you
9    disagree with his last sentence here, that -- that maybe
10   there ought to be a local rule to say that you can't
11   replace a document without a motion made to correct the
12   docket?
13        A.  I disagree with the statement that he said
14   "this could all be averted."  This could all have been
15   averted if he'd asked for a copy of the file stamp,
16   which he didn't do.
17        Q.  Okay.  But the issue of whether you can change
18   things on the docket, do you think that having a local
19   rule requiring a motion to do that would be a better
20   practice?
21        A.  No.  I think the clerk's office needs to get
22   this complete -- computer glitch fixed.  But for lawyers
23   who are relying on the filing dates, they know what to
24   look at.  But I don't -- I don't know how we can do
25   that.

Ward, John  8/10/2009  1:21:00 PM

101

1      Q.  Okay.  All right.  You produced for us a video
2   of you going onto Google.  Do you remember doing that?
3      A.  I do.
4      Q.  And when did you do that?
5      A.  I'm sure it's -- you can get it off that
6   document.  It would show a -- I don't know.  It was
7   shortly after it happened.  My IT guy said:  I want to
8   capture this to show that now I'm -- you put my name in
9   and "attorney."  The first thing that's popping up is
10  Patent Troll Tracker.
11     Q.  Yeah.  I think you -- you put in "Eric
12  Albritton, patent attorney," and the October 17th post
13  showed up.  Correct?
14         MS. PEDEN:  Objection to form.
15     A.  I think I put --
16     Q.  (BY MR. BABCOCK)  Do you know?
17     A.  I think I put in "Johnny Ward," but I --
18     Q.  Okay.  Yeah.
19     A.  I -- it's been a long time since I've looked
20  at it.
21     Q.  We both should have listened to her objection.
22     A.  Okay.
23     Q.  It's "Johnny Ward" --
24         MS. PARKER:  Patent.
25     Q.  (BY MR. BABCOCK)  "Patent attorney."

102

1         MS. PARKER:  Not --
2      Q.  (BY MR. BABCOCK)  I said "Eric Albritton."
3         MS. PARKER:  Not "attorney," just
4   "patent."
5      Q.  (BY MR. BABCOCK)  Oh, "Johnny Ward, patent."
6      A.  Okay.
7      Q.  "Johnny Ward, patent."  And then the
8   October 17th article popped up, right?
9      A.  Again, I don't remember exact --
10     Q.  It's whatever it says?
11     A.  It's whatever it says.
12     Q.  Okay.
13     A.  It's --
14     Q.  How many times -- how many different
15  combinations of words did you put into the Google system
16  before you got "Johnny Ward, patent" --
17         MS. PEDEN:  Objection to form.
18     Q.  (BY MR. BABCOCK)  -- if any?
19     A.  I -- I don't remember.  I remember that I did
20  it, and I was shocked that that was what was coming up
21  And I was like:  I'm going to save this, because
22  there's -- in my mind, it was more sophisticated than
23  just some individual out there blogging.  They had a lot
24  of time.  They were giving lots of stats.  Either this
25  person had -- was independently wealthy or someone was

103

1   paying them to do this or there was a crew of people
2   doing it.  I don't know.
3      Q.  Do you know whether the -- the March 17th -- I
4   mean the October 17th and 18th, 2007 Patent Troll
5   Trackers can be accessed today?
6      A.  I believe they can be.
7      Q.  Okay.  And how do you think they can be?
8      A.  I know I've played around on the Internet, and
9   I -- you can -- you can see them captured in some spots.
10  Now, whether or not they're the altered ones or the
11  revised ones or not, I -- I -- I think you can still
12  access them.
13     Q.  And have you actually, yourself, accessed
14  them?
15     A.  I don't believe I have.  Well, I don't -- I
16  can't remember.  I know I've looked at them and they
17  were available for -- I haven't done this in a long
18  time, but I think they're still there.
19     Q.  Okay.
20     A.  I kind of operate under the -- the belief that
21  once it's out there, it's always out there,
22  unfortunately, whether it's e-mail or Web sites.  I know
23  we've been involved in cases where we use this deal
24  called the way-back machine and you go and -- I didn't
25  realize this -- you find Web sites that were around 15

104

1   years ago.  I did it in a case with your firm.
2      Q.  Besides your -- besides yourself -- excuse
3   me -- besides yourself, do you know of anybody who has
4   tried to -- to see the -- see the October 17th or 18th
5   articles after March of 2008?
6         MS. PEDEN:  Okay.  I need to interject
7   and just tell you not to disclose any
8   attorney-client-privileged communications.  So you can
9   answer to the extent that you have any knowledge outside
10  of those.
11     A.  As far as other individuals, other than what
12  my lawyers have told me, I can't.  I -- I know of nobody
13  else.
14     Q.  (BY MR. BABCOCK)  Okay.  Have you retained a
15  testifying expert to -- to testify on this expert -- on
16  this subject?
17         MS. PEDEN:  Again, I'm going to interject
18  and just instruct you not to divulge attorney-client
19  communications.
20     Q.  (BY MR. BABCOCK)  Can't answer it?
21     A.  Well, I have not individually gone out and
22  retained somebody to testify, no.
23     Q.  But do you know of a testifying expert
24  who's --
25         MS. PEDEN:  I instruct you not to answer.

105

1    A.  The only way I'd know that is if my lawyers
2    have told me, and I'm not answering that one way or the
3    other.
4    Q.  (BY MR. BABCOCK)  Okay.
5        MR. BABCOCK:  We need a tape change, and
6    so let's --
7        MR. PATTON:  Oh, I'm so glad.
8        MR. BABCOCK:  -- let's take a little
9    break.  Okay.
10       THE VIDEOGRAPHER:  Off the record, 11:37.
11   This is the end of Tape 1 of the deposition of John
12   Ward.
13       (Lunch recess 11:37-12:36.)
14       (Videotape 2.)
15       THE VIDEOGRAPHER:  This is the beginning
16   of Tape 2 of the deposition of John Ward, Jr.  Back on
17   the record, 12:36.
18   Q.  (BY MR. BABCOCK)  Can you tell us, Mr. Ward,
19   who John Olivo is, O-l-i-v-o?
20   A.  Jack Olivo.
21   Q.  Okay.
22   A.  Yeah, Jack Olivo.  He's a lawyer in New
23   Jersey.
24   Q.  And do you recall him telling you that -- that
25   you'd play perfectly in Connecticut?

106

1    A.  Is that who wrote that e-mail?  I don't --
2    maybe
3    Q.  Okay.  I probably have it somewhere
4        MR. BABCOCK:  Where -- where are my
5    documents?  Let's see if I can find it.
6    Q.  (BY MR. BABCOCK)  Here's Exhibit 4.  This is
7    an e-mail that Jack Olivo from New Jersey sent to you on
8    November 5th, 2007.
9    A.  Yeah.
10   Q.  Still friends with Mr. Olivo?
11   A.  I am.  I mean, we're -- we're professional
12   acquaintances.
13   Q.  Okay.  But you took this as a -- as a
14   complimentary communication regarding -- following the
15   October 17th e-mail saying:  Wonder how he'll play in
16   Connecticut?
17   A.  That's not how I took it.  It was, yeah,
18   people are reading this, and they're in New Jersey
19   reading it.  So, I mean, it kind of --
20   Q.  You didn't think he was being critical of you,
21   did you?
22   A.  No.  He's saying:  Shake it off.  You'll be
23   all right.
24   Q.  Okay.  David Pridham you've talked about
25   earlier.  Let me hand you Exhibit 5, which is an e-mail

107

1    from him.  And it's dated December 4th, 2007, and it
2    directs you to a -- a Web site or something.  Do you
3    know what it is?
4    A.  I'm sure I clicked it at the time, but I don't
5    know what it is now.
6    Q.  Okay.  Okay.  Let me hand you Exhibit 6.  This
7    is, I think, maybe the cartoon that you -- you referred
8    to earlier --
9        MS. PEDEN:  Chip, do you have another
10   copy?
11       MR. BABCOCK:  Oh, I'm sorry.
12       MS. PEDEN:  That's all right.  Thank you.
13   Q.  (BY MR. BABCOCK)  This is the cartoon that you
14   referred to earlier, where Mr. Niro is jumping out of
15   the bushes and Mr. Frenkel is looking scared, sitting on
16   a stone?
17   A.  Yeah, that's the one I -- I was referring to.
18   He framed it in a little -- it's not blown up.  It's
19   this size, in a frame.
20   Q.  Okay.  And signed it for you?
21   A.  It says:  We got him --
22   Q.  Okay.
23   A.  -- Ray.
24   Q.  And this is dated February 29th of 2008, the
25   e-mail to you; is that correct?

108

1    A.  Correct.
2    Q.  And was the framed cartoon given to you
3    sometime subsequent to that -- subsequent to that?
4    A.  Yes.  It was in that October -- October 2008
5    trip that we took up to Chicago.
6    Q.  Okay.  And here's Exhibit 7.  This is an
7    e-mail from Dennis Crouch to you, dated March 8th, 2008,
8    asking you to comment about your defamation lawsuit
9    against Frenkel and Cisco.
10       MS. PEDEN:  Objection to form.
11   Q.  (BY MR. BABCOCK)  I'll back up.  This is an
12   e-mail from Dennis Crouch, dated March 8th, 2008, to
13   you, subject:  Lawsuit against Frenkel.  Correct?
14   A.  That's what it says.
15   Q.  Okay.  Did you get this?
16   A.  I believe I did.
17   Q.  And then he says he's writing a post on your
18   defamation lawsuit against Frenkel and Cisco.  Any
19   comments?
20       Did you have any?
21   A.  No.
22   Q.  Did you refer to your lawyer?
23   A.  I don't know if I even responded to it.
24   Q.  Okay.  This is the third of three lawsuits
25   that you filed relating to the articles written by

109

1   Mr. Frenkel.  You filed the first one against Google,
2   trying to find out who Frenkel was, right?
3      A.  Yeah, I don't think of it --
4        MS. PEDEN:  Objection to form.
5      A.  I don't think of it as a lawsuit filed against
6   Google.  It was a lawsuit --
7      Q.  (BY MR. BABCOCK)  Actually, it was a 202, and
8   you gave Google notice?
9      A.  Right.
10     Q.  Okay.
11     A.  It was a lawsuit against John Doe, I think, is
12  how it was --
13     Q.  Right.
14     A.  -- styled.
15     Q.  And then the -- and then the next one was
16  filed in -- in state court in Gregg County, correct?
17     A.  Correct.
18     Q.  And that attached the -- the two articles
19  we've been talking about today, correct?
20     A.  I believe so.
21     Q.  Okay.  And then that was nonsuited, and this
22  case was filed in federal court in Arkansas, correct?
23     A.  Correct.
24     Q.  And that attached the articles to the federal
25  lawsuit initially, correct?

110

1      A.  If you say it did.  I don't doubt that.
2      Q.  Okay.  Why did you not comment to Mr. Crouch,
3   who was trying to seek your -- get your comment about
4   the lawsuit?
5        MS. PEDEN:  I just want to interject.
6   If -- to the extent it doesn't call for any
7   communications you've had with counsel.
8      A.  I really have a rule of not commenting to
9   anybody about anything going on with this case.  I've
10  tried to let my lawyers talk for me.  Kind of the same
11  advice I give my clients.
12     Q.  (BY MR. BABCOCK)  Okay.
13     A.  I try to be a good client.  And I know we're
14  not -- lawyers are, they say, the worst clients, but --
15     Q.  That's what I've always heard.
16     A.  -- I try not to be.
17     Q.  This fellow, Terry Fokas, you said, is a -- is
18  a client?
19     A.  Yes.  Not individually, but his companies are
20     Q.  His company.  Is that Parallel Networks?
21     A.  Yes, formerly Epic Realm, now Parallel
22     Q.  Okay.  Here's Exhibit 8, which is an e-mail
23  from Mr. Fokas --
24        MR. PATTON:  Chip, let me have one, too,
25  if you don't mind.

111

1        MR. BABCOCK:  Sure.
2      Q.  (BY MR. BABCOCK)  -- is an e-mail to Larry
3   Carlson and Kevin Meek and you, subject:  Patent Troll
4   Tracker Defamation Suit.  "Johnny Ward is my hero."
5        Did you receive that e-mail?
6      A.  I did.
7      Q.  Who is Larry Carlson?
8      A.  He's an attorney at Baker Botts.  We tried a
9   case together --
10     Q.  Okay.
11     A.  -- for Parallel, and this was leading up to
12  that trial.
13     Q.  Okay.  And Kevin Meek, also at Baker Botts?
14     A.  Yes.
15     Q.  All right.  And did you take it that Mr. Fokas
16  was saying that you're his hero?
17     A.  I mean, that's what he wrote.
18     Q.  Any -- any idea why you were heroic, in his
19  eyes?
20        MS. PEDEN:  Objection to form.
21     A.  I can speculate.  I -- I know that the Patent
22  Troll Tracker had written about Parallel Networks, as
23  well, and -- there were lots -- lots of folks he wrote
24  unflattering things about.  I don't know that they
25  crossed the line into being defamatory, but there were a

112

1   lot of folks who wanted to know who he was.
2      Q.  (BY MR. BABCOCK)  Okay.  And -- and "Johnny
3   Ward is my hero" is right above a -- what appears to be
4   a news article about Mr. Frenkel, under the headline
5   "Down & Outed."
6      A.  Right.
7      Q.  Okay.  Did you believe that Mr. Fokas, in
8   saying that you were his hero, were -- was also
9   commenting about Frenkel and Cisco?
10       MS. PEDEN:  Objection to form.
11     A.  I don't know what you mean.
12     Q.  (BY MR. BABCOCK)  Well --
13     A.  I'm -- I'm his hero for -- maybe I
14  misunderstood you.
15     Q.  Yeah.
16     A.  Ask me that again.
17     Q.  Probably -- well, it probably wasn't a good
18  question.
19       Why do you think Mr. Fokas was saying
20  "Johnny Ward is my hero"?
21     A.  I'd be guessing.  I'm happy to guess why he'd
22  think that.
23     Q.  Well, why don't you first tell me what you're
24  thinking, and then I'll ask you if you talked to him
25  about it.

113

1      A.   Okay.  I'll answer your second question first.
2    I didn't talk to him --
3      Q.   Okay.
4      A.   -- about:  Why -- why am I your hero, Terry?
5           I think it was because I was not going to
6    take it.
7      Q.   Got it.
8           Here's Exhibit 9, another one from
9    Mr. Fokas.  Did you receive this e-mail regarding Patent
10   Troll Tracker defamation suit?
11     A.   Yeah, and I re-- -- I responded to it in
12   between.  And then that would have been his reply.
13     Q.   Okay.  You -- your response in the middle
14   says:  I'm getting drawn and quartered in a bunch of the
15   blogs.
16     A.   Yes.
17     Q.   What -- what did you mean by that?
18     A.   When the lawsuit hit the press, you know,
19   whether it's -- I don't remember what all the blogs
20   were.  Like, the Patent Prospector, Patent Leo.  There's
21   some guy who writes another blog, and maybe it's one of
22   these.  And people post comments to the story.  I mean,
23   it -- there was very unflattering things being said,
24   which, you know, if you just don't read them, they don't
25   get to you quite as bad, and I quit reading them.

114

1      Q.   Okay.
2      A.   But that -- but that's what I was referring
3    to.
4      Q.   All right.
5      A.   I didn't save those, but I think they're still
6    out there.  If you want to go get them, I think they're
7    still online.
8      Q.   Okay.  And these -- these are not Frenkel
9    blogs, but these are other blogs?
10     A.   Correct.
11     Q.   Okay.  And they're saying unflattering things
12   about you?
13     A.   Yes.
14     Q.   Okay.  And do you remember what the -- what
15   the criticism of you was?
16     A.   Yeah, that I had sued Cisco.  Now, they're all
17   anonymous, so you don't ever know who's doing it, but,
18   you know, people saying that they're patent lawyers and
19   I should be more thick-skinned and let people accuse me
20   of a crime and just let it roll off my back and not do
21   anything about it.
22     Q.   So they were critical of you filing a lawsuit,
23   basically?
24     A.   Generally, yeah.
25     Q.   Okay.  And -- and Mr. Fokas says:  I thought

115

1    most of them were trying very, very hard to be as
2    objective as possible (heck, they're probably scared
3    they're going to get tagged for defamation - LOL) --
4    which my kids tell me means laugh out loud.
5      A.   That's what I understand, too.
6      Q.   Okay.
7      A.   I don't use it, but some people do.
8      Q.   And was it your understanding that Mr. Fokas
9    was referring to the blogs that -- that you thought
10   were -- were drawing and quartering you?
11          MS. PEDEN:  Objection to form.
12     A.   You'd have to ask him.  I don't --
13     Q.   (BY MR. BABCOCK)  I know.  My question --
14     A.   I -- I don't -- I didn't -- I didn't follow
15   up and didn't ask him.
16     Q.   So you didn't know what -- when he wrote this,
17   you didn't know what he was talking about?
18     A.   There were a number of articles that were
19   written in a number of magazines and things, so, you
20   know, I don't know what he's referring to specifically
21     Q.   Okay.  Do you -- do you think these blogs and
22   magazine articles damaged your reputation?
23     A.   I -- I don't know.  I think -- I -- I
24   balanced:  Do I stand up for myself, knowing that when I
25   file a lawsuit, people are going to jump all over me

116

1    versus sitting there and taking it.
2           So I don't know if it damaged my
3    reputation by suing Cisco or not.
4      Q.   All right, sir.
5      A.   I don't really care.
6      Q.   "Personally, I believe that Rick Frenkel is an
7    idiot," writes Mr. Fokas.
8           Had you ever had any discussions with
9    Mr. Fokas about Rick Frenkel?
10     A.   I'm sure we've talked about this case at some
11   point.  You know, he's asked me, "How is it going," or
12   something, but I'm pretty quiet about what's going on in
13   this case with anybody.
14     Q.   Okay.  Do you share his view that Mr. Frenkel
15   is an idiot?
16     A.   I think the guy is plenty smart.
17     Q.   So not an idiot?
18     A.   No.  He's pretty -- pretty smart.  I've got
19   other -- other things I think about him, but I don't
20   think he's dumb.  I think he knew what he was doing.
21     Q.   Have you ever met him?
22     A.   No.
23     Q.   Never talked to him, I take it?
24     A.   No.
25     Q.   And never corresponded with him?

Ward, John  8/10/2009 1:21:00 PM

117

1    A.  No.

2    Q.  Let me hand you Exhibit 10.  And this is an

3  e-mail from Michael Smith to you and Eric Albritton on

4  March 14th, 2008, with the message "I'm sure you've seen

5  this, but just in case."  And it attaches a lengthy

6  article from IP Law 360.  Did you receive this?

7    A.  I'm sure I did.

8    Q.  Without going through this whole IP Law 360

9  article, it appears to be commenting, in part, on your

10  lawsuit against Cisco and Mr. Albritton's lawsuit

11  against Cisco and Frenkel.  Is that a fair summary of

12  it?

13    A.  I --

14       MS. PEDEN:  Objection to, form.

15    A.  If you want me to read through it, I can.  I

16  know I read it at one time.  Generally, I think that's a

17  fair -- fair statement, that it was about the lawsuits

18  and what led to the lawsuits.

19    Q.  (BY MR. BABCOCK)  Okay.  Let me hand you

20  Exhibit 11.  This is an article from, I believe,

21  Law.com, which I think is also The Texas lawyer.  Do you

22  remember seeing this article?

23    A.  Again, I think I probably PDF'd it.

24    Q.  Okay.

25    A.  So I'm sure I saw it.

118

1    Q.  And you know that your -- from looking at it,

2  that your lawyer, Mr. Patton, made certain comments to

3  the press about your case, correct?

4    A.  You -- you're going to have to give me a

5  minute, because there were lots of articles, but --

6    Q.  Yeah.

7    A.  -- I imagine he did.

8    Q.  The second page, two-thirds of the way down:

9  Ward's lawyer, Nicholas Patton, a partner in Patton,

10  Tidwell & Schroeder in Texarkana, says Frenkel's

11  postings about his client on Patent Troll Tracker are a

12  "horrible thing," and Ward had no choice but to sue to

13  protect his reputation.  "Those things are damaging.

14  Those kinds of accusations are seen by literally

15  hundreds of thousands of people.  Those are serious

16  accusations that you just can't let go unaddressed,"

17  Patton says.  "There's no truth to it whatsoever."

18       Did I read it correctly?

19    A.  You read it correctly.

20    Q.  Okay.  And those were comments that Mr. Patton

21  was quoted as saying, in any event?

22    A.  They're attributed to Mr. Patton.

23    Q.  Okay.  And as you said before, he was your

24  spokesperson with respect to this case, correct?

25    A.  Was then and is now.

119

1    Q.  Okay.  Here's Exhibit 12 --

2       MR. PATTON:  Got another one?

3       MR. BABCOCK:  Yeah.  (Handing.)

4    Q.  (BY MR. BABCOCK)  -- from Peter Fenner.  Who

5  is Mr. Fenner?

6    A.  He's an inventor who's also a client.

7    Q.  Okay.

8       Johnny, heat up that poker real hot before

9  you stick in the "Patent Troll Tracker" blogger Rick

10  Frenkel and Cisco System, Inc.'s [sic].

11       Did you receive that from Mr. Fenner?

12    A.  I did.

13    Q.  And you respond "thanks."

14    A.  Yep.

15    Q.  Did you discuss this e-mail with Mr. Fenner at

16  any time? .

17    A.  Never.

18    Q.  Okay.  This is March 2008, correct?

19    A.  Correct.

20    Q.  Do you have any idea what prompted this e-mail

21  from Mr. Fenner about a year after you filed the

22  lawsuit?

23       MS. PEDEN:  Objection to form.

24    Q.  (BY MR. BABCOCK)  I'll take that back.  It

25  wasn't a year later.  It was --

120

1    A.  No, it was right -- right about the time.

2    Q.  Right at the time of the lawsuit.

3    A.  That's kind of when I got e-mails from folks

4  that had been watching the Patent Troll Tracker blog.

5    Q.  Fair enough.

6       Let me hand you Exhibit 13.  This is from

7  Rodney Gilstrap.  Do you know who he is?

8    A.  Yes.  He's a lawyer in Marshall.

9    Q.  And he's sending along an article in The Texas

10  Lawyer, dated March 17th, 2008, with the comment, quote,

11  now you're famous --

12    A.  Yeah.

13    Q.  -- end quote.

14    A.  Yeah.

15    Q.  And how did you take that comment, "now you're

16  famous"?

17    A.  Not -- not what I wanted to be famous for.

18    Q.  I think you may even say that here in a

19  minute.

20    A.  Okay.

21    Q.  Let me hand you 14.

22       MR. BABCOCK:  Nick, I think somebody

23  miscopied here.

24       MR. PATTON:  That's okay.  That's okay.

25       MR. BABCOCK:  Maybe -- maybe not.  Maybe

Ward, John  8/10/2009  1:21:00 PM

121

```
1   not.  I just didn't staple it.  That was the problem.
2   Q.  (BY MR. BABCOCK)  This is Terry Fokas sending
3   you another article from Business Week about -- about
4   your lawsuit and then the -- Cisco's reaction to it,
5   correct?
6       MS. PEDEN:  Objection to form.
7   A.  I'm not sure.  We can -- if you want me to go
8   through the article, I can.  I know it was an article
9   about the lawsuit.  I haven't read it in a long time.
10  Kind of what led up to the lawsuit.
11  Q.  (BY MR. BABCOCK)  Yeah.  A lengthy article.
12  You don't need to read the whole thing.
13      But you say:  This is the best article
14  I've seen.
15      That's what you said in March of 2008,
16  correct?
17  A.  Correct.
18  Q.  Have you seen any better articles since then?
19  A.  It's -- and when I say "better" and "best," as
20  far as giving a full rendition of what was said, the
21  Forbes article might have -- I might have thought it was
22  more balanced as far as saying exactly what was at
23  issue.  Clearly, someone else had read it the same way I
24  read it.
25  Q.  All right, sir.  Here's Exhibit 15.  And this
```

122

```
1   is a letter from George P. McAndrews to Mark Chandler,
2   dated April 7th, 2008.  I don't think you're copied on
3   it, but my question is:  Did you see this letter or a
4   draft of it before it was sent to Mr. Chandler?
5       MS. PEDEN:  And I -- I need to interject
6   and say that communications that you had with ESN may be
7   attorney-client-privileged.  So don't divulge any of
8   your confidential communications with your client.
9   A.  I don't recall whether I saw this or not.  I
10  saw it after the fact --
11  Q.  (BY MR. BABCOCK)  Okay.
12  A.  -- for sure.  I know I saw it after he sent
13  it.
14  Q.  Okay.
15  A.  I had no hand in writing it.  I can tell you
16  that.
17  Q.  That was my next question.
18      Here's Exhibit --
19  A.  Not to distance myself from it, but I -- I --
20  I did not have a hand in writing it.
21  Q.  Right.
22      Exhibit 16.  This is from Mark -- is it
23  Strachan (pronunciation) or --
24  A.  Strachan (pronunciation).
25  Q.  Strachan.  And who is he?
```

123

```
1   A.  He's an attorney who used to practice in East
2   Texas and then moved to Dallas, and he's with Mark
3   Werbner.
4   Q.  "I thought you and Eric might enjoy this
5   cartoon.  It was in the National Law Journal.  I hope
6   all is well with you."
7       This is April of 2008.  And the cartoon is
8   on the third page, but I'm wondering if the second page
9   is supposed to be there.
10      MR. PATTON:  It looks like that the
11  second page ends that particular article, Chip.
12      MR. BABCOCK:  It looks like what?
13      MR. PATTON:  The second page, which is
14  99 -- and then you skip to 256 on the --
15      MR. BABCOCK:  Right.
16      MS. PARKER:  What's the --
17      MR. PATTON:  -- Bates number.
18      MS. PARKER:  -- Bates number on the first
19  page?
20      MR. BABCOCK:  98 is the first page.
21      MR. PATTON:  You've got 98, 99, and 256.
22      MR. BABCOCK:  Okay.
23      THE WITNESS:  It looks like it was sent
24  to you.
25      MS. PARKER:  It should only have 256 on
```

124

```
1   it.
2       MR. BABCOCK:  Okay.
3       MR. PATTON:  I'm sorry, Crystal?
4       MS. PARKER:  According to your discovery
5   responses, it should only have 256 as the attachment,
6   not --
7       MS. PEDEN:  So just take off the first
8   two pages?
9       MR. BABCOCK:  Take out the middle page.
10      MS. PARKER:  The middle page.
11      MS. PEDEN:  Oh, the middle page.
12      MS. PARKER:  Sorry about that.
13      MR. BABCOCK:  Yeah.
14      MS. PEDEN:  Okay.
15      MR. BABCOCK:  Yeah.
16  A.  Do you want me to remove it from this exhibit?
17  Q.  (BY MR. BABCOCK)  Sure.  Yeah, let's -- let's
18  take it out of there.  It's not supposed to be there.
19      MR. PATTON:  Okay.  So 98 and 256 are
20  Exhibit 16?
21      MS. PARKER:  Yes.
22      MR. BABCOCK:  Right.
23      MS. PARKER:  Sorry about that.
24  Q.  (BY MR. BABCOCK)  And my question is:  Is --
25  is the second page of Exhibit 16 the cartoon from the
```

Ward, John  8/10/2009  1:21:00 PM

125

1   National Law Journal that Mr. Strachan sent you?
2       A.  I assume it is.  I mean, it says right above
3   it talking about an NLJ column.  So I can't imagine it'd
4   be anything different.
5       Q.  Okay.  It says that -- the headline is Law and
6   Laughter.  "I'd like to know if my blog can be used
7   against me."
8           Did you find that humorous?
9       A.  I don't know how I found it.  I -- you've
10  given it to me as a -- I don't remember looking at it,
11  to be honest with you.
12      Q.  Okay.
13          (Sotto voce discussion between Mr. Babcock
14          and Ms. Parker.)
15      MR. BABCOCK:  What's the next number?
16      MR. PATTON:  17.
17      MS. PARKER:  I've -- I've already marked
18  that one 19.
19      MR. BABCOCK:  Oh, 19.  Okay.
20      Q.  (BY MR. BABCOCK)  The court reporter will have
21  to put this together, but I read you some information
22  from a Web site earlier, and I just want to give you
23  Exhibit 19.  And tell me if -- if that's your -- if
24  that's your Web site.
25      A.  Well, part of it is and part of it isn't.

126

1       Q.  Okay.
2       A.  I'm in the process of redoing my Web site.
3       Q.  Okay.
4       A.  So the Web site that's live, my profile is, I
5   guess, the first part of this exhibit.  And then I was
6   curious as to how you got that because it wasn't live;
7   it's not out there yet.
8       Q.  It must have been the way-back machine.  Did
9   you produce it to us?
10      A.  No.
11      Q.  No?
12      A.  I mean, it's not -- I literally just finished
13  a proof on Friday.
14      Q.  Okay.
15      A.  But it looks -- it's through Find -- FindLaw,
16  and it looks like they've just linked it to my profile.
17      Q.  Okay.  And which is -- which -- the -- the
18  first four pages of the exhibit are the live --
19      A.  What's up right now.
20      Q.  Okay.  And then that's what's coming up,
21  the -- the --
22      A.  This is what's coming up; although there's
23  still some edits that need to be done to -- there's
24  about 30 pages of material on the new Web site that --
25      Q.  Okay.

127

1       A.  -- need to be edited further.
2       MR. BABCOCK:  How did we get that?
3       MS. PARKER:  Google.
4       THE WITNESS:  Okay.
5       Q.  (BY MR. BABCOCK)  We got it from Google
6       A.  There you go.
7       Q.  First thing that popped up.
8       A.  Yeah.
9       MR. PATTON:  They're after us, Johnny
10      THE WITNESS:  Yeah.
11      Q.  (BY MR. BABCOCK)  Okay.  Is there anything in
12  the last three pages, what you've got in your hands now,
13  that is inaccurate?
14      A.  No.  It's -- it's -- well, yeah, areas of
15  practice.  I'm not doing medical malpractice, nursing
16  home negligence.  That's one thing; when I read the
17  proof, I'm, like, they've got two things -- railroad
18  injuries, not doing that.
19      Q.  Okay.
20      A.  I don't even have patent infringement listed
21  as an area of practice, so I, you know --
22      Q.  That's an oversight.
23      A.  Yeah, since that's what I'm doing mostly,
24  so...
25          I mean, I can go through this more

128

1   detailed.  I remember looking at it on Friday, going --
2       Q.  Yeah.
3       A.  -- don't go live with this because this isn't
4   accurate.
5           And so that's why, when you started --
6       Q.  Yeah.
7       A.  -- reading, I knew --
8       Q.  You knew where it was coming from?
9       A.  I knew where it was coming from.
10      Q.  Could -- could you go through it with more
11  detail and tell me anything that's inaccurate?
12      A.  Sure, sure.
13          (Sotto voce discussion between Mr. Babcock
14          and Ms. Parker.)
15      A.  All right.  Everything is accurate down to
16  areas of practice.
17      Q.  (BY MR. BABCOCK)  Okay.
18      A.  I'm not doing medical malpractice; I'm not
19  doing nursing home, I'm not doing railroad injuries; not
20  doing federal tort claims.  I say that.  I've handled
21  those in the past, so I guess I could -- that could be
22  listed.
23          Bar admissions are all accurate, with the
24  exception of maybe the Sixth Circuit.  I remember
25  handling a case, but I don't know if I'm admitted there

Ward, John  8/10/2009  1:21:00 PM

129

1     Just don't...
2         I don't know if I'm still a sustained
3     member of the American Association for Justice.  And I'm
4     a fellow now with the Texas Trial Lawyers Association,
5     which just means I gave them more money.
6     Q.  It's funny how that happens.
7     A.  Yeah.
8         And everything else is accurate.
9         Then we get down to "West Practice
10    Categories."  Again, I'm -- I'm talk-- that's not what
11    I'm going to have listed there, so -- I've -- I've done
12    all those things, but I'm not going to advertise them.
13    Q.  Okay.  Very good.
14         You mentioned Bob Chiaviello earlier.
15    There's a communication between you and him on your
16    privilege log dated March 14th of '08.  The privilege is
17    said to be work product, but it's regarding this case.
18    Do you know why that document is listed as privileged?
19         MS. PEDEN:  Objection.
20    A.  I -- I'd have to look at it.  And like I said,
21    much of those communications with Mr. Fokas I thought
22    would be privileged, but they've decided what to produce
23    to you, and --
24    Q.  (BY MR. BABCOCK)  Okay.
25    A.  -- I haven't gone back and looked at it.

130

1     Q.  Is -- Mr. Chiaviello is the lawyer at
2     Fulbright --
3     A.  Chiaviello (pronunciation).
4     Q.  Chiaviello.  Sorry.  He is the lawyer at
5     Fulbright, correct?
6     A.  Correct.
7     Q.  And he's the one that told you about a
8     conversation he'd had with somebody else about you?
9     A.  Correct.
10    Q.  Okay.  Are you working with him on any case?
11    A.  Yes.
12    Q.  Are -- is he a -- an attorney on the Ward
13    versus Cisco case?
14    A.  No.
15    Q.  Okay.  Okay.
16    A.  But I'm in -- I'm in a number of cases with
17    Mr. Chiaviello and his firm.
18    Q.  Is Mr. Pridham, who you referenced earlier, an
19    attorney in the Ward versus Cisco case?
20    A.  No.
21    Q.  Is he a client?
22    A.  He's an attorney for a client -- former client
23    who I'm no longer working for.
24    Q.  Okay.  Do you recall talking to him about
25    litigation strategy regarding Ward versus Cisco?

131

1         MS. PEDEN:  Objection to form.
2     A.  I -- I can't reveal to you what we've talked
3     about without revealing attorney-client communications
4     dealing with the client that he worked for.
5     Q.  (BY MR. BABCOCK)  Okay.  Bruce Lagerman, who
6     is he -- or Lagerman (pronunciation)?
7     A.  He was a gentleman who contacted me about
8     potential representation who I did not end up working
9     for, I believe.
10    Q.  Okay.  Are your conversations with him -- do
11    you view them as privileged?
12         MS. PEDEN:  Objection to form.
13    A.  I do.  If he was seeking legal representation,
14    yes, sir.
15    Q.  (BY MR. BABCOCK)  Okay.  So anything he said
16    in that conversation would be covered by the
17    attorney-client privilege?
18         MS. PEDEN:  Objection to form.
19    A.  I don't know that anything he says in the
20    conversation with me, when he's seeking legal
21    representation, would be privileged.
22    Q.  (BY MR. BABCOCK)  Did he -- did you
23    have any discussion with Mr. Lagerman about Cisco?
24         MS. PEDEN:  Objection to form.  And,
25    also, I -- you know, I don't know -- because I don't

132

1     know specifically the documents we're talking about,
2     I -- I just want you to be very cautious --
3         THE WITNESS:  Yeah, I don't --
4         MS. PEDEN:  -- since these may be
5     attorney-client-privileged communications.
6     A.  I would need to look at the e-mails before I
7     tell you that, because I don't -- I don't recall,
8     sitting here --
9     Q.  (BY MR. BABCOCK)  Okay.
10    A.  -- saying, "Let me tell you about my case,"
11    because I -- I generally would never do that.
12    Q.  Here -- here's -- you know, here's my view of
13    it:  I certainly don't want to know -- want to know what
14    you talked to a -- even -- even a potential client
15    about.  But if -- if you talked to him about, you know,
16    Frenkel or Cisco or, you know, this thing and that's not
17    anything to do with your representation, then I do want
18    to know about that.  So --
19    A.  I don't recall having those types of
20    conversations, but I'd need to look at whatever document
21    is on the privilege log and see what -- the context and
22    why I've even produced it to -- to --
23    Q.  To them.
24    A.  -- to them.
25    Q.  Yeah.  Yeah, the only -- the only help I can

133

1 give you is it says: Bruce Lagerman, John Ward, 4/5/08,
2 e-mails, re: potential case and comment regarding Troll
3 Tracker post. Attorney client -- or AC and WP, which I
4 assume is attorney client, work product.
5    A.  I'd have to look at the document.
6    Q.  Okay.  But in any event, there's -- there's no
7 con- -- no unprivileged conversation with him that you
8 can share with us today?
9        MS. PEDEN:  Objection to form.
10   A.  Not that I can recall.
11   Q.  (BY MR. BABCOCK)  Okay.
12   A.  Again, I'm -- I'm surprised we even -- the
13 topic came up, but apparently it's in an e-mail, so --
14   Q.  I tell you, these --
15   A.  Dadgum e-mails.
16   Q.  -- these lawyers, you know --
17   A.  Yeah.
18   Q.  -- you've got to watch them all the time.
19   A.  Not mine.
20   Q.  Have you been -- ever been investigated by the
21 State Bar of Texas, to your knowledge?
22       MS. PEDEN:  Objection to form.
23       Now, let me counsel you on attorney-client
24 privilege and if -- and not to divulge any
25 attorney-client communications.

134

1    Q.  (BY MR. BABCOCK)  Well, now she's got --
2        MS. PEDEN:  Do we need to --
3    Q.  (BY MR. BABCOCK)  -- my curiosity up.
4        MS. PEDEN:  No, do you -- do you -- do we
5 need to --
6        THE WITNESS:  Yeah, let's take a break.
7    A.  We're going to --
8        MS. PEDEN:  All right.
9    A.  -- determine privilege and things like that.
10   Q.  (BY MR. BABCOCK)  Sure.
11       THE VIDEOGRAPHER:  Off the record, 1:08.
12       (Off the record 1:08-1:12.)
13       THE VIDEOGRAPHER:  Going back on record.
14 The time is 1:12.
15   Q.  (BY MR. BABCOCK)  I think before the break,
16 the question was:  Have you ever been investigated by
17 the State Bar of Texas?
18       MS. PEDEN:  And I'm going to object.  I'm
19 not going to let the witness answer as to
20 investigations.  Those are absolutely privileged.  If
21 you want to ask him if he's been disciplined by the
22 state bar, that's a different question.  But I'm going
23 to instruct him not to answer as to whether any
24 complaints have been filed.
25       MR. BABCOCK:  Well, your instruction just

135

1 changed my question a little bit, but I'll -- I'll
2 change my question.
3    A.  Okay.
4    Q.  (BY MR. BABCOCK)  Have -- have any -- any
5 complaints been filed against you with the State Bar of
6 Texas, to your knowledge?
7        MS. PEDEN:  I object and instruct the
8 witness not to answer.  Complaints are absolutely
9 privileged.  If you want to ask him if he's been
10 disciplined, he can answer that.
11   Q.  (BY MR. BABCOCK)  Do you know the identity of
12 people that have complained about you to the State Bar
13 of Texas?
14       MS. PEDEN:  Objection.
15       Instruct you not to answer.
16   Q.  (BY MR. BABCOCK)  Okay.  I -- I take it
17 whenever your lawyer says those magic words, you're not
18 going to answer.  Correct?
19   A.  When she tells me not to answer, I'm going to
20 follow her advice.
21   Q.  Okay.  So you're not going to answer about
22 whether complaints have been filed or -- or who the
23 complainants were, correct?
24   A.  That's correct.
25   Q.  Okay.  Can you tell me whether you know if the

136

1 State Bar of Texas has ever investigated you?
2        MS. PEDEN:  Objection.
3        I instruct you not to answer.
4    Q.  (BY MR. BABCOCK)  You're not going to answer
5 that?
6    A.  I'm not going to answer.
7    Q.  Okay.  Have you ever been investigated for
8 alleged criminal misconduct?
9        MS. PEDEN:  Objection.  That question is
10 vague.  What -- what do you mean, "investigated,"
11 "criminal conduct"?
12       I mean, honestly, Chip, I'm -- I'm not --
13 these questions are not relevant and they're aimed at
14 embarrassing and humiliating the witness, and we're
15 going to be very careful about what kind of questions we
16 let you delve into here.
17   Q.  (BY MR. BABCOCK)  Are you going to answer that
18 question or not?
19   A.  I'm going to follow my lawyer's advice.
20   Q.  Okay.  She objected on the basis it was vague,
21 so I want to -- want to cure that, if I can.
22   A.  Okay.
23   Q.  Do you know whether you have been the subject
24 of an investigation by a state district attorney?
25   A.  I know I have not been.

137

1    Q.   Okay.  Have you been the subject of an
2  investigation by a state grand jury?
3    A.   I have not been.
4    Q.   Okay.  Have you been the subject of an
5  investigation by any U.S. attorney or anybody in the
6  U.S. Attorney's Office?
7    A.   Not to my knowledge.
8    Q.   How about the Department of Justice?
9    A.   Not to my knowledge.
10    Q.   How about any federal grand jury?
11    A.   Not to my knowledge.
12    Q.   Okay.  Have you been the subject of any
13  investigation by any law-enforcement agency?
14        MS. PEDEN:  Objection.  Law-enforcement
15  agency?
16    Q.   (BY MR. BABCOCK)  Yeah, an agency of the state
17  or federal government that is charged with enforcing the
18  criminal laws of whatever their jurisdiction is.
19    A.   Why don't we go off the record for just a
20  minute.
21    Q.   Sure.
22    A.   Okay.
23        THE VIDEOGRAPHER:  Off the record --
24    A.   Let me talk to --
25        THE VIDEOGRAPHER:  -- 1:15.

138

1        (Off the record 1:15-1:18.)
2        THE VIDEOGRAPHER:  Back on the record,
3  1:18.
4    Q.   (BY MR. BABCOCK)  Have you ever engaged in any
5  lobbying efforts in Washington regarding patent reform
6  or the patent laws?
7        MS. PEDEN:  Objection, vague and
8  ambiguous.
9        You can --
10    Q.   (BY MR. BABCOCK)  Go -- go ahead and answer.
11    A.   Yeah.
12        MS. PEDEN:  If you can.
13    A.   Yeah.  When you say "have engaged in," have I
14  gone to D.C.?  Have I called congressmen?  You know,
15  what is it that you're wanting to know?
16    Q.   (BY MR. BABCOCK)  All right.  Good questions,
17  all of them --
18    A.   Okay.
19    Q.   -- since you're a trial -- I bet you're a
20  trial lawyer.
21        Have you ever gone to Washington, D.C. in
22  connection with patent law?
23    A.   No.
24    Q.   Have you ever called any members of Congress
25  regarding -- regarding issues of patent law?

139

1    A.   No.
2    Q.   Okay.  Have you ever been involved with any
3  organizations that have been on one side or the other of
4  the patent reform law debate?
5    A.   I think the American Association for Justice
6  got involved, and so -- I send money to them.  I don't
7  believe the Texas Trial Lawyers Association has weighed
8  in on it.  So only the AAJ.
9    Q.   Have you ever been to Washington, D.C. on
10  business?
11    A.   Yes.
12    Q.   And while in Washington, D.C., did you ever
13  meet with a member of Congress, either a senator or a
14  representative --
15    A.   Never.
16    Q.   -- or their staff?
17    A.   Never.
18    Q.   Okay.  Did you ever meet with a lobbyist,
19  somebody who -- either for AAJ or for the -- anybody
20  else who's lobbying Congress?
21    A.   Face-to-face meetings, no.
22    Q.   How about telephone meetings?
23    A.   Never on the telephone.
24    Q.   Okay.  You said that the notice of electronic
25  filing was available online.  Could you tell -- I think

140

1  you said that in your prior testimony.  Could you tell
2  me how you -- how you see that notice of electronic
3  filing?
4    A.   You log in and pull it up.
5    Q.   Have you done that yourself?
6    A.   Yes.
7    Q.   Even for matters where you're -- you're not
8  the lawyer of record?
9    A.   I don't know that.  I did -- I did it to see
10  if I could do it in this case, and I can pull it up.
11    Q.   Okay.  Did you speak to any reporters about
12  the Frenkel Troll Tracker matter before you filed this
13  lawsuit?
14    A.   The instant lawsuit, the one that's filed in
15  Arkansas --
16    Q.   Well, let me say --
17    A.   -- or or --
18    Q.   -- the Gregg County one.
19    A.   -- any one?
20        I don't believe I've ever spoken to a
21  reporter, other than to say "contact my lawyer."  And
22  that's usually through a member of my staff or an e-mail
23  inquiry.  I'll say:  No comment.
24    Q.   Okay.
25    A.   Talk to my attorney

Ward, John  8/10/2009  1:21:00 PM

141

1    Q.   Have you ever lived in Arkansas?

2    A.   No.

3    Q.   Have you ever owned property in Arkansas?

4    A.   No.

5    Q.   Do you have any family in Arkansas?

6    A.   I'm sure I've got some distant family, but no

7    one that I --

8    Q.   No Arkansas jokes, now.

9    A.   No.  My folks came through that area, so...

10   Q.   Have you ever been to Arkansas?

11   A.   Absolutely.

12   Q.   Okay.  You're not a member of any Arkansas bar

13   association?

14   A.   No.

15   Q.   Okay.  Okay.  That's all I have, Mr. Ward.

16   Thank you very much.

17   A.   All right.

18        MS. PEDEN:  Thank you.

19        THE WITNESS:  Thank you.

20        THE VIDEOGRAPHER:  Off the record, 1:21.

21   This concludes the deposition of John Ward.

22        (Deposition concluded at 1:21 p.m.)

23

24

25

143

1    I, THOMAS JOHN WARD, JR., have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4    _____

5

6    THOMAS JOHN WARD, JR.

5

6    STATE OF _____)

7    COUNTY OF _____)

8

9

10   Before me, _____, on this day

11   personally appeared THOMAS JOHN WARD, JR., known to me

12   (or proved to me under oath or through

13   _____) (description of identity card

14   or other document) to be the person whose name is

15   subscribed to the foregoing instrument and acknowledged

16   to me that they executed the same for the purposes and

17   consideration therein expressed.

18   Given under my hand and seal of office this

19   _____ day of _____, 2009.

20

21   _____

     NOTARY PUBLIC IN AND FOR

22   THE STATE OF _____

23   My Commission Expires: _____

24

25

142

1         CHANGES AND SIGNATURE

2    DEPOSITION OF THOMAS JOHN WARD, JR.

3         AUGUST 10, 2009

4    PAGE   LINE   CHANGE          REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

144

1    STATE OF TEXAS      )

2    COUNTY OF DALLAS     )

3

4         This is to certify that I, Stacy L. Jordan,

5    Certified Shorthand Reporter in and for the State of

6    Texas, certify that the foregoing deposition of THOMAS

7    JOHN WARD, JR. was reported stenographically by me at

8    the time and place indicated, said witness having been

9    placed under oath by me, and that the deposition is a

10   true record of the testimony given by the witness.

11        I further certify that I am neither counsel

12   for nor related to any party in this cause and am not

13   financially interested in its outcome.

14        Given under my hand of office on this 17th day

15   of August, 2009.

16

17   _____

     STACY L. JORDAN, CSR 7499

18   Expiration Date: 12/31/10

     Firm No. 593

19

     WEST COURT REPORTING SERVICES

20   221 Main Street

     Suite 1250

21   San Francisco, California 94105

     (800) 548-3668

22

23   Taxable cost of original charged to Defendant:

     $_____

24

     Atty:  Mr. Charles L. Babcock and Ms. Crystal J. Parker.

25   Jackson Walker, L.L.P.