# Ex. B

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ERIC M. ALBRITTON | § | |
| | § | |
| | § | |
| v. | § | |
| | § | C. A. NO. 6:08-CV-00089 |
| CISCO SYSTEMS, INC., | § | |
| RICK FRENKEL, MALLUN YEN & | § | |
| JOHN NOH | § | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE COURT:

Defendants Cisco Systems, Inc. ("Cisco"), Richard Frenkel ("Frenkel"), Mallun Yen[1]

("Yen") and John Noh[2] ("Noh"), hereby file this Motion for Summary Judgment ("Motion")

pursuant to Rule 56 of the Federal Rules of Civil Procedure and the local rules of this Court:

### I. INTRODUCTION

Eric Albritton ("Albritton") was retained as local counsel to file a lawsuit on behalf of

ESN against Cisco Systems, Inc.[3]  ESN planned to file the suit one minute after midnight on

October 16, 2007, the date ESN's patent, which was the basis for the suit, issued.[4]  The midnight

filing was designed to fix venue in the United States District Court for the Eastern District of

Texas before Cisco could file a declaratory judgment suit in some other jurisdiction.[5]

But, from ESN's standpoint, something went wrong.  The federal docket sheet for the

case and the file stamp or header affixed to the top of every page of ESN's complaint reflected a

---

[1] Subject to her Motion to Dismiss for Lack of Personal Jurisdiction, Docket #37.

[2] Subject to his Motion to Dismiss for Lack of Personal Jurisdiction, Docket #35.

[3] Exhibit 2, Albritton Deposition at 93:24-94:1.

[4] Exhibit 2, Albritton Deposition at 26:19-23, 120:4-9, 146:20-147:2.

[5] Exhibit 2, Albritton Deposition at 120:4-14, 146:20-147:2.

filing date of October 15, 2007.[6]  This was a significant problem for ESN because an October 15 filing would deprive the court of subject matter jurisdiction over the patent suit and allow Cisco's suit, filed in Connecticut on October 16, to proceed.[7]  Albritton set about to correct the problem **not** by filing a motion with the court but through private telephone conversations with several employees of the court clerk's office without notice to Cisco.[8]

Albritton, through his legal assistant Amie Mathis ("Mathis"), admittedly spoke with the office of the District Clerk for the United States Court for the Eastern District of Texas five times on the telephone in an effort to alter the docket entry and stamp on the Complaint from October 15, 2007 to October 16, 2007 in the *ESN v. Cisco* litigation.[9]  These private telephone calls were made without notice to or participation by Albritton's litigation opponent, Cisco, even though Albritton was well aware that Cisco was represented in the Eastern District by local attorneys Sam Baxter and former judge Robert Parker.[10]

Despite knowing both Baxter and Parker well (they are both on his witness disclosures to testify about his fine reputation[11]), Albritton did not inform either about his *ex parte* activities with the clerk.  As Mathis attempted to convince the clerk to alter the docket entry, Albritton told her to "stay on top of it," and after learning that her efforts had been successful, Albritton wrote a congratulatory email to her which said "You've done good.  I appreciate you."[12]  He has testified that he "fully supports" everything that she did.[13]

---

[6] Exhibit 3, Maland Deposition at 65:12-19, 127:18-24; Exhibit 1, Frenkel Declaration at ¶ 2.

[7] Exhibit 2, Albritton Deposition at 26:19-22, 146:20-147:2; Exhibit 1, Frenkel Declaration at ¶ 5.

[8] Exhibit 2, Albritton Deposition at 38:22-25; Exhibit 4, Mathis Deposition at 50:15-21, 51:24-52:3; Exhibit 5, Deposition Exhibit 14.

[9] Exhibit 4, Mathis Deposition at 50:15-25; Exhibit 3, Maland deposition at 54:7-22, 56:25-57:3.

[10] Exhibit 4, Mathis Deposition at 51:24-52:3; Exhibit 2, Albritton Deposition at 41:25-42:10.

[11] Exhibit 21, Parker Declaration Exhibit B.

[12] Exhibit 4, Mathis Deposition at 42:14-16; Exhibit 2, Albritton Deposition at 55:7-12.

[13] Exhibit 2, Albritton Deposition at 41:2-9, 147:15-17.

What Albritton "done," through Mathis, is not contested.  He persuaded the clerk, David Maland, to alter a federal docket sheet and the stamps or headers, which are electronically affixed to court records—in this case, the 74 page complaint with exhibits that ESN filed against Cisco.[14]  In District Clerk David Maland's 16 years of experience with the District Clerk's office, alteration of the docket at the request of counsel without notice to the other side had never happened before, and he now admits that the alteration should have been done by motion and that he should not have altered the docket; it "should have been a judicial determination."[15]

Indeed in the second private phone call Mathis had with the clerk's office, Deputy Clerk Shelley Moore told Mathis to do just that: "I told her to do a motion or – and she said 'No, I don't want to do a motion; I've got to have this filed the 16th.'  So I said, 'Your other option is to call the clerk of the court.'"[16]  The clerks were "reluctant" and "leery" about changing the court record.[17]  As one of them, Cynthia Paar ("Paar"), explained "I felt like the system had done what it was supposed to do and that I didn't – I didn't think that, you know, changing a file date was something that I could do without someone higher up telling me to do that."[18]  Deputy District Clerk Rachel Wilson testified that clerks are trained not to change dates.[19]

Furthermore, the docket entry of October 15, 2007 was **not** a "computer glitch" as Albritton and his counsel have maintained.  Rather, as Paar, the assistant systems manager, testified, the system did "exactly what it was supposed to do."[20]  What occurred is that Mathis started uploading the lengthy complaint fifteen to thirty minutes **before** midnight, that is,

---

[14] Exhibit 7, Provines Deposition at 13:2-14:2; Exhibit 3, Maland Deposition at 29:1-3.

[15] Exhibit 3, Maland Deposition at 9:13-17, 74:20-75:24, 78:10-15, 97:15-22, 119:9-16; 196:17-22.

[16] Exhibit 8, Moore Deposition at 24:2-7.

[17] Exhibit 3, Maland Deposition at 57:4-19, 58:11-17, 170:8-15; Exhibit 8, Moore Deposition at 11:25-12:6.

[18] Exhibit 9, Paar Deposition at 8:17-21.

[19] Exhibit 10, Wilson Deposition at 8:22-9:14.

[20] Exhibit 9, Paar Deposition at 7:19-21.

October 15, 2007, and completed it shortly after midnight so as to win a potential "race to the courthouse."[21]  As Paar explained, you will get the earlier filing date every time if you do it that way because that is how the system is designed to work.[22]

On October 15, 2007, Frenkel, who is based in San Jose, California, saw the *ESN v. Cisco* case open on the ECF system.[23]  Later that day (Pacific Time), Frenkel saw that the complaint had been electronically filed.[24]  The docket sheet, complaint and civil cover sheet all indicated that the complaint had been filed on October 15, 2007.[25]  The next day (October 16, 2007), Professor Dennis Crouch noted the ESN filing on his blog, Patently-O, pointing out that the case was filed too early.[26]  Another internet publication, IP Law 360, commented on the premature filing the same day.[27]  Following the Crouch and IP Law 360 articles, Frenkel, who in May of 2007 had started a blog (short for web log) focusing on patent litigation called the Patent Troll Tracker, decided to write his own article about ESN "jumping the gun."  Frenkel's first article was posted on October 17, 2007 at 7:00 p.m. EST.[28]  ("The Oct. 17 Article")

Then Frenkel saw that the docket changed.[29]  Now, instead of showing that the complaint was filed on the 15th, the docket indicated the 16th.[30]  So too did the stamp or header on the

---

[21] Exhibit 7, Provines Deposition at 17:11-16; Exhibit 3, Maland Deposition at 182:12-15; Exhibit 2, Albritton Deposition at 120:4-14.

[22] Exhibit 9, Paar Deposition at 13:19-14:17.

[23] Exhibit 11, Frenkel Deposition at 34:20-35:1.

[24] Exhibit 1, Frenkel Declaration at ¶ 2.

[25] Exhibit 11, Frenkel Deposition at 46:4-8; Exhibit 1, Frenkel Declaration Exhibits A, B and C.

[26] Exhibit 1, Frenkel Declaration at ¶ 4; Exhibit 1, Frenkel Declaration Exhibit D.

[27] Exhibit 1, Frenkel Declaration at ¶ 5; Exhibit 1, Frenkel Declaration Exhibit E.

[28] Exhibit 1, Frenkel Declaration at ¶¶ 2 and 7; Exhibit 1, Frenkel Declaration Exhibit F.

[29] Exhibit 11, Frenkel Deposition at 46:8-12.

[30] Exhibit 1, Frenkel Declaration at ¶ 8; Exhibit 1, Frenkel Declaration Exhibit G.

complaint.[31]   Whereas before it said "10/15/2007", now it said "10/16/2007".[32]   The complaint with the October 15th stamp on it has disappeared from the system.[33]

Frenkel then learned that ESN's local counsel had convinced the clerk to change the date and decided to write another article on October 18, 2007 regarding the *ESN v. Cisco* litigation (the "Oct. 18 Article").[34]

The Oct. 17 Article reported, as had Crouch and IP Law 360, that ESN had "jumped the gun" by suing Cisco "too early."  It provided information about the Plaintiff ESN and described a federal circuit opinion holding that a patent lawsuit could not be filed before the patent issued because "later events may not create jurisdiction where none existed at the time of filing," citing *GAF Building Materials Corp. v. Elk Corp. of Texas*, 90 F.3d 479, 483 (Fed. Cir. 1996).  None of this is challenged by Plaintiff.

The Oct. 17 Article went on to note, correctly, that Cisco had filed a declaratory judgment action in Connecticut.  Frenkel predicted the Connecticut action would stick and speculated as to why ESN filed an amended complaint which changed "absolutely nothing at all."[35]

ESN's counsel, including Albritton, are listed in the Oct. 17 Article, but he is not otherwise mentioned.

The Oct. 18 Article recounted how Frenkel had received a couple of emails pointing out that the docket had been changed, and by then it had.  Frenkel also learned, as he reported, that "ESN's local counsel called the Eastern District of Texas court clerk, and convinced him/her to

---

[31] Exhibit 11, Frenkel Deposition at 137:7-12.

[32] Exhibit 1, Frenkel Declaration Exhibit H.

[33] Exhibit 3, Maland Deposition at 114:20-115:6.  Although Frenkel did not see it (because it goes only to the plaintiff's counsel), the Notice of Electronic Filing ("NEF") (which the clerk Maland says "is the bible") states that the complaint was "entered" on the 16th but "filed" on the 15th.  (Exhibit 12, NEF).

[34] Exhibit 1, Frenkel Declaration at ¶¶ 8 and 9; Exhibit 1, Frenkel Declaration Exhibit J.

[35] This was incorrect.  The amended complaint attached a copy of the by then issued patent.  Exhibit 1, Frenkel Declaration at ¶ 5; Exhibit 1, Frenkel Declaration Exhibit F.

5

change the docket to reflect an October 16 filing date, rather than the October 15 filing date." As Frenkel correctly pointed out, "that's exactly what happened."

He also reported, again accurately, that "only the Eastern District of Texas Court Clerk could have made such a change." Frenkel also correctly noted that Albritton signed the civil cover sheet which bore the date of October 15, 2007 or had a stamp or header on it saying the case was filed on October 15, 2007. This is the only sentence where Albritton's name is mentioned in the Oct. 18 Article.

Frenkel then expressed his opinion concerning the accurately stated facts. It's "outrageous," he wrote, that the Eastern District of Texas is "wittingly or unwittingly" "conspiring" with a non-practicing entity "to try to manufacture subject matter jurisdiction."

## II. STATEMENT OF ISSUES TO BE DECIDED BY THE COURT

Defendants move for summary judgment on the following grounds and request that the Court enter judgment that:

(1)     The undisputed material facts show that the Articles are true as a matter of law or otherwise non-actionable because some of the statements are rhetoric, hyperbole or opinion or not "of and concerning" Albritton as a matter of law. The "of and concerning" element of Plaintiff's claim is constitutionally compelled;

(2)     The Plaintiff is a public figure who must demonstrate by clear and convincing evidence that the articles were published with actual malice, which is negated as a matter of law;

(3)     The Plaintiff has suffered no compensable damages as a matter of law;

(4)     Albritton's "negligence" and "gross negligence" claims fail as a matter of law as an impermissible attempt to repackage his defamation claim; and

(5)     There is no evidence that Noh or Yen published the Articles, an essential element of Plaintiff's claim, or that they did so with actual malice.

### III. STATEMENT OF UNDISPUTED MATERIAL FACTS

The following are undisputed facts for purposes of this motion only:[36]

(1)     Albritton was local counsel for ESN in the ESN Litigation.[37]

(2)     Albritton does not dispute that ESN is a non-practicing entity.[38]

(3)     Amie Mathis, Albritton's legal assistant, logged into the ECF system and began uploading the complaint on the ECF system on October 15, 2007.[39]

(4)     The ECF system is designed to provide the file date as the date when one begins uploading the complaint.[40]

(5)     The Notice of Electronic Filing of the Complaint contains the words "Filed 10/15/07."[41]

(6)     The date on the docket originally reflected a file date of October 15 for the Complaint in the ESN Litigation.[42]

(7)     The date originally stamped on the complaint in the ESN Litigation stated that it was filed on 10/15/2007.[43]

(8)     The Civil Cover Sheet on the ECF system was signed on October 15 and states "Filed 10/15/07."[44]

(9)     The Notice of Electronic Filing did not go to Cisco because Mathis chose not to electronically serve Cisco when she filed the Complaint.[45]

(10)    If the complaint was filed on October 15, 2007, the Court would have lacked subject-matter jurisdiction because the patent did not issue until October 16, 2007.[46]

---

[36] Some of these facts may be contested by Defendants at trial.

[37] Exhibit 2, Albritton Deposition at 93:24-94:1.

[38] Exhibit 2, Albritton Deposition at 100:12-13.

[39] Exhibit 2, Albritton Deposition at 122:8-10; Exhibit 3, Maland Deposition at 33:17-34:8, 38:21-39:1.

[40] Exhibit 3, Maland Deposition at 38:21-39:1; Exhibit 9, Paar Deposition at 17:3-8; Exhibit 7, Provines Deposition at 50:12-17.

[41] Exhibit 12; Exhibit 2, Albritton Deposition at 22:20-24:3.

[42] Exhibit 3, Maland Deposition at 27:8-24, 56:9-14, 125:17-22; Exhibit 1, Frenkel Declaration Exhibit B.

[43] Exhibit 2, Albritton Deposition at 26:5-11; Exhibit 3, Maland Deposition at 127:18-24; Exhibit 1, Frenkel Declaration Exhibit A.

[44] Exhibit 1, Frenkel Declaration Exhibit C; Exhibit 2, Albritton Deposition at 100:9-10.

[45] Exhibit 2, Albritton Deposition at 147:20-22; Exhibit 3, Maland Deposition at 71:18-24, 73:8-74:8.

[46] Exhibit 2, Albritton Deposition at 26:19-23.

7

(11) The date when the Complaint was filed was altered on the docket to reflect a filing date of October 16, 2007. This change occurred on October 17, 2007.[47]

(12) On October 17, the date stamped (the header) on every page of the Complaint on the ECF system was changed to reflect that it was filed on October 16, 2007.[48]

(13) The clerk's office did not make a mistake with respect to the filing,[49] and the ECF software worked exactly as it is supposed to work.[50]

(14) Mathis called the clerk's office at least five times to have the date on the docket changed to reflect a filing date of October 16.[51]

(15) One of the clerks, Shelly Moore, told Mathis to file a motion to change the date on the docket but Mathis said she did not want to file a motion.[52]

(16) Albritton was advised that Mathis was making the calls to get the docket changed, told her to "stay on top of it," "fully support[s] everything she did" "without a doubt" and thought she had "done good" and that he "appreciate you."[53]

(17) The docket entry for the complaint of October 15, 2007, has been completely erased from the ECF system.[54]

(18) Only the clerk's office could have changed the dates on the ECF system.[55]

(19) None of the clerks who spoke with Mathis or were involved had ever been asked to change the date of a complaint on the docket.[56]

(20) Albritton assisted ESN in filing an Amended Complaint, which was only changed to state that it was attaching the patent as an exhibit.[57]

---

[47] Exhibit 2, Albritton Deposition at 93:11-15; Exhibit 3, Maland Deposition at 29:1-3; Exhibit 1, Frenkel Declaration Exhibit G.

[48] Exhibit 2, Albritton Deposition at 96:14-20; Exhibit 7, Provines Deposition at 13:2-14:2; Exhibit 1, Frenkel Declaration Exhibit H.

[49] Exhibit 3, Maland Deposition at 97:7-12.

[50] Exhibit 7, Provines Deposition at 9:5-10:24; Exhibit 9, Paar Deposition at 7:7-21.

[51] Exhibit 4, Mathis Deposition at 50:15-25; Exhibit 8, Moore Deposition at 8:8-18; Exh. 3, Maland Deposition at 54:7-22; 56:25-57:3.

[52] Exhibit 8, Moore Deposition at 12:7-18, 23:21-24:7.

[53] Exhibit 2, Albritton Deposition at 41:2-9, 54:15-55:9, 147:15-17, Exhibit 5, Deposition Exhibit 14; Exhibit 4, Mathis Deposition at 42:3-16, 50:15-51:3.

[54] Exhibit 3, Maland Deposition at 114:20-115:6.

[55] Exhibit 2, Albritton Deposition at 98:21-24.

[56] Exhibit 13, Lafitte Deposition at 16:22-24; Exhibit 8, Moore Deposition at 15:2-14; Exhibit 3, Maland Deposition at 42:10-19, 196:17-22; Exhibit 10, Wilson Deposition at 9:9-12; Exhibit 14, Peggy Thompson Deposition at 20:1-4; Exhibit 7, Provines Deposition at 21:5-11.

[57] Exhibit 2, Albritton Deposition at 106:6-108:8; Exhibit 1, Frenkel Declaration at ¶ 5.

(21)   The Chief Clerk of the Eastern District of Texas now acknowledges that the changing of the date should have been done by motion and "should have been a judicial determination."[58]

(22)   The Articles were about Frenkel's perception of the abuse of the patent system by non-practicing entities in the Eastern District of Texas.[59]

(23)   Albritton has actively lobbied[60] Congress on the issue of patent reform, asking them not to pass patent reform bills, particularly on the issue of venue.[61]

(24)   Albritton was also one of the top filers of patent cases on behalf of non-practicing entities in the Eastern District of Texas from May of 2006 through December of 2007.[62]

(25)   Albritton did not consider the "banana republic" comment, which was removed from Frenkel's blog within "a day or two" to be defamatory of him.[63]

(26)   Frenkel relied on the docket entry showing the complaint was filed on 10/15/07 on the ECF system, the stamp (header) at the top of the complaint showing it was "Filed: 10/15/07" on the ECF system, the Civil Cover Sheet showing "Filed:10/15/2007" and Albritton's signature dated "10/15/07" and a report from Baker Botts that Albritton's office had called the clerk to have them change the file date from 10/15 to 10/16.[64]

(27)   Albritton is not claiming lost wages, money damages or economic damages as a result of the complained-of statements.[65]

(28)   Albritton has not lost any friends because of the articles.[66]

(29)   Albritton has no evidence that his family thinks differently of him because of the Articles.[67]

---

[58] Exhibit 3, Maland Deposition at 74:20-75:24, 78:10-15, 119:11-15.

[59] Exhibit 11, Frenkel Deposition at 12:5-13:15; Exhibit 1, Frenkel Declaration Exhibits F and J.

[60] Albritton did not call what he did "lobbying" because he is "not a lobbyist," but admits that he "was just there for these meetings, but I would broadly, you know, in fairness, say that they had to do with lobbying." (Exhibit 2, Albritton Deposition at 65:1-7). Regardless of the label, Albritton admits petitioning government with regard to patent reform.

[61] Exhibit 2, Albritton Deposition at 63:15-67:13.

[62] Defendants request that the Court take judicial notice of this, as evidenced by publicly available case information on the Electronic Filing System. It is common practice for courts to take judicial notice of filing dates on official court documents, as such records are "not subject to reasonable dispute." *In re James*, 300 B.R. 890 (W.D. Tex. 2003).

[63] Exhibit 2, Albritton Deposition at 69:9-19, 72:22-25, 73:5-7; Complaint at ¶26, Docket #17.

[64] Exhibit 1, Frenkel Declaration at ¶¶ 2, 3 and 8; Exhibit 1, Frenkel Declaration Exhibits A, B and C.

[65] Exhibit 2, Albritton Deposition at 76:21-24.

[66] Exhibit 2, Albritton Deposition at 79:23-80:9.

[67] Exhibit 2, Albritton Deposition at 83:15-19.

9

(30)    Albritton has no evidence that his reputation with the judiciary in the Eastern District of Texas has been harmed.[68]

(31)    Albritton has presented no evidence that his reputation with other lawyers has been harmed, and his witnesses have testified that they have no knowledge of his reputation being harmed.[69]

(32)    Since the articles were published, Albritton has been appointed to the Local Rules Committee by Judge Davis in the Eastern District of Texas.[70]

(33)    Albritton believes that he will make more in 2008 than he did in 2007, and he is not claiming that he has been financially harmed.[71]

## IV.  THE UNDISPUTED MATERIAL FACTS SHOW THAT THE ARTICLES ARE NOT ACTIONABLE BECAUSE THEY ARE (A) TRUE AS A MATTER OF LAW AND/OR (B) RHETORIC, HYPERBOLE OR OPINION AND/OR (C) NOT OF AND CONCERNING PLAINTIFF.

### A.    Albritton cannot prove that the articles are false as a matter of law.

Albritton bears the burden to prove that the Articles are false to prevail on his claim for defamation.  *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 768-69 (1985); *Burroughs v. FFP Operating Partners, L.P.*, 28 F.3d 543, 549 (5th Cir. 1994) ("The plaintiff has the burden of proof as to the element of falsity").  Summary judgment is proper if the undisputed material facts show that the Articles are either literally true or substantially true.  *See McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex. 1990).  Minor inaccuracies do not render an otherwise truthful article actionable.  *See Brueggemeyer v. Associated Press*, 609 F.2d 825 (5th Cir. 1980).

Whether a publication is substantially true involves a consideration of whether the complained-of statement was more damaging to the plaintiff's reputation in the mind of the average listener than a truthful statement would have been.  *McIlvain v. Jacobs*, 794 S.W.2d 14,

---

[68] Exhibit 2, Albritton Deposition at 126:13-21.

[69] Exhibit 15, Carroll Deposition at 6:14-19, 13:23-14:4; Exhibit 16, DeRieux Deposition at 9:8-10:4, 14:1-8; Exhibit 17, Brucceleri Deposition at 21:5-22:5; Exhibit 18, McAndrews Deposition at 81:5-9; Exhibit 19, Williams Deposition at 9:18-11:5, 12:8-13:1; Exhibit 20, Smith Deposition at 12:13-13:1.

[70] Exhibit 2, Albritton Deposition at 117:8-20, 126:18-21; Exhibit 3, Maland Deposition at 131:4-18.

[71] Exhibit 2, Albritton Deposition at 132:23-133:1, 134:2-3.

16 (Tex. 1990). "If the effect on the mind of the recipient would be the same, any variance between the misconduct charged and the misconduct proved should be disregarded." *Wehling v. Columbia Broad. Sys.*, 721 F.2d 506, 509 (5th Cir. 1983). Publications alleged to be defamatory must be viewed as a whole, including headlines and the general tenor and reputation of the source. *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005) ("A court reviewing legal sufficiency cannot disregard parts of a publication"). When, as here, the underlying facts as to the gist of the article are undisputed, the Court should "disregard any variance with respect to items of secondary importance and determine substantial truth as a matter of law." *See McIlvain*, 794 S.W.2d at 16; *see also Associated Press v. Boyd*, 2005 WL 1140369 (Tex. App.-Dallas, 2005, *no pet.*) (reversing denial of summary judgment and rendering take-nothing judgment where Plaintiff claimed allegation that the Plaintiff was involved in securities fraud implied criminal, rather than civil charges that had been filed.).[72]

Under Texas law, the articles are to be "construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 154 (Tex. 2004), *cert. denied*, 545 U.S. 1105 (2005). So too must this court "consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 154 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

The Plaintiff's Complaint provides little detail about what he deems to be false and defamatory beyond pleading in several places that there are "false and defamatory statements of

---

[72] A copy of the case is attached as Exhibit 6.

fact."[73]   Paragraph 17 of the complaint does allege that Albritton was falsely accused of
"conspiring" with the clerk "to alter documents to try to manufacture subject matter jurisdiction
where none existed." This appears to be the gravaman of his claim.

But to be sure, Cisco asked Plaintiff to respond to five interrogatories seeking to
determine whether there were any additional defamatory comments, but the Plaintiff objected
and refused to answer beyond pointing to the two articles themselves.[74]  Several meet and confer
sessions were held, and Plaintiff continued to refuse to answer the interrogatories, necessitating
the filing of a motion to compel, which is pending.[75]

The gist of the Articles is that local counsel for ESN, upon learning that the official court
documents indicated that ESN had filed its complaint on October 15, 2007, which would deprive
ESN of subject-matter jurisdiction on its patent infringement claim, contacted the clerk's office
*ex parte* and had them change the official court documents to reflect a filing date of October 16,
2007, instead of filing a motion with the Court.

None of these facts are in dispute.  Albritton admits that the federal court record on the
docket and that the complaint itself originally indicated that the case was filed on October 15,
2007 and was changed to indicate that the case was filed on October 16, 2007.[76]

He also admits that if the complaint had been filed on October 15, the Court would have
lacked subject-matter jurisdiction:

> Q:   And the filing date was important because if you—if it was, in fact, filed on the
> 15th, then the Court would lack subject matter jurisdiction since the patent didn't
> issue until the 16th, right?
>
> A:   That's correct.[77]

---

[73] Complaint at ¶¶ 27, 28 and 32, Docket #17.
[74] Exhibit 21, Parker Declaration Exhibit A.
[75] Docket # 88.
[76] Exhibit 2, Albritton Deposition at 26:5-11, 93:11-15, 96:14-20.

Albritton admits that he did not make a motion to the Court to correct the docket so that Cisco would have an opportunity to challenge the motion.[78] It is also undisputed that Albritton's legal assistant called the clerk's office five times to have the date of the official court records changed to reflect a filing date of October 16.[79] It is further undisputed that Albritton was advised that Mathis was making the calls, told her to "stay on top of it," "fully support[s] everything she did" "without a doubt" and thought she had "done good."[80] It is further undisputed that only the clerk could have changed the docket.[81] Because the substance of the Articles is true, the Articles are not defamatory as a matter of law, and summary judgment should be granted. *See Wehling v. Columbia Broad. Sys.*, 721 F.2d 506, 509 (5th Cir. 1983) (granting summary judgment because "the substance of the CBS report was true"); *Brueggemeyer v. Associated Press*, 609 F.2d 825, 826 (5th Cir. 1980) (holding that, where a judgment required that the plaintiff "restore all money obtained by deception, either by settling consumers' claims or by referring unsettled or rejected claims to specially appointed masters," and the Attorney General's office informed the defendant that known claims averaged $500 each and that the plaintiff would be required to mail 1,400 letters to consumers, the defendant's report that the plaintiff's liability could total $700,000 to 1,400 customers was substantially true, and therefore not actionable).

---

[77] Exhibit 2, Albritton Deposition at 26:19-23.

[78] Exhibit 2, Albritton Deposition at 38:22-25.

[79] Exhibit 4, Mathis Deposition at 50:15-25; Exhibit 3, Maland Deposition at 54:7-22, 56:25-57:3.

[80] Exhibit 2, Albritton Deposition at 41:2-9, 55:8-12, 147:15-17; Exhibit 4, Mathis Deposition at 42:3-16, 50:15-51:3.

[81] Exhibit 2, Albritton Deposition at 98:20-24; Exhibit 22, Faye Thompson Deposition at 10:7-15.

**B.**    **The word "conspiracy" does not make the articles false or defamatory and/or is non-actionable rhetoric, hyperbole or opinion.**

Albritton argues that the Oct. 18 Article is defamatory because, simply by using the word "conspiracy," it accused him of a crime.[82]  The United States Supreme Court has rejected this argument under similar circumstances.  *See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264 (1973).  In *Old Dominion*, the Supreme Court reversed a libel judgment against a union newsletter for calling the plaintiff a "scab," which the article defined as being, among other things, a "traitor."  *Id.*  The Court determined that the use of the epithet "scab" could not be the basis of a state libel judgment because "one of the generally accepted definitions of 'scab' is one who refuses to join a union […] and it is undisputed that the appellees had in fact refused to join the Branch."  *Id.* at 282-83 (citing to Merriam Webster's Dictionary).  Similarly, in this case, one of the definitions of the word "conspire" has nothing to do with the commission of a crime.  Instead, as Merriam Webster's Dictionary states, "conspire" means "to act in harmony toward a common end" (see http://www.merriam-webster.com/dictionary/conspiring (last visited 11/25/08)).

---

[82] The Complaint also alleges that the "banana republic" comment is defamatory.  (Complaint at ¶ 17, Docket #17).  One of the constitutionally compelled requirements of a claim for defamation is that the defamatory statement be "of and concerning" the plaintiff.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 288 (1964).  The plaintiff must produce evidence showing that "the attack was read as specifically directed at the plaintiff."  *Rosenblatt v. Baer*, 383 U.S. 75, 81 (1966).  Albritton cannot show that the "banana republic" comment was directed to him and has even admitted that the Banana Republic comment was not about him.  When asked at his deposition whether he contended that "that phrase is defamatory of you?"  His answer was "No" although he added a rambling explanation.  (Exhibit 2, Albritton Deposition at 69:17-19).  Albritton later testified the banana republic statement was taken out of the Article "within a day or so," and thus "Cisco thought it was okay to say ugly things about Eric Albritton, but not about the judges."  (Exhibit 2, Albritton Deposition at 72:18-73:7).  Albritton's complaint unequivocally states that the "banana republic" comment refers to the court, stating that Frenkel "referred to the United States District Court for the Eastern District of Texas as the 'Banana Republic of East Texas.'"  (Complaint at ¶26, Docket #17).  Accordingly, Albritton cannot establish that the "banana republic" comment was "of and concerning" him, and summary judgment with respect to that portion of the Article should be granted.

Even if the phrase referred to Albritton, the term "banana republic" is classic rhetorical hyperbole or opinion and therefore not actionable.  Like rhetoric and hyperbole, statements of opinion that do not contain any provable false connotation are protected under the U.S. Constitution and are not actionable.  *Milkovich*, 497 U.S. 1 at 20.  "Opinions and beliefs reside in an inner sphere of human personality and subjectivity that lies beyond the reach of the law and is not subject to its sanctions."  *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986).  The term "banana republic" is no more than an opinion and is not provable as false.  As such, it is not actionable.  *See id.*

14

Reading the Oct. 18 Article in context makes it clear that, to the extent the word "conspiracy" was even used in a literal sense, it was used in this sense. Albritton cannot simply pick and choose words or phrases from the Articles to argue that "conspire" was used to imply a federal crime. *Musser v. Smith Protective Servs., Inc.,* 723 S.W.2d 653, 655 (Tex. 1987). As a whole, the gist of the Oct. 18 Article is that Albritton's office "worked in harmony toward the common end" of changing the date of the complaint in the *ESN* lawsuit from October 15, 2007 to October 16, 2007. Although Frenkel obviously felt that this was improper (and others such as the clerks agree with this opinion), he never accused Albritton of a crime. Since these facts are not in dispute, the Articles are not defamatory as a matter of law. *See Old Dominion*, 418 U.S. at 282-283; *Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6 (1970).

Albritton's allegation that the use of the word "conspiracy" or "conspiring" makes the Articles defamatory also fails as a matter of law because the words are used as rhetorical hyperbole. Contrary to Albritton's argument that the words imply that Albritton was involved in a crime, the words, taken in context, are clearly used as an epithet concerning a very heated political debate about patent reform in the Eastern District of Texas.

The Oct. 18 Article states that "there are a couple of flaws in this conspiracy" and that "it's outrageous that the Eastern District of Texas is apparently, wittingly or unwittingly, conspiring with a non-practicing entity to try to manufacture subject matter jurisdiction." The United States Supreme Court has held on at least two occasions that such epithets are not actionable. In *Greenbelt*, the Court held under similar circumstances that the use of the word "blackmail" was not actionable because it was rhetorical hyperbole. *See Greenbelt* at 398 U.S. 6, 13 ("as a matter of constitutional law, the word 'blackmail' in these circumstances was not slander when spoken, and was not libel when reported in the Greenbelt News Review."). The

Court noted that readers of the article would have known that the use of the word "blackmail," even where it was used as a subheading in the article, was no more than rhetorical hyperbole used by those who thought the plaintiff's negotiating position was extremely unreasonable. *Id.* at 14 (noting that "[t]o permit the infliction of financial liability upon the petitioners for publishing these two news articles would subvert the most fundamental meaning of a free press.")

Similarly, the United States Supreme Court has reversed a libel judgment against a union newsletter for calling the plaintiff a "scab," which it defined as being, among other things, a "traitor." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264 (1973). The Court held even though "traitor" could mean someone guilty of treason, the use of the word was not actionable because the words "were obviously used here in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization." *Id.* at 284. Therefore, the Court held, it was "impossible to believe that any reader of the *Carrier's Corner* would have understood the newsletter to be charging the appellees with committing the criminal offense of treason." *Id.* at 285; *see also Maynard v. Daily Gazette Co.*, 191 W. Va. 601, 607, 447 S.E.2d 293, 299 (W. Va. 1994) (holding that an editorial stating that a college athletic director was part of "the corruption of college athletics" did not actually accuse the director of corruption and thus was not actionable).

Like the use of the words "blackmail" in *Greenbelt* and "scab" in *Old Dominion*, the use of word "conspiracy" was merely used in a loose, figurative sense as an expression of something Frenkel thought was unfair and therefore is non-actionable rhetorical hyperbole. In fact, Frenkel made it clear that he was not accusing Albritton of a crime when he stated that the Eastern District of Texas was "wittingly or unwittingly, conspiring with a non-practicing entity to try to manufacture subject matter jurisdiction." There can be no "unwitting" criminal conspiracies.

16

*U.S. v. Ragsdale*, 426 F.3d 765, 778 n. 6 (5th Cir. 2005) ("the mens rea for [a criminal] conspiracy requires that the defendant willfully committed an act, or acts, forbidden by the underlying statute"). In a later post, Frenkel made his intention even more clear when he wrote "to the extent the word 'altered' implied that anyone did anything *illegal*, that was not my intent."[83]   To the contrary, taken in context, it is clear that the word was used as rhetorical hyperbole and could not reasonably be interpreted as accusing Albritton of an actual crime. Such rhetorical hyperbole is constitutionally protected to provide "assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).

Albritton, his lead counsel in the ESN case Peter McAndrews, and his trial counsel in this case Nick Patton certainly recognize that sharp language and name calling are protected speech. Otherwise, Patton would not have called Frenkel a "coward" and Cisco a "bully" in an interview with the Texarkana Gazette about this case.[84]   Nor would McAndrews have referred to Frenkel as a "punk" in an email exchange with Albritton and in his deposition.[85]   Nor would Albritton have called Frenkel "lots of ugly names" as he admitted in his deposition[86]   Where insults occur in discourse about political issues such as the ones at issue in this case, courts are particularly likely to dismiss them as nonactionable rhetorical hyperbole or opinion because they will probably be understood that way and to insure protection of vigorous political speech. Robert D. Sack, Sack on Defamation § 2.4.7, p. 2-47 (3d ed. 2005); *See also Koch v. Goldway*,

---

[83] Exhibit 1, Frenkel Declaration at Exhibit L.

[84] Exhibit 23, *Texarkana, Longview lawyers file lawsuit against California blogger, saying he libeled them*, Texarkana Gazette, June 29, 2008.

[85] Exhibit 18, McAndrews Deposition at 60:10-61:11; Exhibit 24, Deposition Exhibit 37.

[86] Exhibit 2, Albritton Deposition at 59:15-25.

817 F.2d 507, 509 (9th Cir.1987) ("[c]ontext can be determinative that a statement is opinion and not fact," especially when "the surrounding circumstances of a statement are those of a heated political debate, where certain remarks are necessarily understood as ridicule or vituperation, or both, but not as descriptive of factual matters."). Therefore, summary judgment is appropriate.

## V. ALBRITTON IS A PUBLIC FIGURE WHO MUST DEMONSTRATE BY CLEAR AND CONVINCING EVIDENCE THAT THE ARTICLES WERE PUBLISHED WITH ACTUAL MALICE, WHICH IS NEGATED AS A MATTER OF LAW.

### A.  <u>Albritton is a limited-purpose public figure.</u>

The Court should grant summary judgment that Albritton is a limited-purpose public figure. Whether an individual is a public figure is a matter of law for the court. *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433 (5th Cir. 1987). The Fifth Circuit has adopted a three-part test to determine whether an individual is a limited-purpose public figure: (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *Id.* at 433-34. The Court should grant summary judgment because each of these elements is satisfied as a matter of law.

### 1.  <u>The controversy at issue is a public issue.</u>

The first prong of the *Trotter* test is met in this case because the controversy at issue is one that is public in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution. The Articles at issue in this lawsuit addressed the public controversy regarding <u>the abuse of the patent system by non-</u>

18

practicing entities in the Eastern District of Texas,[87] including the issue of non-practicing entities attempting to maintain venue in the Eastern District of Texas because of advantages of maintaining their case there.

The evidence in this case clearly shows that this was a public controversy, as it was a topic of widespread public debate. *See id.* at 434 holding that the case was a public controversy because it "captured the attention of a diverse and broadly-based audience" and citing to numerous news articles about the issue.

Justice Scalia, during oral argument in *eBay v. MercExchange*,[88] (a patent case) referred to Marshall, Texas (which is in the Eastern District of Texas) as a "renegade jurisdiction" and noted that "maybe we should remedy that problem."[89]

This, along with other concerns about the patent law system has led to proposed legislation to deal with abuses of the patent law system. On September 28, 2006, the U.S. House of Representatives passed House Resolution 5418, which, among other things, requires tracking of any "evidence indicating that litigants select certain of the [designated] judicial districts […] in an attempt to ensure a given outcome."[90]

Numerous law review articles have also discussed this public issue. *See* Yan Leychkis, *Of Fire Ants and Claim Construction: An Empirical Study of the Meteoric Rise of the Eastern District of Texas as a Preeminent Forum for Patent Litigation*, 9 Yale J. L. & Tech. 193 (2007) (discussing forum shopping by patentee plaintiffs in the Eastern District of Texas and proposing legislative solutions "to the problem of forum shopping gone awry" and stating that "the judges

---

[87] Albritton admits that the Articles were "focused on the Eastern District of Texas." Complaint at ¶ 30, Docket #17.
[88] Transcript of Oral Argument at 10-11, *Ebay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (Mar. 29, 2006).
[89] Exhibit 25.
[90] Exhibit 26.

are actually helping to institutionalize the district's pro-patentee bias");[91] David A. Fitzgerald II, *Saving Alternative Dispute Resolution in Patent Law: Counteracting the Effects of the Patent Troll Revolution*, OHIO ST. J. ON DISP. RES. (2008) (discussing exploitation of the patent system by "patent trolls" and proposing legislative solutions);[92] Stephen Schreiner and Andrew J. Baca, *Status of Intellectual Property Reform Legislation in the Congress and How It May Affect How Banks Acquire and Enforce Patents*, THE BANKING LAW JOURNAL 920 (Nov./Dec. ed. 2007), *available at* GoodwinProctor.com (discussing patent reform over the past five years "due in large part to the chorus of voices demanding that Congress reform the patent laws to eliminate perceived abuses and failures of the current patent system," particularly forum shopping in the Eastern District of Texas).[93]

The subject has been the focus of numerous news articles, including the following: *Eastern District Rocket Docket Decelerates in Marshall Division*, TEXAS LAWYER, Aug. 18, 2008 at 20 (noting that the "Eastern District of Texas had the highest number of patent suits filed in the United States in the last fiscal year, which ended Sept. 30, 2007" and that "the U.S. Congress has tried in its last three sessions to pass legislation that included provisions to limit forum-shopping by plaintiffs."),[94] *'Rocket Dockets' Gaining on Popular E. Texas Court*, IP LAW 360, Feb. 20, 2008, *available at* http://ip.law360.com (stating that "the Eastern District of Texas has also become exceedingly popular [for patent cases] because it is perceived as pro-plaintiff," but stating that "if the Patent Reform Act becomes law, it could change things dramatically");[95] *East Texas Now Busiest Patent Litigation Venue*, The NATIONAL LAW JOURNAL, Nov. 12, 2007,

---

[91] Exhibit 32.
[92] Exhibit 40.
[93] Exhibit 41.
[94] Exhibit 27.
[95] Exhibit 28.

at 6, *available at* www.nlj.com (stating that the Eastern District of Texas is now the busiest patent litigation venue in the county for "reasons that are controversial," but that "patent reform legislation now being considered in Congress would change what is now viewed as patent forum shopping");[96] *Taming Texas*, THE AMERICAN LAWYER, Mar. 1, 2008 at 1, *available at* www.law.com (stating that "in the first years of the East Texas patent boom, trial results were starkly one-sided"—that is "plaintiffs won nearly 90 percent of the district's patent trials" but that "a bill already passed by the House of Representatives and now before the Senate is intended to dry up the patent wellspring in East Texas");[97] *Patent Attorneys Sue Cisco and Blogging In-House Lawyer for Defamation*, LAW.COM, March 17, 2008, *available at* www.uk.us.biz.yahoo.com/law (stating that "The Eastern District is a nationally known forum for patent litigation because of rules that allow suits to progress speedily through the court system");[98] *Eastern District of Texas Applies KSR v. Teleflex in Invalidating Patent*, VINSON & ELKINS FIRM NEWS, Aug. 31, 2007, *available at* www.vinson-elkins.com (stating that "the Eastern District of Texas, especially over the past year, has been criticized by many who believe that defendants are at an extreme disadvantage in patent infringement cases filed there.");[99] *Small Town Attracts High Stakes IP Case*, INSIDE COUNSEL, July 1, 2006, *available at* www.insidecounsel.com (stating that Marshall is appealing to plaintiffs because it is a "rocket docket," is "plaintiff friendly," and the judges have firm guidelines to shorten IP trials);[100] *IP Plaintiffs Flocking to Small Town of Marshall in Eastern Texas*, DAILY RECORD, KANSAS CITY DAILY NEWS-PRESS, and LAWYERS USA, June 6, 2006, *available at* www.findarticles.com

---

[96] Exhibit 29.
[97] Exhibit 30.
[98] Exhibit 31.
[99] Exhibit 33.
[100] Exhibit 34.

(discussing the rise of patent litigation in the Eastern District of Texas and proposed reform to address venue issues);[101] *Will the 5th Circuit Ground an Eastern District of Texas Rocket Docket?*, LAW.COM, May 23, 2008, *available at* www.biz.yahoo.com/law (noting the Eastern District of Texas's reputation for being "pro-plaintiff" and discussing case law that could affect venue);[102] *Volkswagen Lawyers Raise Challenge to Texas's 'Rocket Docket,'* THE WALL STREET JOURNAL BLOGS, *available at* www.blogs.wsj.com (discussing case law that could affect venue in the "plaintiff-friendly district" of the Eastern District of Texas);[103] *A Litigation Boom*, AUSTIN-AMERICAN STATESMAN, May 22, 2008 *available at* www.statesman.com (discussing that the Eastern District of Texas has "emerged as an unlikely venue for high stakes lawsuits over patent rights").[104]

Michael Smith, who is an attorney who practices in the Eastern District of Texas, has served as the chair of the Eastern District Rules Committee,[105] has served as president of the Eastern District Bench Bar Association,[106] and maintains a blog concerning practice in the Eastern District of Texas,[107] acknowledges that there is a public controversy about "patent venue specifically focusing on the Eastern District of Texas" and that he has blogged about the issue himself.[108]  He also acknowledges that there is public discussion of legislative proposals that would address venue for patent cases in the Eastern District of Texas.[109]

---

[101] Exhibit 35.
[102] Exhibit 36.
[103] Exhibit 37.
[104] Exhibit 38.
[105] Exhibit 20, Smith Deposition at 48:15-18
[106] Exhibit 20, Smith Deposition at 9:17-19.
[107] Exhibit 20, Smith Deposition at 19:19-22.
[108] Exhibit 20, Smith Deposition at 37:12-17.
[109] Exhibit 20, Smith Deposition at 42:4-43:4.

A controversy that is reported so widely in the media and that garners attention from the government is an issue of public concern. *See Trotter*, 818 F.2d at 435. The fact that some of these articles were published after the Articles at issue does not diminish their importance in this determination; as in *Trotter,* the Articles "did not cause the later press coverage of the [public issue], the [public issue] itself did." *See id.* at 434.

2.    Albritton had more than a trivial or tangential role in the controversy.

Albritton's role in the public debate over the abuse of the patent system by non-practicing entities in the Eastern District of Texas was certainly more than trivial or tangential. In fact, Albritton thrust himself into this public controversy in several respects. First, he lobbied Congress against patent reform aimed at preventing the very abuses alleged by Frenkel.[110]  He admits that he went to Washington D.C. and met with Senator Durbin, Senator Johnson, Senator Cornyn, Senator Boxer or their staff regarding the patent reform effort. (*Id.*) Second, Albritton held an important role in this controversy because he was one of the top filers of patent cases on behalf of non-practicing entities in the Eastern District of Texas.[111]  An individual this engrained in a public issue has more than a trivial or tangential role in the controversy even where he does not actively engage the public's attention. *Trotter*, 818 F.2d at 435-436 ("an individual cannot erase his public-figure status by limiting public comment and maintaining a low public profile.") It is sufficient that Albritton "voluntarily engaged in a course that was bound to invite attention and comment." *Rosanova v. Playboy Enters., Inc.,* 580 F.2d 859, 861 (5th Cir. 1978).

3.    The Articles are germane to Albritton's participation in the controversy.

---

[110] Exhibit 2, Albritton Deposition at 63:15-68:6.

[111] Defendants request that the Court take judicial notice of this, as evidenced by publicly available case information from May of 2006 through December of 2007 on the Electronic Filing System. It is common practice for courts to take judicial notice of filing dates on official court documents, as such records are "not subject to reasonable dispute." *In re James*, 300 B.R. 890 (W.D. Tex. 2003).

23

The third requirement of the *Trotter* test is also met because the Articles are germane to Albritton's participation in the public controversy.  In alleging that Albritton convinced the clerk of the Eastern District of Texas to alter a filing date to create subject-matter jurisdiction, Frenkel was describing Albritton's role in the controversy.  The article addresses how Albritton convinced the clerk to change the date of ESN's pleading so that the case would not be transferred to a different venue; Frenkel was describing Albritton's abuse of the patent system in the Eastern District of Texas to maintain venue in the Eastern District of Texas.  This satisfies the third element of the *Trotter* test.  *See Trotter* at 436 (holding that the third element was satisfied because "[i]n alleging that Trotter was responsible for the anti-union violence, Anderson was also describing Trotter's role in the controversy at Embotelladora.")

## B.    Actual malice is negated as a matter of law.

When a limited-purpose public figure sues a defendant concerning a statement that involves a public issue, the defendant must prove by clear and convincing evidence that the defendant published the statement with actual malice.  *Gertz. v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex. 1998).  The actual malice standard does not mean ill will or spite, but rather means that the defendant published the statement "with knowledge that it was false or with reckless disregard of whether it was false or not."  *New York Times,* 376 U.S. at 279-280 (holding that statements that the defendant "don't like you" and "had it out" for the plaintiff were not evidence of actual malice); *see also Church of Scientology of Calif. v. Cazares*, 638 F.2d 1272, 1286 (5th Cir. 1981) (holding that "while most of the articles and cartoons can fairly be described as slanted, mean, vicious, and substantially below the level of objectivity that one would expect of responsible journalism, there is no evidence called to our attention which clearly and convincingly demonstrates that a single one of

24

the articles was a false statement of fact made with actual malice as defined in the New York Times case"); *Freedom Newspapers of Texas v. Cantu*, 168 S.W.3d 847, 858 (Tex. 2005).  To show "reckless disregard", the plaintiff must prove that the publisher "entertained serious doubts as to the truth of his publication."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 (Tex. 2005).  "An understandable misinterpretation of ambiguous facts does not show actual malice."  *Freedom Newspapers of Texas v. Cantu*, 168 S.W.3d 847, 855 (Tex. 2005) (citations omitted).  Even if the presentation of facts is misleading, actual malice cannot be shown unless the plaintiff brings forth evidence that the publisher knew or strongly suspected that the article was misleading at the time of publication.  When the defendant's words lend themselves to more than one interpretation, the plaintiff bears the burden of showing that the defendant either knew that the words would convey a defamatory message or had reckless disregard for their effect.  *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 162 (Tex. 2004), *cert. denied*, 545 U.S. 1105 (2005).  The publications must be viewed as a whole, taking into account all accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself.  *See City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005) (legal sufficiency "cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict").

The actual malice standard's purpose is to protect innocent but erroneous speech on public issues, while deterring "calculated falsehoods."  *Garrison v. Louisiana*, 379 U.S. 64, 75, (1964).  The purpose of this standard is to protect the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  *See New York Times*, 376 U.S. at 270.

25

A libel defendant is entitled to summary judgment if it can negate actual malice as a matter of law, which can be accomplished by presenting evidence that he or she did not publish the allegedly defamatory statement with actual knowledge of any falsity or with reckless disregard for the truth. *WFAA-TV*, 978 S.W.2d at 574.

In this case, Frenkel's testimony negates actual malice as a matter of law, and therefore summary judgment is appropriate. *See id.* at 574. Frenkel testified that he investigated the truth of the allegations in the Articles and found them to be true. He reviewed the docket sheet, complaint and civil cover sheet, all federal documents posted on a federal website, all of which indicated that the case was "filed" on October 15, 2007.[112] He also viewed the docket sheet, complaint, and civil cover sheet that had been altered to reflect a filing date of October 16, 2007.[113] [114] In addition, he researched case law regarding subject-matter jurisdiction, which he quoted in the Oct. 17 Article. He was also advised by Baker Botts, a trusted and respected law firm, that Albritton's office called the court clerk to have the docket changed to October 16, 2007.[115] Frenkel has further testified that he believed his reports accurately reflected the facts surrounding both Albritton's filing of the complaint in the ESN Lawsuit and Albritton's subsequent efforts to have the date changed in order to create subject-matter jurisdiction.[116] This alone is sufficient to negate actual malice. *See id.* at 574 (holding that "Williams' beliefs and the basis for them was sufficient for WFAA to meet its burden of negating actual malice"); *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 (Tex. 2005) (holding that summary judgment was proper

---

[112] Exhibit 1, Frenkel Declaration Exhibits A, B and C; Exhibit 1, Frenkel Declaration at ¶¶ 2 and 3; Exhibit 11, Frenkel Deposition at 46:4-12

[113] It is common practice for courts to take judicial notice of filing dates on official court documents, as such records are "not subject to reasonable dispute." *In re James*, 300 B.R. 890 (W.D. Tex. 2003). Therefore, it cannot be said that Frenkel acted with malice in relying on those same records.

[114] Exhibit 1, Frenkel Declaration Exhibit F; Exhibit 1, Frenkel Declaration at ¶ 5.

[115] Exhibit 1, Frenkel Declaration at ¶ 8.

[116] Exhibit 1, Frenkel Declaration at ¶ 12.

where the defendants' affidavit, "which stated he believed the article was true and accurate based on his extensive research" negated actual malice and shifted the burden to the plaintiffs to raise a fact issue); *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex. 1989) (holding that summary judgment was proper where the plaintiff accused the defendant of publishing things, which, if true, would be official misconduct, where the defendant submitted an affidavit stating that they entertained no doubts about the truth of the statements and the plaintiff produced no proof of malice).

Accordingly, Albritton bears the burden of raising a fact issue to avoid summary judgment. *Freedom Newspapers of Texas v. Cantu*, 168 S.W.3d 847, 853 (Tex.2005) (affidavits from publisher and copy desk editor averring that neither had knowledge of inaccuracies or any reason to doubt accuracy of articles was some evidence that newspaper acted without malice and shifted burden to plaintiff to produce contrary evidence to avoid summary judgment); *Hearst*, 159 S.W.3d at 637. Albritton cannot meet his burden to raise a fact issue concerning actual malice.

## VI. ALBRITTON HAS SUFFERED NO COMPENSABLE DAMAGES AS A MATTER OF LAW.

Albritton states in his disclosures that he seeks "only an appropriate award of damages for his mental anguish and punitive damages."[117] *See Super Future Equities, Inc. v. Wells Fargo Bank Minnesota, N.A.*, 2007 WL 4410370 (N.D. Tex. 2007)[118] (holding it was proper to exclude damages evidence from consideration in a motion for summary judgment pursuant to Rule 37(c)(1) of the FEDERAL RULES OF CIVIL PROCEDURE where the party seeking to introduce new evidence had failed to provide a computation of damages pursuant to Rule 26(a)(1)(C) because the other side "relied on the lack of damages evidence in preparing their motions for summary

---

[117] Exhibit 21, Parker Declaration Exhibit C.
[118] A copy of the case is attached as Exhibit 39.

judgment").    Accordingly, Albritton should be limited to recovery of mental anguish and punitive damages.

However, Albritton has presented no evidence of mental anguish. Therefore, Albritton is not entitled to any damages. *See Carey v. Piphus*, 435 U.S. 247, 248 (1978) (holding that to recover more than nominal damages for emotional harm, there must be "proof of actual injury"); *Vadie v. Mississippi State Univ.*, 218 F.3d 365, 376 (5th Cir. 2000) (there must be a "specific, discernable injury to the claimant's emotional state, proven with evidence of the nature and extent of the harm, and hurt feelings, anger and frustration are part of life and do not support a mental anguish award") (citations omitted); *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 445 (Tex. 1995) (holding that the plaintiff's statements that he was "hot" and "very disturbed" as a result of the flooding of their home, which "disrupted their lives temporarily," was not sufficient to support the jury's award for mental anguish); *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) (holding that the plaintiff's concerns about future medical expenses was not sufficient to support an award of mental anguish damages and requiring "evidence to justify the amount awarded"); *Brady v. Fort Bend County*, 145 F.3d 691, 719 (5th Cir. 1998) *cert. denied*, 525 U.S. 1105 (1999) (holding that the Plaintiff's testimony, consisting of references to "spending too much time on the couch," "not accepting it mentally," being "highly upset," and experiencing "the worse thing that has ever happened to me" "hardly qualifies as evidence of demonstrable emotional distress" and "is too vague and conclusory to support mental anguish damages"); *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 939 (5th Cir. 1996) (holding that the plaintiff's testimony that he felt "frustrated" and "real bad" for being judged by the color of his skin, that work was "unbearable" and "tearing his self-esteem down," that he felt "hurt," "angry," and "paranoid" for being called a "porch monkey" or a "nigger" was insufficient to

28

support anything more than nominal damages, noting that there was no corroborating evidence and that the plaintiff obtained employment at a higher rate). "Hurt feelings, anger and frustration are part of life" and do not justify an award of mental anguish. *See id.* at 940.

Albritton also cannot recover punitive damages because he has not shown actual malice. *See* Section V, *infra. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) (holding that punitive damages are not permitted upon less than a showing of actual malice). Moreover, because there is not sufficient evidence of actual damages, punitive damages cannot be recovered. *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).

## VII. ALBRITTON'S "NEGLIGENCE" AND "GROSS NEGLIGENCE" CLAIMS FAIL AS A MATTER OF LAW.

Albritton's negligence claim fails as a matter of law because it is an effort to repackage his defamation claim and Defendants had no legally cognizable duty to Albritton. Under Texas law, a plaintiff may not couch his claim for defamation as an additional claim for negligence. *See Oliphint v. Richards*, 167 S.W.3d 513, 517 (Tex. App.—Houston [14th Dist.] 2005, *pet. denied*) (holding that summary judgment was appropriate with respect to a negligence claim because where "a defamation claim not involving a public figure contains a negligence liability standard, that is a component of the defamation claim itself, not a separate claim.") Texas law does not permit a plaintiff to fracture one cause of action into multiple claims. *See Tacon Mech. Contractors, Inc. v. Aetna Cas. & Sur. Co.*, 65 F.3d 486, 488 (5th Cir. 1995) ("Under Texas law, an attempt such as this to fracture one cause of action into three or four by massaging the labels and language is impermissible.")

Instead, to overcome a motion for summary judgment on a negligence claim, the plaintiff must at least identify a cognizable legal duty to the defendant. *See Graff v. Beard*, 858 S.W.2d 918, 919 (Tex. 1993) (recognizing that it is "fundamental" that the existence of a legally

29

cognizable duty is a prerequisite to a negligence claim). Whether a legal duty exists is a matter of law. *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990). Because Albritton has failed to plead or allege any legally cognizable duty, the Court should grant summary judgment with respect to Albritton's negligence claim.

## VIII. THERE IS NO EVIDENCE THAT YEN OR NOH (1) PUBLISHED THE ARTICLES OR (2) DID SO WITH ACTUAL MALICE.

Publication is an essential element of a claim for defamation. *Mims v. Metropolitan Life Ins. Co.,* 200 F.2d 800, 801 (5th Cir. 1952). There is no evidence in this case that Yen or Noh published the articles at issue. Yen and Noh have sworn that they did not write, edit, review or circulate the articles at issue.[119] Albritton also has no evidence of actual malice on the part of Noh and Yen, who have both sworn that they did not even review or edit the Articles before they were published.[120] Therefore, summary judgment is appropriate with respect to both Yen and Noh.

For the reasons stated in this Motion, Defendants respectfully request that the Court grant this Motion for Summary Judgment.

---

[119] Declaration of John Noh, Docket #35, Attachment #1; Declaration of Mallun Yen, Docket #37, Attachment #1, Exhibit A.

[120] Declaration of John Noh, Docket #35, Attachment #1; Declaration of Mallun Yen, Docket #37, Attachment #1, Exhibit A.

Respectfully submitted,

JACKSON WALKER L.L.P.

By: /s/ Charles L. Babcock
      Charles L. Babcock
      Federal Bar No.: 10982
      Email: cbabcock@jw.com
      Crystal J. Parker
      Federal Bar No.: 621142
      Email: cparker@jw.com
      1401 McKinney
      Suite 1900
      Houston, Texas 77010
      (713) 752-4200
      (713) 752-4221 – Fax

ATTORNEYS FOR DEFENDANT
CISCO SYSTEMS, INC.

## CERTIFICATE OF SERVICE

This is to certify that on this 26th day of November, 2008, a true and correct copy of the foregoing was served via electronic mail (without exhibits) and FedEx (with exhibits) upon:

George L. McWilliams
406 Walnut
P.O. Box 58
Texarkana, Texas 75504-0058
*Attorney for Defendant Richard Frenkel*

James A. Holmes
605 South Main Street, Suite 203
Henderson, Texas 75654
*Attorney for Plaintiff Eric Albritton*

Patricia L. Peden
Law Offices of Patricia L. Peden
5901 Christie Avenue
Suite 201
Emeryville, CA 94608
*Attorney for Plaintiff Eric Albritton*

Nicholas H. Patton
Patton, Tidwell & Schroeder, LLP
4605 Texas Boulevard
P.O. Box 5398
Texarkana, Texas 75505-5398
*Attorney for John Ward, Jr.*

/s/ Charles L. Babcock
Charles L. Babcock