# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

TYLER DIVISION

CERTIFIED COPY

| | | |
|---|---|---|
| ERIC M. ALBRITTON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| VS. | * | C.A. NO. 6:08-CV-00089 |
| | * | |
| CISCO SYSTEMS, INC., RICK FRENKEL, MALLUN YEN & JOHN NOH, | * | |
| | * | |
| Defendants. | * | |

*********************************************************

ORAL DEPOSITION OF

ERIC M. ALBRITTON

OCTOBER 27TH, 2008

*********************************************************

ORAL DEPOSITION OF ERIC ALBRITTON, produced as a witness at the instance of the CLAIMANT, and duly sworn, was taken in the above-styled and numbered cause on the 27th of October, 2008, from 12:44 p.m. to 4:24 p.m., before Tammy Staggs, CSR in and for the State of Texas, reported by machine shorthand, at the Law Offices of James A. Holmes, 605 South Main, Suite 203, Henderson, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

P R O C E E D I N G S

(Exhibits 21A - 63 marked)

THE VIDEOGRAPHER: Here begins the videotape deposition of Eric Albritton in the matter of Eric M. Albritton vs. Cisco Systems, Inc., Rick Frenkel, et al. Case No. 6:08CV00089. Today's date is October 27th of 2008. The time is approximately 12:44 p.m. Now on the record.

ERIC ALBRITTON,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BABCOCK:

Q. Would you state your name, sir.

A. Eric Albritton.

Q. Mr. Albritton, here is Exhibit 21A. I just like to start each deposition with a notice. Obviously you're here, so there's no question about that.

What -- how are you employed?

A. I'm a lawyer.

Q. And do you practice with a firm?

A. I do.

Q. What's the name of the firm?

A. Eric M. Albritton, PC.

Q. And PC stands for professional corporation, correct?

documents. But as you certainly know, Mr. Babcock, from working this case --

Q. Don't assume I know anything.

A. Well, that's -- the file stamp, if -- if you read the local Rules and when you talk to Mr. Maland, as he's indicated before, the file stamp are these jumbles of letters and numbers all of which show unequivocally that it was filed on the 16th of 2007. That's the file stamp.

Q. Okay. And the -- if that -- if that shows that unequivocally, then why wouldn't -- why wouldn't this thing up here at the top of the document and every page of the document which -- you'd agree that's a stamp, right?

A. That is not -- you asked if it was a file stamp and it is not.

Q. Well, it's -- what do you call this?

A. I don't know, Mr. Babcock, but it's not a file stamp.

Q. Okay. Well, why was it important to get that changed?

A. It's -- it's a mistake because it shows here that it was filed on the 16th. And if you look here, when you read the local Rules you'll see it says that the date and time indicated on the ECF notice of filing

is when the filing is made. It says that it was entered on the 16th of 2007 at 12:01 a.m. That is the file -- that indicates it was filed on the 16th at 12:01 a.m.

And when you get to depose the clerk's office, they will tell you unequivocally that the filing -- this is the file stamp, and it shows that it was filed on the 16th. Why there was some glitch in the system to where this incorrect date was stamped on the top of these documents, I do not know the answer to that.

Q. Okay. You left out a little bit when you were reading here. It said entered on 10/16 at 12:01 a.m. CDT, and then what does it say?

A. And filed at 12/15/07.

Have you read the local Rules, Mr. Babcock?

Q. I'm going to take the deposition, Mr. Albritton.

A. Okay.

Q. Do you want to take my deposition?

A. The local rule says at the date and time stamped is when it's deemed filed. There's only one entry on this where there's a date that corresponds with the time, and it's at 10/16/2007 at 12:01 a.m. Central Daylight Time.

Q. What are the words that immediately follow that?

A. And filed on 10/15/2007.

Q. Okay. And so you would admit that there's at least an ambiguity there?

A. I would not.

Q. Okay. Well, then -- then why didn't you just leave it alone? Why did you have to have Amie --

A. Because --

Q. -- calling the clerk?

A. I didn't -- A, I did not have Amie call the clerk. And B, because Cisco was taking the frivolous position in Connecticut that we had filed this on the 15th, which was in truth and fact incorrect.

Q. Well, if it was frivolous, then surely the Connecticut court would have seen that.

A. Well, evidently Cisco realized it because they dismiss -- they agreed to jurisdiction in this court.

Q. Well, what happened, in fairness, is that both parties dismissed their lawsuits. Both ESN dismissed the Texas lawsuit and Cisco dismissed the Connecticut lawsuit. So you could try to settle it, right?

A. I was actually involved in that. I don't believe you were, Mr. Babcock. And they certainly agreed to the dismissal of these lawsuits. And the

Q. Well, three months then.
A. Okay.
Q. Ninety days would be three months, right?
A. It would.
Q. Okay. And getting back to the -- the thing -- you called it a stamp at the top of the complaint. It says filed 10/15/2007. That's what it says, right?
A. It does say that.
Q. And that is a stamp, right?
A. That is a stamp of some sort generated by the software, yes.
Q. And the software is -- belongs to the United States District Clerk for the Eastern District of Texas, right?
A. I believe so.
Q. Okay.
A. I mean, it's -- it belongs to the government in some way.
Q. Okay. And the filing date was important because if you -- if it was, in fact, filed on the 15th, then the Court would lack subject matter jurisdiction since the patent didn't issue until the 16th, right?
A. That's correct.
Q. Okay. And you say that Cisco's position that it was filed on the 15th was frivolous. And why do you

this court that there -- there is not a complaint that has a file stamp on it that says 10/15/2007 and another one that says 10/16/2007?

A. Mr. Babcock, that is not a file stamp. I don't know if you're imprecise on purpose or by accident, but that is not a file stamp. There are not two documents that have different filed stamp dates.

Q. All right. You don't want to call it a stamp, even though you did in your testimony. You're not -- are you telling this court and the jury that there are not two documents that have different things on them, whether you want to call it a stamp or a piece of writing or whatever, but one says filed 10/15/2007 and the other one says filed 10/16/2007?

A. There are two documents --

Q. All right.

A. -- that have headers that have different dates on them, yes.

Q. And -- all right. And did you tell Judge Folsom about that?

A. No.

Q. Did you make a motion to the Court to correct the docket so that Cisco would have an opportunity to challenge that?

A. I did not.

filed against me.

Q. Okay. And I take it that everything Amie did after the first phone call, which you say you didn't know about, but everything she did after that first phone call was with your knowledge and approval, correct?

A. I don't re- -- I do not know where in the process we talked, but I fully support everything that she did.

Q. Okay. And you -- of course, after this problem surfaced, you did an investigation to determine exactly what had happened, what had gone on, correct?

A. What do you mean by "an investigation"?

Q. Well, I mean, once it became such a big deal, you know, there's a newspaper art- -- I mean, Internet articles about it, you felt compelled to file a lawsuit, you certainly investigated thoroughly the facts surrounding this filing problem, correct?

A. Well, I looked very early on and looked at the document before we filed this motion to enjoin that clearly showed when it was filed. I looked again at my E-mail that shows the E-mail says it was filed at the 16th on 12:01 a.m. And so, you know, no other investigation was necessary.

Q. Well, did you -- did you have any dialogue

with Cisco about these clear facts that you're talking about? Did you call anybody from Cisco up and say, hey, there's been a problem. We want to fix it this way.

A. Well, I've talked to Judge Parker and to Sam Baxter both and told them that, you know, this was filed in the morning and that, you know, somebody had accused me of being a criminal and that I was very, very unhappy about that. I knew both of them had represented Cisco, and I know then Cisco ultimately agreed and never filed anything in court.

If they think I did something wrong, not only has no grievance been filed, but nobody ever filed anything at the clerk's office and said, whoa, wait a minute, you know, there is no subject matter jurisdiction or Mr. Albritton did -- did something wrong. Nobody's ever done that.

Q. Let me ask you a little more precise a question. Before the entries were changed, the docket sheet and the -- whatever you want to call it on the top of the complaint was changed from the 15th to the 16th, did you speak to anybody at Cisco about it?

A. I don't recall the chronology of when I talked to Judge Parker and to Sam Baxter.

Q. Well, let me just ask you since you put both of them on your disclosures. Did you talk to

Q. For the last five or ten years certainly?
A. Well, not for the last ten years, no.
Q. Five years?
A. Maybe five years, maybe less.
Q. Okay.
MR. BABCOCK: He needs to do the tape, and we'll take a quick break.
THE VIDEOGRAPHER: This marks the end of Tape 1. Going off the record. The time is approximately 1:43 p.m.
(Recess held, 1:43 p.m. to 1:51 p.m.)
THE VIDEOGRAPHER: This is the beginning of Tape No. 2. Back on the record. The time is approximately 1:51 p.m.
Q. (BY MR. BABCOCK) Mr. Albritton, I want to have you look at Exhibit 14.
A. Yes, sir.
Q. And it's a series of E-mails. And it starts, you say to Amie Mathis, is this right. And are you referring to this memo from Mr. Maland about the sequence of events in the -- on the filing issue?
A. Yes, sir.
Q. All right. And then Amie replies right above that, (as read): The chain is right. I talked to Texarkana, and then I talked to David Provines and

then -- and then the/they were supposed to transfer me to David Maland, but he was out and I was given to Peggy Thompson.

And then she goes on to explain more, correct?

A. Yes, sir.

Q. All right. And then after the -- after the clerk's memo you say (as read): Thanks. You've done good. I appreciate you.

Did you tell that to Ms. Mathis on March 14th of 2008?

A. Absolutely.

Q. Okay. How did you -- how did you -- how did your office get the Maland memo, do you know?

A. Yeah, Jamie Holmes sent it to me.

Q. Okay. Do you know how he got it?

A. I believe Mr. Maland sent it to him.

Q. And was Mr. Holmes acting as your counsel at that time?

A. Yes, sir.

Q. Did Mr. Baxter tell you in this conversation on October 18th that he was going to be representing Cisco in this case that you had filed, the ESN case?

A. I don't recall specifically, although I believe that he would.

me and the clerk's office of being criminals and conspiring together to manufacture subject matter jurisdiction, something to that effect.

Q. Okay. What did -- what did Wesley Hill respond?

A. I don't recall. I'm sure he said something about them being sorry no-good suckers. Them being whoever the anonymous person was, but I don't recall specifically.

Q. Do you recall him using the phrase "sorry no-good suckers"?

A. No.

Q. That's your phrase?

A. Yes, sir.

Q. Have you ever called the people responsible for the Troll Tracker article on the October 18th sorry no-good suckers before?

A. I don't recall if I've called them that specifically, but I've called them lots of ugly names.

Q. Okay. To whom?

A. I don't know.

Q. But you're not shy about calling them names, I take it?

A. When they accuse me of being a criminal, absolutely not.

Q. And the TTLA is the Texas Trial Lawyers Association, correct?
A. Uh-huh.
Q. Is that a "yes"?
A. Yes, sir.
Q. And that is normally a -- that group is consistent members of the plaintiff's side of the bar, right?
A. That's right.
Q. Okay.
A. I mean, I don't know if it's exclusively the case.
Q. I think they give you some DNA testing before you can get in, is what I've heard.
The -- have you ever participated in any lobbying efforts to lobby for legislation?
A. I have been to DC a couple of times with lobbyists, yes.
Q. Okay. And were they -- were those lobbyists lobbying on any specific piece of legislation?
A. Yes.
Q. And what legislation was that?
A. The patent reform legislation.
Q. And who were those lobbyists?
A. Max Sandlin.

Q. Anybody else?

A. I went to some -- some people in Max's office and then I've met with -- although I don't think I ever went to any meetings with the AAJ, or however you call it, lobbyists.

Q. What is AAJ?

A. American Association for Justice, I believe.

Q. And what -- what does -- is that an industry group or is that -- what kind of --

A. It's a lawyer group.

Q. Lawyer group?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes, sir. I'm sorry.

Q. And is that lawyer group typically plaintiff's lawyers?

A. I guess. I mean, it's -- it used to be called ATLA.

Q. Okay.

A. And each time I went, I went with Sam Baxter.

Q. And you say you went with him. Did you -- I mean, are you saying you physically traveled with him or were you part of the same --

A. We were there together. We were there together.

Q. And were you lobbying on patent reform in the same way? Were you lobbying for -- both lobbying for the same --

A. Absolutely. And I'm not a lobbyist, so I wasn't lobbying. I was just -- I was just there for these meetings, but I would broadly, you know, in fairness, say they that had to do with lobbying.

Q. Okay. And these meetings were held in Washington, DC, I take it?

A. Yes, sir.

Q. And who were you meeting with?

A. I met with Senator Durbin. I met with, you know, various people. I can't recall. A senator from South Dakota, not Tim Johnson. The -- although I spoke to people in mister -- or Senator Johnson's office. I don't recall exactly. I mean, Senator Cornyn, your senator.

Q. Our senator?

A. Absolutely. I've met with his staff on several occasions.

Q. Okay. Did you meet anybody on the House side?

A. Yes.

Q. And who on the House side?

A. I don't recall.

Q. You said you were up there on two occasions?

A. Yeah, at least two.

Q. At least two?

A. I've talked to -- also I've talked extensively to a fellow in Senator Boxer's office.

Q. That's the senator from California, right?

A. Yes, sir.

Q. Okay. In addition to these two -- in addition to these two trips, did you also communicate with people in congress, both the Senate and the House side, by telephone even though you weren't physically in Washington?

A. I've spoken on the phone with Senator Boxer's staff several times.

Q. And what committee does Senator Boxer sit on that would -- would be involved in the patent reform effort?

A. I have no idea.

Q. Why was it that you were speaking to Senator Boxer's staff, a California senator, as opposed to Cornyn or...

A. Well, I spoke to Cornyn also, but this guy and I had become friendly. I think Mr. Frenkel had been lobbying the same fellow.

Q. And he -- Mr. Frenkel would have been on the opposite side of you on this --

A. Presumptively.

Q. Because you were against the patent reform effort, correct?

A. Some aspects of it, yes.

Q. Particularly the aspects dealing with venue, right?

A. I certainly do not support the venue provision.

Q. And so we're on the same page, the venue provision would have made the filing of patent suits in the Eastern District of Texas not as easy to do, harder to do, right?

A. That's right.

Q. Okay. When did you begin your lobbying effort?

A. Yeah, I mean, that's really -- I'm not fussing with you, but that's a little bit of a -- you know, not fully accurate characterization. I'm sort of tagging along, but I don't remember the first time I went up there with Sam.

Q. Okay. Was that the first time you did it when you went to Sam up to Washington?

A. Yes, sir.

Q. Okay. And was that in 2008 or before 2008?

A. I don't recall, Mr. Babcock.

Q. Was it before the ESN lawsuit?

A. I don't recall. I don't believe so, but I'm not sure. It may have been. I frankly just don't recall.

Q. Okay.

A. Maybe before and after, I don't know.

Q. Okay. Was this patent reform effort -- and specifically focusing on the venue part of it, that is where you can bring a lawsuit -- was that something that was being discussed in the public media? I seem remember a New York Times article about it. But anyway it doesn't matter. Is that something that was being discussed in the public media?

A. I don't recall.

Q. Are you aware that some members of the Bar across the country felt that -- that the Eastern District of Texas was -- was an unfair venue or put defendants at a disadvantage in some -- in some way?

A. I don't know what other people think.

Q. Are you aware that Justice Scalea from the bench called the Eastern District a renegade district?

A. I recall something about that, yes.

Q. Okay. What do you recall about that?

A. Just exactly what you said.

Q. Do you know if that -- if that got any

traction in terms of being discussed in the Eastern District?

A. Not -- I mean, I can't tell you anything specific. I mean, I certainly don't think that's an accurate characterization. But what Justice Scalea said about the Eastern District of Texas has nothing to do with the fact that Cisco Systems and Rick Frenkel called me a criminal.

Q. Are you -- do you remember there's a phrase in the -- in the article about the Banana Republic?

A. Uh-huh.

Q. About -- something about abusive practices in the Banana Republic of East Texas? I'll get it out in a second, but --

A. Yeah, I mean, you're sort of smiling. I guess -- I don't think that's a cute saying.

Q. Do you think that that phrase is defamatory of you?

A. No. I think it gives context to what he was saying about me, but -- or potentially does, I don't know. But I don't -- I don't think -- well, strike that.

I mean, I certainly think he is saying that what I did was abusive because he seems to be linking that, I don't know. Yeah, I mean, he clearly

certain that we talked about it that day as well, the day of the Inn of Court meeting.

Q. Okay. Did you ever hand the Troll Tracker articles, either the October 17th or October 18th, to any person?

A. Not to my knowledge.

Q. Okay. Did you ever distribute it in some other way like E-mail or mail or fax to anybody else?

A. I don't believe so, Mr. Babcock.

Q. In the -- at the Inn of Court meeting on the 18th, did you tell Bob Parker that -- about the Banana Republic statement?

A. I don't recall specifically.

Q. And how about Sam Baxter, did you tell him at the Inn of Court meeting about the Banana Republic statement?

A. I don't recall specifically.

Q. Do you know whether the October 18th article has ever been modified?

A. Yes.

Q. Okay. And tell me what you know about that.

A. Well, I know that somebody evidently thought better of that statement and took it down, but decided evidently to leave up the outrageous statements about me.

Q. Okay.

A. So I guess it was Cisco thought it was okay to say ugly thinks about Eric Albritton, but not about the judges.

Q. Do you know when the Banana Republic statement was taken down?

A. Within a day or two.

Q. Was it -- was the October 18th article ever, to your knowledge, modified in any other way?

A. I don't recall. There were some other slight modifications. I think there was some, you know, language that tried to soften it that said, well, we're -- you know, whether this was intentional or not -- I don't recall, but you can obviously just compare them, but I don't recall specifically.

I do know that up until February it continued to say that I conspired with the United States District Clerk to alter a document, to manufacture subject matter jurisdiction where none existed, and I also know that it continued to say that I had filed an amended complaint for no other reason than to correct the -- the problem with subject matter jurisdiction as evidence that it was some sort of a recognition on my part that I had done wrong.

Q. You said up until February. What happened in

these defamatory statements.

Q. But are you going to say to the jury that even though you can't quantify it, you think that you have lost --

A. No, I'm not going to say that because I can't quantify it. I mean, I very well may have, but I -- I'm not seeking that damage because there's no way to know it. People don't call me up and say, hey, Eric, we're not using you anymore because, you know, Rick Frenkel told us that you're a criminal.

Q. Okay.

A. It doesn't work that way.

Q. All right. So -- so for whatever reasons you're not -- you're not going to claim reputational damages in this case?

A. That's not true.

Q. Okay. So you are going to claim reputational damages?

A. Well, Mr. Babcock, you're a lot smarter than me about first amendment law. I don't -- I don't know exactly what you mean. I'm not claiming lost wages or money damages, economic damages, as a result of lost business based on the defamatory statements. But has my reputation being harmed --

Q. Yes.

you believe the law presumes?

A. I'm not here to offer legal opinions. Whatever the law presumes is whatever the law presumes.

Q. Okay. So -- so to get -- get back to my question a few questions ago, you're not willing to rule out anything that the law would permit you to have other than economic damages?

A. I'm not asking for any economic damage.

Q. And other than that, you're going for everything?

A. As we sit here this second, I think a jury ought to be able to award, you know, the damages it believes are appropriate, except for I'm not asking for, you know, medical bills or economic damages.

Q. Okay. The ambiguity that I mentioned earlier was created by your complaint vis-a-vis your disclosures, and it says in your complaint that you've endured shame, embarrassment, humiliation, mental pain, and anguish. Are you still seeking damages for all those things?

A. Yes. This has been extremely, extremely traumatic.

Q. Okay. Can you identify for me a friend who was a friend of yours prior to the October 18th and 17th articles and who is -- and who is now not a friend as a

result of those articles?

A. Thank God I can't. My real friends know that this is untrue. It's the other folks in the world who don't know me that are the problem.

Q. Okay. Well, we'll just go category by category. And you say real friends. Are there any kind of casual friends that are no longer friends because of these articles?

A. Not that I know of.

Q. Okay. How about business associates, are there any business associates who thought highly of you before these articles who no longer do?

A. Yeah, evidently so.

Q. Okay. Tell me who.

A. Michael Barclay. You know, he's a lawyer at Wilson Sonsini where George McWilliams's client networks. I worked for Michael Barclay, in fact. In fact, I worked for Wilson Sonsini on two occasions. I worked for them in my very first patent case or my very first IP cases, the one I referenced where Cisco sued Huawei. Michael Barclay -- I'm sorry. Jonathan -- oh, I don't remember his last name right now. Wilson Sonsini Goodrich & Rosati hired me to represent 3Com. They evidently thought I was a pretty smart guy and pretty good lawyer.

17th and 18th articles and after?

A. Based on what Cisco said about me?

Q. Yes, based on the articles.

A. Of what Cisco said about me?

Q. Well, are you distinguishing something that Cisco said versus the articles?

A. Well, didn't Cisco take responsibility for what Mr. Frenkel said?

Q. Well, you know, that's, as you say, a matter of law. But I'm trying to focus on the articles that you're suing about.

A. My family has not said to me that -- and I don't believe that they think different of me based on what Cisco and Rick Frenkel lied about me.

Q. So your relationship with your family is unaffected by the articles, correct?

A. That was not the question you asked, but I don't believe they think of me any differently as a result of these statements. Has this affected my family life? Certainly.

Q. Okay. Tell me how.

A. Because I'm sick, not physically, I'm sick over the fact that those people said these horrible, malicious lies about me. And that you and George McWilliams to this day are telling the world that what

A. Then maybe Mr. McWilliams hasn't produced all the documents, but I don't believe seeing multiple -- more than one anonymous E-mails.

Q. Well, be that as it may, you have no basis then for saying whether he got a couple of anonymous E-mails this morning or not, right?

A. All I know is what he has said in many respects is untrue, so I have no reason to know if this would -- would be the exception and that it would be true.

Q. The -- it is true, however, that the docket in ESN vs. Cisco had been altered, correct?

A. The -- the date on the docket had been changed to -- the docket entry No. 1, the date had been changed, yes.

Q. All right. And it says (as read): One E-mail suggested that ESN's local counsel called the Eastern District Texas court clerk and convinced him, slash, her to change the docket to reflect on October 16th filing dater rather than the October 15th filing date.

And forget about whether the E-mail suggested it or not, but it is true that your clerk -- well, strike that.

It is true you were local counsel for ESN, correct?

A. I was.
Q. All right.
A. And still am.
Q. Still are. And it is true that Amie Mathis called the Eastern District of Texas court clerk. That's true, right?
A. She did call the court clerk, yes.
Q. And you say, I guess, that it's not true that Amie convinced him, slash, her to change the docket to reflect an October 16th filing date rather that the October 15th filing date?
A. Yeah, that's absolutely untrue. She did not convince him to do it or her to do it, and I think that they will tell you that she did not convince anybody to do anything.
Q. Well, we'll -- we'll -- we'll see what they say.
A. You can accuse them to.
Q. And are you saying that -- that they would have changed this on their own if she hadn't contacted them?
A. That's not what I'm saying. I'm saying that she pointed out to them that there was a mistake and they fixed it because it was obviously a mistake.
Q. You don't think that she asked them to fix the

here is --

A. It's not an argument. It's just the facts.

Q. Your position. I've litigated with people before that think that their version of the facts is true, and that's fine you have that right.

A. It's good. We'll let the jury decide, Mr. Babcock.

Q. That's true.

A. I didn't call your people criminals.

Q. And apparently they didn't call you a criminal either --

A. Okay. Well, that's good.

Q. But we'll get to it.

There's no question, as we went through before, that whatever you call it -- whether you call it a file stamp or a header or gibberish -- there was something changed on the complaint that went across the top of every page and it changed it from the October 15th to the October 16th, correct?

A. That's correct.

Q. And so if he had just said instead of what he said that the complaint was altered to change the header from October 15th to October 16th, that would be accurate?

A. If you ignore the -- the introduction where it

A. You can try that.

Q. Does the local rule not provide for that?

A. That's fine, Mr. Babcock.

Q. We'll probably get done by 5:00 if you answer my questions. Okay?

Now, I'm referring to this language here which says -- I'm not referring to the headline. I'm referring to the language that says (as read): The docket was altered to reflect an October 16th filing date, and the complaint was altered to change the filing date stamp from October 15th to October 16th.

If we change that from the filing date stamp to the header, that would be accurate, correct?

A. Not when taken in context with the -- you know, whatever you call it, the title of the article.

Q. But it would be more accurate if he had said the complaint was altered to change the header from October 15th to October 16th, correct?

A. Yes.

Q. All right. He then goes on to say (as read): Only the Eastern District court clerk could have made such changes.

That's true, isn't it?

A. Absolutely.

Q. All right. So you couldn't have done that,

Q. Did you sign --

A. It says -- it says -- you have to be accurate.

Q. Mr. Albritton, will you listen to my question?

A. It says (as read): ESN counsel signed the civil cover sheet stating that the complaint had been filed on October 15th.

That is untrue.

Q. Okay.

A. Did I sign the civil cover sheet on the 15th? That is true.

Q. Okay. Thank you.

Is ESN a non-practicing entity?

A. I have no idea. I assume that's true.

MR. BABCOCK: I think we're out of tape, maybe. Let's take a quick break.

THE VIDEOGRAPHER: This is the end of Tape 2. We're going off the record. The time is approximately 2:50 p.m.

(Recess held, 2:50 p.m. to 3:03 p.m.)

THE VIDEOGRAPHER: This marks the beginning of Tape 3. We're back on the record. The time is approximately 3:03 p.m.

Q. (BY MR. BABCOCK) Mr. Albritton, I'm going to hand you Exhibit 22, which is something that's called Patently-O, Patent Law Blog. Have you ever seen this

A. Well, you have the E-mails there if you'll give them to me, but basically when we filed the complaint, the patent -- as I understand it, patents issue at midnight Eastern.

Q. Right.

A. But you can't get a printed copy until later in the day. And so despite the fact the patent had issued prior to us filing the lawsuit, we could not attach a copy of the complaint -- I'm sorry -- a copy of the patent to the complaint. So the complaint makes no reference to an exhibit -- the patent as the exhibit. We obviously didn't attach it. So I E-mailed Johnny, and I'm sure we talked about it too, that said should we go ahead and amend to add the complaint. Because, you know, there's no local rule that says you have to attach a patent.

Q. And when you said -- when you said attach the complaint, you meant attach the patent?

A. I meant attach the patent.

Q. Right. Okay.

A. So I said to Johnny, should we go ahead and amend and he said, well, don't burn your amendment yet. And then I said -- because as you surely know under the Federal Rules, you get, you know, one free amendment. And I said to him, well, the reason we need to amend is

because of what I just explained to you. And he said, oh, okay, then go ahead and amend. And so we did, which of course shows that the statement of Mr. Frenkel about we amended to make no changes and only for the purpose of correcting our mistake is -- that statement is false.

Q. Here's Exhibit 26 and that's the E-mail you were referring to, correct?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes, sir. That's on the 16th at like 8 o'clock.

Q. And then there's a longer string that is Exhibit 28, which refers to the -- what you were saying about then (as read): Yes, let's burn the amendment. We can amend again without leave after the DCO is entered if we need to.

You were -- that's what you were just talking about a minute ago?

A. Yeah. I say to Johnny, should we file an amended complaint? He responds and says don't burn it. Did we reference the patent in the complaint? I said no because we -- it hadn't printed at the time we filed the complaint. And then Johnny said, yeah, he agrees. Let's burn the amendment. We can always amend later.

Q. Okay. So your point is that -- that there was

something changed from the original complaint to the amended complaint because you had attached the actual patent where as before you had not?

A. Well, yes, and if you look at the complaint it's different. It now says attached as Exhibit A or whatever is the patent. So there was a change. And it was not, you know, for the purpose of fixing some error on our part.

Q. Okay.

A. I make lots of mistakes, but I didn't here.

Q. We were talking about Dennis Crouch the author of Patently-O a minute ago.

A. Yes, sir.

Q. Let me show you Exhibit 39. And Exhibit 39 appears to be an E-mail from Peter McAndrews to yourself and John Ward. It says (as read): See attached E-mail from Dennis Crouch. Crouch is the guy who allegedly tipped off Frenkel about our complaint.

Were you aware at the time you received this -- this E-mail that Crouch had tipped off Frenkel about the complaint?

A. I don't know if Crouch tipped off Frenkel. I have no idea what the real truth is there about -- in fact, based on -- and I don't know this for sure, but based on the documents you've produced, I doubt that

Q. And in what -- what capacity?
A. Well, I mean, we're, for instance, on the Local Rules Committee together.
Q. Okay. And is that the federal court rules?
A. Yes, sir.
Q. And how long have you been on the Local Rules Committee?
A. I've been on the Local Rules Committee for three months or so.
Q. So you got on in --
A. After the -- after the defamation.
Q. So you got on in August of '08?
A. No, that's not -- I don't know when I got on. I estimated. I don't know when I got on.
Q. But it's -- but it's sometime --
A. And three months would not -- yeah, I don't know. I just don't recall.
Q. And how do you get on the Local Rules Committee?
A. It's recommended by the Court.
Q. And any specific member of the Court?
A. I don't know exactly how that works.
Q. All right. And how often does the Local Rules Committee meet?
A. I don't know.

complaint. Now, you can, as I understand it, file without going through all the procedure of requesting a case number in advance.

Q. By the way, why was it so important to file this at -- at midnight or the one minute after midnight as opposed to just, you know, filing it the next morning or the next afternoon?

A. Well, because there was concern that Cisco would file a declaratory judgment action.

Q. And if they had done that and gotten it first, then you would have been stuck in any forum they wanted?

A. Potentially.

Q. As opposed to what ESN wanted?

A. Potentially, yes.

Q. Have you talked to Michael Smith about the issues revolving around the filing of the ESN vs. Cisco Systems case in October -- the October filing is what I'm talking about.

A. Yeah. I don't recall having any, you know, oral conversations with Michael Smith.

Q. Have you had any written conversations?

A. He's E-mailed me a couple of times. As you know -- I gave this to you -- he E-mailed me about some newspaper reporter that had called him and then he had E-mailed about some other things, you know, because

something you have to get online, and there's a whole procedure you have to go through. Okay. And then after you upload the document, it says -- there's a button and it's got a big warning. Maybe Mr. McWilliams has done this, I don't know. I'm sure she has. And it says warning, when you push this button this is when the thing is filed, something to that effect, okay.

So she logged in on the 15th, uploaded the stuff, but did not make the transmission and the filing until after the 16th. So maybe as -- what I can understand from what Dave Maland says -- and I don't know if Dave has direct knowledge of this or where he's learning this -- but evidently from reading what Dave Maland says in that most recent memo that you kept referencing, it appears to me that he's saying the mistake is a -- on the date is a result of logging in on the 15th initiating that session even though it was filed on the 16th.

Q. But would that be a software mistake or an Amie mistake?

A. Amie did nothing wrong here because filing is at the time you transmit the document, and that was done on the 16th.

Q. So you're saying it's a software mistake?

A. I'm saying that the wrong date being stamped

Q. Okay. And are the -- is the information in this Exhibit 62 to your law firm Web site accurate?

A. I believe it is.

Q. In October of 2007 was it just you and Scott Hacker that were the lawyers in this firm?

A. No. I mean, right around that time Jason Saunders had come on.

Q. Okay. So you, Mr. Hacker, and Jason Saunders, correct?

A. Yeah, he was only there for a short while.

Q. Okay. And is Mr. Hacker still there?

A. No, he's a federal judge.

Q. I take it that this -- that this -- these articles by the Troll Tracker and Mr. Frenkel have not hurt your relationship with the judiciary in the Eastern District of Texas, would that be fair to say?

A. Not to my knowledge.

Q. In fact, some -- one or more judges appointed you to this committee since the articles, right, the Rules Committee?

A. Yes.

Q. Okay.

A. I mean, I assume that's how it works. I think I was recommended by a judge, and I don't know exactly how it works.

Q. Okay.

A. I know I was at the office all weekend working on a cert petition and death penalty case while I'm getting ready to pick a jury on the third, so this week I'm real, real busy.

Q. Okay. And do you recall how much income you received from your law practice in 2007?

A. Uh-uh.

Q. Excuse me?

A. No, sir.

Q. Okay. And how do you file with the Internal Revenue Service? Do you have a Subchapter S Corporation or how do you handle that?

A. I think it is an S Corp.

Q. Okay. And you would have to refer to your federal income tax return to tell me how much income you made in 2007, right?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes, sir. But, of course, you know, income -- you know, some of the things that I earned in 2007 were from cases that were, you know, signed up in 2005.

Q. Sure. Do you know whether your income from your law practice is going to increase in 2008 over 2007? I know we've got two months to go.

A. I believe it will.

Q. Okay. Even though you can't be specific, can you tell me generally how much you made in 2007 from your law practice?

A. No.

Q. Can you tell me whether it was 100,000 or a hundred million?

A. It was neither a 100,000 nor a hundred million.

Q. Somewhere in between?

A. Yes, sir.

Q. Was it in the millions?

MR. HOLMES: Let's -- why don't we hold off on that until we get a response from the Court on your motion. We -- you asked for that information in your motion to compel --

MR. BABCOCK: I did.

MR. HOLMES: -- and that's part of what I've been objecting to. So I would ask we hold off on that until we get a ruling.

MR. BABCOCK: Okay.

Q. (BY MR. BABCOCK) I know you're your own man, but you're going to follow what your lawyer says?

A. Yeah, and just to be clear, I'm not saying -- I mean, I will have made more money in 2008 than 2007.

And just like I told you in the very beginning, you know, I cannot quantify and I'm not claiming that I've been financially harmed as a result of this. I may have been, but there's no way of knowing that.

MR. BABCOCK: Well, subject to reserving the right to ask the witness questions on that topic if the Judge rules in our favor, then I'll pass to Mr. McWilliams.

MR. HOLMES: All right. Thank you.

EXAMINATION

BY MR. McWILLIAMS:

Q. Eric, I don't know whether Mr. Babcock asked you about your case load change from 2007 to 2008. What -- has your case load increased in 2008 over 2007 or can you tell?

A. I have no idea.

Q. What's your sense about that?

A. Well, what case load are you talking about, Mr. McWilliams?

Q. Well, like most lawyers know what case load is.

A. I've got fewer criminal cases probably. You know, when Hacker was appointed judge, I started ramping down my criminal business. So my criminal business is diminishing. I have probably -- I have filed -- I have

A. You know, that is my assumption. I do not know specifically, you know, all the intricacies about jurisdiction when you have a published application or not. I don't know that level of minutia. My operating assumption is that we were filing on the 16th because that's when the patent issued.

Q. But assume that it was filed on the 15th and assume that there would be an issue about the timeliness of the prosecution of the complaint on this patent, that would have been an untimely filing, would it not?

A. That's exact -- maybe I'm being unclear. That's what I'm trying to answer. It was my operating assumption that it needed to be filed on the 16th because that's when the patent issued. Whether or not you -- provisional rights would have given subject matter jurisdiction, I do not know the minutia about that. And, obviously, there's some confusion and if you read your own E-mails there's lengthy discussions about that with Mr. Frenkel.

Q. Okay. Why then was it so important for Amie to stay up until midnight and file it from her home?

A. Because just as I just said, it was our operating assumption -- okay. And I believe this to this day. I mean, again, I don't know the minutia but the patent issued on the 16th. We believed it needed to

be filed after the patent issued, and we wanted to file suit before Cisco could sue us.

THE VIDEOGRAPHER: End of Tape 3. Going off the record. The time is approximately 4:04 p.m.

(Recess held, 4:04 p.m. to 4:10 p.m.)

THE VIDEOGRAPHER: This marks the beginning of Tape 4. Back on the record. The time is approximately 4:10 p.m.

Q. (BY MR. MCWILLIAMS) Eric, do you know if anybody contacted the clerk's office regarding this filing date issue other than Amie Mathis?

A. No, sir.

Q. Okay. You didn't contact the office?

A. No, sir.

Q. I believe you say you fully support whatever she did in her contacts with the office?

A. Without a doubt.

Q. Okay. And I guess Johnny Ward would also?

A. You'll have to ask him in his deposition.

Q. Okay. Did the electronic notice of this filing on the 16th, did it -- did it go to Cisco?

A. I don't think so.

Q. Now, not only was the banner, quote, filed October 15th, 2007 in error but the actual docketing of the complaint was also an error, was it not?

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

TYLER DIVISION

ERIC M. ALBRITTON, *
*
Plaintiff, *
*
VS. * C.A. NO. 6:08-CV-00089
*
CISCO SYSTEMS, INC., RICK *
FRENKEL, MALLUN YEN & *
JOHN NOH, *
*
Defendants. *

REPORTER'S CERTIFICATION

DEPOSITION OF ERIC ALBRITTON

OCTOBER 27TH, 2008

I, TAMMY LEA STAGGS, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ERIC ALBRITTON, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ____________________ to the witness or to the attorney for the witness for examination, signature and return to

me by ______________________;

That the amount of time used by each party at the deposition is as follows:

Mr. James A. Holmes - (0:00)

Mr. Charles L. Babcock - (2:38)

Mr. George L. McWilliams - (0:35)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFF:
James A. Holmes, Esq.

FOR THE DEFENDANT, CISCO SYSTEMS, INC.:
Charles L. Babcock, Esq.

FOR THE DEFENDANT, RICHARD FRENKEL:
George L. McWilliams, Esq.
Nicole Peavy

That $____________ is the deposition officer's charges to the Defendant, Cisco Systems, for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 31st of October, 2008.

Tammy Lea Staggs, CSR 7496
Expiration Date: 12/31/2009
Firm No. Dallas: 69 Houston: 373
HG Litigation Services
2501 Oak Lawn Avenue
Suite 600
Dallas, Texas 75219
214/521.1188 Fax 214.521.1034
1.888.656.DEPO

AUTHENTIC COPY
The original certified transcript
file was electronically signed
using RealLegal technology.