# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

CERTIFIED COPY

ERIC M. ALBRITTON )
)
v. )
) C.A. NO. 6:08-CV-00089
CISCO SYSTEMS, INC., )
RICK FRENKEL, MALLUN YEN & )
JOHN NOH )

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
DAVID MALAND
NOVEMBER 3, 2008
VOLUME I

*********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF DAVID MALAND, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 3rd day of November, 2008, from 9:25 a.m. to 3:15 p.m., before April R. Eichelberger, CSR in and for the State of Texas, reported by machine shorthand, at the United States District Court for the Eastern District of Texas, 211 West Ferguson Street in the City Tyler and the State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

will announce, in regard to the scope of the authorized testimony today.

MR. WELLS: And Robert Wells, also with the United States attorney's office in the same role.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

DAVID MALAND,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BABCOCK:

Q. Would you state your name, sir?

A. David J. Maland.

Q. And, Mr. Maland, how are you employed?

A. I am the United States District Clerk for the Eastern District of Texas.

Q. How long have you held that position?

A. Sixteen years and three months.

MR. GIBSON: Mr. Babcock, before we go any further, can we put our -- just our brief housekeeping matters on the record? First of all, we -- as you know, we have several depositions that are set for today. I have the witness fees that were tendered to Mae Velvin, to Shelley Moore, and to Rhonda Lafitte. They are all deputy clerks employed by the United States District Clerk's Office and reside and work or work in

near the end of the day and they wouldn't record it until the beginning of the next day?

Q. (BY MR. BABCOCK) Right.

A. Entirely possible.

Q. Okay.

A. That's as much as I can say about it. I'm not qualified to go forth.

Q. And you're way ahead of me, so -- Ms. Parker is computer-literate, but I'm not. Okay.

A. I can tell you that the docket entry, now, these -- this docket entry, which is really the docket entry in question that was modified --

Q. Right.

A. -- that does show filing fee, 350, Receipt Number 1292, there's no date connected with it other than October the 16th.

Q. And of course, that was changed from the 15th.

A. And that was changed. It was originally what Ms. Thompson, Faye N. Thompson in the parenthetical, those are her initials.

Q. Okay.

A. What she did was change -- when I first looked at it on the computer screen on -- I believe it was October the 17th.

Q. Right. Yeah.

Q. And then Ms. Thompson modified it on -- two days later on the 17th to reflect 10/16/2007?

A. Yes.

Q. Okay. Fine. And the other -- other than the date filed, changing it from the 15th to the 16th, and the modified language --

A. That -- that gets put in automatically by the computer.

Q. Okay. But my point was, the other language before modified was the same on the 15th and the 16th, correct?

A. Yeah.

Q. That was my point.

A. Yeah.

Q. Let me keep going through these e-mails that you produced for us, which will be great.

A. Very good.

Q. Here's Exhibit 86. Are these e-mails -- is the government the same as some of these where you start at the back and go to the front?

A. Start at the back. Yeah, chronologically it started out with the --

Q. So -- so the first e-mail here would be from Shelley Moore to yourself on October 18th, 2007, at 9:23 a.m.?

telephonically.

Q. Okay.

A. This is an e-mail conversation.

Q. Right. Okay. "Dear Shelley, check the NEF for the complaint in that case," you wrote back. "I believe it shows a date of 10/16. That's the document that really matters." That's what you wrote back to her?

A. I did.

Q. And then she writes back to you, "I saw that. And that is why I was puzzled that the computer showed the 15th. She must have finished the entry just seconds after midnight."

A. Yes.

Q. And that's what she wrote back?

A. That's what she wrote.

Q. And did your subsequent investigation show that what happened here was that Ms. Mathis had started uploading this lengthy complaint with exhibits prior to midnight and finished it shortly after midnight?

A. Yes, yes.

Q. And that's what -- that's what you found happened?

A. Oh, yes, yeah.

Q. Okay. And that's why it got the date on the

15th because she had started the filing process on the 15th?

A. Yeah. Now, there's a document that I want to --

Q. First of all, is that right?

A. It is right.

Q. Okay.

A. Absolutely. A document that's germane to this -- let's see if -- it wouldn't be in the e-mails. It would be in the -- oh, it is in the e-mails right at the end.

Q. Okay. Let me --

A. This is a fairly important document. It is that one.

Q. That one.

A. Very good.

Q. Okay. Exhibit 94, and --

A. This is something that we were -- wanted some written confirmation from our administrative office. They are located -- their help desk, their -- really the programmers for this national electronic filing system, they are in San Antonio, Texas. They cover the entire country. And we look to them for information as to how the software operates.

Q. Right.

writing.

Q. Okay. All right. And under the -- under the hypothetical, under our case, if Ms. Mathis started uploading the complaint at 11:30 on the 15th, even though she didn't hit, as the help desk says, the "submit" button until 12:01, the nationwide system is going to create a filing date of October 15th, not October 16th when she hits the button?

MR. HOLMES: Objection, form.

Q. (BY MR. BABCOCK) Is that right?

A. That's a con -- what you mean by filing date is -- it's a real term of art here.

Q. Okay. Let me put it --

A. And there's more than one date contained on the NEF, which is the document that really determines filing date.

Q. Yeah. But the problem, anyway, is -- and do you know who on the help desk was helping you on this? Do you know the name of the person?

A. David might.

Q. Okay. I'll ask David about it. But the help desk is telling you that the reason the 15th popped up is because Ms. Mathis had started entering the complaint, which is a lengthy complaint, before midnight --

A. Yes.

Q. -- even though she didn't only hit the submit button until shortly after midnight?

MR. HOLMES: Objection, form.

A. Right.

Q. (BY MR. BABCOCK) Okay. That clears that up.

A. We just wanted something from the people who are involved and knew the most about how the software operated to confirm our longstanding suspicion that it dragged in the date when she started the process.

Q. Right.

A. And I -- well...

Q. And you know, from having dealt with rules for your entire career and -- you probably don't know this, but I'm the chair of the Supreme Court advisory committee --

A. Are you?

Q. -- so I've dealt with rules -- not as long as you.

A. The Supreme Court of Texas?

Q. Texas, yeah.

A. Okay.

Q. And normally, with rules, because of statute of limitations and jurisdictional filing deadlines, you want the earlier date, not the later date, right?

was riding in the court van back from Plano, Texas. We were working on our new courthouse there, and I was --

MR. McWILLIAMS: By the way, is it in west Plano or east?

THE WITNESS: Yeah.

MR. BABCOCK: See, I told you.

THE WITNESS: It's near 121 and the Tollway. Very nice location.

MR. BABCOCK: Yeah.

A. But this is just -- you know, when I got back there, I was like, oh, that already happened, because she called me or I talked to Ms. Jeffreys while in the van heading home that afternoon, and she immediately -- I'm paraphrasing, but said, have you ever -- have you or your staff ever changed a filing date in a case?

And I said, well, there's only one that I recall adjusting or correcting the filing date, and it involved a patent case filed by Eric Albritton, only time.

And so she quizzed me about that, said she was writing an article about that for deadline soon, wanted just some quotes that she could put in her article, you know, this afternoon was her deadline so she needed something quickly.

Q. They always do that.

A. It was either Rhonda Lafitte, who is the deputy in charge, or Shelley Moore, deputy clerk. I believe it was Shelley Moore.
Q. Okay.
A. I'm pretty sure it was Shelley Moore that talked to her.
Q. All right. And the -- what you say to the Texas Lawyer, you go on to say, "She wanted" -- she meaning Amie, correct?
A. Yes.
Q. -- "wanted the clerk's office to change the date to October 16th because she had waited to file the complaint until after the midnight on the 16th." Did I read that correctly?
A. Yes, uh-huh.
Q. And how did you learn that Ms. Mathis wanted the clerk's office to change the date to October 16th?
A. That was relayed to me by Peggy Thompson of the Tyler clerk's office. After Ms. Mathis talked to both Ms. Lafitte and Ms. Moore in Texarkana, they both told her we are not authorized to do something like that; you'll have to call Tyler.
So she called Ms. Thompson, Peggy Thompson, who is the criminal court reporter, CJ; she's a supervisor. And then Ms. Thompson relayed the request

Thompson relayed to you? That's just what I want to know right now.

A. Yeah. The -- it's to change on the docket entry -- where is -- docket sheet. I'm looking for the docket sheet.

Q. Here you go.

A. Thank you.

Q. It's Exhibit 99.

A. Thank you. On Exhibit 99, the date in the "date filed" column on page 3 of the then -- of the docket sheet. It pertains to Document Number 1, and the docket text is that for the complaint. When I looked at the docket entry on that day, this date filed read 10/15/2007. And what I was told they wanted to change was to change that so it reflected 10/16/2007.

Q. Okay. So Ms. Thompson told you the request from Ms. Mathis and Mr. Albritton were that they wanted the date filed, which originally showed 10/15/2007, to be changed to 10/16/2007?

A. Yes.

Q. That was the request?

A. Yeah, based on their notice of -- well, their Notice of Electronic Filing that showed that they had finished the --

Q. They had reasons, but that was the request?

A. That was the request.

Q. Okay.

A. To change that date, yes.

Q. Okay. And as you tell the Texas Lawyer, continuing on in this paragraph --

A. Uh-huh.

Q. -- the Texarkana deputy clerk was reluctant to change the date.

A. Yes.

Q. And referred Amie to the Tyler clerk's office. And as you've just testified, that -- you understood that's what happened?

A. Yes.

Q. And you're not sure whether it was Rhonda Lafitte or Shelley Moore that referred her to the Tyler clerk's office?

A. I think they both talked to her and they both expressed a reluctance and suggested that she talk to us.

Q. Did they tell you why they were reluctant? And I'm talking contemporaneously now, back in October of 2007.

A. No. You know, the first I heard about it was Peggy coming to me. I was beginning -- I was, to my recollection, getting ready to go somewhere. Maybe it

was home. It was close to, you know, afternoon time by my recollection.

And the first I heard of it was Peggy coming to me and said, wait, wait, wait, we've got a request here. I need you to take a look at this. But I never talked to Ms. -- either of the Texarkana deputies. I can tell you, though, that this, you know, is rather deeply engrained in them, and I think is evinced by their actions, that they would not do something like that without my permission.

Q. Right. And as Shelley Moore told you in writing, she was a little leery about changing the date, correct?

A. Yeah, uh-huh.

Q. And then she talked to Cindy Paar, and she's even more leery about changing the date?

A. Yeah, yeah.

Q. And did you ever learn about this Cindy -- and we'll find out later today, but about this Cindy Paar/Shelley Moore conversation that made Shelley Moore even more leery about changing the date?

A. I never talked to Cindy about this until just a few days ago.

Q. Okay. What did Cindy say?

A. She said that the -- she was aware that -- on

A. Yeah, but some of it was changed because of the way that the underlying programming worked. The only thing that she changed was that. But the computer automatically puts in this modification language.

Q. But the actual stamp at the top of the document -- of the complaint changed as well, you know.

A. Not that.

Q. No, no. You're talking about the docket sheet. I'm talking about the complaint itself. Hang on. I'll show it to you.

A. Okay. I wasn't...

Q. Here is Exhibit 21, and you'll see, at the top of the complaint, "Complaint for patent infringement, ESN versus Cisco Systems and Cisco-Linksys, LLC." It says here case, and it gives the case number and document; and it says filed October 15, 2007?

A. Yeah.

Q. Right?

A. Right.

Q. And then that -- what do you call that, by the way, that thing at the top of the document?

A. Well, it's a header, term of art. Cindy or David may know the answer to that.

Q. Okay.

A. But that's automatically put in there by the

10/16. That, to me, was the ballgame.

I had no doubt then and I have no doubt now that -- and I'm not a judge. But I'm the clerk of court, and I know a lot about what's at play here, I think. In my opinion, there was no doubt that those stamps are determinative. The electronic stamps that say 10/16 for each of those documents on the NEF are outcome determinative of this matter.

Q. Did -- obviously your office was in contact with Mr. Albritton's office. Do you know whether anybody in your office was in contact with Cisco about this?

A. No. No, I don't believe anyone was.

Q. Okay.

A. I -- they can tell you, but I am quite confident no one talked to them.

Q. Okay. And --

A. Of course, at the time that it was filed, the Schell case and the complaint was filed, they chose not to E -- use the e-service feature.

Q. Who is they, Mr. Albritton?

A. Albritton. When Amie filed that thing, I looked at it. They didn't put in opposing counsel. They were serving by -- not by our system. I thought perhaps they had. Now, I just found that out. But if

A. It's amongst the -- it's an attachment on these things.

Q. Well, in any event, you said you just found out -- you got it?

A. I'm looking for my e-mail to the Texas Lawyer because it's got all the attachments.

Q. Oh, okay.

A. Here we go. Here we go. Okay. We're looking for the NEF. Here we go. This is contemporaneous. This is what happened at that time. Notice will be electronically mailed to. All she did was put her boss's name, Eric M. Albritton. She was the only one that got a copy of the NEF.

Q. Okay.

A. And I -- just by looking over the materials, I discovered that within the last couple of days. I had thought, you know, another typical way of doing it and many attorneys use the e-service feature of our electronic filing system so that this could be conveyed directly to the other litigants. But obviously when that complaint was filed, it was not. The only notice went to Albritton, the only e-mail notice of that, and of course, to us.

Q. Right. Okay. But there was a feature that your office had that, had Mr. Albritton chosen, he could

have inputted Cisco data so they would have gotten notice of all these things?

A. Yes. The procedure is described amongst those documents that I've given you as to how attorneys are trained so they can input the e-mail addresses of -- or from a pick list, take the opposing counsel and put them into the system and they will get the electronic notification.

Q. Okay. So as -- as Mr. Albritton's office was making this request to change the date from the 15th to the 16th, first to the Texarkana office and then to the Tyler office, as far as you know, Cisco had no input into that request?

A. I didn't -- at that juncture, know -- other than the caption, know who the attorneys were or anything, just they were the defendants.

Q. So my -- the answer is, yes, they didn't have any input into this?

A. They had no input, right.

Q. And you tell the Texas Lawyer in your -- the last -- next-to-last sentence, "Hindsight being 20/20, I should have instructed the Tyler docket clerk to tell Mr. Albritton to file a motion to correct the docket report rather than having the deputy clerk do a correcting entry." Did I read that correctly?

A. You surely did.

Q. And why did you feel that way?

A. Well, I think at the time that this occurred, when I got the phone call, I was focusing on what I knew about the local rules committee's desire with our procedure to have it work so it reflected the date and time of filing, the -- you know, if there was indicia, clear indicia when the thing -- when they hit the "submit" button on the NEF, which there was, to me, that was the issue being presented. I was not thinking about defendants.

And yet, five, six months hence, reflecting on what happened where, you know, we have lawsuits and things happening, I was of the opinion that it would have been preferable to just tell them file a motion to clarify. This is a complex venue.

Yet at the time that I did authorize the change, it was my clear opinion that the document was timely filed. And I didn't really have any doubt about it.

And yet, when I think back on it, I'm a clerk. I'm not a judge. It ought to be -- you know, if it gets down to this, it should have been a judicial determination. They would have had to ask me and my staff for the same kind of information you're having to

Q. Yeah.

A. Because it didn't do what it was supposed to.

Q. And -- and that's all helpful and I appreciate it. To get back to my question --

A. Yes.

Q. That's okay. It -- and I'm not being critical of the way you handled it, but I'm just saying that your letter to the Texas Lawyer would seem to indicate --

A. Yes.

Q. -- that, if this came up again, you would give notice to both sides and let the judge decide whether the docket entry should be changed?

A. Absolutely.

Q. Is that true?

A. Yes, absolutely.

Q. Let me ask you to look at Exhibit 88, and this, the bottom of it, it's your letter to the Texas Lawyer. But then above it, it's an e-mail from you to Faye Thompson, Shelley Moore, and Rhonda Lafitte. And you say -- dated March 14, 2008, "Here for your information is a memo I sent to the Texas Lawyer with copies to Chief Judge Heartfield and Judge Folsom regarding the matter above. It represents, to the best of my knowledge, what happened in this case. There is pending litigation involving the facts below in state

Q. Yeah. My question was bad because that's not what I was going to.

A. Yeah.

Q. Was there a mistake made by the clerk's office in -- hang on.

A. Pardon me.

Q. Was there a mistake made in the clerk's office in handling the initial filing? Forget about the correcting entry. I'm just talking about the initial filing.

A. None at all. Thank you for slowing me down. But none, no mistakes at all.

Q. Okay. And now, moving -- and you corrected me, too, so we both pat each other on the back.

Moving forward to the correcting entry, you don't think your office did anything wrong, but in hindsight, it would have been better if there had been a motion filed?

A. It would have been better to have a motion filed, and I should have sent -- I should have alerted -- once I became aware of counsel -- the defense counsel, they should have been put into the loop.

Q. Okay. We're out of tape. Thanks. We'll take a quick break, and I'm nearing the end if you can believe this.

Tyler and just things like that.

Q. Other -- other than logistical e-mails about just getting here and that type of thing, are there any other documents you've withheld?

A. No, no.

Q. Okay. And are either Mr. Gibson or Mr. Wells representing you as your attorneys in this?

A. Only -- they are representing the interest of the United States and not us. That was another helpful clarification that they provided us with. They're here to ensure that the scope of the testimony doesn't go outside of our, you know, specifics on the Tuohy regulations.

Q. Sure. Just another couple of questions. First of all, I've noticed, just by looking at the PACER in the eastern district, that sometimes you'll see entries that say filed in error or there will be some indication like that.

A. Yeah, yeah.

Q. I noticed in this case, however, the docket entry of October 15th, 2007, has completely disappeared from the system. Can you -- number one, do you know that to be true?

A. The docket entry for the complaint?

Q. Yeah. The docket entry that said

October 15th --
A. Oh.
Q. You know what I'm saying?
A. Right. Yeah, that -- that disappeared when Faye Thompson made that correcting -- I mean, that -- that's the one thing that disappeared. And yet, from the transaction log, you can see that that adjustment was made. And when I first saw the docket sheet, it said October 15th. But once that change was made, it changed it in the database.
Q. Okay. Why wouldn't it show filed in error as you do other? What's the distinction between that?
A. Filed in error is a procedure that is used primarily for what we call quality control events, but they are -- when attorneys -- and this, again, is a provision in our local rules. We are not authorized to reject documents for failure to comply with the rules.
Nonetheless, this court and many courts have authorized the clerk's office to, in effect, monitor electronic filings for rule compliance. And so, say if you submitted a document that lacks something significant, sometimes the document would be withdrawn and then resubmitted in the proper format.
But it's primarily to do with our function of quality control and looking at those documents and,

A. And then they've also -- if they're looking at the Notice of Electronic Filing, which is really the document that all of us ought to be looking at because, under the rules, that is the -- it's not what a docket clerk puts under Document Number 1. It's the -- what does the NEF say.

Q. But --

A. But that was kind of where I was coming from. But looking back on all the difficulty this has caused and what -- you know, perhaps a better course of action at the time, knowing what I know now, you know, there's no way, if this situation occurred again, that we would do the same thing, that we would make an adjusting entry. We would hopefully fix it before then, but we're not going to touch another similar case like this. We would leave it up to a judge.

Q. And the reason for that is that a judge would have all the facts available like you provided the Texas Lawyer?

A. Yes, right.

Q. The public would have those facts available?

A. Yes.

Q. And the explanation would be there for everyone to take a look at?

A. Right. That -- hindsight being 20/20, that

reference the complaint, and it does evidence a change in the date filed; but it does not mention 10/15 in that text.

Q. We may have this already marked as another exhibit.

MR. McWILLIAMS: Chip, I'm going to use your sequence here.

MR. BABCOCK: Sure.

(Exhibit Number 111 was marked.)

Q. (BY MR. McWILLIAMS) Marked as Exhibit 111, and can you identify what that exhibit is?

A. That is -- well, it's -- are these a copy of the same? Yeah, you just want me to -- this appears to be a copy of that.

Q. Right, right. Just identify the first two pages.

A. Yeah, okay. Yeah, yeah, this is a copy of the docket sheet that shows the way that it looked before Ms. Thompson corrected that entry.

Q. All right. And what -- what does it say the filing date of the complaint is?

A. October 15, 2007.

Q. Now, that is the docket sheet and the filing date that is now gone?

A. Yeah. But it is indicia of how it looked.

the 20 some-odd pages following had a file date of October the 15th, 2007, did it not?

A. Right. Yes.

Q. Did you send a copy of that complaint in the exhibits to the Texas Lawyer?

A. No. I mean, the first time I'd seen that complaint with the header on it was today. But even with or without the header, of course, any -- any printing of that document out of the database would have -- after the case is filed, that header appears on everything.

Q. I understand.

A. On every page.

Q. So if --

A. But I did not send the complaint as part of my attachments because I was focusing, as we should, on the Notice of Electronic Filing.

Q. I understand. So if a member of the public, on this same October 16th date at 9:40 a.m., had looked at the complaint, it would have had the October 15th filing date across the top?

MR. HOLMES: Objection, form.

A. At any time, you're correct, yeah, it would have had that.

MR. HOLMES: Objection, form.

A. Yes. It was in November of 2007. It's that local -- pardon me -- General Order 07-9 was the order amending the local rules.

Q. And Mr. Albritton became a member of the local rules committee on what date?

A. It would have been in the spring of 2008. That -- there's a particular rhythm to the way that our rules committee works. We -- the appointments are made typically in May of a year, and I send a letter out in June welcoming the new ones. There's generally four new ones every year.

Q. And I believe you said that Mr. Albritton was appointed by Judge Davis?

A. Judge Davis. And so he would have been appointed by Judge Davis sometime in May of 2008. The letter would have gone out June of 2008 or maybe late May, and we had a physical meeting in that courtroom, Judge Steger's courtroom, sometime in July of 2008.

Q. Are all the members of the rules committee appointed by the federal judges --

A. Yes.

Q. -- in this --

A. There are some standing appointments. The then-current U.S. attorney, anybody can -- she or he can delegate their position to others. Also, the

about litigating patent cases in the Eastern District of Texas, to your knowledge?

A. No.

Q. Now, what do you take this to mean, "the banana republic of East Texas"?

A. Well, I'm aware that -- I mean, the implication is that our court is some kind of plaintiffs' clip joint and that it favors, you know, plaintiffs over -- or at least favored certain parties over others, that it's less than unbiased. That's what it implies to me. Banana republic is sort of a place that, in common parlance, I think means that it's sort of a dictatorship that invites money to come their way, that it's some kind of ill-gotten gains there. That's what it means to me. It has a negative connotation.

Q. Is there any truth to it?

A. No.

Q. Now, continuing on down the first page, there's another posting. This one's dated Wednesday, October 17th, 2007. Do you see that one?

A. Yes.

Q. Would you read the title of that one for us?

A. "Troll Jumps the Gun, Sues Cisco Too Early."

Q. Now, what is a troll, Mr. Maland?

A. Well, I do know, you know, a troll -- I was --

ought to know exactly what was being sent to them. And he was aware of it prior to me sending.

Q. Did either Judge Heartfield or Judge Folsom criticize or ask you to change anything --

A. No.

Q. -- in what you submitted to them?

A. No.

Q. Let me ask you to clear this up for me. A couple of these e-mails indicated that at least one of the clerks communicated to you that she was -- the word she used was "leery"?

A. Yes.

Q. She was leery of making any change to the docket?

A. Right.

Q. Is that an inappropriate response on her part?

A. No.

Q. Why not?

A. Because the deputy clerks are trained that any kind of adjustment -- now, there's a difference between the type of situation we talked about before where -- docketed in error. We do that kind of thing all the time. Things get -- either because of an error on the attorney's part or error in the clerk's office part, they get a notation made. It is rare that we would do a

they started loading the documents, and that was vexatious to them and therefore asked for help clarifying that. And they asked the help of my office who appropriately sent the question to me.

And being as involved as I am in the local rule formulation process, the process to even provide an instrumentality for electronic filing, I had a background that my deputies didn't and I made a decision to -- based on the document, the NEF that was available, it was clear to me that that's what exactly happened. They had followed the procedures. They were trying and did tender the document electronically shortly after midnight and you could -- I could tell from the documents then at hand and I made a decision to authorize my deputy to change the file date -- date filed in Column 1 on Document Number 1 on the docket sheet, which really -- quite frankly, even that's not dispositive. It's the NEF that matters.

Q. Does the content --

A. That's what -- I guess because the NEF controlled is why we did it, because I felt that that clarification was, under our rules, appropriate, that that's when in fact -- and I could clearly tell that's when the documents were tendered.

Q. Do the contents of Exhibit 31 bear any

we've been going up until last year, and some of that is -- the diminution between '07 and '08 would be a loss of -- prisoner cases have gone down a bit.

MR. BABCOCK: Darn.

THE WITNESS: Yeah.

A. But generally speaking, our court, up until this last year, has been bucking a national trend where, because of tort reform initiatives in many states and -- civil case filings across the country have been dropping, and ours have maintained a certain amount of steadiness to them.

Q. (BY MR. McWILLIAMS) Would it be fair to say that over the last five years, there have been from 10 to 15,000 cases filed in the eastern district?

A. Yeah, that'd be about right, somewhere in there.

Q. And just going back over the last five years and the 10 to 15,000 cases that have been filed, I understand it's your testimony that you've never been asked to change a docket filing date up until this case?

A. Right, not like this, that -- no, I've never had that -- this kind of question presented to me.

Q. And I believe it's Exhibit 111. We'll find the exhibit, but I --

MR. BABCOCK: What are you looking for?

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERIC M. ALBRITTON )
)
v. )
) C.A. NO. 6:08-CV-00089
CISCO SYSTEMS, INC., )
RICK FRENKEL, MALLUN YEN & )
JOHN NOH )

REPORTER'S CERTIFICATION
DEPOSITION OF DAVID MALAND
NOVEMBER 3, 2008

I, April Eichelberger, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DAVID MALAND, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ________________________ to the witness or to the attorney for the witness for examination, signature and return to me by ________________________;

That the amount of time used by each party at the deposition is as follows:

MR. BABCOCK......2 hours, 33 minutes

MR. McWILLIAMS...37 minutes

MR. HOLMES.......1 hour, 5 minutes;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFF:

Mr. James A. Holmes

FOR THE DEFENDANT CISCO SYSTEMS, INC.:

Mr. Charles L. Babcock, Ms. Crystal J. Parker

FOR THE DEFENDANT RICHARD FRENKEL:

Mr. George L. McWilliams

FOR THE WITNESS:

Mr. Thomas E. Gibson, Mr. Bob Wells

That $__________ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this _____ day of _________________________, 2008.

___________________________________
April Eichelberger
Texas CSR No. 7495
Expiration Date: December 31, 2009

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFF:

Mr. James A. Holmes

FOR THE DEFENDANT CISCO SYSTEMS, INC.:

Mr. Charles L. Babcock, Ms. Crystal J. Parker

FOR THE DEFENDANT RICHARD FRENKEL:

Mr. George L. McWilliams

FOR THE WITNESS:

Mr. Thomas E. Gibson, Mr. Bob Wells

That $__________ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 5th day of November, 2008.

April Eichelberger
Texas CSR No. 7495
Expiration Date: December 31, 2009

The original certified transcript file was electronically digitized using RealLegal technology

0fcf60b9-dc5a-4208-9af6-db3df4461427