EXHIBIT 9

1          UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF TEXAS

3              SHERMAN DIVISION

4

5     -----------------------------------------------------------------

6     ERIC ALBRITTON           ] CASE NO. 6:08CV89

7     VS.                 ] 9 AM, SEPTEMBER 16, 2009

8     CISCO SYSTEMS, INC.     ] TYLER, TEXAS

9     -----------------------------------------------------------------

10

11      REPORTER'S SAME-DAY DELIVERY TRANSCRIPT OF JURY TRIAL

12

13         VOLUME 3 OF 6, PAGES 529 THROUGH 813

14

15            TABLE OF CONTENTS, 1106

16

17    THE HONORABLE RICHARD SCHELL, U.S. DISTRICT JUDGE, PRESIDING

18

19

20

21

22

23

24    PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE,

25    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION.

1          [COURT REPORTER'S NOTES 20090916, 9 AM, WEDNESDAY,

2    SEPTEMBER 16, 2009, TYLER, TEXAS, U.S. DISTRICT JUDGE RICHARD

3    SCHELL PRESIDING]

4

5    APPEARANCES:

6

7    FOR THE PLAINTIFF:        JAMES A. HOLMES

8                             ATTORNEY AT LAW

9                             605 SOUTH MAIN, SUITE 203

10                            HENDERSON, TEXAS 75654

11                            903-657-2800

12                            AND

13                            NICHOLAS H. PATTON

14                            ATTORNEY AT LAW

15                            PATTON, TIDWELL & SCHROEDER

16                            4605 TEXAS BOULEVARD

17                            TEXARKANA, TEXAS 75505

18                            903-792-7080

19                            AND

20                            PATRICIA L. PEDEN

21                            ATTORNEY AT LAW

22                            1316 67TH STREET

23                            EMERYVILLE, CALIFORNIA 94608

24                            510-268-8033

25

```
1      FOR THE DEFENDANT CISCO SYSTEMS, INC:

2                  CHARLES L. BABCOCK

3                  CRYSTAL PARKER

4                  ATTORNEYS AT LAW

5                  JACKSON WALKER

6                  1401 MCKINNEY, SUITE 1900

7                  HOUSTON, TEXAS 77010

8                  713-752-4200

9                  AND

10                 DAVID T. MORAN

11                 ATTORNEY AT LAW

12                 JACKSON WALKER

13                 901 MAIN STREET, SUITE 6000

14                 DALLAS, TEXAS 75202

15                 214-953-6000

16     FOR THE DEFENDANT RICHARD FRENKEL:

17                 GEORGE MCWILLIAMS

18                 ATTORNEY AT LAW

19                 PATTON, ROBERTS, MCWILLIAMS &

20                 CAPSHAW

21                 406 WALNUT

22                 TEXARKANA, TEXAS 75504

23                 903-277-0098

24

25
```

1    A.    AND MS. PEDEN, YES.  YES.

2    Q.    DID YOU AND ERIC EVER HAVE DIFFERENCES THAT CAUSED YOU

3    TO SPLIT UP?  WAS IT AMICABLE OR --

4    A.    NO.  IT WAS A VERY AMICABLE SPLIT.  IT WAS A TOUGH

5    SPLIT, BECAUSE -- I DON'T KNOW.  -- I HAD TO MAKE A DECISION

6    ABOUT WHICH DIRECTION I THOUGHT MY PRACTICE WAS GOING, AND HE

7    MADE A DECISION ABOUT WHICH DIRECTION HIS PRACTICE WAS GOING.

8    I THINK IN THE LONG RUN, IT ENABLED US TO BE BETTER FRIENDS NOT

9    BEING BUSINESS PARTNERS, BUT -- SO IT WAS AMICABLE, AND WE GET

10   ALONG WELL NOW.

11   Q.    WHAT TYPE OF PRACTICE DO YOU HAVE NOW, MR. WARD?

12   A.    MY PERSONAL PRACTICE OR MY FIRM'S PRACTICE?  BECAUSE

13   THEY'RE A LITTLE BIT DIFFERENT.

14   Q.    WELL, LET'S DO YOUR PERSONAL PRACTICE.

15   A.    MY PERSONAL PRACTICE RIGHT NOW CONSISTS OF ABOUT

16   95 PERCENT OF -- 90 TO 95 PERCENT OF PATENT-INFRINGEMENT

17   LAWSUITS.

18   Q.    SO YOU'RE FAMILIAR WITH THAT TYPE OF LITIGATION?

19   A.    I'VE BECOME VERY FAMILIAR WITH IT OVER THE LAST -- I

20   LIKE TO THINK I HAVE.  -- OVER THE LAST SIX OR SEVEN YEARS.

21   Q.    DO YOU HAVE SOME YOUNG FOLKS THAT WORK WITH YOU,

22   MR. WARD?

23   A.    I HAVE SUPPORT STAFF THAT'S YOUNGER THAN ME.  I'VE GOT

24   TWO PARTNERS THAT ARE ACTUALLY OLDER THAN ME.

25   Q.    OKAY.  AND WHAT TYPE OF WORK DO THEY DO?

1   DIDN'T KNOW THIS AT THE TIME, BUT WE NOW KNOW THAT IT WAS

2   CISCO, CISCO'S ATTORNEY, SO I DON'T THINK HE GOT ANONYMOUS

3   E-MAILS POINTING OUT SOMETHING WHAT HAPPENED TO THE ESN DOCKET.

4   I THINK CISCO WAS MONITORING THIS CASE.  MR. FRENKEL, WE NOW

5   KNOW WAS THE ATTORNEY IN CHARGE IN-HOUSE FOR THE ESN VERSUS

6   CISCO CASE.  SO I DON'T THINK THAT STATEMENT IS TRUE.  AND IT'S

7   NOT TRUE THAT IT HAD BEEN ALTERED.

8   Q.   ALL RIGHT.  NEXT SENTENCE, "ONE E-MAIL."

9   A.   YEAH.  "ONE E-MAIL SUGGESTED ESN'S LOCAL COUNSEL."  IT

10  WAS ACTUALLY MS. MATHIS, BUT SHE WAS WORKING FOR ERIC, AND I

11  DON'T HAVE ANY PROBLEM WITH ANYTHING THAT SHE DID.

12        THAT WE HAD CALLED THE EASTERN DISTRICT OF TEXAS

13  COURT CLERK AND CONVINCED HIM OR HER TO CHANGE THE DOCKET TO

14  REFLECT AN OCTOBER 16TH FILING DATE RATHER THAN THE

15  OCTOBER 15TH FILING DATE.  THAT STATEMENT IS UNTRUE.  THERE WAS

16  NOT AN OCTOBER 15TH FILING DATE.  IT WAS AN OCTOBER 16TH FILING

17  DATE.  THEY'VE GOT A PROBLEM IN THEIR SOFTWARE.  IT WAS POINTED

18  OUT TO THEM, AND THEY CORRECTED THE DOCKET.

19  Q.   OKAY.  THERE'S A STATEMENT THERE, "I CHECKED, AND SURE

20  ENOUGH, THAT'S EXACTLY WHAT HAPPENED."

21  A.   HE'S STATING IT AS A FACT THAT, AGAIN, WE HAD CONVINCED

22  THE CLERK TO DO SOMETHING TO CHANGE FILING DATE, WHICH, AGAIN,

23  IS UNTRUE.

24  Q.   BY THE WAY, MR. WARD, WHEN YOU SAW THIS, THE HEADER,

25  PARTICULARLY, ABOUT YOU CONVINCING AND THE CONSPIRACY AND ALL

1    OF THAT STUFF, DID YOU THINK YOU'D BEEN ACCUSED OF A CRIME?

2    A.    WITHOUT A DOUBT, AND IT'S IN THE NEXT SECTION HE TALKS

3    ABOUT THE DOCKET BEING CHANGED; BUT THEN HE GETS TO THE

4    COMPLAINT, AND HE SAYS THE COMPLAINT WAS ALTERED TO CHANGE THE

5    FILING DATE.  THERE WAS NO DOUBT IN MY MIND THAT WHAT HE WAS

6    WRITING RIGHT THERE WAS A CRIME.  IT WOULD BE THE SAME -- IN

7    THE OLD DAYS, WE WOULD TAKE A COMPLAINT IN AND IT WOULD BE

8    FILE-STAMPED.  THERE WOULD BE A STAMP PUT ON IT, HAVE THE DATE

9    AND THE TIME.  THAT WOULD BE LIKE ME SCRATCHING THAT DATE OUT

10   OR CONSPIRING WITH THE CLERK TO SCRATCH IT OUT AND CHANGE IT TO

11   A DIFFERENT DATE.  THERE WAS NO DOUBT IN MY MIND THAT TO DO

12   THAT, I WOULD BE IN BIG TROUBLE BOTH WITH THE STATE BAR OF

13   TEXAS, THE EASTERN DISTRICT OF TEXAS.  I WOULD BE IN BIG

14   TROUBLE, AND I THINK I WOULD BE IN HOT WATER WITH THE U.S.

15   ATTORNEY.

16   Q.    I SUSPECT YOU WOULD HAVE A DADDY THAT DIDN'T LIKE IT

17   VERY MUCH EITHER, WOULD YOU?

18   A.    I WASN'T WORRIED ABOUT MY DADDY AT THAT POINT.

19   Q.    NO.  I MEANT IF YOU HAD ALTERED A DOCUMENT.

20   A.    AGAIN, THAT WAS NOT MY CONCERN, BUT I'M SURE HE

21   WOULDN'T HAVE BEEN PROUD OF THAT.

22   Q.    WHAT ELSE IS UNTRUE?

23   A.    DO YOU WANT TO KEEP GOING INTO THE NEXT PARAGRAPH?  I

24   MEAN I THINK HE'S RIGHT THAT ONLY THE EASTERN DISTRICT COURT

25   CLERK CAN MAKE CHANGES.  I GUESS I COULD MAKE THE CHANGES ON

1     THE FILING DATE, BUT NOW THE WAY THE SYSTEM IS SET UP ONLY

2     THE COURT CLERK COULD MAKE THESE CHANGES.

3     Q.    OKAY.

4     A.    AND THEN HE TALKS ABOUT A CONSPIRACY IN THAT VERY NEXT

5     SENTENCE, WHICH THERE WAS NO CONSPIRACY TO DO ANYTHING.

6         ERIC DID SIGN THE CIVIL COVER SHEET ON THE 15TH, BUT

7     IT DID NOT STATE THAT THE COMPLAINT HAD BEEN FILED ON THE 15TH.

8     Q.    ALL RIGHT.

9     A.    SO THAT'S UNTRUE.

10        AND THEN THE VERY NEXT SENTENCE IS UNTRUE.  IT SAYS

11    THERE'S TONS OF PROOF THAT ESN FILED ON OCTOBER 15TH.  THERE

12    WAS ABSOLUTELY NO PROOF THAT A COMPLAINT HAD BEEN FILED ON THE

13    15TH.  THERE WAS A NOTICE OF ELECTRONIC FILING THAT IS NOW LIKE

14    THAT FILE STAMP THAT SHOWS YOU EXACTLY WHEN THE DOCKET--OR WHE

15    THE COMPLAINT GOT FILED.  SO THAT WAS ABSOLUTELY UNTRUE.

16    Q.    ALL RIGHT.  NEXT PARAGRAPH?

17    A.    HE'S TALKING ABOUT THE--WHEN HE SAYS THE EASTERN

18    DISTRICT OF TEXAS, I TOOK THAT AS THE CLERK'S OFFICE.  SOMEONE

19    IN THE CLERK'S OFFICE IS APPARENTLY, WITTINGLY OR UNWITTINGLY,

20    CONSPIRING.  SO THEY'RE EITHER WORKING WITH US AS LOCAL COUNSEL

21    KNOWINGLY OR WE'RE HOODWINKING THEM INTO OBLITERATING THAT FILE

22    DATE AND CHANGING IT TO MANUFACTURE SUBJECT-MATTER JURISDICTION

23    WHICH IS A MAJOR ALLEGATION OF WRONGDOING.

24    Q.    DID YOU GUYS DO ANYTHING LIKE THAT?

25    A.    ABSOLUTELY NOT.  AND THERE WAS NEVER ANYTHING FILED

1    IN THAT CASE WHERE--ANY DISCIPLINARY ACTION TAKEN AGAINST US.

2    THEY NEVER FILED ANYTHING IN THE CASE TO SAY THAT ANY OF THIS

3    HAPPENED, THEY ONLY DID IT IN THIS BLOG.  AND IT WAS CISCO THAT

4    WAS DOING IT.

5    Q.    THE LAST SENTENCE THERE, DO YOU THINK THAT'S TRUE?

6    A.    NO, I DON'T THINK THAT WE HAVE AN ABUSIVE PRACTICE IN

7    THE EASTERN DISTRICT OF TEXAS.  I THINK THAT WAS MORE CISCO'S

8    OPINION OF WHAT IT'S LIKE TO BE IN THE EASTERN DISTRICT OF

9    TEXAS.  I DON'T THINK IT'S TRUE, BUT THEY'RE ENTITLED TO THEIR

10   OPINION ON THAT.

11   Q.    ABOUT THE BANANA REPUBLIC?

12   A.    YOU CAN'T SAY THAT AS A LAWYER IN A PLEADING.  YOU

13   CAN'T CRITICIZE THE COURT.  SO IF MR. FRENKEL HAD DONE THAT AS

14   A LAWYER IN TEXAS, HE WOULD BE SUBJECT TO BEING DISCIPLINED.

15   BUT, YOU KNOW, HE'S DOING IT ANONYMOUSLY IN A BLOG.

16   Q.    OKAY.

17        AND THEN THE LAST SENTENCE SAYS, "DON'T BE SURPRISED

18   IF THE DOCKET CHANGES BACK ONCE THE HIGHER-UPS IN THE COURT GET

19   WIND OF THIS, MAKING THIS POST COMPLETELY IRRELEVANT."

20   A.    WELL, AND AGAIN, HE'S SAYING:  THESE GUYS ARE GONNA GET

21   CAUGHT WHEN THE JUDGES FIND OUT WHAT'S HAPPENED, AND IT WILL

22   GET CORRECTED AFTER WE GET CAUGHT, AFTER WE GET CAUGHT IN THIS

23   CRIME.

24        MR. PATTON:  ALL RIGHT.

25        LET'S GO TO THE NEXT ONE, DEREK.  THAT'S THE--IT

1    WOULD BE THE NEXT--THE 19TH OF--I'M SORRY.  IT WILL BE THE 19TH

2    BLOG.

3    Q.    NOW I'LL TELL YOU, MR. WARD--AND I DON'T THINK ANYONE

4    WILL DISAGREE--THAT THIS SAYS THE 18TH UP ON THE TOP, BUT

5    ACTUALLY THIS APPEARED ON THE 19TH.

6    A.    OKAY.

7    Q.    OKAY?  I NOTICE IT STILL HAS THE SAME HEADER.

8    A.    RIGHT.  CORRECT.

9    Q.    I ASSUME IT WASN'T TRUE THERE EITHER.

10   A.    NO.

11   Q.    OKAY.  NOW, THE FIRST PART THERE--

12   A.    I HAD THE SAME TESTIMONY ABOUT EVERYTHING EXCEPT, YOU

13   KNOW, WE CAN LOOK AT WHAT HE CHANGED OR WE CAN GO THROUGH THI

14   LINE-BY-LINE.  I THINK THIS IS THE ONE WHERE HE EDITED IT.

15   Q.    YEAH, IT IS.  LET'S GO TO THE THINGS THAT YOU THINK ARE

16   NOTEWORTHY.  ANYTHING ABOUT THE "OF COURSE, THERE ARE A COUPLE

17   OF FLAWS"?  IS THAT ANY DIFFERENT?

18   A.    IT'S TOUGH TO TELL WITHOUT LAYING THEM RIGHT NEXT TO

19   EACH OTHER.  I DON'T THINK THAT THERE'S ANYTHING DIFFERENT IN

20   THAT.

21   Q.    OKAY.  NOW LET'S GO TO THE NEXT PARAGRAPH.

22   A.    HE TOOK "CONSPIRING" OUT.  ON THESE BLOGS, PEOPLE CAN

23   WRITE IN AND MAKE COMMENTS.  AND I THINK HE WROTE THAT HE WAS

24   GETTING A LOT OF COMMENTS ON THESE BLOGS THAT WERE CRITICAL OF

25   THE LANGUAGE THAT HE USED, WHICH I'M SURE THERE WERE--IT WAS

1    LAWYERS MOSTLY THAT WERE READING IT, THE PEOPLE I KNEW THAT

2    WERE READING IT WERE ATTORNEYS AND CLIENTS.  AND THERE'S NO

3    DOUBT THAT LAWYERS WERE PICKING UP ON THIS, GOING, "YOU JUST

4    ACCUSED THESE GUYS OF A CRIME.  YOU MIGHT WANT TO TONE YOUR

5    LANGUAGE DOWN."  HE TONED IT DOWN A LITTLE BIT, BUT NOT MUCH.

6    TOOK THE WORD "CONSPIRING" OUT.  AND THEN HE SAYS "EVEN IF THIS

7    WAS A MISTAKE"--AND HE PUTS MISTAKE IN QUOTES--AND HE SAYS HE

8    CAN'T SEE HOW IT COULD BE.

9    Q.    ANYTHING IN THERE ABOUT A BANANA REPUBLIC?

10   A.    NO.  THAT'S GONE.  AGAIN, SOMEONE MIGHT HAVE MADE HIM

11   PRIVY TO THE FACT THAT CRITICIZING THE COURT LIKE THAT COULD

12   GET HIM DISCIPLINED IF HE WERE A LAWYER PRACTICING IN TEXAS.

13   Q.    THE WORD "CONSPIRACY" WAS TAKEN OUT THERE, BUT LOOK

14   BACK UP TO THE VERY TOP.  THE INFORMATION ABOUT ALTERING

15   DOCUMENTS AND THAT TYPE OF THING IS STILL THERE, ISN'T IT?

16   A.    ABSOLUTELY.  IT WAS THERE FOR--IT'S STILL OUT THERE.

17   YOU CAN GO FIND THESE ARTICLES EVEN NOW.  BUT THE BLOG IS NOT

18   NEARLY AS ACCESSIBLE AFTER HE REVEALED HIMSELF.

19   Q.    MR. FRENKEL TESTIFIED EARLIER TODAY, MR. WARD, THAT HE

20   GOT FUSSED AT BY HIS BOSS, MR. CHANDLER, ON THE BANANA REPUBLIC

21   DEAL.

22   A.    I'M SURE MR. CHANDLER WAS WELL AWARE OF WHAT WAS GOING

23   ON IN THIS BLOG.

24        MR. BABCOCK:  YOUR HONOR, I'LL OBJECT.  THAT'S

25   NON-RESPONSIVE AND IT'S SPECULATIVE.

1          THE COURT:  I'LL SUSTAIN THE OBJECTION.  IT'S NOT

2     RESPONSIVE.

3          MR. PATTON:  OKAY.

4          I CAN'T REMEMBER MY QUESTION, JUDGE.  MAYBE I COULD

5     WORD IT DIFFERENTLY.

6          THE WITNESS:  I THINK YOUR QUESTION WAS THAT

7     MR. FRENKEL HAD GOTTEN FUSSED AT BY HIS BOSS FOR TALKING ABOUT

8     THE BANANA REPUBLIC.  I DON'T KNOW WHETHER HE FUSSED AT HIM OR

9     NOT.

10         MR. PATTON:  OKAY.

11    Q.   HE DID TAKE IT OUT, THOUGH?

12    A.   HE DID TAKE THAT OUT.

13    Q.   DO YOU KNOW HOW LONG THIS BLOG WAS UP WHERE YOU COULD

14    ACCESS IT?

15    A.   WHERE I COULD ACCESS IT, IT WAS UP UNTIL HE REVEALED

16    HIMSELF AND TOOK THE BLOG DOWN.  I CAN'T REMEMBER WHETHER THAT

17    WAS FEBRUARY OR MARCH OF 2008.

18    Q.   MR. FRENKEL TESTIFIED THAT THE BANANA REPUBLIC AND THE

19    CONSPIRACY ASPECT, THAT HE CORRECTED ALL THAT THE NEXT DAY AND

20    YOU COULDN'T ACCESS IT.  IS THAT SO?

21         MR. BABCOCK:  OBJECTION, YOUR HONOR.  MISSTATES THE

22    TESTIMONY, THAT YOU COULDN'T ACCESS--

23         MR. PATTON:  I'LL WITHDRAW THE QUESTION, JUDGE, AND

24    SOLVE THAT PROBLEM.

25         THE COURT:  OKAY.

1          MR. PATTON:

2     Q.    COULD YOU ACCESS IT?

3     A.    ABSOLUTELY.  YOU COULD DO GOOGLE SEARCHES AND YOU COULD

4     GET THE OLD POSTS THAT WERE CIRCULATING ON THE INTERNET AT THAT

5     POINT, THAT ARE STILL OUT THERE CIRCULATING RIGHT NOW.

6     Q.    IF I WANTED TO FIND THIS POST ON THE INTERNET--WELL,

7     LET'S DON'T USE ME, LET'S USE SOMEBODY THAT KNOWS ABOUT

8     COMPUTERS.

9          [LAUGHTER]

10    Q.    COULD SOMEBODY THAT KNOWS ABOUT COMPUTERS FIND THIS

11    THING ON THE INTERNET, IF THE BLOG WAS OPEN?

12    A.    I BELIEVE ABSOLUTELY YOU COULD.

13    Q.    OKAY.

14    A.    THE EDITS DIDN'T INTEREST ME THAT MUCH.  HE WAS STILL

15    ACCUSING ME OF A CRIME EVEN AFTER HE EDITED IT.  SO OLD OR NEW,

16    IT DIDN'T REALLY MATTER.  IT WAS ACCESSIBLE.  HIS BOSS WAS

17    FUSSING ABOUT IT, THEY ALL KNEW THAT IT WAS THERE.

18         MR. BABCOCK:  YOUR HONOR, NON-RESPONSIVE AND WITHOUT

19    THE WITNESS'S KNOWLEDGE.

20         THE COURT:  EVERY TIME I LOOK AT SOMETHING, I GET AN

21    OBJECTION.  LET'S SEE.

22         MR. PATTON:

23    Q.    LET ME ASK YOU, MR. WARD--

24         MR. BABCOCK:  YOUR HONOR, I ASK THAT THAT LAST

25    TESTIMONY BE STRICKEN?

1        THE COURT:  OKAY.  I'VE GOT TO LOOK BACK AT THE

2    QUESTION.  HANG ON JUST A MINUTE.  OKAY.

3        WELL, MR. WARD ANSWERED THE QUESTION:  COULD

4    SOMEBODY THAT KNOWS ABOUT COMPUTERS FIND THIS THING ON THE

5    INTERNET IF THE BLOG WAS OPENED?

6        HE SAID:  ABSOLUTELY THEY COULD.

7        AND THEN HE WENT ON AND ADDED MORE.

8        MR. BABCOCK:  THAT WAS THE PART I OBJECTED TO.

9        THE COURT:  I UNDERSTAND.  I'LL SUSTAIN YOUR

10    OBJECTION.

11        MR. BABCOCK:  THANK YOU, YOUR HONOR.

12        THE COURT:  OKAY, GO AHEAD.

13        MR. PATTON:  YOU ARE SUSTAINING THE OBJECTION, YOUR

14    HONOR?

15        THE COURT:  WELL, TO ADDITIONAL INFORMATION THAT

16    MR. WARD ADDED THAT WASN'T RESPONSIVE TO THE QUESTION.

17        MR. PATTON:  OKAY, I'VE GOT YOU.

18        THE WITNESS:  I'LL DO BETTER.

19        THE COURT:  JUST TRY TO LIMIT YOUR ANSWER TO

20    WHATEVER THE QUESTION WAS.

21        THE WITNESS:  I WILL.

22        MR. PATTON:

23    Q.    DOES THE CONSPIRACY ALLEGATION REMAIN THERE TO THIS

24    VERY DAY?

25    A.    I THINK HE TOOK THE WORD "CONSPIRING" OUT, BUT I

1    BELIEVE THAT THE CONSPIRACY ALLEGATION REMAINS, YES.

2    Q.   OKAY.

3         YOU GUYS--DID YOU CONSPIRE TO ANY DEGREE ABOUT

4    ANYTHING THAT RELATES TO THE FILING OF THE ESN COMPLAINT?

5    A.   NO.

6    Q.   IS THERE ANY TRUTH WHATSOEVER ABOUT A CONSPIRACY?

7    A.   NO.

8    Q.   DO YOU KNOW WHETHER YOU OR MR. ALBRITTON HAVE EVER BEEN

9    ABLE TO CONSPIRE WITH THE UNITED STATES FEDERAL DISTRICT COURT

10   CLERK?

11   A.   I DON'T KNOW IF WE COULD.  I'VE NEVER TRIED, AND I'M

12   NOT GOING TO.

13   Q.   MR. MALAND DOESN'T STRIKE ME AS A MAN WHO WOULD ENGAGE

14   IN A LOT OF CONSPIRING.

15   A.   I DON'T KNOW MR. MALAND, BUT I DON'T THINK THAT ANYONE

16   IN THE CLERK'S OFFICE IS GONNA DO ANYTHING IMPROPER FOR ME OR

17   ANYBODY ELSE.

18        MR. PATTON:  ALL RIGHT.

19        IF WE COULD SEE THE LAST BLOG, DEREK, THANK YOU.

20   THERE WERE FOUR BLOGS.  IT'S THE ONE ON THE 20TH.  LET'S MOVE

21   ALONG AND WE'LL COME BACK TO IT, DEREK.

22   Q.   COULD YOU EXPLAIN TO THIS JURY, MR. WARD, ABOUT HOW THE

23   INTELLECTUAL-PROPERTY SPECIALISTS OPERATE REGARDING THEIR

24   COMMUNITY?

25   A.   WELL, IT'S LIKE ANY COMMUNITY OF TRIAL LAWYERS.  IT'S A

1    PRETTY SMALL GROUP.  YOU COME ACROSS THE SAME LAWYERS WHETHER

2    THEY'RE ON THE WEST COAST OR EAST COAST, THE LAWYERS THAT ARE

3    ACTUALLY TRYING THESE CASES, THAT ARE STANDING UP PICKING

4    JURIES AND MAKING ARGUMENT.  AND THAT WAS KIND OF A NICHE THAT

5    ERIC AND I HAD FOUND OURSELVES IN.  AND IT DEVELOPED.  SO YOU

6    GET TO KNOW A LOT OF THE LAWYERS THAT ARE TRYING THESE CASES.

7    I THINK IT'S A RELATIVELY SMALL COMMUNITY.

8    Q.    OKAY.  DID YOU HAVE AN UNDERSTANDING ABOUT WHO READ AND

9    WHO ACCESSED AND WHO WAS INTERESTED IN THIS BLOG?

10   A.    I DID.

11   Q.    AND WHAT WAS THAT?

12   A.    I KNEW I HAD CLIENTS WHO WERE PROSECUTING PATENT-

13   INFRINGEMENT CASES, LAWYERS FROM ALL OVER THE COUNTRY THAT

14   WERE READING THESE ARTICLES.  AND CISCO BOASTED THAT THERE WERE

15   HUNDREDS OF THOUSANDS OF PEOPLE READING THESE BLOGS AT SOME

16   POINT AFTER THESE ARTICLES HAD BEEN POSTED.  I THINK HE HAD A

17   POST THAT TALKED ABOUT, "I'VE PASSED THE HUNDRED THOUSAND

18   MARK."  AND IN FACT, THE ABA JOURNAL SAID THIS WAS A MUST-READ

19   FOR THOSE IN INTELLECTUAL-PROPERTY LITIGATION.  SO IT WAS NOT

20   KNOWN TO FOLKS OUTSIDE OF PATENT LAW, REALLY, BUT IT WAS

21   SOMETHING THAT WAS COMMONLY READ BY LAWYERS THAT WERE

22   PRACTICING IN THIS AREA.

23   Q.    GENERALLY SPEAKING, ARE LAWYERS FAIRLY GOSSIPY?

24   A.    I DON'T KNOW HOW LAWYERS ARE.  I MEAN I LIKE TO THINK

25   NO, WE DON'T GOSSIP.  BUT, YOU KNOW, THERE'S PUBLICATIONS THAT

1     WE ALL READ, WHETHER IT'S THE "TEXAS LAWYER" OR TROLL TRACKER

2     OR WHAT IT IS.  WE KEEP UP WITH WHAT'S GOING ON, OR WE TRY TO.

3     Q.    DOES WORD SPREAD PRETTY FAST ABOUT THINGS?

4     A.    ABSOLUTELY.

5          MR. PATTON:  OKAY.

6          IF YOU WOULD PULL UP EXHIBIT 356, THAT'S THE OCTOBER

7     20TH BLOG.  LAST PARAGRAPH.  IF YOU WOULD HIGHLIGHT THE LAST

8     PARAGRAPH.  CAN YOU HIGHLIGHT THAT FOR ME, DEREK?

9     Q.    THE LAST PARAGRAPH OF THIS--WE'VE HAD BLOGS ON THE

10    17TH, THE 18TH, THE 19TH, AND THIS IS THE 20TH.  WHAT DID

11    MR. FRENKEL TELL PEOPLE THERE?

12    A.    HE'S NO LONGER ALLOWING COMMENTS AND E-MAILS, HE'S

13    GONNA KEEP POSTING, ALTHOUGH FOR MUCH OF THIS WEEK HE'LL BE

14    AWAY FROM HIS COMPUTER, HOPE EVERYONE KEEPS ENJOYING.  IF YOU

15    WANT TO COMPLAIN ABOUT HIM, GO TO IHATETROLLTRACKER.COM.

16         MR. PATTON:  OKAY.  LET'S GO BACK UP TO THE

17    PARAGRAPH ABOVE, DEREK.

18    Q.    TALKING ABOUT THE FEEDBACK.

19    A.    RIGHT.

20    Q.    "WHILE I'VE ENJOYED WRITING IT, ONE PART I HAVEN'T

21    ENJOYED ARE THE OFTEN NASTY AND THREATENING COMMENTS."  AND

22    THEN HE TELLS YOU IN THAT BOTTOM PARAGRAPH HE'S SHUTTING IT

23    DOWN FOR COMMENTS, CORRECT?

24    A.    CORRECT.

25         MR. PATTON:  GO TO THE FIRST PARAGRAPH, IF YOU

1    WOULD, DEREK.  START WITH "MY READERS," THE FIRST LINE DOWN,

2    RIGHT NEAR THE END OF THE SENTENCE, PLEASE, DEREK, ALL THE WAY

3    TO THE BOTTOM.

4    Q.    "MY READERS INCLUDE THOSE FROM THE SENATE, HOUSE OF

5    REPRESENTATIVES, THE PATENT AND TRADEMARK OFFICE, THE

6    DEPARTMENT OF JUSTICE, MANY MAJOR LAW FIRMS, A TON OF

7    CORPORATIONS, AND QUITE A FEW OWNERS OF SHELL COMPANIES SUING

8    IN EAST TEXAS.  NOT SURPRISINGLY, A GOOD PORTION OF THE HITS

9    MY BLOG GETS COME FROM TEXAS."  DO YOU SEE THAT?

10   A.    I DO.

11   Q.    DO YOU REMEMBER HOW IT STARTED, GOTTEN QUITE A FEW

12   NASTY OR--

13         JUST PUT IT UP, DEREK, THE FIRST PARAGRAPH.  I DON'T

14   WANT TO MISQUOTE IT.  FIRST PARAGRAPH.  TOP PARAGRAPH.

15         IS THAT THE ONE THAT SAYS "SIX MONTHS AGO"?

16   A.    I THINK IT'S IN THE NEXT PARAGRAPH THAT YOU READ WHERE

17   HE HAD GOTTEN NASTY COMMENTS.

18   Q.    YEAH, THE SECOND PARAGRAPH.  MOST OF IT HAS BEEN GOOD,

19   BUT THAT HE'S GETTING PROBLEMS AND HE'S SHUTTING IT DOWN.

20   A.    RIGHT.  HE'S ONLY SHUTTING DOWN THE COMMENTS.

21   Q.    RIGHT.

22   A.    THE BLOG KEEPS GOING.

23   Q.    I UNDERSTAND.  SHUTTING THE COMMENTS DOWN.  DO YOU KNOW

24   WHY HE DID THAT?

25   A.    WHY HE SHUT IT DOWN FOR COMMENT?  I MEAN HE SAYS HE'S

1   GETTING TOO MANY COMMENTS RIGHT AFTER HE'S WRITTEN THIS--THIS

2   ARTICLE. I DON'T KNOW THAT WE HAVE THOSE COMMENTS THAT HE WAS

3   GETTING.

4        MR. BABCOCK:  YOUR HONOR, AGAIN I'D OBJECT AS

5   NON-RESPONSIVE.  THE QUESTION WAS:  DO YOU KNOW WHY HE SHUT IT

6   DOWN FOR COMMENTS?  AND HE SAID A WHOLE BUNCH OF THINGS THAT

7   WEREN'T RESPONSIVE TO THAT.

8        THE COURT:  WELL, I DIDN'T TAKE WHAT HE SAID TO BE

9   TOTALLY NON-RESPONSIVE, AND I KEEP LOSING THE REALTIME.  HERE

10  IT IS.

11       MR. BABCOCK:  MAYBE MR. PATTON--

12       THE COURT:  GETTING TOO MANY COMMENTS RIGHT AFTER

13  HE'S WRITTEN THIS ARTICLE.  I DON'T KNOW THAT WE HAVE THOSE

14  COMMENTS.  I GUESS HE'S ASSUMING THAT IT'S BECAUSE HE WAS

15  GETTING TOO MANY COMMENTS IS WHY HE SHUT IT DOWN.  I THINK

16  THAT WAS YOUR ANSWER, WASN'T IT?

17       THE WITNESS:  I BELIEVE SO.

18       THE COURT:  I'LL OVERRULE THE OBJECTION.  GO AHEAD.

19       MR. PATTON:

20  Q.    HOW DID YOU FEEL, YOURSELF, MR. WARD, KNOWING THAT

21  PEOPLE IN THE SENATE, THE HOUSE OF REPRESENTATIVES, JUDGES,

22  PEOPLE IN THE EASTERN DISTRICT OF TEXAS, AND TONS OF

23  CORPORATIONS--HOW DID YOU FEEL WHEN THAT ACCUSATION OF THE

24  CONSPIRACY--WHEN YOU SAW THAT, HOW DID YOU FEEL?

25  A.    IT INFURIATED ME WHEN I FIRST SAW IT.  I DIDN'T NEED

1    TO SEE WHO HE SAID WAS READING HIS BLOG.  I KNEW THAT I HAD

2    CLIENTS AND FELLOW LAWYERS THAT WERE READING THE BLOG BECAUSE

3    PEOPLE WERE TALKING ABOUT IT.  IT INFURIATED ME.

4    Q.    WERE YOU, AT THAT TIME, SEEING ERIC ALBRITTON ON NEARLY

5    A DAY-TO-DAY BASIS?

6    A.    PROBABLY EVERY DAY; IF NOT, EVERY OTHER DAY.

7    Q.    OKAY.

8    A.    I SAW HIM ON THE DAY THAT THAT GOT POSTED.

9    Q.    WERE YOU ABLE TO OBSERVE WHAT WAS GOING ON WITH ERIC

10    AS IT REGARDS THIS POSTING?

11    A.    I DID.

12    Q.    LET'S START THE FIRST TIME YOU SAW EACH OTHER AFTER

13    IT OCCURRED AND JUST TELL ME WHAT YOU OBSERVED ABOUT WHAT WAS

14    GOING ON WITH ERIC ALBRITTON.

15    A.    THERE WAS A LOT GOING ON AT THAT TIME, BUT I REMEMBER

16    ERIC BEING IN MY OFFICE AND WE PULLED THE BLOG UP TO LOOK AT

17    IT TO SEE WHAT WAS WRITTEN, AND WE WERE BOTH JUST INCREDULOUS,

18    JUST VERY ANGRY, YOU KNOW.  WE KNEW THIS HAD NOT HAPPENED.  WE

19    HAD NO IDEA THAT IT WAS CISCO THAT WAS WRITING THIS ABOUT US.

20    YOU KNOW, WE CAME UP WITH A PLAN, LET'S GET THIS SHUT DOWN.  IS

21    THERE A WAY WE CAN GET THIS SHUT DOWN.  THAT WAS OUR IMMEDIATE

22    REACTION.

23    Q.    DID YOU UNDERTAKE ANY STEPS--WHAT WAS THE FIRST STEP

24    YOU TOOK, ACTIVE STEP YOU TOOK AFTER SEEING THIS?

25    A.    THE FIRST ACTIVE STEEP I TOOK, I BELIEVE, WAS TO COME

1    SEE YOU.

2    Q.    OKAY.  AND WHAT DECISIONS WERE MADE AS A RESULT OF THAT

3    TRIP, MR. WARD?

4    A.    WE FILED A JOHN DOE PETITION IN GREGG COUNTY TO TRY AND

5    TAKE THE DEPOSITION OF GOOGLE, BECAUSE IT WAS A BLOG HOSTED BY

6    GOOGLE.  WE WANTED TO GET THE IDENTITY OF THE PERSON WHO WAS

7    WRITING THIS SO THAT WE COULD GET IT TAKEN DOWN.

8    Q.    OKAY.  AND DID WE--

9    A.    THAT WAS WITHIN--I THINK IT WAS WITHIN A COUPLE OF

10   WEEKS THAT WE FILED THAT LAWSUIT.  IT WASN'T A LAWSUIT, BUT

11   WE FILED THAT PLEADING.

12   Q.    AND DID YOU AND I ACTUALLY GO TO A HEARING?

13        THE COURT:  OBJECTION?

14        MR. BABCOCK:  YEAH.  A POINT OF CLARIFICATION, YOUR

15   HONOR.  WHEN THE WITNESS SAID, "WE FILED," I'M NOT CERTAIN

16   WHETHER HE'S TALKING ABOUT MR. PATTON OR MR. ALBRITTON.

17        MR. PATTON:  I WAS TALKING ABOUT JOHNNY AND ME.

18        MR. BABCOCK:  THANK YOU, YOUR HONOR.

19        MR. PATTON:

20   Q.    THAT'S THE "WE"?

21   A.    CORRECT.

22   Q.    OKAY.  THE LAWSUIT WAS IN YOUR NAME, OBVIOUSLY?

23   A.    CORRECT.

24   Q.    AND I SIGNED THE PLEADING?

25   A.    YOU SIGNED THE PLEADING.

1    Q.    OKAY.  AS YOUR LAWYER.

2    A.    AS YOUR LAWYER [SIC] YOU SIGNED MY PLEADING.

3    Q.    WHICH I HAVE REMAINED SINCE THAT TIME?

4    A.    CORRECT.

5    Q.    OKAY.  AND DID WE HAVE A HEARING ABOUT THAT?

6    A.    WE DID HAVE A HEARING, AND THE COURT ISSUED, I BELIEVE,

7    AN ORDER FOR THE DEPOSITION TO PROCEED.

8    Q.    OKAY.  AND WHAT HAPPENED FROM THAT POINT FORWARD?

9    A.    I DON'T KNOW EXACTLY OTHER THAN GOOGLE SAID THEY WERE

10   GONNA TURN THE NAME OVER TO US, IF THERE WAS NO OBJECTION,

11   WITHIN 10 DAYS.  AND APPARENTLY THERE WAS AN OBJECTION, AND

12   WE DID NOT GET THE INFORMATION AT THAT TIME.  WE WERE PURSUING

13   THAT DEPOSITION WHEN MR. FRENKEL REVEALED HIS IDENTITY.

14   Q.    ALL RIGHT.  WHAT HAPPENED AS WE WERE PURSUING GETTING

15   A HEARING IN CALIFORNIA?

16   A.    I DON'T KNOW THE TIMELINE.  I MEAN I KNOW THAT

17   MR. FRENKEL REVEALED HIMSELF.  FOR SOME REASON, HE SAID SOMEONE

18   THREATENED TO OUT HIM AND HE OUTED HIMSELF IN A BLOG POST.  AND

19   WHEN WE FOUND OUT WHO IT WAS, WE FILED A LAWSUIT FOR DEFAMATION

20   Q.    THERE WASN'T ANY NEED TO GO THROUGH GOOGLE ANYMORE, WAS

21   THERE?

22   A.    NO.  WE KNEW WHO IT WAS.

23   Q.    WE KNEW WHO IT WAS.

24        DID MR. ALBRITTON FILE AT THE SAME TIME OR VERY,

25   VERY CLOSE IN TIME?

1    A.    VERY CLOSE AFTER WE FILED THAT--THE ACTUAL DEFAMATION

2    SUIT.  OF COURSE, THERE WERE THINGS THAT HAPPENED BEFORE THAT,

3    BUT, YES, HE FILED.

4    Q.    OKAY.

5          DO YOU KNOW THE MR. CHANDLER WHO IS THE CHIEF LEGAL

6    COUNSEL FOR--

7    A.    I'VE MET HIM ONE TIME.  I KNOW HE'S NOT HERE.

8    Q.    OKAY.

9          LET'S GO BACK TO TALK ABOUT ERIC ALBRITTON.

10   A.    OKAY.

11   Q.    OKAY?  ARE YOU IN CONTACT WITH ERIC, AS YOU HAVE

12   STATED, ON AN ALMOST-DAILY BASIS?

13   A.    YES.

14   Q.    YOU ARE IN THE SAME BUILDING?

15   A.    CORRECT.

16   Q.    AND WHAT DID YOU SAY, ABOUT 75 FEET?

17   A.    YES, SIR.  WE USUALLY HAVE COFFEE TOGETHER IN THE

18   MORNING IF WE'RE BOTH IN THE OFFICE.

19   Q.    OKAY.  AFTER THIS STUFF CAME OUT, I WILL NOT TALK ABOUT

20   WHAT YOU WERE FEELING, BUT WHAT YOU OBSERVED ABOUT ERIC.

21   A.    OKAY.  YOU KNOW, MY OBSERVATIONS WERE--IT'S HARD TO

22   TALK ABOUT IT WITHOUT TALKING ABOUT ME, BECAUSE WE HAD A LOT

23   OF THE SAME FEELINGS.

24   Q.    I UNDERSTAND.

25   A.    BUT I KNEW HE WAS VERY ANGRY, VERY UPSET, WANTED TO

1      KNOW WHO IT WAS WHO WAS WRITING THIS ABOUT US, BECAUSE AFTER IT

2      WAS WRITTEN IT WAS OUT THERE AND REMAINED POSTED FOR QUITE SOME

3      TIME AND IS STILL OUT THERE.  SO WE TALKED ABOUT IT DURING THE

4      TIME PERIOD THAT WE WERE TRYING TO FIND OUT WHO WAS DOING THIS

5      TO US, YOU KNOW, I DON'T WANT TO SAY EVERY DAY, BUT, YOU KNOW,

6      HAVE YOU FOUND ANYTHING OUT?  HAVE YOU FOUND ANYTHING OUT?  AND

7      THERE WERE OTHER PEOPLE IN THE COUNTRY WHO WERE LOOKING FOR

8      MR. FRENKEL.  SO WE TALKED ABOUT THAT.

9      Q.    WAS HE UPSET?

10     A.    ABSOLUTELY.

11     Q.    TELL THE JURY ABOUT THAT.  THEY'RE ENTITLED TO KNOW

12     WHAT YOU KNOW ABOUT THAT.

13     A.    WHAT I KNOW IS, YOU KNOW, WE TALKED ABOUT LOSING SLEEP;

14     THAT IT WAS DISTURBING THAT, YOU KNOW, WE HAD CLIENTS CALLING

15     US AND OTHER LAWYERS COMMENTING ON THIS; AND HE WAS--WE WERE

16     ANGRY.  I MEAN THAT--NO DOUBT ABOUT IT.

17     Q.    WAS IT A DISTRACTION FROM WORK?

18     A.    WORRYING ABOUT IT, I GUESS, WAS A DISTRACTION.  BUT I

19     THINK ERIC AND I ARE KIND OF ALIKE.  YOU WORK HARDER WHEN YOU

20     KIND OF FOCUS YOUR ATTENTION ON SOMETHING ELSE.  I DON'T KNOW

21     THAT THAT'S UNUSUAL FOR ANYBODY WHO'S, YOU KNOW, IN A STRESSFUL

22     SITUATION.  THEY THROW THEMSELVES INTO THEIR WORK.  I THINK I

23     DID THAT, I THINK ERIC DID THAT.

24     Q.    DO YOU KNOW WHETHER OR NOT ERIC ALBRITTON WAS

25     EMBARRASSED ABOUT THIS?

1    A.    I THINK WE WERE BOTH--IT WAS HUMILIATING.  I MEAN TO BE

2    ACCUSED OF A CRIME WHEN I THINK ERIC AND I PRACTICE LIKE WHAT

3    YOU'VE GOT IN THIS PRACTICE IS YOUR NAME.  WE APPEAR IN THESE

4    COURTS REGULARLY, WEEKLY.  AND THAT'S HUMILIATING TO BE ACCUSED

5    OF A CRIME IN A PUBLICATION THAT YOU KNOW YOU GO INTO A ROOM

6    FULL OF LAWYERS WITH HEARINGS IN THESE COURTS WHERE THERE'S 60

7    OR 70 LAWYERS THAT DO PATENT-INFRINGEMENT WORK AND YOU GO IN

8    THERE AND YOU'RE GOING, "THESE GUYS THINK I'M A CRIMINAL."  OR

9    READING THAT I'VE BEEN ACCUSED OF A CRIME.

10   Q.    WERE PEOPLE TALKING ABOUT IT, MR. WARD?

11   A.    ABSOLUTELY.

12   Q.    DO YOU KNOW WHETHER MR. ALBRITTON KNEW THEY WERE

13   TALKING ABOUT HIM?

14   A.    WE TALKED ABOUT THE FACT THAT, YOU KNOW, WHEN HE WOULD

15   GET A CALL OR I WOULD GET A CALL, SO, YES, I KNOW THAT HE KNEW

16   PEOPLE WERE TALKING ABOUT IT.

17   Q.    HAVE YOU EVER GOTTEN AN APOLOGY FROM ANYBODY?

18   A.    NO.

19   Q.    DO YOU KNOW IF MR. ALBRITTON HAS?

20   A.    AS FAR AS I KNOW, HE HAS NOT.

21   Q.    MR. BABCOCK QUOTED ME AS MAKING A COMMENT ABOUT

22   STUNNING COWARDICE, WHICH I AFFIRMED TO THIS JURY A WHILE AGO

23   THAT I DID MAKE THAT COMMENT, AND STILL DO.  HAS MR. BABCOCK

24   MADE ANY COMMENTS TO THE PRESS THAT BOTHERED YOU?

25   A.    ABSOLUTELY, HE HAS.

1    Q.    AND WHAT WAS THAT?

2    A.    HE WAS QUOTED AS SAYING THAT WE HAD FILED THESE

3    LAWSUITS TO CURRY FAVOR WITH THE COURT, WHICH WAS UPSETTING AS

4    WELL.  I MEAN IT'S ESSENTIALLY SAYING THAT THESE LAWSUITS ARE

5    BASELESS AND WE'RE JUST TRYING TO SUCK UP TO THE COURT IS THE

6    REASON WE'RE PURSUING CISCO.

7    Q.    DO YOU KNOW WHY ERIC PURSUED THIS LAWSUIT?

8    A.    I THINK TO CLEAR HIS NAME.

9        MR. PATTON:  I'LL PASS THE WITNESS, YOUR HONOR.

10        THE COURT:  ALL RIGHT, MR. BABCOCK.

11        MR. BABCOCK:  THANK YOU, YOUR HONOR.

12    CROSS-EXAMINATION OF JOHNNY WARD ON BEHALF OF THE DEFENDANT

13    CISCO

14        MR. BABCOCK:

15    Q.    IN FACT, THAT ARTICLE THAT MR. PATTON JUST REFERENCED

16    WHERE I WAS QUOTED SAID EXACTLY THE OPPOSITE OF WHAT YOU JUST

17    SAID, DIDN'T IT?

18    A.    I DON'T KNOW.  IF YOU WOULD SHOW ME THE ARTICLE, I

19    COULD TELL YOU FOR SURE.

20    Q.    WE'RE LOOKING FOR IT.  WE'RE LOOKING FOR IT.  IT SAID I

21    DIDN'T KNOW IF YOU WERE--IT QUOTED ME AS SAYING I DIDN'T KNOW

22    IF YOU WERE TRYING TO CURRY FAVOR WITH THE JUDGES.  BUT WE'LL

23    SEE IT IN A MINUTE.

24    A.    I THINK THAT'S THE SAME THING, BUT WE CAN PULL IT UP

25    AND LOOK AT IT.

1    Q.    YEAH.  AND YOU WEREN'T THERE WHEN I WAS INTERVIEWED BY

2    WHOEVER THIS BLOGGER WAS?

3    A.    ABSOLUTELY NOT.

4    Q.    YOU DON'T KNOW IF I SAID WHAT I WAS QUOTED AS SAYING?

5    A.    DID YOU?  TELL US NOW.

6    Q.    NO.

7    A.    OKAY.

8    Q.    BUT IN ANY EVENT, YOU SAID THERE WAS NO APOLOGY.  THE

9    FIRST THING YOU DID WHEN YOU SAW THIS ARTICLE ON OCTOBER 18TH,

10   I THINK YOU SAID, WAS GO VISIT MR. PATTON, CORRECT?

11   A.    HE WAS THE FIRST--FIRST PERSON I WENT TO VISIT.

12   Q.    RIGHT.  THAT WAS THE FIRST STEP YOU TOOK.  AND THAT

13   WAS--I DON'T WANT TO GET INTO YOUR DISCUSSIONS, OBVIOUSLY--

14   A.    RIGHT.

15   Q.    --BUT THAT WAS FOR THE PURPOSES OF INITIATING LITIGATION,

16   CORRECT?

17   A.    THAT'S INCORRECT.

18   Q.    OKAY.  WELL, YOU WANTED HIS ADVICE, I ASSUME.

19   A.    CORRECT.

20   Q.    AS A LAWYER?

21   A.    YEAH.  I WANTED AN INDEPENDENT PERSON TO SAY, "AM I

22   READING THIS--YOU KNOW, IT'S GOT MY NAME IN IT, SO AM I

23   OVERREACTING?"

24   Q.    AND YOU KNOW THAT MR. PATTON IS A LITIGATOR, THAT'S

25   WHAT HE DOES FOR A LIVING?

1   A.   ABSOLUTELY.

2   Q.   OKAY.  AND SO THE VERY FIRST THING YOU DID WAS GO TALK

3   TO A LITIGATOR ABOUT WHAT TO DO ABOUT THIS, RIGHT?

4   A.   HOW TO SHUT IT DOWN, ABSOLUTELY.

5   Q.   RIGHT.  THAT WAS ONE OF YOUR OBJECTIONS--OBJECTIVES,

6   WAS TO SHUT DOWN THE PATENT TROLL TRACKER, RIGHT?

7   A.   TO TAKE DOWN THE ARTICLES THAT WERE WRITTEN ABOUT ME,

8   ABSOLUTELY.

9   Q.   IF YOU WERE SO INTERESTED IN TAKING DOWN THE ARTICLES

10   THAT WERE WRITTEN ABOUT YOU, AND YOU ARE TALKING ABOUT OCTOBER

11   17 AND 18, RIGHT?

12   A.   CORRECT.

13   Q.   WHY DID YOU ATTACH THEM TO YOUR COMPLAINT THAT YOU

14   FILED IN GREGG COUNTY?

15   A.   WHY?

16   Q.   YES.

17   A.   SO I COULD SHOW THE JUDGE THAT I HAD BEEN ACCUSED OF A

18   CRIME.

19   Q.   BUT YOU KNEW THAT ONCE YOU ATTACHED THEM TO A COMPLAINT

20   THEY WOULD BE IN THE PUBLIC RECORD AND AVAILABLE FOR THE PUBLIC

21   TO SEE, RIGHT?

22   A.   THE PUBLIC IS NOT LOOKING AT THOSE THINGS, BUT YOU ARE

23   RIGHT, THEY ARE OUT THERE.

24   Q.   RIGHT.

25   A.   THE LAWYERS THAT I PRACTICE WITH ARE THE ONES WHO ARE

1    LOOKING AT IT.

2    Q.    YOU THINK THAT NOBODY IS GONNA LOOK AT IT IF IT'S

3    ATTACHED TO A PLEADING?  THAT'S NOT SOMETHING ANYBODY WOULD

4    EVER LOOK AT?

5    A.    OH, I THINK PEOPLE WOULD LOOK AT IT.  I'M SURE THERE

6    ARE SOME PEOPLE THAT WOULD.

7    Q.    AND IN FACT, WHEN YOU FILED THIS LAWSUIT, THERE WAS A

8    FAIR AMOUNT OF PRESS INTEREST IN THE CLAIMS THAT YOU MADE IN

9    THE LAWSUIT, AND THEY QUOTED FROM THE ARTICLES THAT YOU

10   ATTACHED TO YOUR LAWSUIT, RIGHT?

11   A.    WRONG.

12   Q.    WHY DO YOU SAY THAT'S WRONG?

13   A.    WELL, BECAUSE I THINK THERE WAS A LOT OF INTEREST

14   BECAUSE PEOPLE WERE IN SHOCK THAT CISCO WOULD ENGAGE IN THIS

15   CONDUCT, IS WHAT I THINK BROUGHT A LOT OF THE INTEREST IN THIS.

16   Q.    WELL, THERE'S A DOCUMENT IN EVIDENCE THAT'S THE "TEXAS

17   LAWYER" EXHIBIT 81, AND IT WAS A FRONT-PAGE ARTICLE SPREAD

18   ACROSS THE TOP OF THE PUBLICATION.  YOU SAW THAT ARTICLE, DID

19   YOU NOT?

20   A.    ABSOLUTELY.

21   Q.    AND MR. PATTON WAS QUOTED EXTENSIVELY IN IT, CORRECT?

22   A.    WE COULD LOOK AT IT.  I THINK HE WAS QUOTED IN IT.  I

23   DON'T KNOW IF IT WAS EXTENSIVELY.

24   Q.    AND MY PARTNER PAUL WATLER DECLINED COMMENT.  YOU KNOW

25   THAT, DON'T YOU?

1    A.    I DON'T KNOW WHO YOUR PARTNER IS, MR. BABCOCK.  IF

2    YOU TELL ME THAT HE DECLINED COMMENT, THEN I'D TAKE YOUR

3    REPRESENTATION.

4    Q.    I WOULD REPRESENT THAT TO YOU.

5    A.    OKAY.

6    Q.    BUT YOU GUYS, YOU AND MR.--YOUR LAWYER, MR. PATTON, AND

7    MR. ALBRITTON'S LAWYER, MR. HOLMES, DID NOT DECLINE COMMENT.

8    THEY CHARACTERIZED THE OCTOBER 18TH ARTICLE AS BEING THE

9    ACCUSATION IS THAT HE INTENTIONALLY CONSPIRED TO COMMIT A

10   FELONIOUS ACT.  YOU READ THAT IN THE TEXAS LAWYER, DIDN'T YOU?

11   A.    WE FOUGHT BACK, YEAH.

12   Q.    OKAY.  0AND YOU FOUGHT BACK EVEN THOUGH THERE HAD NOT

13   BEEN ANY PUBLICITY ABOUT THESE TWO PATENT TROLL TRACKER

14   ARTICLES BETWEEN OCTOBER 18TH AND WHEN YOU FILED YOUR LAWSUIT

15   ON MARCH 3RD, ISN'T THAT TRUE?

16   A.    WELL, IT DEPENDS ON HOW YOU ARE DEFINING PUBLICITY.

17   I KNEW THAT MY PEERS AND CLIENTS WERE READING THIS STUFF.

18   Q.    LET ME PUT IT A DIFFERENT WAY.

19   A.    OKAY.

20   Q.    THERE WAS NO NEWS ARTICLE ABOUT THE PATENT TROLL

21   TRACKER ARTICLES THE 17TH AND THE 18TH BETWEEN THAT DATE

22   AND MARCH 3RD, 2008, WHEN YOU FILED YOUR LAWSUIT, RIGHT?

23   A.    WRONG.

24   Q.    IDENTIFY AN ARTICLE FOR ME.

25   A.    THERE WERE ARTICLES THAT WHEN MR. FRENKEL REVEALED

1    HIMSELF AS WORKING FOR CISCO IN THE LAWSUIT THAT FORMED THE

2    BASIS OF HIS--HIS BLOG.  SO THERE WAS PUBLICITY.

3    Q.    BUT NOTHING ABOUT YOU?  THERE WAS NO ARTICLE THAT SAID,

4    HEY, BY THE WAY, ON OCTOBER 18TH, JOHNNY WARD WAS IDENTIFIED IN

5    A PATENT TROLL TRACKER ARTICLE AS DOING SOME BAD STUFF?

6    A.    NO.

7    Q.    THERE'S NOTHING LIKE THAT?

8    A.    NO, THERE WASN'T.

9    Q.    THERE WAS ABSOLUTELY NO PUBLICITY.  SO NO NEWS

10   ARTICLES, NO INTERNET BLOGS BETWEEN THE DATE OF OCTOBER 18TH

11   AND MARCH 3RD, 2008, RIGHT?

12   A.    I CAN'T SAY THAT FOR A FACT.  I THINK THERE WAS NOT

13   REFERENCE BACK TO THE ARTICLES UNTIL WE FOUGHT BACK AND

14   ATTACHED THEM TO OUR COMPLAINTS.

15   Q.    OKAY.  AND IN TERMS OF E-MAIL TRAFFIC, WHAT YOU GOT WAS

16   ONE E-MAIL FROM A GUY IN NEW JERSEY, WHO SAID, "I THINK YOU'RE

17   GONNA PLAY FINE IN NEW HAVEN," RIGHT?

18   A.    ARE YOU SAYING THAT'S THE ONLY COMMUNICATION I GOT?

19   Q.    YOU GOT THAT E-MAIL, DID YOU NOT?

20   A.    I GOT THAT E-MAIL.

21   Q.    OKAY.  AND THAT WAS REFERRING TO WHETHER OR NOT YOU

22   WERE GONNA PLAY WELL IN CONNECTICUT, RIGHT?

23   A.    YOU WANT TO LIMIT IT TO E-MAIL AND NOT PHONE CALLS?

24   YES.

25   Q.    I WANT TO LIMIT IT TO E-MAILS RIGHT NOW, YES.

1    A.    YES.

2    Q.    OKAY.  SO BETWEEN OCTOBER 18TH OF 2007 AND MARCH 3RD OF

3    20208, NO ARTICLES, NO INTERNET BLOG PUBLICATIONS REFERENCING

4    YOU, RIGHT?

5    A.    WRONG.  THIS BLOG IS UP THERE FOR THE WORLD TO SEE.

6    Q.    OTHER THAN THE OCTOBER 18TH BLOG.

7    A.    AS FAR AS I KNOW, THAT'S RIGHT.

8    Q.    OKAY.  AND YOU GOT AN E-MAIL FROM A GUY IN NEW JERSEY

9    SAYING, "I THINK YOU'RE GONNA PLAY GREAT IN CONNECTICUT,"

10   RIGHT?

11   A.    RIGHT.

12   Q.    OKAY.

13         NOW, YOU SAY YOU GOT TELEPHONE CALLS.  AND WERE ANY

14   OF THESE PEOPLE THAT PHONED YOU--AND I DON'T WANT YOU TO TELL

15   ME WHAT THEY SAID, BUT WAS THERE ANYTHING THAT WAS CRITICAL OF

16   YOU, SAYING, "HEY, THIS IS THE DEPARTMENT OF JUSTICE CALLING;

17   YOU ARE UNDER INVESTIGATION"?

18   A.    NO.

19   Q.    ALL RIGHT.  YOU NEVER GOT CALLED BY THE DISTRICT

20   ATTORNEY EITHER, DID YOU?

21   A.    NO.

22   Q.    AND YOU NEVER GOT CALLED BY THE STATE BAR OF TEXAS, DID

23   YOU?

24   A.    NO.

25   Q.    NOBODY--NO MEMBER OF CONGRESS EVER CALLED YOU AND SAID,

1   "HEY, I'VE READ THAT YOU HAVE COMMITTED SOME SORT OF CRIME AND

2   WE'RE INVESTIGATING IT"?

3   A.    THAT'S CORRECT.

4   Q.    ALL RIGHT.

5         AND YOU DIDN'T GET AN APOLOGY, BUT YOU DIDN'T REACH

6   OUT TO MR. FRENKEL'S BLOG, TO THE PATENT TROLL TRACKER, EITHER,

7   DID YOU?

8   A.    YOU DON'T WRESTLE WITH A SNAKE, YOU CUT ITS HEAD OFF.

9   AND THAT'S WHAT WE DID.

10   Q.    WELL, HE'S STILL GOT HIS HEAD, SO YOU ARE A LITTLE

11   PREMATURE IN THAT.

12   A.    WELL, NO, WE SHUT THE BLOG DOWN IS WHAT WE DID.  AND I

13   WASN'T GONNA ENGAGE WITH HIM ON HIS HOME TURF WHERE HE COULD

14   SPIN WHATEVER HE WAS GONNA SPIN.

15   Q.    YOU SHUT THE BLOG DOWN, AND THAT WAS ONE OF YOUR

16   OBJECTIVES, OF COURSE?

17   A.    MY OBJECTIVE WAS TO GET THE ARTICLES THAT WERE ACCUSING

18   ME OF A CRIME TAKEN DOWN.  HE TOOK THE WHOLE THING DOWN ON HIS

19   OWN ONCE CISCO GOT OUTED.

20   Q.    THE ANSWER TO MY QUESTION A MINUTE AGO WAS:  YOU DID

21   NOT REACH OUT TO HIM BY E-MAILING HIM EVEN THOUGH THERE'S A

22   BUTTON RIGHT THERE, RIGHT?

23   A.    ABSOLUTELY NOT.  NEVER WOULD.

24   Q.    YOU NEVER WOULD?

25   A.    NO WAY.

1    Q.    LITIGATE FIRST, ASK QUESTIONS LATER?

2    A.    NO.  GET HIS IDENTITY AND GET THIS OFF THE INTERNET.

3    THAT WAS MY GOAL.

4    Q.    WHY DIDN'T YOU E-MAIL HIM AND SAY, "HEY, I KNOW YOU ARE

5    ANONYMOUS, BUT I'M VERY UPSET ABOUT THIS"?

6    A.    AGAIN, WHY DIDN'T I DO THAT?

7    Q.    YEAH.

8    A.    BECAUSE I WAS LOOKING AT THE VENOM THAT THIS GUY WAS

9    SPEWING.  HE OBVIOUSLY--I DIDN'T KNOW HE WORKED FOR CISCO AT

10   THE TIME.  HE OBVIOUSLY HAD A LOT OF TIME ON HIS HANDS, BECAUSE

11   HE WAS DOING A LOT OF STATISTICS, WRITING DAY AFTER DAY.

12   THAT'S WHY.  THIS IS WHY I DIDN'T ENGAGE THIS GUY.

13   Q.    KEEP GOING.  AND IN FACT, THOSE STATISTICS WERE

14   HARMFUL TO YOU AND YOUR PRACTICE HERE, WEREN'T THEY?  THEY WERE

15   CRITICAL OF WHAT WAS GOING ON IN THE EASTERN DISTRICT OF TEXAS,

16   WASN'T IT?

17   A.    I DON'T THINK THEY HARMED MY PRACTICE, MR. BABCOCK.  I

18   WAS WATCHING IT, BUT I HAD NO INTENTION OF SHUTTING ANYTHING

19   DOWN UNTIL HE ACCUSED ME OF A CRIME.

20   Q.    AND THEN YOU WANTED TO SHUT IT DOWN?

21   A.    I WANTED TO TAKE THE ARTICLES DOWN THAT WERE WRITTEN

22   ABOUT ME.

23   Q.    WHICH YOU HAVE ACCOMPLISHED?

24   A.    ABSOLUTELY.

25   Q.    OKAY.

1    A.    WELL, THEY'RE STILL OUT THERE, BUT HE'S NOT, YOU KNOW,

2    STILL ANONYMOUSLY ACCUSING ME OF CRIMES.

3    Q.    YEAH.  NOT TO BEAT A DEAD HORSE, BUT YOUR GREGG COUNTY

4    LAWSUIT WHICH ATTACHED THE ARTICLES, YOU DISMISSED THAT, RIGHT?

5    A.    CORRECT.

6    Q.    AND THEN YOU RE-FILED IT IN FEDERAL COURT IN ARKANSAS,

7    CORRECT?

8    A.    CORRECT.

9    Q.    AND YOU ATTACHED THE ARTICLES AGAIN, RIGHT?

10    A.    CORRECT.

11    Q.    OKAY.  AND GREGG COUNTY WAS A STATE COURT THAT YOU

12    FILED IN, RIGHT?

13    A.    CORRECT.

14    Q.    AND YOU DISMISSED THAT, THEN YOU RE-FILED IN ARKANSAS.

15    AND NOW IT'S ON THE FEDERAL NATIONAL PACER SYSTEM, RIGHT, THESE

16    ARTICLES?

17    A.    THEY ARE.

18    Q.    SO WHEN YOU SAY THAT THEY'RE ON THE INTERNET, THAT'S

19    CERTAINLY TRUE, BUT IT'S BECAUSE OF WHAT YOU'VE DONE, RIGHT?

20    A.    IN PART.

21    Q.    OKAY.  AND YOU KNOW THAT IN FEDERAL COURT YOU CAN FILE

22    THINGS UNDER SEAL IF YOU WANT?

23    A.    YEAH, BUT THERE'S MORE THERE THAN JUST THE ARTICLES.

24    Q.    CERTAINLY.  I MEAN YOU'VE GOT ALL SORTS OF ALLEGATIONS.

25    A.    RIGHT.

1    Q.    BUT YOU DON'T HAVE TO--YOU DON'T HAVE TO ATTACH THE

2    ARTICLES IN A PUBLIC DOCUMENT AND LET THEM GET ON PACER SO THAT

3    ANYBODY CAN SEE IT, DO YOU?

4    A.    ONCE WE FOUND OUT IT WAS CISCO, I DIDN'T CARE WHAT

5    PEOPLE SAW, 'CAUSE THEY KNEW WHO WAS BEHIND THIS.  I DON'T CARE

6    IF PEOPLE SEE IT.  THEY KNOW THAT IT'S AN ADVERSE LITIGANT

7    SAYING THESE THINGS ABOUT ME.

8    Q.    AND PEOPLE WILL DISCOUNT THAT, OBVIOUSLY?

9    A.    NOW?

10    Q.    YEAH.

11    A.    OH, I THINK NOW, EXCEPT FOR CISCO.  CISCO IS NOT GONNA

12    APOLOGIZE, RIGHT?

13    Q.    WELL, WE'LL SEE ABOUT THAT.  BUT AS OF FEBRUARY 23RD

14    OF 2008, WHEN MR. FRENKEL REVEALED HIMSELF, THEN EVERYBODY KNEW

15    THAT CISCO WAS HIS EMPLOYER, RIGHT?

16    A.    THAT'S THE LIMITED INFORMATION THEY KNEW AT THAT TIME.

17    Q.    OKAY.  AND WHAT YOU ARE JUST SAYING IS THAT AS SOON AS

18    EVERYBODY KNOWS THAT, THEY'RE NOT GONNA BELIEVE A WORD THAT HE

19    SAID IN THIS OCTOBER 18TH ARTICLE, RIGHT?

20    A.    THEY GET TO SEE THE FULL PICTURE, RIGHT.  WHEN THEY GET

21    TO READ MY PLEADING WITH THE ARTICLES ATTACHED, THEY GET TO SEE

22    THAT CISCO IS THE ONE WHO IS SAYING THIS ABOUT US.

23    Q.    SO YOU REALLY HAVEN'T HAD ANY DAMAGE, HAVE YOU?

24    A.    OH, NO, IT'S BEEN A WALK IN THE PARK, MR. BABCOCK.

25    Q.    WELL, YOU ARE NOT EVEN CLAIMING ANY ECONOMIC DAMAGE,

1    ARE YOU, SIR?

2    A.    NO.

3    Q.    IN FACT, YOU MADE MORE MONEY IN 2008 THAN YOU DID IN

4    2007?

5         MR. PATTON:  I OBJECT, YOUR HONOR.  THIS IS NOT

6    RELEVANT.

7         THE COURT:  IT'S NOT RELEVANT.  SO I'LL SUSTAIN THE

8    OBJECTION.

9         MR. BABCOCK:  YOU SAID, IN RESPONSE TO MR. PATTON'S

10   QUESTIONS--

11        MR. PATTON:  EXCUSE ME, MR. BABCOCK.

12        MR. BABCOCK:  SURE.

13        MR. PATTON:  COULD I ASK THE COURT TO INSTRUCT THE

14   JURY TO DISREGARD THE QUESTION THAT MR. BABCOCK ASKED?

15        THE COURT:  YES.

16        LADIES AND GENTLEMEN, DISREGARD MR. BABCOCK'S

17   QUESTION ABOUT HOW MUCH MONEY MR. WARD MADE IN 2008, WHICH

18   HE DIDN'T ANSWER, BUT--

19        THE WITNESS:  RIGHT.

20        MR. BABCOCK:  OKAY.

21   Q.    LET ME SEE IF I CAN GET BACK TO THE QUESTION THAT I WAS

22   ABOUT TO ASK WHEN MR. PATTON STOOD UP.  YOU SAID IN RESPONSE TO

23   HIM THAT THIS THING--THAT THIS OCTOBER 18TH ARTICLE INFURIATED

24   YOU, RIGHT?

25   A.    YES, SIR.

1    Q.    ALL RIGHT.  AND YOU ARE ASKING FOR ONLY MENTAL-ANGUISH

2    DAMAGES AGAINST CISCO, CORRECT?

3    A.    I DON'T BELIEVE THAT'S CORRECT.

4    Q.    WELL, ARE YOU ASKING FOR MENTAL-ANGUISH DAMAGES?

5    A.    I AM.

6    Q.    OKAY.  AND YOUR MENTAL ANGUISH CONSISTS OF YOUR WAKING

7    UP EVERY NIGHT--

8         MR. PATTON:  YOUR HONOR, I OBJECT TO THIS.  WHATEVER

9    MENTAL ANGUISH MR. WARD MAY HAVE SUSTAINED IS NOT RELEVANT TO

10   THIS CASE.

11        MR. BABCOCK:  I HAVE TWO ANSWERS TO THAT, YOUR HONOR:

12        THEY, IN DIRECT EXAMINATION, ASKED HIM SEVERAL

13   QUESTIONS, ONE OF WHICH WAS:  DID IT INFURIATE YOU?  AND I

14   WANT TO EXPLORE THE EXTENT OF HIS FURY.

15        BUT THE SECOND THING IT WOULD BE PROBATIVE OF IS

16   HE'S SUING OVER THE SAME ARTICLE, CLAIMS TO BE 75 FEET AWAY

17   FROM MR. ALBRITTON, AND I WANT TO SEE IF HIS MENTAL ANGUISH

18   IS GONNA MATCH MR. ALBRITTON'S MENTAL ANGUISH.

19        THE COURT:  AND YOU ARE OBJECTING BECAUSE IT'S TWO

20   DIFFERENT INDIVIDUALS?

21        MR. PATTON:  THAT'S TRUE.

22        THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.

23   THIS IS MR. ALBRITTON'S CASE.  MR. WARD HAS A SEPARATE CASE.

24        MR. BABCOCK:  OKAY.

25   Q.    SO YOU HAVE NO INFORMATION TO SHARE WITH THIS JURY FROM

1    YOUR OWN EXPERIENCE ABOUT YOUR MENTAL ANGUISH THAT WOULD BE

2    PROBATIVE OF MR. ALBRITTON'S MENTAL ANGUISH, CORRECT?

3    A.    I CAN ONLY TELL YOU WHAT I SAW IN MR. ALBRITTON AND

4    WHAT HE TOLD ME.

5    Q.    RIGHT.  BUT YOU ARE NOT TRYING TO TELL THIS JURY THAT

6    YOU SUSTAINED MENTAL ANGUISH AND THEREFORE MR. ALBRITTON MUST

7    HAVE SUSTAINED MENTAL ANGUISH?

8    A.    THAT WAS NOT MY TESTIMONY.

9    Q.    OKAY.  AND YOU ARE NOT TRYING TO OFFER THAT TESTIMONY?

10   A.    NO.

11   Q.    YOU SAID THAT THE ABA JOURNAL SAID THAT THE PATENT

12   TROLL TRACKER WAS A MUST-READ.

13   A.    THAT'S MY RECOLLECTION, YES, SIR.

14   Q.    OKAY.  FOR THE JURY'S BENEFIT, YOU AND I KNOW WHAT

15   THE ABA JOURNAL IS, BUT THAT'S THE AMERICAN BAR ASSOCIATION

16   JOURNAL, WHICH IS A MAGAZINE THAT COMES OUT WHAT, ONCE A MONTH,

17   I THINK?

18   A.    THIS WAS ACTUALLY AN ONLINE DEAL IS WHERE I SAW IT.

19   Q.    OKAY.

20   A.    YOU GET SOMETHING IN YOUR E-MAIL.  AND I BELIEVE THAT'S

21   WHERE THIS REFERENCE TO THE PATENT TROLL TRACKER BEING A

22   MUST-READ WAS.

23   Q.    OKAY.  AND TELL ME IF YOU RECALL WHAT THE JUSTIFICATION

24   FOR IT BEING A MUST-READ--MUST -READ SOUNDS LIKE IT'S SOMETHING

25   YOU SHOULD READ.

1    A.    IF YOU ARE A PATENT LITIGATOR, YOU SHOULD READ THE

2    PATENT TROLL TRACKER--

3    Q.    OKAY.

4    A.    --TO SEE--HE WAS TRACKING WHAT LAWSUITS WERE GETTING

5    FILED, WHEN, WHERE, WHO THE PARTIES WERE.

6    Q.    OKAY.  SO AT LEAST IN THE VIEW OF THE AMERICAN BAR

7    ASSOCIATION JOURNAL, THE PATENT TROLL TRACKER WAS PROVIDING

8    USEFUL INFORMATION THAT PEOPLE IN THE AREA MUST READ IN ORDER

9    TO INFORM THEMSELVES?

10    A.    I DON'T THINK THAT'S THE WAY THEY MEANT IT, BUT IT WAS,

11    "YOU OUGHT TO BE READING THIS IF YOU WANT TO KNOW WHAT'S GOING

12    ON IN PATENT LITIGATION."

13    Q.    OKAY.

14    A.    AND I THINK PEOPLE WERE DOING THAT.

15    Q.    OKAY.  AND YOU DID IT REGULARLY?

16    A.    NOT REGULARLY.  I GOT--I PROBABLY STARTED READING IT

17    MORE AS WE GOT NEARER THE TIME THAT THESE ARTICLES WERE

18    PUBLISHED, BECAUSE HE WAS WRITING ABOUT SOME OF MY CLIENTS.

19    AND I THINK HE WROTE ABOUT--HE WROTE ABOUT ME IN ONE OF THESE

20    ARTICLES BEFORE, I BELIEVE.

21    Q.    OKAY.

22    A.    BUT IT WASN'T ANYTHING THAT I SAID, "I'VE BEEN ACCUSED

23    OF A CRIME, I'M GONNA SHUT THIS GUY DOWN AND GET THIS GUY OFF

24    THE INTERNET."

25    Q.    IN FACT, YOU ARE NOT MENTIONED BY NAME IN THE OCTOBER

1    18TH ARTICLE, ARE YOU, SIR?

2    A.    NO.  "LOCAL COUNSEL" IS WHAT IT SAYS.  HE IDENTIFIES ME

3    THE DAY BEFORE.

4    Q.    AND MR. ALBRITTON IS MENTIONED IN THE OCTOBER 18TH

5    ARTICLE, BUT YOU ARE NOT, CORRECT?

6    A.    THAT'S CORRECT.

7    Q.    AND YOU, FRANKLY, GOT BROUGHT INTO THIS CASE AFTER

8    MR. ALBRITTON HAD ALREADY FILED IT, RIGHT?

9    A.    NO.

10   Q.    I THOUGHT YOU MADE YOUR APPEARANCE--I THOUGHT THE

11   SECOND DOCKET ENTRY SHOWED YOU MAKING AN APPEARANCE AFTER

12   MR. ALBRITTON HAD ALREADY FILED.  AM I WRONG ABOUT THAT?

13   A.    WELL, IN THE EASTERN DISTRICT, THE PLEADING IS FILED,

14   AND I BELIEVE I'M ON THE PLEADING; BUT TO GET ELECTRONIC

15   NOTICES, YOU HAVE TO FILE A NOTICE OF APPEARANCE SO THAT YOU

16   CAN GET--EVERY LAWYER, EVEN IF THERE'S 15 LAWYERS ON THE

17   PLEADING, ONLY THE ONE WHO SIGNED THE COMPLAINT GETS THE

18   ELECTRONIC NOTICE.  SO YOU'VE GOT TO FILE A NOTICE OF

19   APPEARANCE.  SO I WAS ON THE ORIGINAL DOCUMENT.

20   Q.    YOU DIDN'T KNOW PETER MCANDREWS, THAT WAS PRIMARILY

21   MR. ALBRITTON, CORRECT?

22   A.    CORRECT.

23   Q.    AND SO IT WAS REALLY MR. ALBRITTON WHO BROUGHT YOU INTO

24   THE CASE WHENEVER HE DID?

25   A.    CORRECT.

1    Q.    AND AS I UNDERSTAND IT, YOU AND MR. ALBRITTON WERE

2    MEDIATING TOGETHER WHEN THIS PROBLEM AROSE OR THE SITUATION

3    AROSE.

4    A.    WELL, WE WEREN'T TOGETHER.  IT'S KIND OF FUNNY.  WE

5    WERE--DO YOU WANT TO KNOW WHERE WE WERE AT THAT POINT?

6    Q.    YEAH.  I WON'T OBJECT TO YOUR BEING NON-RESPONSIVE,

7    BECAUSE--

8    A.    OKAY.  I'LL TELL YOU ABOUT THE MEDIATION.  WE WERE AT

9    BAKER BOTTS' OFFICES.  I WAS ACTUALLY WORKING WITH BAKER BOTTS

10   IN A CASE THAT WE ULTIMATELY TRIED FOR A PLAINTIFF UP IN

11   TEXARKANA; MR. ALBRITTON REPRESENTED THE DEFENDANT; AND

12   MR. PATTON WAS THE MEDIATOR.  TALK ABOUT A SMALL WORLD.

13   Q.    COZY.

14   A.    YEAH.  LIKE I SAID, IT IS A SMALL, SMALL WORLD.

15   Q.    RIGHT.  AND NOBODY THAT KNOWS YOU HAS EVER SAID THAT

16   THEY THOUGHT THAT YOU HAD COMMITTED A CRIME, HAVE THEY?

17   A.    I'M NOT WORRIED ABOUT THE FOLKS THAT KNOW ME.

18   Q.    OKAY.  AND SO YOU ARE IN THIS MEDIATION.  IT'S

19   MR. ALBRITTON ON ONE SIDE, YOU ARE ON THE OTHER SIDE, AND

20   MR. PATTON IS THE MEDIATOR.  AND FOR THE JURY'S BENEFIT,

21   THAT'S SORT OF THE NEUTRAL THIRD PARTY?

22   A.    RIGHT.

23   Q.    OKAY.  AND WHAT DAY WAS THIS?  DO YOU REMEMBER?

24   A.    I THINK--I'M THINKING THAT IT WAS EITHER THE DAY IT GOT

25   FILED OR THE DAY AFTER.

1    Q.    AND--

2    A.    BECAUSE THE REASON I KNOW THAT--

3    Q.    YEAH.

4    A.    --BECAUSE BAKER BOTTS, WHO WAS MY CO-COUNSEL IN THAT

5    CASE, KEVIN MEEK, I KNEW THAT THEY REPRESENTED CISCO, AND I

6    MADE A COMMENT WHILE WE WERE IN A SESSION BY OURSELVES, I SAID,

7    "I'M GENERATING BUSINESS FOR YOU OUT IN EAST TEXAS.  WE'VE SUED

8    ONE OF YOUR CLIENTS."  AND HE ALREADY KNEW ABOUT IT.  SO THAT'S

9    WHY I KNOW IT HAD TO BE--YOU KNOW, IT MIGHT HAVE BEEN THE 17TH.

10          AND HE SAID, "YEAH, BUT Y'ALL HAVE GOT A PROBLEM."

11          AND I SAID--AND I HAD TALKED TO ERIC ALREADY EARLIER

12   THAT DAY, HE'D JUST TOLD ME THAT WE GOT THE COMPLAINT FILED AND

13   THERE WAS A GLITCH IN THE SOFTWARE, SOMETHING TO THAT EFFECT,

14   AND TOLD ME THAT AMIE WAS TAKING CARE OF IT.

15          AND I TOLD KEVIN, "YEAH, I KNOW ABOUT THAT, BUT

16   THAT'S BEEN TAKEN CARE OF."

17   Q.    OKAY.  AND YOU KNOW NOW THAT THERE WAS NO GLITCH IN THE

18   SOFTWARE.  YOU KNOW THAT, RIGHT?

19   A.    I THINK THERE WAS A GLITCH IN THE SOFTWARE.

20   Q.    YOU THINK THERE WAS?

21   A.    YES, SIR.

22   Q.    HAVE YOU LISTENED--YOU, OF COURSE, COULDN'T LISTEN TO

23   THE TESTIMONY OF MR. MALAND.

24   A.    NO.

25   Q.    SO EVEN TO THIS DAY YOU THINK THERE WAS A GLITCH IN THE

1     SOFTWARE?

2     A.    WELL, FOR THE DOCKET TO SAY THAT IT WAS FILED ON THE

3     15TH, WHEN WE KNOW IT WAS FILED ON THE 16TH--MAYBE IF A PERSON

4     TYPED THAT IN, THEN IT WASN'T A GLITCH IN THE SOFTWARE.  MY

5     UNDERSTANDING WAS THAT THE SOFTWARE GENERATED THAT.  BECAUSE

6     IT'S INDISPUTABLE THAT WE FILED IT ON THE 16TH.

7     Q.    WELL, YOU HAVEN'T BEEN HERE FOR ALL THE TESTIMONY YET,

8     BUT--

9     A.    MAYBE YOU'VE GOT A DIFFERENT NOTICE OF ELECTRONIC

10    FILING THAT YOU'LL SHOW ME, BECAUSE THE ONE I'VE SEEN SAYS

11    THE 16TH.

12    Q.    SURE.  THAT'S THE NOTICE OF ELECTRONIC FILING IN THIS

13    CASE.  WHERE DOES IT SAY IT WAS FILED?

14    A.    WELL, YOU'LL HAVE TO BLOW UP THE NOTICE OF ELECTRONIC

15    FILING, AND NOT SHOW ME WHAT Y'ALL TYPED, AND I CAN SHOW YOU.

16    Q.    NO, NO, I DIDN'T TYPE IT.  SURE, IF YOU WANT TO SEE THE

17    WHOLE THING, PULL UP DEFENDANT'S EXHIBIT 13 AND GO TO THE SAME

18    SPOT ON THE DOCUMENT.  IT WILL TAKE A MINUTE.

19    A.    OKAY.

20    Q.    THERE YOU GO.

21    A.    THERE'S THE SPOT WHERE IT SAYS ENTERED ON 10/16 AT

22    12:01, THINK.  ENTERED ON 10/16/2007 AT 12:01 AM.

23    Q.    GO TO THE NEXT PAGE.

24    A.    AND THAT'S THE GLITCH I'M TALKING ABOUT.  UNLESS

25    SOMEONE TYPED IN "AND FILED ON," BECAUSE IF YOU GO DOWN--YOU'VE

1     CUT OFF BELOW THE DOCKET TEXT--KEEP GOING DOWN.  RIGHT THERE.

2     ORIGINAL FILE NAME--

3     Q.    MR. WARD, HANG ON FOR A MINUTE.

4     A.    OKAY.

5     Q.    I'M RUNNING THIS SHOW.

6           [LAUGHTER]

7     A.    I'M JUST TRYING TO ANSWER YOUR QUESTION.

8           MR. PATTON:  I OBJECT TO THAT.  HE IS RUNNING THE

9     SHOW, BUT MR. WARD WAS ANSWERING A QUESTION THAT HE ASKED.

10          MR. BABCOCK:  THERE WAS NO QUESTION PENDING.

11          MR. PATTON:  I WOULD LIKE FOR HIM TO BE ABLE TO

12    FINISH IT.

13          THE COURT:  I THINK HE DID ANSWER THE QUESTION.

14    SO WE'RE WAITING FOR THE NEXT QUESTION.

15          MR. BABCOCK:  NEXT QUESTION.

16          TIM, WILL YOU HIGHLIGHT THE "FILED"?  YES.

17    Q.    IF YOU GO FROM THE PRIOR PAGE TO THIS PAGE, YOU'LL

18    SEE THAT THE NOTICE OF ELECTRONIC FILING SAYS IT WAS FILED

19    ON 10/15/2007, CORRECT?

20    A.    INCORRECT.

21    Q.    WELL, THAT'S WHAT IT SAYS, DOESN'T IT?

22    A.    YOU'VE GOT HALF--GO ON DOWN THE DOCUMENT.  BECAUSE IT

23    SAYS ELECTRONIC DOCUMENT STAMP DATE 10/16/2007.  THAT'S WHAT

24    CONTROLS.  AND THAT'S THE GLITCH I'M TALKING ABOUT, BECAUSE

25    IT WAS ENTERED ON 10/16, 12:01, WE ALL KNOW THAT.

1           MR. BABCOCK:  TIM, SEE IF YOU CAN SHOW US BOTH PAGES

2      SO WE CAN GET PAST THIS.

3           THE WITNESS:  I KNOW MR. HERNDON; HE CAN DO IT.

4           MR. BABCOCK:

5      Q.   YEAH, HE TOLD ME HE'S WORKED WITH YOU BEFORE.

6      A.   WE'VE WORKED TOGETHER BEFORE.  SMALL WORLD.

7      Q.   YEAH, IT IS INDEED.  OKAY.  SO NOW YOU SEE "NOTICE"--

8      IT SAYS HERE ON THE DOCUMENT "NOTICE OF ELECTRONIC FILING.

9      THE FOLLOWING TRANSACTION WAS RECEIVED FROM ALBRITTON, ERIC,

10     ENTERED ON 10/16/2007 AT 001 AM CENTRAL DAYLIGHT TIME AND FILED

11     ON 10/15/2007."  THAT'S WHAT IT SAYS, RIGHT?

12     A.   THAT PART OF THE DOCUMENT SAYS THAT, YES, SIR.

13     Q.   OKAY.  AND THERE'S NOWHERE ELSE ON THIS DOCUMENT THAT

14     THE WORD "FILED" IS USED, WOULD I BE CORRECT ABOUT THAT?

15     A.   LET'S SCROLL DOWN TO WHAT I WAS TALKING ABOUT, THE

16     ELECTRONIC DOCUMENT STAMP.

17     Q.   AND LET ME JUST ASK YOU TO CONFINE YOUR ANSWER TO

18     WHETHER THE WORD "FILED" IS USED ANYWHERE ELSE.

19     A.   THE WAY YOU ARE ASKING IT, IT MIGHT NOT BE THERE, BUT

20     I WANT TO LOOK AT THE ELECTRONIC DOCUMENT STAMP.

21     Q.   SURE.  LOOK AS LONG AS YOU WANT.

22     A.   IT'S CLOSE, BUT IT DOESN'T SAY "FILED," YOU ARE RIGHT.

23     Q.   OKAY.

24          NOW, IN ADDITION TO THIS SUIT AGAINST CISCO IN

25     ARKANSAS--AND BY THE WAY, YOU DROPPED MR. FRENKEL AS A

1    DEFENDANT IN THAT CASE, DID YOU NOT?

2    A.    WHY?  OR YES.

3    Q.    OKAY.  YES.

4    A.    YES.  YOU DON'T WANT TO KNOW WHY.

5    Q.    IN ADDITION TO THAT SUIT, YOU ALSO STILL COUNSEL FOR

6    ESN AGAINST CISCO IN FEDERAL COURT IN FRONT OF JUDGE FOLSOM,

7    CORRECT?

8    A.    CORRECT.

9    Q.    NOW, MR. MCANDREWS, WHO WAS THE FIRST WITNESS HERE,

10   IS ALSO COUNSEL FOR ESN WITH YOU AND MR. ALBRITTON, CORRECT?

11   A.    CORRECT.

12   Q.    AND YOU STAND TO BENEFIT PERSONALLY, FINANCIALLY, IF

13   ESN WINS THAT CASE, CORRECT?

14   A.    SURE.

15   Q.    OKAY.  AND YOUR POSITION IN THAT CASE IS ADVANTAGED

16   IF CISCO LOSES THIS CASE, RIGHT?  WOULD YOU AGREE WITH

17   MR. MCANDREWS ON THAT OR NOT?

18   A.    MY POSITION IS--I DON'T KNOW THAT THE RESULT OF THIS

19   TRIAL WILL COME INTO EVIDENCE IN THAT TRIAL.

20   Q.    WELL, YOU ARE TRYING TO GET IT INTO EVIDENCE, BECAUSE

21   YOU ARE ASKING DISCOVERY ABOUT IT IN THAT CASE, ARE YOU NOT?

22   A.    WE WANT TO GET INTO THE FACT THE LENGTHS THAT CISCO

23   WOULD GO TO IN THAT CASE, SO, YEAH, WE WANT THIS CONDUCT TO

24   COME OUT IN THAT CASE.

25   Q.    SURE.  AND SO IF CISCO LOSES HERE, THAT WILL BENEFIT

1    YOUR TEXARKANA CASE FOR ESN, RIGHT?

2    A.    I DON'T KNOW THAT THAT'S RIGHT.  WHETHER THEY WIN OR

3    LOSE, THE FACTS ARE THE FACTS, AND THOSE FACTS COME INTO THAT

4    CASE, I THINK.

5    Q.    WELL, YOUR FACTS WOULD BE A LITTLE BIT BETTER IF THE

6    JURY ACCEPTS YOUR VERSION OF THE EVENTS, WON'T IT?

7    A.    I DON'T THINK SO, BECAUSE I DON'T THINK THAT'S

8    ADMISSIBLE.

9    Q.    OKAY.  WELL, GOOD.

10    YOU ALSO--YOU AND MR. ALBRITTON HAVE SUED CISCO IN

11    ANOTHER CASE, HAVE YOU NOT, RECENTLY?

12    A.    WE HAVE A CLIENT WHO HAS, YES.

13    Q.    I'M SORRY.

14    A.    RIGHT.

15    Q.    YOU ARE REPRESENTING A DIFFERENT CLIENT THAN ESN THAT

16    HAS ALSO SUED CISCO IN THE EASTERN DISTRICT OF TEXAS?

17    A.    IT'S ANOTHER PATENT-INFRINGEMENT CASE, YES, SIR.

18    Q.    OKAY.  AND IF YOU WIN THAT CASE, YOU STAND TO BENEFIT

19    PERSONALLY, DO YOU NOT?

20    A.    I THINK THAT CASE IS HOURLY.  THERE MIGHT BE A

21    CONTINGENT COMPONENT TOO, AS WELL, BUT THAT'S THE WAY 95

22    PERCENT OF MY BUSINESS IS, IT'S CONTINGENT-FEE LITIGATION.

23    Q.    SURE.  OKAY.

24    NOW, YOU SAID IN GOING THROUGH THE ARTICLE THAT YOU

25    THOUGHT IT WAS FALSE THAT MR. FRENKEL HAD GOTTEN ANONYMOUS

1   E-MAILS.  DO YOU REMEMBER THAT PART ABOUT "I GOT A COUPLE OF

2   ANONYMOUS E-MAILS"?

3   A.   RIGHT, RIGHT.

4   Q.   YOU DON'T KNOW WHAT MR. FRENKEL GOT ONE WAY OR THE

5   OTHER, DO YOU?

6   A.   WELL, HE WAS THE LAWYER IN CHARGE OF THIS FILE, SO--

7   MAYBE IN ADDITION TO THE INFORMATION HE WAS GETTING FROM HIS

8   OWN LAWYERS HE WAS GETTING AN ANONYMOUS E-MAIL TOO, I DON'T

9   KNOW.

10   Q.   OKAY.  YOU REALLY DON'T KNOW WHAT HE GOT IN TERMS OF

11   ANONYMOUS E-MAILS, DO YOU?

12   A.   NO.  ARE WE GONNA SEE THEM?

13   Q.   YOU ARE LOOKING AT ONE.

14   A.   THIS IS ONE?

15   Q.   "GO BACK AND CHECK THE MODIFIED FILING DATE FOR THE

16   ORIGINAL COMPLAINT IN THE ESN VERSUS CISCO CASE.  THEY'RE

17   COOKING SOMETHING UP TO KEEP THIS CASE IN TEXAS."  NOW, YOU

18   DON'T KNOW WHETHER HE RECEIVED THAT OR NOT, DO YOU?

19   A.   I DON'T KNOW WHO IT CAME FROM EITHER.

20   Q.   SURE.  THAT'S WHAT ANONYMOUS IS ALL ABOUT, YOU DON'T

21   KNOW WHERE IT'S COMING FROM.

22   A.   RIGHT.

23   Q.   OKAY.  BUT WHEN YOU TOLD THE JURY THAT IT WAS FALSE

24   THAT HE GOTTA ANONYMOUS E-MAILS, YOU HAD NO BASIS FOR SAYING

25   THAT, DID YOU, SIR?

1    A.    WELL, I GUESS MAYBE HE'S TELLING PARTIAL TRUTH.  HE

2    DOESN'T SAY, "I'M THE LAWYER IN CHARGE OF THIS FILE AND I'VE

3    GOT LAWYERS MONITORING THE DOCKET AND I KNOW EXACTLY WHAT'S

4    GOING ON."  SO PARTIAL TRUTH, YEAH, I GUESS HE TOLD A PARTIAL

5    TRUTH.

6    Q.    OKAY.  BUT WHEN YOU ANSWERED MR. PATTON'S QUESTION,

7    YOU WERE QUITE EMPHATIC THAT IT WAS FALSE THAT HE RECEIVED

8    ANONYMOUS E-MAILS.  AND YOU HAD NO BASIS FOR SAYING THAT,

9    DID YOU?

10   A.    NO, I DO HAVE A BASIS.  BECAUSE NOW WE KNOW HE WAS THE

11   LAWYER IN CHARGE OF THE FILE FOR CISCO, SO HE'S TELLING A HALF-

12   TRUTH.  I THINK THAT'S FALSE.  TO TELL A HALF-TRUTH I THINK IS

13   FALSE.

14   Q.    YOU DON'T EVEN KNOW IF HE GOT THIS AS PART OF HIS

15   DUTIES AS A CISCO LAWYER, DO YOU?

16   A.    I HAVE NO IDEA.  I WOULDN'T THINK SO.  HOW WOULD THEY

17   KNOW HE WAS IN CHARGE OF THE ESN CISCO CASE?

18   Q.    WELL, MAYBE BECAUSE THEY E-MAILED TO THE PATENT TROLL

19   TRACKER.

20   A.    YEAH, BUT THEY WOULDN'T BE SAYING, "YOU'RE IN CHARGE

21   OF THE ESN CISCO CASE.  LET ME TELL YOU WHAT'S GOING ON."

22   Q.    DOES THAT E-MAIL SAY "YOU ARE IN CHARGE OF THE CISCO

23   ESN CASE"?

24   A.    NO.  BUT I UNDERSTOOD YOUR QUESTION DIFFERENTLY.

25   Q.    OKAY.  HOW DID YOU UNDERSTAND MY QUESTION?

1    A.    I UNDERSTOOD YOUR QUESTION TO BE SOMEONE WROTE IN

2    KNOWING THAT HE WAS IN CHARGE OF THIS LITIGATION, THAT I DIDN'T

3    KNOW THAT.

4    Q.    NO, NO.

5    A.    THAT I WOULDN'T HAVE KNOWN THAT.

6    Q.    YOU DID MISUNDERSTAND MY QUESTION.

7    A.    OKAY.

8    Q.    IN DIRECT TESTIMONY, IN RESPONSE TO MR. PATTON'S

9    QUESTION, YOU SAID THAT IT WAS--REMEMBER, HE SAID "GO THROUGH

10   THIS WHOLE ARTICLE AND TELL ME ALL THE THINGS THAT ARE FALSE"?

11   A.    RIGHT.

12   Q.    AND THE VERY FIRST THING IT SAYS IS, "I GOT A COUPLE OF

13   ANONYMOUS E-MAILS."

14        AND YOU SAID, "THAT'S FALSE; HE DIDN'T GET THOSE, HE

15   DIDN'T GET ANONYMOUS E-MAILS."

16        AND YOU HAD NO BASIS FOR SAYING THAT, DID YOU?

17   A.    I THINK I'VE TOLD YOU WHAT MY BASIS WAS FOR SAYING

18   THAT.  IF YOU WANT ME TO TELL YOU AGAIN, I WILL.

19   Q.    WELL, I DO WANT, BECAUSE I THINK MAYBE YOU

20   MISUNDERSTOOD MY QUESTION.

21   A.    WELL, I THINK THAT IT WAS FALSE.  I DO THINK THAT IT'S

22   FALSE, BECAUSE HE IS TELLING HALF OF THE TRUTH.  HE IS THE

23   LAWYER IN CHARGE OF THE CASE, SO HE KNOWS WHAT'S GOING ON IN

24   THE CASE.  HE'S SAYING HE'S GETTING HIS INFORMATION FROM

25   ANONYMOUS E-MAILS, WHICH MAYBE THAT'S PART OF THE INFORMATION

1    HE'S GETTING.

2        MR. BABCOCK:  PULL UP PLAINTIFF'S EXHIBIT 251 AND GO

3    TO THE FIRST SENTENCE UNDER THE HEADLINE.

4    Q.    "I GOT A COUPLE OF ANONYMOUS E-MAILS THIS MORNING."

5    AND YOU SAID THAT WAS FALSE, AND YOU'VE GOT NO BASIS FOR SAYING

6    THAT?

7    A.    POINTING TO THE REST OF THE SENTENCE, POINTING OUT THAT

8    THE DOCKET IN ESN VERSUS CISCO HAD BEEN ALTERED.

9    Q.    YOU DON'T KNOW WHAT E-MAILS HE GOT THAT MORNING, DO

10   YOU?  YOU'VE NEVER SEEN THEM, HAVE YOU?

11   A.    NOT IN ADDITION TO THE ANONYMOUS E-MAILS, NO, SIR.

12   Q.    OKAY.  THANK YOU.

13        YOU AND MR. ALBRITTON WERE PARTNERS FOR A COUPLE OF

14   YEARS, CORRECT?

15   A.    THAT'S CORRECT.

16   Q.    AND YOU SAID THAT YOU SPLIT UP BECAUSE YOU HAD

17   DIFFERENT TYPES OF PRACTICE.

18   A.    YES, SIR.

19   Q.    AND WHAT WAS--

20   A.    I WAS DOING, AT THAT TIME, ALMOST EXCLUSIVELY

21   PERSONAL-INJURY LITIGATION, AND MR. ALBRITTON WAS DOING

22   PRIMARILY CRIMINAL DEFENSE WORK.

23   Q.    ALL RIGHT, SIR.  AND THAT WAS THE REASON?  THERE WAS

24   NO OTHER REASON FOR THE SPLIT?

25   A.    NO.  IN FACT, WE WENT TO THE SAME BUILDING TO WORK IN.

1    SO THE SPLIT WAS IN PARTNERSHIP.

2    Q.    ALL RIGHT.

3        AND MR. ALBRITTON RECENTLY BOUGHT THE BUILDING

4    ADJACENT TO HIS OFFICE BUILDING, BOUGHT THAT BUILDING NEXT

5    DOOR IS WHAT I'M TRYING TO GET.

6        MR. PATTON:  YOUR HONOR, I FAIL TO SEE THE RELEVANCE

7    OF THAT.

8        MR. BABCOCK:  I'LL TIE IT UP IN A SECOND, YOUR

9    HONOR.

10        THE COURT:  I'M NOT SURE ABOUT THAT.  HE BOUGHT A

11    BUILDING?

12        MR. BABCOCK:  THAT'S HOUSING HIM AND A LAWYER FOR A

13    WITNESS AND SOME OTHER PEOPLE, BUT--

14        THE COURT:  OKAY.  YOU WANT TO ASK IF MR. ALBRITTON

15    BOUGHT A BUILDING?

16        MR. BABCOCK:  YEAH.  I WASN'T TALKING ABOUT WARD, I

17    WAS TALKING ABOUT ALBRITTON.

18        THE COURT:  I DON'T KNOW WHERE THAT GOES, BUT GO

19    AHEAD.

20        MR. BABCOCK:

21    Q.    YOU AND GREG LOVE ARE TENANTS, BASICALLY, OF A BUILDING

22    THAT MR. ALBRITTON OWNS, CORRECT?

23    A.    NO.

24    Q.    NO?  WHAT'S THE SITUATION?  YOU SAID YOU OFFICE WITH

25    HIM.  I'M SORRY.  75 FEET AWAY.

1   A.   RIGHT.  THERE'S THREE OF US THAT OWN THE BUILDING,

2   ALBRITTON, ME AND SCOTT STEVENS.  AND THERE'S A NUMBER OF

3   LAWYERS IN THAT BUILDING.

4   Q.   ALL RIGHT.  SO YOU ARE A BUSINESS PARTNER OF

5   MR. ALBRITTON?

6   A.   YES, SIR.

7   Q.   OKAY.  GREG LOVE IS A TENANT, PERHAPS?

8   A.   YES.

9   Q.   GREG LOVE IS A LAWYER, RIGHT?

10   A.   WELL, STEVENS & LOVE MERGED THEIR LAW FIRMS TOGETHER,

11   SO STEVENS--I DON'T KNOW HOW THEY'RE SET UP, BUT, YEAH, HE IS

12   IN THE SAME BUILDING.  THERE'S 11 LAWYERS, I BELIEVE, IN THAT

13   BUILDING.

14   Q.   OKAY.  AND THE JURY MET MR. LOVE BRIEFLY, BECAUSE HE

15   REPRESENTED AMIE MATHIS, WHO TESTIFIED HERE.

16   A.   OKAY.

17   Q.   DID YOU KNOW THAT OR NOT?

18   A.   I KNEW THAT HE REPRESENTED HER, AND I SAW HIM IN THE

19   COURTROOM DURING VOIR DIRE.  I DIDN'T KNOW THAT THEY HAD MET

20   HIM.

21   Q.   BEAR WITH ME TWO SECONDS, MR. WARD.

22   A.   SURE.

23   Q.   I GUESS ONE FINAL QUESTION:  YOU'VE INITIALLY FILED

24   YOUR LIBEL CASE IN GREGG COUNTY, WHICH IS HERE IN EAST TEXAS

25   BUT THEN YOU MOVED IT TO ARKANSAS.  WHY DID YOU MOVE IT OUT OF

1    THE EASTERN DISTRICT OF TEXAS?

2    A.   I THINK THAT GETS INTO OUR LITIGATION STRATEGY.

3        MR. PATTON:  I OBJECT TO THAT.  THAT WOULD BE A

4    PRIVILEGED COMMUNICATION.

5        MR. BABCOCK:  PROBABLY WOULD BE.  I'LL WITHDRAW IT,

6    YOUR HONOR.  THANK YOU.  PASS THE WITNESS.

7        THE COURT:  Okay.  LET'S SEE.  MR. MCWILLIAMS, DO

8    YOU KNOW HOW LONG YOUR EXAMINATION OF MR. WARD WILL BE?

9        MR. MCWILLIAMS:  PROBABLY VERY SHORT, YOUR HONOR.

10        THE COURT:  VERY SHORT?  OKAY.  ALL RIGHT.  GO

11    AHEAD.

12        THE WITNESS:  MR. MCWILLIAMS, CAN I GET A GLASS OF

13    WATER BEFORE WE START?

14        THE COURT:  OH, SURE.  YEAH.

15        THE WITNESS:  I'LL JUST GET IT OFF THAT TABLE.

16        THE COURT:  ALL RIGHT.

17            EXAMINATION

18    BY MR. MCWILLIAMS:

19    Q.   MR. WARD, IT'S GOING TO BE A LITTLE HARD FOR ME TO CALL

20    YOU MR. WARD INSTEAD OF JOHNNY.

21    A.   ALL RIGHT.

22    Q.   OKAY.

23    A.   I UNDERSTAND WHY YOU HAVE TO.

24    Q.   YOU AND I HAVE KNOWN EACH OTHER YOUR ENTIRE CAREER,

25    HAVE WE NOT?

1   A.   SINCE ABOUT 1996, ONE YEAR AFTER I STARTED.

2   Q.   AND WE HAVE BEEN OPPOSED TO EACH OTHER IN LITIGATION

3   BEFORE?

4   A.   WE HAVE BEEN.

5   Q.   AND AS FAR AS I CAN TELL, WE REALLY NEVER HAD A CROSS

6   WORD WITH EACH OTHER, HAVE WE?

7   A.   TRY NOT TO WITH ANYBODY, BUT YOU AND I HAVE NOT HAD A

8   CROSS WORD.

9   Q.   YOU WERE VERY CERTAIN ABOUT A LOT OF THINGS ABOUT THE

10   DOCKET, AND I WANT TO EXPLORE A LITTLE BIT OF THAT AND SEE IF

11   YOU HAVE A RECOLLECTION OF IT.

12       ARE YOU AWARE THAT THE DOCKET IN THE ESN CASE, A DAY

13   OR SO AFTER OCTOBER 15TH, WHEN YOU PULL THAT DOCKET UP ON

14   PACER, IT SHOWED A FILING DATE ON THE DOCKET OF OCTOBER THE

15   15TH?  WERE YOU AWARE OF THAT?

16   A.   CAN I CORRECT ONE THING IN YOUR PREMISE --

17   Q.   SURE.

18   A.   -- TO THAT QUESTION?  THE ONLY THING I'M REALLY CERTAIN

19   OF WAS THE DATE THAT THE COMPLAINT GOT FILED ON.  AND WHEN I

20   GAVE MY DEPOSITION, I THINK I SAID I HADN'T GONE BACK TO LOOK

21   THROUGH THE DOCKET.  I UNDERSTAND THAT THERE WERE CORRECTIONS

22   MADE TO THE DOCKET, BUT I HAVE NEVER GONE BACK AND LAID THOSE

23   OUT AND LOOKED AT THEM.  SO I'M GOING TO HAVE TO TRUST YOU ON

24   WHAT YOU TELL ME HAPPENED TO THE DOCKET.

25   Q.   AND I THINK THE TESTIMONY WILL BEAR ME OUT HERE THAT

1    THERE WAS A DOCKET ENTRY ON THE DOCKET THAT SAID OCTOBER 15TH

2    AS A FILE DATE, BUT YOU SAY YOU HAVE NOT SEEN THAT?

3    A.   I'VE NOT GONE AND LOOKED AT IT.  I UNDERSTAND AT SOME

4    POINT, THE DOCKET SAID THAT; NOT THE NOTICE OF ELECTRONIC

5    FILING, BUT THE DOCKET SAYS THAT.

6    Q.   AND DO YOU ALSO UNDERSTAND THAT AT SOME POINT, THE

7    HEADER STAMP ACROSS EACH PAGE OF THE COMPLAINT, WHICH WAS 74

8    PAGES LONG, SAID, FILED OCTOBER THE 15TH?  DID YOU EVER GO BACK

9    AND LOOK AT THAT?

10   A.   WELL, THE HEADER STAMP IS NOT PART OF THE COMPLAINT, AS

11   YOU KNOW, RIGHT?

12   Q.   BUT IT WILL SHOW ON THE COMPLAINT, WILL IT NOT?

13   A.   IF YOU SELECT IT TO PUT ON THERE, RIGHT.

14   Q.   YOU CAN'T CHANGE THAT DATE, CAN YOU?

15   A.   I CANNOT.

16   Q.   RIGHT.  BUT YOU HAVE NOT LOOKED AT THE 74 PAGES OF THAT

17   COMPLAINT THAT SHOW A HEADER THAT SAYS, FILED OCTOBER THE 15TH,

18   HAVE YOU?

19   A.   NO, SIR, I HAVE NOT.

20   Q.   NOW, DO YOU KNOW THAT AMIE MATHIS CALLED THE CLERK

21   ABOUT THAT ISSUE?

22   A.   THE ISSUE -- I DON'T KNOW IF IT WAS THAT ISSUE.  I KNOW

23   SHE CALLED THE CLERK BECAUSE THEY WERE SHOWING SOMETHING ON TI

24   DOCKET THAT SAYS, FILED ON THE 15TH, WHEN --

25   Q.   EXACTLY.

1    A.    -- WE SAID IT WAS FILED AT 12:01 ON THE 16TH.

2    Q.    AND DO YOU KNOW THAT DAVE MALAND INVESTIGATED THAT

3    ISSUE WITH HIS CLERKS?

.4   A.    I THINK IT WAS INVESTIGATED INTERNALLY.  I DON'T KNOW

5    IF IT WAS DAVE MALAND THAT DID IT.

6    Q.    HAVE YOU EVER READ THE MEMO THAT DAVE MALAND WROTE

7    FOLLOWING HIS INVESTIGATION OF THAT MATTER?

8    A.    NO, SIR, I HAVE NOT.

9    Q.    ALL RIGHT.  DO YOU KNOW THAT IN DAVE MALAND'S MEMO, HE

10   STATED THAT AMIE MATHIS ASKED THE CLERKS TO CHANGE THE FILING

11   DATE?  YOU HADN'T READ THAT, HAD YOU?

12   A.    TO CHANGE THE FILING DATE?

13   Q.    YES.

14   A.    IF YOU TELL ME THAT'S IN THE MEMO, THEN NO, I HAVEN'T

15   SEEN THAT.  I THINK THAT'S AN IMPOSSIBILITY; BUT IF YOU SAY

16   IT'S IN THERE, THAT MIGHT BE THE WORDS HE USED.

17   Q.    I THINK MR. MALAND'S MEMO IS IN EVIDENCE HERE, AND THE

18   JURY WILL BE ABLE TO SEE THAT.

19   A.    OKAY.

20   Q.    AND DID YOU KNOW THAT THE CLERKS CHANGED THE DOCKET TO

21   SHOW A FILING DATE OF OCTOBER 16TH?

22   A.    I THINK THAT DID HAPPEN.

23   Q.    THAT'S RIGHT.  AND DID YOU KNOW THAT THE CLERKS CHANGED

24   THE HEADER STAMP ON EACH PAGE OF THE COMPLAINT TO SHOW

25   OCTOBER THE 16TH?

1    A.    I DON'T KNOW HOW THAT HAPPENS.  I ASSUME THAT WHEN THEY

2    CHANGE IT ON A DOCKET ENTRY, IT AUTOMATICALLY DOES THAT.

3    Q.    ALL RIGHT.

4    A.    I DON'T THINK YOU HAVE TO GO BACK AND DO THAT.

5          MR. MCWILLIAMS:  LET'S PULL UP THE MALAND MEMO,

6    EXHIBIT 87.  TIM, GO TO -- SCROLL IT ON DOWN SOME MORE.  ALL

7    RIGHT.

8          MR. MCWILLIAMS:

9    Q.    WE'RE GOING TO LOOK AT THIS PARAGRAPH THAT STARTS, ON

10   OR ABOUT THURSDAY, OCTOBER THE 17TH.  IT SAYS, SHE WANTED THE

11   CLERK'S OFFICE TO CHANGE THE DATE TO OCTOBER THE 16TH, BECAUSE

12   SHE HAD WANTED [SIC] TO FILE THE COMPLAINT UNTIL AFTER MIDNIGHT

13   ON THE 16TH.  DO YOU SEE THAT?

14   A.    I THOUGHT YOU SAID THEY WANTED TO CHANGE THE FILING

15   DATE.

16   Q.    SHE WANTED THE CLERK'S OFFICE TO CHANGE THE DATE TO

17   OCTOBER THE 16TH.

18   A.    SHE'S TALKING ABOUT THE DOCKET SHEET IN THE PREVIOUS

19   SENTENCE.

20   Q.    THE FILING DATE ON THE DOCKET SHEET, RIGHT.

21   A.    RIGHT.  THE WAY I UNDERSTOOD YOUR QUESTION WAS SHE

22   ASKED THE CLERK TO CHANGE THE FILING DATE ON THE COMPLAINT, AND

23   THAT WAS GOING TO SURPRISE ME, BECAUSE THAT'S NOT WHAT THAT

24   SAYS.

25   Q.    WELL --

1    A.    AT LEAST THAT'S HOW I UNDERSTOOD YOUR QUESTION.

2    Q.    SHE ASKED THEM TO CHANGE THE FILING DATE ON THE DOCKET

3    THAT INDICATED THAT THE COMPLAINT WAS FILED ON THE 15TH?

4    A.    WELL, I DON'T THINK THAT'S WHAT IT SAYS.

5    Q.    SO WHAT DO YOU THINK SHE'S ASKING THE CLERK TO DO?

6    A.    SHE WANTS THE DOCKET TO CORRECT -- TO ACCURATELY

7    REFLECT THE DATE THAT THE COMPLAINT WAS FILED.

8    Q.    RIGHT.

9    A.    WHICH UP IN THE PREVIOUS PARAGRAPH -- I'VE NEVER SEEN

10   THIS, BUT IT SAYS, "AT 12:02 A.M. ON THE 16TH, AMIE

11   ELECTRONICALLY FILED THE COMPLAINT AND ACCOMPANYING DOCUMENTS

12   THIS IS REFLECTED IN THE NOTICE OF ELECTRONIC FILING, WHICH

13   STATES THE PLAINTIFF'S COMPLAINT AND EXHIBITS WERE

14   ELECTRONICALLY ENTERED AT 12:01 A.M. ON THURSDAY."

15        SO I DON'T THINK SHE'S ASKING TO CHANGE --

16   Q.    OCTOBER 16TH.  LET'S READ THE REST OF THAT.

17   A.    OKAY.

18   Q.    AND FILED ON WHAT DATE?

19   A.    OCTOBER -- FILED ON OCTOBER -- THAT'S WHAT WE JUST

20   READ.

21   Q.    YOU REALLY HAVEN'T SEEN THIS MEMO, NOR HAVE YOU LOOKED

22   AT THE PREVIOUS DOCKET ENTRIES, HAVE YOU?

23   A.    NO, SIR, BUT I'M LOOKING AT IT.  IN THAT NEXT

24   SENTENCE -- AND THIS IS WHAT I WAS POINTING OUT WITH

25   MR. BABCOCK.  -- "THE NOTICE OF ELECTRONIC FILING, HOWEVER,

1    ALSO CLEARLY REFLECTS IN THE SECTIONS MARKED 'DOCUMENT STAMP'

2    THAT THE COMPLAINT AND ATTACHMENTS WERE ELECTRONICALLY FILED O

3    OCTOBER 16TH.

4        AND AGAIN, WE'RE CUTTING HAIRS, BUT YOU DON'T GO

5    ACCUSING SOMEONE OF A CRIME BASED UPON THIS.

6    Q.    THAT'S NOT WHAT THE DOCKET SAID, DID IT?  THE DOCKET

7    ACTUALLY SAID, FILED OCTOBER THE 15TH?

8    A.    I BELIEVE THAT'S CORRECT.

9    Q.    ALL RIGHT.  NOW, DO YOU KNOW WHO MADE THE CHANGES TO

10   THE DOCKET?

11   A.    NO, SIR.

12   Q.    IT WOULD HAVE HAD TO HAVE BEEN THE CLERK'S OFFICE,

13   WOULDN'T IT?

14   A.    YES, SIR.

15   Q.    ALL RIGHT.  NOW, THIS GLITCH WE'RE TALKING ABOUT, ARE

16   YOU AWARE THAT EXACTLY THE SAME THING WOULD HAPPEN TODAY IF

17   AMIE MATHIS STARTED UPLOADING THIS COMPLAINT BEFORE MIDNIGHT

18   AND THEN DIDN'T ENTER IT UNTIL AFTERWARDS?  ARE YOU AWARE OF

19   THAT?

20   A.    NO.  IT WOULDN'T SURPRISE ME, BUT --

21   Q.    DO YOU KNOW IF THERE'S ANY WARNING OR ANY INDICATION IN

22   THE LOCAL RULES THAT SAYS YOU BETTER WATCH OUT FOR THIS

23   SITUATION?

24   A.    I DON'T THINK IT'S THAT BIG OF A PROBLEM.

25   Q.    OKAY.  THE ONLY TIME IT'S A BIG PROBLEM IS WHEN YOU

1    START UPLOADING YOUR COMPLAINT BEFORE MIDNIGHT AND FINISH

2    AFTERWARD, ISN'T IT?

3    A.    NO, SIR.

4    Q.    OKAY.  WELL, IS --

5    A.    NOTHING EVER GOT FILED IN THE LAWSUIT SAYING THAT THERE

6    WAS A PROBLEM WITH THE WAY WE FILED IT.  IT WAS ONLY IN THIS

7    ANONYMOUS BLOG BY CISCO THAT ANYONE MADE THESE ALLEGATIONS.

8    Q.    IF THIS WASN'T A PROBLEM, WHY WAS AMIE MATHIS CALLING

9    THE CLERK'S OFFICE ASKING THAT IT BE CHANGED?

10   A.    BECAUSE WE KNEW WE HAD FILED IT ON THE 16TH, AND WHY IS

11   THE DOCKET SHOWING THE 15TH?  SO -- AND IT'S CRITICAL.  WHY IS

12   THE DOCKET INCORRECT?

13   Q.    RIGHT.  AND SHE WANTED THAT CORRECTED?

14   A.    SHE WANTED IT TO CORRECTLY REFLECT WHEN WE FILED IT,

15   RIGHT, AND I STAND BEHIND WHAT SHE DID.

16   Q.    NOW, LET ME GET TO MY LAST QUESTION.  I'M NOT SURE WHY

17   YOU'RE HERE TO TESTIFY, BUT -- AND IT'S NOT ABOUT YOUR MENTAL

18   ANGUISH, I UNDERSTAND.

19   A.    NO, SIR.

20   Q.    BUT YOU INDICATED THAT YOU HAD CONCERNS THAT YOU'D

21   BE -- YOU'RE IN A ROOM WITH 60 OR 70 LAWYERS, AND, THESE GUYS

22   THINK I'M A CRIMINAL --

23   A.    RIGHT.

24   Q.    -- AND I KNOW PEOPLE ARE TALKING ABOUT IT.

25   A.    RIGHT.