# EXHIBIT 13



# Intellectual Property Law Section
## State Bar of Texas

### Winter 2007

## Inside this newsletter...

Chairman's Update.................................................................................................................1
Mark Your Calendar..............................................................................................................2
In The Section.......................................................................................................................3
  Section Member Profiles....................................................................................................3
  Call for Submissions..........................................................................................................3
  Nominations & Scholarships..............................................................................................4
  Announcing The First Annual Intellectual Property Law Writing Competition...................4
The Watercooler....................................................................................................................4
  On The Move.....................................................................................................................4
Practice Points......................................................................................................................5
  Is Texas at Risk of Being Excluded from Latest Congressional Patent Reform Effort?..........5
  V Is For "Vindication" For Owners of Famous Trademarks................................................8
  Proposals For Modifying Venue For Patent Litigation......................................................11
Photo Caption Contest........................................................................................................16
Photo Caption Contest Winner!..........................................................................................17

## Chairman's Update
By Bart Showalter



Work this year at the IP Section is well underway. Many of our committees have been very active. For example, the Unfair Competition and Trade Secrets Committee (Darin Klemchuck, Chair) recently produced their annual review of unfair competition cases. You can find the paper posted on our website (http://www.texasbariplaw.org) under the "Committees" section. The Litigation Committee (Scott Breedlove, Chair) has been active in disseminating information about proposed local patent rules in Texas district courts (also posted on our website). The IP Opinions Committee (Tom Felger, Chair) has been busy with meetings and developing materials and CLE speaker ideas, and the Newsletter Committee (Shannon Bates, Chair) continues its fine work with our great newsletter.

We have a great lineup of CLE events in 2007. Vice Chair Sharon Israel and her planning committee have put together a comprehensive and thoughtful Spring CLE to be held March 1-2 at the Fairmont Hotel in Dallas. You will be receiving information from the State Bar about the event, and I encourage all SBOT IP Section members to attend. Our Chair-Elect Ted Lee will soon be planning our CLE at the SBOT Annual Meeting on June 22 in San Antonio. Again, please mark your calendar and make plans to attend.

I am proud to announce our new SBOT IP Section Writing Contest. The contest is

JW.000741

Ark.000720

open to all students in Texas law schools and all Texas residents that are in law schools outside of Texas. The winner will be announced at our business luncheon at the Annual Meeting in San Antonio, and will receive a cash prize of $2,500 and consideration for publication in the Texas IP Law Journal. We are taking submissions now through May 15, 2007, and contest rules and other information can be found at our website homepage by clicking on "Awards" at the top. Many thanks to Paul Herman, Patty Meier, and Paul Morico for their help in developing the contest.

Thanks again for the hard work of the committees, council, officers and members of the SBOT IP Section in 2006, and Happy New Year!



## Mark Your Calendar

**20th Annual Intellectual Property Law Course**, March 1-2, 2007 at the Dallas Fairmont Hotel.

This course has been approved for 13.75 hours CLE credit, including 3 hours ethics credit. The CLE program will include a variety of interesting speakers and relevant topics that will offer something for everyone, regardless of whether your practice focuses on patent litigation, patent prosecution, trademarks or copyrights. To view the complete course brochure, click here.

There will also be opportunities for you to catch up with fellow IP practitioners at a sponsored Thursday evening reception.

The cost of registration is $495 per person through February 15, 2007 and $515 thereafter. Section members receive a $25 discount off these registration fees. For registration information, go to TexasBarCLE.com.

**State Bar of Texas 125th Annual Meeting, June 21-22, 2007**, in San Antonio. On Friday June 22nd, our section will once again offer a full day of high-quality CLE.

We will also conduct our section's annual business meeting at a ticketed luncheon on Friday June 22nd. During this meeting, new officers and Council members will be elected, and awards will be presented to the Inventor of the Year, the Women & Minority Scholarship recipients, the Chair Award recipient, and the winner of our first annual IP law writing competition.

Block out June 21-22 on your calendar now, and make plans to attend the Annual Meeting in San Antonio – we look forward to seeing you there!





## In The Section

### Section Member Profiles

The following section members were asked to answer questions about their professional and personal lives. These questions were:
- Where do you work?
- How would you describe your legal practice?
- What is the last book you read?
- What is your favorite movie?
- What are your hobbies?
- If you could have dinner with three famous people (not limited to Hollywood types) of the past or present, who would they be and why?

**Feras Mousilli:**

**Work?** Dell Inc.
**Practice?** My position at Dell encompasses the myriad of interactions between law and technology. Any time a new technology is introduced there are a number of business and legal considerations that need to be taken: patent rights, licensing issues, trademarks and branding, performance testing and marketing claims, as well as competitor analysis.
**Last book read?** *Warriors of God* by James Reston. It's a richly detailed account of Richard the Lionheart and Saladin, and their interactions, in the Third Crusade.
**Favorite movie?** *Gattaca* with Ethan Hawke and Uma Thurman – it never fails to rekindle in me awe for the power of the human spirit over the most difficult of circumstances.
**Hobbies?** My hobbies include mountain biking, reading about history, computer design, and cultural anthropology.
**Dinner?** Benjamin Franklin, Saladin, and Angelina Jolie. I don't think you'd have to worry about a lull in that conversation!

**Dan Moffett:**

**Work?** The San Antonio office of Akin, Gump, Strauss, Hauer & Feld.
**Practice?** Second year associate in the Intellectual Property group.
**Last book read?** *White Noise* by Don DeLillo.
**Favorite movie?** *Raising Arizona*.
**Hobbies?** Playing guitar, poorly.
**Dinner?** Kurt Vonnegut – He is my favorite author and his unique perspective on life would probably translate to excellent dinner conversation. Hunter S. Thompson – Dinner with the late Hunter S. Thompson would probably be a little bit scary, but I am certain it would be unforgettable. Eric Clapton – He is an incredibly talented musician. Perhaps I could learn something from him.



### Call for Submissions

The Newsletter Committee welcomes the submission of articles for potential publication in upcoming editions of the IP Law Section Newsletter, as well as any information regarding IP-related meetings and/or CLE events. If you are interested in submitting an article to be considered for

publication or to calendar an event, please email your submission to Newsletter@texasbariplaw.org.

**Article Submission Guidelines:**

STYLE: Journalistic, such as a magazine article, in contrast to scholarly, such as a law review article. We want articles that are current, interesting, enjoyable to read, and based on your opinion or analysis.

LENGTH: 1-5 pages, single spaced

FOOTNOTES AND ENDNOTES: Please refrain! If you must point the reader to a particular case, proposed legislation or Internet site, or credit another author, please use internal citations.

PERSONAL INFO: Please provide a one paragraph bio and a photograph, or approval to use a photo from your firm's website.

If you have any additional questions, please email Shannon Bates, Newsletter Chair, at sbates@dfw.conleyrose.com.

## Nominations & Scholarships

It is never too early to start thinking about Inventor Of The Year nominations. The nomination form is available from the section web site.

Women and minority law students who intend to practice IP law in Texas may apply for one of two scholarships offered by the IP Section. The application form is available at the section's web site.

The Inventor Of The Year award and the scholarships are announced during the IP Law Section's luncheon and business meeting at the State Bar Annual Meeting.

## Announcing The First Annual Intellectual Property Law Writing Competition

The IP Law Section has introduced a new IP law writing contest for Texas law school students. Subject matter must be related to intellectual property law. The article must be written by a student or students either in part time or full-time attendance at a Texas law school or by Texas residents attending other law schools. For more information and complete rules, visit the section's web site at www.texasbariplaw.org or click here for the competition rules.



## The Watercooler

### On The Move

**Priscilla Ferguson** has accepted a position as Patent Counsel for Frito-Lay in Plano, Texas.

**Alex Nolte** has joined Haynes and Boone, LLP as Of-Counsel in the Houston office.

**Kristin Timmer** has joined Haynes and Boone, LLP, as an associate in the Dallas office.

**Bart Fisher** has joined Haynes and Boone, LLP, as an associate in the Austin office.

**Jerry C. Harris, Jr., G. Byron Jamison, Pamela Ratliff, Clint Stuart** and **Annette Thompson** have all joined the Plano office of Conley Rose, P.C. www.ConleyRose.com.

JW.000744

Ark.000723



## Practice Points

### Is Texas at Risk of Being Excluded from Latest Congressional Patent Reform Effort?

By C. Erik Hawes & James Beebe

On September 28, 2006, the U.S. House of Representatives passed House Resolution 5418, which was co-sponsored by Rep. Darrell Issa and Rep. Adam Schiff. *See* H.R. 5418 (109th Congress, 2nd Sess.). H.R. 5418 is designed to enhance efficiency, expertise, and consistency among district judges presiding over patent cases. The primary way in which the bill seeks to accomplish that objective is through the creation of specialized "patent courts." District court judges would be allowed to expressly request to hear patent cases, while other judges in the district could decline to accept any patent case assigned to him or her, in which case the matter would be transferred to one of the designated patent judges. *Id.* at § 1(a)(1).

Beyond consolidating patent cases before a relatively small number of judges, H.R. 5418 also provides those judges with additional tools to handle the patent cases assigned to them. The bill authorizes a $5,000,000 annual appropriation for (1) "educational and professional development" of the designated patent judges "in matters relating to patents and plant variety protection"; and (2) "compensation of law clerks with expertise in technical matters arising in patent and plant variety protection cases . . . ." H.R. 5418 at § 1(f).

The specific goals of H.R. 5418 are reflected in the periodic reports that would be required from the Director of the Administrative Office of the United States Courts, in consultation with the chief judge of the participating districts and the Director of the Federal Judicial Center. First, the drafters of the bill were concerned with the expertise gained by the designated patent judges, both in general and as shown by the reversal rate of those judges at the Federal Circuit, compared with the reversal rate for all other district judges. *See* H.R. 5418 at §§ 1(e)(1)(A) and 1(e)(1)(C)(i). Second, the bill is expected to affect efficiency of patent litigation before the designated judges, again both in a general sense, and as compared to other district courts. *See id.* at §§ 1(e)(1)(B) and 1(e)(i)(C)(ii). Third, the bill is concerned with forum shopping, as reflected by the required tracking of "any evidence indicating that litigants select certain of the [designated] judicial districts . . . in an attempt to ensure a given outcome." *Id.* at § 1(e)(1)(D).

> The "pilot program" proposed by H.R. 5418... would be implemented in only a handful of district courts across the country.

The "pilot program" proposed by H.R. 5418, however, would be implemented in only a handful of district courts across the country. Specifically, the program would be adopted in "not less than 5 United States district courts, in at least 3 different judicial circuits ..." H.R. 5418 at § 1(b). The Director of the Administrative Office of the United States Courts is directed to designate the

participating districts "from among the 15 district courts in which the largest number of patent and plant variety protection cases were filed in the most recent calendar year that has ended ...." *Id.* Pursuant to a late amendment, the bill now also provides that eligible districts are restricted to those that have (1) at least ten district judges; and (2) at least three judges that have requested to be designated as patent judges. See *id.* Because of the way this program is structured, if H.R. 5418 is enacted into law, *none* of the four judicial districts in Texas would be eligible to participate in the pilot program.

For the Northern and Southern Districts of Texas, the obstacle to participation in the H.R. 5418 program lies in the requirement that the districts be selected from among the fifteen most active patent litigation districts "*in the most recent calendar year that has ended ....*" H.R. 5418 at § 1(b). According to rough figures obtained from a search of electronic court records, the top fifteen districts in terms of patent cases filed during calendar year 2005 were as follows:

| | |
|---|---|
| 1. | Northern District of California |
| 2. | Central District of California |
| 3. | Eastern District of Texas |
| 4. | Northern District of Illinois |
| 5. | Southern District of New York |
| 6. | District of Delaware |
| 7. | District of New Jersey |
| 8. | District of Minnesota |
| 9. | District of Massachusetts |
| 10. | Southern District of Florida |
| 11. | Northern District of Georgia |
| 12. | Northern District of Texas |
| 13. | Southern District of California |
| 14 (tie). | Southern District of Texas |
| 14 (tie). | Middle District of Florida |

If H.R. 5418 had become law during 2006, then 2005 would have been "the most recent calendar year that has ended," and both the Northern and Southern Districts of Texas would have been ineligible to participate in the pilot program.

However, H.R. 5418 did *not* become law during 2006. The House bill was referred to the Senate Judiciary Committee on November 13, 2006, and a companion bill (S. 3923) was introduced in the Senate on September 21, 2006 by Senators Orrin Hatch and Dianne Feinstein. See S. 3923 (109th Congress, 2nd Sess.). The progress of this measure stalled, however, following the change in congressional leadership that occurred with the mid-term elections. Accordingly, although the bill is still very much alive, it will not be enacted until at least sometime in 2007.

This becomes significant when one looks at the top fifteen most active districts for patent litigation during the first eleven months of calendar year 2006:

| | |
|---|---|
| 1. | Eastern District of Texas |
| 2. | Central District of California |
| 3. | Northern District of California |
| 4. | District of New Jersey |
| 5. | Northern District of Illinois |
| 6. | District of Delaware |
| 7. | Southern District of New York |
| 8. | Northern District of Georgia |
| 9. | District of Massachusetts |
| 10. | District of Minnesota |
| 11. | Southern District of Florida |
| 12. | Eastern District of Michigan |
| 13. | Southern District of California |
| 14. | Middle District of Florida |
| 15 (tie). | District of Colorado |
| 15 (tie). | District of Utah |

As of the end of November 2006, the Northern District of Texas was the 18th most active district for patent litigation, while the Southern District of Texas was tied for 28th on the list. The Western District of Texas ranked in a tie for 19th during calendar year 2005 and dropped to 39th through the first

eleven months of 2006. Thus, unless these rankings change significantly during the final month of 2006, if H.R. 5418 is enacted in its present form by the 110th Congress at any point during calendar year 2007, neither the Northern District of Texas nor the Southern District of Texas will be eligible to participate in the pilot program for specialized "patent courts."

Furthermore, although the Eastern District of Texas is currently one of the most active – if not *the* most active – district for patent litigation in the country, it would also be ineligible to participate in the H.R. 5418 pilot program. Shortly before the bill was passed in the House, it was amended such that participation is now limited to districts "in which (1) at least 10 district judges are authorized to be appointed by the President ...; and (2) at least 3 judges of the court have made the request under subsection (a)(1)(A)" to be "designated" patent judges. *See* H.R. 5418 at § 1(b)(1)-(2). The Eastern District of Texas presently has only eight district court judges, with a ninth who is on senior status. Accordingly, if the pilot "patent court" program is ultimately implemented as set forth in H.R. 5418, the Eastern District of Texas will be ineligible to participate because it lacks the required complement of ten district court judges.

> ...if H.R. 5418 is enacted into law, none of the four judicial districts in Texas would be eligible to participate in the pilot program.

The net result of these factors is that, assuming the program set forth in H.R. 5418 becomes law during 2007, none of the four judicial districts in Texas would be eligible to participate in the pilot program. Certainly, many other states will be in a similar position, so the ineligibility of a single state might not seem at first glance like a significant problem. Texas, however, is the second most populous state in the nation, and an important center of industry, as the home of more than 10% of the Fortune 1000 companies. In fact, Houston and Dallas are two of only four U.S. cities with more than ten Fortune 1000 headquarters. Texas is also an important hub of technological innovation, as reflected by the fact that, in 2005, more patents were issued to residents of Texas than any state other than California. Texas also currently ranks second in the nation (behind California) in terms of patent litigation activity. According to a search of electronic court records, through the first eleven months of 2006, approximately 320 patent cases had been filed in the four district courts of Texas – almost exactly twice as many as the next closest state (New York, with 161).

Yet, if H.R. 5418 is enacted as currently structured, Texas companies and residents will be faced with the choice of (1) litigating patent cases in a different state altogether (hardly a palatable option); or (2) litigating in a district that has not benefited from the enhanced expertise, increased efficiency, and other salutary effects intended by the proposed pilot program. Worse yet, this situation would not be short-lived, as the pilot program is currently slated to last for ten years. H.R. 5418 at § 1(c).

Rather than structuring the program to exclude all four Texas districts, a much more reasonable solution would be to alter the plan such that the five participating districts are chosen from the five *states* with the most patent litigation activity. This would likely result in the pilot program being implemented in one of the very active California districts (Central or Northern), the Southern District of New York, the Northern District of Illinois, the District of New Jersey, and one of the four Texas districts. Such a structure would ensure that the program is

JW.000747

Ark.000726

implemented in districts that are active in patent litigation, and would also achieve the stated goal of geographic diversity, as the five districts would be located in five different regional circuits (Second, Third, Fifth, Seventh, and Ninth). In fact, this would increase geographic diversity, as H.R. 5418 currently requires only that the five districts be located in three different judicial districts. *See* H.R. 5418 at § 1(b).

Another reasonable approach would be to designate the participating districts from the five (or ten) states with the most technological innovation, as measured by the number of patents issued on an annual basis. This would likely result in the pilot program being adopted in the Central or Northern Districts of California, the Southern District of New York, one of the Texas districts, the Eastern District of Michigan, and the District of Massachusetts – also a structure that would ensure an active and diverse program.

Yet another potential solution would be to delete the late addition to H.R. 5418 requiring a minimum of ten district judges for eligibility. This would remove the current obstacle to implementing the pilot program in the Eastern District of Texas.

Whatever approach is adopted, it would not make sense for the pilot program of "patent courts" to go forward while completely excluding the state that is second only to California in terms of (1) total population; (2) large corporate headquarters; (3) technological innovation, as measured by the number of patents granted; and (4) volume of patent litigation. Such a result would be unfair to Texas businesses, Texas residents, and litigants in Texas federal courts.

*The above article expresses the view of the authors, and not necessarily those of the State Bar of Texas IP Law Section.*



Erik Hawes (ehawes@fulbright.com) is a partner in the Houston office of Fulbright & Jaworski, L.L.P., where he practices in the areas of complex commercial and intellectual property litigation.



James Beebe (jbeebe@fulbright.com) is an associate in the Intellectual Property & Technology department of the Houston office of Fulbright & Jaworski, L.L.P.

## V Is For "Vindication" For Owners of Famous Trademarks
### Trademark Dilution Revision Act Overturns Victoria's Secret Case

By David Bell and Jeff Becker

**What happened?**

On September 25, 2006, the U.S. House of Representatives passed H.R. 683, the Trademark Dilution Revision Act of 2006 ("TDRA"). President Bush signed the bill into law on October 6, 2006.

**What led to the passage of the TDRA?**

The United States Supreme Court issued a landmark dilution ruling in 2003 in *Mosely v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003). In that case, the national lingerie chain Victoria's Secret had sent a cease-and-desist letter to the owners of an adult novelty store doing business as Victor's Secret. In response to the demand letter, the shop changed its name to Victor's Little Secret. Evidently deeming the addition of the term "Little" to be too, well, little,

State Bar of Texas Intellectual Property Law Section, Winter 2007 – 8

JW.000748

Ark.000727

Victoria's Secret filed suit in the Western District Court of Kentucky for, *inter alia*, blurring and tarnishment under the Federal Trademark Dilution Act of 1995 ("FTDA").

The District Court ruled in favor of Victoria's Secret on the FTDA claim, and the Sixth Circuit affirmed. However, the Supreme Court reversed, interpreting the FTDA to not protect against tarnishment and to require proof of actual dilution.

The impetus behind the TDRA was to rectify the legal options available to trademark owners and provide an adequate remedy for dilution under federal trademark law. The International Trademark Association (INTA) provided testimony and written documentation to Congress, summarizing recommendations for legislative action. Representative Lamar Smith, the Chairman of the House Subcommittee on Courts, the Internet and Intellectual Property, introduced H.R. 683 to the House.

**What changes does the new federal dilution law bring?**

The TDRA will supplant the FTDA. Accordingly, the new law will replace the dilution language found within the Lanham Act of 1946, namely §43 of the Act, 15 U.S.C. 1125.

Two elements of the TDRA directly overturn language articulated in the *V Secret Catalogue* ruling and, in doing so, broaden the availability of a federal dilution cause of action for some plaintiffs.

First, the Act clarifies that not only is blurring (or a weakening of another mark's distinctiveness) actionable under federal dilution law, but that tarnishment (the harming or degrading of another mark's reputation) is actionable as well.

Second, the TDRA states that injunctive relief is available upon a showing of only a *likelihood* of dilution. No longer must a plaintiff prove *actual* dilution or economic injury for a successful claim of dilution under the Lanham Act. The TDRA also clarifies that the standard for dilution in inter parties proceedings before the Trademark Trial and Appeal Board ("TTAB") is likelihood of dilution. Because the Trademark Trial and Appeal Board Manual of Procedure already recognizes this standard, the TDRA might not have a great impact upon opposition and cancellation proceedings before the TTAB.

The TDRA also arguably expands federal dilution law by clarifying that famous marks with either acquired or inherent distinctiveness are protected. Although the FTDA does not expressly require marks to be inherently distinctive, some courts had interpreted the statute to exclude descriptive marks with secondary meaning from meeting the distinctiveness requirements for protection under the statute.

> The impetus behind the TDRA was to rectify the legal options available to trademark owners and provide an adequate remedy for dilution under federal trademark law.

In one way, however, the TDRA restricts the availability of relief under the Lanham Act. Both the FTDA and TDRA clearly state that only famous marks may be diluted. Whereas the FTDA does not provide a definition of "famous," the TDRA defines the term to mean "widely recognized by the general consuming public of the United States...." It also provides that "all relevant factors," including the geographic scope of advertising and publicity, extent of sales,

actual recognition, and registration on the Principal Register of the U.S. Patent and Trademark Office, may be used to determine fame. As this definition remains rather vague, it is difficult to ascertain how courts will interpret that standard. Most judges are expected to rule that the majority of marks would *not* be considered famous under this definition. Instead, perhaps only marks recognizable by a great majority of typical U.S. buyers – and not, for instance, merely within limited geographic regions or among narrow industry or consumer groups – would be protected under the new statute.

The new statute also provides some additional clarification to dilution law, previously absent from the Lanham Act. It provides that all relevant factors should be considered when determining whether a mark is likely to cause dilution by blurring. It lists six non-exhaustive factors that may be considered: the degree of similarity between the marks, the distinctiveness of the plaintiff's mark, the extent of substantially exclusive use of the plaintiff's marks, recognition of the plaintiff's mark, the defendant's intent, and actual association that has occurred between the marks.

Nonetheless, the TDRA does not provide much elucidation on dilution by tarnishment. It does not even provide any illustrative factors to be considered when determining whether tarnishment is likely.

**What are the practical implications of these changes?**

A famous mark owner may now look to federal law to effectively prevent dilution, rather than enjoining activity only after a mark has been diluted. Due to the lower burden of proof, mark owners may be more likely to raise claims of federal dilution in cease-and-desist letters. Owners of well-known marks should be more likely to prevail during litigation involving federal dilution claims, including at the preliminary injunction stage.

In short, by expanding the types of activity prohibited under federal law and decreasing the plaintiff's burden of proof, the statute should be an appealing remedy for owners of well-known marks concerned about unauthorized, commercial use of similar marks by third parties.

Of course, the TDRA might ultimately hurt many small business owners faced with legal action by larger companies that own famous marks. Owners of somewhat well-known, but not necessarily famous, marks also will not be able to take advantage of federal dilution law as amended. For these reasons, only owners of particularly valuable and well-known marks should be able to more adequately protect their rights and stop use by others of those marks, whereas the TDRA may not be a blessing for other trademark owners.

*The above article expresses the view of the authors, and not necessarily those of the State Bar of Texas IP Law Section.*



*David Bell practices in the IP & Tech Transactions section of Haynes and Boone, LLP, in the Dallas office.*



*Jeff Becker is a partner in the Dallas office of Haynes and Boone, LLP, where he practices in the IP & Tech Transactions section.*

## Proposals For Modifying Venue For Patent Litigation
*Elimination of Improper Forum Shopping or Infringer Tactic to Avoid Justice*

By Eric W. Buether

### Background of the Patent Venue Restriction Legislation Initiative

During the last two years, Congress has considered legislation that would result in the most significant changes to patent law in the last 50 years. Among these proposed changes are proposals to modify and restrict the venue statute applicable to patent litigation. Presently, the patent venue statute allows a patent lawsuit to be filed in any district in which the defendant does business or where the product accused of infringement is sold. In many cases involving defendants with nationwide business operations, this permits a patent owner to file suit against such defendants in virtually any district court in the country. One version of the proposed legislation would restrict venue in patent cases to districts in which the defendant is incorporated or has its principal place of business or where the defendant has committed acts of infringement and has a regular and established place of business. Another version would add the district in which any party is incorporated or has its principal place of business. Yet another version would mandate transfer of venue to "a more appropriate forum" which includes a district where a party to the action has substantial evidence or witnesses.

Some view the proposed venue changes as a necessary reform to a patent litigation system that has run out of control and encouraged frivolous and abusive patent infringement lawsuits resulting in substantial litigation costs and harm to innovation in the United States. Others contend that the asserted problems with the patent litigation system are exaggerated and view the proposed changes as part of an effort by large companies with entrenched intellectual property interests guilty of patent infringement to make it significantly more difficult for patent holders to enforce their legitimate patent rights. This article examines the arguments made by proponents and opponents of the proposed changes.

### The Arguments in Favor of Restricting Venue in Patent Lawsuits

Proponents of the proposed venue restriction legislation assert that the remarkable growth in the number of patent filings in particular courts demonstrates a serious problem with patent litigation. The patent docket in Marshall, Texas, is often cited as a prime example of improper forum shopping. Where only twelve patent lawsuits were filed in 2001 in that venue, over 100 patent lawsuits have been filed in that court in 2006. These patent venue reform proponents contend that there are several reasons that filings are focused in particular districts. First, they assert, local juries in some jurisdictions are perceived to be "plaintiff-friendly." Data does indicate that plaintiffs do in fact prevail more frequently in some jurisdictions than in others. Second, they argue, some jurisdictions are seeking to attract patent litigation. They point out that a number of plaintiffs' attorneys in East Texas have transitioned from personal-injury work – in steady decline since the Texas Legislature

> *...the patent venue reform proponents argue that venue standards should be drawn to preclude "gaming the system" through forum-shopping.*

enacted tort reform – to intellectual property work. They call this the "PI to IP transition." Thus, the patent venue reform proponents argue that venue standards should be drawn to preclude "gaming the system" through forum-shopping. They contend that lawsuits should be resolved in a forum that has a reasonable connection to the underlying claim, and that plaintiffs should not be permitted to funnel cases into plaintiff-friendly courts, just as defendants should not be able to target courts predisposed in the opposite direction.

In support of the contention that Marshall, Texas is a "patent friendly" venue, most proponents of the proposals to restrict venue in patent lawsuits cite a study by a firm called LegalMetric, which states that "since 1994, patent owners have prevailed in 88 percent of all jury trials and 75 percent of bench trials in Marshall." These figures, the proponents assert, far exceed the national averages of 68% and 51% respectively found in Moore, *Judges, Juries, and Patent Cases — An Empirical Peek Inside the Black Box*, 99 Mich. L. Rev. 365, 386 (2000). The study also asserts that it seems reasonable to assume that people are filing in certain jurisdictions because they are perceived to be pro-plaintiff. This sort of blatant forum-shopping cries out for venue reform, the patent venue reform supporters claim. Some supporters contend that the Eastern District of Texas has become a popular venue for patent lawsuits because courts in that district typically try to set a trial date in a patent case within 18 months or less from its filing date, and that this threat of imminent trial is the "gun to the head" that the patent owner can use to force unfairly large settlements from defendants. Supporters of restricting patent venue also cite with pleasure Supreme Court Justice Scalia's reference to Marshall, Texas, as a "renegade jurisdiction" during oral argument in the eBay case.

The supporters of the mandatory transfer of venue legislation argue that the legislation would create a viable means for the defendant to have the case moved to a more appropriate venue, asserting that the practice of filing suit in jurisdictions with a demonstrated pro-plaintiff bent warps settlement demands and undermines confidence in the fairness of adjudicated outcomes. Such forum shopping, they contend, has proven very burdensome for technology companies sued in jurisdictions far removed from their principal places of business where the bulk of the evidence or witnesses are to be found. Consequently, they conclude, patent infringement lawsuits should be resolved by a forum that has a reasonable connection to the underlying claim, and venue standards should be drawn to preclude "gaming the system" through forum-shopping. As one supporter of the patent venue legislation summarized:

> Today, too many plaintiffs are gaming the system to force very large settlements by filing suits in plaintiff-friendly jurisdictions like the Eastern District of Texas. Their leverage is the threat of obtaining monetary damages that are disproportionately large, or of obtaining triple damages where there has been no evidence of conduct warranting a punitive measure of damages, or of obtaining injunctions that could shut down major production enterprises. This presents a U.S. based company with a Hobson's choice of deciding whether to settle the matter at a hold-up price or run the risk of having its products shut down. These practices have to be addressed by creating disincentives to filing these types of "gaming the system" suits.

*Patent Quality and Improvement*, 109th

Cong. (April 25, 2005) (statement of David Simon, Chief Patent Counsel, Intel Corporation).

### The Arguments Against Restricting Venue in Patent Cases

Opponents of the legislative proposals to restrict patent venue emphasize that the asserted problems with current broad venue law are often exaggerated, and that restricting venue will unduly tilt the litigation balance in favor of defendants and hinder the ability of patent holders with legitimate patents to enforce their rights against infringers.

These opponents contend that allegations of forum shopping "abuses" are overblown and unsubstantiated. As Professor John R. Thomas of Georgetown University Law Center observes, because the Federal Circuit hears all patent appeals in this country, "forum shopping doesn't really involve the search for more favorable alternative interpretations of the law, but rather different judicial levels of expertise as well as distinct docket management systems that imply a different pace of litigation." Hearing, *Amendment in the Nature of a Substitute to the Patent Act of 2005*, Testimony of John R. Thomas, Professor, Georgetown University Law Center, September 15, 2005 at p. 35. "As a result," Professor Thomas concludes, "the impact of forum shopping is diminished in comparison to many other fields of law." *Id.* In fact,

> *Opponents [argue] that restricting venue will unduly tilt the litigation balance in favor of defendants and hinder the ability of patent holders with legitimate patents to enforce their rights against infringers.*

Professor Thomas asserts, the ability of patent litigants to engage in forum shopping is not necessarily a negative:

> Flexibility in forum selection may well have contributed to the concentration of patent litigation in a handful of districts. The trend has allowed "thought leaders" to develop among members of the federal bench – distinguished jurists who have heard more than their share of patent cases. In addition to providing experienced fora for the resolution of patent disputes, these trial jurists enrich our bar and provide perspectives that might otherwise be lacking in law and policy debates.

*Id.* "The potential impact of any proposed legislation upon this development should be considered," Professor Thomas cautions. *Id.*

Many major corporations have engaged in forum shopping and selected the Eastern District of Texas to bring patent infringement lawsuits, even though the factual basis for the lawsuits have no substantial connection to that venue. These major corporations include IBM, Xerox, Texas Instruments, Ericsson, Halliburton, Qualcomm, Nokia, Samsung, Nike, Alcatel, TiVo and Apple computer, hardly entities anyone would label as patent trolls. Counsel for these companies often cite as reasons for filing patent lawsuits in the Eastern District of Texas the judges' high level of experience with patent cases, efficient docket management practices and firm trial dates.

Opponents of patent venue restriction legislation emphasize that there is nothing pernicious about shopping for a forum that provides judges with a high level of experience with patent cases, efficient docket management practices and firm trial

dates. As the Fifth Circuit once declared, "[f]orum-shopping is sanctioned by our judicial system. It is as American as the Constitution, peremptory challenges to jurors, and our dual system of state and federal courts." *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1261 (5th Cir. 1983). Studies have shown that forum shopping in patent litigation has been prevalent for many years, long before the Eastern District of Texas became a popular venue for such litigation. Kimberly A. Moore, *Forum Shopping in Patent Cases: Does Geographic Choice Affect Innovation?*, 79 N.C.L.Rev. 889, 897 (2001). "For example," noted one scholar, "a patent holder may prefer to initiate its lawsuit in a jurisdiction with sufficient familiarity with patent cases, such as the District of Delaware or the Eastern District of Virginia ("Rocket Docket") in the hope of an expedient resolution of their proprietary rights." *Id.* at 900. That patent holders now select the Eastern District of Texas, therefore, is not a new phenomenon that requires significant modification of the patent venue law.

Proponents of the Eastern District of Texas venue also dispute the claim that a quick docket is a gun to a defendant's head in a patent case, pointing to a recent confidential survey of patent practitioners in the court indicating that most defense counsel do not perceive the court's quick trial settings as harmful (the survey results are posted on the Eastern District of Texas Web site at www.txed.uscourts.gov/.) The supporters of the Eastern District of Texas contend that courts there have become national leaders in patent litigation because they provide a relatively quick system for resolving patent disputes, which reduces the cost of preparing a case for both sides. This efficiency is due in part to several of the judges' use of special rules for patent cases and their continuation of the district's tradition of early, firm trial settings. Some lawyers perceive speedy trial settings and discovery limitations as benefitting plaintiffs, but in expensive commercial litigation, they work in small defendants' favor as well.

The proponents of venue reform do not provide any data to show that adjudicated outcomes in the Eastern District of Texas or other asserted "plaintiff-friendly" jurisdictions have a higher degree of error than other jurisdictions, opponents of patent venue restrictions argue. For example, there is no data showing that judicial rulings or jury verdicts in the Eastern District of Texas are reversed at a higher rate than other jurisdictions. The LegalMetric study discussed above and often cited by patent venue restriction proponents as evidence that the Eastern District of Texas is "plaintiff-friendly" is of dubious value, given that it examines jury and bench trials going back to 1994 and not recent results when that venue began to handle a substantial number of patent lawsuits.

> The supporters of the Eastern District of Texas contend that courts there... provide a relatively quick system for resolving patent disputes, which reduces the cost of preparing a case for both sides.

The opponents of patent venue legislation also point out that there is no data to show that the redirection of venue of patent lawsuits that would result from the proposed patent venue legislation would lead to outcomes that are less biased or more legally correct, efficient or predictable. They also argue that the proposed legislation that would mandate patent venue only in the district in which the defendant has its

principal place of business or is incorporated, or the district where the defendant has committed acts of infringement and has a regular and established place of business would give an unfair advantage to the home town defendant, all other things being equal, and make it difficult for small companies to afford to enforce their patent rights. This, the opponents of the proposed patent venue legislation contend, would amount to legislatively mandated forum selection for the benefit of defendants.

The proposed legislation to require mandatory transfer of patent infringement lawsuits also has been criticized. The opponents of this legislation point out that there is no data indicating that defendants are inconvenienced to any appreciable extent when patent lawsuits are brought in venues without a substantial connection to the parties or evidence. Most companies who are supporters of the legislation are large corporations that have the resources to litigate effectively in virtually any jurisdiction and have not presented evidence of any difficulty litigating in the Eastern District of Texas. Most witnesses in patent infringement trials are employees of or experts retained by the parties, and documentary evidence these days is stored electronically and easily available to the parties no matter where the venue of the lawsuit. Furthermore, in the Eastern District of Texas, as in most federal district courts, pleadings can be filed electronically from anywhere in the world. In addition, the transfer of venue provision will generate substantial satellite litigation over the venue issue, resulting in delay and increased expense of resolving patent litigation.

**Final Observations**

In the final analysis, the debate surrounding the proposed patent venue legislation revolves around whether the current law encourages abusive forum shopping producing an appreciable number of unfair outcomes, and whether the proposed changes to patent venue law will substantially reduce such abuses without unduly shifting the advantage in such litigation to defendants. As Robert Merges, Professor of law at the Center for Law and Technology at the University of California, Berkeley, observes, "sometimes people will become pretty good at playing the patent game. They'll get a patent and not really contribute anything significant in terms of technology, but just be a little ahead of the curve and be pretty clever about working the patent system. It's kind of a tricky policy issue. How do you slap down and try to stop the illegitimate guys while not wrecking any of the beneficial uses people have found for patents?" The Motley Fool, *TGIF for Patent Terrorism Foolishness*, available at Fool.com.

With the control of the House and Senate changing to the Democrats as a result of the 2006 elections, one can only guess about the potential outcome of the proposed patent reform legislation in general, or the venue legislation in particular. One thing is certain, there will be continued disagreement about the perceived necessity and benefits and detriments of such legislation.

*The above article expresses the view of the author, and not necessarily those of the State Bar of Texas IP Law Section.*



*Eric W. Buether is a shareholder in the Dallas, Texas office of the law firm of Greenberg Traurig, LLP.*

JW.000755

Ark.000734

# Photo Caption Contest

## WRITE A WINNING CAPTION, GET A PRIZE

The IPLS Newsletter Committee announces the third **Photo Caption Contest**. The rules are simple: (1) write a humorous caption for the photo; and (2) email your entry to newsletter@texasbariplaw.org by the entry deadline. Please include your contact information with your entry. The Newsletter Committee members will select a winner from the eligible entries and award a prize, which may vary from issue to issue.

This issue's prize: $25 GIFT CARD to the winner's choice of Amazon.com, Starbucks, or Brinker restaurants (Chili's, On the Border, Maggiano's, and Macaroni Grill).

Please submit a humorous caption for this picture showing some "high-tech" equipment of yesteryear. To be eligible to win, your entry must be emailed to newsletter@texasbariplaw.org by February 28, 2007. **Good luck!**



State Bar of Texas Intellectual Property Law Section, Winter 2007 – 16

JW.000756

Ark.000735

# Photo Caption Contest Winner!

**In the Fall 2006** we announced the second Photo Caption Contest, and we sincerely thank all of you who took the time to submit an entry. The captions were judged by the Newsletter Committee, and a winner has been chosen.

Drum roll, please...

And, the winning caption is...



*"An underwater movement device comprising:*
   *a body portion having a head end, a tail end and a substantially oval cross-section;*

   *a muscle contained within said body portion for moving a fin attached to said tail end back and forth; and*

   *a plurality of movable guide fins attached to said body portion for changing the direction of movement."*

Submitted by Alan R. Thiele, a partner in the San Antonio office of Strasburger.

Runner Up: *"Plants have patents. Why can't fish?"* submitted by Joe Herbert in Dallas.