EXHIBIT 19

# OF FIRE ANTS AND CLAIM CONSTRUCTION: AN EMPIRICAL STUDY OF THE METEORIC RISE OF THE EASTERN DISTRICT OF TEXAS AS A PREEMINENT FORUM FOR PATENT LITIGATION

YAN LEYCHKIS[*]

9 YALE J. L. & TECH. 193 (2007)

## ABSTRACT

*Forum shopping by patent litigants is nothing new. However, in recent years, there has been an increase in forum shopping by patentee plaintiffs. Because of this forum shopping phenomenon, the Eastern District of Texas, a technological backwater, is on pace to become the leading patent docket in the United States. This Article empirically analyzes the reasons for the popularity of the Eastern District among patentee plaintiffs and considers a number of possible legislative solutions to the problem of forum shopping gone awry.*

[*] J.D. Candidate, UCLA School of Law, 2007; M.S., University of California San Diego, 1998; B.S., Carnegie Mellon University, 1995. The author is infinitely grateful to his wife Tamila and son Daniel for their patience and support and to Professor Stephen Munzer for his guidance and helpful comments.

JW.000698

9 YALE JOURNAL OF LAW & TECHNOLOGY 193                    2006-2007

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 195
I. FORUM SHOPPING ................................................................................. 196
   A. GENERAL BACKGROUND ................................................................ 196
   B. PATENT LITIGATION ..................................................................... 197
      1. Professor Moore's Study (1995-1999) ..................................... 199
      2. Recent Trends in Patent Forum Shopping (2002-2006) ......... 204
II. THE EASTERN DISTRICT OF TEXAS ..................................................... 205
   A. GENERAL BACKGROUND ................................................................ 205
   B. PLAINTIFF'S PERSPECTIVE ............................................................ 206
      1. Knowledgeable Judges ............................................................. 206
      2. Special Patent Rules ................................................................ 209
      3. Plaintiff-friendly Juries ........................................................... 210
   C. DEFENDANT'S PERSPECTIVE .......................................................... 215
      1. Problems with the Judges ......................................................... 216
      2. Problems with the Patent Rules ................................................ 219
      3. Problems with the Juries .......................................................... 219
III. PROBLEMS WITH FORUM SHOPPING .................................................. 220
   A. PROBLEMS WITH ACCURACY ........................................................ 221
   B. PROBLEMS WITH FAIRNESS ........................................................... 222
   C. PROBLEMS WITH EFFICIENCY ....................................................... 222
IV. PROPOSALS FOR PATENT ADJUDICATION REFORM ............................ 224
   A. PATENT VENUE REFORM ............................................................... 224
   B. UNIFORM PROCEDURAL RULES ..................................................... 225
   C. SPECIALIZED PATENT JUDGES ...................................................... 226
   D. SPECIALIZED PATENT COURT ....................................................... 227
   E. PROFESSIONAL JURIES .................................................................. 230
CONCLUSION ............................................................................................. 231

JW.000699

Ark.000678

OF FIRE ANTS AND CLAIM CONSTRUCTION

## INTRODUCTION

It has been called a "lawyer's dream,"[1] a "plaintiff's best bet,"[2] a "haven for patent pirates,"[3] a "hotbed for patent trolls,"[4] and even a "renegade jurisdiction."[5]   One local attorney described it as "a cross between 'Hee Haw' and 'Twin Peaks.'"[6]  Welcome to Marshall, Texas, a tranquil town of 25,000 not far from the Louisiana border, about 150 miles east of Dallas.  Until recently, this self-proclaimed Pottery Capital of the World was known mainly for its annual Fire Ant Festival and as the former home of George Foreman and Lady Bird Johnson.  In the past few years, however, this former railroad hub named after the fourth Chief Justice of the United States, John Marshall, transformed itself into a veritable juggernaut of national and international high-tech patent litigation.  It took only five years for Marshall to grow from a tiny speck on the national litigation map to the second-busiest patent docket in the country, ahead of New York, Chicago, Washington and San Francisco and closely trailing Los Angeles, the perennial leader of IP litigation.  If it maintains its current growth rate, the Eastern District of Texas, where Marshall is located, will likely surpass the Central District of California in 2007 to become the new national leader in patent litigation.  This phenomenon has not gone unnoticed; commentators have recognized the curious disconnect between Marshall's utterly unremarkable outward appearance and the important role it plays in shaping the future of global technology.[7]

Despite the wealth of journalistic accounts, one is hard pressed to find a thorough, systematic study of what has led to Marshall's rise in the patent litigation arena and whether this rise is good or bad for the patent system.  With this Article, I attempt to fill this void.  In Part I, I discuss forum shopping, generally and specifically in the context of patent litigation.  I review past statistical studies which seek to identify the reasons behind forum shopping in patent litigation, and I then present my own empirical findings, highlighting new trends in forum shopping among patent litigators.  In Part II, I discuss patent litigation in the Eastern District of Texas, presenting both plaintiffs' and defendants' perspectives on the

---

[1] Brenda Sandburg, *The Marshall Plan*, RECORDER, June 16, 2003 (quoting a Howrey Simon Arnold & White partner describing Marshall as "a lawyer's dream. . . . a fair, fast court, a knowledgeable court . . . a luxury").

[2] *Eastern District of Texas: A Plaintiff's Best Bet*, IP LAW360, Dec. 9, 2005.

[3] Sam Williams, *A Haven for Patent Pirates*, TECH. REV., Feb. 3, 2006.

[4] Peter Lattman, *Patent Trolls: Grazing the Piney Woods?*, WALL ST. J. L. BLOG, Mar. 27, 2006.

[5] HUNTON & WILLIAMS LLP, PATENT LITIGATION IN THE EASTERN DISTRICT OF TEXAS, July 2006 (quoting Justice Scalia during the oral argument of the recent *MercExchange, L.L.C. v. eBay Inc.*, 126 S. Ct. 1837 (2006), lawsuit).

[6] *See* Sandburg, *supra* note 1.

[7] Julie Creswell, *So Small a Town, So Many Patent Suits*, N.Y. TIMES, Sept. 24, 2006, at C1.

JW.000700

current situation. In Part III, I highlight common problems caused by forum shopping, and in Part IV, I discuss possible alternatives to the U.S. system of patent adjudication and various reform proposals put forth in recent years. Finally, I present my major conclusions.

## I. FORUM SHOPPING

### A. GENERAL BACKGROUND

"Forum shopping" is a litigant's "practice of choosing the most favorable jurisdiction or court in which a claim might be heard."[8]  In no way unique to patent litigation, forum shopping is encountered wherever the applicable rules of civil or criminal procedure provide a choice of where to bring suit. Forum shopping can be vertical or horizontal. Vertical forum shopping refers to the choice to file suit in either federal or state court in a particular jurisdiction, whereas horizontal forum shopping refers to the choice between different jurisdictions—different federal districts or different state courts. Since patent litigation constitutes a subset of civil litigation, I am not concerned with criminal procedure here. As a general matter, the rules of civil procedure dictate that a civil lawsuit may be brought in any court having personal and subject matter jurisdiction, as long as venue requirements are met. Under the U.S. patent statute, federal courts have exclusive jurisdiction over all patent infringement matters,[9] with the exception of cases where patent infringement is a secondary issue in a much broader controversy dominated by state issues such as unfair competition or trade secrets.[10]  Thus, in the vast majority of patent infringement cases, vertical forum shopping does not occur, and the patentee plaintiff's only choice is between different district courts. Because all federal district courts have original subject matter jurisdiction over patent cases, personal jurisdiction and venue are the two primary determinants of where a patent lawsuit may properly be brought.

Personal jurisdiction generally exists where the defendant has had "minimal contacts"[11] with the forum and has "purposefully availed himself" of commercial benefits from his affiliation with the forum.[12]  "The defendant's conduct and connection with the forum state must be such that he should reasonably anticipate being haled into court there."[13]  The purpose of these requirements is to provide notice to prospective defendants that, by engaging in certain types of commercial activities, such as selling, advertising, or licensing products to residents of a particular forum, they are

---

[8] BLACK'S LAW DICTIONARY 666 (7th ed. 1999).
[9] 28 U.S.C. § 1338(a) (2006).
[10] *Id.* § 1338(b).
[11] International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).
[12] Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75 (1985).
[13] World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

JW.000701

Ark.000680

subjecting themselves to the risk of litigation in that forum.[14]  As a result, a company that attempts to sell its products nationally satisfies the personal jurisdiction requirements in most forums.

While personal jurisdiction is meant to ensure that the court has legal authority over the litigants, venue rules are designed to promote fairness and efficiency by requiring that a suit be litigated where most convenient for both parties.  Under the special patent venue statute, "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant *resides*, or where the defendant has *committed acts of infringement* and has a regular and established place of business" (emphasis added).[15]  According to the general venue statute, a corporate defendant resides "in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced."[16]  Historically, the patent venue statute was distinct from the general venue statute; however, in *VE Holding Corp. v. Johnson Gas Appliance Co.*, the U.S. Court of Appeals for the Federal Circuit held that the general venue statute's definition of "reside" also applies to the patent venue statute,[17] thereby subjecting large corporate defendants to patent infringement lawsuits in every federal district where they are subject to personal jurisdiction.  The important practical implication of this holding is that most large national corporations may now be sued for patent infringement in virtually *any* of the ninety-four federal district courts.[18]

## B. PATENT LITIGATION

Patent litigation constitutes a relatively small fraction of overall civil litigation.[19]  However, despite the small number of cases, patent litigation has been growing rapidly in recent years as more and more high-tech, biotech and pharmaceutical companies expend millions of dollars to protect their patent portfolios.  As shown in Table 1, the number of new patent infringement cases doubled between 1993 and 2004.  Despite the temptation

---

[14] Asahi Metal Indus. Co. v. Super. Ct., 480 U.S. 102, 113 (1987) (holding that personal jurisdiction requires that the defendant commit some act demonstrating that it expressly aimed its conduct at the forum state).

[15] 28 U.S.C. § 1400(b) (2006).

[16] *Id.* § 1391(c).

[17] VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1578 (Fed. Cir. 1990).

[18] LEONIDAS RALPH MECHAM, THE FEDERAL COURT SYSTEM IN THE UNITED STATES 12 (2d ed. 2001).

[19] In recent years, patent infringement cases have comprised a little more than 1% of all civil cases filed in federal district courts in the United States. *See* U.S. COURTS JUDICIAL FACTS & FIGURES, tbl.4.1, *at* http://www.uscourts.gov/judicialfactsfigures/Table401.pdf (last visited Apr. 24, 2007) (showing that 253,273 cases were filed in federal district courts in 2005); *id.* at tbl.4.7, *at* http://www.uscourts.gov/judicialfactsfigures/Table407.pdf (last visited Apr. 24, 2007) (showing that 2720 federal district court cases filed in 2005 were patent infringement actions).

JW.000702

Ark.000681

to blame this increase on the growing litigiousness of corporate America, there appears to be a strong correlation between the number of patent cases filed in federal district courts in a given year and the number of new patent applications filed in that year. The number of patent applications filed also doubled between 1993 and 2005 (see Fig. 1). The correlation is a bit less striking between the number of patent cases filed and the number of new patents granted, but the data shows 80% growth in the number of patent issuances over the 12-year period. It seems likely that the strong growth in patent litigation reflects the rise of more tech-based businesses or perhaps the rising importance of intellectual property for existing companies. Considering that many patent lawsuits are "bet the company" cases,[20] companies spare no expense on legal services, spending an average of $2,000,000 per lawsuit.[21]

**Table 1**: New patent applications, patents granted and patent infringement cases filed in federal district courts, 1993-2005.[22]

| Year | Patent applications | Patents granted | Infringement cases filed |
|------|---------------------|-----------------|--------------------------|
| 1993 | 188,739 | 109,746 | 1,553 |
| 1994 | 206,090 | 113,587 | 1,617 |
| 1995 | 228,238 | 113,834 | 1,723 |
| 1996 | 211,013 | 121,696 | 1,840 |
| 1997 | 232,424 | 124,069 | 2,112 |
| 1998 | 260,889 | 163,144 | 2,218 |
| 1999 | 288,811 | 169,086 | 2,318 |
| 2000 | 315,015 | 175,979 | 2,484 |
| 2001 | 345,732 | 183,972 | 2,520 |
| 2002 | 356,493 | 184,376 | 2,700 |
| 2003 | 366,043 | 187,015 | 2,814 |
| 2004 | 382,139 | 181,302 | 3,075 |
| 2005 | 417,508 | 157,717 | 2,720 |

---

[20] *See, e.g.*, Matthew B. Lowrie, *Critical Issues in Managing Patent Litigation*, 44 IDEA 267, 268 (2004) (stating that patent litigation has "seen explosive growth in recent years" and characterizing patent cases as "bet-the-company cases.)

[21] A 2003 survey of the American Intellectual Property Lawyers Association found that "the average cost of bringing a patent litigation is almost US$2 million." *Playing "Patentopoly"*, PAT. WORLD, Sept. 2004.

[22] The totals include utility, design and plant patents. The data were gathered from the U.S. Patent & Trademark Office's U.S. PATENT STATISTICS CHART, CALENDAR YEARS 1963-2005, http://www.uspto.gov/web/offices/ac/ido/oeip/taf/us_stat.htm (last visited Apr. 24, 2007), and from the U.S. COURTS JUDICIAL FACTS & FIGURES, *supra* note 19, at tbl.4.7.

JW.000703

Ark.000682

**Figure 1**:  Relationships between the number of patent infringement cases filed in federal district courts and the number of patent applications filed (left) and between the number of patents granted and patent infringement cases filed in federal district court (right), 1993-2005.



## 1. Professor Moore's Study (1995-1999)

In light of the importance of patent litigation and the special jurisdictional and technical issues that set it apart from most run-of-the-mill property disputes, it seems crucial to understand what factors affect the choice of jurisdiction in patent litigation and whether these factors remain fairly constant or change over time.  In 2001, Professor Kimberly Moore[23]

---

[23]  In 2006, Professor Moore was nominated and confirmed as the newest – and youngest – Federal Circuit Judge.  *Judicial Nominations*, *at* http://www.whitehouse.gov/infocus/judicialnominees/moore.html (last visited Apr. 24, 2007).

JW.000704

Ark.000683

published an empirical study addressing these very questions.[24]  The study examined whether the creation of the Federal Circuit, which eliminated the possibility of patent forum shopping at the appellate level, affected patent forum shopping at the trial court level.  The results clearly showed that forum shopping was alive and well, with almost half of all litigation concentrated in the top ten districts (Table 2).  The study identified certain procedural and substantive differences in district court adjudication of patent cases which appeared to have a major impact on litigation.[25]

**Table 2**:  Comparison of civil and patent caseloads in the top ten patent districts, 1995–1999.[26]

| Rank | District | Number of Patent Cases | % of All U.S. Patent Cases | % of All U.S. Civil Cases | Ratio of % Patent Cases to % Civil Cases |
|------|----------|------------------------|----------------------------|---------------------------|------------------------------------------|
| 1 | C.D. Cal. | 870 | 9.1 | 4.2 | 2.2 |
| 2 | N.D. Cal. | 606 | 6.3 | 2.3 | 2.7 |
| 3 | N.D. Ill. | 569 | 5.9 | 3.4 | 1.7 |
| 4 | S.D.N.Y. | 394 | 4.1 | 4.1 | 1.0 |
| 5 | D. Mass. | 319 | 3.3 | 1.4 | 2.4 |
| 6 | D. Del. | 308 | 3.2 | 0.3 | 10.7 |
| 7 | S.D. Fla. | 302 | 3.1 | 2.5 | 1.2 |
| 8 | E.D. Va. | 288 | 3.0 | 1.7 | 1.8 |
| 9 | D.N.J. | 286 | 3.0 | 2.6 | 1.2 |
| 10 | D. Minn. | 276 | 2.9 | 1.0 | 2.9 |

Professor Moore's study focused on the 9615 patent cases that were terminated between 1995 and 1999 and on the 1409 patent cases that went to trial from 1983 (the year following the establishment of the Federal Circuit) to 1999.  Moore found that patent litigation was not evenly distributed across the ninety-four federal district courts.  If litigation had been evenly distributed, each district court would have handled roughly 100 patent cases in the five-year period.  Instead, we observe a very top-heavy distribution where the top five districts (Los Angeles, San Francisco, Chicago, New York and Boston) account for 29% of all patent cases, and the next five districts account for another 15%, bringing the total for the top ten districts to 44% of all cases.  Moreover, according to my research, in the ten years between 1996 and 2006, the top twenty-five patent jurisdictions accounted for about 75% of all patent infringement cases filed in the United

---

[24] Kimberly A. Moore, *Forum Shopping in Patent Cases: Does Geographic Choice Affect Innovation?*, 79 N.C. L. REV. 889 (2001).
[25] *See id.* at 892.
[26] *See id.* at 902-3.

JW.000705

Ark.000684

States.[27]

Although these numbers are impressive, they do not tell the whole story. If, say, 44% of the U.S. population resided in the top ten districts, and 44% of all civil cases were filed in the same ten districts, then the uneven distribution of patent cases across the federal district courts would represent nothing more than a demographic trend. To address this possibility, Moore compared the number of patent infringement cases to the number of civil cases filed over the same time period in each district. Interestingly, the top ten districts accounted for only 23.5% of all civil cases, almost half the percentage of their patent caseload. Granted, some districts appeared more "normal" than others. For example, New York, Miami and New Jersey all had ratios close to 1.0, meaning that their patent caseloads were proportional to their civil caseloads. At the other end of the spectrum was Delaware, which accounted for 3.2% of all patent cases but only 0.3% of all civil cases, resulting in a ratio of 10.7. Thus, demographic trends alone could not explain the abnormal distribution of patent cases.

Another possibility was that certain districts were homes to centers of technological innovation (for example, Silicon Valley in the Northern District of California), producing greater numbers of patents and, as a direct consequence, more patent litigation. To test this hypothesis, Moore compared the percentage of patents granted to inventors in a state with the corresponding percentage of patent litigation cases brought in that state (Table 3). Moore found that the ratio of percentages of patent cases to those of patents granted was close to 1.0 for many states, including the leading states (California, New York, Illinois and Massachusetts). Once again, Delaware was the outlier, with five times more patent cases than one would have predicted based on the number of patents granted to local inventors. Virginia was also on the high side with a 2.5 ratio of cases to patents granted. Notably, some states, such as New Jersey, had abnormally low ratios, meaning that patent litigation there was low relative to the amount of technological innovation.

**Table 3**: Comparison of the numbers of cases and patents granted (by state), 1995–1999.[28]

| Ranking by # of Patents Granted | State | % of All Patents Granted in U.S. | % of All U.S. Patent Cases | Ratio of % Patent Cases to Patents Granted |
|---|---|---|---|---|
| 1 | California | 18.6 | 18.7 | 1.0 |
| 2 | New York | 7.9 | 7.7 | 1.0 |
| 3 | Texas | 7.0 | 6.8 | 1.0 |

[27] From 1996 to 2006, 18,348 out of 24,440 patent infringement cases were filed in the top twenty-five jurisdictions (data collected from Lexis Courtlink).

[28] See Moore, supra note 24, at 904: I have modified the table to remove the number of patents granted in each state and to add the ratio column.

JW.000706

| 4  | New Jersey    | 4.9 | 3.0 | 0.6 |
|----|---------------|-----|-----|-----|
| 5  | Illinois      | 4.8 | 6.4 | 1.3 |
| 6  | Michigan      | 4.7 | 3.6 | 0.8 |
| 7  | Pennsylvania  | 4.5 | 3.4 | 0.8 |
| 8  | Ohio          | 4.2 | 3.6 | 0.9 |
| 9  | Massachusetts | 4.1 | 3.3 | 0.8 |
| 10 | Florida       | 3.4 | 5.3 | 1.6 |
| 11 | Minnesota     | 3.0 | 2.9 | 1.0 |
| 21 | Virginia      | 1.3 | 3.2 | 2.5 |
| 32 | Delaware      | 0.6 | 3.2 | 5.3 |

Thus, it appears that none of the simple answers provide a wholly satisfying explanation. Theoretically, a litigant may be guided by multiple factors in choosing a particular forum. Such factors include the reputation of a district's judges and their experience in patent matters, the swiftness of adjudication in that district, whatever local patent rules exist, the likelihood of getting to jury trial, the likelihood of winning the case, the leanings of the local jury pool, the relative reputations of the parties in the district, and the simple geographic convenience. For example, a patent holder planning to sue another party for infringement would likely seek a venue with speedy adjudication, plaintiff-friendly juries, and judges reluctant to grant venue transfers and summary judgments. An alleged infringer, on the other hand, might prefer a venue with urban, tech-savvy juries, slower adjudication and judges more disposed to grant summary judgments. Fortunately, most of these factors can be quantified. With the wealth of statistical data available, it is possible to assess the speed of adjudication, the odds of winning a case or getting summary judgment, the patent expertise of the local judges and the sophistication of the juries in a particular district. It seems reasonable to assume that many patent litigators and their consultants engage in this type of analysis prior to deciding where to file their next lawsuit.

Moore found that the mean time for resolution of all patent cases between 1995 and 1999 was 1.12 years, with the Eastern District of Virginia resolving cases fastest in an average of 0.43 years and the Western District of New York resolving cases slowest, averaging just under two years.[29]   While the finding helped explain the disproportionately high number of patent cases finding their way to East Virginia, it could not account for the high rankings of Delaware and Massachusetts, both of which had been historically slow districts. Moore solved the mystery of Delaware's high ranking when she examined the fraction of all patent cases reaching trial. While on average only 5% of all patent cases culminated in some sort of trial, the fraction of patent cases reaching trial varied widely among the top ten districts, from as high as 23% in Delaware and 14% in Eastern Virginia to as low as 1% in New Jersey and Southern California.[30]

---

[29] See id. at 907-08.
[30] See id. at 910.

JW.000707

Ark.000686

Of Fire Ants and Claim Construction

Furthermore, while some districts, such as Central and Northern California, tended to facilitate early case resolution with about 70% of all cases settling without any court action, other districts, such as Delaware, New Jersey and East Virginia, had much lower rates of early resolution (30-40% range).[31] Another interesting characteristic of the Eastern District of Virginia was its very high transfer rate (16%), almost three times the national average.[32] The implication of these trends is that plaintiffs who desired a quick resolution with a low probability of reaching trial would gravitate toward California; those interested in a quick trial would file in Eastern Virginia, and those plaintiffs who wanted a trial at all cost, regardless of the time it took, would look to Delaware for answers. An additional unique advantage that Delaware has is the fact that many corporate defendants were incorporated in the district, thus providing a solid foundation for personal jurisdiction and venue.

Of course, any party to a lawsuit usually wants, first and foremost, to win. Other factors are only relevant as long as the target district is also receptive to plaintiff patent holders. In her 2001 study, Moore found that patent holders won 58% of all patent cases from 1995 to 1999.[33] However, as was the case with the other factors, different districts showed markedly different win rates for plaintiffs and defendants. While patent holders in Northern California won 68% of the time, patent holders in Chicago and Delaware did not fare nearly as well, winning only 48% and 46% of cases, respectively. The Eastern District of Virginia was average with a 58% plaintiff's win rate. Massachusetts, on the other hand, appeared highly favorable to alleged infringers – patent holders won only 30% of the cases there.[34] Since Massachusetts was the fifth and Delaware the sixth most popular patent litigation venue from 1995 to 1999, the obvious question was: "Why would any sane plaintiffs choose to file cases there, knowing that the districts' track records were highly unfavorable to them?" One reason may be that plaintiffs perceived certain other benefits to these forums that cannot be easily quantified and supported by empirical evidence. Another possibility may be that the plaintiffs simply had not been aware of these statistics before the Moore study came out in 2001. Moore herself wondered how empirical results presented in her article might affect future forum selection.[35] Since it had been years since the publication of the Moore study, I decided that it was a good time to investigate what impact, if any, the study had on forum shopping in patent cases.

---

[31] See id. at 911.

[32] See id. at 913.

[33] See id. at 916.

[34] See id. at 917.

[35] "Further research should consider why patent holders select these forums and how the empirical results presented in this Article might impact future forum selections." Id. at 938.

JW.000708

Ark.000687

**2. Recent Trends in Patent Forum Shopping (2002-2006)**

To uncover the recent trends in forum selection for patent infringement cases, I analyzed 13,522 patent cases filed between January 1, 2002 and November 1, 2006 (see Table 4).

**Table 4**: Comparison of civil and patent caseloads in the top ten patent districts, 2002-2006.[36]

| Rank | District | Number of Patent Cases | % of All U.S. Patent Cases | % of All U.S. Civil Cases | Ratio of % Patent Cases to Civil Cases |
|------|----------|------------------------|----------------------------|---------------------------|----------------------------------------|
| 1 | C.D. Cal. | 1417 | 10.5% | 5.0% | 2.1 |
| 2 | N.D. Cal. | 1184 | 8.8% | 2.3% | 3.8 |
| 3 | N.D. Ill. | 751 | 5.6% | 3.6% | 1.6 |
| 4 | D. Del. | 623 | 4.6% | 0.5% | 8.5 |
| 5 | S.D.N.Y. | 617 | 4.6% | 4.3% | 1.1 |
| 6 | D.N.J. | 581 | 4.3% | 2.5% | 1.8 |
| 7 | E.D. Tex. | 568 | 4.2% | 1.2% | 3.5 |
| 8 | D. Minn. | 374 | 2.8% | 1.9% | 1.5 |
| 9 | D. Mass. | 351 | 2.6% | 1.2% | 2.1 |
| 10 | E.D. Mich. | 313 | 2.3% | 1.9% | 1.2 |

The first salient observation I made is that patent litigation has become even more concentrated in the years since Moore's study. The top ten districts now account for half of all patent cases, with the top five districts carrying 36% of the caseload. My next observation is that the leadership has not changed much: eight out of the ten leaders in the Moore study are still in the top ten, but Eastern Virginia and Southern Florida have been replaced with Eastern Texas and Eastern Michigan. Delaware has become even more prominent, with its caseload doubling relative to the 1995-1999 period. Massachusetts, on the other hand, has dropped from the fifth to ninth place, as its patent caseload remained fairly flat between 2002 and 2006. Since Massachusetts had the lowest plaintiffs' win rate in Moore's study, it is reasonable to assume that the publication may have contributed to its drop in the rankings.

However, the biggest story of the last five years is not readily apparent from the five-year numbers shown in Table 4; it can only be fully appreciated by looking at the number of patent infringement cases filed annually (see Table 5). Tucked inconspicuously in the seventh position is the new superstar of patent litigation districts: the Eastern District of Texas, which has risen from almost complete judicial obscurity only five years ago to second place in 2006, ahead of all the perennial favorites except the Central District of California.

---

[36] The data were collected from Lexis Courtlink.

JW.000709

Ark.000688

OF FIRE ANTS AND CLAIM CONSTRUCTION

**Table 5**:  Number of new patent cases filed in the top ten districts from 2002 to 2006.[37]

| Rank | District | 2002 | 2003 | 2004 | 2005 | 2006[38] | 2002-2006 |
|---|---|---|---|---|---|---|---|
| 1 | C.D. Cal. | 250 | 415 | 287 | 240 | 225 | 1417 |
| 2 | N.D. Cal. | 281 | 250 | 245 | 247 | 161 | 1184 |
| 3 | N.D. Ill. | 184 | 148 | 170 | 138 | 111 | 751 |
| 4 | D. Del. | 116 | 138 | 145 | 119 | 105 | 623 |
| 5 | S.D.N.Y. | 104 | 133 | 150 | 135 | 95 | 617 |
| 6 | D.N.J. | 102 | 138 | 111 | 107 | 123 | 581 |
| 7 | **E.D. Tex.** | **32** | **55** | **108** | **159** | **214** | **568** |
| 8 | D. Minn. | 80 | 75 | 84 | 75 | 60 | 374 |
| 9 | D. Mass. | 70 | 68 | 79 | 72 | 62 | 351 |
| 10 | E.D. Mich. | 74 | 68 | 68 | 52 | 51 | 313 |
| | U.S. Total | 2710 | 2914 | 2933 | 2663 | 2302 | 13522 |

        This achievement is all the more remarkable considering the fact that overall patent litigation has actually declined in the last two years, which is reflected in the lower 2005-2006 numbers in almost every district – except in Eastern Texas.  The data show that the Eastern District of Texas has been luring patent litigants away from other districts, having doubled its caseload load from 2004 to 2006 while almost every other district experienced strong declines.  With a story so extraordinary, the Eastern District warrants a separate investigation into what makes it so irresistible to plaintiff patent holders – besides, of course, the Fire Ant Festival.

## II. THE EASTERN DISTRICT OF TEXAS

### A. GENERAL BACKGROUND

        The U.S. District Court for the Eastern District of Texas has jurisdiction over forty-three counties in eastern Texas, counties located near the borders with Arkansas and Louisiana.  The district has six divisions: Beaumont, Lufkin, Marshall, Sherman, Texarkana and Tyler, where it is headquartered.[39]  As of the time of this writing, the district has ten District Judges[40] and six Magistrate Judges.[41]  While it is generally true that over

---

[37] The data were collected from Lexis Courtlink.  Although the data spans only four years and ten months, I do not believe the difference between four years and ten months and five years is significant for the purposes of this Article.

[38] The 2006 data cover the period from January 1, 2006 to November 1, 2006.

[39] *See U.S. District Court for the Eastern District of Texas,* http://www.txed.uscourts.gov/Directories/DistrictInformation/DistrictInformation.htm (last visited Apr. 24, 2007).

[40] Chief Judge Heartfield, Judges Brown, Clark, Crone, Davis, Folsom, Schell, Schneider, Steger and Ward. *Id.*

[41] Judges Bush, Craven, Giblin, Guthrie, Hines and Love. *Id.*

JW.000710

half of all patent cases in the district are filed in Marshall, a fair amount of patent litigation has been spilling over to the other divisions as well.

## B. PLAINTIFF'S PERSPECTIVE

Plaintiff patent holders and their attorneys love the Eastern District of Texas.[42]   There are three key factors that make Marshall such an attractive forum: 1) knowledgeable judges experienced in patent cases; 2) special patent rules that compel open discovery with tight deadlines to which the judges strictly adhere, resulting in quick and relatively inexpensive trials; and 3) plaintiff-friendly juries.[43]

### 1. Knowledgeable Judges

Although the Eastern District of Texas has a total of sixteen judges, the bulk of its patent docket is currently handled by only four: Judges Ward, Davis, Folsom and Clark (see Table 6).  Judge Ward is appointed in Marshall, Judge Davis in Tyler, Judge Folsom in Texarkana and Judge Clark in Beaumont/Lufkin.  To reduce "judge shopping," any case filed in Marshall may be assigned to Judge Ward (60% of civil cases), Judge Davis (30% of civil cases) or Judge Folsom (10% of civil cases).  Regardless of the judge assigned, jury trials of cases filed in Marshall are usually held in Marshall before local juries.[44]

**Table 6**:  Distribution of new patent cases among the district judges in the Eastern District of Texas (as of Oct. 13, 2006).[45]

| Year | Judge Ward | Judge Davis | Judge Folsom | Judge Clark | E.D.Tex. Total |
|------|-----------|-------------|--------------|-------------|----------------|
| 1999 | 2 | -- | 2 | -- | 14 |
| 2000 | 5 | -- | 5 | -- | 23 |
| 2001 | 10 | -- | 7 | -- | 33 |
| 2002 | 16 | 6 | 4 | -- | 32 |
| 2003 | 24 | 7 | 11 | 1 | 55 |
| 2004 | 48 | 25 | 14 | 3 | 108 |
| 2005 | 45 | 65 | 30 | 5 | 159 |
| 2006 | 63 | 51 | 29 | 44 | 196 |
| Total | 213 | 157 | 102 | 53 | 620 |

---

[42] *See* Shahnaz Mahmud, *See Y'all Real Soon!*, MANAGING INTELL. PROP., Oct. 2006.
[43] Michael C. Smith, *Rocket Docket: Marshall Court Leads Nation in Hearing Patent Cases*, 69 TEX. B.J. 1044, 1045-1048 (2006) (listing and discussing judges, patent rules, and juries as reasons for Marshall's ascent).
[44] *See* HUNTON & WILLIAMS LLP, *supra* note 5.
[45] The case data were collected from Lexis Courtlink.

JW.000711

Ark.000690

OF FIRE ANTS AND CLAIM CONSTRUCTION

### (a) Hon. T. John Ward

Judge Ward is the patent "rock star" of the Eastern District. He is a Clinton appointee who serves the Marshall and Texarkana Divisions and conducts the majority of patent jury trials in the district. A skilled defense trial lawyer who practiced for thirty years in the Eastern District before being appointed to the federal bench in 1999, Judge Ward has a genuine interest in and a deep understanding of patent law.[46] These qualities are very rare among today's federal judges, most of whom are put off by the technical intricacies of a patent trial and by the high reversal rate of patent cases on appeal. Interestingly, Judge Ward did not practice much patent law before his appointment, despite his bachelor's degree in applied chemistry from Texas Tech.[47] His one notable brush with patent litigation came toward the end of his private practice in 1998, when he defended Hyundai Electronics against the local giant Texas Instruments in a patent infringement suit.[48] Although Ward lost the trial, which resulted in a $25.2 million jury verdict against his client, Marshall lawyers say he was intrigued by patent law and sought to streamline the litigation process for patent cases when he took the bench.[49]

After he was appointed to the bench, Judge Ward spent three years in Tyler, where in 2001 he adopted the first set of local patent rules, modeled closely after those of the Northern District of California (see Part IIB2). In 2002, Judge Ward became the resident judge for the Marshall division. His patent rules were soon adopted throughout the Eastern District, which helped establish his reputation as a nationally recognized figure in patent litigation. As shown in Table 6, Judge Ward has presided over 200 patent cases since 1999, making him one of the most experienced patent jurists in the country. In 2004, *Managing Intellectual Property* magazine acknowledged his accomplishments when it named Judge Ward one of the fifty most influential people in the world of intellectual property.[50]

### (b) Hon. Leonard Davis

Judge Davis is a relatively recent addition to the Eastern District; he was appointed to the bench in 2002. Although he is the resident judge in Tyler, Judge Davis also serves the Marshall division, sharing 30% of its civil case load. He holds a bachelor's degree in mathematics from the

---

[46] Dick Dahl, *IP Plaintiffs Flocking to Small Town of Marshall in Eastern Texas*, KAN. CITY DAILY NEWS-PRESS, June 6, 2006.

[47] *Id.*

[48] *Id.*

[49] *Id.* As a curious side note, Judge Ward was quoted as saying "I probably lost more cases in the courtroom than any defense lawyer you could find." *See* Sandburg, *supra* note 1.

[50] Editorial, *IP's Most Important Figures*, MANAGING INTELL. PROP., July/Aug. 2004.

JW.000712

Ark.000691

University of Texas, Arlington, a master's in management from Texas Christian University, and a law degree from Baylor, where he graduated first in his class. Judge Davis practiced civil and criminal law for twenty-three years, after which he served for several years as Chief Justice of the Twelfth Circuit Court of Appeals of the State of Texas before receiving his federal judicial appointment.[51]  Much like Judge Ward, Judge Davis did not practice patent law before becoming a judge; however, this did not prevent him from becoming the second-busiest patent judge in the Eastern District in a little over four years, with over 150 patent cases assigned.

**(c) Hon. David Folsom**

Judge Folsom, another Clinton appointee, is the longest-serving patent judge in the Eastern District, having been the Texarkana resident judge since 1995. Unlike Judges Ward and Davis, Judge Folsom holds an undergraduate degree in liberal arts and spent several years working as a high school history teacher before embarking on a career in the law. Before he was appointed to the bench, he spent twenty years in private practice, engaging in various types of civil litigation. Since 1999, Judge Folsom has dealt with about 100 patent cases, making him the third-busiest patent judge in the district. Because he lacks a science or engineering background, Judge Folsom tends to hire clerks with engineering degrees or master's degrees in intellectual property law.[52]

**(d) Hon. Ronald Clark**

Judge Clark is the most recent addition to the Eastern District patent group, appointed in 2002 to the Beaumont and Lufkin Divisions to replace retiring Judge Cobb. Judge Clark received bachelor's and master's degrees in economics from the University of Connecticut before getting a law degree from the University of Texas. He started his career as an assistant city attorney in Abilene, Texas, later moving to a private firm where he continued to defend local governmental entities in a broad variety of civil cases. An experienced trial lawyer, he tried over seventy cases, many of which culminated in a jury trial.[53]  As shown in Table 6, Judge Clark's patent docket has experienced a very steep rise within the last year, growing from five cases filed in 2005 to forty-four filed so far this year, a rate of increase virtually unheard of in any other jurisdiction.

---

[51] *Judiciary Nominees: Hearing Before the S. Comm. on the Judiciary*, 106th Cong. (2002) (Statement of the Honorable Orin Hatch), *available at* http://judiciary.senate.gov/member_statement.cfm?id=234&wit_id=51.

[52] Editorial, *Judge David Folsom: From Small-Town Beginnings to Technology-Rich Present*, ARK. L. REC., Winter/Spring 2004, at 23.

[53] *See Judiciary Nominees, supra* note 51.

JW.000713

Ark.000692

OF FIRE ANTS AND CLAIM CONSTRUCTION

### 2. Special Patent Rules

One of the biggest reasons patent holders gravitate toward Marshall, Texas is the special patent rules adopted in the Eastern District of Texas,[54] rules modeled after those adopted earlier in the Northern District of California. The Northern District of California includes San Francisco, San Jose, and Silicon Valley, and therefore it is home to many prominent high-technology companies, some of which occasionally engage in patent litigation. In 1998, the Northern District adopted the first set of rules specifically addressing patent litigation. These rules, which stress early and significant disclosure requirements and claim construction,[55] were designed to create a faster, more efficient patent litigation process.

One substantial difference between the Texas and California rules is that defendants in Eastern Texas only have nine months to complete discovery, whereas defendants in Northern California get eighteen months. Another important feature of the Eastern District patent litigation process is the sanctity of discovery deadlines and trial dates. Barring certain truly extraordinary circumstances, these dates must be strictly honored and no routine extensions are allowed. While the system is somewhat biased in the plaintiff's favor, it is structured to clear the docket and get cases resolved in a quick and efficient fashion. According to LegalMetric, a legal data analysis company, bench patent trials in the Eastern District take 22.3 months on average compared to 37.8 months nationwide; jury patent trials take an average of 21.1 months compared to 27.1 months nationwide.[56]

It is important to note that, in addition to the special patent rules, there are other factors that have accelerated patent litigation in the Eastern District. First, due to its aging rural demographic, the district has a relatively small criminal docket, and the criminal docket usually takes precedence over civil matters in other districts.[57] Second, in 2003, Texas voters approved Proposition 12, granting the Texas Legislature the authority

[54] *See* The Rules of Practice for Patent Cases before the Eastern District of Texas, *available at* http://www.txed.uscourts.gov/Rules/LocalRules/Documents/Appendix%20M.pdf [hereinafter E.D.P.R.].

[55] *See* Michael C. Smith, *Eastern District of Texas Patent Rules* 3, 2004 AIPLA Spring Meeting (March 19, 2004), http://mcsmith.blogs.com/eastern_district_of_texas/2004_patent_rules_ed_texas.pdf ("The rules provide a complex series of dates directed at the early stages of a patent case, specifically the claim construction process. Judges of the Northern District of California have explained that: 'The patent local rules were adopted by this district in order to give claim charts more 'bite.' The rules are designed to require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed. . . . Unlike the liberal policy for amended pleadings, the philosophy behind amending claim charts is decisively conservative, and designed to prevent the 'shifting sands' approach to claim construction.'").

[56] *See* Mahmud, *supra* note 42.

[57] Monica Perin, *Town Practices "Rocket Docket" Law: Tiny Marshall Gaining Fame as Popular Venue for High-Tech Litigation*, HOUS. BUS. J., Jan. 24, 2005, *available at* http://houston.bizjournals.com/houston/stories/2005/01/24/story1.html.

209

JW.000714

to impose caps on non-economic (i.e. pain-and-suffering) damages in health care liability actions.[58]   As a direct consequence of this legal development, the number of medical malpractice lawsuits filed in Marshall, Tyler and other Eastern District divisions has dropped precipitously.[59]

Although the Eastern District of Texas is clearly quicker to resolve a typical patent infringement case (if there is such a thing) than the average federal district court, especially in a bench trial, its patent docket has been slowing in recent years as the judges are inundated with more and more new cases.[60]   Some commentators have noted similarities with the Eastern District of Virginia, the original "rocket docket," which experienced a similar wave of popularity among patent litigators in the 1990s but was soon forsaken when the docket slowed down.[61]   In contrast, despite the recent slowing, patent case filings in Marshall continue their exponential growth, suggesting that speed is not the most important factor at play here. In the meantime, similar patent rules have been adopted in the Northern District of Georgia (Atlanta) and the Western District of Pennsylvania (Pittsburgh), in an effort to attract more patent litigation.[62] So far, however, the effect of these new rules in those districts appears to have been substantially less pronounced than it has been in the Eastern District of Texas.[63]

### 3. Plaintiff-friendly Juries

To say that juries in the Eastern District of Texas favor patent holders is something of an understatement – quite plainly, an Eastern District jury is the patentee plaintiff's best friend. Patentees have won 90% of all jury trials in the district between 1998 and 2006 (see Table 7).[64]

---

[58] Texas Medical Ass'n, *Texans Vote "Yes on 12"*, TEXAS MEDICAL ASSOCIATION, *at* http://www.texmed.org/Template.aspx?id=2819 (last visited Apr. 24, 2007).

[59] *See* Williams, *supra* note 3.

[60] *See* Tresa Baldas, *Texas IP Rocket Docket Headed for Burnout?*, NAT'L L.J., Dec. 28, 2004; *see also* Allen Pusey, *Patent Lawyers Flock to East Texas Court*, DALLAS MORNING NEWS, Mar. 25, 2006 (recognizing that Marshall patent cases that used to take eight to twelve months to resolve are now taking twenty to twenty-four months).

[61] *See* Baldas, *supra* note 60.

[62] *See* JONES DAY COMMENTARIES, FEDERAL DISTRICT COURT IN PITTSBURGH ADOPTS SPECIALIZED LOCAL RULES FOR PATENT CASES (2005), http://www.jonesday.com/ services/services_pubs.aspx (last visited Apr. 24, 2007). The Northern District of Geogria patent rules are available online at http://www.gand.uscourts.gov/documents/ NDGARulesPatent.pdf (last visited Apr. 24, 2007) and the Western District of Pennsylvania patent rules are available online at http://www.pawd.uscourts.gov/ Documents/Forms/LocalPatentRules.pdf (last Apr. 24, 2007).

[63] *See* Roderick McKelvie & Scott Weidenfeller, *Pennsylvania Bids for Patent Litigation*, MANAGING INTELL. PROP., Mar. 2005 (noting that, whereas E.D. Tex. patent infringement filings more than doubled from fifty in 2003 to 103 in 2004, N.D. Ga. saw a more modest increase, from forty-five in 2003 to sixty-one in 2004).

[64] The data were collected from Lexis and Westlaw databases of jury verdicts and settlements and from other online sources. Similar figures have been reported elsewhere;

JW.000715

Ark.000694

OF FIRE ANTS AND CLAIM CONSTRUCTION

Compare that to the nationwide figure of 68%,[65] and you have got an extremely patentee-friendly venue. So friendly, in fact, that before June 2006, patentees won every single jury trial in the district, before the defendants' dry spell was finally broken with two back-to-back victories[66] (see Table 7). What is even more remarkable is that it has taken eighteen years of patent infringement trials for an Eastern District jury to find a patent invalid; it happened for the first time ever in the 2006 case *Hyperion Solutions Corp. v. OutlookSoft Corp.*[67]

**Table 7:** Outcomes of patent jury trials in the Eastern District of Texas, 1999-2006.[68]

| Case Name | Date | Judge/Division | Prevailing party | Patent Damages[69] |
|---|---|---|---|---|
| *Texas Instruments, Inc. v. Hyundai Elecs. Indus. Co.*[70] | 3/25/1999 | Heartfield/Marshall | Plaintiff | $25,200,000 |
| *Edmark Indus. v. Azad Int'l, Inc.*[71] | 7/17/2000 | Cobb/Beaumont | Plaintiff | $326,302 |
| *John D. Watts v. XL Systems, Inc.*[72] | 3/3/2001 | Hines/Beaumont | Plaintiff | $1,675,450 |
| *Ericsson, Inc. v. Harris Corp.*[73] | 6/3/2001 | Brown/Sherman | Plaintiff | $4,281,000 |
| *Imonex Servs., Inc. v. WH Munzprufer Deitmar*[74] | 1/10/2003 | Ward/Marshall | Plaintiff | $10,350,000 |
| *Nat'l Instruments Corp. v. The Mathworks, Inc.*[75] | 1/30/2003 | Ward/Marshall | Plaintiff | $3,500,000 |
| *Microtune (Texas), L.P. v. Broadcom Corp.*[76] | 3/20/2003 | Brown/Sherman | Plaintiff | $5,650,000 |
| *Halliburton Energy Servs., Inc. v. Smith Int'l, Inc.*[77] | 6/25/2004 | Davis/Tyler | Plaintiff | $24,000,000 |
| *Brooktrout v. Eicon Networks*[78] | 11/12/2004 | Ward/Marshall | Plaintiff | $94,500 |
| *O2 Micro Int'l Ltd. v. Sumida Corp.*[79] | 11/17/2005 | Ward/Marshall | Plaintiff | $2,000,000 |
| *Acco Brands Inc. v. ABA Locks Mfr. Co.*[80] | 12/15/2005 | Ward/Marshall | Plaintiff | $2,075,000 |

*see, e.g.,* Bob Cote & Rodger Sadler, *Survival Strategies in the New IP Economy,* MANAGING INTELL. PROP. at 26, June 2006 (reporting that patentees won 92% of all jury trials in the district); *see also* Alan Cohen, *From PI to IP,* IP L. & BUS., Nov. 2005 at 36 (quoting LegalMetric reports that plaintiffs won 88% of all jury trials in the Eastern District of Texas since 1994).

[65] *See* Cohen, *supra* note 64 (quoting nationwide data from LegalMetric).

[66] The defendants' victories were in *Sensormatic Elecs. Corp. v. WG Security Prods., Inc.,* No. 2:04-CV-167, 2006 WL 2325361 (E.D. Tex. June 30, 2006), and *Hyperion Solutions Corp. v. OutlookSoft Corp.,* No. 2:04-CV-436 (E.D. Tex. Sept. 15, 2006).

[67] 422 F. Supp. 2d 760; *see* Creswell, *supra* note 7.

[68] The case data were collected from Lexis, Westlaw and other online sources.

211

9 YALE JOURNAL OF LAW & TECHNOLOGY 193                    2006-2007

| | | | | |
|---|---|---|---|---|
| *Paice LLC v. Toyota Motor Corp.*[81] | 12/20/2005 | Folsom/Marshall | Plaintiff | $4,600,000 |
| *TiVo Inc. v. EchoStar Comms. Corp.*[82] | 4/13/2006 | Folsom/Marshall | Plaintiff | $73,991,964 |
| *Z4 Techs., Inc. v. Microsoft Corp.*[83] | 4/19/2006 | Davis/Tyler | Plaintiff | $133,000,000 |
| *Visto Corp. v. Seven Networks Inc.*[84] | 4/28/2006 | Ward/Marshall | Plaintiff | $3,683,000 |
| *O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*[85] | 5/15/2006 | Ward/Marshall | Plaintiff | Not determined |
| *Avid Identification Systems v. Datamars SA*[86] | 5/31/2006 | Ward/Marshall | Plaintiff | $26,981 |
| *Finisar Corp. v. DirectTV*[87] | 6/23/2006 | Clark/Beaumont | Plaintiff | $78,900,000 |
| *Sensormatic Elecs. Corp. v. WG Security Prods., Inc.*[88] | 6/30/2006 | Ward/Marshall | Defendant | $0 |
| *Hyperion Solutions Corp. v. OutlookSoft Corp.*[89] | 9/15/2006 | Ward/Marshall | Defendant | $0 |

Figure 2 below compares patent holders' jury trial win rates in cases filed between 1999 and 2004 across several major patent litigation districts. It is interesting to note that the two districts with the highest patentee win rates are the ones referred to as the "rocket dockets" – apparently, speedier trials strongly correlate with higher win rates by patent holders.

---

[69] The table lists original jury awards; some of these awards were later reduced by the trial judge.

[70] No. 98-VC-74, 1999 WL 33491157 (E.D. Tex. Mar. 25, 1999).

[71] No. 1:98-CV-1530, 2000 WL 33720974 (E.D. Tex. July 17, 2000).

[72] No. 99-CV-369, 2001 WL 1824621 (E.D. Tex. Mar. 3, 2001).

[73] No. 4:98-CV-325 (E.D. Tex. June 3, 2001).

[74] No. 2:01-CV-174, 2003 WL 1855363 (E.D. Tex. Jan. 10, 2003).

[75] No. 2:02-CV-256, 2003 WL 1855301 (E.D. Tex. Jan. 30, 2003).

[76] No. 4:01-CV-23, 2003 WL 21695675 (E.D. Tex. Mar. 20, 2003).

[77] No. 4:02-CV-269, 2004 WL 1687064 (E.D. Tex. June 25, 2004).

[78] No. 2:03-CV-59, 2004 WL 2921644 (E.D. Tex. Nov. 12, 2004).

[79] No. 2:03-CV-7, 2005 WL 3691550 (E.D. Tex. Nov. 17, 2005).

[80] No. 2:02-CV-112, 2005 WL 3690829 (E.D. Tex. Dec. 15, 2005).

[81] No. 2:04-CV-211 (E.D. Tex. Dec. 20, 2005).

[82] No. 2:04-CV-1, 2006 WL 1458443 (E.D. Tex. Apr. 13, 2006).

[83] No. 6:06-CV-142, 2006 WL 1626711 (E.D. Tex. Apr. 19, 2006).

[84] No. 2:03-CV-333, 2006 WL 1626701 (E.D. Tex. Apr. 28, 2006).

[85] No. 2:04-CV-32 (E.D. Tex. May 15, 2006).

[86] No. 2:04-CV-183, 2006 WL 1889522 (E.D. Tex. May 31, 2006).

[87] No. 1:05-CV-264, 2006 WL 3246407 (E.D. Tex. June 23, 2006).

[88] No. 2:04-CV-167, 2006 WL 2325361 (E.D. Tex. June 30, 2006).

[89] No. 2:04-CV-436 (E.D. Tex. Sept. 15, 2006).

JW.000717

Ark.000696

OF FIRE ANTS AND CLAIM CONSTRUCTION

**Figure 2**:  Comparison of patent holders' win rates in jury trials, 1999-2004.[90]



There are several plausible explanations for the high plaintiffs' win rate in jury trials.  First, Eastern District juries have a tendency to view patents in much the same way as they view real property.[91]  Framed in this fashion, any patent infringement dispute can be distilled to a simple trespass action, and any invalidity defense can be viewed as a claim of defective title – terms that can be easily understood even by an unsophisticated small town juror.[92]  Because a valid title holder has a broad right, within certain legal limits, to do anything he or she wants to do with the land, including leasing it out or doing nothing at all, juries in the Eastern District do not see much difference between a patentee who exploits his or her invention commercially and a "patent troll," a holding company that exists solely to license patents to other companies.[93]  Thus, any defense arguments based on the public policy of using the patent system to promote common welfare are likely to fall on deaf ears in the Eastern District of Texas.

Additionally, according to Marshall attorney Michael C. Smith, local juries have a great respect for the government and a general distrust of large corporations, especially foreign ones.[94]  As a result, whenever in doubt, these local juries defer to government agencies, or rule in favor of

[90] *See* Cote & Sadler, *supra* note 64 (based on Lexis Courtlink data covering the period between Apr. 1, 1999 and Mar. 31, 2004).
[91] Michael C. Smith, *"Patent Pirates" Only Exist in Neverland*, TEX. LAW., Oct. 11, 2004, at 30.
[92] *Id.*
[93] James Nurton, *They're Out There Somewhere*, MANAGING INTEL. PROP., June 2006 (quoting Michael C. Smith as saying, "Juries are very committed to property rights and very willing to recognize that someone who has a patent can do what they want.")
[94] Susan Decker, *Texas District Is Heaven for Patent Holders Under Siege*, SEATTLE TIMES, May 1, 2006, at C3.

JW.000718

Ark.000697

the small plaintiff.  In complex patent matters, Eastern District juries tend to interpret the presumption of patent validity very rigidly, taking the fact that the U.S. Patent & Trademark Office issued a patent as conclusive proof that the patent must be valid, merely because the government knows what it is doing.[95]  The distrust of corporate defendants goes back many decades to the time when the district was a major railroad center, which resulted in many personal injury claims against large railroad companies.[96]  Even long after the railroads ceased to play the important role they once did, mass tort claims against the employers persisted, with plaintiffs' wins outnumbering their losses.[97]

The combination of the local juries' respect for personal property rights and government agencies and their distrust of large corporate defendants makes the Eastern District of Texas an ideal venue for "patent trolls."  My analysis of all patent cases filed in the Eastern District since 1999 revealed that many such "trolls" have shown a clear preference for the Eastern District over other venues.[98]  It is interesting to note that, in many instances, the same patent holder gets to litigate most, if not all, of its cases before the same judge.  As I have stated earlier, most patent cases are filed in Marshall, where a random lottery is used to allocate cases among several judges.  However, cases filed in other Eastern District divisions are substantially more likely to be heard by the resident judge of that division, so the plaintiff is well positioned to engage in "judge shopping" if so inclined.  The observation that many "trolls" tend to litigate most of their cases before the same judge may reflect trolls' perceptions of a strategic advantage or the efficiency of litigating the same or highly similar issues before a judge who is already familiar with the technology in dispute.  Whatever the reasons, the data show that for many patent-holding companies, the Eastern District Texas has become the district of choice.

---

[95] *See id.*

[96] *See* Creswell, *supra* note 7.

[97] *See, e.g.*, Neil Vidmar, *The Performance of the American Civil Jury: An Empirical Perspective*, 40 ARIZ. L. REV. 849, 871-72 (1988) (finding a 66% "prevail rate" for mass tort plaintiffs).

[98] *See* Nurton, *supra* note 93 (describing the most litigious patent-holding companies and their affinity for the Eastern District of Texas).

214

JW.000719

Ark.000698

OF FIRE ANTS AND CLAIM CONSTRUCTION

**Table 8**: Patent infringement lawsuits initiated by selected patent-holding companies since 1999.[99]

| Plaintiff/Patent Holder | Judge Ward | Judge Davis | Judge Folsom | Judge Clark | E.D.T. total | All other districts |
|---|---|---|---|---|---|---|
| Ronald A. Katz Technology Licensing, LP | 1 | -- | 5 | 15 | 21 | 11 |
| Data Treasury Corp. | -- | -- | 15 | -- | 15 | 5 |
| Orion IP, LLC | -- | 11 | -- | -- | 11 | 1 |
| IAP Intermodal, LLC | 11 | -- | -- | -- | 11 | -- |
| Rembrandt Technologies, LP | 5 | -- | -- | -- | 5 | -- |

Some commentators have also noted that Eastern District juries are prone to awarding "Texas-size" damages.[100] According to Table 7, six out of twenty jury trials resulted in damage awards over $10,000,000. However, in many of these cases, both parties were large corporations that had spent many years and millions of dollars on the litigation,[101] so the sheer size of these awards is not particularly unusual. As a general matter, however, most of the patent infringement damages in the Eastern District are on par with those awarded in other districts.

## C. DEFENDANT'S PERSPECTIVE

There is no denying it: with an average win rate of just 22%, the Eastern District of Texas is about the worst place in the country to be a defendant in a patent infringement lawsuit.[102] The same factors that make the district so appealing to the plaintiff make the defendant's life extremely difficult. Speedy and predictable patent adjudication refereed by experienced, knowledgeable judges may benefit both plaintiffs and defendants equally in theory, but once we step into the defendant's shoes, we see that practice and theory often fail to align.

---

[99] The data were collected from Lexis Courtlink.

[100] See Cresswell, *supra* note 7 (noting that "jurors here have a history of handing out Texas-sized verdicts to winners").

[101] See, e.g., Texas Instruments v. Hyundai Elecs. Indus. Co., No. 98-CV-74, 1999 WL 33491157 (E.D. Tex. Mar. 25, 1999) ($25,000,000); TiVo Inc. v. EchoStar Comms. Corp., No. 4:04-CV-1, 2006 WL 1458443 (E.D. Tex. Apr. 13, 2006) ($74,000,000); Finisar Corp. v. DirecTV, No. 1:05-CV-264, 2006 WL 3246407 (E.D. Tex. June 23, 2006) ($79,000,000).

[102] As a point of reference, the nationwide defendant win rate in patent cases is 41%; see Cresswell, *supra* note 7 (quoting LegalMetric data showing that plaintiffs prevailed in 78% of all patent cases in the Eastern District of Texas, compared with an average of 59% nationwide).

JW.000720

Ark.000699

9 YALE JOURNAL OF LAW & TECHNOLOGY 193                    2006-2007

## 1. Problems with the Judges

### (a) Are the Judges Fair?

For all their experience and expertise in patent matters, the judges of the Eastern District show certain extreme tendencies in their judicial decision making. For starters, patent holders have won 75% of bench trials in Marshall since 1994, compared to 47% nationwide.[103] In addition, the district has the lowest rate of summary judgments in patent cases by far: less than 10% of all summary judgment motions are granted here, compared to almost 70% in the Northern District of California, 50% in the Central District of California, and about 40% nationwide.[104] In and of itself, the low number of summary judgments seems quite innocuous – after all, by refusing to grant summary judgments, the judges do not seem to show bias to either party, merely transferring the ultimate fact-finding burden to the jury. However, given the local juries' well-known track record of repeatedly finding for the plaintiff, the judges are actually helping to institutionalize the district's pro-patentee bias.

Similarly, the Eastern District of Texas has one of the lowest rates of venue transfers granted. While the national average is close to 50%, with some jurisdictions having much higher rates (e.g., the Southern District of New York judges grant almost 80% of all transfers), the Eastern District of Texas grants only one in every three motions to transfer venue.[105] This rate is about half that of the Eastern District of Virginia, the original "rocket docket."[106] Thus, while Eastern Virginia judges countered the onslaught of patent litigators with a fairly liberal venue transfer policy, the Eastern Texas judges are holding the fort, so to speak, by refusing to transfer cases based merely on inconvenience to the defendant or the court's overly busy patent docket.[107]

In cases where an alleged infringer files a motion to stay litigation pending the outcome of patent reexamination by the Patent Office, the Eastern District of Texas is in the middle of the pack, granting just over 50% of such motions, compared to a 100% grant rate by judges in the

---

[103] See Cohen, *supra* note 64 (quoting LegalMetric patent bench trial data covering the period between 1994 and 2005).

[104] See Cote & Sadler, *supra* note 64 (based on Lexis Courtlink data between June 1, 2003 and June 1, 2004).

[105] See *id.* (based on Lexis Courtlink data covering the period between June 1, 2002 and June 1, 2004).

[106] See *id.*

[107] See Cohen, *supra* note 64 ("At least one defendant… has cited the growing number of patent cases, and the congestion they could create, as a reason to request a transfer out of Marshall. In September [2005], Judge Ward denied the company's motion, writing that 'the court is aware of its own docket and ability to manage cases promptly and efficiently.'")

216

JW.000721

OF FIRE ANTS AND CLAIM CONSTRUCTION

Central District of California and the Southern District of New York.[108] Although this is clearly consistent with the district policy of promoting quick and efficient resolution of patent disputes, it also seems wasteful to require that parties continue litigation while the Patent Office itself has not made a final determination regarding the scope of the claims in question.

The combined effect of all these trends is that alleged infringers find themselves trapped in a district with defendant-hostile juries and scarce opportunities for transfer, stay or summary judgment. In such an environment, any reasonable defendant might seriously consider settlement – and the vast majority of all patent cases in the Eastern District do settle before trial.[109] Rational reasoning would suggest that defendants with weak or even intermediate strength positions tend to settle, while only those defendants who perceive their position to be strong proceed to trial. If this is true, the dismal win rates by defendants in the Eastern District of Texas would have been even lower had it not been for the high rate of settlements.

**(b) Are the Judges Accurate?**

It is clear that, due to the sheer number of patent cases passing through their courtrooms, the judges of the Eastern District of Texas are experienced patent jurists. A different question is whether that experience translates into the increased accuracy of their decisions. Since there is hardly an objective measure of accuracy in any given area of law, the only objective readout is the appellate track record of the judges at the Federal Circuit level. Unfortunately, due to the lengthy appeal process and the relatively recent explosion in the number of patent cases filed in the Eastern District, a search revealed only twenty-six Federal Circuit appeal decisions from Eastern District patent infringement actions. Some of these appeals addressed procedural issues, and some dealt with substantive patent law issues such as claim construction or the doctrine of equivalents. Table 9 classifies these appeals by district judge, and Table 10 categorizes them by year in order to discern potential temporal trends.[110] I remind the reader that the sample size is very small and therefore the uncertainty level accompanying my conclusions is high.

Predictably, Judge Ward has the best appellate record, with only one out of six decisions overruled based on one incorrect claim construction. Other judges have less admirable records, and the overall reversal rate for

---

[108] *See* Cote & Sadler, *supra* note 64, chart 6.

[109] *See* Creswell, *supra* note 7 (stating that roughly 5% of patent cases eventually make it to trial in Marshall).

[110] Where the Federal Circuit affirmed in part and reversed in part, I counted it as two separate decisions, which is why the totals in Tables 9 and 10 come to 28 instead of 26. Judge Clark has not accumulated any appellate record in patent cases; hence, he does not appear in the tables.

JW.000722

Ark.000701

9 YALE JOURNAL OF LAW & TECHNOLOGY 193            2006-2007

the district is about 40%, twice the national average of about 20%.[111] The overall numbers appear even less encouraging when we examine claim construction: almost 50% of all constructions appealed were held erroneous, significantly higher than the national average of about 35%.[112]

**Table 9**: Recent appellate track record of E.D. Tex. judges in patent cases.

| Appellate Review | Judge Ward | Judge Davis | Judge Folsom | Other judges[113] | Total |
|---|---|---|---|---|---|
| Decisions affirmed | 4 | 1 | 2 | 10 | 17 |
| Decisions reversed | 1 | 0 | 2 | 8 | 11 |
| Correct claim constructions | 5 | 0 | 3 | 1 | 9 |
| Erroneous claim constructions | 1 | 0 | 1 | 6 | 8 |

Table 10 also fails to demonstrate a clear trend toward improved accuracy. The overall district reversal rate in patent cases oscillated between 33% and 45%, without a discernable temporal trend. The same is generally true about claim constructions, which were reversed 40% to 50% of the time depending on the time frame. Thus, the odds of getting a correct claim construction in the Eastern District of Texas appear to be about as good as those one can expect from flipping a coin, not exactly promoting public confidence in the system.

**Table 10**: Recent appellate track record of E.D. Tex. judges in patent cases (by year).

| Appellate Result | 1988-1998 | 1999-2001 | 2002-2004 | 2005-2006 | Total |
|---|---|---|---|---|---|
| Decisions affirmed | 3 | 2 | 6 | 6 | 17 |
| Decisions reversed | 2 | 1 | 5 | 3 | 11 |
| Correct claim constructions | 0 | 0 | 7 | 2 | 9 |
| Erroneous claim constructions | 0 | 1 | 5 | 2 | 8 |

---

[111] *See* Kimberly A. Moore, *Are District Court Judges Equipped to Resolve Patent Cases?*, 15 HARV. J. L. & TECH. 1, 14 (2001) (demonstrating that, from 1995 through 2000, the overall Federal Circuit reversal rates for patent cases ranged from 13% to 27%, averaging about 20%).

[112] *See* Kimberly A. Moore, *Markman Eight Years Later: Is Claim Construction More Predictable?*, 9 LEWIS & CLARK L.R. 231, 233 (2005) (concluding, based on empirical research, that the reversal rate for all appealed claim constructions from 1996 through 2003 was 34.5%).

[113] Includes appeals of older decisions by Judges Heartfield, Hines and Fisher; Senior Judges Brown, Steger and Cobb; and Magistrate Judge McKee.

218

JW.000723

Ark.000702

OF FIRE ANTS AND CLAIM CONSTRUCTION

Thus, based on the admittedly limited appellate data, with the sole exception of Judge Ward, the judges of the Eastern District of Texas leave a lot to be desired in the accuracy of their patent decisions.

## 2. Problems with the Patent Rules

The local patent rules also stack the deck against the defendant. Perhaps the most important Eastern District of Texas rule is a common civil case requirement for early disclosure of all relevant documents.[114] The effect of this rule is that a defendant in a patent infringement case only has a few months to collect and produce all documents relevant to any claim or defense in the case. Additionally, defendants have the same short time frame for identifying all relevant prior art that can be used to challenge the validity of a patent.[115] Failure to produce documents or identify all relevant prior art may preclude the use of any late-identified prior art during trial.[116]

Because patent holders initiate most patent infringement lawsuits (with the limited exception of declaratory judgment actions), they all the time they desire to prepare and investigate most relevant documents before they initiate a lawsuit. Additionally, patentees have the statutory presumption of patent validity[117] on their side, which means that the burden is on the defendant to establish that the patent in the suit is invalid, a common defense strategy in many infringement actions. Defendants, on the other hand, have a limited time to come up with theories and evidence of invalidity; moreover, much of such evidence is oftentimes in the hands of the patent owner who is not especially eager to share it voluntarily. Therefore, any rules that compress discovery deadlines weaken the defendant's position.

## 3. Problems with the Juries

In addition to their heightened respect for private property, deference to government agencies and distrust of large corporations, Eastern District of Texas juries have a number of other characteristics that make them problematic audiences for patent infringement cases. According to the 2001 demographic profile of Harrison County, from which presumably most of Marshall's jury pool originates, 21.6% of local residents never

---

[114] E.D. TEX. R. CV-26; *see* Mahmud, *supra* note 42; *see also* E.D.P.R. §§ 3.1-3.4 (requiring plaintiff to serve on all parties a complete "Disclosure of Asserted Claims and Preliminary Infringement Contentions" no later than 10 days after the initial Case Management Conference and requiring defendant to serve on all parties its "Preliminary Invalidity Contentions" no later than 45 days thereafter).

[115] *See* E.D.P.R. § 3.4.

[116] *See* E.D.R.P. §3.7 (severely limiting later opportunities for amending or modifying Infringement and Invalidity Contentions by requiring a showing of good cause).

[117] 35 U.S.C. § 282 (2006).

219

JW.000724

Ark.000703

graduated from high school, only 15.5% have bachelor's degrees and 5.1% hold graduate degrees.[118]   The area also has a relatively large elderly population.   Wilson Sonsini Goodrich & Rosati partner M. Craig Tyler recalled that at one of his recent trials, all the jurors were over the age of fifty.[119]   A study of jurors in two Texas counties found that Texas juries include far fewer young adults than their proportion in the population.[120] Furthermore, according to Tyler, most jurors have only a marginal understanding of the technology issues being litigated.[121]   Also, unlike in larger cities such as Austin or Dallas, where at least some of the jurors are likely to be technologically savvy, all the potential jurors in the Eastern District live and work in small towns and rural areas, where there are no high-tech or academic employers at all.[122]   In fact, the most tech-savvy local people in the courtroom are often the judges.

Finally, there is the problem of the small jury pool.   One of the unfortunate byproducts of the small pool size is the inevitability that many local jurors are often personally familiar with the local attorneys hired by out-of-town plaintiffs to help them navigate the muddy legal waters of the Eastern District.  They go to the same barbeque parties; their children and grandchildren attend the same public schools – in short, they are not strangers like the big city lawyers with their funny Yankee accents.  As a result, the party that hires the most personable, well-connected local attorney probably has the best chance of getting through to the jury and prevailing in the case.   And since patent holders initiate virtually every patent infringement lawsuit in the Eastern District, they probably almost always get the upper hand by having the first pick of local attorneys.

## III. PROBLEMS WITH FORUM SHOPPING

In evaluating any aspect of a legal system, we must establish how well it serves three principal goals: accuracy, fairness and administrative efficiency.  Despite its numerous technical nuances, the patent adjudication system is no different in this respect – it too strives toward a healthy balance of consistency, equity and administrability.  It is fair to assume that, to the extent patent forum shopping undermines any of these three goals, it is generally damaging to the system.  We will next look at each of these goals in turn to assess the impact, if any, that forum shopping has on them.

---

[118] MARSHALL ECON. DEV. CORP., DEMOGRAPHIC CHARACTERISTICS OF HARRISON COUNTY, TX, http://www.medco.org/demographics.htm (last visited Apr. 24, 2007).

[119] See Mahmud, supra note 42.

[120] See Robert C. Walters, et al., Jury of Our Peers: An Unfulfilled Constitutional Promise, 58 SMU L. REV. 319, 322 (2005) (finding that in Dallas and Harris counties, jury panels are not representative of the local community because young adults make up 8% of prospective jurors but 37% of the population).

[121] Mahmud, supra note 42.

[122] See id.

JW.000725

Ark.000704

OF FIRE ANTS AND CLAIM CONSTRUCTION

## A. PROBLEMS WITH ACCURACY

Accuracy is arguably the most important goal of a legal system. Accuracy is not an absolute notion; it merely refers to the vertical consistency between different courts. In a system built on statutes and common law precedent, we view a trial court's decision as accurate as long as it is in line with prior cases within the same jurisdiction and comports with guidance from the relevant appellate courts. Once all of the available appeals have been exhausted, any lower court's decision that has not been reversed is considered accurate by default.

In the context of patent litigation, forum shopping was especially rampant prior to 1982, when every federal Circuit Court had appellate jurisdiction over patent cases litigated in its circuit. Due to a substantial number of splits between different circuits and a relatively low number of Supreme Court decisions in the area of patent law, plaintiff patent holders were able to pick and choose among the many jurisdictions to suit their particular needs. To address this serious problem, in 1982 Congress established the Court of Appeals for the Federal Circuit, which was granted exclusive appellate jurisdiction over patent cases. Having one appellate court instead of eleven was meant to reduce the incentives for forum shopping and provide consistent patent guidance to all district courts across the country.[123] Patent forum shopping received two other blows when the Supreme Court held in *Markman v. Westview Instruments* that issues of claim construction were questions of law to be decided by judges instead of juries,[124] and the Federal Circuit ruled that questions of claim construction were to be reviewed de novo on appeal.[125] With so much critical decision making taken away from the juries, one would think forum shopping would soon decrease, but the much anticipated decline has yet to materialize.

There are at least two accuracy-related reasons for the remarkable resiliency of forum shopping. First, even ten years after *Markman*, district court judges are still learning to apply claim construction guidance from the Federal Circuit in a consistent manner, and over a third of all appealed claim constructions eventually are reversed.[126] As I have shown, the reversal rate is no better in the Eastern District of Texas, despite the high number of patent cases passing through its courtrooms and the fact that two of the four judges handling patent cases have science backgrounds. Second, even though claim constructions are now handled by judges, juries still get

---

[123] S. REP. NO. 97-275, at 4-5 (1981), *reprinted in* 1982 U.S.C.C.A.N. 11, 14-15 (stating that the establishment of the Court of Appeals for the Federal Circuit was intended to provide a forum for appeals in areas of the law where Congress determined that there was special need for national uniformity, and specifically hoping that this forum would increase doctrinal stability in the field of patent law).

[124] 517 U.S. 370, 388-89 (1996).

[125] Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc).

[126] *See* Moore, *supra* note 112 and accompanying text.

JW.000726

Ark.000705

to decide a number of very important patent issues such as novelty, certain factual aspects of nonobviousness, infringement and willfulness of infringement. For example, in order to determine nonobviousness, jurors must put themselves in the shoes of a "person having ordinary skill in the art" at the time of the invention.[127] This presents certain obvious problems when the person skilled in the art is an expert in integrated circuits or a Ph.D. in molecular biology, while the typical rural juror in East Texas has a high school education. Thus, there still remains much room for exploiting the inaccuracies of the system.

## B. PROBLEMS WITH FAIRNESS

Fairness is another important goal of our legal system – we want similarly situated parties to receive similar legal treatment. The integrity of the legal system is compromised whenever parties receive disparate treatment under the guise of fair and balanced dispute resolution. As I have mentioned above, different federal district courts have different rules governing patent adjudication. Some district courts allow lengthy discovery and grant extensions with relative ease, while other courts require quick discovery and strictly adhere to preset deadlines. Since defendants accused of patent infringement need as much time as possible to scour the earth for evidence of patent invalidity, they are likely to fare much better in the former districts. On the other hand, in the absence of tight deadlines, a wealthy corporate defendant may litigate every insignificant nuance to death in the hope that the plaintiff runs out of money and settles the case for less than it is worth. When they were first drafted, the patent rules in the Northern District of California attempted to strike the right balance between fairness to the plaintiff and fairness to the defendant. When the Eastern District of Texas patent rules were drafted, they shifted the balance toward the plaintiff, which has resulted in the highly distorted statistics of bench and jury verdicts from the district.

## C. PROBLEMS WITH EFFICIENCY

Administrative efficiency is the third important goal of the legal system, often acting as a practical counterbalance to the high ideals of accuracy and fairness. For example, the doctrines of res judicata and collateral estoppel curtail future litigation and establish some degree of closure, even if such closure comes at a price of potentially reduced accuracy and fairness. Similarly, in the realm of patent litigation, we are interested in a speedy resolution of every dispute not only because speedy resolutions conserve judicial resources and save money for the litigants, but also because patents have a limited lifespan. The difficulty is in striking the right balance between resolving cases quickly and resolving them equitably.

---

[127] *See* 35 U.S.C. § 103(a) (2006).

JW.000727

Ark.000706

OF FIRE ANTS AND CLAIM CONSTRUCTION

The argument that patent litigation has become too expensive, costing each party on average $2,000,000,[128] is a valid one in a large number of cases in which damage awards barely cover the cost of litigation. The system hardly serves its purpose when legal fees consume the bulk of the plaintiff's damages. On the other hand, many patent cases involve potential damages of tens and sometimes hundreds of millions of dollars, and perhaps even more importantly, injunctions threatening to shut down entire businesses.[129] In cases of that nature, legal expenses and the speed of resolution take second seat to reaching an accurate and fair decision, because the district court can rest assured that an appeal will follow regardless of the outcome. The point is that any legal system designed with administrative efficiency in mind should provide certain exceptions for extraordinary situations in which administrative efficiency is less important than achieving the right result.

There is a plausible argument that patent forum shopping actually decreases the overall efficiency of the adjudicatory system. First, forum shopping forces parties to litigate in various remote locales, causing additional monetary spending and personal aggravation to many of the participants. Second, due to the small overall number of patent cases (recently, less than 3000 per year), forum shopping deprives judges in most districts of valuable opportunities to gain hands-on experience in this important area of law, instead concentrating it in the hands of a relatively small number of judges. For example, forty-three out of ninety-four federal district courts handled less than ten patent cases per year in the last ten years.[130] Notably, all the judges in the Western District of Louisiana, which is the immediate eastern neighbor of the Eastern District of Texas, have handled a total of seventy-two patent cases in the last ten years, roughly the same number Judge Ward has handled in 2006 alone.[131]

On the one hand, this can be viewed as a positive outcome because it allows some judges to become highly proficient patent jurists who are not afraid of patent cases and can dispose of them in an efficient, expert manner. On the other hand, it leaves the vast majority of remaining judges completely unprepared for patent cases. The overall effect is probably

---

[128] American Intellectual Property Law Association, *AIPLA Report of Economic Survey 2003*, 93, tbl. 22 (2003) (estimating that the median cost of a patent case with $1,000,000 to $25,000,000 at risk was $2,000,000 for each side).

[129] *See, e.g.*, Brian T. Yeh, *Availability of Injunctive Relief in Patent Cases:* eBay, Inc. v. MercExchange, L.L.C., CRS REP. RS22435, May 2, 2006, *available at* http://ipmall.info/hosted_resources/crs/RS22435_060502.pdf (last visited Mar. 12, 2007) (discussing *eBay Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837 (2006), and *NTP Inc. v. Research in Motion Ltd.*, 418 F.3d 1282 (3d Cir. 2005), two cases in which entire business operations were threatened by patent injunctions; Research in Motion was forced to settle for $612,500,000 to avoid having to shut down the BlackBerry wireless network).

[130] Data collected from Lexis Courtlink (all patent cases filed from Jan. 1, 1996 to Oct. 13, 2006).

[131] *See id.*

223

JW.000728

beneficial, since most judges would be perfectly content spending their entire careers without seeing another patent case.[132]   It is also consistent with numerous proposals to create a specialized patent court or at least specialized patent judges within each district court and relieve the rest of the federal judiciary of the duty to adjudicate patent cases.   I discuss these proposals, along with several others, in greater detail below.

## IV. PROPOSALS FOR PATENT ADJUDICATION REFORM

Before we start thinking about all the possible ways to improve a legal system, we must first identify the main characteristics of the system that are causing unwelcome results. When we discuss the reasons patent holders engage in forum shopping, such characteristics are fairly easy to recognize.   First, patent forum shopping takes place because the venue statute allows it.  Second, patent plaintiffs shop for different venues because many different district courts have vastly different procedural rules that affect the odds of winning their case.   Third, patent plaintiffs choose different forums because the most convenient forum may not have judges experienced in patent matters.  Fourth, due to often vague and sometimes inconsistent guidance from the Federal Circuit, plaintiffs may attempt to exploit different interpretations of the patent law by different district judges. Finally, one of the biggest reasons patent plaintiffs still shop for forums is the fact that, under the Constitution, they are entitled to a jury trial on a number of critically important issues.[133]

## A. PATENT VENUE REFORM

One of the easiest and most obvious ways to reduce forum shopping in patent cases would be to amend the patent statute to reverse the effect of *VE Holding Corp. v. Johnson Gas Appliance Co.*[134]   As the reader may recall from Part IA, in *VE Holding* the Federal Circuit held that the meaning of corporate residence is the same in the patent and general venue statutes, thereby rendering the patent venue statute superfluous and potentially subjecting corporate defendants to patent litigation in every district court having personal jurisdiction over them.[135]

---

[132] In the words of the colorful U.S. District Judge for the Southern District of Texas Samuel B. Kent, "Frankly, I don't know why I'm so excited about trying to bring this thing to closure.  It goes to the Federal Circuit afterwards.  You know, *it's hard to deal with things that are ultimately resolved by people wearing propeller hats.* But we'll just have to see what happens when we give it to them.  I could say that with impunity because they've reversed everything I've ever done, so I expect fully they'll reverse this, too."  Moore, *supra* note 111, at 10 (quoting O.I. Corp. v. Tekmar Co., No. 95-CV-113 (S.D. Tex. June 17, 1996) (emphasis added).

[133] U.S. CONST. amend. VII.

[134] 917 F.2d 1574, 1578 (Fed. Cir. 1990).

[135] *See supra* notes 15-17 and accompanying text.

JW.000729

Ark.000708

OF FIRE ANTS AND CLAIM CONSTRUCTION

There are two possible ways to deal with this problem: 1) revise the current transfer of venue statute to make it easier to transfer patent cases out of districts having little to do with the subject matter of the litigation; and 2) include a narrower definition of corporate residence in the patent venue statute to distinguish it from the general venue statute. The Congressional Judiciary Committee entertained both options in 2005, and favored the latter.[136] The Patent Reform Act of 2006, which has not been enacted and is not likely to be addressed by Congress until late 2007, contains a provision that defines corporate residence as "the judicial district in which the corporation has its principal place of business or in the State in which the corporation is incorporated."[137] If adopted, this proposal may severely limit the number of federal districts satisfying the venue requirement and provide better notice to potential corporate defendants in patent cases.

## B. UNIFORM PROCEDURAL RULES

As I have shown, local court rules play a very important role in forum selection. At the present time, federal district courts are at liberty to adopt their own procedural rules as they see fit, as long as these rules are not in conflict with the Federal Rules of Civil Procedure.[138] As a result, we have ninety-four sets of local rules that regulate the flow of patent litigation in different districts.[139] Some of the districts, such as the Northern District of California and the Eastern District of Texas, adopted local patent litigation rules to make the process more predictable; others, such as the

---

[136] *See Improving Federal Court Adjudication of Patent Cases: Hearing Before the Subcomm. on Courts, the Internet, and Intell. Prop. of the H. Comm. on the Judiciary,* 109th Cong. 9-10 (2005) (prepared statement of Kimberly A. Moore) [hereinafter Moore Statement].

[137] *See* Patent Reform Act of 2006, S. 3818, 109th Cong. § 8(a) (2006).
VENUE FOR PATENT CASES.—Section 1400 of title 28, United States Code, is amended by striking subsection (b) and inserting the following:
(b) Any civil action arising under any Act of Congress relating to patents, other than an action for declaratory judgment or an action seeking review of a decision of the Patent Trial and Appeal Board under chapter of title 35, may be brought only—
(1) in the judicial district where either party resides; or
(2) in the judicial district where the defendant has committed acts of infringement and has a regular and established place of business.
(c) Notwithstanding section 1391(c) of this title, for purposes of venue under subsection (b), a corporation shall be deemed to reside in the judicial district in which the corporation has its principal place of business or in the State in which the corporation is incorporated.
*Id.*

[138] *See* 28 U.S.C. § 2071(a) (authorizing individual federal courts to prescribe rules for the conduct of their business and requiring the local court rules must be consistent with federal law and the federal rules of practice and procedure); *see also* FED. R. CIV. P. 83(a).

[139] For links to local court rules, see http://www.uscourts.gov/rules/distr-localrules.html (last visited Mar. 12, 2007).

JW.000730

Ark.000709

Western District of Pennsylvania and the Northern District of Georgia, made similar rules in an open attempt to steer more patent cases toward their courts. A large number of federal districts do not have any special patent rules at all, which makes them appear less interested in patent cases and therefore less attractive to plaintiff patent holders.

One way to address the problem of differences between the local court rules would be for Congress to promulgate federal rules of patent litigation procedure that would encapsulate the best local practices currently in place in different districts. These federal rules should specify the maximum lengths of time allowed for different phases of patent litigation such as discovery and claim construction, identify special circumstances in which extensions of time would be warranted, and delineate those procedural areas most amenable to local rulemaking. Adopting such federal rules would help create greater uniformity among the ninety-four federal district courts, thereby reducing the general incentive for forum shopping in patent cases.

## C. SPECIALIZED PATENT JUDGES

The lack of patent experience and the related deficit of enthusiasm toward patent cases among most federal district judges is another important reason patent plaintiffs choose to travel to places like Marshall, Texas to file their complaints. As of 2005, there were 678 authorized Article III judges, 642 active judges and 292 senior judges in the United States, not to mention 503 full-time magistrate judges.[140] Considering that only 3% of the less than 3000 patent cases per year go to trial, in any given year we have a ratio of about one patent trial per ten federal judges. Given the fact that these trials are highly concentrated in a small number of districts, this means that a large number of federal judges do not regularly preside over patent trials. There is little doubt that this inexperience is an important factor contributing to the 35% reversal rate of all appealed patent cases at the Federal Circuit level, leading to more expensive and time consuming litigation.

In order to tackle this problem, some commentators have suggested designating at least one trial court judge in each district as a "patent judge" and consolidating all incoming patent cases in this judge to allow him or her to develop patent trial expertise. Professor Kimberly Moore advocated this position during her testimony before Congress in 2005, emphasizing that many other countries such as Germany, China, Japan, Great Britain, Australia, New Zealand and Korea no longer have patent cases decided by generalist judges.[141] In May 2006, Representative Darrell Issa of California introduced a bill in Congress that would establish a ten-year pilot program

---

[140] See U.S. COURTS JUDICIAL FACTS AND FIGURES, *supra* note 19, tbl.1 (Total Judicial Officers).

[141] See Moore Statement, *supra* note 136.

JW.000731

Ark.000710

OF FIRE ANTS AND CLAIM CONSTRUCTION

in at least five federal districts. Judges who opt-in to the program will be assigned a clerk with technical expertise or expertise in patent law.[142] Under this legislation, a judge who opts-in to the program keeps every patent case he or she is randomly assigned; in contrast, all other judges in the district have the choice of keeping a patent case or transferring it to one of the specialized patent judges.[143] The right to transfer a case under the federal transfer of venue rules is preserved under this bill.[144] The bill's core intent is to "steer patent cases to judges that have the desire and aptitude to hear patent cases, while preserving the principle of random assignment to help avoid forum shopping."[145] The Northern District of Virginia and the Southern District of California (Representative Issa's home district) have already expressed an active interest in participating in the program.[146] Five years after the launch of the program, the Director of the Administrative Office is expected to submit a report to the Judiciary Committee of Congress evaluating the program and recommending whether or not to make it permanent and national in scope.[147] The bill passed the House of Representatives on September 28, 2006, and a companion bill was introduced in the Senate by Senators Orin Hatch and Diane Feinstein on September 21, 2006.[148] Because the Senate failed to take action before the close of business of the 109th Congress, Representative Issa reintroduced the bill this year,[149] and the bill passed the House unanimously on February 12, 2007. Judging by the broad support in Congress, Issa's patent bill appears likely to become law later this year.

### D. SPECIALIZED PATENT COURT

A more radical approach to solving the problem of inexperienced patent judges is the establishment of a specialized trial court with exclusive jurisdiction over patent infringement cases. Over a dozen foreign countries already have this type of specialized patent trial court.[150] In recent years, the European Union has also moved towards establishment of a single European patent court with trial and appellate divisions. To this end, in November 2003, representatives from several European countries drafted a European Patent Litigation Agreement (EPLA) that was meant to provide a

---

[142] *See* H.R. 5418, 109th Cong. § 1 (2006).
[143] *See id.* § 1(a)(1).
[144] *See id.* § 1(a)(3).
[145] *See* Erik Larson, *"Rocket Docket" Bill Introduced in Congress*, IP LAW360, May 19, 2006.
[146] *See id.*
[147] *See supra* note 142, § 1(e).
[148] S. 3923, 109th Cong. (2006).
[149] H.R. 34, 110th Cong. (2007).
[150] *See* Moore Statement, *supra* note 136, at 9 (stating that specialized patent trial courts exist in Germany, China, Japan, the United Kingdom, Australia, New Zealand, Singapore, Zimbabwe, Jamaica, Kenya, Thailand, Korea and Turkey).

JW.000732

Ark.000711

single cost-effective forum for litigating all European patent disputes.  An amended and more detailed version of the draft agreement was published in December 2005.[151]  In a recent assessment of the impact of the EPLA on litigation of European patents, the European Working Party on Litigation identified forum shopping as one of the main undesirable effects of non-uniform patent litigation that weaken the European patent system:[152]

> In all instances, forum shopping between different courts operating in legal systems which have not been harmonised is likely to weaken the patent enforcement system, induces unpredictability and works against the creation of a level playing field for businesses in Europe. It also constitutes a waste of resources as time and money are diverted from quick and fair dispute resolution towards intricate assessments regarding which court would best serve one party's cause and which blocking strategies the other party should aim at.[153]

As a default rule, the EPLA proposes that the European Patent Court have one central court of first instance (the Central Chamber), but the creation of regional chambers in any member state is also allowed.[154]  The regional chambers may compete with the Central Chamber for cases.  In October 2006, the European Parliament backed the proposal in principle but expressed concern over the procedural rules.  In response, a group of twenty-six European judges have unanimously agreed on rules of procedure for the planned European patent court.[155]

The proposed procedures have been characterized as "much more continental than British," with all oral arguments designed to be concluded in one day.[156]  Unlike in the American system, no jury trials are allowed, and the procedure is largely front-loaded, with oral arguments and evidence presented upfront.  The procedure provides for an initial meeting between the parties and a rapporteur judge at an early stage followed by a short oral

---

[151] The drafts are found at http://www.european-patent-office.org/epo/epla/index.htm (last visited Apr. 24, 2007).

[152] *See* EUROPEAN WORKING PARTY ON LITIGATION, ASSESSMENT OF THE IMPACT OF THE EUROPEAN PATENT LITIGATION AGREEMENT (EPLA) ON LITIGATION OF EUROPEAN PATENTS 3-4 (Feb. 2006), *available at* http://www.european-patent-office.org/epo/epla/pdf/impact_assessment_2006_02_v1.pdf (last visited Apr. 24, 2007).

[153] *See id.* at 4.

[154] *See* EUROPEAN WORKING PARTY ON LITIGATION, DRAFT AGREEMENT ON THE ESTABLISHMENT OF A EUROPEAN PATENT LITIGATION SYSTEM § 10 (Dec. 2005), *available at* http://www.european-patent-office.org/epo/epla/pdf/ewl0510.pdf (last visited Apr. 24, 2007).

[155] Editorial, *Judges Set Out Patent Court Principles*, MANAGING INTELL. PROP., Nov. 1, 2006.

[156] *See id.* (quoting Kevin Mooney, a partner at Simmons & Simmons and president of EPLAW).

228

JW.000733

Ark.000712

procedure before a panel of at least three judges.[157]   The draft rules propose limited cross-examination and expert evidence, with all questioning being controlled by the court and limited to what is strictly necessary.   The proposed rules also suggest that the judges should render their written judgment within three months of the oral hearing, and that the court should steer clear of producing dissenting opinions whenever possible in order to provide clearer guidance.[158]   If the European Commission approves the judges' latest proposal, the European Patent Court could be established by 2010.

Court specialization at the trial level is not an entirely new concept in the United States either.   There are three specialized federal trial courts having national jurisdiction: the Court of International Trade (CIT), the Court of Federal Claims and the Tax Court.   Additionally, the State of Delaware is well known for its Court of Chancery, which by virtue of its limited jurisdiction – it has no jurisdiction over criminal and tort matters – has become a preeminent forum for corporate litigation.   Some commentators have argued that the patent field could similarly benefit from the availability of a trial court with no jurisdiction over criminal and tort cases to create backlogs, and a volume of litigation sufficient to develop an efficient and expert court system.[159]   As in the case of the Delaware Court of Chancery, such a court could not only resolve disputes, but also could contribute to refinement of the patent law and trial level patent litigation procedure so that businesses can position themselves to avoid patent lawsuits.

One recent proposal suggested that the CIT should be given patent and related claim jurisdiction paralleling that of the federal district courts.[160]   Factors that make the CIT an attractive candidate include its nonexistent criminal and tort docket, Article III designation and a position as a court within the Federal Circuit, which already has exclusive appellate jurisdiction over patent cases.[161]   Because of its existing international trade docket, the CIT would not be just a patent court, but its judges would have the potential to develop expertise in patent law through greater exposure to patent cases than the average district judge.   However, Professor Moore recently argued that, if a specialized trial patent court were ever created, it would have to be given exclusive jurisdiction over patent cases rather than concurrent jurisdiction with the district courts, since concurrent jurisdiction would merely provide yet another forum shopping venue.[162]

Of course, there are a number of problems with a specialized patent

---

[157] *See id.*
[158] *See id.*
[159] *See* John B. Pegram, *Should There Be a U.S. Trial Court With a Specialization in Patent Litigation?*, 82 J. PATENT & TRADEMARK OFF. SOC'Y. 765, 781 (2000).
[160] *See id.* at 782-86.
[161] *See id.* at 782-83.
[162] *See* Moore Statement, *supra* note 136, at 10.

JW.000734

Ark.000713

trial court. One obvious problem is that a centralized trial court could be an inconvenient forum for localized controversies, working against the small plaintiff who cannot afford to litigate away from home. Another commonly perceived risk is that a highly specialized court might be "captured" by a narrow segment of its constituency – in this case the patent bar.[163] To avoid this problem, the Federal Circuit was given appellate jurisdiction in several specialized fields and its judges are required to rotate on different panels. The risk is greater if a trial court is focused exclusively on patent cases. Yet another danger is that having a single patent trial court could eliminate the exchange of ideas that currently takes place among the various district courts. Some believe that the patent law has a better opportunity to evolve when multiple courts address the same issue and come up with different substantive and procedural solutions.[164] Ultimately, the Federal Circuit can resolve the various inconsistencies and select what it considers to be the most optimal legal rules. However, even though having a specialized patent court at the appellate level can achieve some of the same goals as a specialized patent trial court, it certainly has not done enough to eliminate or even noticeably reduce the problem of forum shopping in patent litigation.

## E. PROFESSIONAL JURIES

The United States has the dubious distinction of being the only country in the world which allows lay juries to decide patent cases.[165] Commentators have agreed that, under the current interpretation of the Seventh Amendment, it appears highly unlikely that the jury could ever be entirely eliminated from patent litigation in the United States.[166] Instead, the courts are more likely to continue to clarify and limit the right to a jury trial in patent cases with respect to individual issues, such as infringement, invalidity, enforceability and inequitable conduct.

However, there is a plausible alternative to lay juries: well educated, professional, "blue-ribbon" juries familiar with the technical areas at issue. Since the ratio of patent cases brought in different areas of technology does not change very rapidly, one can anticipate with a fairly high degree of accuracy the numbers of jurors needed for biotechnological, pharmaceutical, electrical, optical, mechanical and other types of patent cases years in advance. Having tech-savvy juries decide patent cases might actually increase the settlement rate and decrease the number of cases going to trial, since fewer patent holder plaintiffs would be willing to "roll the dice" and count on the kindness of a patentee-friendly and tech-ignorant jury.

---

[163] See Pegram, *supra* note 159, at 787.
[164] See Moore Statement, *supra* note 136, at 10.
[165] See Moore Statement, *supra* note 136, at 9.
[166] See Pegram, *supra* note 159, at 770.

JW.000735

Ark.000714

OF FIRE ANTS AND CLAIM CONSTRUCTION

Numbers suggest that professional juries are far from impossible. Considering that each patent trial lasts from one week to one month, averaging about two weeks, each set of twelve jurors and three alternates could decide about twenty cases per year. Since less than 100 patent cases go to trial every year, fewer than ten sets of jurors would be required to satisfy the national demand. Thus, in theory, less than 150 professional jurors could effectively replace all the thousands of confused lay jurors currently called upon to tackle complex technological controversies. At a somewhat conservative expense rate of $200,000 per juror, this federal program could require about $30,000,000 per year to run, which does not seem like that much when considering that much higher amounts are sometimes at stake in individual patent cases. Since large corporate defendants would be particularly interested in having a jury that understands their technology, contributions from various trade organizations might be used to help fund such a program.

## CONCLUSION

So what is the Eastern District of Texas exactly – a guiding light for all the other federal districts, or, as Justice Scalia put it, a "renegade jurisdiction"[167] and the epitome of everything that is wrong with the American system of patent adjudication? The answer, as is often the case, is somewhere in the middle. Through a confluence of several independent factors, the Eastern District of Texas found itself in the eye of a perfect storm of patent litigation, amplifying the good and the bad, and highlighting the areas in need of reform. We must view what has happened in the Eastern District as an opportunity to learn about our patent litigation system and understand how to make it better.

What have we learned about our patent system? We have learned that forum shopping is alive and well, and its remarkable persistence cannot be easily explained in terms of one, two or even three simple factors.

---

[167] This famous quote refers to the following exchange that occurred during the oral argument of *eBay Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837 (2006):

> Counsel for eBay: We're in a world where if a patent holder files a lawsuit in Marshall, Texas, no patent has ever been declared invalid in that jurisdiction, and no patent has ever been found not to infringe. And then you take that finding automatically and you turn it into an injunction. Any person who has been threatened under those circumstances and told that we're going to face a lawsuit in Marshall, Texas is going to have a very different negotiating posture than in a situation where –
>
> Justice Scalia: You know, I mean, that's – that's a problem with Marshall, Texas, not with the patent law. I mean, maybe – maybe we should remedy that problem…. But I don't think we should write – write our patent law because we have some renegade jurisdictions."

Oral argument transcript, eBay v. MercExchange, L.L.C., Mar. 29, 2006, http://www.supremecourtus.gov/oral_arguments/argument_transcripts/05-130.pdf (last visited Apr. 24, 2007).

231

JW.000736

Ark.000715

9 YALE JOURNAL OF LAW & TECHNOLOGY 193                    2006-2007

Different plaintiffs look for different things in a venue. Strong plaintiffs look for districts with educated jurors and experienced judges who are likely to force an early settlement, or, at the very least grant a motion for summary judgment. Weaker plaintiffs seek districts with quick trials, patentee-friendly juries and judges who do not like to rule summarily and do not mind taking cases all the way to trial. The ultimate choice of venue is the result of a complex, multifactor formula, taking into account the location, judges, juries, local court rules, speed of trial, odds of transfer, odds of summary judgment, and ultimately the odds of winning the case. For plaintiffs, the Eastern District of Texas provides a winning combination of four experienced patent judges, two of whom have undergraduate degrees in technical disciplines, favorable patent rules, which make it harder for defendants to mount an effective defense, and largely uneducated local juries who rule for the plaintiff 90% of the time. Combined with a very liberal venue statute that allows suing corporate defendants in any district which has personal jurisdiction over them, these factors resulted in an avalanche of patent cases filed in the Eastern District in the recent years, a trend that is not likely to reverse itself anytime soon.

While some commentators have praised the Eastern District for the expertise of its judges, the special patent rules, and the quick adjudication of patent disputes, others have raised concerns over the abnormally high plaintiffs' win rate and the highly attenuated connections between many of the litigants and the district. My empirical research has demonstrated that, on average, the judges of the Eastern District are no better at construing patent claims than the average district judge, despite their experience. The speed of adjudication has gone down over the last year, so that the difference between the Eastern District and the national average, while statistically significant, is no longer as dramatic as it used to be. It appears that the main reason plaintiffs flock to Marshall in growing numbers is the perception that it would be easier to win there, thanks to all the factors outlined above, particularly the wonderful Marshall juries.

This type of forum shopping harms the patent adjudication system in a number of ways. First, it raises doubts about the fairness of the system and undermines the public confidence by clearly demonstrating that "results may vary" depending on where the complaint is filed. Secondly, it results in a high number of appeals and reversals, thus reducing the overall predictability of the system and leading to more expensive litigation. Finally, it reduces the efficiency of the system by increasing monetary spending by the litigants and depriving the majority of judges in other federal districts of opportunities to gain hands-on experience in patent adjudication.

Several different methods have been proposed to improve the system of patent litigation in America, such as a fairly simple amendment of the patent venue statute to narrow down the scope of available forums, uniform local court rules, designated patent judges in each district, a

JW.000737

Ark.000716

specialized patent trial court, or professional juries familiar with the technology in dispute. Clearly, some of these reform proposals are more radical than others and less likely to gain support from Congress. However, judging by the recently introduced bills to amend the venue statute and designate specialized patent judges in a limited number of districts, the need for reform is recognized on Capitol Hill, and therefore the days of Marshall, Texas and its world-famous Fire Ant Festival dominating the patent litigation news are likely numbered.

JW.000738

Ark.000717