EXHIBIT 26



*Westlaw*

23 OHSJDR 345                                                           Page 1
23 Ohio St. J. on Disp. Resol. 345
**(Cite as: 23 Ohio St. J. on Disp. Resol. 345)**

Ohio State Journal on Dispute Resolution
2008

Notes

*345 SAVING ALTERNATIVE DISPUTE RESOLUTION IN PATENT LAW: COUNTERING THE EFFECTS
OF THE PATENT TROLL REVOLUTION

David A. Fitzgerald II [FNa1]

Copyright (c) 2008 Ohio State Journal on Dispute Resolution; David A. Fitzgerald II

I. Introduction

    The patent law field has been ripe for exploitation in the past ten years by "patent trolls"-holders of patents who do not practice the inventions but instead hold large patent portfolios to exact licensing fees from legitimate businesses. [FN1] The mere threat of lengthy litigation and an impending injunction forces innovative industry leaders into unfavorable licensing agreements. [FN2] The online auction phenomenon eBay stood up to patent troll MercExchange in 2006, allowing the United States Supreme Court to deliver a landmark ruling on the issuance of injunctions after patent infringement is *346 found. [FN3] With the termination of patent troll reliance on automatic injunctions, more corporations will likely follow eBay and take patent trolls to court. [FN4] As fewer settlements occur outside the courtroom, [FN5] alternative dispute resolution (ADR) in the field stands at a crucial crossroads. Unless actions are taken immediately, ADR may lose the biggest opportunity it has had to expand in the critical patent law industry. Part II of this Note provides the recent developments and history in the patent law field giving rise to the eBay case and describes what happened at the Supreme Court. Part III illustrates the immediate and long-term effects of the eBay decision. Part IV examines the current role alternative dispute resolution plays in the patent law field. In Part V, several possible solutions to the eBay problem are discussed and analyzed. The best solutions to save alternative dispute resolution in patent law and give hope for more expansion of ADR into the field are: (1) increasing awareness in the patent law field of ADR alternatives through formal training; and (2) legislative changes to the Alternative Dispute Resolution Act or the Patent Act in order to force more parties into ADR processes.

II. The Landmark Decision Against Patent Trolls

A. Historical Context

    In patent litigation, once a court found a patent infringed, it originally had the option of fashioning the correct remedy-damages, permanent *347 injunction, or both-for the circumstances. [FN6] The Court of Appeals for the Federal Circuit was created in 1982 and has exclusive jurisdiction over all patent law appeals and certain trademark appeals. [FN7] The reasons for creating a separate circuit for patent appellate cases are twofold: (1) to provide consistency and reliability in the patent laws by removing circuit splits of opinion; and (2) to allow judges with special patent law experience and expertise to decide cases as opposed to general circuit court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



JW.000766

23 OHSJDR 345                                                                                                      Page 2
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

judges. [FN8] Faced with the task of establishing the proper remedy for infringed patents, the Federal Circuit fashioned a presumption of automatic permanent injunctions for any case where infringement is found. [FN9] The Federal Circuit based this presumption upon the nature of patent law itself, which is centered upon the granting of monopolies of useful articles for a limited period of time in exchange for full disclosure of the useful article to the public. [FN10]

While the Federal Circuit's automatic injunction presumption did indeed provide consistency in patent law, this decision opened the door for non-practicing owners of patents-patent trolls-to more effectively threaten large companies with lawsuits over infringed patents. [FN11] There have always been legitimate patent owners who license the rights to make their inventions because they lack the capability to manufacture or capital to invest in the *348 invention. [FN12] The term patent troll appeared when an increasing trend emerged over the past ten years of companies acquiring patents from true inventors or innovative businesses for the sole purpose of threatening litigation and extracting license fees from manufacturing companies. [FN13] Despite the grave consequences a permanent injunction can have on a large business entity, some of these companies have risked it all to take the patent trolls into court and battle over the validity of patents and infringement. [FN14] Consequently, the mere existence of patent trolls has increased litigation in the patent law field dramatically. [FN15]

Another recent development in patent law occurred when business method patents were affirmed as patentable subject matter under 35 U.S.C. § 101. [FN16] This determination has enlarged the patent field even more, *349 generating many more opportunities for patent trolls to acquire business method patents and threaten litigation against legitimate companies. [FN17] Both the business method patent and the automatic injunction presumption finally came into the spotlight when a patent troll targeted eBay over a business method patent of online auction services in 2002. [FN18]

### B. eBay v. MercExchange

Against the background of rising litigation and increasing patent troll activity, the U.S. Supreme Court granted certiorari to review the Federal Circuit's rule of automatic injunctions. [FN19] Legal debate raged on both sides as eBay put its own existence on the line by fighting MercExchange in court as opposed to agreeing to the licensing fees MercExchange desired for the online auction business method patent it possessed. [FN20] Patent trolls and supporters defended the automatic injunctions as necessary to maintain the vitality of the entire patent system by guaranteeing the natural rights entitled to patent owners upon infringement. [FN21] Large corporations and many scholars argued otherwise, citing the need to stop rising litigation and undesirable bullying or *350 enforcement tactics of patent trolls. [FN22] Even Congress weighed in on the patent troll issue in 2005, deciding that injunctions should be harder to get for "non-market participant" companies who are not actively using and making their patented inventions. [FN23] The future of not only eBay and its millions of consumers, but perhaps also patent trolls hung in the balance as the Supreme Court deliberated in the case. [FN24]

The Supreme Court disagreed with the Federal Circuit, stating that automatic injunctions as a remedy for patent infringement does not make sense. [FN25] Ironically, the Court brought uniformity to patent law by discarding the Federal Circuit ruling and by making the injunction remedy determination the same as every other field of law. [FN26] For a patent owner to get an injunctive remedy against an infringer, the owner must win the balance of the following four traditional equitable factors: (1) irreparable injury to the patent owner; (2) inadequacy of alternative remedies at law; (3) *351 balance of hardships; and (4) public interest. [FN27] The only surprise in the case was that the Court did not speak explicitly on patent troll activity or try to prevent trolls

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000767

23 OHSJDR 345                                                                                         Page 3
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

from obtaining injunctions. [FN28] Consequently, the decision will have immediate as well as long-term effects.

### III. Effects of the eBay Decision

#### A. Immediate Effects

In the first lower court applications of the equity four-factor injunction test (eBay rule) for patent cases, there was enough wiggle room for judges to deny permanent injunctions to most patent trolls because patent trolls have trouble proving that monetary damages are inadequate. [FN29] The eBay rule has not only affected business method patents and patent trolls, but also the rest of patent law and other areas of law, such as copyright and trademark. [FN30] Injunctive relief is obviously still possible for many patent owners whose patents are infringed, but relief has become uncertain for more than just *352 patent owners that are classified as patent trolls. [FN31] The short term effects of the eBay decision have not been surprising thus far, but time will tell if district courts can uniformly apply the Supreme Court test and bring the desired consistency the Federal Circuit is trying to achieve in patent law. [FN32]

#### B. Long-Term Effects

Although the Supreme Court did not specifically write an opinion or make a rule targeting patent troll activity, the Court did hurt trolls by making it nearly impossible to get a permanent injunction in cases of infringement. [FN33] Patent trolls used to be able to simply rely on the threat of an automatic permanent injunction to force licensing agreements or settlements out of court. [FN34] Now the accused infringers have little reason to fear a court ruling against them. Consequently, the uncertainty surrounding the type of relief granted in these cases will increase the number of cases going to litigation. [FN35] More litigation is a problem for courts and creates more inefficiency for the corporations and individuals involved in the patent business. [FN36]

*353 In the patent troll context, less negotiation may appear like a good result because patent trolls made negotiation too one-sided and coercive in the past. [FN37] While the eBay holding was a step in the right direction to stop the patent troll problem, a further rise in litigation is just as insidious and must be countered. [FN38] The alternative dispute resolution community has already made inroads into the patent law world, but this recent Supreme Court decision provides an invaluable opportunity for ADR to expand here. [FN39] One of the best ways to counteract the problem of rising litigation is to make alternative dispute resolution a favorable option to opposing parties. [FN40] Before attacking the problem at hand, a look at how ADR currently operates in the patent law field is necessary and appropriate.

### IV. The Current Role of ADR in Patent Law

Before 1983, no measure of alternative dispute resolution was allowed in patent law disputes. [FN41] Congress enacted legislation in 1983 to allow *354 arbitration and mediation in the field and to overcome the old presumption that government had a duty to intervene in patent disputes involving any public interest. [FN42] Over the course of the past twenty years, arbitration and mediation have become increasingly popular among disputing parties in the patent field. [FN43] The growth of ADR in patent law has been one of the quickest-growing areas of alternative dispute resolution. [FN44] This section will cover the three widely used alternative dispute resolution methods in patent law disputes: arbitration, mediation, and negotiation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000768




23 OHSJDR 345                                                                                                      Page 4
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

### A. Arbitration

Arbitration is basically a form of private judging where a knowledgeable third-party decides the dispute. [FN45] The lengthy discovery, evidentiary, and appeals processes are all reduced, and these lower levels of formality help an arbitrator decide a case much quicker than the classic judicial litigation system. [FN46] Arbitration usually arises as part of a contractual agreement to license a patent, and circumstances are rare where two parties agree to *355 arbitrate a dispute already in progress. [FN47] The key to figuring out the rules and procedures of an arbitration proceeding will thus be found in the arbitration clause itself. [FN48] The two attributes that make arbitration so desirable in patent law are the overall cost and time savings, and the fact that arbitration rulings are enforceable at law. [FN49] A final introductory note is that the parties must notify the patent office of the arbitration award to make the award fully enforceable at law. [FN50]

The nature of patent trolls fighting big corporations usually does not create a friendship between disputants; however, arbitration can help the parties develop a successful business relationship. [FN51] All patent arbitrations are subject to the Federal Arbitration Act (FAA), which requires courts to recommend and even force-parties into arbitration if a contractual agreement between the parties indicates that arbitration is to be used. [FN52] While all patent law appeals go through the Federal Circuit Court of Appeals, limited appeals over patent arbitration agreements usually do not involve patent law at all and, therefore, can be reviewed by other regional circuit *356 courts of appeal. [FN53] The process of arbitration has a solid rule structure and many obvious benefits to patent disputants. Consequently, it comes as no surprise that arbitration is already solidly entrenched in United States patent dispute resolution. [FN54] Arbitration alone cannot completely solve the problem of higher caseloads in public courts involving patent law, [FN55] but there are other alternative dispute resolution methods for disputants to consider.

### B. Mediation

Mediation is a completely different procedure from arbitration. [FN56] Arbitration seeks to adjudicate disputes in an alternative forum, whereas mediation attempts to formulate a negotiated solution to the problem at hand. [FN57] In addition, there are few rules in mediation, and the basis of resolving the dispute lies in the creativity and willingness of the mediator and *357 both parties to work together to come to an acceptable solution. [FN58] Even if mediation does not bring the parties together to one final solution, the disputants can still find some common ground which will not need to be litigated in court. [FN59]

Mediation comes in two flavors: court-connected and private. [FN60] Court-connected mediation occurs when the parties wish to mediate while litigating in court. [FN61] The results of a court-connected mediation are public (only the settlement portion, not the private discussions with the mediator) and used to help resolve the litigation. [FN62] Private contractual mediation usually arises from the same contract clause as arbitration in licensing agreements. [FN63] Patent cases do not settle in mediation as frequently as in other fields, so the ADR community has room to improve the efficiency and success rates for all kinds of patent disputes. [FN64] Certainly in the worst of cases, mediation and arbitration *358 will not provide a solution, and court litigation may need to be employed to resolve the dispute. However, ADR methods at least give patent disputants a chance to save themselves from the lengthy and costly trial process. [FN65] There is one final possibility before the parties must turn back to litigation though, and that is negotiation.

### C. Negotiation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000769

23 OHSJDR 345                                                                                          Page 5
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

Negotiation is not much different from mediation, with the one crucial difference being the lack of a third party present to help the parties discuss the issues. [FN66] Negotiations can therefore be a little harder and a little more litigious because the parties have no choice but to work with one another across the bargaining table. [FN67] The classic method of negotiation is called distributive negotiation or positional negotiation, where both parties make initial offers and then slowly compromise on terms to meet somewhere in the middle. [FN68] The more heralded version of negotiation is interest-based negotiation, where creative solutions-which allow mutual gain and objective criteria-are used to help parties focus on making both parties better off as opposed to each party focusing on personal positions. [FN69]

In the patent troll context, negotiation most often takes the role of pre-litigation dispute resolution because licensing agreements are traditionally *359 hammered out in a negotiation. [FN70] One minor problem relevant to patent troll disputes is that some courts have denied an alleged patent infringer the right to move for a declaratory judgment if the infringer was the party that terminated licensing negotiations. [FN71] The major problem of one-sided patent troll licensing negotiations has diminished now that the Supreme Court nixed the automatic injunction presumption. [FN72] This has allowed patent law to move back into the realm of negotiations-as well as mediations and arbitrations-effectively to resolve disputes. [FN73] Despite this foothold in the patent law system, the alternative dispute resolution community now needs to come up with more solutions in order to increase the role these three ADR processes play in patent law disputes.

## V. Possible Solutions to the eBay Problem

Knowing that mediation, arbitration, and negotiation are already finding a foothold in the wide world of patent litigation, where can ADR continue to grow and help solve the issue of an increase in litigation from the patent troll problem? There are many avenues to consider, but the most obvious solution is to increase awareness of ADR possibilities in the field. [FN74] Whether by instituting required formal training for all patent lawyers or by spreading goodwill through word-of-mouth, ADR offers many possible choices on how *360 to engage the patent law community further. [FN75] There are also possibilities for stricter requirements on patent licensing agreements and patent troll companies. [FN76] Furthermore, Congressional action towards expansion in the Alternative Dispute Resolution Act for the patent law field or in the Patent Act itself could help ADR infiltrate a greater percentage of patent disputes. [FN77] This Congressional action appears to be the best option because many scholars and attorneys have been notably pushing for patent system reform for the past five years. [FN78] Each of these possibilities is discussed in turn as follows.

## A. Increasing Awareness of ADR Possibilities in Patent Law

Increasing patent lawyer awareness of ADR possibilities must affect both kinds of patent lawyers: prosecutors and litigators. [FN79] Patent prosecutors deal with the transactional side of the business, and their willingness to engage in arbitration or even mediation on behalf of the patent holder is critical to the *361 success of the ADR process. [FN80] Patent prosecutors develop the ground upon which disputes arise by creating the patents themselves, so an ADR-educated prosecution profession will perhaps help resolve problems before they start with more careful drafting and filing. [FN81] Patent prosecutors also have an opportunity to work with 100% of clients (whereas patent litigators only work with the small percentage of clients in patent disputes), so prosecutors probably hold a critical role in spreading goodwill about ADR processes to all future patent holders. [FN82] Proper transactional planning by patent prosecutors can certainly play a role in the reduction of patent litigation, but the real emphasis should be on educating patent litigators. [FN83]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000770



23 OHSJDR 345                                                                                                          Page 6
23 Ohio St. J. on Disp. Resol. 345
**(Cite as: 23 Ohio St. J. on Disp. Resol. 345)**

Patent litigators must know about ADR and must be taught to encourage or even compel patent disputants to try mediation or arbitration before taking a long battle into court. [FN84] Litigators have a tendency to think recommending alternative dispute resolution makes them appear weak in the eyes of clients, *362 and this misperception must be corrected if ADR is to flourish in this field. [FN85] Once a client resolves a dispute in mediation or arbitration, the time and money the client will save instead makes the lawyer who recommends these procedures a hero in the eyes of the client. [FN86] Patent litigators supporting the use of ADR methods can help decrease litigation from patent trolls. [FN87] The critical issue is not necessarily to whom the virtues of alternative dispute resolution need to be extolled, but more importantly, how these virtues are to be revealed.

### 1. Word-of-Mouth Recommendations

The first method is just word-of-mouth, which has been an effective way to direct clients and lawyers into ADR processes since 1983 (at least in patent law). [FN88] As more judges and patent attorneys have positive experiences using alternative dispute resolution methods, the word will naturally spread to others in the patent law profession. [FN89] There is not too much to say on this side except that the responsibility for starting this word-of-mouth *363 recommendations system falls upon the leading ADR scholars as well as leading patent law scholars. [FN90]

Another method of word-of-mouth recommendations is through patent clientele. [FN91] A similar process can ensue where large corporations or small inventors have success in patent ADR processes and then advise other corporations and inventors to do the same. [FN92] Clients spreading the word may be more effective than the patent lawyer society because clients hold the ultimate decision about whether to utilize ADR. [FN93] While word-of-mouth will certainly be an easy way to help advance ADR in the patent law field, this alone is not an adequate solution to the patent troll problem.

### 2. Additions to the CLE and Law School Required Curriculum

Another possible method is requiring training in alternative dispute resolution as a part of the required continuing education curriculums at all patent firms around the world. [FN94] An emphasis on continuing legal education (CLE) will not only allow new lawyers to learn what they need to know *364 about ADR, but also the leading partners and experts of patent firms. [FN95] One argument against this plan is that it may be unrealistic to expect continuing education requirements to adequately cover this whole new topic while also trying to keep patent lawyers educated on the cutting edge of technology and science. [FN96] Nevertheless, training in alternative dispute resolution tactics and strategy will not need to be done separately from technical or patent training. [FN97] ADR could simply be one panel discussion out of four or five in a symposium. [FN98] Practice in ADR techniques could also come at the same time patent practitioners learn how to work with new technologies; for example, imagine a CLE course where patent litigators work through three mock cases in a new technological field, one of which is dealt with in mediation or arbitration. [FN99] Minor changes like these can advance the ADR agenda in patent law without overburdening the CLE process. [FN100] The only way to truly train current patent attorneys in the ADR field is to offer more CLE options, and thus it appears to be one of the best options for spreading the good news about ADR.

*365 The easier half of this formal training initiative is requiring a basic ADR course in all the accredited law schools in America. [FN101] By training tomorrow's patent law workforce in the nuances and benefits of ADR, future clients are more likely to hire a patent attorney trained for recommending as well as participating in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000771



ADR. [FN102] The newly trained lawyers will also be able to gradually convince senior partners of the merits of ADR in patent law disputes by participating in ADR processes and helping clients come to a fast and inexpensive solution. [FN103] Most schools already offer good training in the ADR field, so the only extra requirement would be to make an introductory course in ADR mandatory for all students similar to the introductory courses in other fields, such as criminal or property law. [FN104] Alternative Dispute Resolution touches every field of law today, and there may even be justification to add ADR subject material to state bar examinations. [FN105] This bar addition would naturally follow from forcing all the law schools to include an ADR course requirement in their curricula. [FN106] Although these solutions are not going to finish the job at hand, they are a good start for increasing positive views and awareness of ADR.

### *366 B. Legislative or Administrative Action Options

Another possible avenue is convincing the legislature to expand upon or pass new laws requiring ADR programs in federal courts. The Alternative Dispute Resolution Act already requires that federal courts give litigants in all fields the option of court-connected ADR programs such as mediation. [FN107] This Act also requires an officer of the court to evaluate the effectiveness of ADR programs each court offers and encourages courts to improve existing ADR options. [FN108] While this legislation is very broad and far-reaching, perhaps Congress could pass another smaller act or addendum to the ADR Act for district courts acting in patent law cases. [FN109] This new legislation could require any district court to not only passively provide ADR programs, but also highly encourage the use of mediation or arbitration before expensive discovery takes place in preparation to litigate. [FN110] By requiring the parties to sign a waiver of ADR possibilities at the outset of a patent trial in order to continue litigation, a district court could at least force the patent attorneys and parties to seriously consider keeping the dispute out of court. [FN111]

This kind of legislation would affect patent troll cases as well as other patent cases, which is desirable because reducing the patent caseload in every area is a commendable goal. [FN112] The hardest part of this option is getting this kind of legislation (or any kind of legislation for that matter) through both houses of Congress and signed into law. [FN113] Many Congressional attempts to *367 resolve this patent troll problem ended up being cut out of patent reform acts because it is very hard to get a solid consensus from both conservatives and liberals on statutory language. [FN114] When it comes to ADR regulation though, Congress is probably more likely to see past the party lines to the important goal of helping patent disputants as well as federal courts. [FN115]

Another legislative or executive method of encouraging ADR participation could be to require all patent licensing agreements to have an ADR clause. This could come in an executive regulatory order from the Patent and Trademark Office or Congress could create a federal statute in the Patent Code. [FN116] In either case, the requirement would be attached to the grant of patent so that any licensing away of the patent owner's rights must include a clause for mediation or arbitration somewhere in the agreement. [FN117] This alternative may be the most effective solution and would get the objective completed; however, this kind of regulation or statute could be deemed to take away constitutionally-mandated choice or right to trial. [FN118] Any constitutional challenge or question is one the ADR community at large should avoid, as public perception and positive feedback is how ADR thrives. [FN119] Nevertheless, on a scale of possible solutions to the growing litigation problem, every plausible possibility must be considered.

### *368 C. Joining the Patent Reform Movement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000772



23 OHSJDR 345                                                                                                  Page 8
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

Returning again to the patent reform topic briefly touched on above, the alternative dispute resolution community may have its best chance to currently increase ADR use in patent law as a part of the ever increasing drive to reform the patent laws. [FN120] There are multiple problems arising in patent law currently, so the pressure on Congress to fix patent law is currently at a maximum. [FN121] The first problem is that too many bad patents are being granted. Additionally, the ridiculously backlogged patent office docket has resulted in more and more bad patents getting through the system filters. [FN122] The development of "patent thickets," which means the situation where building a common device, such as a DVD player, requires licensing of as many as 290 patents held by many different patent holders in the DVD industry, is a debatable problem with the patent system right now as well. [FN123] Additionally, reform proponents highlight the patent troll economy as a leading problem to fix in the field. [FN124] Each of these problems has occurred for various reasons, but the underlying cause of all patent law problems is almost definitely uncertainty (with respect to patent enforceability and patent law generally). [FN125] This uncertainty stems from seemingly random judicial decision trends in patent law as well as low patent quality in the last fifteen *369 years. [FN126] Uncertainty raises costs for all parties involved in the patent system, and lowering uncertainty will reduce opportunities for strategic behavior. [FN127]

To remove this uncertainty causing the various problems in patent law, various patent reforms are on the table every session for Congress to consider. [FN128] The most drastic proposed change is making America a first-to-file patent system instead of the current first-to-conceive system, but the first-to-file system is what is already used in every other major industrial country. [FN129] Setting limitations on continuing applications is also a reform with plenty of support because Lemelson and other inventors have abused the continuation system famously for the last forty years. [FN130] A more subtle change Congress has seriously considered is publishing all applications within 18 months of the filing date in order to allow other companies to have notice of the patent as soon as reasonably possible. [FN131] This early publishing system would reduce the time a company may infringe unknowingly, and hopefully this would reduce the number of lawsuits brought overall. [FN132] One final rule that was on the table in recent years was modification of the rules *370 for granting injunctions in patent cases, but the eBay decision accomplished this reform in the judiciary instead of in Congress. [FN133] Each of these reforms has created heavy disputes for two reasons: (1) small company inventors and universities are inherently disfavored by these new patent rule proposals; and (2) different industries are affected in vastly different ways if any patent law is changed. [FN134] Despite the opposition making strong points, some patent reform is likely to occur either in Congress or through Supreme Court decisions within the next few years. [FN135]

The patent reform movement and the alternative dispute resolution community actually may have a unique joint opportunity to help each other in this circumstance. ADR use needs to increase in the patent law field, and the patent reform movement could drive Congress to seriously consider adding mandatory ADR in patent disputes. [FN136] As discussed above, the patent reform movement has not been able to break through Congressional debates and advance into making law yet. [FN137] Many controversial pieces of legislation make it through Congress by "piggy-backing" on the heels of another bill with high popular and social support. [FN138] Consequently, a large ADR provision could garner enough support to force through some of these other *371 patent reforms. [FN139] The ADR community should not waste this opportunity to join the patent reform movement and get ADR-based reforms added to patent law.

One final type of patent reform works so well with ADR processes that it merits a little consideration. Other countries such as Japan have open opposition proceedings run by the patent office, much like the United States PTO has for trademarks. [FN140] These opposition procedures allow for challenges by the public against newly-granted patents in front of the USPTO, who may have better access to applicable prior art. [FN141] This opposi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000773



23 OHSJDR 345                                                                                    Page 9
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)



tion process is significantly less expensive than going through a patent litigation, and the process removes uncertainty or bad patents from the system up front. [FN142] ADR comes into the process because opposition procedures are binding determinations and are structured like arbitration. [FN143] The ADR community could easily recommend arbitration standards to solidify the drive to add opposition procedures through patent reform. [FN144] The ADR community's expertise in arbitration could help the USPTO train patent examiners properly to be arbitrators in opposition proceedings. [FN145] This reform is probably the least opposed by various technological industries which deal *372 with patent law, so ADR should support and work with patent reform proponents in this debate.

## VI. Conclusion

Although there are many solutions to the eBay problem, the ADR community should come out in force behind one or two of them. The easiest and best possible solutions to rising patent troll litigation are spreading good news about ADR through mandatory CLE or law school training, and encouraging Congress to reform the patent laws in such a way to increase ADR opportunities in patent disputes. A united front to continue building positive relationships with the federal court system and patent lawyers is crucial to continuing the rapid development ADR has had in this field. The patent troll problem will probably never fully go away with the patent economy America has in place today, but the spawned problem of increased litigation is one the ADR community can easily handle. With great opportunity comes great responsibility, and the ADR community should not miss this chance to forever improve the patent law arena. There is more than just hope in the future of ADR and patent law, and that is something everyone can be excited about.



[FNa1]. J.D. Candidate, The Ohio State University Michael E. Moritz College of Law, 2008; B.S.M.E., The Ohio State University, 2005. I would like to first thank my wife Kelley for all her support and understanding through the late nights of law school. Thanks also to my parents, siblings CJQ, SMW, and JTX, and other family members for providing me with motivation and love throughout the process. Finally, thanks to all the members of the Ohio State Journal on Dispute Resolution who have worked with me in my role as Executive Editor and have ensured the continuous high quality of the articles and Notes in this journal.

[FN1]. Richardson v. Suzuki Motor Co., Ltd., 868 F.2d 1226, 1232-34, 1246-47 (Fed. Cir. 1989). The patent troll problem does not refer to patent-holding inventors who license the rights to a bigger manufacturing company because they do not have the resources to manufacture and sell (practice) the invention themselves. See Jeremiah Chan & Matthew Fawcett, Footsteps of the Patent Troll, 10 Intell. Prop. L. Bull. 1, 1 (2005). The problem refers to companies that buy up patent portfolios from inventing companies with the sole goal of bringing infringement lawsuits to make a quick dollar from large corporations, and the term was first used to describe these companies by Intel senior counsel including David Simon. Id. at 1 n.2. For more on the current definition and debate over patent trolls, see **Patent Troll Tracker**, a blog by Rick Frenkel, an in-house patent counsel for Cisco. **Patent Troll Tracker**, http://trolltracker.blogspot.com (last visited Feb. 23, 2008).

[FN2]. Alyson G. Barker, Patent Permanent Injunctions and the Extortion Problem: The Real Property Analogy's Preservation of Principles of Equity, 88 J. Pat. & Trademark Off. Soc'y 256, 272 (2006). Barker analogizes the patent law problem to similar "extortion" in real property transactions, where courts regularly deny an injunction if they find the only reason for seeking an injunction is economic windfall.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000774

23 OHSJDR 345                                                                                                        Page 10
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

[FN3]. eBay Inc. v. MercExchange, L.L.C., 126 S. Ct. 1837, 1839 (2006). The Supreme Court rejected any auto-
matic injunction rule the Federal Circuit Court of Appeals might be using in the patent law context. See also
MercExchange, L.L.C. v. eBay, Inc., 401 F.3d 1323 (Fed. Cir. 2005).

[FN4]. James F. McDonough III, The Myth of the Patent Troll: An Alternative View of the Function of Patent
Dealers in an Idea Economy, 56 Emory L.J. 189, 193 (2006). Although most scholars believe otherwise, Mc-
Donough makes a new argument that patent trolls are not only good for patent law, but they should be encour-
aged as the next evolutionary step in the development of patent law at large. Id. at 189. McDonough notes that
other fields like securities markets follow a similar development path, and patents will be better off in the long
run with patent trolls acting as an intermediary in the patent market.

[FN5]. Robert E. Thomas, Vanquishing Copyright Pirates and Patent Trolls: The Divergent Evolution of Copy-
right and Patent Laws, 43 Am. Bus. L.J. 689, 736-37 (2006). Thomas views the eBay decision as a vital step in
the drive for Congressional patent reform, which should also slow patent trolls. Id. at 738. For more on patent
reform, see infra notes 123-45 and accompanying text.

[FN6]. Robert C. Weiss & Thomas J. Brindisi, Dealing with the Willfulness Issue, Including Bifurcation Motion
Practice, 457 PLI/Pat 151, 156 (1996).

[FN7]. United States Court of Appeals for the Federal Circuit, About the Court, www.fedcir.gov/about.html (last
visited Sept. 15, 2007). The Federal Circuit also has jurisdiction to hear trademark appeals as well as other fed-
eral governmental affairs, but the court has exclusive appellate jurisdiction only in patent law.

[FN8]. Thomas H. Case & Scott R. Miller, An Appraisal of the Court of Appeals for the Federal Circuit, 57 S.
Cal. L. Rev. 301, 318-20 (1984); see also Charles W. Adams, The Court of Appeals for the Federal Circuit:
More Than a National Patent Court, 49 Mo. L. Rev. 43, 50 (1984).

[FN9]. Richardson, 868 F.2d at 1246-47 ("Infringement having been established, it is contrary to the laws of
property, of which the patent law partakes, to deny the patentee's right to exclude others from use of his prop-
erty."). The Federal Circuit disagrees with the common perception that this injunction rule is automatic, but in
practice the rule has become automatic in every case where the court finds infringement. MercExchange, L.L.C.,
401 F.3d at 1338-39.

[FN10]. Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1548 (Fed. Cir. 1983) (saying that an injunction is a
proper remedy because "the right to exclude recognized in a patent is but the essence of the concept of prop- erty").

[FN11]. Chan & Fawcett, supra note 1, at 4-6. Chan and Fawcett give three prime examples of technology used
widely by consumers-eBay, Blackberry, and Microsoft Explorer-that are at risk of being shut down by an injunc-
tion in a patent troll case. Id. at 5-6.

[FN12]. See id. at 2; see also Amy L. Landers, Let The Games Begin: Incentives to Innovation in the New Eco-
nomy of Intellectual Property Law, 46 Santa Clara L. Rev. 307, 308 (2006). Landers points out that not only
have companies appeared on the scene for the sole purpose of trolling activity, but legitimate patent holders
have also tried to "monetize" their dormant patents in a similar way. There are no abandonment provisions in
patent law like there are in trademark law, so a dormant patent will not be barred from being enforced against
later infringers.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

23 OHSJDR 345                                                                    Page 11
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

[FN13]. The term was first used in the late 1990s by Peter Detkin, general counsel at Intel, to describe patent holders who generally do not practice inventions. Over time this definition has been refined to the meaning it has today. Jason Rantanen, Slaying the Troll: Litigation as an Effective Strategy Against Patent Threats, 23 Santa Clara Computer & High Tech. L.J. 159, 163-64 (2006).

[FN14]. Chan & Fawcett, supra note 1, at 5-6. Although Microsoft has enough other products in the market to withstand an injunction on a current version of Explorer, the companies behind eBay auction services (eBay Inc.) and Blackberry personal digital assistants (Research in Motion, RIM) are really at risk in their respective litigation. Id. at 5. This is also proven by RIM settling for more than $600 million after losing its infringement suit.

[FN15]. Id. at 4; Derek C. Stettner, Meet the Patent Enforcers, 77 Wis. Law. 19, 20-21 (2004). The man who started companies down the path of trolling was Jerome Lemelson, who for the past thirty years has patented broad ideas and waited for them to be infringed by Fortune 500 companies. Id. Although Lemelson's tactics are clearly not what the government intends when granting patents, the line blurs when manufacturing companies stop creating a patented product and instead try to license it out for the quick monetary value.

[FN16]. State St. Bank & Trust Co. v. Signature Fin. Group, Inc., 149 F.3d 1368,. 1375 (Fed. Cir. 1998). A business method patent is a vague term, meaning a method of doing business (such as a system of how salespeople should best handle certain customer demands) as opposed to the means of carrying out the business (such as software that tells salespeople how to handle these situations). Id. at 1376. The distinction has essentially been eradicated by the current complexity of modern business systems. The Federal Circuit announced that the business method exception to patentability was done away with in 1952 when patent law adopted the obviousness requirement, but the exception would clearly cause nothing but confusion in modern business cases. Id. Although the Supreme Court and Federal Circuit have been extending patent rights like this for many years, many scholars observe that recent decisions indicate the pendulum swinging the other way now. See Steve Seidenberg, Reinventing Patent Law, ABA Journal Online, http:// www.abajournal.com/magazine/reinventing_patent_law (last visited Feb. 23, 2008).

[FN17]. See Elizabeth D. Ferrill, Patent Investment Trusts: Let's Build a PIT to Catch the Patent Trolls, 6 N.C. J. L. & Tech. 367, 368 (2005). Ferrill notes that the expansion in patentable subject matter has helped lead to a tripling in the number of patents issued annually since 1985.

[FN18]. MercExchange, L.L.C. v. eBay, Inc., 271 F. Supp. 2d 789, 789 (E.D. Va. 2002). For example, one of the business methods at issue here was the method of searching the internet for goods to purchase. Id. at 795.

[FN19]. eBay, Inc., 126 S. Ct. at 733.

[FN20]. MercExchange, L.L.C., 271 F. Supp. 2d at 789.

[FN21]. Ronald J. Mann, Do Patents Facilitate Financing in the Software Industry?, 83 Tex. L. Rev. 961, 1024 (2005); see also Dan L. Burk & Mark A. Lemley, Policy Levers in Patent Law, 89 Va. L. Rev. 1575, 1615 (2003). Burk and Lemley debate whether the different industries and different types of patent owners deserve different patent systems, but they come to the conclusion that all patent owners should be covered by a unitary system. Mann goes even further in defense of patent trolls by arguing that these companies promote progress by allowing inventors to sell rights to big corporations which have more resources to continue developing the state of the art.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



JW.000776

23 OHSJDR 345                                                    Page 12
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

[FN22]. Chan & Fawcett, supra note 1, at 1. Chan and Fawcett observe that the government allows an inventor to have a patent primarily for the benefit of the public. The patented material eventually goes into the public domain, and the patent holder can continue to develop the state of the art by using and selling the invention to the public and getting feedback on what improvements could be made. The public obviously benefits in both ways, but a patent troll is a problem because holding patents to later litigate for damages does not benefit the public. Indeed this activity harms the public because it impedes development and discourages companies from bringing certain new technologies to the public. Id. at 3-4.

[FN23]. William C. Rooklidge, Reform of the Patent Laws: Forging Legislation Addressing Disparate Interests, 88 J. Pat. & Trademark Off. Soc'y 9, 13-14 (2006). Unfortunately, Congress left this part of the Patent Reform Act on the Capitol floor, opening the door for the Supreme Court to make a decision on patent trolls. The patent reform drive continues every year (for example, the I/S Journal at Ohio State recently held a symposium in February 2007 on what patent law reforms should be supported), and Congress could easily propose to add this extra layer of law at any point in the next few years.

[FN24]. Barker, supra note 2, at 257-58. Obviously if the permanent injunction were upheld and MercExchange decided to not license the business method to eBay, eBay would shut down and online auction commerce would be crippled immediately. Barker also compares this case to the similar Blackberry case, which could have hurt U.S. businesses significantly if the majority of personal digital assistants used by executives and employees were shut down by an injunction.

[FN25]. eBay, Inc., 126 S. Ct. at 1841.

[FN26]. Id. at 1839 ("These familiar [equity] principles apply with equal force to disputes arising under the Patent Act . . . [n]othing in the Patent Act indicates that Congress intended [to depart from the principles of equity].").

[FN27]. Id. The Supreme Court indicated that even though the District Court claimed to apply this four-factor test, it erred by holding that irreparable harm could never be shown by a patent holder who prefers to license rather than practice. This would make any patents held by legitimate small inventors like university professors useless. Each of the factors is also generally given equal weight, making none of them completely decisive either way. The Supreme Court also noted that the test for injunctive relief in the analogous intellectual property field of copyright law is the traditional four-factor equity test. Id. at 1840.

[FN28]. Parker H. Bagley, Outside Counsel: Supreme Court Clarifies Standard for Injunctions in Patent Cases, 5/25/2006 N.Y.L.J. 4, 4. Many scholars had thought that the Supreme Court granted certiorari to fashion a rule against patent troll companies, but clearly the review was simply to fix the Federal Circuit's interpretation of injunction law.

[FN29]. Thomas L. Casagrande, The Reach of eBay Inc. v. MercExchange, L.L.C.: Not Just for Trolls and Patents, 44 Dec. Hous. Law. 10, 16 (2006). The first three cases in the Eastern District of Texas showed the breadth of possibilities under the eBay approach: a patent troll was denied an injunction, a practicing manufacturer was denied an injunction in a close equity balance, and another practicing manufacturer was granted a permanent injunction. At least in patent law, the Supreme Court test appears to be working to help solve the troll problem.

[FN30]. Id. at 12. The traditional four-factor equity test was expressly applied in eBay to patent and copyright only. However, the holding extends to all statutes where injunctions may be granted "in accordance with the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000777

23 OHSJDR 345
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

principles of equity" or "on such terms as the court may deem reasonable." Therefore, other areas of law such as trademark law and the Federal Water Pollution Control Act are covered by this decision. Id. at 13-14.

[FN31]. Id. at 16. The eBay rule has already denied an injunction to one practicing and manufacturing patent-holder; however, this is the correct result in cases where monetary damages are the only proper remedy.

[FN32]. See Availability of Injunctive Relief, 120 Harv. L. Rev. 332, 341. This simple Supreme Court decision helps solve the patent troll problem by allowing local courts the opportunity to determine if the circumstances compel an injunction. For most circumstances where the plaintiff is a patent troll, the court will be able to deny injunctive relief. Id. at 336.

[FN33]. Bagley, supra note 28, at 4. In the patent troll context, it is very hard to prove irreparable harm has been done or that monetary damages are not an adequate remedy at law. Also, the public interest factor typically does not favor the patent troll.

[FN34]. Landers, supra note 12, at 307. While Landers focuses mostly on the exorbitant damages patent trolls have been awarded in court, the more sinister effect of nearly automatic injunctions was the money trolls could make in forced settlements. Landers believes this is a problem because sometimes damages or license fees far exceed the true economic value of a patent.

[FN35]. See Hon. Thomas G. Nelson, The Future of the Federal Courts: The Case for a Mission Statement, 37-Aug. Advoc. (Idaho) 12, 14 (1994). Nelson warns against increasing the number of federal appellate judges because more judges lead to more instability and differences of opinion, which leads to uncertainty of outcomes and more litigation. The concept of uncertainty of outcomes leading to more litigation is more general than his article topic, as it extends to every area of the law including current patent law. Therefore, more legitimate companies will contest patent infringement suits from patent trolls because the outcome is uncertain.

[FN36]. See George M. Sirilla et al., Will eBay Bring Down the Curtain on Automatic Injunctions in Patent Cases?, 15 Fed. Circuit B.J. 587, 604-06 (2006). In the software business for example, life cycles of the patented material can be very short and inefficiency is created by any delay or interruption of service to consumers due to impending litigation or possible injunctions.

[FN37]. See Ferrill, supra note 17, at 376 n.64. The patent troll aspect of patent law has brought "the personal injury game" to the table, meaning that companies settle in one-sided negotiation sessions more often in these contexts than in every other legal context. Id. at 377.

[FN38]. Casagrande, supra note 29, at 16. The problems of inefficiency in time-sensitive industries such as computer software are still compounded whether the problem is more litigation or more possible injunctions.

[FN39]. Steven J. Elleman, Note, Problems in Patent Litigation: Mandatory Mediation May Provide Settlements and Solutions, 12 Ohio St. J. on Disp. Resol. 759, 767-68 (1997). Courts originally did not favor alternative dispute resolution in patent law because strong public policy concerns are present in every patent validity and infringement determination, dictating attention from federal courts exclusively. Eventually in 1982, Congress determined the virtues of arbitration outweighed any risk of threatened public interests, and alternative dispute resolution has been present in patent law ever since.

[FN40]. See Anne K. Subourne, Motivations for Mediation: An Examination of the Philosophies Governing Di-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000778



vorce Mediation in the International Context, 38 Tex. Int'l L.J. 381, 394 (2003). Similar to the divorce context Subourne discusses, patent law disputants can save a significant amount of money and time by considering alternative dispute resolution options. Of course, the best side benefit is a reduced court docket and overall efficiency of the dispute system.

[FN41]. Jennifer Mills, Alternative Dispute Resolution in International Intellectual Property Disputes, 11 Ohio St. J. on Disp. Resol. 227, 228 (1996). Again, the government's view before 1980 was that it had to be involved in private disputes whenever the public had a significant interest to protect. As patent law is a deal between individual inventors and the federal government representing the American public, every patent case used to be in the general category of non-arbitrational.

[FN42]. Id. The first legislation can be found in the 1988 version of 35 U.S.C. § 294, which provides rules for voluntary arbitration of disputes.

[FN43]. See Alan W. Kowalchyk, Resolving Intellectual Property Disputes Outside of Court: Using ADR to Take Control of Your Case, 61 Disp. Resol. J., Jul. 2006, at 28, 30. Not only does Kowalchyk notice the cost and time savings of alternative dispute resolution, but he also notes the desire of some companies to stay out of a long public trial where more than just patent problems may surface in discovery.

[FN44]. E. Casey Lide, ADR and Cyberspace: The Role of Alternative Dispute Resolution in Online Commerce, Intellectual Property and Defamation, 12 Ohio St. J. on Disp. Resol. 193, 207 (1996); S. Gale Dick, ADR at the Crossroads, 49 Disp. Resol. J., Mar. 1994, at 47, 47. The intellectual property field is just like commercial law in that networked communication between parties is highly encouraged, so this leads to a landscape where alternative dispute resolution can grow faster than in other fields.

[FN45]. Jill I. Gross, Securities Mediation: Dispute Resolution for the Individual Investor, 21 Ohio St. J. on Disp. Resol. 329, 357 (2006). Arbitration is much like a court proceeding in that both sides get to show their cases and a third party decides what agreement should happen, but the proceedings are private and quicker. Gross argues that arbitration allows perhaps a better opportunity than litigation to fully and fairly consider all options of resolution.

[FN46]. Kowalchyk, supra note 43, at 30. An arbitrator's hourly fee is high compared to costs in court, but generally parties still save money because the arbitration is significantly shorter than any court proceeding.

[FN47]. See id. Unless the licensing parties agree otherwise before a dispute arises, the two parties will likely have trouble agreeing on anything including going to binding arbitration proceedings. For patent trolls that do not even try to license the patent before bringing a lawsuit, there is less likelihood of arbitration starting at any point. On the other hand, trolls who show no willingness to license without good reason would almost certainly lose in court when trying to obtain an injunction.

[FN48]. Id. at 31. Usually the specific rules of arbitration are not spelled out in detail on the contractual agreement itself, but instead the agreement will specify an arbitration agency such as the American Arbitration Association (AAA). Entities such as the AAA have their own well-settled rules and procedures. Id. at 30-32.

[FN49]. Id. See also Thomas O. Main, ADR: The New Equity, 74 U. Cin. L. Rev. 329, 354 (2005). Main notes that more disputes in the United States are resolved using traditional alternative dispute resolution practices than in courts of law currently. Id. at 341.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000779



23 OHSJDR 345                                                                    Page 15
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

[FN50]. Kowalchyk, supra note 43, at 34; 35 U.S.C.A. § 294 (2006). Required notice for each patent disputed includes "names and addresses of the parties, the name of the inventor, the name of the patent owner . . . [the] number of the patent, and a copy of the award." Id.

[FN51]. See Michael Buhler et al., Practitioner's Handbook on International Arbitration 9 (Frank-Bernd Weigand ed., 2002). A patent troll and a practicing corporation coming to a friendly licensing/business relationship is a huge possible victory for patent law.

[FN52]. M.A. Smith et al., Arbitration of Patent Infringement and Validity Issues Worldwide, 19 Harv. J.L. & Tech. 299, 321-22 (2006). Many states also have separate arbitration laws that may apply, but only to the extent that the arbitration covers non-substantive patent law issues. The FAA still applies even if the parties do not agree contractually to arbitrate before going to court, which is the most likely case in patent troll disputes.

[FN53]. Id. at 323. Of course if there is any question of patent law or mixture of patent law questions with non-patent law questions, the Federal Circuit will have jurisdiction as normal. Smith is just pointing out that many appeals of patent arbitration agreements deal only with contracts or arbitration law, which can easily be dealt with by the other circuits.

[FN54]. See id. at 320-28. In other countries or in international patent disputes, arbitration does not have all the same support and benefits as it does in the United States. Nevertheless, increasing arbitration in the US patent law field can only encourage the same ADR movements worldwide.

[FN55]. See Marion M. Lim, Note, ADR of Patent Disputes: A Customized Prescription, Not an Over-The-Counter Remedy, 6 Cardozo J. Conflict Resol. 155, 168 (2004). Lim attempts to argue that both arbitration and mediation will not solve increased litigation in patent law disputes because patent attorneys and large corporations "do not generally embrace either as a means for resolving patent disputes." Id. Lim bases her thesis on many reasons, including public interest being involved in patent disputes, both parties wanting their day in court, and arbitrators being less impartial than judges. Id. at 174-87. These are all arguments that were dismissed when Congress initially allowed ADR into the patent field in 1982, and therefore hold little weight (if any) today. With the new context of injunctions being difficult to obtain, many patent litigators would probably be open to reconsidering these traditional alternative dispute resolution methods again.

[FN56]. Jeffrey M. Senger, Advocacy in Mediation with the Government, 61 Disp. Resol. J., Jan. 2007, at 50, 50-51. Litigation tactics (that could help in arbitration proceedings) do nothing but hinder a mediation session, and the disputing parties need to recognize this before mediation can proceed smoothly.

[FN57]. See Gerald F. Phillips, May Arbitrators Suggest Mediation?, 61 Disp. Resol. J., Jan. 2007, at 28, 29. Phillips tackles the interesting debate of whether arbitrators should suggest mediation as a better vehicle for resolving disputes, and he comes to the conclusion that arbitrators indeed should encourage mediation first. The parties certainly have a chance for more open dialogue and creative solutions in mediation.

[FN58]. Kowalchyk, supra note 43, at 32. Disputing parties can come to solutions such as cross-licensing or even joint development ventures in mediation. There are no limits to the possible outcomes in mediation when both parties are open to finding creative solutions.

[FN59]. Id. The parties have complete control over what kind of settlement comes out of mediation, and the mediator cannot decide any issue for the parties like an arbitrator would. Despite this limit on mediators, the parties

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

23 OHSJDR 345                                                                                           Page 16
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

can still leave mediation with an agreement on some terms that will hasten the process of later arbitration or litigation.

[FN60]. Id. at 32-33. The key difference between the two kinds of mediation is that the parties can choose a mediator both parties know and are comfortable with when engaged in private mediation.

[FN61]. Bobbi McAdoo & Nancy A. Welsh, Look Before You Leap and Keep on Looking: Lessons From the Institutionalization of Court-Connected Mediation, 5 Nev. L.J. 399, 401 (2005). The mediator is generally chosen by the courts in this type of mediation. Id. at 400.

[FN62]. See Judith Resnik, Uncovering, Disclosing, and Discovering How the Public Dimensions of Court-Based Processes are at Risk, 81 Chi.-Kent L. Rev. 521, 568 (2006). This publicity of the settlement itself is no different than that of the private arbitration system, but an even greater emphasis exists in mediation on keeping conversations with the mediator private. This allows the parties to feel relaxed and encourages honesty and good faith in trying to come to an agreement with no unfair disadvantages to either party if the mediation attempt fails in the end.

[FN63]. See Kowalchyk, supra note 43, at 30. In the patent troll context, this pre-arranged contractual agreement is highly unlikely to be present. Nevertheless, the two parties in a patent troll dispute can still choose a private mediation session on their own before a lawsuit brings the parties in front of a judge formally.

[FN64]. International Institute for Conflict Prevention & Resolution, A New Addition to CPR's Master Guide Book Series, 24 Alternatives to High Cost Litig. 22, 23 (2006). The ADR community is currently publishing many books and law review articles on how to improve mediation in patent law, an area where mediation is underused.

[FN65]. See, e.g., Grain Processing Corp. v. American Maize Products Co., 185 F.3d 1341 (Fed. Cir. 1999) (a patent suit filed originally in 1981 still needed damages issues resolved 18 years later). Obviously with the patent grant only lasting twenty years and litigation sometimes extending for a decade or more, parties are well-inclined to avoid litigation and come to a solution quickly in order to preserve the value of the patent.

[FN66]. See generally Alain Burrese, Success is in the Planning, 31 Mont. Law. 32, 32 (Aug. 2006). Without a mediator present, the two parties must prepare thoroughly in advance of the negotiation session if the negotiation is to be successful. Both parties need to come in with a plan and know how to work in the negotiation for- um.

[FN67]. Id. at 32-33. The key to good negotiations is figuring out how to most effectively express your party's interests and demands to the other party.

[FN68]. H. Thomas Fehn et al., Securities Arbitration Mediator Model SAM User's Manual, 1554 PLI/Corp 245, 250 (2006). Fehn observes that this classic model of negotiations is the least effective but most popular because this type of negotiation is practically taught to every person in elementary school.

[FN69]. F. Peter Phillips, Speeches Spreading the Word on Business ADR: Assessing Recent Efforts . . . and Looking Forward, 25 Alternatives to High Cost Litig. 3, 7 (2007). Phillips points out that this interest-based negotiation has been refined ever since its creation in 1981 by Roger Fisher and William Ury.

[FN70]. David B. Conrad, Mining the Patent Thicket: The Supreme Court's Rejection of the Automatic Injunc-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000781



23 OHSJDR 345                                                                                           Page 17
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

tion Rule in eBay v. MercExchange, 26 Rev. Litig. 119, 141 (2007). The terms of a negotiated agreement at the early pre-litigation stage can be much more reasonable than the "reasonable" royalties awarded by courts later on. Id.

[FN71]. Christopher R. Leslie, The Anticompetitive Effects of Unenforced Invalid Patents, 91 Minn. L. Rev. 101, 144 (2006). In theory, this allows the holder of an invalid patent to force licensing negotiations on a legitimate manufacturer and then have an advantage in court if the "infringer" breaks negotiation talks. By allowing patent trolls or holders of invalid patents this advantage later, no encouragement exists for a good faith negotiation strategy from the patent troll (if the troll would even have one to begin with). Courts simply have to see that neither party should be penalized for breaking off negotiations because the reasons may not always be in bad faith.

[FN72]. Yixin H. Tang, Recent Development, The Future of Patent Enforcement After eBay v. MercExchange, 20 Harv. J.L. & Tech. 235, 242-43 (2006). Tang cites eBay to note that a patent holder with a patent that covers just a small portion of the large infringing product has even less right to an injunction in the patent troll context. Id.

[FN73]. See supra Parts IV.A and IV.B.

[FN74]. International Institute for Conflict Prevention & Resolution, Model Mediator Standards are Revised, but Commercial Applications are Questioned, 23 Alternative to High Cost Litig. 154, 154 (2005). The American Bar Association is a critical avenue of educating lawyers, as this institute points out.

[FN75]. See infra Parts V.A.1 and V.A.2.

[FN76]. Doug Harvey, Reinventing the U.S. Patent System: A Discussion of Patent Reform Through an Analysis of the Proposed Patent Reform Act of 2005, 38 Tex. Tech L. Rev. 1133, 1162 (2006). One of the ways patent trolls abuse the patent system is by filing continuing applications on their vague patents in order to extend the patent term long enough to have a big corporation infringe the patent. Regulating continuation applications is one example of how the Patent and Trademark Office could weed out the patent trolls and eliminate abuse of this continuation system.

[FN77]. See Mark D. Janis, Second Tier Patent Protection, 40 Harv. Int'l L.J. 151, 185 (1999). Janis notes that there are concerns about forcing ADR onto patent disputants, but these concerns are never articulated or ex- plained.

[FN78]. See Mark A. Lemley, Rational Ignorance at the Patent Office, 95 Nw. U. L. Rev. 1495, 1495-97 (2001). Lemley observes that even back in 2001 patent reform proponents were loudly complaining that too many bad patents were being granted. Lemley disagrees that patent reform will work because the number of patents that need heavy United States Patent and Trademark Office (USPTO or PTO) or judicial review is minimal. Id. at 1497-98. With the rise in litigation over the past six years and the new patent troll problem on top of this rise, his main argument is unpersuasive today.

[FN79]. See Kevin R. Casey, International Institute for Conflict Prevention & Resolution, Law Firm ADR Departments Can Respond to Market Challenges, 25 Alternatives to High Cost Litig. 1, 9-10 (2007). Casey argues that every law firm (intellectual property included) should have an ADR department and all attorneys need to be trained in ADR, or else they will not be able to provide complete and competent advice to their clients. Some

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



JW.000782

23 OHSJDR 345                                                                                                  Page 18
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)



fields and states have required attorneys to pursue ADR education as an ethical obligation, but patent law is not one of these fields yet.

[FN80]. Sean B. Seymore, The Competency of State Courts to Adjudicate Patent-Based Malpractice Claims, 34 AIPLA Q.J. 443, 448-49 (2006). Patent prosecutors already follow four sets of ethical rules: (1) the disciplinary rules of the state they practice in; (2) the ABA Model Code of Professional Responsibility; (3) the ABA Model Rules of Professional Conduct; and (4) the USPTO Code of Professional Responsibility. Id. The USPTO as well as the ABA could easily add an ethical requirement of patent prosecutors to consider ADR when drafting patents just like they consider what issues may come up in future litigation.

[FN81]. John J. Okuley, Note, Resolution of Inventorship Disputes: Avoiding Litigation Through Early Evaluation, 18 Ohio St. J. on Disp. Resol. 915, 955 (2003). Okuley discusses the non-traditional role patent prosecutors must take sometimes of investigating who actually invented the patented device (one of the requirements for obtaining a patent is disclosing the actual inventor on the patent application). This is just part of the careful process that patent prosecutors must follow in drafting patents, so it is not going to be that much harder to draft patents with future ADR concerns in mind.

[FN82]. See id. Patent prosecutors set the table up front for how litigation will go later on in a patent's life. Consequently, patent prosecutors are in a perfect position to recommend things such as further inventor experimentation to better support the claims or recommend ADR procedures for future licensing agreements.

[FN83]. Marshall J. Breger, Should an Attorney Be Required to Advise a Client of ADR Options?, 13 Geo. J. Legal Ethics 427, 434 (2000). Breger finds that while all litigators should certainly be encouraged to inform clients about ADR options, a stiff rule requiring or compelling litigators to pursue other options would not be a positive ethical improvement.

[FN84]. Id. Note the critical difference here between compelling a client to use ADR and compelling litigators to do the same. Compelling a client to use ADR is within the ethical responsibilities and advisory capacity of a patent litigator, while forcing patent litigators to always advise ADR would usurp the attorney's ability to judge the circumstances of the case at hand. Id.

[FN85]. Donald E. Paulson & Diane E. Kenty, Advising Clients of ADR Before Filing a Lawsuit: A Perspective, 40 Boston B.J. 6, 20 (1996). Paulson and Kenty propose that an express requirement or guideline instructing all attorneys to inform clients about ADR options before litigating on the client's behalf would be highly beneficial to get around this silly misconception.

[FN86]. See id. While a handful of clients may indeed initially think an attorney is showing weakness by offering alternative dispute resolution tactics, these clients will undoubtedly change their minds when the dispute is resolved effectively, quickly, and cheaply (the three things litigators have trouble accomplishing).

[FN87]. See Carl A. Kukkonen III, The Use of a Patent Licensing Center as an Intermediary for Facilitating the Licensing of Commercially Viable, Unused Patents, 3 Va. J.L. & Tech. 10, 12 (1998). Kukkonen proposes that with the current realization that patents can be strategically exploited (an early description of patent trolling), a central patent licensing center using ADR methods could remove a lot of the modern patent litigator's cases into the ADR forum.

[FN88]. Thomas R. Donahue & Barbara C. Deinhardt, Survey: ADR Use Increasing, 15 Alternatives to High

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

23 OHSJDR 345                                                                    Page 19
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

Cost Litig. 66, 68 (1997). By the mid-90s, most large companies had a chance to try ADR in a business dispute, and the good results (especially with certain mediators) spread by word-of-mouth from company to company.

[FN89]. Survey Shows Pervasive Use of ADR in Large Corporations, 8 World Arb. & Mediation Rep. 99, 99 (1997). A Cornell University survey not only shows that nearly 100% of America's largest corporations favor ADR over litigation, but also that mediators and ADR methods are chosen based on word-of-mouth and reputation. Id.

[FN90]. The leaders in each field are best equipped to inform patent attorneys of the merits of all ADR processes. These leaders also play a critical role in keeping attorneys informed about the current cutting-edge or state of the art in patent law, so it is natural for ADR encouragement to be most effective through these industry leaders.

[FN91]. See Scott H. Blackmand & Rebecca M. McNeill, Alternative Dispute Resolution in Commercial Intellectual Property Disputes, 47 Am. U. L. Rev. 1709, 1710-11 (1998). Blackman and McNeill condone and explain the uses of ADR in all the major intellectual property fields, and they point out that there are few times when counsel should not tell clients to consider ADR. These times occur in "bet the company" situations, meaning too much risk is involved to avoid trial. Id. at 1711.

[FN92]. See id. Clients are more likely to recommend ADR to other inventors or patent-holders because good experiences with technically-adept arbitrators or mediators tend to get clients talking. Clients are also more likely to recommend ADR to others because both parties generally win in ADR patent proceedings (one party usually receives money and the other receives some rights to practice the invention). Id. at 1716.

[FN93]. Id. Again, a client's advice to other clients may be more persuasive than even legal counsel recommendations because former clients have actually experienced the benefits of ADR personally.

[FN94]. Dori Cohen, Note, Making Alternative Dispute Resolution (ADR) Less Alternative: The Need for ADR as Both a Mandatory Continuing Legal Education Requirement and a Bar Exam Topic, 44 Fam. Ct. Rev. 640, 649 (2006). Cohen is specifically speaking to divorce lawyers and family law ADR practitioners, but the increase of ADR in that field is a nice analog to the similar possible ADR increase in patent law. State legislatures enact CLE requirements in order to keep attorneys up to date with the cutting edge of law. Id. Training in alternative dispute resolution is crucial because this topic was not taken by a lot of law students in the past.

[FN95]. Cohen indicates that the practice of law without formal training in ADR today is against the goal of the legal profession and against consumer protection from malpractice offered by CLE programs. Id.

[FN96]. Numerous attorneys are reprimanded with fines, suspensions, or disbarment from state bar associations every year for not complying with CLE requirements already, so adding more requirements could cause even more attrition against CLE. See Jay M. Zitter, Discipline of Attorney for Failure to Comply with Continuing Legal Education Requirements, 96 A.L.R. 5th 23 (2002).

[FN97]. The New York State Bar Association supports adding ADR into regular mandatory CLE required courses, implying that ADR can work side-by-side with the usual technical training in all fields. New York State Bar Association, Committee on Alternative Dispute Resolution, Bringing ADR Into the New Millennium-Report on the Current Status and Future Direction of ADR in New York 55-57 (1999), available at http://nysba.org/MSTemplate.cfm?MicrositeID=84 (last visited Mar. 6, 2007).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000784

23 OHSJDR 345                                                                                    Page 20
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

[FN98]. Although many symposia dealing with alternative dispute resolution focus solely on those procedures, the patent law reform symposium at The Ohio State University Moritz College of Law in February 2007 could have easily had another 45 minute panel discussion on ADR (none of the other panel discussions focused on the issue).

[FN99]. Cohen, supra note 94, at 649. ADR courses in CLE seminars are most effective when small groups of attorneys (around 20) work on sample cases with a certified mediator in the field. This type of activity would also provide a nice break from the normal panel discussion routine of the day.

[FN100]. Furthermore, forty states require some form of CLE training for all attorneys, so these minor changes would reach a vast majority of patent lawyers in the United States. Id.

[FN101]. See Andrew I. Schepard, Children, Courts, and Custody: Interdisciplinary Models for Divorcing Families 136-37 (Cambridge Univ. Press 2004). Two pioneers in ADR course offerings have been The Ohio State University Moritz College of Law and Harvard Law School. Other law schools could learn from how successful the ADR Certificate program has been at Ohio State. The demand for these courses is clear: now law schools have to step up and meet the demand.

[FN102]. Cohen, supra note 94, at 650. Training attorneys in ADR at the law school level is the only way to have "a lasting impact" on the field, be it patent law or family law. Id.

[FN103]. This process of training new lawyers and filtering the knowledge through to older attorneys down the road is a common way to infiltrate any field (law, engineering, etc.) with a new or better process.

[FN104]. See supra note 101 and accompanying text. The use of ADR has increased significantly in all fields including the typical first year subjects of tort, criminal, and property law. Consequently, it makes perfect sense to add ADR as a mandatory requirement in addition to the traditional fields. Cohen, supra note 94, at 651.

[FN105]. New York State Bar Association, supra note 97, at 55. This process happened recently in many states, including New York, when professional responsibility was added to bar exams across the country. Alternative dispute resolution is just as important to new lawyers today as professional responsibility. Cohen, supra note 94, at 650.

[FN106]. Alternatively, adding ADR to the state bar exam would undoubtedly force many more law schools to offer ADR courses and encourage many more students to take ADR courses while in law school. "Most law students select law school courses which will aid them in passing the bar examination." Cohen, supra note 94, at 650-51.

[FN107]. 28 U.S.C.A. §§ 651-58 (West 2006).

[FN108]. 28 U.S.C.A. § 651 (West 2006).

[FN109]. Arbitration of patent disputes is allowed under 35 U.S.C. § 294 already, but this provision is only permissive and not compelling or mandatory. Congress will need to write a stronger bill into law to achieve this objective. Elleman, supra note 39, at 775.

[FN110]. Lim, supra note 55, at 157-58. The lengthy discovery, prior art searches, and Markman hearings can

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000785



23 OHSJDR 345
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

all be replaced with one cost-effective arbitration or mediation. This is why ADR is such a good economic choice for most clients.

[FN111]. Congress has encouraged federal district courts to experiment with different types of ADR ever since 1990 when it passed the Civil Justice Reform Act (CJRA). John Maull, ADR in the Federal Courts: Would Uniformity Be Better?, 34 Duq. L. Rev. 245, 245-46 (1996).

[FN112]. CPR Institute for Dispute Resolution, Mediation Motivation and Encouragement: How International Organizations Build ADR, 23 Alternatives to High Cost Litig. 81, 82 (2005). The Institute does observe that caseload reduction should not be the only reason or the main reason to adopt ADR procedures, but this clearly is a laudable result of increasing ADR.

[FN113]. Susan Jane M. Brown, David and Goliath: Reformulating the Definition of "The Public Interest" and the Future of Land Swaps After the Interstate 90 Land Exchange, 15 J. Envtl. L. & Litig. 235, 259 (2000). No matter the context (Brown focuses on a piece of environmental legislation), public support must outweigh public opposition, which is a slow process in the patent law reform field. Id.

[FN114]. There has been no patent reform act to make it off the Congressional floor thus far this decade, and this is probably in part due to how long it takes to build a dual-party consensus.

[FN115]. ADR reforms or bills in many fields including patents have a tendency of being passed very quickly by Congress. See Elleman, supra note 39, at 769.

[FN116]. I believe a Congressional statute is far more likely, but the USPTO does have the administrative rule-making capability to add this requirement to all patent license agreements.

[FN117]. See Smith et al., supra note 52, at 302. Arbitration and mediation frequently occur because the parties agree in licensing negotiations to arbitrate all later disputes. Extending these procedures to regular patent disputes makes plenty of sense to make disputes uniform whether or not there was a license agreement before the dispute. Id.

[FN118]. See generally U.S. Const. amend. VI.

[FN119]. Jack M. Sabatino, ADR as "Litigation Lite:" Procedural and Evidentiary Norms Embedded Within Alternative Dispute Resolution, 47 Emory L.J. 1289, 1347 (1998). Sabatino illustrates the cycle of ADR being attentive to clients, which causes more positive feedback and brings more clients into ADR.

[FN120]. Mark A. Lemley, Ten Things to do About Patent Holdup of Standards (and One Not To), 48 B.C. L. Rev. 149, 149-50 (2007).

[FN121]. Stuart Minor Benjamin & Arti K. Rai, Who's Afraid of the APA? What the Patent System can Learn from Administrative Law, 95 Geo. L.J. 269, 270 (2007). Large patent reform bills have been left on the legislative floor in 2005 and 2006, so it is only a matter of time before one merits serious debate and votes in Congress.

[FN122]. Andrew Kopelman, Note, Addressing Questionable Business Method Patents Prior to Issuance: A Two-Part Proposal, 27 Cardozo L. Rev. 2391, 2402-03 (2006).

[FN123]. See Benjamin & Rai, supra note 121, at 303, 307. Obviously, the DVD example illustrates that patent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000786

23 OHSJDR 345
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

thickets force the patentees to work together, or else nobody will be able to profit or make DVD players.

[FN124]. Robert E. Thomas, Vanquishing Copyright Pirates and Patent Trolls: The Divergent Evolution of Copyright and Patent Laws, 43 Am. Bus. L.J. 689, 692-93 (2006).

[FN125]. James Bessen & Michael J. Meurer, Lessons For Patent Policy From Empirical Research on Patent Litigation, 9 Lewis & Clark L. Rev. 1, 2 (2005). Bessen and Meurer point out these two types of uncertainty in the patent system and then propose what reform could do to solve the problems.

[FN126]. A main focus of Bessen and Meurer is to eliminate the sources of uncertainty, and this could be more easily done if the judicial branch could become truly consistent in patent law. Id. at 2-3.

[FN127]. The main source of extra cost is the litigation costs of enforcing or challenging patents in court, which can range from $500,000 to $4 million (median) based on how much patent value is at risk. Id. at 2.

[FN128]. Robert M.M. Seto, A Federal Judge's View of the Most Important Changes in Patent Law in Half-A-Century, 11 J. Tech. L. & Pol'y 141, 145-46 (2006). Seto gives a thorough analysis of thirteen separate patent reforms offered in the Patent Reform Act of 2005, but he also opposes any changes.

[FN129]. Id. at 146. This change would not only make United States patent law match other large countries, it would also remove a lot of cost and conflict at the PTO because no more priority disputes involving proving the date of invention would be necessary.

[FN130]. Id. at 148-49. Continuation procedures can extend the time from conception to patent expiration to a whopping 44 years (which is what Lemelson did many times). This is contrary to the patent law system goal of removing unnecessary delays between patent application and patent issuance.

[FN131]. This reform was discussed at length at the Ohio State I/S Symposium on Patent Reform, but most of the panelists at that conference were against patent reforms in general (the primary presenters were university researchers and representatives from Battelle, a small research and development company that stays in business only by licensing inventions). The benefits of early publication far outweigh the small detriment to small companies which hope to have a long time to fully test every aspect of an invention before finally applying for a pat- ent.

[FN132]. Seto, supra note 128, at 150. Seto thinks continuation procedures do not need to be eliminated because the problems of heavy and irrelevant litigation could be solved better by early publishing of all patent applica- tions.

[FN133]. Id. at 155-56. The language in the 2005 Patent Reform Act condoned the very equitable test that the Supreme Court ended up choosing.

[FN134]. All of this information comes from the I/S Symposium on Patent Reform referred to in previous notes, but the opposition and reasons are clear. Part of the problem is that the definition of patent troll activity as li- censing without practicing is too broad and covers these universities and small research firms. Even if certain re- forms such as early publication do hurt some parties such as universities, Congress must balance the equities be- fore just dismissing any change. See Seto, supra note 129, at 161-63.

[FN135]. Id. at 145. The consensus for patent reform is building quickly every year, so it would be hard to con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000787

23 OHSJDR 345
23 Ohio St. J. on Disp. Resol. 345
(Cite as: 23 Ohio St. J. on Disp. Resol. 345)

clude otherwise.

[FN136]. See supra note 115 and accompanying text.

[FN137]. See supra note 121 and accompanying text.

[FN138]. A perfect example of this phenomenon happened in late 2006 when Senator Bill Frist wanted to force through legislation banning online gambling, but nobody in Congress supported this view. Frist then pulled strings to add the gambling ban into a completely unrelated, large port security bill which was in the best interests of national security and certain to overwhelmingly pass both houses of Congress. Frist probably put the security of the country at risk by "piggy-backing" his disfavored bill on the port security bill. Nevertheless, the port security bill passed, and now bank funding of online gambling is illegal. See I. Nelson Rose, Congress Makes Sausages, 11 Gaming L. Rev. 1, 1-2 (2007).

[FN139]. The trends of ADR bills passing and the bipartisan support of ADR indicate that patent reformers could pull a Bill Frist-like action to force some reforms through. See supra note 138 and accompanying text.

[FN140]. Seto, supra note 128, at 177-78. Seto does point out that the USPTO does allow a somewhat similar system called reexamination, but this procedure does not provide any of the same benefits as the European or Japanese opposition procedures. Id. at 146, 178.

[FN141]. Benjamin & Rai, supra note 121, at 270. This is one reform that has widespread support already in Congress and is almost certain to pass in the next five years once technical and cost details are worked out.

[FN142]. Jay P. Kesan & Andres A. Gallo, Why "Bad" Patents Survive in the Market and How Should We Change? The Private and Social Costs of Patents, 55 Emory L.J. 61, 105-06 (2006). The analysis can be hard to follow in this empirical study, but graphically it is clear that costs are lowered and patent applicants and others opposing the applications have a much broader range of choices to consider when a dispute arises in the opposition system.

[FN143]. Id. at 107-08. Kesan also clarified many points in his presentation at the I/S Symposium on Patent Reform at Ohio State, and he is traveling around as much as possible to spread the good word about this reform.

[FN144]. See supra Part IV.A.

[FN145]. The new patent examiners or arbitrators that would be hired if opposition procedures were added to the USPTO would need full training in technical fields they practice in as well as arbitrator training. This process could be a little expensive up front, but the long term benefits seem too good to pass up now.
23 Ohio St. J. on Disp. Resol. 345

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JW.000788