# EXHIBIT 27

# Intellectual Property

STEPHEN T. SCHREINER
AND ANDREW J. BACA

## Status of Intellectual Property Reform Legislation in the Congress and How It May Affect How Banks Acquire and Enforce Patents

*Patent reform has gained a lot of steam over the past five years due in large part to the chorus of voices demanding that Congress reform the patent laws to eliminate perceived abuses and failings of the current patent system. The financial services industry has an interest in these reforms taking place in Congress. The increasing number of applications for financial method patents and the recent enforcement of financial method patents against banks and other financial institutions, demonstrate the impact patent law now has in the financial services industry. This column examines the Patent Reform Act of 2007 and how the different provisions may impact the financial services industry.*

There is a burgeoning recognition among the financial services industry of the importance of patents. Prominent banks and financial services institutions are filing for increasing numbers of patents.[1] Banks and financial institutions are also feeling the sting of enforcement of patent rights. During a recent hearing, Tony Squires of Goldman Sachs & Co. addressed the Senate Judiciary Committee, and quoted a Harvard study that found financial patents were significantly more likely than non-financial patents to be asserted against alleged infringers.

920

Published in the November/December 2007 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

JW.000797

Ark.000776

INTELLECTUAL PROPERTY

For these reasons, banks and financial institutions have an interest in the current debate and legislative action on patent reform.

Somewhat surprisingly, Summer 2007 was a busy period for patent reform. Many practitioners anticipated that with the beginning of an election cycle and the fact that a new administration will take over the federal government in 2008, patent reform would be put on the back-burner until at least 2010. The two bills, S. 1145 and H.R. 1908, referred to as the "Patent Reform Act of 2007," were introduced in April 2007. The remainder of the Summer saw a flurry of activity.

The Senate bill, S. 1145, was referred to committee in April, hearings and markup sessions were held in June, and the bill was reported with amendments in July. On the House side, H.R. 1908 was referred to committee where it underwent hearings and several markup sessions before being reported to the floor of the House in September. The House passed the bill 220-175 once on the floor, and adopted several amendments before placing the bill on the Senate Calendar.

The "Patent Reform Act of 2007" is, in large part, an attempt by the legislature to respond to heavy criticism leveled against the patent system over the past several years. A particularly hot political issue is worry about overly broad patents, which are allegedly curbing innovation and creating uncertainty in the market place. Another concern is the uncertainty and cost of patent litigation.

Some commentators argue that so called "bad" patents exist because the requirements for granting a patent are too low. Others argue that the Patent Office Examining corps[2] is overwhelmed by the large numbers of applications.[3]

Stephen Schreiner is a partner at the Washington D.C. office of Goodwin Procter LLP. Mr. Schreiner's practice focuses on all aspects of intellectual property law, including patent litigation, patent prosecution, and counseling related to electronics, e-commerce, business methods, interactive media, and other areas. He can be reached at sschreiner@goodwinprocter.com. Andrew J. Baca is an associate in the firm's Washington, D.C. office. His practice focuses primarily on patent prosecution and counseling mostly related to electronics, software, business methods and other areas, and he can be reached at abaca@goodwinprocter.com.

921

Published in the November/December 2007 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

S. 1145/H.R. 1908 seek to address the perceived failings of the patent system, by providing for patent quality enhancing procedures, placing limits on damages, and adding procedures to increase certainty in patent litigation. To enhance the quality of patents, S. 1145/H.R. 1908 implement both a post-grant review system and a pre-issuance submission system for interested third parties to submit prior art to the U.S. Patent Office, and exclude "Tax Planning" and "Check Imaging" technology from being patented in the future.

On the patent litigation front, S. 1145/H.R. 1908 alter the basic formula for calculating damages, and limit when a plaintiff may seek enhanced damages. The bills also add new restrictions on where a plaintiff may file suit to limit forum-shopping.

As will become clear from the following description of the current patent reform initiatives, the proposed changes could have strong implications to banks and financial institutions, which are increasingly seeking to get patents, enforce their patents, and are often the target of patent suits.

## TAX PLANNING METHODS

Patents may only be granted if they fall into one of the statutory classes. On the other hand, such things as laws of nature and abstract ideas are assumed to be unpatentable.[4] Although processes (a.k.a. methods) are a statutory class, H.R. 1908 seeks to impose a special carve-out to exclude processes that are "tax planning methods."

H.R. 1908 defines a "tax planning method" as a "plan, strategy, technique, or scheme that is designed to reduce, minimize, or defer, or has, when implemented, the effect of reducing, minimizing, or deferring, a taxpayer's tax liability." There is an exception for "tax preparation software or other tools used solely to perform or model mathematical calculations or prepare tax or information returns."

This legislation is the result of criticism recently leveled against tax patents. For example tax professionals and other observers of the tax industry have argued that tax planning patents are unnecessary. Some remark on the number of tax strategies created without patent protection, and argue that the entrepreneurial incentive created by patents is not needed in the tax strategy industry. Others argue that, as a matter of policy, tax planning

922

Published in the November/December 2007 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

JW.000799

Ark.000778

INTELLECTUAL PROPERTY

patents conflict with the tax concept that two similarly situated taxpayers should pay the same amount of tax.[5]

Regardless of the reasons behind the criticisms, the categorical denial of patentability to tax planning strategies would mark a departure from a long held norm of patent law: technology-neutrality. The lean crafting of the Patent Statute allows for flexibility and adaptability in the patent system, and prevents special interest groups from introducing the kind of complexity found in the tax laws into the patent laws. To amend the Patent Statute in order to categorize a particular technology field as non-statutory subject matter would simply be unprecedented in patent law.

An alternative bill, H.R. 2365, was introduced in May 2007 by Rep. Boucher (D-VA), which takes the less severe approach of simply limiting the damages that could be incurred by taxpayers, tax practitioners and related professionals with regard to tax planning methods. HR. 2365 was referred to committee in June 2007, and has seen no activity since.

For banks, the elimination of tax planning patents might reduce the likelihood of being a defendant in an infringement suit. It would also be a victory for tax accountants, tax lawyers and other tax planning professionals who can issue advice without worrying whether their clients will run afoul of a tax planning patent.

On the patentee side, it would be a loss because it would prohibit tax professionals from protecting their novel tax planning packages. However, the severity of this change is mitigated somewhat by the fact that software tools developed for tax planning purposes may still find protection.

## LIMITS ON CHECK IMAGING PATENTS

Check imaging relates to using a digital image of a check rather than the paper check. Working with digital images allows for quicker transfer of funds and reduces the cost of processing checks.

S. 1145 includes a limitations on check imaging patents. An amendment proposed by Sen. Sessions (R-AL) limits injunctions, damages and collection of attorneys fees with respect to check imaging methods. S. 1145 accomplishes this by stating that the sections of the Patent Statute that provide for injunctions, damages, and fee shifting are not available against

Published in the November/December 2007 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

JW.000800

Ark.000779

BANKING LAW JOURNAL

infringers of check imaging patents.

Both the amendment itself, and the manner in which the amendment limits check imaging patents have caught some by surprise. The amendment is likely a response to a series of lawsuits filed by DataTreasury™ Corp. ("DataTreasury"), alleging infringement of various check imaging and check processing patents by such financial heavyweights as JPMorgan Chase, Bank One, Bank of America, CitiGroup, Meryl Lynch, Groupe Ingenico, NetDeposit, Inc., RDM Corp. and Wachovia.

DataTreasury is primarily asserting two patents. The first patent is "Remote Image Capture with Centralized Processing and Storage."[6] The second patent is "Remote Image Capture With Centralized Processing Storage."[7] Both patents are purported to describe a process capable of implementing the federally enacted Check Clearing for the 21st Century Act, also known as "Check 21." Check 21 provides for financial institutions to exchange digital images of checks rather than paper copies, which results in big savings for banks.

According to information on the DataTreasury Web site, Meryl Lynch, JPMorgan Chase, Bank One, Groupe Ingenico, NetDeposit, Inc., and RDM Corporation are a few of the financial institutions now licensing DataTreasury's patents.[8]

Sen. Sessions' amendment to S. 1145 may in part be a legislative response to DataTreasury's assertion of its patents to payment systems that comply with Check 21. Licensing fees paid to DataTreasury are cutting into the cost savings realized by banks that are using check imaging, and the amendment seeks to limit DataTreasury's future ability to extract fees from banks, either through damages or injunctions.

Regardless of the reason for the amendment, limits on check imaging patents would be a benefit to banks, especially in light of Check 21. Banks that use check imaging to efficiently process check-based transactions can enjoy the benefits of increased savings. This reform would significantly reduce the ability of a patentee to extract money from a bank. The patentee would not be able to leverage an injunction against an infringer. Further, patent holding companies which do not manufacture the goods covered by their patents, so called "patent trolls," largely depend on attorney fee shifting provisions or contingency fee agreements to pay litigation expenses. Since

924

Published in the November/December 2007 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

JW.000801

Ark.000780

INTELLECTUAL PROPERTY

Sen. Sessions' amendment eliminates attorney fee shifting, damages and injunctions, attorneys would only take those cases where the patentee demonstrates the resources to pay litigation bills.

## APPORTIONMENT OF DAMAGES

The Patent Statute provides that a patent owner is entitled to damages adequate to compensate for the infringement, but no less than a *reasonable royalty* for use of the invention by the infringer. Under current law, a reasonable royalty is essentially the royalty which would result from a hypothetical negotiation between a willing licensee and a willing licensor.

S. 1145/H.R. 1908 provide that a patentee will have to make a showing whether their invention's specific contribution over the prior art is the predominant basis for market demand for an infringing product or process. If the patentee's contribution is the predominant basis for market demand, damages may be based upon the entire market value of the products or processes. However, if the patentee's contribution is not the predominant basis for market demand, a reasonable royalty would be applied only to that economic value properly attributable to the patent's "specific contribution over the prior art." In other words, the proposed damages calculus would exclude the economic value properly attributable to the prior art and other features or improvements. This minimization of damages base for patent infringement is referred to as "apportionment."

Ever since the idea of limiting damages to the contributions over the prior art was first introduced, it has been the subject of criticism by commentators who worry that apportioning damages would be a massive undertaking for courts and juries, requiring complex calculations and economic valuations not only of the patentable advance but also of the prior art. However, apportionment has been in both S. 1145 and H.R. 1908 since the bills were introduced, and has undergone few amendments, although it remains a hotly-contested issue in the competing constituencies.

If the change to damages law is enacted, the practical result should be that damage awards are smaller. Also, violating financial patents which add only a tiny improvement over the prior art will not be catastrophic, because a damages award may be a fraction of what it would be otherwise.

925

Published in the November/December 2007 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

BANKING LAW JOURNAL

## TREBLE DAMAGES FOR WILLFUL INFRINGEMENT

Treble damages is the punch to the solar plexus that can knock the wind out of a bank found guilty of willful infringement. Patent reform seeks to limit treble damages by making it more difficult or a plaintiff to prove infringement was willful.

S. 1145/H.R. 1908 provide for treble damages upon a showing of willfulness if: (1) the alleged infringer received written notice of specific acts of infringement from the patentees; (2) infringer intentionally copied the patented invention with knowledge that it was patented; (3) the patentee continues to infringe after having been found guilty of infringement. An informed good faith belief that the infringer is not infringing may protect from a finding of willfulness. In essence, it will be harder for a patent holder to prove willful infringement.

Another development in the area of willfulness is the recent federal circuit decision in *In re Seagate Technology*,[9] which held that willful infringement enhanced damages now requires "at least a showing of objective recklessness." The new standard replaces the "affirmative duty of due care" upon receiving notice of infringement. How the *Seagate* standard will interplay with the changes to willfulness in S. 1145/H.R. 1908 remains to be seen.

The proposed limits on willful infringement and treble damages in S. 1145/H.R. 1908 should, as a whole, benefit the banking industry by reducing uncertainty created by fear of large damages awards. For patentees, however, limits on willfulness and treble damages further erode the value of patents because, practically speaking, it is the fear of such damages that keeps companies from knowingly violating a patented product or patented process, thereby enlivening a patentee's right to exclude.

## POST-GRANT REVIEW

Post-grant review means that following the grant of a patent by the Patent Office, members of the public can oppose or challenge that patent on the basis that it should have never been granted. Primarily, petitioners would submit prior art that the Patent Office did not consider during examination. The purpose is to improve patent quality by preventing the grant of overly

926

Published in the November/December 2007 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

JW.000803

Ark.000782

INTELLECTUAL PROPERTY

broad patents.

There is one major difference between how the House and Senate treat post-grant opposition. S. 1145 provides for two windows during which a petitioner may oppose the grant of a patent, but H.R. 1908 provides for only one window.

Both S. 1145 and H.R. 1908 provide for a first, 12-month post-grant opposition window. Only S. 1145 provides for a second, unlimited post-grant opposition window. During the second window, a petitioner must satisfy higher burdens of proof than during the 12-month window.

Instead of a second window, H.R. 1908 makes changes to the existing inter partes patent reexamination process. Inter partes reexamination allows a third party to initiate a reexamination of an issued patent when there is a substantial new question of patentability. This process is not widely used, however, because the requesting party is estopped from raising at a later date the same issue or issues *it could have raised*. H.R. 1908 eliminates the estoppel for issues a requesting party *could have raised*, thereby removing a large disincentive to participating in inter partes reexamination.

Generally, post-grant opposition should benefit banks and financial institutions. It may save time otherwise wasted in litigation by cancelling the grant of a patent that is too broad (i.e., broad enough to encompass prior art). Banks would no longer have to wait until litigation to assert a prior use defense. Further, it can strengthen the value of a patent by subjecting it to further examination. However, the unlimited window in the Senate version may invite abuse. Petitioners with large budgets could grind down smaller patentees with never ending oppositions. At some point, there should be finality in the examination process.

## PREISSUANCE SUBMISSIONS OF PRIOR ART

Currently, third parties may submit prior art to the Patent Office for consideration by examiners. The window for submission is two months from the date of application or before a notice of allowance is mailed, whichever occurs earlier.

S. 1145/H.R. 1908 greatly expand public participation by providing that any person would be able to submit for consideration and inclusion in

927

Published in the November/December 2007 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

JW.000804

Ark.000783

the record of a patent application any patent, published patent application or other publication of potential relevance to the examination of the application before the date of notice allowance, six months after the application is published, or the date of the first rejection. In other words, S. 1145/H.R. 1908 creates a larger window for third party submissions.

Third party submissions benefit banks (and everyone else) by improving the quality of granted patents, and strengthening their value to patentees. Enlarging the window for such submissions should further increase the benefit to banks and financial institutions.

## VENUE REFORM

Forum shopping, or the attempt to have a case heard in a court which is thought to be more favorable to a plaintiff, is an increasing problem in patent litigation. Forum shopping has led to the so called "Eastern District of Texas" ("EDTX") phenomenon, which is that many patent plaintiffs choose to file infringement suits in the EDTX because it is perceived to be pro-plaintiff.[10] For example, all of the DataTreasury suits were filed in EDTX.

S. 1145/H.R. 1908 limit venue to where a defendant has its principal place of business, or has committed a substantial portion of the acts of infringement and has a regular and established physical facility that the defendant controls and that constitutes a substantial portion of the defendant's operations. This should benefit banks who are defendants because there will be some meaningful nexus between the district where a suit is filed and a defendant.

Defendant-based venue rules run the risk of forcing plaintiffs to bring suit in districts with a bias to the defendant (imagine if every suit against Microsoft has to be filed in Redmond, Washington). S. 1145/H.R. 1908 attempt to alleviate the danger of defendant-bias by providing for venue where a plaintiff resides, if the plaintiff is a university, non-profit or small time patent owner. However, most banks and financial institutions will not fit into one of the categories that qualify for the plaintiff-based venue provisions.

Published in the November/December 2007 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

JW.000805

Ark.000784

INTELLECTUAL PROPERTY

## BEST MODE DEFENSE

Under current law, defendants may invalidate an asserted patent by arguing the patent fails to comply with the "best mode" requirement.[11]

H.R. 1908 strikes the Best Mode defense. The "best" mode of practicing an invention is inherently subjective, therefore, so is the question whether an inventor had a best mode at the time of application. Removing subjective questions reduces the expense of litigation and increases the certainty of outcome earlier in the litigation process. On the balance, removing the best mode defense is probably a benefit to banks and financial instructions, which are more concerned with certainty.

## INTERLOCUTORY APPEALS OF *MARKMAN* RULINGS

Most patent infringement suits stand or fall on the definitions of claim terms, i.e., the interpretation of the scope of the patent. During trial, a district court will issue so called *Markman* rulings interpreting the meaning and scope of patent claim terms.

The meaning of a patent is an issue of law reviewed *de novo* by the federal circuit court of appeals. Historically, the rate of reversal by the federal circuit of *Markman* rulings is high — roughly 40 percent. Thus, a patent suit may go through a full trial when there is a 40 percent probability that the federal circuit court of appeals will reverse the *Markman* ruling, remanding the case for further district court proceedings and perhaps even a new trial.

Interlocutory appeals of *Markman* rulings would allow a party to appeal a *Markman* ruling before the end of the trial at the district court, in order to increase certainty in outcomes. When interlocutory appeals of *Markman* rulings was first proposed, the idea was heavily criticized by Judge Michel of the federal circuit court, who argued it would delay trials and overburden the federal circuit. Judge Michel's argument appeared to gain support at the beginning of Summer 2007; however, S. 1145 and H.R. 1908 have undergone hearings and amendments, and interlocutory appeals of *Markman* rulings still remain in both versions of the bill.

Interlocutory appeals of *Markman* rulings would probably benefit banks

929

Published in the November/December 2007 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.

JW.000806

Ark.000785

BANKING LAW JOURNAL

and financial institutions by increasing litigation outcome certainty, as well as reduce overall litigation costs.

## CONCLUSION

Patent reform continues to be a hot topic as legislatures move to respond to the many criticisms against the United States patent system. With their increasing awareness of the importance of acquiring patents and defending against patent suits, banks and financial institutions have an interest in closely monitoring Congress's attempts to improve patent quality, increase certainty in litigation outcomes, and reduce the overall cost of litigation. Many of the reforms have the potential to benefit the financial services industry, and the next year will determine whether the right provisions continue to receive support or not.

## NOTES

[1] For example, a search of for "Bank of America" using the Patent Office's patent searching system turns returns more than 100 issued utility patents and 200 published patent applications.
[2] Examiners are the specialists who work at the United States Patent & Trademark Office, granting and denying patent applications.
[3] According to the Patent Office's Electronic Information Products Division Patent Technology Monitoring Team, there were 390,733 applications filed in 2005.
[4] See, Diamond v. Chakrabarty, 447 U.S. 303 (1980).
[5] Jack Cathey, Howard Godfrey and Justin Ransome, Tax Patents Considered, J. Acct. Online (July 2007) http://www.aicpa.org/PUBS/jofa/joaiss.htm.
[6] U.S. Patent No. 6,032,137.
[7] U.S. Patent No. 5,910,988.
[8] DataTreasury, http://www.datatreasury.com (last visited September 18, 2007).
[9] No. 830, slip op. (Fed. Cir. Aug. 20, 2007).
[10] Justice Scalia, during oral argument at the Supreme Court in eBay v. MercExchange on March 29, 2006, referred to the Eastern District of Texas as a "renegade jurisdiction" when counsel for eBay noted that "no patent has ever been declared invalid in that jurisdiction."
[11] To comply with 35 U.S.C. § 112, an inventor is required to provide the best mode for practicing an invention, if known.

930

Published in the November/December 2007 issue of The Banking Law Journal.
Copyright ALEXeSOLUTIONS, INC.