Ward v. Cisco Systems, Inc. et al
Case 4:08-cv-04022-JLH   Document 150-6   Filed 11/16/09   Page 1 of 15
Doc. 150 Att. 5

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

JOHN WARD, JR.,           *
                          *
V.                        *   C.A. NO. 08-4022
                          *   JURY TRIAL DEMANDED
CISCO SYSTEMS, INC.       *

*CERTIFIED COPY*

---

ORAL AND VIDEOTAPED DEPOSITION OF

THOMAS JOHN WARD, JR.

AUGUST 10, 2009

---

ORAL AND VIDEOTAPED DEPOSITION of THOMAS JOHN WARD, JR., produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and -numbered cause on the 10th day of August, 2009, from 9:44 a.m. to 1:21 p.m., before Stacy L. Jordan, CSR in and for the State of Texas, reported by machine shorthand, taken in the law offices of John Ward, Jr., 111 West Tyler Street, City of Longview, County of Gregg, State of Texas, pursuant to the Federal Rules of Civil Procedure.

```
 1   having been first duly sworn, testified as follows:
 2                        EXAMINATION
 3   BY MR. BABCOCK:
 4        Q.   Will you state your name, sir.
 5        A.   Thomas John Ward, Jr.
 6        Q.   Mr. Ward, right in front of you is -- is the
 7   deposition notice for your wife, which I forgot to
 8   introduce.
 9        A.   Okay.
10        Q.   But here's Exhibit 2.  That's your notice.
11        A.   Okay.
12        Q.   The only reason I do this is so I can keep
13   track of depositions by numbers.
14             Would you tell us how you're employed?
15        A.   I'm an attorney working for Ward & Smith law
16   firm, which is an assumed name.
17        Q.   Okay.
18        A.   T. John Ward, Jr., P.C. is the business entity
19   that I'm employed by.
20        Q.   And T. John Ward, P.C. is the owner of the
21   Ward & Smith law business; is that right?
22        A.   Jr.  Yes.
23        Q.   T. Ward [sic], Jr., P.C.
24             I take it there is a Smith?
25        A.   There is.
```

```
 1   going to have a trial.
 2        Q.   Okay.  Great.
 3             Your -- you just sat through the
 4   deposition of your wife, correct?
 5        A.   I did.
 6        Q.   And she said that -- that after these Troll
 7   Tracker articles that are at issue in this case, she
 8   believed that your sleepless -- sleep problem -- or
 9   inability to sleep through the night increased from one
10   to two times a week to three to four times a week.  Is
11   that true?
12        A.   I had more sleepless nights, I believe, after
13   this --
14        Q.   Okay.
15        A.   -- these articles were published, yes.
16        Q.   Okay.  And do you relate your sleep problems
17   to the articles?
18        A.   The increase in sleepless nights initially,
19   yes.
20        Q.   Okay.  And -- and is that because you'd be
21   lying in bed asleep and then you'd wake up thinking
22   about the Patent Troll Tracker?
23        A.   During the four months that we were trying to
24   find out who the Patent Troll Tracker was, yes, because
25   I knew these articles were out there; I knew people were
```

1   reading them, and so yes, it was something that had me
2   very agitated --
3       Q.   Okay.
4       A.   -- angry, frustrated, upset about.
5       Q.   Okay. And focusing on the -- on the
6   sleeplessness, your wife estimated that it was three to
7   four times a week that you would wake up, and she
8   attributed it to the Patent Troll Tracker.
9            My question to you, since you're the only
10  one that would know: Was it three to four times a week
11  that you were waken up for that four-month period?
12      A.   It's hard to pinpoint. I think it's gotten
13  better over time. I think she's a better judge, because
14  I -- I have a bad habit of waking her up when I'm having
15  trouble sleeping. I can't disagree that it was three or
16  four nights because I don't -- I don't have a good feel
17  for it.
18      Q.   And in that -- you say "it's gotten better."
19  When did it get better?
20      A.   Well, she forgot that I take Tylenol PM every
21  night, and I didn't take that before. It's gotten
22  better since I take Tylenol PM. I've got a friend who's
23  an ER doctor, and I said: I'm not sleeping.
24           And I didn't attribute it to -- it to
25  anything but I'm having trouble sleeping.

| | |
|---|---|
| 1 | He said: Try taking Tylenol PM before you |
| 2 | get to something harder. |
| 3 | Q. What's the name of the doctor? |
| 4 | A. Brian Mendenhall, a good friend of mine, ER |
| 5 | doctor. |
| 6 | Q. And when did you talk to Dr. -- Mendenhall, |
| 7 | did you say? |
| 8 | A. Mendenhall. I know it was when we lived at |
| 9 | 101 Fountain Valley Court. I want to say it was over a |
| 10 | year ago. |
| 11 | Q. Have you been taking Tylenol PM for a year |
| 12 | every night? |
| 13 | A. Yeah, one. |
| 14 | Q. One -- one tablet? |
| 15 | A. One tablet. |
| 16 | Q. Okay. And now are you sleeping through the |
| 17 | night every night? |
| 18 | A. I didn't last night, but pretty much, yeah. |
| 19 | I've had -- |
| 20 | Q. You were worried about me, right? |
| 21 | A. Well, I was worried about my wife, what -- how |
| 22 | my wife was going to -- |
| 23 | Q. She seemed -- |
| 24 | A. -- hold up. |
| 25 | Q. She seemed okay. |

```
 1         A.   A lovely lady, but I can't recall her name,
 2   sitting here.
 3         Q.   Okay.  And -- and your wife gave a
 4   recollection of that conversation.  Give me yours.
 5         A.   Hers was pretty close to mine.  I -- you know,
 6   we had gone out there just kind of to keep business
 7   contacts going.  It was nice to go have dinner with
 8   these folks.  And something came up about the Cisco
 9   case.  I mean, that's the only case that Pete and I have
10   together.  And his wife said:  Oh, you're the one.  And
11   clearly, they had talked about it.
12              And I said:  Yeah, I'm the one.
13              And Pete -- I don't think he would have
14   ever told me if he'd known it was going to end up in
15   get- -- getting his deposition taken -- told about this
16   time where he was meeting with some in-house counsel at
17   some company.  And I don't know if they were
18   contemplating filing a lawsuit in the Eastern District
19   or what.  And he said:  We've got good local counsel
20   down there, Johnny Ward and Eric Albritton.
21              And they relayed to him they'd have
22   nothing to do with us; they'd read about us; they knew
23   that we were unethical or engaged in bad acts, and not
24   to raise our names again as hiring us as local counsel.
25   That's my recollection of --
```

| | |
|---|---|
| 1 | Q. Okay. |
| 2 | A. -- what was said. |
| 3 | Q. Did you do anything to follow up on that and say: Hey, you know, I assume you told the in-house counsel that we're good guys and -- |
| 6 | A. I didn't -- I mean, I was kind of surprised that I'm hearing this. I -- I had suspected that that had gone on, but it's hard -- people don't call me and say: Hey, you were in the running, but we're not hiring you because of what we read about you. |
| 11 | Q. Uh-huh. |
| 12 | A. So it kind of confirmed my suspicion.<br><br>And I subsequently talked to Pete and said: I know we were having this over-a-casual-dinner conversation, but it's important to me. Would you mind me telling my lawyers about it and letting them know that I have confirmation?<br><br>And he said -- he's a stand-up guy, and he said: Have at it. The facts are the facts. |
| 20 | Q. Do you remember the name of the in-house counsel? |
| 22 | A. No. He -- he -- he would know because he called them by name and company. |
| 24 | Q. Okay. And you didn't make any effort to contact the in-house counsel or the company yourself |

```
 1   to --
 2        A.   I think that --
 3        Q.   -- talk to --
 4        A.   I think that'd be improper, but I wouldn't
 5   have done that.
 6        Q.   Okay.  In any event, improper or not, you
 7   didn't do it?
 8        A.   I did not do it.
 9        Q.   Okay.  And did Pete at dinner specify the
10   Patent Troll Tracker as the source of this in-house
11   counsel's comment to him about you and Mr. Albritton?
12        A.   That's the only place I've been accused of a
13   crime and unethical behavior.  So maybe I just assumed
14   that that's what the source of his information was.
15        Q.   Okay.  But he didn't mention it?
16        A.   I -- I can't recall, sitting here.  I -- I
17   would defer to Pete whether or not he mentioned it or
18   not.
19        Q.   Okay.  As lawyers, we all, from time to
20   tame -- time to time, get -- get in beauty contests,
21   what they call, the counsels -- I mean the companies
22   trying to pick counsel.
23        A.   I -- I understand that goes on in the big
24   firms.  I hear about it because -- Jackson Walker, Baker
25   Botts, or Vinson & Elkins, they get interviewed by
```

1   clients, and I've heard that goes on.  I don't
2   typically -- we're not --
3       Q.   You don't do --
4       A.   -- involved -- my name's brought up, and
5   that's how I found out about another instance where
6   someone had a negative reaction to me.
7       Q.   Okay.  But you typically don't do the beauty
8   contests like the big firms do?
9       A.   No.
10      Q.   Okay.
11      A.   I've got lawyers that use me as local counsel,
12  and they tend to come back to me.
13      Q.   Okay.  You say there was another instance,
14  other than the Peter McAndrews matter, where somebody
15  was reporting what somebody else had said?
16      A.   Right.
17      Q.   And who was that?
18      A.   Bob Chiaviello at Fulbright & Jaworski.
19      Q.   And what did Mr. Chiaviello say?
20      A.   Same general type of thing.  They were
21  enrolled in a beauty contest, and he brought up that:
22  Hey, we use Johnny Ward as local counsel.  We could help
23  you out.
24           You know, it would've had to have been a
25  case filed in Judge Davis' court or Judge Folsom's

```
 1   court --
 2        Q.   Sure.
 3        A.   -- defense case.
 4             And whoever his contact -- and he said it
 5   happened on more than one occasion.  He didn't give a
 6   client name to me.  He just said that people have said:
 7   We've -- we've heard about that guy; we've read about
 8   him; we're not going to use him.
 9             And he attributed it to the Patent Troll
10   Tracker specifically.
11        Q.   Okay.
12        A.   So I assume that these folks raised the
13   articles to him.
14        Q.   Okay.  And Chiaviello said that he heard about
15   it from how many clients?
16        A.   I don't know if it was one or several.  It
17   seems like it was on more -- more than one occasion that
18   he had been trying to land some business and had
19   referenced me by name and --
20        Q.   Okay.
21        A.   He did not specify a client, though.
22        Q.   Okay.
23        A.   And I kind of had the same conversation:  Bob,
24   I hate to put you in this situation, but can I give your
25   name to my lawyers?  Would you be willing to talk to
```

```
 1   them about what's happened?
 2        Q.   Uh-huh.  And he -- he said yes?
 3        A.   He said --
 4        Q.   Okay.
 5        A.   -- whatever you need to do.
 6        Q.   Is there anybody of this nature, like Pete
 7   McAndrews and Bob Chiaviello, who you've asked
 8   permission who have denied it, said:  No, you can't give
 9   my name to the lawyers?
10        A.   Yes.
11        Q.   Who is that?
12        A.   I don't -- they don't want their names out
13   there, and I -- I don't -- I'm not comfortable giving
14   them to you.  I think it's confidential.  They've had
15   clients who've -- and I can't -- obviously, if I
16   can't -- if I don't give it to you now, I'm not going to
17   get to talk about it at trial, and I understand I live
18   and die by that.
19        Q.   Okay.  Are you claiming economic damages in
20   this case?
21             MS. PEDEN:  Objection to form.
22        A.   I don't believe so.  I think I'm claiming
23   pain, suffering, mental anguish, and reputational
24   damage.  I think I've lost business, but, you know, I
25   can't ever -- again, I can't prove who's not hiring me
```

```
 1   because of this, so I can't put any dollar value on it.
 2        Q.   (BY MR. BABCOCK)  You could prove, however,
 3   that a bunch of people are hiring you.  I mean --
 4        A.   I've --
 5        Q.   -- you've got a pretty active docket.
 6        A.   I've got an active docket, yes.  This has, by
 7   no means, shut my practice down.
 8        Q.   Okay.  So there's Pete McAndrews, Bob
 9   Chiaviello, and one or more people that you won't name?
10        A.   One.  One lawyer.
11        Q.   Okay.  One lawyer that you won't name.
12        A.   And Mr. Fokas has told me that he would not
13   have hired me if he did not know me prior to this and
14   know this to be untrue about me.  That's hindsight,
15   but --
16        Q.   Uh-huh.
17        A.   -- he's made that comment to me.  I think he's
18   very happy with my representation of him, so I'm not
19   worried about losing him as a client.
20        Q.   All right.  Okay.  Anybody -- anybody else,
21   other than McAndrews, Chiaviello, the one lawyer you
22   won't tell us, who has said that because of this Patent
23   Troll Tracker article -- were you even quoting somebody
24   else?
25        A.   Quoting some- --
```

1   Q.  Yeah.
2   A.  Who he would not identify.
3   Q.  Right.
4   A.  He said: I'm not going to testify.
5   Q.  Okay. So anybody else other than those
6   people?
7   A.  No.
8   Q.  Okay.
9   A.  Not -- not that I know of.
10  Q.  Okay. Is there -- is there anybody outside of
11  your professional life -- and I understand the patent
12  bar is a small bar and talks and everything. But
13  anybody outside of your professional life that has made
14  comments -- disparaging comments to you about the Patent
15  Troll Tracker? I mean, anybody at church or at school
16  or --
17  A.  Nobody.
18  Q.  Okay.
19  A.  I mean, people, obviously, read about it when
20  we sued and it turned out to be Cisco, but no one's said
21  anything disparaging to me.
22  Q.  Okay.
23  A.  But, obviously, there are folks outside of the
24  profession that have read about it now.
25  Q.  Because there has been -- there has been some

1    STATE OF TEXAS      )

2    COUNTY OF DALLAS    )

3

4           This is to certify that I, Stacy L. Jordan,

5    Certified Shorthand Reporter in and for the State of

6    Texas, certify that the foregoing deposition of THOMAS

7    JOHN WARD, JR. was reported stenographically by me at

8    the time and place indicated, said witness having been

9    placed under oath by me, and that the deposition is a

10   true record of the testimony given by the witness.

11          I further certify that I am neither counsel

12   for nor related to any party in this cause and am not

13   financially interested in its outcome.

14          Given under my hand in office on this 17th day

15   of August, 2009.

16

17                    _____
                      STACY L. JORDAN, CSR 7499
18                    Expiration Date:  12/31/10
                      Firm No. 593
19
                      WEST COURT REPORTING SERVICES
20                    221 Main Street
                      Suite 1250
21                    San Francisco, California 94105
                      (800) 548-3668
22

23   Taxable cost of original charged to Defendant:
     $_____
24

25   Atty: Mr. Charles L. Babcock and Ms. Crystal J. Parker,
     Jackson Walker, L.L.P.

AUTHENTIC COPY
The original certified E-Transcript
file was electronically signed
using RealLegal technology

11c2d571-4af8-4945-8ce3-67feef482e63